1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                              --o0o--

4  FRANK CORNEJO, et al.,         )  Case No. 1:15-cv-00993-JLT
                                  )
5                    Plaintiffs,  )  Bakersfield, California
                                  )  Monday, October 17, 2016
6       vs.                       )  3:10 P.M.
                                  )
7  OCWEN LOAN SERVICING, LLC,     )  Jury Trial - Day 1
   et al.,                        )
8                                 )
                     Defendants.  )  Plaintiff's Opening Statement
9  _____  )

10              PARTIAL TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JENNIFER L. THURSTON
11        UNITED STATES MAGISTRATE JUDGE, and a jury.

12  APPEARANCES:

13  For Plaintiff:              GIANDOMINIC VITIELLO
                                Katchko, Vitiello and Karikomi
14                              11500 W. Olympic Blvd., #400
                                Los Angeles, CA   90064
15                              (310) 943-9587

16                              JOHN HEENAN, PHV
                                Bishop Heenan & Davies
17                              1631 Zimmerman Trail
                                Billings, MTT   59102
18                              (406) 839-9091

19  For Defendant:             SANFORD P. SHATZ
                                BRIAN A. PAINO
20                              McGlinchey Stafford
                                18201 Von Karman Ave., #350
21                              Irvine, CA   92612
                                (949) 381-5811

22
    Court Recorder:            OTILIA ROSALES
23                              U.S. District Court
                                2500 Tulare Street, Suite 1501
24                              Fresno, CA   93721
                                (559) 499-5928

25

ii

1   APPEARANCES (Cont.):

2   Transcription Service:          Petrilla Reporting &
                                        Transcription
3                                   5002 - 61st Street
                                    Sacramento, CA    95820
4                                   (916) 455-3887

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1

1    BAKERSFIELD, CALIFORNIA, MONDAY, OCTOBER 17, 2016, 3:11 P.M.

2

3        (Partial transcript begins as follows:)

4            THE COURT:  You may begin.

5            MR. VITIELLO:  Thank you.

6                PLAINTIFF'S OPENING STATEMENT

7            MR. VITIELLO:  On April 16th, 2015 Dora Cornejo woke

8    up excited.  She thought that was the day she was going to save

9    her home from foreclosure.  It was a three-bedroom house and

10   she and her husband Frank had owned it for 22 years.  They

11   raised their baby girls there.  That's where they planned to

12   grow old together.  It was right here in Bakersfield,

13   California.

14           What she didn't realize is that the defendant, Ocwen

15   Loan Servicing who I'll refer to as Ocwen, they were going to

16   trick them into thinking that their loan would be restructured

17   and as soon as their guard was down was going to sell it right

18   out from under them.  They would do so in a way that brazenly

19   violated California protective laws designed to prevent this

20   from happening.

21           See, Frank and Dora were behind in their bills.  They

22   knew it.  They were embarrassed by it.  One of those bills was

23   their mortgage payment.  That's a tough payment to make with a

24   high interest rate and Ocwen was threatening to sell their home

25   on April 19th -- excuse me, April 29th.  She had 13 days from

2

1   the 16th to the 29th.  In that time Ocwen was going to consider

2   her for this loan modification.

3        She had been told that she qualified for terms and

4   those terms would lower her mortgage payment and help her keep

5   her home.  Those terms were something her husband and her could

6   afford and they were willing to pay those terms.  She needed to

7   send Ocwen an application to receive them and April 16th was

8   the day she was going to do it.

9        She had been introduced through a friend, Hernan

10  Ernie Cortez (phonetic) through church group affiliates.  They

11  were at St. Joseph's Catholic Church also right here in

12  Bakersfield and they connected because Ernie had been

13  successful in the past helping others that Dora knew through

14  church obtain loan modifications.

15       The paperwork was complicated.  Dora knew that she

16  needed help so she turned to Ernie for this help.  Together in

17  his office they assembled paperwork, financial documentation

18  and they watched as page by page went through the fax machine

19  over to Ocwen's office, at least one of its offices in Bangel

20  (phonetic) or India where it would be reviewed and imaged by

21  outsourced personnel.

22       She had that feeling that you get when you're nervous

23  but you're excited at the same time because you're on the cusp

24  of something potentially really good because she was taking

25  that action.  She had been behind and now she was ready to get

1  right with this mortgage.  She believed in her heart that she

2  was on a track and that track was for her to keep her home.

3  She didn't realize that Ocwen had her on a second track, one

4  that would end with her losing her home to a public auction

5  while her complete application sat on Ocwen's desk.

6         The evidence will show you how Frank and Dora, along

7  with this help from Ernie sent Ocwen every document that it

8  asked for, a complete application in order to prevent the

9  foreclosure of the Cornejo's home.  Ocwen took that application

10  under review, concluded that yes, the Cornejos qualified, they

11  should be able to keep their home with terms that they can

12  afford.  You're going to see that evidence.  It'll show you

13  that Ocwen offered them new terms, new numbers on paper with a

14  written agreement that they signed and paid.

15         The evidence will also show you that Ocwen foreclosed

16  on the home anyway, that Ocwen lied to its own foreclosure

17  agent about the status of that loan modification and tricked

18  them into selling the Cornejo's home.  The evidence will also

19  show you how, as a result of this conduct, the Cornejo's home

20  was actually auctioned off to a third party who became

21  unreasonable and wouldn't work with her to get it back.  In

22  fact, they evicted her from her own house and sent the sheriff

23  to lock her out forever.

24         But the Cornejos weren't the only California

25  homeowners to have this happen to them and have their lives

4

1    destroyed by a foreclosure that really should never have

2    happened.  The practice of dual tracking, which is a term

3    you're going to hear often through this trial, means putting

4    you on a track to keep your home while simultaneously putting

5    you on the track to lose it.  It's something that was so

6    widespread in California that California actually passed a law

7    against it in 2013 and that's why we're here.

8           The Judge is going to instruct you on that law.  It's

9    part of California's Homeowner Bill of Rights, another term

10   you're going to hear throughout this trial.  And before the

11   homeowner bill of rights became law Ocwen might have gotten

12   away with this.

13          Fortunately this conduct is now unlawful and at the

14   end of this trial the evidence will have shown you that Ocwen

15   was guilty of dual tracking when it sold the Cornejo's home;

16   it'll show you that it wasn't an accident, like an oops, sorry

17   we sold your home.  No.  It'll show you that this was willful,

18   that it was intentional and that it was reckless.  And your job

19   will be to weigh the evidence and to award money if you find

20   that Ocwen materially violated the law.

21          The stories about how Ocwen turned the Cornejo's

22   American dream of owning a home in Bakersfield, California into

23   an American nightmare.  But first, I do need to explain how we

24   got here so I'm going to give you some background on the

25   parties and the law that I just described.

1    So who's Ocwen?  It used to be the case that if you

2    wanted to borrow money you would go down to your neighborhood

3    bank, you'd shake hands with a loan agent there; maybe it's a

4    guy you've seen before because you bank there; maybe it's your

5    local credit union and you'd talk about the business you wanted

6    to open or the home you wanted to buy.  You'd sign some

7    paperwork, show some financial documentation and you'd be on

8    your way.

9    And maybe month by month you'd go back to that same

10   bank, you'd shake the same hand and make your mortgage payment

11   if you were inclined to go down there and do it or maybe you'd

12   just mail it in.  You might actually form a relationship with

13   the person that gave you the loan, have him over for coffee

14   occasionally, but it doesn't work that way anymore.

15   Eventually Wall Street decided that these mortgages

16   were big time investment opportunities.  They bundled them

17   together by thousands.  They sold off the entire bundle of many

18   thousands of loans to investment companies.  U.S. Bank National

19   Association, who we've talked about a little bit, is a trustee

20   of one of these bundles.  The trust owns an interest in a

21   bundle of loans and the Cornejo's loan was one little sliver,

22   one little tiny loan in that entire bundle of many thousands.

23   So that the way these loans are now bundled, again by

24   thousands, the neighborhood bank, they just can't service them

25   anymore.  It's impossible, or at the least, impractical.

6

1   There's too many loans in the bundle, they're all over the

2   country, rules are different everywhere and there's no direct

3   relationship with that borrower anymore.

4          So Wade, if you could pull up demonstrative No. 1?

5          Something pops up -- a new type of company pops up

6   and that company is called a mortgage servicer.  A mortgage

7   servicer's role really is to, we say service the loans by the

8   thousands, but really they're doing the day to day loan stuff

9   on behalf of who I described, U.S. Bank, as the trustee of this

10  bundle.  They do it on U.S. Bank's behalf, and in that sense,

11  they're an agent of U.S. Bank and there's no dispute about that

12  relationship.

13         This is a little diagram of how this relationship

14  kind of works and we have U.S. Bank at the top, Ocwen in the

15  middle as a servicer.  And the way it works is that they mail

16  statements down to the borrowers, the borrowers mail back money

17  in and Ocwen as a mortgage servicer would deal with the

18  Cornejos over the phone should there be an issue that they

19  needed to discuss.  But the actual party that holds this note

20  is at the way top, it's U.S. Bank.

21         And in the event that a company like Ocwen would need

22  to foreclose on a property because the borrowers couldn't pay,

23  they would contract with a third party.  In this case it's

24  Western Progressive who you have there on the right side, and

25  they would conduct a sale.

1          The agency of these parties is not in dispute.  Ocwen

2     takes a little fee for its work before money gets passed to

3     U.S. Bank and like I said, they have the obligation to

4     communicate with the borrower.  And sometimes that means

5     talking to them about loan modifications in the instance that

6     they would need one.

7          An interesting thing about this relationship is that

8     the Cornejos had never dealt with Ocwen before 2013.  They were

9     captive in this relationship.  These interests get changed all

10    the time and like I said, the neighborhood bank that you go to

11    originally to get the loan you may never hear from again

12    because the mortgage servicer all of a sudden becomes involved

13    and now you're captive in that relationship, whether it's a

14    good company or a bad company, or a good guy or a bad guy.

15    They have no choice over who their loan servicer is.

16         So before the economy crashes in 2007 and 2008, I

17    don't think I have to go into great detail about that, but at

18    that time Ocwen was a small time Florida mortgage servicer with

19    some offices in beautiful Palm Beach, Florida, but with most of

20    its work force eventually outsourced overseas to India and

21    Philippines to save money.

22         At that time they're servicing a few hundred thousand

23    loans which is actually not that many in the grand scheme of

24    things for a mortgage servicer, but they're not a bank.  I want

25    to make that abundantly clear.  They're not a bank, they're

8

1   just this mortgage servicer with this very specific type of

2   relationship that I'm describing.  They send out statements and

3   they receive money basically, that's what they do.

4        So in 2007 the economy's brought to its knees and

5   banks were failing, mortgage servicers were failing in large

6   part due to irresponsible lending practices and things like

7   that, and that all got exposed to us as the American public

8   really for the first time around then.  And a huge culprit in

9   the economy crashing was mortgage companies and those who dealt

10  with what we call subprime mortgages.

11       You may have heard this term before, but subprime

12  loans are effectively loans with a high likelihood of failure;

13  the type that are likely to have borrowers fall behind or the

14  type that are likely to end up in foreclosure.  But a lot of

15  these loans begin to fail because the economy crashes, people

16  can't pay, Wall Street investments and the bundles, those many

17  thousands of loans together in a bundle, those also began to

18  fail.

19       And what happened is that then the companies who had

20  banked on those, who had invested in them were on the brinks of

21  collapsing.  Ultimately our government, the U.S. government

22  took a bunch of taxpayer money to bail those companies out.

23       So after the economy crashes and with banks around

24  them and mortgage servicers around them failing, Ocwen sees an

25  opportunity to make a bunch of money.  They start purchasing up

1    the rights to service these mortgages that are filled with

2    subprime loans.  This opportunity is presented to them because

3    banks are crashing, they don't want to service them anymore.

4            Mortgage servicers now realize oh man, there's so

5    many of these loans, we don't want to service those, let's get

6    rid of them.  And the subprime loans that were likely to end up

7    in foreclosure were just there for the picking and Ocwen

8    picked.

9            So they end up specializing actually in servicing

10   mortgages that are likely to be foreclosed on.  Their claim to

11   fame in fact becomes handling delinquent loans 70 percent

12   cheaper than other servicers.  So they're out there effectively

13   soliciting business on the basis that they can do this cheaply.

14   They can get your loan serviced and they can do it cheaply.

15   And they grow in that time from servicing a few hundred

16   thousand loans to servicing over three million in just a few

17   years.

18           Like I said before, they end up making that jump by

19   outsourcing thousands of jobs to India, to the Philippines and

20   the majority in fact of their employees are overseas because

21   that's where they can cheaply hire them.  That in and of itself

22   is not necessarily a bad thing until they get caught.  They get

23   caught having almost no control on oversight of those people,

24   on the quality of their service and what happens is that all of

25   that plummets.  They start getting into trouble over their

1  business practices, including issues of misdating letters with

2  sensitive timing deadlines.

3  　　　　MR. SHATZ:  Objection.  Relevance.

4  　　　　THE COURT:  Sustained.

5  　　　　MR. VITIELLO:  Ultimately in 2009 the government

6  passes the Troubled Asset Relief Program; that's a bailout that

7  we all know about.  Ocwen took $123 million on that deal.

8  　　　　MR. SHATZ:  Objection.  Relevance.

9  　　　　THE COURT:  Sustained.

10 　　　　MR. VITIELLO:  Their slogan becomes helping

11 homeowners is what we do.  It's on every one of their

12 documents.  The suggestion is that the primary form of help was

13 this type of loan modification that I'm describing to you and

14 that I've already told you that the Cornejos applied for.

15 　　　　Applying for this loan modification's not an

16 automatic process.  You have to qualify for it, you have to

17 have a certain degree of financial hardship, you have to have

18 enough income to support a new loan and mortgage servicers, in

19 their discretion were there to decide if you qualify.  So

20 that's Ocwen.

21 　　　　Where are the Cornejos?  Obviously important.  Frank

22 Cornejo, who can't be with us because of medical issues, is a

23 67-year-old Mexican-American also from Bakersfield, California.

24 He's a veteran.  He was called on our country to serve in a

25 draft, made it to the Vietnam War where he served overseas and

1  was honorably discharged.

2         MR. SHATZ:  Objection.  Relevance.

3         THE COURT:  Sustained.

4         MR. VITIELLO:  It's a VA loan, Your Honor.

5         THE COURT:  Is there a dispute on that point?

6         MR. SHATZ:  That it's a VA loan or --

7         THE COURT:  Correct.

8         MR. PAINO:  VA insured loan.

9         THE COURT:  All right.  The objection's overruled.

10        MR. VITIELLO:  His service to our country led him to

11 obtain a loan sponsored by the Department of Veterans Affairs

12 and he used that loan to purchase the home which is the subject

13 of this case.

14        Dora Cornejo, his wife, who's seated here is 55, born

15 and raised in Bakersfield, California also to a Mexican-

16 American family.  She's a churchgoer, active at St. Joseph's,

17 spiritual leader with the Archdiocese of Fresno, Girl Scout

18 leader, feeder of homeless and an active Goodwill donator.

19 She's the mother of two daughters that she has with her husband

20 Frank.

21        When they fell in love they opted to run the Cornejo

22 family restaurant and start a family.  For more than 30 years,

23 since 1984 the Cornejos have run a Mexican restaurant, La

24 Colonia, also in Bakersfield.

25        It's a mom and pop place, it's a staple of the

12

1   community and they themselves work at the restaurant every

2   single day along with the majority of their family.  She knows

3   most of their customers by their first names.  Their patrons

4   report that she's always smiling, that she treats them like

5   family.  Most of the staff, like I said, is family.  Her aunt

6   works there, her daughters work there.  Her sister-in-law works

7   there.  Frank works there.

8        In 1992 things are going pretty good so they go check

9   out 3425 Rancho Sierra in Bakersfield.  It's a quaint three

10  bedroom, two bath house with a view of the Panorama Bluffs,

11  called Panorama because of the view.  It's a perfect location

12  for them.  Why?  They have two kids at the time.  Monica is

13  five, Michelle is two and this place is close to Dr. Juliet

14  Thorner Elementary School, it's a magnet school, the best place

15  around to send them.  The home itself is on a cul-de-sac where

16  all the neighborhood families get together for holidays, 4th of

17  July, that sort of thing, barbeques, parties, it's perfect.

18       But they can't afford the house on their own.  They

19  don't have enough in the bank.  And because of Frank's

20  honorable discharge he gets his VA loan so they buy it, they

21  raise their family there and they have a lot of memories there.

22  Today Monica's 31, Michelle is 28 and Dora and Frank watched

23  them grow up in that house.  They used to have Girl Scout

24  meetings there, build forts in the living room with bedsheets

25  and chairs stacked together.

1       Dora's father, Alex, grandfather to Monica and

2  Michelle buried a rose garden in the back yard of that house

3  right before he died.  That's the last memory that she has of

4  him.  It's also the last place that she saw her dearest cousins

5  alive.  But apart from those things, life was good.  Did they

6  ever get behind on bills?  Of course.  Who hasn't?  But they're

7  hardworking people, they worked to catch up.  They wanted to

8  pay their debts and in fact on $113,400 loan that they took off

9  [sic] to buy this house, they had actually paid over 200,000 of

10 it back at the time that it was sold.

11      Before the market crashed they were living the

12 American dream, but after the crash a lot changed for them.

13 What happens?  Well the first thing that people stop doing when

14 the market crashes is they stop entertaining themselves in an

15 expensive way; that includes going to restaurants so the

16 restaurant takes a dive.

17      To make matters worse, at the restaurant they have a

18 stove that blows, very expensive item to replace.  They can't

19 cook food for people for a couple of days, the restaurant has

20 to close down.  Things like that seem to happen to them over

21 and over.

22      They get hit with a tax assessment from the IRS.

23 They learn that they're behind on taxes.  They never got really

24 good at having their paperwork in order with the IRS and the

25 IRS had come for them.  So they entered into a payment plan

1    with the IRS and they ended up paying some of that money back,

2    but they could only pay some of it.  And they end up falling

3    behind on the mortgage.  They catch up and they fall behind.

4    And then they catch up and they fall behind.  They're

5    struggling, but they're trying.

6            And although they had occasionally been behind in the

7    past and caught up, when the financial crisis happened they

8    found themselves in a real bind because they couldn't catch

9    back up as easily as they had before.  They thought about

10   laying off workers, try to cut corners at the restaurant or at

11   least talked about it and they decided we're not going to do

12   that.  We're not going to do that to our customers, we're not

13   going to lay off our workers because their families depend on

14   this income, a lot of them are our family, we can't do that.

15           They really took their role in the community

16   seriously with respect to their small business.  And as a

17   military and churchgoing family they knew that they had to pay

18   their debts.  That's not what this is about.  They just

19   genuinely couldn't pay them.

20           So they started to borrow money from family and

21   friends that they would try to reinstate the mortgage.  And

22   when I say reinstate I mean to bring it current.  Not to pay it

23   off completely, but to pay back what it is that you're behind.

24   But the longer it took Dora to drum up that money to pay back

25   what she was behind, what she found is that the mortgage kept

1    growing.  The amount that she owed kept growing and she wasn't
2    able ever to fully put that money aside that would get her
3    current.
4            So eventually she had to face the reality of the
5    situation that if she couldn't find a way to pay it back they
6    might lose their house.
7            So 2013 is this really critical time for this case.
8    I've already kind of given you a hint why.  But four very
9    critical things happened at the same time almost.  The first is
10   that Ocwen becomes the Cornejo's new loan servicer in 2013.
11   And like I said before, they were captive in that relationship.
12   They had no ability to pick who their mortgage servicer would
13   be.  They default on the loan in the way that I've described,
14   meaning they fell behind and California puts this homeowner
15   bill of rights into law.  The last critical thing that happens
16   is that the loan gets put into foreclosure.
17           I talked about it a little bit already before, but I
18   didn't tell you why the homeowner bill of rights was
19   specifically passed, but during the mortgage crisis and the
20   financial meltdown there was this issue that was very typical
21   for mortgage servicers to do which was to foreclose on a home
22   while telling a borrower that he or she was in the running for
23   a loan modification.
24           MR. SHATZ:  Objection.  Argument, relevance.
25           THE COURT:  Sustained.

1          MR. VITIELLO:  Wade, can you pull up demonstrative

2     piece No. 2?

3          MR. SHATZ:  Objection.  The Court instructs as to the

4     law.

5          MR. VITIELLO:  This is the preamble, Your Honor, to

6     the operative law.

7          THE COURT:  Not at this time.  We're not going to

8     post the (indiscernible).

9          MR. VITIELLO:  Let's not publish then.

10          So California researches and decides to do some

11     things.  They find that from 2007 to 2011 there were 900,000

12     foreclosures completed.  The top 38 of the top -- excuse me, 38

13     of the top 100 hardest hit zip codes were here in California.

14     Those foreclosures affected property values.  It resulted in

15     less money for public schools, public safety and other public

16     services.

17          MR. SHATZ:  Objection.  Relevant and argument.

18          THE COURT:  Counsel, can we have a sidebar quickly?

19        (Sidebar begins at 3:33 p.m.)

20          THE COURT:  Sorry to interrupt you at this time.  Are

21     you going to be bringing any evidence on this topic?

22          MR. VITIELLO:  It's the preamble to the law.

23          THE COURT:  Right.  Are you going to be presenting

24     evidence on that?

25          MR. VITIELLO:  We weren't planning on it.  We didn't

1  think there would be an issue with the law that we're here to

2  talk about.

3          THE COURT:  The findings of the legislature is not

4  something that's going to be put into evidence.  So at this

5  time your opening statement needs to be confined to what the

6  evidence is going to be.

7          MR. VITIELLO:  Then I'll skip ahead.

8          THE COURT:  All right.  Thank you.

9          MR. VITIELLO:  Sure.

10      (Sidebar ends at 3:34 p.m.)

11          MR. VITIELLO:  So what we get in 2013 with Ocwen and

12  the Cornejos is an actual business policy that relies on dual

13  tracking.  We're going to show you letters confirming that

14  Ocwen employed a dual tracking strategy which was designed to

15  on the one hand review or offer to review borrowers for

16  alternatives to a foreclosure while at the same time pushing a

17  foreclosure forward.  They call it a dual path strategy in

18  those letters, but that's what it is.

19          When the Cornejos missed their payments they remained

20  accountable for them.  Like I said, they worked to borrow money

21  to get money together they could use to reinstate the mortgage

22  for what they owed, but ultimately when they get into

23  foreclosure they start to freak out a little bit,

24  understandably.

25          How does foreclosure work in California?  Well it's

1   almost as simple as Ocwen decides a price to fetch for the

2   property, they notify the borrowers and the public with some

3   notice and then they direct their foreclosure trustee to hold a

4   sale.  And we've already described that.  In this case it's a

5   company called Western Progressive and there's no dispute on

6   this.

7          So Dora's panicking.  It's now February of 2015.  She

8   learns that the house is going to be sold on March 27, 2015 and

9   she doesn't think she's going to be able to borrow enough money

10  in time.  She learns that Ocwen's going to auction the house

11  for about $70,000, but it's worth $167,500.

12         So you've heard the circumstances that lead us

13  essentially to the foreclosure in 2015.  The auction date's

14  been set.  The Judge is going to instruct you on the specifics

15  of that law, but what you're here to decide on is the part of

16  the story that the Cornejos and Ocwen don't agree on.

17         So on April 16th, she's freaked, she realizes the

18  urgency of the situation, but she wakes up excited to take the

19  reins and to apply for a loan modification finally when she

20  hadn't before.  Her husband Frank trusts her with everything

21  because well, she handles the stuff at the restaurant, she's

22  got to be better than him with this paperwork.  He doesn't do

23  it at the restaurant.  So she does it all with a friend, Ernie,

24  who you'll hear from.

25         They reach out together to Ocwen and start talking

1    and Ocwen takes some financial information from the two of them

2    over the phone and tells her, lady, you've got to stop

3    borrowing money.  You've got to apply for a loan modification

4    because you're coming close.  You just got to send in this

5    application.  Your financials look good.  Looks like you're

6    going to get this.

7            So they allow her to apply.  They actually postpone

8    the foreclosure sale from March 27th to April 29th, the date

9    that I gave you earlier, specifically to give them time to

10   apply for a loan modification.  We're going to show you those

11   internal notes from Ocwen so you'll see that.

12           So Dora and Ernie, they complete this application

13   together.  We're going to show you those documents as well.

14           Wade, if you could pull up Joint Exhibit 17.

15           And Your Honor, this is a joint exhibit.  Can we

16   publish?

17           THE COURT:  Yes.

18           MR. VITIELLO:  So April 16th they fax this complete

19   application to Ocwen and Ocwen's own records will show you that

20   it was received.

21           Wade, if you could zoom in on the sent date for us.

22   April 16th, 2015.  Just go ahead and cycle through those pages

23   for me.

24           And you'll see all these records during trial.

25   There'll be testimony on them.  You'll see records establishing

1   without a doubt that this application was ultimately approved

2   when Ocwen offered new loan terms to the Cornejos that they

3   accepted and paid on, that Ocwen accepted their payment.

4   You'll see those records as well.  And something happens on

5   April 27th.

6           Ocwen calls Dora, tells her that they want three

7   additional documents apart from that which she submitted in her

8   April 16th application.  It's April 27th.  Her home's going to

9   be lost in two days.  All of a sudden the rug is yanked out

10  from under her.  She thought she was on the road, on the path,

11  on the track to this loan modification and now she's freaked

12  again.

13          The documents that Ocwen asks for are profit and loss

14  forms, and pay stubs, tax returns.  We'll show you all those

15  because she gathered them.  She sent them to Ocwen the very

16  next morning.  Drove all the way down to Porterville, which is

17  about an hour from where she is because she's a fighter.  She

18  wasn't going to lose this home.

19          Wade, pull up Joint Exhibit 18 on page two and zoom

20  in on that fax banner for us.

21          Can we publish, Your Honor?

22          THE COURT:  Yes.

23          MR. VITIELLO:  Ocwen receives these documents on

24  April 28th and the evidence will show from Ocwen's own records

25  that these documents were received.  The same records will show

1  you that Ocwen's outsourced employees in India, they began

2  emailing each other about these documents, acknowledging that

3  they had been sent and received.  Those emails will show you

4  that the same representatives questioned whether the sale

5  scheduled for April 29th should actually move forward in light

6  of receiving these documents.

7         But on the morning of April 29th Ocwen directed its

8  foreclosure trustee to sell their home at a public auction even

9  though they had all these documents.  The loan modification

10 application was there.

11        We're going to show you evidence establishing that it

12 was complete.  We're going to show you evidence establishing

13 that it was pending a decision on approval or denial and that

14 there's no other alternative.  They're either approved or

15 denied.  They were on the track to keeping this home and the

16 evidence will establish for you that more likely than not this

17 was dual tracking.  But it doesn't stop there.

18        The evidence will show you that Ocwen didn't just

19 allow this to happen by accident.  They'll show you that the

20 morning of the sale Ocwen's foreclosure trustee, Western

21 Progressive, the agent that they hired to sell the property

22 emailed them specifically asking to double check on whether the

23 sale should happen on the basis that is there loss mitigation

24 going on.  Because of course if there is, that's dual tracking.

25 We don't know whether Ocwen actually cared enough to check.

1   All we know is that Ocwen didn't tell the truth when it

2   responded.  The evidence will establish that Ocwen told the

3   trustee to proceed with the sale on the basis that there was no

4   loss mitigation pending.

5           And Wade, could you pull up Joint Exhibit 1521 and

6   show us the sent date on that?

7           Again, Your Honor, a joint exhibit.  Can we publish?

8           THE COURT:  Yes.

9           MR. VITIELLO:  So you see an email from April 29th in

10  the morning and let's read that email.  Down at the bottom it

11  says review completed, no loss mitigation in process and file

12  is good to go for sale.  File means home.  The home was good to

13  go for sale.

14          The evidence will show you that when the property was

15  sold it was bid on and it was purchased by a property investor

16  that once he acquired a deed to the property he exercised his

17  legal rights, now holding a deed to evict the Cornejos and

18  their family from their own home.  But all the while Ocwen was

19  telling the Cornejos that they were going to work this out.

20          Internally -- you're going to see notes on the inside

21  saying that they sent this issue up to something called a

22  recission department.  Effectively a department that handles

23  this sort of thing where the foreclosure action could be

24  reversed potentially.  And while it was in that department,

25  you'll see from Ocwen's records, that representatives were

prepped in case the Cornejos called them.  And they were told

to tell them that just tell them their loan terms are being

reviewed even though Ocwen knew that the property had already

been sold to somebody else.

        The final twisted knife that you'll see from the

evidence is when Ocwen finally got around to taking a look at

the application that was sitting there the whole time, several

days later, they actually approved it.  They sent them back a

new loan agreement; better interest rate, new terms that they

could afford, congratulating them.

        Wade, Joint Exhibit 19 please.

        THE COURT:  You can publish that.

        MR. VITIELLO:  Thank you, Your Honor.

        Wade, if you could zoom in on the congratulations?

        They got it in the mail, they signed it, sent it

back.  They paid on it.  Down below there's a little principal

and interest payment -- excuse me, an escrow payment that they

have to make.  Dora hustled to the bank, got a certified

cashier's check.  We'll show you that.  We'll show the proof of

the mailing.  All of it goes to Ocwen.  Ocwen receives it,

cashes it.  And then after all of this, Ocwen didn't even

exercise its power to reverse the sale.  The property stayed

with that third-party purchaser who, like I said, evicted her

and her family.

        Because of what they did, the Cornejos lost the only

1   home that they've ever known together as a family.  From

2   economic damages, that means that they lost a certain amount of

3   equity that they enjoyed in that property.  But of course

4   that's really the smallest thing they lost.  They lost the

5   view, the rose garden, the memories, the forts, the Girl Scout

6   meetings.  Now it's replaced by sleepless nights, stress,

7   anxiety --

8           MR. SHATZ:  Objection.  The damages are not relevant

9   to -- this type of damages is not relevant to the case,

10  emotional distress.

11          THE COURT:  All right.  I'm going to overrule it at

12  this time.  Go ahead.

13          MR. VITIELLO:  Thank you, Your Honor.

14          They lost the American dream.  We expect the evidence

15  to show you that the application was complete, that Ocwen

16  received the complete application yet foreclosed anyway or dual

17  tracked.  And we expect the evidence to show that to this day

18  Ocwen has never actually told the Cornejos that the application

19  was incomplete, that their April 28th submission of those last

20  three documents was defective in some way and the evidence will

21  show you that this sale should not have happened.

22          It'll show you that Ocwen considered a reversal of

23  the sale supporting that the sale should not have happened,

24  that several employees on the inside questioned whether this

25  should've happened.  And the fact that Ocwen later approved

1  their loan for modification shows that this should not have

2  happened and they have a lot of hard work to do in this case to

3  prove otherwise.

4          They need to convince you that despite all of these

5  facts that they still didn't do anything wrong.  And to do it,

6  they're going to blame everybody else.  They're going to reject

7  all notion of accountability.  And the reason we're here is

8  because Ocwen simply won't accept the fact that it failed the

9  Cornejos and that it failed the homeowner bill of rights

10  despite in its pledge to help homeowners as what it does.  So

11  they've come up with some creative defenses and I want to tell

12  you what I expect them to be.

13          First they're going to talk sweet to you.  They're

14  going to tell you that foreclosure is an ugly business, that

15  they don't want to do it but sometimes they have to.  And when

16  it happens people lose their homes.  They might even say

17  they're sorry, but it'll be the first time that the Cornejos

18  ever actually hear that from them.

19          They're going to blame the Cornejos.  They're doing

20  something called a deadbeat defense.  These people were behind

21  in their bills.  They don't deserve protection under the law.

22  They're going to tell you they gave Dora and Frank chance after

23  chance before things came to a critical time to apply, but

24  really they're just trying to distract you from the fact that

25  the homeowner bill of rights protects them as long as they

1    provide the documents that Ocwen asks for.

2            They're going to try to say after the fact that no,

3    no, no, application was never complete.  We're going to show

4    you the approved loan modification so you'll know that's not

5    true.  You'll see their records showing receipt of every single

6    document that they asked for.

7            These are just creative arguments that they've come

8    up with now.  They're going to try to tell you that the

9    application wasn't on time, that it was too late.  But again,

10   you will see from the evidence that they adhered to every time

11   frame that Ocwen set out.  And that even when documents were

12   asked for on the 27th of April, two days before the foreclosure

13   sale, that Dora hustled to Porterville the very next morning

14   and sent them.

15           Another defense they'll try to raise is actually to

16   prey on the Cornejo's desperation in those last few hours when

17   the sale was about to happen.  You're going to hear that the

18   Cornejos were so terrified that they ran to an attorney who

19   didn't do anything for them other than to produce a

20   manufactured fake bankruptcy notice on the basis that he

21   thought well, bankruptcy might slow them down, Ocwen that is.

22   But there was no bankruptcy.  Ocwen's records will show you

23   that they researched whether there was a bankruptcy and

24   concluded that there wasn't.  So there's not a lot to that

25   either.

27

1          The last thing they'll try to show is that the

2     Cornejos could've mitigated their damages or they could've

3     suffered a little bit less, lost a little bit less money if

4     they were more careful.  Maybe now because they're renters they

5     could be renting a little bit of a cheaper place.  But they'll

6     never own a home again.

7          They might try to blame the buyer, the guy who bought

8     the property, the property investor.  They're going to tell you

9     that that guy was unreasonable with the way he evicted them,

10    but all of that is to really distract from the fact that none

11    of that would've happened if Ocwen didn't sell this house.

12    They're going to try to paint a bad picture of that guy and

13    make him look like the enemy.  That's because they still won't

14    accept accountability.

15         So what we're going to ask of you is to weigh this

16    evidence when you see it and decide was there a complete

17    application.  It's critical.  Was it timely, was it on time?

18    What we're going to ask you to do is to look past the Cornejo's

19    embarrassing shortcomings and their ability -- excuse me, their

20    inability to pay their mortgage because they're not on trial

21    here.  Ocwen's on trial for what it did after the Cornejos

22    couldn't pay and there's an important distinction there.

23         We're going to ask you to find that when Ocwen sold

24    the home that doing so was material.  In other words, it

25    affected the Cornejos in a substantial way that they would not

1    have been affected without it actually happening, without the

2    sale going through.  We're going to ask you to find that this

3    was intentional, that it was willful and reckless what Ocwen

4    did, especially given how many chances they had to stop it from

5    ever happening and their chance to reverse it after it

6    happened, but they didn't do that.

7            Ocwen already took their home and they can't give it

8    back because now it belongs to somebody else.  So all the

9    Cornejos are asking for is fair compensation for that.  The

10   role of the jury, your job, it's a sacred one here.  You have

11   the opportunity to be the Cornejo's heros and administer

12   justice as long as it's supported by the evidence.  I

13   appreciate your time and your service.  Thank you.

14       (Whereupon the partial trial in the above-entitled matter

15   was adjourned at 3:52 p.m.)

16                        --o0o--

17                       CERTIFICATE

18       I certify that the foregoing is a correct transcript from

19   the electronic sound recording of the proceedings in the above-

20   entitled matter.

21

22   /s/ Jennifer Barris                  October 18, 2016

23   Jennifer Barris, Transcriber

24   AAERT CET*668

25