1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3    --o0o--

4    FRANK CORNEJO, et al.,          )  Case No. 1:15-cv-00993-JLT
                                     )
5                    Plaintiffs,     )  Bakersfield, California
                                     )  Monday, October 17, 2016
6         vs.                        )  8:35 A.M.
                                     )
7    OCWEN LOAN SERVICING, LLC,      )  Jury Trial - Day 1.
     et al.,                         )
8                                    )
                     Defendants.     )
9    _____)

10                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JENNIFER L. THURSTON
11         UNITED STATES MAGISTRATE JUDGE, and a jury.

12   APPEARANCES:

13   For Plaintiff:              GIANDOMINIC VITIELLO
                                 Katchko, Vitiello and Karikomi
14                               11500 W. Olympic Blvd., #400
                                 Los Angeles, CA   90064
15                               (310) 943-9587

16                               JOHN HEENAN, PHV
                                 Bishop Heenan & Davies
17                               1631 Zimmerman Trail
                                 Billings, MTT   59102
18                               (406) 839-9091

19                               EDWARD E. ANGWIN
                                 Angwin Law Firm
20                               827 Moraga Drive
                                 Los Angeles, CA   90049
21                               (310) 471-2707

22   For Defendant:             SANFORD P. SHATZ
                                BRIAN A. PAINO
23                              McGlinchey Stafford
                                18201 Von Karman Ave., #350
24                              Irvine, CA   92612
                                (949) 381-5811

25

ii

APPEARANCES (Cont.):

Court Recorder:                    OTILIA ROSALES
                                   U.S. District Court
                                   2500 Tulare Street, Suite 1501
                                   Fresno, CA   93721
                                   (559) 499-5928

Transcription Service:             Petrilla Reporting &
                                      Transcription
                                   5002 - 61st Street
                                   Sacramento, CA   95820
                                   (916) 455-3887

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

iii

<u>INDEX</u>

<u>PAGE</u>

PRELIMINARY MATTERS                                   1

POTENTIAL JURORS IN                                 37l

JURY VOIR DIRE                                       41

POTENTIAL JUROR MOORADIAN QUESTIONED                 95

JURY VOIR DIRE CONTINUES                            105

JURY SWORN                                          181

DISCUSSION OF JURY INSTRUCTIONS                     184

PRELIMINARY JURY INSTRUCTIONS                       185

PLAINTIFF'S OPENING STATEMENT                       191

DEFENDANT'S OPENING STATEMENT                       219

DISCUSSION OF RULE 50 MOTION                        233

HOUSEKEEPING; DISCUSSION OF VERDICT FORM            236

<u>EXHIBIT INDEX</u>

<u>JOINT</u>:                              <u>FOR I.D.</u>   <u>RECEIVED</u>

ALL                                                16


<u>FOR PLAINTIFF</u>:



<u>FOR DEFENDANT</u>:

577 through 579                                    16

1

BAKERSFIELD, CALIFORNIA, MONDAY, OCTOBER 17, 2016, 8:35 A.M.

2

3          THE COURT:  All right.  We're on the record in the

4  case of Frank and Dora Cornejo v. Ocwen Loan Servicing, LLC, et

5  al., Case No. 1:15-cv-00993-JLT.

6          May I have appearances please?

7          MR. VITIELLO:  Good morning, Your Honor.  Giandominic

8  Vitiello for the plaintiffs.

9          THE COURT:  All right.  Good morning.

10          MR. HEENAN:  Good morning, Your Honor.  John Heenan

11  also on behalf of the plaintiffs.

12          THE COURT:  All right.

13          MR. ANGWIN:  Good morning, Your Honor.  Edward Angwin

14  also on behalf of the plaintiffs.

15          THE COURT:  Mr. Angwin, how do you spell your last

16  name?

17          MR. ANGWIN:  A-n-g-w-i-n.

18          THE COURT:  All right.  And for the defense then.

19          MR. SHATZ:  Good morning, Your Honor.  Sanford Shatz,

20  S-h-a-t-z.

21          MR. PAINO:  And good morning, Your Honor.  Brian

22  Paino.

23          THE COURT:  All right.  We are on calendar today of

24  course for our jury trial.  I have left you a couple of sets of

25  documents this morning.  You will need to take a look at the

2

neutral statement as well as you have two sets of instructions.
One is thicker, that'll be the concluding instructions.  The
smaller packet are the preliminary instructions that will be
given once our jury is seated.  So I do expect to give those
after the lunch break.  We will have our jury seated before we
take our lunch break.

The neutral statement is one that you submitted.  I
did simplify it somewhat.  You'll want to take a look at that
because that will be given to our jury during selection.  I
also gave you a copy of the witness list.  I found 13 people
who are identified in the pretrial statement.  I'm assuming
though No. 7 and 8, Tastsi and Tabu will not be testifying, is
that correct?

MR. HEENAN:  That's correct, Your Honor.

MR. VITIELLO:  That's right, Your Honor.

THE COURT:  All right.  Anyone else on the list who
is not going to be called?

MR. VITIELLO:  Your Honor, Frank Cornejo is sidelined
with medical issues.  We don't expect to call him.

THE COURT:  All right.  Anyone else?

MR. VITIELLO:  We don't expect to call Monica Cornejo
either.

THE COURT:  Okay.  For the defense?

MR. PAINO:  Your Honor, I don't think we expect to
call -- I think the parties have stipulated as to the only

3

expert issue in the case which was why Gary Crabtree was

designated.  He was a real estate appraiser.  Since we've

stipulated to the value we don't anticipate calling Mr.

Crabtree.

THE COURT:  Okay.

MR. PAINO:  We also don't anticipate calling Ms.

Spurlock or Ms. Hernandez.

THE COURT:  All right.

MR. VITIELLO:  And Your Honor, Mr. Harris -- Curtis

Harris, No. 11, he was an expert also so we can cross him off

the list.

THE COURT:  So I'm seeing five witnesses.  Does that

sound right?

MR. VITIELLO:  We also don't expect to call Melissa

Gaeta.

THE COURT:  Okay.  Four witnesses.

MR. ANGWIN:  Before the Court moves off witnesses, we

haven't finalized the stipulation concerning Ms. Spurlock, but

we expect that to happen.

THE COURT:  All right.

MR. ANGWIN:  So it's a possible, but not likely.

THE COURT:  Okay.  And Mr. Ablin as I recall was a

representative of the third-party buyer.  Is he going to be

called?

MR. VITIELLO:  The plaintiffs won't call him, Your

4

Honor.

MR. SHATZ:  We're planning to, depending on what the parties work out, Your Honor.

THE COURT:  Okay.  All right.  So we don't have that many witnesses.  There was a time estimate of four to seven days which I always thought was a little bit long.  I see this more as a four to five day estimate.  What is counsel's impression?

MR. VITIELLO:  We agree.

MR. SHATZ:  Yes, Your Honor.

THE COURT:  All right.  That will mean I'll tell the jury that we will complete by Friday.

MR. VITIELLO:  We're fine with that, Your Honor.

MR. SHATZ:  Yes, Your Honor.

THE COURT:  Okay.  The other issue I wanted to talk about was the issue of the affirmative defense raised by the defense, obviously, the issue related to the -- whether you're signatory to the agreement.

My impression of that issue is first it's a pure legal issue as to what the statute means and whether it encompasses the situation.  There may be some fact questions, I don't know.  But it seems like what you're saying in your trial brief was that you have some documents to authenticate, but is there any other -- anything else that would need to be presented on that affirmative defense?

5

1          MR. PAINO:  No, Your Honor.  I think that the Court's

2   understanding is correct.  There's a document, massive purchase

3   agreement that specifically refers to Ocwen's agreement to be

4   bound by the consentia [sic].  I mean that's really the only

5   possible factual issue.

6          THE COURT:  Okay.  So what I -- based on that, my

7   thinking on the topic is that that information does not need to

8   be presented to the jury.  It doesn't seem to me that the

9   affirmative defense is one for the jury, but that is in fact a

10  question for the Court.

11          So what I intend to do on that issue is we'll let the

12  jury go to verdict.  If there is a verdict in favor of the

13  plaintiff, then at that time we'll excuse the jury, we'll turn

14  to another phase, we'll let the defense present -- authenticate

15  the document and then the question of whether the statute

16  applies will be one that the Court will decide.  So we'll get

17  to that second phase as necessary, but those documents and that

18  issue should not be introduced to the jury.  Does that make

19  sense?

20          MR. SHATZ:  Yes, Your Honor.

21          THE COURT:  Any questions by the plaintiffs on that?

22          MR. VITIELLO:  No, Your Honor.

23          THE COURT:  All right.  As to the jury, we are going

24  to be seating eight jurors today.  That will give you four

25  strikes each.  That will mean when we pass the strike sheet of

6

course you strike one at a time; one, we go to the next party,
go back and forth.  If there are two passes in a row then that
will be your jury regardless of whether you have additional
strikes left.  Any questions on that?  For some reason that
kind of trips people up a little bit.  Make sense?

MR. SHATZ:  If my understanding is then that there
are eight people, for example, in the box, we have already
passed, the plaintiff passes, if we pass again we're done?

THE COURT:  Right.

MR. SHATZ:  Thank you.

THE COURT:  What we'll do is we'll have 18 people up
so you're never going to get to No. 18 even with -- even if you
use all your strikes, and the jury will be the first eight.
You have to kind of just keep it in mind.

So the other issue I want to talk about is hardships.
I can do that one of two ways depending on what counsel want to
do.  Hardships, I tend to ask for all hardships at one time and
then decide those at one time.  I will give you an opportunity
to discuss the issues of hardship in sidebar if that's what
you'd like.  Otherwise I will just deal with those.  Do you
want to have the opportunity to discuss hardships before I rule
on them?

MR. VITIELLO:  We think that's fine, Your Honor, that
Your Honor can decide.

THE COURT:  You don't -- okay.

7

          MR. SHATZ:  If the Court's going to grant a request
for excusal due to hardship we are not going to stand in the
way.  If the Court's going to deny one, we may wish to speak
with you.

          THE COURT:  I'll tell you I tend to deny more than I
grant so maybe we should just talk about that because some of
the -- I don't -- what I find is counsel have softer hearts
than I do on some of these issues, so we'll do that.  I'll just
call you to sidebar and we can talk about hardships at that
time.

          You have submitted some joint exhibits.  Is there any
objection to those being admitted at this time so that you can
use them in your opening statements if you choose?

          MR. VITIELLO:  There's no objection to the admission
of the exhibits that are the joint exhibits, Your Honor.  But
we found that there was one or two potentially that had
previously been agreed to as joint which didn't make it into
the binder.  We've been corresponding about that, but no real
finality on it so maybe the Court could address it for us now.

          THE COURT:  All right.  What's the -- we have a
couple of documents then that -- what are the documents at
issue?

          MR. VITIELLO:  There are a couple of letters.
They're all in the defendant's binder, but a couple of letters.
One dated April 21, 2015, one dated April 30, 2015 that were on

8

1  a list that was being circulated as stipulated joint and we

2  agreed to those, but they just never made it into the binder.

3  Probably just an oversight.

4       THE COURT:  All right.  What's the exhibit numbers?

5       MR. VITIELLO:  From defendant's exhibit binder I

6  believe it's 568.

7       MR. SHATZ:  The other one?  You mentioned there were

8  two.

9       MR. VITIELLO:  Off the top of my head I don't know.

10  It might be the very next one.

11       MR. SHATZ:  Okay.  Let me -- give me a second to look

12  it up.

13       MR. PAINO:  The April 20th letter --

14       MR. VITIELLO:  There was an April 20, April 21 and an

15  April 30.

16       THE COURT:  568 is not a letter.

17       MR. VITIELLO:  I'm sorry, Your Honor.  I don't have

18  the tabs in front of me.

19       MR. SHATZ:  We will get it to you in one second.

20       MR. VITIELLO:  I can grab it from the witness room or

21  we can --

22       MR. PAINO:  I think it's 577, 578 and 579.  That's

23  the April 20th, April 21st and April 30th letters.

24       MR. SHATZ:  Say it one more time, the numbers.

25       MR. PAINO:  577, 578 and 579.

9

1          THE COURT:  All right.  So do the plaintiffs have any

2      objection to those being marked as joint exhibits, or rather

3      than doing that we can just call those admitted at this time.

4          MR. VITIELLO:  I think we can call them admitted.  We

5      don't want to take them out of the binders.

6          THE COURT:  Okay.  All right.  So any objections by

7      the defendants to admitting all of the joint exhibits in

8      addition to 577, 78 and 79 at this time?

9          MR. PAINO:  No, Your Honor.

10         MR. SHATZ:  Joint Exhibit 15, still need that one?

11         MR. VITIELLO:  Yes, we do.

12         MR. SHATZ:  Okay.  No objections.

13         THE COURT:  All right.

14         MR. VITIELLO:  Your Honor, one last point before we

15     get off of exhibits.  We had a couple of questions about --

16     well two things really.  There are a few joint exhibits that we

17     would like to publish to the jury during opening.  We just want

18     to clear that with the Court.

19         THE COURT:  Any objections to that?

20         MR. SHATZ:  No, Your Honor.

21         THE COURT:  All right.

22         MR. VITIELLO:  And we had a couple of demonstrative

23     pieces that we'd also like to share with counsel, make sure

24     they're not objectionable.

25         THE COURT:  Okay.

MR. VITIELLO:  We would do that now if possible, or after we conclude if there's going to be a break.

THE COURT:  You'll have -- we'll have a break before we get to the opening statements so you can talk about that with counsel on the break.

MR. VITIELLO:  Will we have a break before our jury comes in?

THE COURT:  This morning?

MR. VITIELLO:  Yeah.

THE COURT:  Hopefully not.

MR. VITIELLO:  Okay.  Fair enough.  And then there's one last bit.  The National Mortgage Settlement and this signatory issue kind of aside, we wonder whether this exhibit is still up for grabs to talk about the relationship of -- well maybe some of the stipulations that were reached in that agreement and the general nature of it during opening and argument.

THE COURT:  How does that bear on the issues?

MR. VITIELLO:  It shows a pattern of business practice and it goes to intent for our recklessness prong and our intent prong.

THE COURT:  You can refer to anything assuming you're going to prove it, but you're suggesting that that evidence needs to be before the jury in order to come to a verdict, right?

        MR. VITIELLO:  We are not.  I think really what we
are tiptoeing around is the idea of opening with statements
that ultimately a jury's not going to necessarily see evidence
about because if this signatory issue is not one for the jury,
then potentially that exhibit never gets published to the jury
in which case, you know, from our opening we'd be talking about
facts and stipulations that they actually never see.

        THE COURT:  I'm not following why that would be the
case.  Are you intending on introducing that evidence?

        MR. VITIELLO:  We are not, but I think counsel --

        MR. ANGWIN:  Your Honor, the issue is this is that
the -- all servicers are bound in essence by the terms of the
National Mortgage Settlement, signatories -- or the five
signatories of course.  But through federal regulation and
actually Hobart they've sort of expanded that to all servicers.

        So we are going to want to refer to past decisions
and consent judgments with regard to Ocwen and other servicers
to show that the conduct here was conduct that they knew about,
not to show that they acted of course in accord with that
conduct, but to show intent, motive, opportunity and lack of
mistake.

        THE COURT:  How do you intend to introduce
information as to what's in that standing -- or in that
settlement agreement?

        MR. ANGWIN:  In the consent judgment?

1    THE COURT:  Right.

2    MR. ANGWIN:  We're going to try and introduce it

3  through Ocwen's representative, and also we're going to ask the

4  Court to take judicial notice.

5    THE COURT:  I'm not following.  You're saying this is

6  an issue that the jury -- this is evidence that the jury you

7  think, at least from your perspective, should consider in

8  coming to a verdict on the claims that are remaining in this

9  case?

10    MR. ANGWIN:  Your Honor, we wanted to broach it now

11  because it might come up later.  So we are uncertain whether or

12  not it will actually come up.  I think we can probably address

13  it at that time, but before it comes up I think we need to

14  present the Court with a point brief to discuss how we think

15  it's relevant and admissible.  I think it's difficult to --

16  we're --

17    THE COURT:  My question though is if you think it's

18  going to be relevant, if you think it's -- I'm not so much

19  worried on the document because it sounds like the defendants

20  want the Court to consider it, but if it's not an issue that

21  the jury needs to know about to come to a verdict I'm not sure

22  why you would be introducing that information.

23    MR. ANGWIN:  Your Honor, we want to introduce it

24  because if we get to the element of statutory damages we need

25  to show willfulness, recklessness and intent.  One way we think

13

we can do that is to show that the wrongdoing we're saying

occurred here was something that was a pattern that had

occurred, for example, backdating letters due to -- not to show

evil intent, of course, but just to show that their systems

were such that they spit out backdated letters.  We are not

going to do it of course to show that they acted in conformity

with that prior conduct, but under Rule 404 and California Rule

1101 we're going to say this goes to intent, lack of mistake.

And again, Your Honor, we can give you a little point

brief on that if you want to to make -- I don't think I'm being

articulate right now.

THE COURT:  No.  I appreciate what you're saying.  I

guess I'm having trouble with how you're going to get around

that 404 issue.  You're saying it's not in conformity, but

you're saying absence of mistake.

MR. ANGWIN:  I think we can get with knowledge,

absence of mistake.  We can get in there with -- under our

trying to show recklessness and intent I believe we can show

that if you create a system whereby you -- for example, you

lose documents and you know you're losing documents and you

have a system where -- and you don't fix it, doesn't that come

into a situation where we can argue to the jury that that would

show lack of mistake for -- or knowledge or intent?

THE COURT:  All right.  Well that's something that

obviously we're going to have to get to further.  Comments at

14

this time on that issue?

MR. SHATZ:  The National Mortgage Settlement terms, the federal rules put out by the CFPB amending the RESPA regulation; in this case 1024.41, and the California Homeowner Bill of Rights all have subtly different terms.  To equate them all as being the same would require a juggling act and require more to show that it's applicable.

Our interest in using the National Mortgage Settlement is to show the exemption assuming compliance with it, not to show that a violation of it constitutes an act that plaintiffs have a cause of action for because under the National Mortgage Settlement borrowers don't have a right to pursue it.

THE COURT:  Right.

MR. SHATZ:  So I'm not sure what plaintiffs are trying to do and I frankly -- apparently I'm not as bright as I thought, I don't understand their argument.

THE COURT:  I'm not sure I do either because it almost sounds like what you're saying is you agree that they're a signatory.

MR. ANGWIN:  No, Your Honor.  The National Mortgage Settlement terms apply to all rate servicers because they've been expanded.  So if you buy their argument, then actually every -- the Homeowner's Bill of Rights doesn't exist.

What we're going to argue, for example, Your Honor,

Ocwen was -- entered a consent judgment with New York financial
regulators in that they admitted that they had bad systems
which -- where they backdated letters, hundreds of thousands of
letters; where they were unable to show that they were
actually -- when they got documents in they were putting them
in the right files; that they had a sort of patchwork of
systems that were based upon their requiring so many disparate
companies and that they were unable to actually fulfill their
obligations as a servicer.

Now if that is true we're not going to say look, you
did it there, you're doing it here.  We're going to say
certainly this shows this is lack of mistake, this is intent.
You understood -- Ocwen understood that it had bad systems, did
nothing to rectify that.

THE COURT:  As I understand the law on the topic
though and the question presented by the California statutes is
not whether you understood a settlement with government
regulators.  It is did you know what the California law was,
did you despite that take a certain course of action or did you
purposely take the course of action despite your understanding
of the California law.  So I'm not sure I understand how the
settlements are at issue.

In any event, that's a topic we're going to have to
address before you get there.  If you want to refer to it in
your opening statement then you will do that at your peril

1   because I don't know that you're going to get that evidence in.

2   I'm also concerned, and something you may want to think about

3   when you file a brief on the issue, is the ability of the

4   witness to discuss that -- the issues you're describing.

5           All right.  So at this time then all joint exhibits

6   as well as Defense Exhibit 577, 578, 579 will be admitted.

7       (All Joint Exhibits and Defense Exhibits 577, 578, 579

8   received into evidence.)

9           THE COURT:  You'll talk further as to use of

10  demonstrative evidence during your opening statements before

11  that occurs.

12          All right.  Anything else to talk about then before

13  we bring in the jury?

14          MR. PAINO:  Your Honor --

15          MR. SHATZ:  Stop.  Go ahead.

16          MR. VITIELLO:  Your Honor, we wanted to dismiss one

17  claim, the 2924.10 claim.  We have reached an agreement where

18  we want to simply move forward on the 2923.6 claim and we --

19  have we reached a stipulation on --

20          MR. SHATZ:  We have no problem with the dismissal if

21  that's what you're asking.

22          MR. VITIELLO:  With respect to the dismissal, then I

23  think we've reached a stipulation.

24          Now the last issue is Western Progressive.

25          MR. ANGWIN:  Your Honor, if I may, we have been

17

working with defense counsel to try and reach a stipulation

with regard to certain facts to eliminate the need for the

Western representative to show up live.  If we do that, it's

quite possible we'll be able to also agree to dismiss them as a

defendant.

THE COURT:  All right.

MR. ANGWIN:  And we -- this is -- I apologize, it's

somewhat last minute.  We've been going back and forth.

They're in Georgia so there's been a little logistical delay,

but they -- defense counsel gave us a final proposal on that

this morning which we will be addressing and we are hopeful

that we can reach an agreement on that this morning.

THE COURT:  On the 2924.10 issue or on the Western

Progressive?

MR. ANGWIN:  I'm sorry, Your Honor.  I was unclear.

We are agreeing to dismiss the 2924.10 claim at this time.

THE COURT:  All right.  That'll be dismissed.

MR. ANGWIN:  And we were going solely on the 2923.6

claim.

THE COURT:  Okay.

MR. ANGWIN:  With regard to defendants, we are trying

to reach an agreement to dismiss Western as a defendant.

THE COURT:  All right.  And that's not yet

determined?

MR. ANGWIN:  Yeah.  We're really close, Your Honor.

18

It's just that because of just logistical issues we didn't get their final proposal till this morning.  So I'm not in any way -- it's just been difficult to get the exact language worked out.

THE COURT:  Okay.

MR. SHATZ:  Yes, Your Honor, in that regard, when Georgia woke up they sent us emails this morning talking about what they could do and we forwarded it to plaintiffs but people sleep and we apologize for that.

THE COURT:  I don't think it's going to make much difference.  It's just a matter of we'll mention the name of the case, they'll be included in that.  I'll ask questions of the jury about Western Progressive, if they know that company, but if they never hear it again I don't think it's going to make any difference to the jury.

Speaking of the jury issues, of course, I will conduct the significant part of the voir dire of the jury. You're entitled to question as well as long as you don't repeat my questions and as long as you don't argue your case.  I know that's a very common tactic in state court.  It's not permitted here.  If you attempt to do that, then I will stop you.

Any questions about then that topic?

MR. VITIELLO:  Your Honor, just a clarification. Ball park time that we would have for follow up?

THE COURT:  I don't usually set a time frame.  I do

19

1  expect that we -- I'll tell them we're going to seat them

2  before the lunch break so you want to keep that in mind, so you

3  don't want to go too long.  I think they're going to hold you

4  accountable for that.  I know often you just want to get up

5  there and let them see you, and hear you and do that, and

6  that's fine, but don't take that too long.  If you have

7  substantive issues that you need to investigate I get that, but

8  try to be concise.

9       MR. VITIELLO:  And just a final point, Your Honor.  I

10 understand that we're fairly bound to the lectern.  Does that

11 apply to voir dire as well?

12      THE COURT:  It does.

13      MR. VITIELLO:  Okay.  Thank you.

14      THE COURT:  We will have people in this front row

15 here, so we don't want you to get too close to them.  We just

16 don't want to invade their space too much.

17      MR. VITIELLO:  Don't want to scare anybody.  Okay.

18 Thank you.

19      THE COURT:  All right.

20      MR. SHATZ:  Logistics.  What hours does the Court

21 typically hear trial?

22      THE COURT:  8:30 to 5:00.  We'll take a lunch break

23 generally if we can around 12:00 to 1:30.  We'll take a break

24 in the morning, break in the afternoon.  I think we have a

25 criminal appearance this afternoon so we'll have to take a

break to accommodate that as well.  That criminal appearance
will be at 2:30.

MR. ANGWIN:  And Your Honor, excuse me, I just looked
over the verdict form and the special instructions.  Am I
correct that you are saying that the statutory damages include
mental suffering or that they're punitive damages?  I'm a
little unclear because that might be relevant to the arguments
made in opening as well to the questions asked in voir dire.

THE COURT:  No.  If it's still in there it's because
I simply failed to delete that out.  When I considered the
issue and read the law on that it did not appear to me that
that statute makes any sense to suggest that you get economic
damages for a simple, in essence, breach of the statute.

But on a willful, then you get emotional harm because
it seems to me if there is a breach, the plaintiffs suffered
the same harm emotionally on a breach as they would on a
willful conduct.  It just didn't make a lot of sense to me that
they intend emotional distress as a result of recklessness or
something else.

MR. ANGWIN:  Then if I may, Your Honor, because I
apologize, I'm a little dense sometimes.  Then what is the
element of statutory damages?

THE COURT:  Three times or $50,000 of the economic
damages.

MR. ANGWIN:  Three times the economic damages or 50-,

21

1  whichever is greater?

2          THE COURT:  Right.

3          MR. ANGWIN:  Okay.  Great.  Thank you.

4          THE COURT:  Yes, sir.  We have someone in the

5  audience here.

6          MR. ABLIN:  Yes.  I'm a witness.  My name's Ablin.

7          THE COURT:  Mr. Ablin --

8          MR. ABLIN:  Am I going to be called?

9          THE COURT:  You may be.

10         Who is calling Mr. Ablin?  Is that going to be the

11 defense?

12         MR. SHATZ:  Yes.  So if we could take two seconds?

13         THE COURT:  Yeah.  Mr. Ablin, I guarantee we're not

14 going to get to you today, so you can talk with counsel and

15 they'll make arrangements for you to come back.

16         MR. SHATZ:  Should I do that now or wait a few

17 minutes?

18         THE COURT:  Yes.  Go ahead and do that now.

19         MR. SPEAKER:  Is it okay to ask him to leave?

20         THE COURT:  I'm sure he wants to leave.

21         MR. ANGWIN:  And Your Honor --

22         THE COURT:  Yes.

23         MR. ANGWIN:  -- I'm sorry.  Given your -- what you

24 just told us on the statutory damages, can we have two minutes

25 to confer with defense counsel?

22

1        THE COURT:  Sure.

2        MR. ANGWIN:  Thank you, which might actually be five

3   minutes.

4        THE COURT:  All right.

5        MR. ANGWIN:  It'll be brief.

6        THE COURT:  Okay.  We'll go off the record for a

7   moment.

8     (Recess from 9:00 a.m. to 9:02 a.m.)

9        THE COURT:  All right.  So you made arrangements with

10  Mr. Ablin to come back at some other time?

11        MR. SHATZ:  Yes.

12        THE COURT:  All right.

13        MR. SHATZ:  And we have done that and we'll work that

14  out.

15        THE COURT:  Okay.  Any other issues at this time?

16        MR. ANGWIN:  Your Honor, we --

17        MR. SHATZ:  I'm sorry.  I have not read, because I

18  was listening to you, the jury instructions.  Did you say the

19  short pack is the one you intended to read after the jury was

20  selected?

21        THE COURT:  Correct.

22        MR. SHATZ:  The long packet is after the case?

23        THE COURT:  Correct.

24        MR. SHATZ:  And then the special verdict is of course

25  after the case.

1          THE COURT:  Right.  We'll have an opportunity to talk

2   about the full set of jury instructions and the verdict at

3   another time.

4          MR. SHATZ:  So we can amend if we need or add or --

5          THE COURT:  Right.

6          MR. SHATZ:  Thank you.  And then the statement of the

7   case which you intend to read at the start, again I was

8   listening to the Court, if I could have two minutes if you're

9   going to bring the jury in?

10         THE COURT:  Uh-huh.

11         MR. SHATZ:  Okay.

12         MR. ANGWIN:  And Your Honor, if you want to be -- I

13  don't want to --

14         MR. SHATZ:  No.  I just wanted to read this.

15         MR. ANGWIN:  I'll wait then.

16      (Pause.)

17         MR. ANGWIN:  Mr. Shatz, are you ready?

18         MR. PAINO:  I have one minor thing, Your Honor, on

19  the neutral statement of the case.

20         THE COURT:  Uh-huh.

21         MR. PAINO:  While I understand the case caption names

22  U.S. Bancorp and indicates that it does business as U.S. Bank

23  National Association, which are two separate entities, so I

24  think it's slightly inaccurate to reference them as they are on

25  the caption, which is what reflects here, U.S. Bancorp, dba

24

U.S. Bank National Association.  I think it'd be more accurate
to just say U.S. Bank National Association as trustee.

THE COURT:  So drop off U.S. Bancorp.?

MR. SHATZ:  Drop off U.S. Bancorp. dba.

THE COURT:  All right.  Any objection to that?

MR. VITIELLO:  No objection, Your Honor.

THE COURT:  Any other changes to the neutral
statement?

MR. SHATZ:  No, Your Honor.

MR. VITIELLO:  I don't believe we have any, Your
Honor.

THE COURT:  All right.

MR. ANGWIN:  No, Your Honor.

THE COURT:  Okay.

MR. ANGWIN:  All right.  Your Honor, Mr. --

MR. SHATZ:  Please.

MR. ANGWIN:  Your Honor, we'd like to --
respectfully, our position has been that actual damages under
the statute are more than just the trebling of economic damages
and with all due respect to the Court's hearing, we're trying
to think logistically the best way to approach this because if
we are correct, then we'd have to come back for a retrial.  If
the defense of course is correct, then -- with your position
-- then what we would suggest is this, that you allow us to on
the verdict form put a place for actual damages, explain to the

25

jury the plaintiffs' version of actual damages.  Once that's

back, then the Court can do whatever it wishes to strike it.

And then when we -- if we do an appeal of that, then

if we're right and come back we won't have to retry the case.

If they're right, then they're right, you know, it just sticks.

That way it seems like it would save everyone time and

inconvenience.  I don't think that would really prejudice the

defendants because I think the same evidence will come in, but

I think it would be just -- it would allow us to not worry

about just having to retry the case.

THE COURT:  Right.  Makes sense.

What's the defense position?

MR. PAINO:  Your Honor, my concern with that is the

emotional distress testimony or other evidence that's put on

wouldn't be relevant in any way to the case, and in that sense

we believe it would be prejudicial to allow emotional distress

type of evidence to come in during a case when it has no

relevance.

THE COURT:  I'm going to let you all talk about that

a little bit further.  We'll have to maybe have some briefing

on the topic because the -- I don't think the plaintiffs

actually submitted to me anything on that really of substance

on the issue of emotional distress, or at least what I found

wasn't helpful.

MR. ANGWIN:  I'm sorry.  Your Honor, with regard to

whether emotional distress is actual damages or with regard to

whether --

THE COURT:  Right.

MR. ANGWIN:  All right.

THE COURT:  Unless that was your best shot.  If

that's the case, then I'll just take a further look at it.

MR. ANGWIN:  No.  It actually was not our best shot,

Your Honor, but we would be glad to do -- would you like to do

a -- whatever the Court decides.  I think we can talk of course

with defense counsel, but I'm not sure we'll reach consensus.

If the Court would like additional briefing on that I think we

could do that tonight and get it to you tomorrow morning.

THE COURT:  Tomorrow or Wednesday is fine.  It's up

to you.  If you don't want anything else on the docket, I don't

care about whether you do.  It sounds like though maybe you

want to be heard further on the topic.  If you do, then it's up

to you if you want to file that --

MR. ANGWIN:  Well since we're losing right now we'd

like to be heard some more, Your Honor.

THE COURT:  Okay.  So it's up to the defense whether

you want to file something additional on that.  In any event,

it shouldn't be long.  I don't want to say five pages, but I

mean something about that.

MR. ANGWIN:  Right, Your Honor.

And Your Honor, if I may, one more thing.  I'm a

27

little confused on the clear and convincing instruction with

regard to -- because it's sort of -- I think I know what the

Court's trying to do, but it looks like you're sort of saying

they're to punish, therefore it's clear and convincing; but

they're not punitive damages under --

THE COURT:  Right.  They aren't punitive damages, but

it is -- it appears to me that they are intended to punish.  It

uses language that is similar to a punitive damage award and

under California law the standard is clear and convincing

evidence.

MR. ANGWIN:  And if it is punitive damages, Your

Honor, it just sort of leads us to the question then can we go

into the usable elements of punitive damages, the -- you know,

how many times they've done this, whether they've been punished

before and the size of the company?  I'm just trying to get

some guidance.

THE COURT:  I don't see how size of the company would

have any bearing since it's not an issue that -- the amount is

not variable; it's three times or $50,000 and there's very few

companies of any size who couldn't pay that.  I mean I don't

know the exact value of the house off hand, but we can't be

talking more than about a half a million dollars at the most I

would think.

MR. ANGWIN:  Right.  And so, Your Honor, with regard

to the other elements which can be brought up in punitive

28

1    damages, the type of wrongdoing, whether they've done it before

2    and whether they've been punished or should be punished; can we

3    go into those areas?

4            THE COURT:  I'm not sure how that -- unless you're

5    going to say that that bears on the issue of willfulness or

6    recklessness --

7            MR. ANGWIN:  We will, Your Honor.

8            THE COURT:  Okay.

9            MR. ANGWIN:  And I'm sorry to interrupt, but it's

10   just -- it's to me all these things cut both ways, and most

11   laws do.

12           THE COURT:  Okay.

13           MR. ANGWIN:  So if they're able to argue clear and

14   convincing which is a higher standard, seeking benefit of the

15   -- really the punitive damages statute, then I think it's just

16   equal that we could be able to argue the elements necessary to

17   show that which are that they have done this before, they've

18   been punished for it before and still continue to do it.  Is

19   that fair?

20           THE COURT:  We can talk about that issue as well too.

21   It seems fair to me.

22           MR. PAINO:  I guess in the context, Your Honor,

23   however, the statute is fairly narrow.  It requires a showing

24   of willfulness, intentional or reckless conduct with

25   specificity as to the violation of the Homeowner Bill of

1   Rights, evidence of past wrongful conduct really has no bearing

2   whatsoever on this particular case and a showing in this

3   particular case as to whether there was willful intentional or

4   a reckless violation of the statute.

5          THE COURT:  Except as I read it, it is -- I read

6   definitions that I assume the legislature intended, willfulness

7   can mean -- or recklessness certainly means you knew about the

8   law and completely disregarded it.  If that's the case and if

9   there are similar situations in which Ocwen's people did the

10  same thing, it seems that that would be maybe some pertinent

11  evidence, but it would have to be similar conduct.

12         While we're on this topic, maybe we should talk about

13  this a little bit.  The statute to me doesn't make a whole lot

14  of sense because it says intentional, willful or reckless.

15  What it seems to be saying to me is it can't be negligent.

16         But there is such a difference between intentional

17  and willful as to make no sense to me because if you can simply

18  prove an intentional act, then why do we need willful and

19  reckless?  It doesn't make sense to me as the way the statute

20  is worded.  It seems to me it should say willful or reckless,

21  or an intentional act that was willful or reckless.  But if you

22  can -- are the plaintiffs taking the position that simply

23  demonstrating an intentional act is sufficient for statutory

24  damages?

25         MR. ANGWIN:  Your Honor, I think our position is

going to be this, is that the first prong, the violation can be

even a technical violation.  That could be, you know,

transposing numbers, that could be anything.  And then to get

to statutory you have show something more; did we intend to do

it --

THE COURT:  Well, let's stop there a second though.

For that initial violation it has to be a material breach

though, right?

MR. ANGWIN:  Of course material, Your Honor.  I'm

sorry.

THE COURT:  Okay.  Go ahead.

MR. ANGWIN:  The materiality's subsumed in all my

discovery.

THE COURT:  Okay.

MR. ANGWIN:  Thank you.

THE COURT:  So then -- I'm sorry --

MR. ANGWIN:  So then a material breach can be any

breach that's material even it's just we mixed up two

documents, we sent it to the wrong address; as long as it's

material.  To show willfulness, recklessness or intent it's

really more like almost gross negligence and on up.  You know,

you have to show something.

You can show that they knew about the problems and

didn't fix it, you have to show up to intent, which would of

course be a higher standard.  But I think that the way the

31

statute's written it's almost any conduct that was beyond just
negligence would qualify.  And I agree it's poorly written, but
I think the legislature clearly intended that.

THE COURT:  Okay.  So I think we agree on that then
because as I understood it -- I don't want to use the word
gross negligence, but I expected conduct that was more usually
described as willful or reckless.

MR. ANGWIN:  It's culpability.

THE COURT:  Right.

MR. ANGWIN:  It's we did it because we knew we were
doing it, or we just turned a blind eye, or --

THE COURT:  Right.

MR. ANGWIN:  -- whatever the standard is, I think
it's alternative grounds and I think that's what the
legislature intended was to say we can't cover everything, it's
more than just you sent page 10 when you should have sent page
11, but it's -- we can't really tell you what it is because we
want it to be broad.

THE COURT:  Right.  I think you and I agree on the
same -- on that issue.

Defense?

MR. PAINO:  Your Honor, I guess the only qualifier I
would add is the recklessness to willfulness or the
intentionalness needs in some way to be tied to the actual
violation -- the specific material violation.  As long as

that's what the Court's understanding is, and I think --

        THE COURT:  Yeah.  I see what you're -- I mean if you have a material breach on this issue, your evidence can't be something else that wasn't related to the breach.  We agree on that?

        MR. ANGWIN:  Right.  Yeah.  We can't just say they were reckless with regard to something totally unrelated and that proves recklessness.  We would not do that.

        THE COURT:  Right.  Okay.

        MR. ANGWIN:  But within that, Your Honor, we're going to ask for some -- there'll probably be some evidentiary issues we need to talk about with regard to how close the conduct needs to be.  For example -- one example --

        THE COURT:  Oh, I see, similarity of acts.

        MR. ANGWIN:  Yeah.  Backdating letters.  They're going to say well backdating letters doesn't technically apply and we're going to go well, yes, it does; or they'll say we misplaced files, well that doesn't technically apply.  I can see them arguing that and we'll show how it does.  But I think that's going to be a point by point thing the Court's going to have to look at.

        THE COURT:  Okay.  Anything else then to talk about before we bring in the jury?

        MR. PAINO:  Your Honor, just one other logistical issue with respect to the emotional distress issue.  While I

understand we're going to submit additional briefing, as I
noted earlier, we believe that there will be some prejudicial
effect to allowing commentary or evidence on emotional distress
damages even at the outset of the case, and for that reason I
suspect that to the extent that the plaintiffs intend to
introduce or suggest that there's a recovery of emotional
distress during opening statements, we would find that to be
objectionable.

THE COURT:  All right.  We'll have to deal with that
as it comes then.  I see your point and I don't necessarily
disagree with you.  I think though inherent in losing your
house in foreclosure there is emotional issues that arise,
whether it is associated to your own conduct or somebody
else's.  I think that's understood by a jury so I guess I'm
just not all that concerned about it.

I think the argument that the statute is poorly
written, we all agree on that.  If I was -- either side, and I
lost on that issue I'd take it up.  Somebody needs to decide
that issue.  So I think we can anticipate an appeal.

So really down the road it's something you want to
think about too, does it make sense to you to win and then have
to fight it out for two years and then have to come back for
another trial if you're wrong.  What I think -- juries are
pretty good about going wow, you know, that's a bummer, but if
there's no place on the verdict form to put it, I don't know

how it would impact the verdict because the verdict form's

going to ask them simply what are the damages and it's going to

be some hard numbers and there's not really a way to fudge

that.  So I'm not quite sure I appreciate what the prejudice

would be, but I want to give you some time to think about that

further.  It may come up in opening statement and depending on

how it's worded --

MR. PAINO:  That's exactly it is it depends how it's

presented.  And I think while it may not have any bearing on

the baseline recovery, I think when discussions about emotional

distress damages come into play and a jury's then called upon

to make a determination as to whether punitive or the troubling

component should come into play, that's purely discretionary

under the statute.  And I think to the extent that these

emotional distress damages come in, they have the potential to

prejudice that decision as to whether to exercise the

discretion under the second clause of the statute to award the

troubling damage component.  I think that would be our concern.

THE COURT:  Maybe.  Okay.  It's something for you to

think through then because, and for the plaintiffs too, you run

the risk in mentioning it and then not being able to present

evidence on it.  So it's up to you how you want to do that.

Okay?

MR. ANGWIN:  Thank you, Judge.

THE COURT:  All right.  Anything else then at this

35

time?

MR. VITIELLO:  Just one sort of housekeeping matter, Your Honor.

THE COURT:  Yeah.

MR. VITIELLO:  Now that the 2924.10 claim has been dismissed, it's fairly clear that the verdict form will need to be reworked somewhat.

THE COURT:  Right.  Sure.

MR. VITIELLO:  If the Court has a particular deadline in mind or whether we want to hold a separate hearing about that.

THE COURT:  We're going to have time to talk about that further, but if you have time in the evenings to work through what you think is a better verdict form I think you should do that.  It was a very difficult form I thought and I didn't like how either side did it, so I made a stab at it.  So you're welcome to take it and go from there.

MR. ANGWIN:  Your Honor, I don't think it'll be better, but I think we'll take a stab at making it simpler. How's that?

THE COURT:  That'd be great.  One thing I did note and you'll probably see it too, is it did seem to me that if -- well you're right, maybe it won't matter anymore with the -- yeah, it wouldn't matter anymore, but yeah, it's a difficult form.  So --

1      MR. ANGWIN:  Yeah.  Thank you for acknowledging that.

2  We had the same issue.

3      THE COURT:  All right.  So the other thing too, we've

4  given you the list of jurors.  It has judge's list on the top.

5  We're going to give you some brackets to use in seating the

6  jury.  The judge's list is the randomized list of our jurors

7  who appeared today in the order in which they'll be called, so

8  you can anticipate who will be the next juror called if we

9  excuse somebody.  You should know though if we have a set of 18

10 and say No. 4 gets excused for hardship the next juror we call

11 will take the place of No. 4.

12     MR. SHATZ:  Oh, so No. 19 goes to No. 4?

13     THE COURT:  Right.  Okay?

14     MR. SHATZ:  Yes.  You jumped to jury and I had one

15 prior question.

16     THE COURT:  Okay.

17     MR. SHATZ:  I'm at a slight loss, disadvantage.  Our

18 client who was flying in last night was going to land -- was

19 rerouted in Dallas and is now spending a lovely morning in San

20 Francisco and is not here.  So I can't do certain things with

21 them, but I did want to talk to plaintiff for one second in

22 light of some of the things the Court has said.  So before you

23 bring in the jury may I take two minutes?

24     THE COURT:  Okay.

25     MR. ANGWIN:  And Your Honor, we will not make any

comment to the jury about the representative not being here.

THE COURT:  Okay.

MR. ANGWIN:  I know sometimes people like to do that.

(Recess from 9:18 a.m. to 9:27 a.m.)

THE COURT:  Bring in our jury please.

(Pause.)

(Potential jurors in at 9:29 a.m.)

THE COURT:  Good morning, everyone.

POTENTIAL JURORS:  Good morning.

THE COURT:  I'll ask counsel to take a seat.

I'm Judge Thurston.  I'm going to be hearing -- or handling this trial that you have been called to serve on as jury members.  What we're going to be doing today is selecting eight of you to serve on a jury on this trial.

I'd like to give you the good news and the bad news first.  The good news is, if you are not selected on this trial, then your jury service will be complete for this week.  If you are selected on this jury, then our jury -- our trial should be finished by the end of the week.  So it is a very quick trial.

If you are not going to be selected on this jury, then I do expect that you will be on your way before we take a lunch break.  Our lunch break will -- I can't promise you will be exactly at noon, but we're going to do our best to hit that time.  So if you're not called you're going to be back to your

38

normal duties by the end of the day.

          Thank you very much for coming to jury duty.  I know it is not the favorite thing people have.  I like to call it jury opportunity because rather than -- it makes it sounds maybe a little more positive and yet when I'm called on jury opportunity to state court I don't enjoy it very much either. State court -- when I've -- as a Judge I still have to go and I do sit there, generally all day and maybe sometimes get called to the courtroom.  You at least don't have to sit all day before you're called to the courtroom.  You're here already, we're going to get you through as quickly as possible.

          I do appreciate that it is an inconvenience to your schedule and I know that some of you have come from quite a long distance to be here today.  So I know counsel and the parties also very much appreciate your willingness to come today.

          Let me give you a little bit of information.  First, you're here to serve as jurors in a case called Frank Cornejo and Dora Cornejo v. Ocwen Loan Servicing, LLC., U.S. Bancorp and Western Progressive, LLC.

          As I mentioned, we're going to be seating eight of you as jurors in this case and as I told you, it's going to be a fairly quick trial.  We should complete by the end of the week.  That is very unusual in federal court.  It is not unusual in federal court to have trials that last a month, two

39

months.  We have had trials that last as long as six months.

So if you want to be on jury service, this is a very good trial for you to be on.  It will introduce you to the federal system and will get you fairly -- through the process as conveniently as possible.  If you are called on the trial I want to give you some information so that you can evaluate whether you are able to serve.

Generally we will start every morning at 8:30.  We will try to go as close to 5:00 o'clock at the end of the day as we can in order to get as much time and as much work done in one day as we can.  We'll take a morning break and an afternoon break.  We will also take a lunch break generally about 90 minutes to give you plenty of time to have a little break as well as to get your food for lunch.

I am the only Judge in this courthouse, which means sometimes things do come up that I have to attend to, even while in trials.  For example, I'm aware that someone decided to be arrested over the weekend so I will have to handle that initial appearance this afternoon, so we'll take a little break to allow that to occur as well.

Generally though, unlike in state court, you will not be sitting in the hallway, despite the fact you did that this morning, very much.  Instead you're going to be spending most of your time here in the courtroom listening to evidence.  I don't want you to go away from your jury service feeling like

40

your time was wasted, so we are going to be as aware as we can

of your schedule.

I'm sure you've already heard this as well, but if

you haven't already turned off your cell phone please do that

now.  On your breaks you will have the opportunity to consult

you email, to play Candy Crush or whatever you'd like to do;

just not while we're in session.  The last time I gave that

instruction one of the attorney's cell phone's went off during

jury selection and that wasn't pretty, so hopefully they have

done that as well.  We'll see.

Let me introduce you to our court staff.  If you're

called on this jury, then Susan Hall, the courtroom deputy here

to my left, she will be your point of contact for virtually

everything.  We also have with us today Otilia Rosales.  She is

our -- what we call our electronic recording operator, our ECRO

operator.

Everything in federal court, for the most part, in

magistrate judge's courts are recorded which means that

everything is being recorded, she is making notes as to what's

said so we can go back later if we need and look at that.  We

don't have a court reporter which is typical in state court, so

that's a little bit different.

What we're going to do now, give you a little more

room there in the audience, is to call our first 18 witnesses

-- sorry, jurors.  When we do that, the first juror who's

called, we're going to ask you to take the seat on the back

row, farthest away from me.  That way we don't have to climb

over each other to get to your seats.  If you aren't sure where

to go, we'll certainly tell you.  So let's go ahead and call

our first 18.

JURY VOIR DIRE

THE CLERK:  Buck Moore, William Stanfield, Jamie

Odom, Barnard Wamocha, Maria Kwon, Olivia Macchia, Marisol

Montero Pardo, John Lourenco, Nataxa Estrada, Shanda Lackey,

Michael Martinez, James McCloud, Robert Hemmis.

THE COURT:  And Mr. Hemmis, we have switched this up

on you.  We're going to ask you to come to the seat closest to

me on the bottom row.

MR. HEMMIS:  Yes, ma'am.

THE CLERK:  Jon Price, Patricia Beard, Janae Vance,

Barbara Mooradian, Susanne Salles.

THE COURT:  All right.  Good morning, everyone.  We

have our 18 up in the box.  I'm going to first ask questions of

everyone, including those in the audience.

First, as I mentioned, this trial is a very short

trial in terms of federal court.  It's only expected to last

between now and the end of the week, no later than that.

Keeping that in mind and keeping also in mind that you could be

called to a -- the next trial may be much longer, is there

anyone who has a hardship that makes it impossible to serve as

a jury member?  If so, if you'd raise your hand.

All right.  We have a couple of people.  We are going to ask that when you speak, to use the microphone; not because we can't hear you, but because we do need our recording system to pick it up.  So let's start -- first, Ms. Kwon, you did indicate that you have a hardship, Juror No. 2.

MS. KWON:  My medical, you know, condition.  So I'm diabetic, so now I cannot open my eyes and (indiscernible) and double vision.  So I --

THE COURT:  All right.  You have a medical condition that makes it impossible for you to serve you're saying?

MS. KWON:  But I want to -- I like to and I wish I -- to make a right decision, a honor to be here today, really appreciate and then, you know, honor to country and my county and everything, but I -- you know, someone is better than me, so I just, you know -- yeah.  I really appreciate --

THE COURT:  Okay.  Is there anything that we can do to accommodate you and your medical condition that would allow you to be able to serve?  For example, if you needed frequent breaks or something else that we could do that could assist you?

MS. KWON:  Yeah.  Hypoglycemia symptoms and then could frequently use to the restroom and -- because I'm thirsty.  So I'm a Asian woman and also my (indiscernible) something, so my doctor really, you know, gave me

(indiscernible) so --

        THE COURT:  Okay.

        MS. KWON:  Thank you.

        THE COURT:  Let's see, was there any -- there were a couple other people in the box who also have -- all right.  If you'd pass that microphone down.  This is Juror No. 10, Ms. Estrada.

        MS. ESTRADA:  I don't drive, so I don't have a car to be able to come over here.

        THE COURT:  Do you typically go to school or to a job?

        MS. ESTRADA:  No.  I'm a stay-at-home mom.

        THE COURT:  And so when you need to go some place how do you usually travel?

        MS. ESTRADA:  My mom takes me.

        THE COURT:  Is your mom able to take you in the mornings to the courthouse and pick you up in the evening?

        MS. ESTRADA:  No, because I live like far from here.

        THE COURT:  I see you're in Tulare County.

        MS. ESTRADA:  Yes.

        THE COURT:  How did you get here today?

        MS. ESTRADA:  Today my boyfriend brought me, but I don't live with him and he works night times so it would be hard for him to be bringing me.

        THE COURT:  What time does he normally get off work?

44

1        MS. ESTRADA:  At 7:00 a.m.

2        THE COURT:  So for him to -- well the other issue

3   too, if you're picked on the jury we do provide a per diem, you

4   may have gotten a little information about that already, that

5   would allow you to spend the night here and then just go home

6   at the end of the trial.  Is that something that you could do?

7        MS. ESTRADA:  No.  Well I have three children at

8   home.

9        THE COURT:  Who's caring for your children now?

10       MS. ESTRADA:  My mom.

11       THE COURT:  Are they school aged children?

12       MS. ESTRADA:  One of them.

13       THE COURT:  If you had to be on the jury and spend

14   the night here for the rest of the week would she be able to

15   stay with them, and get them off to school and take care of the

16   other two?

17       MS. ESTRADA:  No, because they have -- she has doctor

18   appointments.

19       THE COURT:  Okay.  So generally is it fair to say

20   that you're the sole caretaker for your children?

21       MS. ESTRADA:  Yes.

22       THE COURT:  All right.  When you need assistance in

23   caring for your children is it your mom who usually does that

24   for you?

25       MS. ESTRADA:  Like in what?

1    THE COURT:  Like do you have a regular babysitter?

2    MS. ESTRADA:  No, I don't.

3    THE COURT:  Okay.  If something comes up like this,

4    where you have to be some place else without your children, is

5    it your mom who usually assists you?

6    MS. ESTRADA:  Yes.

7    THE COURT:  Okay.  All right.  Was there anyone else

8    of the 18 who -- all right.  If you'd pass the microphone down

9    in front.  Let's see, it's Ms. Vance?

10   MS. VANCE:  Yes.  Thank you.  First I just wanted to

11   express my gratitude that it wasn't -- I was called to

12   Bakersfield.  Being local, that makes a big deal.

13   I am an optometrist in town and I work for an

14   ophthalmologist.  I work part time.  I work 28 hours a week and

15   I also then pick up my children Tuesday, Thursday, Friday

16   afternoons starting at 1:00 and a couple times after that, and

17   my nephew.  I -- even though I work that amount I am two-thirds

18   of our family's income and so we would be down to one-third of

19   our income and then paying more towards childcare to cover the

20   full days that I wouldn't be able to pick them up.  So that's

21   kind of the personal part.

22   Professionally, I'm in the middle of buying 50

23   percent of the practice, so our finances are very tight right

24   now between -- sorry -- legal fees and down payments and

25   everything, trying to get a practice loan.  So any backup

46

savings we had to get us through this type of thing is spoken

for.

THE COURT:  Okay.  And so the practice you're

currently working for --

MS. VANCE:  I'm not an owner currently.

THE COURT:  Okay.  And that business does not pay

their employees to go to jury duty?

MS. VANCE:  Oh, no.  In fact that was the other

point, if there's no doctor -- so I had 30 patients scheduled

for today.  If there's no doctor scheduled, then there's two

medical assistants, to opticians and a front desk person that

needs to go home as well without pay.

THE COURT:  Okay.  All right.

All right.  Anyone in the audience who also may have

a hardship and can't serve?  Thank you, Ms. Vance.

MS. REICHENBACH:  Hi.  Good morning.

THE COURT:  Good morning.

MS. REICHENBACH:  My name is Carol Reichenbach and I

am -- I have a small little business that I own and operate

myself and I have one other employee that she's actually on

jury duty also, so as it states right now I actually have a

funeral to do today and I am the person who does all that, all

the business and all the designing.

THE COURT:  Your employee I'm assuming is not here on

jury duty?

1    MS. REICHENBACH:  Pardon me.  Say that again.

2    THE COURT:  Your employee is on jury duty some place

3 else?

4    MS. REICHENBACH:  That's correct.

5    THE COURT:  And I see from the information provided

6 it's a flower shop that you own?

7    MS. REICHENBACH:  That is correct.

8    THE COURT:  And so is it -- do you get all your

9 orders in advance so that maybe you could prepare them at night

10 and then --

11    MS. REICHENBACH:  Of course not.  People call in

12 daily.  So as I stated, I do have a funeral today.  I knew that

13 Friday when I took it.  The family came in -- and so with

14 saying that, you know, I'm probably getting calls right now for

15 it, you know, from family members and other people also that

16 knows the deceased.

17    THE COURT:  So when you took that order then you made

18 arrangements for someone to be able to deliver those flowers

19 for you?

20    MS. REICHENBACH:  That is not correct.

21    THE COURT:  Okay.

22    MS. REICHENBACH:  Because my girl, she actually had a

23 call the night before, so she just called me last night and

24 said that she does not have to appear until 12:00 o'clock

25 today, then she has to call the court and see if she has jury

48

duty.

THE COURT:  Okay.  So it's really -- it sounds like the problem is that you both may have to be gone, but if one of you's there you can still kind of cover it?

MS. REICHENBACH:  That is absolutely correct too, because what you said, that this might be a -- you know, a jury end this week.  It would be the prime jury for me to be sitting on at this moment, but with her being on jury duty also, it is a hardship right now for myself.

THE COURT:  Okay.  All right.  Thank you.

MS. REICHENBACH:  You're welcome.

THE COURT:  Was there anyone else in the audience who had a hardship?  All right.

MR. SERQUINIA:  Hello, Your Honor.  My name is John Serquinia.  I live in Orange Cove.  Recently my car broke down and requires to be fixed, but it's going to cost quite a bit and at this time I'm currently unemployed and I also take care of my granddaughter which is two years old for my daughter that goes to school five days a week.  So that's my only problem.

THE COURT:  Who's caring for your granddaughter today?

MR. SERQUINIA:  Well she doesn't have school today because her teacher had some sort of meeting, so I was very fortunate to make it.

THE COURT:  Oh, so your daughter is not in school

49

today?

MR. SERQUINIA:  No, not today.

THE COURT:  And what time are your daughter's classes during --

MR. SERQUINIA:  She goes to school at 8:30 and gets off around 2:00 or 3:00 o'clock.

THE COURT:  And so are you the primary caretaker for the -- your granddaughter?

MR. SERQUINIA:  Yeah.

THE COURT:  Is there anyone else in the family who provides care to your granddaughter, even if it's not on a regular basis?

MR. SERQUINIA:  Yeah.  I'm the only one.

THE COURT:  Are there other family members in the area of Orange Cove that could provide that service?

MR. SERQUINIA:  Not my granddaughter's very familiar of and she's the -- only the one that's really attached to me, that she doesn't trust any other relatives if I won't stay.

THE COURT:  All right.  And as to your car, how did you get here today?

MR. SERQUINIA:  My brother.  Today was his day off and he was pretty reluctant to take me because, you know, he wanted to go fishing.

THE COURT:  All right.  So again, as you heard me mention earlier, that if you were chosen to be on the jury then

50

you would be able to stay over here and not have to travel.

MR. SERQUINIA:  Yeah.  I don't mind if I have to stay over, but --

THE COURT:  Your main concern is your granddaughter?

MR. SERQUINIA:  Yeah.  Well I'll have to try to make plans or talk to my daughter about seeing if we can -- she can make other arrangements, but I'll have to wait and see.

THE COURT:  What do you think the chances are of that?  For example, the child's father or paternal relatives?

MR. SERQUINIA:  Well see, his father [sic] works also.  He works five days a week and he goes to work at 10:00 o'clock and doesn't get off till about 5:00 or 6:00.

THE COURT:  Okay.  Is there anyone else who has a hardship that -- all right, sir.

MR. SHALLOCK:  Hello.  Basically I'm a businessman so I have a number of trips -- I travel outside the country.  I have a trip coming up in just two weeks to Israel, followed by another one to Egypt and I have a travel meeting in 10 days to Phoenix that I prepaid tickets for and has to do with business. And today I do have a doctor's appointment, which was hard to get, at I think it's 12 -- just before lunch, at 11:45.

THE COURT:  You're Larry Schallock, is that right?

MR. SCHALLOCK:  Yes.

THE COURT:  Mr. Schallock, you appeared pretty late this morning.

1      MR. SCHALLOCK:  Yeah.  I couldn't find the card with

2  the number on it and I called and it said call for your number.

3  No one picked up the phone.  Called again, still no one picked

4  up the phone.

5      THE COURT:  You called where?  Here?

6      MR. SCHALLOCK:  The number that's in this booklet

7  here.

8      THE COURT:  The number for Fresno?

9      MR. SCHALLOCK:  It was 559, and I tried the other

10  one.  There was no way to get it.

11      THE COURT:  You called after 5:00 o'clock on Friday?

12      MR. SCHALLOCK:  Yeah.  I called this morning at 9:00.

13  No one was -- yeah.  But I didn't have the number was the

14  problem.

15      THE COURT:  Yeah.  After 9:00 that made you more than

16  half an hour late already, so it sounds like you --

17      MR. SCHALLOCK:  Right.  I thought I'd call from home

18  before just to try to get the number and figure out what it

19  was.

20      THE COURT:  Okay.  Mr. Schallock, you mentioned a

21  trip in about two weeks, as well as a trip in about 10 days and

22  a doctor's appointment and some planning.  This trial -- I know

23  you were late, so you didn't hear me say this already -- will

24  conclude this week.  So it doesn't sound like that will impact

25  your travel plans.  Do you agree with that?

1        MR. SCHALLOCK:  Yeah.  Just being a businessman I

2   also just had some travel, have lots of people be calling me

3   that I cannot assist, which impacts my income.

4        THE COURT:  What type of business are you in?

5        MR. SCHALLOCK:  I'm in the travel business.

6        THE COURT:  Okay.  And what is the agency that you --

7        MR. SCHALLOCK:  Lambourne Travel.

8        THE COURT:  And you own that company or you work

9   there?

10        MR. SCHALLOCK:  Yes, I do, but also a working agent.

11        THE COURT:  And because I'm a local person as well I

12   know that agency and you have a number of people who work

13   there, right?

14        MR. SCHALLOCK:  I do, but when you're doing a group

15   trip, no one else in the office knows Israel.  Egypt, should I

16   say the most expertise on that.  I have people coming in with

17   deposits and payments and expecting answers.

18        THE COURT:  As I mentioned, you probably didn't hear

19   this, what I will do is give you morning breaks, an afternoon

20   break, you'll have a 90-minute lunch break and I think your

21   office -- where's your office located?

22        MR. SCHALLOCK:  Stockdale Fashion Plaza.

23        THE COURT:  Okay.  So you could probably get back to

24   your office if you wanted to spend your time at that -- or you

25   could just use your cell phone and make your calls from the

53

courthouse on your breaks.  It seems like that would be
something we could accommodate you with.

          MR. SCHALLOCK:  I do have people coming in with
payments and checks, particularly on the one coming up with the
Israel trip.

          THE COURT:  Okay.  Now the other question I had is
about your doctor appointment.  You said it's at what time?

          MR. SCHALLOCK:  11:45.  Dr. Valdez (phonetic).

          THE COURT:  Okay.  All right.  Anyone else who has a
hardship today?

          All right.  Juror No. 17.  Yes, ma'am.

          MS. MOORADIAN:  Hi.  I also have two or three
appointments this week.  I live in Selma, just south of Fresno.
The biggest -- some of the appointments of course I've had for
a couple of months.  I understand they can be rescheduled, but
physical therapy for my torn Achilles tendon is what I'm really
going to miss.  My doctor told me he could get me a note and
fax it in here.  I found out Friday.  I didn't have time to
even ask him for it.

          I also have a part-time business watching dogs and I
start a three-week trip tomorrow.  I can do my best to find
someone to take care of the dog till I get back, but nothing's
going to help me with my ankle.

          THE COURT:  All right.  So how long have you been in
physical therapy for your ankle?

54

1        MS. MOORADIAN:  Since August.

2        THE COURT:  And how many times per week do you go?

3        MS. MOORADIAN:  One or twice a week depending on the

4    appointments I can get.

5        THE COURT:  Do you have current physical therapy

6    appointments set up as you sit here right now?

7        MS. MOORADIAN:  No, because I knew that I was being

8    called to jury duty and so I didn't want to take an appointment

9    someone else could use.

10       THE COURT:  All right.  And you say -- you said you

11   had a trip that's three weeks.  Does that mean you're taking

12   care of someone's dog, that they're going to be gone for three

13   weeks?

14       MS. MOORADIAN:  Someone's going to be gone for three

15   weeks and I'm a dog sitter, so I've offered to take her dogs.

16   I can find someone for a couple of days.  I just need to kind

17   of get on that because that's effecting me and my income too

18   and just making arrangements if I'm chosen to stay.

19       THE COURT:  If you -- when you take care of the dogs

20   do you do it at the home of the person who's away or do you

21   take the dog to your own location?

22       MS. MOORADIAN:  These dogs, I go to their house.

23       THE COURT:  Okay.  Do you have someone who you can

24   generally turn to when you have a job like that and something

25   comes up that you can't do?

55

1          MS. MOORADIAN:  My 15-year-old son.  That's also an

2     issue.

3          THE COURT:  Okay.  All right.  Is there anyone else

4     who has a hardship at this time?

5          MR. YANG:  Hi.  My name is Chang.  I'm not really

6     good with my vocabulary, English and I'm self -- unemployed, so

7     I have to babysit my boy.

8          THE COURT:  All right.  It's Mr. Yang, correct?

9          MR. YANG:  Yeah.

10          THE COURT:  Mr. Yang, how long have you -- were you

11     born in this country?

12          MR. YANG:  Yeah.

13          THE COURT:  And so were your parents born in this

14     country?

15          MR. YANG:  No.

16          THE COURT:  Were you educated in this country?

17          MR. YANG:  Yeah.

18          THE COURT:  How many years of school did you attend?

19          MR. YANG:  Till my high school year, graduate.

20          THE COURT:  You graduated from high school?

21          MR. YANG:  Yeah.

22          THE COURT:  And you're telling me you don't

23     understand English?

24          MR. YANG:  Well I do, but I'm not that good.

25          THE COURT:  Are you saying that you're worse than any

56

other normal high school graduate or you're way worse than that?

MR. YANG:  I'm not too sure.

THE COURT:  Do you speak English in your home?

MR. YANG:  No.

THE COURT:  What language do you speak at home?

MR. YANG:  Hmong.

THE COURT:  Hmong?  When you were in school did you speak Hmong or did you speak English?

MR. YANG:  English for like the teachers and stuff like that.

THE COURT:  All right.  And do you -- I'm sorry, did you say you were currently working or you're not?

MR. YANG:  Unemployed.

THE COURT:  You're unemployed?

MR. YANG:  Yeah.

THE COURT:  Have you had jobs in the past?

MR. YANG:  Yeah.

THE COURT:  What types of jobs did you have?

MR. YANG:  I did restaurant, at the Japanese Kitchen.

THE COURT:  Okay.  Any other jobs?

MR. YANG:  No.  That's it.

THE COURT:  When you worked at the Japanese restaurant I expect -- did you speak English at the restaurant?

MR. YANG:  Yeah.  Kind of.

THE COURT:  What was your job?

MR. YANG:  A teppanyaki chef.

THE COURT:  So did you have to take orders and --

MR. YANG:  Yeah.  A little bit, yeah.

THE COURT:  And did you actually cook the food at the table?

MR. YANG:  Yeah.

THE COURT:  And so when the customers would place their orders were you able to understand what they were ordering?

MR. YANG:  Yeah.

THE COURT:  And they were ordering Japanese food items, right?

MR. YANG:  Yeah.

THE COURT:  Okay.  When you graduated high school were you required to submit to a high school testing exam that made you eligible for graduation?

MR. YANG:  No.  I don't think so.

THE COURT:  You don't remember taking a test that was a standardized test that everyone in high school has to take?

MR. YANG:  Oh, the high school exit exam, yeah.

THE COURT:  The exit exam, right?

MR. YANG:  Yeah.

THE COURT:  And you passed that, right?

MR. YANG:  Yeah.

58

1          THE COURT:  Was that given to you in English?

2          MR. YANG:  Yeah.

3          THE COURT:  Do you have a driver's license?

4          MR. YANG:  Yeah.

5          THE COURT:  And was that driver's license given to

6    you in English as well?

7          MR. YANG:  Yeah.

8          THE COURT:  Okay.  All right.  Anything else, sir?

9          MR. YANG:  That'd be it, but I have to take care of

10   my boys too, so --

11         THE COURT:  How old are your children?

12         MR. YANG:  He's two.

13         THE COURT:  Two?  And what does he normally do during

14   the day?

15         MR. YANG:  Play -- I don't know, just play.

16         THE COURT:  Okay.  Is the mother of the child

17   involved in his life as well?

18         MR. YANG:  Yeah.  She's working, so --

19         THE COURT:  Okay.  And do you live at home only with

20   your son and the mother of the child?

21         MR. YANG:  We live with my mother-in-law right now.

22         THE COURT:  So your --

23         MR. YANG:  But my mother-in-law, she works, she

24   farms, so she'll be at the farm everyday.

25         THE COURT:  Okay.  Are there other relatives in the

59

area where you live?

         MR. YANG:  No.  My parent, but my parent, they work
too.

         THE COURT:  Okay.  When you have -- like for example,
who's caring for your child today?

         MR. YANG:  Right now, my wife.

         THE COURT:  Your wife, she's not working today?

         MR. YANG:  Yeah.  She's working at around 3:00
o'clock to 11:00.

         THE COURT:  Who's going to care for your child at
3:00 o'clock?

         MR. YANG:  She'll just have to find somebody right
now after that.

         THE COURT:  Because she knows you're not going to be
home by 3:00, right?

         MR. YANG:  Yeah.

         THE COURT:  Okay.  So she's able to take care of
covering that today?

         MR. YANG:  Yeah.

         THE COURT:  Are her normal hours 3:00 to 11:00?

         MR. YANG:  Yeah.

         THE COURT:  Okay.  All right.  Anything else then?

         MR. YANG:  No.  That'd be it.

         THE COURT:  All right.  I kind of hate to ask this
question.  Is there anyone else who has a hardship?

All right.  Counsel, let me speak to you at a sidebar.

(Sidebar begins.)

THE COURT:  All right.  So Juror No. 2, Ms. Kwon.

MR. SPEAKER:  (Indiscernible) --

THE COURT:  We need to pick you up on the mic.  I didn't feel like you're talking loud enough, so you need to speak loud enough so we can pick you up on the microphone.  It has the static so they can't --

MR. VITIELLO:  Let me turn my back to them.  So (indiscernible) -- jury voir dire (indiscernible) --

THE COURT:  Louder.

MR. VITIELLO:  Okay.  We have no objection to dismissing No. 2 for her hardship.

THE COURT:  All right.

MR. SHATZ:  And we don't have any objection to striking two for hardship.

THE COURT:  All right.  Strike No. 2.

Ms. Estrada, she is the one who says she doesn't drive, doesn't have a car.  She's coming from Tulare County.

MR. VITIELLO:  I believed her, so we don't have a problem.

THE COURT:  No problem?

MR. VITIELLO:  No problem with striking her.

MR. SHATZ:  (Indiscernible).

THE COURT:  Ms. Estrada.

No. 16, Ms. Vance, the optometrist.

MR. VITIELLO:  She's the one whose practice --

THE COURT:  She's 28 hours a week, she has (indiscernible).

MR. SHATZ:  She's (indiscernible) emotional distress, picks up her kids at 1:00 o'clock three days a week.  I don't have any problem with her as well.

MR. SPEAKER:  I hate to --

THE COURT:  (Indiscernible) --

MR. SHATZ:  Ms. Herman, I understand because it was like (indiscernible) --

THE COURT:  Yeah.

MR. SHATZ:  (Indiscernible).

THE COURT:  Juror No. 17, she (indiscernible) --

MR. SPEAKER:  ACL.

THE COURT:  2, 10, 16 and 17 (indiscernible).

MR. SHATZ:  (Indiscernible) --

THE COURT:  Selma is south of Fresno, about 10 minutes.  (Indiscernible) -- she has physical therapy issue, but she doesn't have any appointments.  My inclination is not to let her go, but it's up to you.

MR. SHATZ:  I think our position is, Your Honor, (indiscernible).

THE COURT:  Yeah.  I'm not asking you to.

62

(Indiscernible).

MR. SHATZ:  (Indiscernible) -- I hurt my Achilles tendon, the physical therapy was amazingly necessary and very helpful, so I appreciate her courtesy of not scheduling it and I understand her hardship (indiscernible).

THE COURT:  Okay.

MR. SHATZ:  Dog walker.

THE COURT:  Dog sitter.

MR. SHATZ:  My dog sitter who stays at my house goes out (indiscernible) --

THE COURT:  So your position as to No. 17, strike or no?

MR. SHATZ:  I don't frankly have a preference.

THE COURT:  (Indiscernible).  Does anyone have any preference on Mr. Yang and the lack of English skill and a two-year-old child.  My inclination is not to strike him, but comments?

MR. VITIELLO:  I didn't really get a sense of hardship there, but (indiscernible) I guess.

MR. SHATZ:  We also think we don't really want to be here, but if you say (indiscernible) here, we're not going to argue.

THE COURT:  Ms. Reichenbach, No. 23, she's the flower shop owner.  Both she and her employee are on jury duty.

MR. SPEAKER:  Are they both using the same excuse?

1      THE COURT:  Probably.

2      MR. SPEAKER:  Most likely.

3      THE COURT:  Well she said (indiscernible) that her

4  employee wasn't called this morning she may or may not -- we

5  should have asked what the panel number is, but she's not

6  attending -- or at least until noon.  (Indiscernible) on that?

7  You know what strikes me as an issue, assuming the employee

8  gets called as well.  Hard to know.

9      MR. SHATZ:  Yeah.  I mean it seems that there's

10 probably an issue there.

11     THE COURT:  Mr. Serquinia --

12     MR. SHATZ:  No. 24?

13     THE COURT:  -- No. 24, car broke down.  He cares for

14 his granddaughter 8:30 to 2:00 or 3:00 everyday while the

15 daughter's in school.

16     MR. SHATZ:  He said he worked in some lake something.

17 I don't know what that is.

18     THE COURT:  Orange Cove.

19     MR. VITIELLO:  Orange Cove.  I don't know what that

20 is either.

21     THE COURT:  It's Fresno County, kind of a small --

22     MR. SHATZ:  (Indiscernible) two hours from here.

23     THE COURT:  Couple hours, yeah.

24     MR. VITIELLO:  I normally have absolutely no

25 sympathy, except that my car died three weeks ago.  I cannot

64

tell you how disconcerting and miserable it is, and it was bad.

(Indiscernible) -- it was just a miserable week.

THE COURT:  Sounds very --

MR. VITIELLO:  So if his brother is driving him or

not driving him --

THE COURT:  As I mentioned, the Court pays for him to

stay over (indiscernible) --

MR. VITIELLO:  (Indiscernible)?

THE COURT:  Yeah.  Federal courts (indiscernible) --

MR. VITIELLO:  State court is like $12 or $20

(indiscernible) --

THE COURT:  No.  I think it's around --

MR. VITIELLO:  -- cheap hotels.

THE COURT:  -- it's around $120, something like that.

MR. SPEAKER:  Make a good living doing that.

THE COURT:  Uh-huh.  (Indiscernible) --

(Indiscernible - discussing strikes).

(Sidebar ends.)

THE COURT:  All right.  First, Ms. Kwon, No. 2, we

are going to excuse you.  Thank you.  All right.  So Ms. Kwon,

you do need to call the 1-800 number after 5:00 o'clock on

Friday.  All right.  Thank you, ma'am.

Let's call our next chair.

THE CLERK:  Chang Yang.

THE COURT:  Mr. Yang, if you'll come forward.  You

65

can take that empty chair, sir.

Ms. Estrada, we are also going to excuse you, so we'll ask you also call the 1-800 number after 5:00 o'clock on Friday.

MS. ESTRADA:  Okay.

THE CLERK:  Matthew Somerville.

THE COURT:  Thank you, Mr. Somerville.

Ms. Vance, we are going to excuse you as well. Hopefully you can get to your 30 patients as you get back.

MS. VANCE:  Thank you so much.

THE COURT:  Next juror please.

THE CLERK:  Heather Peck.

THE COURT:  Thank you, Ms. Peck.

Ms. Reichenbach, we are going to go ahead and excuse you.  Thank you, ma'am.

And as to Mr. Yang, Mr. Serquinia and Mr. Schallock, at this time I'm not going to excuse you.  We'll see how it goes, whether you're actually selected on the panel.

So at this time what's going to happen is I'm going to be asking you some questions.  The attorneys may ask some questions after I'm finished.  The questions I'm going to be asking are generally for those who are up in the box, these 18 people up here.

For those few of you left in the audience, if you'll just pay attention because as you can see just a twist of fate

66

and you'll end up there as well.  So I'm going to ask you to
pay attention because if I do get you up in the box I'm going
to say to you anything else that -- anything that we need to
know about.  So hopefully if you've heard a question that
triggers something in your mind you can just say oh, Judge, I
remember this I need to tell you about so they don't have to
repeat the questions to you.

As to any questions though, if there's questions that
I ask you that you are not comfortable talking about in front
of everyone else, simply let me know that and what will happen
is we will complete your questioning outside the presence of
your fellow jurors.  It would still include the attorneys and
others in this case.

Before we do that though I did not allow counsel to
introduce themselves and their clients, so let's go ahead and
do that at this time.

MR. VITIELLO:  May I stand, Your Honor?

THE COURT:  Yes, please.

MR. VITIELLO:  Hi.  My name is Giandominic Vitiello.
I represent Dora Cornejo and her husband Frank Cornejo who is
unfortunately suffering from some medical issues and can't be
here today.

I'm with co-counsel John Heenan.

THE COURT:  All right.  And for the defense please.

MR. SHATZ:  Good morning.  Sanford Shatz and Brian

Paino and we're representing U.S. Bank as trustee and Ocwen

Loan Servicing, and they're on their way today also.

THE COURT:  All right.  Thank you very much.

To give you some information about this case I'm

going to give you a brief description.  First, before I do

that, I'm going to tell you that this case is being brought by

Mr. and Mrs. Cornejo.  Because they are the people who have

filed this lawsuit they're called plaintiffs.  Now the word

plaintiff does not mean anything good or bad.  It just simply

means those are the people who filed the lawsuit.

On the other hand, the defendants in this case are

Ocwen Loan Servicing, LLC, Western Progressive, LLC and U.S.

Bank as trustee.  Because they are the defendants they are

called -- or those are the people being sued, they're called

defendants.  And defendant also is just a descriptive word

saying who is being sued in this case.  It doesn't mean

anything good or bad.

Oftentimes you hear that word on TV shows or on the

news because generally they're talking about a criminal case.

This is a civil case.  This is not a case in which we're

talking about the application of criminal law.  So we still use

the same words, plaintiff and defendant, but they're just

simply descriptors.  It doesn't have any negative or positive

connotation to those words.

Just knowing what I've told you so far, that this

68

case is filed by the Cornejos against certain entities, as you sit here is there anyone here who thinks simply because someone is a plaintiff and someone else is a defendant that you know how the case should turn out?  If you think so, if you'd raise your hand at this time.

All right.  No one has done that.

And that's kind of a silly question and I'm sure you appreciate that because at this point we don't know anything about the case so we can't decide how the case should turn out. In fact, that's not something that we can even do until we've heard all of the evidence, you hear the arguments of counsel and you're back in the jury deliberation room talking about the case.

So you have an idea about this case I'm going to give you a brief description.  And by introducing the case to you please understand that I don't know anything about the case, I'm not a witness to the case.  I am providing this information because that is what the parties have provided to me.  By doing this I am not attempting to influence you or thinking about the case one way or the other.  I'm simply giving this information to you to help you decide if you recognize the case or any of the people in it.  It also is to give you sort of a context to know what the case is about.

Frank Cornejo and Dora Cornejo obtained a mortgage in July 1992 that was secured to their home located here in

Bakersfield, California.  Ocwen Loan Servicing, LLC became the mortgage servicer in 2013 and in this role handled most aspects of servicing the loan including mailing the mortgage statements and applying payments.  U.S. Bank National Association as trustee was the owner of the loan and Ocwen acted as its agent.

When Mr. and Mrs. Cornejo were unable to make their required loan payments they applied to Ocwen for a modification of their loan.  Mr. and Mrs. Cornejo submitted documents to Ocwen in connection with the request for a loan modification. The parties dispute when the documents were submitted and whether all required documents were submitted in a timely manner.

Ocwen foreclosed on the home on April 29th, 2015 and sold it to a third party.  The parties dispute whether the foreclosure sale was proper and dispute whether the loan modification application was complete at the time the Cornejos' home was sold.  The Cornejos claim the foreclosure sale was wrongful and that they are entitled to compensation.  The defendants deny and dispute these claims.

The questions I'm going to be asking you, you should know, there generally is no right or wrong answer.  The questions I ask you are simply to give us an idea whether you are the best representatives of those within the Eastern District of California to decide this case.  And again, as I mentioned, if there's something that makes you uncomfortable

70

discussing in front of others simply just let me know that.

First, do any of you know Frank or Dora Cornejo?  If you do, would you raise your hand?  All right.  No one has done that.

Do any of you know Mr. Vitiello, Mr. Paino, Mr. Shatz or Mr. Heenan?  If so, if you would raise your hand?  All right.  No one has done that.

Have you or any member of your family or close friend or close relative ever had prior dealings with Ocwen Loan Servicing, LLC, Western Progressive, LLC or U.S. Bank N.A. as trustee?  If so, if you'd raise your hand?  All right.  Let me look.  Pass the microphone.  Juror No. 11, is it Lourenco?

MR. LOURENCO:  Correct.

THE COURT:  All right, sir.

MR. LOURENCO:  I previously had an auto loan through U.S. Bank.

THE COURT:  All right.  How long ago was that?

MR. LOURENCO:  Probably 10, 12 years.

THE COURT:  Did you have any problems with that bank -- I mean with the loan?

MR. LOURENCO:  No.  I think eventually it was sold to another servicer.

THE COURT:  And did you eventually pay the loan off or sell the car?

MR. LOURENCO:  Paid the loan off.

71

THE COURT:  All right.  So your experience is just simply you had a loan?

MR. LOURENCO:  Correct.

THE COURT:  Did you get the loan originally through U.S. Bank?

MR. LOURENCO:  I think the -- it was through the dealership and they shopped it or whatever and it ended up with U.S. Bank.

THE COURT:  All right.  Did you have any role in selecting this bank as the financier?

MR. LOURENCO:  I don't remember them presenting multiple options.  I think it was that was who had the cheapest rate at the time and that's who I went with.

THE COURT:  And when you made payments did you just simply send it to an address that they gave you?

MR. LOURENCO:  It was electronically drafted.

THE COURT:  Okay.  Did you have any contact with any employees of that bank?

MR. LOURENCO:  Not that I recall.

THE COURT:  All right.  Anything about the fact that you had an auto loan through that bank that you think would impact your ability to be fair in this case one way or the other?

MR. LOURENCO:  No.

THE COURT:  All right.  Okay.  And Mr. Martinez, did

72

1   you raise your hand as well?  If you could pass the microphone

2   down please?

3           MR. MARTINEZ:  I also had an auto loan with them,

4   Your Honor.

5           THE COURT:  All right.  And how long ago was that?

6           MR. MARTINEZ:  That was probably 10 years or so.

7           THE COURT:  Any problems with that loan?

8           MR. MARTINEZ:  No, ma'am.

9           THE COURT:  Did you pay it off or sell the car

10  eventually?

11          MR. MARTINEZ:  Both.

12          THE COURT:  Okay.  And was it a bank that you

13  selected or was it just an option given to you?

14          MR. MARTINEZ:  No.  It was sold to them eventually.

15  I didn't have a choice in the matter.  I started out originally

16  with Wachovia Dealer Services and then it ended up being sold

17  -- excuse me, sold off and I just finished it up with U.S.

18  Bank.

19          THE COURT:  Okay.  Was it the same sort of situation

20  Mr. Lourenco mentioned, that you went to buy a car and that's

21  what your dealer originally had Wachovia and then --

22          MR. MARTINEZ:  Yes, ma'am.

23          THE COURT:  All right.  Is there anything about that

24  experience that would influence you in this case one way or the

25  other?

1          MR. MARTINEZ:  None that I can be sure of, you know.

2     I don't think so.

3          THE COURT:  All right.  Okay.  Thank you.

4          In the front row.  All right.

5          MS. MOORADIAN:  Ms. Mooradian?

6          THE COURT:  Yeah.  I'm sorry, I was going to ask you

7     how to pronounce it.

8          MS. MOORADIAN:  Okay.

9          I guess I'm not being excused, huh?

10          THE COURT:  Not at this time.

11          MS. MOORADIAN:  I'm retired from U.S. Bankruptcy

12     Court.

13          THE COURT:  Okay.

14          MS. MOORADIAN: So I do recognize the name U.S. Bank

15     and Ocwen as being creditors in numerous dealings including

16     motions for relief from stay that we handled in court.

17          THE COURT:  Okay.  So the bankruptcy court in the

18     Eastern --

19          MS. MOORADIAN:  In Fresno.

20          THE COURT:  Oh wow.  Okay.  What judge did you work

21     with?

22          MS. MOORADIAN:  Judge Lee and Judge Reimel (phonetic)

23     at the time.

24          THE COURT:  Okay.

25          MR. MOORADIAN:  I understand Renee Elestrado

74

(phonetic) is a new judge there?

THE COURT:  Uh-huh.

MS. MOORADIAN:  Okay.

THE COURT:  Great.  How long have you been retired?

MS. MOORADIAN:  Since 2008, after the last big boom.

THE COURT:  Okay.  And in that time period then I do recall there was a lot of bankruptcy filings.

MS. MOORADIAN:  Yes.

THE COURT:  And so what you saw -- were you a courtroom deputy or some other role?

MS. MOORADIAN:  No.  Case administrator.

THE COURT:  Case administrator.  Okay.  And so in that role you saw cases in which people who filed for bankruptcy had loans of some sort through Ocwen or one of the other defendants, is that right?

MS. MOORADIAN:  Yes.  And the cases and difficulties in trying to keep their house.

THE COURT:  Okay.  And in this instance you don't recall -- I'm not meaning to imply anything, but you don't remember the particular parties of this case being involved in something in the past?

MS. MOORADIAN:  No.  Not from that long ago. Absolutely not.

THE COURT:  All right.  And so you remember circumstances in which one or more of these defendants filed

75

for relief from the stay in order to pursue further activities

with the filer of the bankruptcy act, is that right?

MS. MOORADIAN:  Right.  They would attempt to work

out whatever they could, usually in an effort to save their

house.

THE COURT:  All right.  In those experiences did you

form opinions, without expressing them one way or the other, as

to any of these companies that you think would impact your

ability to be fair in this case?

MS. MOORADIAN:  Yes.

THE COURT:  Okay.  And understanding that, of course,

having worked for the court, that every situation is different,

would you be able to set aside those feelings, whether they're

good or bad, and decide the case only on the evidence presented

here and, I know it's a difficult thing to suggest, but setting

aside and not even thinking about the other experience you had

in your past role?  Could you do that?

MS. MOORADIAN:  I would try.

THE COURT:  Okay.  And having served in a court,

although bankruptcy doesn't do jury trials, you do understand

that in any trial, whether it's before a judge or a jury that

to start a trial I like to imagine a starting line and it's a

big white line, and all of the parties have their toe right on

the line.  Nobody gets to have a toe across the line or five

feet behind or forward.  Can you commit to the parties that in

starting this case right now everyone's toe is on that line or

for you is somebody's toe a little bit ahead or somebody's toe

a little bit behind?

MS. MOORADIAN:  Oh, I like to think that they're

starting fresh from the beginning.  I can't promise that I

won't see something that I've seen in -- similar, something

I've seen in a past case.

THE COURT:  Right.  But we all --

MS. MOORADIAN:  I can't promise I won't remember.

THE COURT:  Right.  We all have experiences that we

bring to jury service.  I'm not asking -- it's maybe a little

dated now, but you remember that movie with -- shoot, I can't

remember what it's called, where they came up and they did the

little camera thing and it wiped your brain and you couldn't

remember anything anymore?

MR. SPEAKER:  Men in Black.

THE COURT:  What was it?

MR. SPEAKER:  Men in Black.

THE COURT:  Men in Black, right.  So we don't -- I

mean that would be ideal I guess if we had that little camera,

but we don't.  So everyone's going to bring your experience.

I'm not asking you to set aside your common sense.  In fact,

we're going to ask you to keep ahold of that pretty firmly.

But what we're trying to do is make sure that you

don't go I've seen this ten times before and even though I

77

don't have any evidence on this I'm going to assume this is No.

11.  Can you assure the parties and should they be confident

that you can do that?

MS. MOORADIAN:  I can assure them that I will give

them my best shot.  And I can go into it fairly, but it's hard

not to look back at a lot of people that lost a lot of things

and not have a little bit of empathy there.

THE COURT:  Right.  And of course it's natural to

have that, but you do appreciate that, especially being in

bankruptcy court, some people get there for reasons that the

rest of us could never even contemplate and some people get

there for legitimate -- just, you know, that's the way things

happen.

At this point as you sit here today, you don't have

information as to whether anyone here did anything wrong

instead of this just being a series of events, right?

MS. MOORADIAN:  Absolutely.

THE COURT:  So as you --

MS. MOORADIAN:  I just wanted to bring it to

everyone's attention that I've seen and dealt with some cases

like this in the past and that I am from the courts.  And so

everyone should --

THE COURT:  Be aware of that.

MS. MOORADIAN:  -- be fairly warned.

THE COURT:  Okay.  So I'm going to hit you with a big

78

question then.  Is there any reason, based upon that information, that you would be unable or could be unable to be fair and impartial in this case?

MS. MOORADIAN:  My empathy would be my biggest concern.

THE COURT:  And you're saying you can't set that aside?

MS. MOORADIAN:  I'm trying.  I want to start -- I would want to start from the beginning and just be absolutely fair, but it's hard.  Bad things happen to good people.

THE COURT:  Okay.

MS. MOORADIAN:  And I believe that and I hope that doesn't affect my judgments one way or the other.

THE COURT:  All right.

MS. MOORADIAN:  I'm just trying to be really honest.

THE COURT:  I appreciate that.  That's all we can ask for.

Is there anyone else who (indiscernible) dealings with them?  All right.  Thank you.  A hand.  I don't think I recognize anybody, but is there anyone who knows me or the court staff that I introduced to you?  If so, if you'd raise your hand.  All right.  No one has done that.

Have any of you served on a jury panel before or been a witness in a case that involved any of the attorneys or the parties?  If so, if you'd raise your hand.  All right.  No one

79

has done that.

I'm going to read to you now the list of witnesses in this case.  The purpose of doing this is see if you recognize any of these names.  Lance Ablin, Rashad Blanchard, Dora Cornejo, Herman Ernie Cortez, Stephanie Spurlock.  Do anyone know any of those people that I've read off?  All right.  No one has raised their hand.

Do any of you have any feelings toward any of the parties, the attorneys or the witnesses I have read that you think would impact your ability to be fair in this case?  If so, if you'd raise your hand.  All right.  No one has done that.

A party, an attorney or a witness may have a different national origin than you, maybe of a different race or ethnicity, may have a lifestyle that's different than yours. If that is the case, does anyone think that that would impact your ability to be fair in this case?  If so, if you'd raise your hand.  No one has done that.

Have any of you heard of this case before today?  No one has raised their hand.

Have any of you heard anything about the parties or the lawyers that you think could cause you to be unfair in this case?  If so, if you'd raise your hand.  No one has done that.

Have you, your spouse, significant other, close friend or close relative ever sued anyone or ever been sued by

80

anyone?  If so, if you'd raise your hand.  All right.  No one
has done that.

        Have you, your spouse, significant other, close
friend or close relative ever been a witness at a trial?  If
so, if you'd raise your hand.  All right.  No one has done
that.

        Do any of you have any feelings or beliefs that would
make you opposed to anyone who files a lawsuit or anyone who
defends a lawsuit?  If so, if you'd raise your hand.  No one
has done that.

        Now this is going to be a hard question.  Do you,
your spouse, significant other, close friend or close relative
have friends who are attorneys, judges or are court personnel?
If so, if you'd raise your hand.  All right.  Well we have a
couple.

        All right.  So Mr. Somerville.

        MR. SOMERVILLE:  Yes.  I have a cousin who is a
district attorney down in San Diego.

        THE COURT:  All right.  And is your cousin the actual
district attorney or assistant or a deputy attorney?

        MR. SOMERVILLE:  Assistant.

        THE COURT:  Okay.  How long has your cousin been in
that office?

        MR. SOMERVILLE:  I think around four years.

        THE COURT:  Do you know what area of law your cousin

81

practices?

        MR. SOMERVILLE:  No.  I'm not sure.

        THE COURT:  All right.  How often do you see your cousin?

        MR. SOMERVILLE:  Two or three times a year.

        THE COURT:  When you see your cousin do you talk about his or her work?

        MR. SOMERVILLE:  Yes.  Just in talking.

        THE COURT:  In general terms?

        MR. SOMERVILLE:  Right.

        THE COURT:  Do you know whether your cousin actually handles criminal proceedings that are, for example, white collar or regular criminal case?

        MR. SOMERVILLE:  Yes.  Criminal cases, dealing with children right now.

        THE COURT:  All right.  So some sort of crimes against children?

        MR. SOMERVILLE:  Yes.

        THE COURT:  Do you know if that's been the entirety of your cousin's career in the D.A.'s Office?

        MR. SOMERVILLE:  No, it hasn't.  I'm not sure what she did prior.  I just recently found out that she's working with children.

        THE COURT:  All right.  Any other attorneys, or court staff or judges that you know?

82

1    MR. SOMERVILLE:  No.

2    THE COURT:  Anything about the fact that your cousin

3  works in the D.A.'s Office here in San Diego that you think

4  would impact your ability to be fair in this case?

5    MR. SOMERVILLE:  No.

6    THE COURT:  All right.  Thank you.

7    And Mr. Lourenco.  All right.  (Indiscernible).

8    MR. LOURENCO:  I have a friend who's a Fresno County

9  Sheriff who works in the courthouse.

10    THE COURT:  As a bailiff?

11    MR. LOURENCO:  He's in the courtroom with the judge.

12  I'm not sure what the official title is.

13    THE COURT:  Okay.  Do you know how long he's had that

14  assignment or she's had that assignment?

15    MR. LOURENCO:  He's had that for five or six years.

16    THE COURT:  Do you know how long he's been in the

17  sheriff's department?

18    MR. LOURENCO:  The same amount of time.

19    THE COURT:  So the entire time he's been assigned to

20  the courtroom?

21    MR. LOURENCO:  Yeah.  He's never been on the street.

22    THE COURT:  Okay.  In that role, do you know if he

23  makes arrests while at court?

24    MR. LOURENCO:  He hasn't specifically mentioned he

25  has.  You know, people kind of get out of hand and so there's

83

times where he has --

THE COURT:  He generally deals with safety issues in the courtroom?

MR. LOURENCO:  For the most part, yes.

THE COURT:  Okay.  Does your cousin --

MR. LOURENCO:  Friend.

THE COURT:  I'm sorry, your friend.  Does your friend talk to you about his work?

MR. LOURENCO:  In generalities, yeah.

THE COURT:  Okay.  Does he tell you about things he sees happening in court sometimes?

MR. LOURENCO:  Yes.

THE COURT:  All right.  I imagine the stories he tells you are --

MR. LOURENCO:  Amusing.

THE COURT:  All right.  Sadly our trial will not be that way.  It will be very serious.  I'll try to keep it as entertaining as I can.

MR. LOURENCO:  I appreciate that.

THE COURT:  So as to your friend's work there in the courtroom, is there anything about the stories he's told you or his job in particular that you think would impact your ability to be fair in this case?

MR. LOURENCO:  No.

THE COURT:  All right.  And you understand this is

not a criminal case, right?

MR. LOURENCO:  Yeah.  He doesn't -- he's not in the criminal courthouse.  He's in the family courthouse.

THE COURT:  Okay.  And so family law proceedings seem to be much different than other types of proceedings which is probably why you have the stories that you do, and you understand that there are different burdens of proof between a criminal case and a civil case?

MR. LOURENCO:  Correct.

THE COURT:  All right.  And of course.  I don't think I still heard how to pronounce your name correctly yet.

MS. MOORADIAN:  Mooradian --

THE COURT:  Mooradian.

MS. MOORADIAN:  -- or Mooradian.

THE COURT:  However people get it out, huh?  All right.  Ms. Mooradian, obviously you know a lot of people in the bankruptcy court at least.

MS. MOORADIAN:  Yes.  Judge Elestrado, Judge Lee, Judge Reimel which I'm not positive they're still there.

THE COURT:  Judge Lee is actually.

MS. MOORADIAN:  Okay.

THE COURT:  On a recall status.

MS. MOORADIAN:  Well is Judge Forn (phonetic) still on recall status?

THE COURT:  I'm not sure about that.

1          MS. MOORADIAN:  Okay.  I know John Vincent.

2          THE COURT:  I'm sorry, is he a trustee or staff?

3          MS. MOORADIAN:  I thought he was head of the U.S.

4   Attorney's Office at one point.  He may have retired.  I'm

5   retired from the government now too, so -- I also know Judge

6   John Cappertan (phonetic), Judge John Conklin.  A lot of my

7   former attorneys are now prosecutors -- or I'm sorry,

8   prosecutors are now judges.

9          THE COURT:  Right.

10         MS. MOORADIAN:  I know most employees of the

11  bankruptcy court in Fresno.  I still know a few of the old-

12  timers from district court.

13         THE COURT:  Okay.

14         MS. MOORADIAN:  And a lot of law enforcement --

15         THE COURT:  Right.

16         MS. MOORADIAN:  -- from every federal agency that

17  comes with that.

18         THE COURT:  Right.  Okay.  And so you realize I'm

19  going to ask you you've had these relationships your entire

20  career I assume?

21         MS. MOORADIAN:  Yes.

22         THE COURT:  How long were you at the bankruptcy

23  court?

24         MS. MOORADIAN:  The bankruptcy court, 15 years --

25         THE COURT:  Were you --

86

1      MS. MOORADIAN:  -- for a total -- I was with the U.S.
2  Attorney's Office and the Department of Justice and a criminal
3  investigator for the other 20 -- sorry, the other 10 years.
4      THE COURT:  So the other 10 years was with the U.S.
5  Attorney, just in different roles, is that fair?
6      MS. MOORADIAN:  Yes.
7      THE COURT:  Okay.  So you've had your entire career
8  within the federal court family at least?
9      MS. MOORADIAN:  Yes.
10     THE COURT:  Given that, is there -- do you think that
11  that experience would impact your ability to be fair in this
12  case, other than what we talked about already of course?
13     MS. MOORADIAN:  Basically, to me it takes a lot to
14  get a trial evidence wise, to bring it in.  So if it's come
15  this far it is serious and there are two sides to every story.
16  I used to be really pro-prosecution.  Then I got into
17  bankruptcy court and the empathy started kicking in.  So I'm
18  torn between two sides.
19     THE COURT:  So in essence you're equally -- can you
20  say you're equally partial to both sides then?
21     MS. MOORADIAN:  To a certain extent, yes.
22     THE COURT:  Okay.  Just for everyone's understanding
23  that trials happen in different ways, the way to get to trial.
24  Every case that's filed in our court is serious.  I don't mean
25  to put anything over the state court, but federal court has

different standards in filing cases.  You can't just bring any, you know, slip and fall somewhere into this courthouse.  So every case that is filed in this courthouse or into the bankruptcy court are very serious matters.

The fact that this case has come to trial, I don't think you should draw any conclusions one way or the other though because every case that comes in is a very serious case.  We take them all very seriously.  So the fact that it's here doesn't mean that it has less or more bearing than any other case that's filed in this courthouse.

All right.  Anyone else, U.S. courts -- yes.  Let's see, Juror No. 8, Ms. Lackey.

MS. LACKEY:  I apologize.  I need to go two questions back.

THE COURT:  Okay.

MS. LACKEY:  It didn't come to mind immediately because I don't think it has anything to do with this case whatsoever.  My brother was injured with BNSF, the railroad and did sue, and it went on for several years.  It went to -- the railroad did apply all the way to the Supreme Court and it was denied and then stopped at that level.  So it was settled earlier this year.

But again, it's such different circumstances I don't think that it would influence my thinking one way or the other in this case.

88

THE COURT:  All right.  So do you think it makes you more partial to people who do file lawsuits, or those who defend them or you just don't have an opinion one way or the other?

MS. LACKEY:  I really don't.  I'm -- probably prior to that I would be more negative on people who sue for injuries, but I do know that my brother's injuries are real and I've seen the suffering.  So I see that there are legitimate reasons why people do need to sue.  So I don't -- I really don't feel like I'm biased one way or the other.

THE COURT:  I think that's probably a pretty common thing.  You see things in the paper and you think holy cow, you know, somebody's got some hot coffee.  Then you hear that someone who was seriously injured because the coffee, I don't know, is poison.  You know, so you can't just draw conclusions because of the lawsuit.  Does everyone agree to that?

Did anyone who had problems with the concept that there are good lawsuits and bad lawsuits, good judges, bad judges, good lawyers -- there's -- we have all types of everything.  I think we all agree to that, right?  Does anyone have a problem with that?  If so, if you'd raise your hand.  No one does.

All right.  And then you also indicated you know some attorneys and court staff?

MS. LACKEY:  I apologize.  I don't.  I just felt like

89

I needed to respond to your previous question.

        THE COURT:  All right.  Is there anything -- I think
I asked you that already.  You think you can set that
experience aside and judge this case solely on the evidence
that's presented here?

        MS. LACKEY:  Correct.

        THE COURT:  All right.  Thank you.

        Anyone else who -- yes.  Hang on.  Let's see, that
must be Ms. Beard.

        MS. BEARD:  Yes.  I know K.C. Twisselman just as
social.  He married us.  So he's a judge here in --

        THE COURT:  That's funny.  I've never heard him
called K.C.

        MS. BEARD:  Well that's all we call him.  His
initials are K.C.

        THE COURT:  And yet I've still never heard that
before.  I never even put that together.  So you know Judge
Twisselman?

        MS. BEARD:  Yes.

        THE COURT:  And you've been friends with him for some
time?

        MS. BEARD:  My husband for a long, long time.
They're both cattle people and we see him socially at least
once a year.

        THE COURT:  All right.  Does Judge Twisselman talk

90

about his work when you see him?

MS. BEARD:  Not if he can help it.

THE COURT:  All right.  Maybe the occasions that he has, is there anything about what he's told you that you think would impact your ability to be fair in this case?

MS. BEARD:  No.  He really never talks -- the only time I see is if we read about him in the paper.

THE COURT:  Okay.  How often do you see Judge Twisselman?

MS. BEARD:  About once a year.

THE COURT:  Okay.  And I assume you see him once a year or so that his job doesn't really come up?

MS. BEARD:  No, not at all.

THE COURT:  I would think too when you see things in the paper, as I do, those are cases that are currently before him and that there's just no way he's going to talk about them even if he wanted to.

MS. BEARD:  No.

THE COURT:  All right.  Can you think of anything that he has shared with you in the past about his work?

MS. BEARD:  No.

THE COURT:  All right.  Anyone else who knows court staff, judges or attorneys?  All right.  No one else.

Does anyone have any legal education or training, meaning you went to law school, or you went to paralegal

91

school; anything like that, or you had a type of job where you learned legal training on the job?  Yes, Juror No. 17, Ms. Mooradian.

MS. MOORADIAN:  I did take a slight break from my career where I worked at Oklahoma City Law School for the dean of the law school and attended one semester of law school.

THE COURT:  And then you got out while you were smart.

MS. MOORADIAN:  Exactly.

THE COURT:  All right.  So in that first semester of law school I guess you were probably talking about contracts, torts, maybe some common law, yes?

MS. MOORADIAN:  Real basic stuff quite a few years ago.

THE COURT:  And while you were working for the dean of that law school, how long -- well first, how long did you work there?

MS. MOORADIAN:  Approximately eight months.

THE COURT:  Okay.  And did that overlap with the time that you were actually in law school?

MS. MOORADIAN:  Yes.  Tuition was free.

THE COURT:  Okay.  And even still it wasn't a good buy then.  So when you were in law school or working for the law school I'm sure you came into contact with some concepts of law and you appreciate already, of course, that there are

different burdens of proof between this case and even some of
the requirements of bankruptcy court, you understand that as
well?

Would you be able to set aside the information you
learned at law school, whether in school or working for the
school or at the bankruptcy court, and apply the law as I give
it to you even if it contradicts something that you know from
the past?

MS. MOORADIAN:  Yeah.  Laws change all the time.

THE COURT:  All right.  And also, if I instruct you
say as to one burden of proof and you think wow, I seem to
recall Judge Lee did it differently.  Would you be able to set
aside what Judge Lee told you?

MS. MOORADIAN:  Hopefully, but I'm a big believer in
burden of proof.

THE COURT:  Well he's a very smart man, but if I tell
you I don't know what he would say in this instance, but I know
and this is what the law is, you would do what I instruct you
is the law, yes?

MS. MOORADIAN:  Correct.

THE COURT:  All right.  Thank you.

Anyone else who's had legal training?  No one else
has.

All right.  Ladies and gentlemen, we've been going
for a while and I'm going to ask that we take a quick break.

93

Let's give you about 10 minutes or so.  What I'm going to ask you to do is you can leave the courtroom, you can use the facilities as you like and be back outside the courtroom and we'll begin again after that.

Before we do that though I do want to give you an admonition that is something that I'm going to maybe not express to you every time we break, but it is something that I want you to keep in mind every time we do have a break and that is that you are not to form or express any opinions about this case, not to let yourself be exposed to any outside report or comment, to not electronically access any information about the case or any subjects related to it and that you don't do any research, investigation or inquiry on your own.

This is a fairly small courthouse.  That means that the attorneys and the parties will be sharing your bathrooms out in the public area, so you will see them.  I'm going to ask that you not engage with them.  You don't have to chat with them, even about anything.

And the reason I do that is, you know, let's say you just happen to say hi to one of the attorneys and the attorney on the other side sees it.  We don't want to give any impression that you have, you know, chatted it up with anyone. I'm not saying you need to be rude and -- but to the best that you can, try to avoid them and they will do the same.  They're not being rude either, they just don't want to give any

appearance of trying to influence you.

All right.  So if you'll go ahead and take your break.  Thank you very much.

(Potential jurors out at 10:38 a.m.)

THE COURT:  All right.  We are outside the presence of the jury.  And I have obviously is the concerns of Ocwen is Ms. Mooradian.  Comments about Ms. Mooradian at this point?

MR. ANGWIN:  Ms. Mooradian, No. 17, comments?  Just brainstorming, it seems like she would be able to be fair.  It seems like she doesn't necessarily want to be here, but it seems like she would be able to put that aside.(indiscernible).

THE COURT:  How about from the defense?

MR. SHATZ:  It seems like she's wanting to say something, but hasn't said it yet and she's harboring a claim against someone but I haven't figured out who yet.

THE COURT:  I don't disagree with you.  I was being very careful for the reason I think she's going to say something that we can't risk her saying.  So I have a couple of suggestions.  It's going to be after the break.  We bring her in here and just ask her flat out what her opinions are, because I do think she's got things she hasn't expressed.

And my concern to you is just by the fact she worked for the bankruptcy court.  She is not following my leads, and usually when I question a witness or a juror I have -- they will commit to be fair.  I did not hear that commitment from

her, so at this point I'm not yet confident that she's willing

to (indiscernible).

　　　So we'll take our break now and before we come back

in from break, bring her in and ask her exactly what her

opinions are.  All right?  Anything else for the record at this

time?

　　　MR. SHATZ:  Thank you.

　　　THE COURT:  All right.

　　(Recess from 10:40 a.m. to 10:54 a.m.)

　　　THE COURT:  Yes, back on the record.

　　　And on -- we have Ms. Mooradian here, Juror No. 17.

　　　Ma'am, we brought you in here because I was kind of

careful -- you don't have to stand unless you just prefer it.

　　　MS. MOORADIAN:  For my ankle I'm going to stand for a

little bit.

　　　THE COURT:  Okay.  So I asked you some questions

earlier and I was being kind of careful about it because I

didn't want you to just blurt out your opinions, but I got the

impression that in your work with bankruptcy court you did run

into one or more of the defendants in cases.  It struck me that

you did form an opinion that was either negative or positive

about one of those.

　　　So rather than ask you within the presence of the

other jurors I have brought you in here to do that so --

because I think it's important that the parties understand

96

where you stand.

MS. MOORADIAN:  Thank you.

THE COURT:  Could you please express that?

MS. MOORADIAN:  From here?

THE COURT:  Yes.

MS. MOORADIAN:  Yes.  I did not want to taint any other jury members.  I did, in my time in bankruptcy, and we had two huge booms for the Eastern District with over 10- to 15,000 bankruptcies filed in a year.  Both of them were caused, from what I saw, mostly by banks and reselling of loans and putting people -- and that's my empathy that kicks in, is I feel bad for myself, as a homeowner, or anything that would be in that situation and possibly have to file bankruptcy.

I know no details of this, but to be in that kind of situation and still having a major corporation with all this money coming at you is just -- I just see how hard it makes it for everybody, so I -- I wish I could promise you that I would not show any empathy, but I also -- I do believe in being fair.

THE COURT:  Now you said that you saw a number of cases that involved one of the defendants.  Can you give us an estimate of how many cases that was?

MS. MOORADIAN:  Over 15 years I would have to say hundreds of years [sic] with -- at least with U.S. Bank.  Am I saying it wrong, Ocwen?

THE COURT:  Ocwen.

1      MS. MOORADIAN:  I've heard of it.  Don't know a lot.

2  I wouldn't even -- after eight years of being out of there

3  wouldn't know any of the attorneys or anyone with there, but I

4  do kind of know of the companies and unfortunately I probably

5  have formed an opinion.

6      THE COURT:  And what is that opinion?

7      MS. MOORADIAN:  That the banks took advantage of

8  individuals during that time so that the banks could make all

9  the money that they can and that some good people suffered

10  because of it.

11      THE COURT:  Now in your mind is there a time period

12  you're thinking of or is -- do you think that has continued

13  since you leaving the bankruptcy court?

14      MS. MOORADIAN:  From friends still at the bankruptcy

15  court is sounds like it still continues, but we don't go into

16  any specifics of names or anything.

17      THE COURT:  Okay.

18      MS. MOORADIAN:  Just the amount of motions and the

19  different things that they have.

20      THE COURT:  Would you be willing to say that in some

21  of the bankruptcies you saw people lost their homes in some

22  part at least maybe, maybe you would agree with this, due to

23  their own mismanagement and that some people lost their homes

24  based upon your opinion that the banks took advantage?  Could

25  you allow for that, that it wasn't always the banks at fault?

98

1      MS. MOORADIAN:  Absolutely.  It was not always the

2  banks' fault.

3      THE COURT:  Given you can allow for that, can you say

4  that it happened half the time it was the borrower's problem,

5  half the time it was the bank, or do you think you have a

6  different proportion on that?

7      MS. MOORADIAN:  I couldn't even give you a

8  proportion.

9      THE COURT:  Okay.

10      MS. MOORADIAN:  A lot of people that were forced into

11  these were due to medical bills and other things that should

12  not have had anything to do with the housing, but still my

13  empathy for somebody when they lose -- whether -- if it's their

14  own fault, the empathy goes away, but I myself have a lot of

15  medical bills.  I know how difficult it is.

16      THE COURT:  Now in the periods you're talking about,

17  those were some of the periods that we were seeing the national

18  economy, some terrible things happening and people were losing

19  jobs and were not able to make their payments.

20      Are you saying that particular situation that you

21  felt like the banks were not being -- I don't know what the

22  words are -- maybe lender friendly, that they were not

23  attempting to work it out?

24      MS. MOORADIAN:  In my personal opinions, banks were

25  selling off loans to other people to make profit, and the other

99

people weren't necessarily charging the same fair interest rate
and put people continually in a downward spiral where their
balances were just raising farther and higher than any payments
they could make.

THE COURT:  Okay.  And you realize that in some of
those situations it's because the borrower had entered into the
loan that was a variable rate loan, or required some sort of
balloon payment that put them in a situation that they maybe
didn't anticipate because of the downturn in the economy, but
in terms of their loan, did give them reason to anticipate that
that could happen, do you agree with that?

MS. MOORADIAN:  I agree with that.  I also agree that
some loans weren't presented openly and honestly to some
people --

THE COURT:  Okay.

MS. MOORADIAN:  -- and they felt they were taken
advantage of.

THE COURT:  Okay.

MS. MOORADIAN:  Again, I was there when the Chapter 7
requirements -- probably like nine years ago when Chapter 7 was
no longer going to be a get out of jail free pass and so that's
when we had 12 to 15,000 filings that year.

THE COURT:  Okay.

MS. MOORADIAN:  And so some people there were taking
advantage of the system.  It goes both ways.

THE COURT:  All right.  And I do appreciate that.
You were just telling us your honest opinion.  That's all we
can ask for, but I do want to make sure, do you think we've
gotten all your opinions on the topic or there are some
strongly known feeling that you don't feel like you've
expressed yet?

MS. MOORADIAN:  No.  My biggest thing is that during
my times in the court I felt like I saw some people possibly
taken advantage of.  I also saw people taking advantage.

THE COURT:  Okay.  And in this instance you can't
tell at this point --

MS. MOORADIAN:  I have no information.

THE COURT:  In fact you don't know whether either
side took advantage?

MS. MOORADIAN:  Exactly.  I would assume that's what
we're here to find out.

THE COURT:  Right.

MS. MOORADIAN:  Of course I guess it would be the
plaintiff that I would put more you need to prove it to me.  So
I would be a little -- asking a lot more from them.

THE COURT:  You do appreciate that of course the
plaintiff does have the burden of proof in this case, at least
on that issue.  And of course if the plaintiffs cannot prove it
by a preponderance of the evidence, then your verdict would
have to be for the defendants.  On the other hand, if the

plaintiffs do meet that burden, do you have any problem

awarding judgment in favor of the plaintiffs?

MS. MOORADIAN:  No.  However everything plays out, I

just maybe have a little stricter guidelines that I would

hope -- and I would hope that I would not bring any of my legal

knowledge of the different terms and stuff used and try to read

more into something than there is.

THE COURT:  Okay.  You said a couple things I just

need to drill down on a little bit.  You said that you have

some stricter standards.  I'll tell you that the only standard

that you can apply in this case is the proof by a preponderance

of the evidence as to the elements of the claims that I'm going

to give you.  Could you set aside your personal, well I would

have a stronger requirement, and instead go with the one what I

tell you has to be the standard?

MS. MOORADIAN:  Yes.  I think I can.  I just like to

really believe I am a fair person.

THE COURT:  Okay.  I actually need more than

though --

MS. MOORADIAN:  You need me to commit and say --

THE COURT:  I need a commitment from you that you can

or you can't.  And if you can't, then it's time to say so.  In

fact, that's your obligation because we don't want anybody to

later on think I don't know what's going on in that jury room

because we want everybody to be deciding the case in the same

way.  You understand that.

So we need from you a commitment that you can and will be fair, you'll set aside your experience at the bankruptcy court and your legal training and you will judge this case only on the evidence as presented and the law as I give it to you.  Can you commit to us to do that?

MS. MOORADIAN:  I'm sorry, I don't think I could be 100 percent fair.

THE COURT:  All right.  I don't know if counsel wants to inquire on this limited issue?

MR. VITIELLO:  May I stand, Your Honor?

THE COURT:  Yes.

MR. VITIELLO:  Hi.  So the question is I heard you say a couple of times that you understand that there's a burden of proof, that the Judge is going to instruct you on the law and it sounded like you would be able to apply, or at least you're confident that you would be able to apply those instructions and those laws to the facts that you learn over the course of the case, but then you ended with that you don't think you could be impartial.  So I think there's a bit of a confusion there.  Let me just try to close the loop on it.

If you were following the Judge's instructions as you've indicated that you'd be willing to do after hearing all of the evidence, would you be able to be fair with respect to the law that the Judge will instruct you on and the facts that

are presented to you?

MS. MOORADIAN:  Yes, I feel like I can.

MR. VITIELLO:  Thank you.

MS. MOORADIAN:  My biggest fear is going into deliberations with the jury and spewing out something that I shouldn't be.

MR. VITIELLO:  That's a fair answer.  Thank you very much.

THE COURT:  All right.  Anything else to ask this juror at this time?

MR. SHATZ:  No, Your Honor.

THE COURT:  All right.  Ms. Mooradian, if you'll step outside for just a moment and we'll (indiscernible).

(Juror 17 out.  Pause.)

THE COURT:  All right.  We're outside the presence of all the jurors.  I think she wants off this jury.  I don't know that she's going to do what you just said, but I don't know that she's not.  She would not commit to me that she will be fair despite the rehabilitation that you did do with her.  My impression was she thought wow, maybe I've just made it so I have to stay on this jury, so she shot something else out.  I don't know, but I'm not really willing to risk that.  At this time it would be my intention to strike her.  So are there comments on that?

MR. VITIELLO:  Your Honor, I mean I think it sounds

like she probably would be able to be fair and that she does probably want off the jury, but I understand the concerns of the Court of course.

THE COURT:  I think as a former member of the court staff of the bankruptcy court she does appreciate her obligations.  I can't tell though how much of what she's saying is an honest belief, although to be frank we do know that a lot of the housing meltdown in bankruptcy they saw a ton of cases and so I don't want to minimize her comments or make them seem like they're not true.  I just can't figure she wants to be off this jury more than she wants to be truthful and I just can't tell.

Comments for the defense now?

MR. SHATZ:  Totally agree, Your Honor.  I don't have a strong and great confidence that she has established that she would be fair and impartial.

THE COURT:  All right.  I don't feel like I have been able -- and I'm usually pretty good at being able to rehabilitate, but she keeps wiggling.  So at this -- we'll call the panel in and then I'll excuse her at this time.

Our next juror, as you know, is going to be Mr. Espinola.

All right.  Let's bring back our jurors.

(Potential jurors in at 11:08 a.m.)

THE COURT:  We have all of our jury members back in

their places.  I said to you I'm not going to keep you hanging around in the hallway and that's exactly what I did, very first time, so I do apologize for that.

We at this time are going to excuse Ms. Mooradian and we're going to call -- there may be a better jury or trial for you at this time so you need to call the 1-800 number after 5:00 on Friday.  Thank you.

MS. MOORADIAN:  Thank you.

THE COURT:  Let's go ahead and call our next juror please.

THE CLERK:  Sean Espinola.

THE COURT:  Good morning, Mr. Espinola.  I see you out in the audience.  I think that you've been paying quite a lot of attention.  Let me make sure that there's questions I had asked that maybe you do have some responses to.  Are there any questions that triggered anything in your mind that you'd like to express at this time?

MR. ESPINOLA:  (Indiscernible).

THE COURT:  Okay.

MR. ESPINOLA:  Thank you.  Approximately 20 years ago I did file a case, a personal injury suit in Merced County.  I was the plaintiff in a file where I was a bicycle rider, got ran over by a vehicle.

THE COURT:  Okay.  And how -- that was all probably about maybe 19 years ago, 18 years ago?

1        MR. ESPINOLA:  More than that even.

2        THE COURT:  More than that.  Okay.  And no matter how
3   it turned out, do you feel like you were treated fairly in that
4   process?

5        MR. ESPINOLA:  Yes, I was.

6        THE COURT:  All right.  Was there anything about that
7   process that you think would make you in favor of one side or
8   the other in this case?

9        MR. ESPINOLA:  No.  Nothing.

10       THE COURT:  All right.  And you are able to set that
11  experience aside and judge this case only on the facts and the
12  evidence presented to you?

13       MR. ESPINOLA:  Yes, I am.

14       THE COURT:  All right.  At that time were you
15  represented by a lawyer or did you represent yourself?

16       MR. ESPINOLA:  I was represented.

17       THE COURT:  By a lawyer?

18       MR. ESPINOLA:  Yes.

19       THE COURT:  And at that time maybe you had some
20  conversations with your lawyer where your lawyer explained
21  certain things about the law or about the proceedings and it
22  may be in this case that you hear something different than what
23  your lawyer told you.  Would you be able to set aside what your
24  lawyer told you back 20 years ago and follow the procedures and
25  the law as I give it to you?

1       MR. ESPINOLA:  Yes, I will.

2       THE COURT:  Anything else about that experience that

3  you think that we should know about that would -- or could

4  impact your ability to be fair in this case?

5       MR. ESPINOLA:  No.  Nothing.

6       THE COURT:  All right.  Thank you.  Any other

7  questions that I asked that -- all right.  Nothing else.

8       All right.  Ladies and gentlemen, I did give you a

9  brief statement of this case just to give you a background

10 about what it is about, but you haven't heard any evidence

11 about the case.  Despite that, does anyone think that they at

12 this time can go into the jury room and render a verdict one

13 way or the other in this case based upon what you know so far?

14 If so, if you'd raise your hand.  All right.  No one has done

15 that.

16      I did say that there are no right or wrong answers.

17 In fact though this is the one question where there is a right

18 or wrong.  I do appreciate your willingness to hold off until

19 you actually hear some evidence and you hear the arguments of

20 counsel before making your decision.  It is your obligation, as

21 well as mine.  You will determine the facts of this case and

22 you can't do that until you hear them.  So I do appreciate your

23 willingness to be neutral at this time.

24      Have you, your spouse, close friend or close relative

25 ever lost a house in foreclosure?  If so, if you'd raise your

1    hand.  All right.  We do have a number of hands.  Mr. Espinola,
2    you have the mic already.  You said that you lost a house in
3    foreclosure?
4              MR. ESPINOLA:  It was actually a short sale, but yes.
5              THE COURT:  Okay.  And how long ago was that?
6              MR. ESPINOLA:  Approximately five years.
7              THE COURT:  And you said it was a short sale, so
8    that's something that you arranged with the bank to sell your
9    house for less than what you owed on the mortgage, right?
10             MR. ESPINOLA:  That is correct.
11             THE COURT:  Was the reason for the short sale due to
12   an economic pressure that you were experiencing or is it simply
13   due to the changes in values of the house?
14             MR. ESPINOLA:  No.  It was actually -- it was
15   paperwork that our lender did not keep properly and forced us
16   into a lump six-month payment we were unable to make.
17             THE COURT:  All right.  Let me just ask this
18   question.  Was your lender anyone who's involved in this case?
19             MR. ESPINOLA:  No, it was not.
20             THE COURT:  All right.  It sounds like though you do
21   feel like the lender is what caused you to have that problem,
22   is that fair?
23             MR. ESPINOLA:  Yes.  And there's lots of history
24   behind that lender.
25             THE COURT:  All right.  Since that time have you been

able to reestablish in a new home?

MR. ESPINOLA:  Oh, yes.

THE COURT:  Okay.  And I imagine that you have some unhappy feelings about that short sale, is that right?

MR. ESPINOLA:  Just that one lender, nothing else.

THE COURT:  Okay.  And you said that happened about five years ago, in 2011?

MR. ESPINOLA:  Yes, approximately.

THE COURT:  Okay.  You realize that this is a case about someone whose house was -- went into foreclosure, which is a little different than a short sale, right?

MR. ESPINOLA:  Yes.

THE COURT:  Do you think that the fact that you had this experience with a short sale and a problem with a lender that it would impact you one way or the other in having you decide this case?

MR. ESPINOLA:  No, because just like you said, in every field, everything, there's always good and bad to everything, so no, I don't think it would impact me at all.

THE COURT:  All right.  Do you think that it would cause you to be overly empathetic to one side or the other? For example, if you find out wow, I did everything I can, but maybe other people didn't, so you know, I should judge them harsher than I would be judged in that situation?

MR. ESPINOLA:  No.  I don't think that would come in.

1       THE COURT:  And even though you had a situation with

2  this lender do you think that you would uphold your hard

3  feelings against that lender against the defendants in this

4  case?

5       MR. ESPINOLA:  No, I would not.

6       THE COURT:  All right.  And you are willing to commit

7  that you will judge this case only on the evidence that's

8  presented here?

9       MR. ESPINOLA:  That's correct.

10       THE COURT:  All right.  Thank you.

11       There were other people I think.  In the first row is

12  there someone else?  No.  All right.  Anyone in the second row?

13  If you'd pass that microphone back?  Thank you.

14       And Mr. Somerville.

15       MR. SOMERVILLE:  Yes.

16       THE COURT:  You also lost a house in foreclosure at

17  some point?

18       MR. SOMERVILLE:  Yes, I did.

19       THE COURT:  Was it a foreclosure or short sale

20  (indiscernible)?

21       MR. SOMERVILLE:  It was a foreclosure.

22       THE COURT:  And how long ago was that?

23       MR. SOMERVILLE:  It was in 2010.

24       THE COURT:  All right.  And were the circumstances

25  related to an economic pressure you were suffering or was it

for some other reason?

   MR. SOMERVILLE:  Yes.  For economic pressure.

   THE COURT:  All right.  And your house was sold to someone else, is that right?

   MR. SOMERVILLE:  That's correct.

   THE COURT:  Did you go through a loan modification process during that foreclosure?

   MR. SOMERVILLE:  Tried to, yes.  But --

   THE COURT:  And what was the reason that it didn't succeed to your knowledge, at least based upon what you know?

   MR. SOMERVILLE:  Apparently we didn't get the paperwork in on time and the lender was unable to work with us.

   THE COURT:  Okay.  You know I explained to you a little bit about this case, just a very brief picture of it and part of the claim is that the plaintiffs didn't get their paperwork in on time.  Do you think the fact that you had this experience would impact your ability to be fair in this case?

   MR. SOMERVILLE:  I do.

   THE COURT:  All right.  You understand that -- well first of all, let me ask you this.  Was your lender any of the parties to this case?

   MR. SOMERVILLE:  No.

   THE COURT:  And you understand that -- well let me ask you this, was your paperwork on time or not?

   MR. SOMERVILLE:  Well that depends on who's side

1   you're looking at.

2          THE COURT:  Okay.  You believe your paperwork was

3   timely I assume?

4          MR. SOMERVILLE:  I do.

5          THE COURT:  Okay.  And is it -- would you be able to

6   appreciate -- or do you appreciate that your situation could be

7   widely different from the one that you're seeing in this trial?

8   Do you realize that?

9          MR. SOMERVILLE:  I do.

10          THE COURT:  If that was the case, do you still think

11   that you would be unfair to one side or the other?

12          MR. SOMERVILLE:  That's hard to say.  I am still

13   angry about the way things happened.  You know, things are out

14   of control that aren't in my hands that I dealt with, so I

15   don't know.

16          THE COURT:  Okay.  Let me suggest to you that there

17   are all different types of situations and in this trial, like

18   in any other civil trial, the plaintiffs have the burden of

19   proof.  And what that means is they have to prove that their

20   claims are more likely true than not true.

21          I'm wondering though, given your experience, are you

22   going to hold them to that standard or are you going to say

23   they got close and so we're going to give it to them even

24   though that's not the law.  And oftentimes what you see, as an

25   example, is a scale.  You know, obviously everyone knows

there's a scale of justice.

What preponderance means is that scale simply has to tip.  A feather has to fall that is weightier than the other side and that would mean the plaintiffs win.  However, if that feather doesn't fall, then they can't -- if the feather is even on the other side they will not win this case, they cannot win this case.  Are you willing to hold them to that burden of proof or are you going to say you know what, it happened to me, it probably happened to them?  What can we --

MR. SOMERVILLE:  I'd like to think I wouldn't say the latter.  I mean I think that I would be able to hold them to that burden of proof.

THE COURT:  Okay.  When you get to a point where you have to say gosh, I have two things that could be true, you know, who gets the benefit of the doubt in that case?  And I'll tell you, the law requires the benefit of doubt to go against the party with the burden of proof because that would mean they didn't prove it to you.  Would you be able to do that?

MR. SOMERVILLE:  Yes, I would.

THE COURT:  All right.  So all of us like to believe that we're fair, and I'm not suggesting that you're not.  What I need though from you is a commitment that -- I talked earlier about that line where everyone's toes are behind it.  Can you commit to us that when we start this trial everyone's toe's going to right on the line but nobody's ahead or behind?

1          MR. SOMERVILLE:  That's a tough question.  I mean

2     yes -- yes, I can commit.

3          THE COURT:  Okay.

4          MR. SOMERVILLE:  However --

5          THE COURT:  However, you've had experience.  As I

6     mentioned, we've all had experiences.  What I'm asking you to

7     do is set your bad experience with that lender aside and judge

8     these facts as you would've wanted to be judged, for example,

9     if you had sued, if you were in a lawsuit related to that you

10    would not want somebody in the jury who says gosh, you know

11    what, I'm going to give somebody a break who doesn't -- who the

12    law doesn't give the break to.  You would want to be judged

13    fairly according to the standards just like the parties here.

14    You understand that?

15         MR. SOMERVILLE:  I do understand that.

16         THE COURT:  And I'm assuming that means that's why

17    you can commit that you will be fair, is that true?

18         MR. SOMERVILLE:  That's true.

19         THE COURT:  All right.  Thank you.

20         Is there someone else -- right behind you, Mr.

21    Somerville.  Thank you.

22         Let's see, so that's Mr. --

23         MR. ODOM:  Odom.

24         THE COURT:  -- Mr. Odom, right.  Sir, you also lost a

25    house in foreclosure, is that right?

1    MR. ODOM:  I did.

2    THE COURT:  And again, was that foreclosure or was

3    that a short sale or something else?

4    MR. ODOM:  Foreclosure.

5    THE COURT:  How long ago was that?

6    MR. ODOM:  Started in 2009.

7    THE COURT:  All right.  And about when was the house

8    sold?

9    MR. ODOM:  2010.

10    THE COURT:  Okay.  And again, do you -- what were the

11    reasons for that?  Was it a job loss or was it some other

12    problem with the lender or something like Mr. Espinola

13    mentioned?

14    MR. ODOM:  It was actually due to a divorce and it

15    went down to one single person working and so I was unable to

16    continue on, but I had done it for like 18 months or 20 months

17    by myself and --

18    THE COURT:  There was just too much?

19    MR. ODOM:  Yeah.  It was too much.

20    THE COURT:  Okay.  So when you bought the house you

21    anticipated two incomes and then later on it turned into just

22    one?

23    MR. ODOM:  Correct.

24    THE COURT:  All right.  In that process did you feel

25    that -- first let me ask, was the lender anyone who's in this

116

case?

MR. ODOM:  No.

THE COURT:  All right.  Did you feel like the lender treated you fairly in that process?

MR. ODOM:  Somewhat.  It was Washington Mutual at the time.  I went through and did the modification with them.  They helped out during that time.  They came back with a figure of $24 less than what I was paying initially and it just wasn't feasible at that point.  So I stayed in it as long as I possibly could and --

THE COURT:  So you were hoping that your modification would've brought the payment down to something that was manageable for someone with one income?

MR. ODOM:  Correct.  Even if they would've done it for a 30-year loan I could afford to stay there.

THE COURT:  Okay.  Did you ever investigate whether that was something you were obligated to do or should have done, or is it something -- was it something that you just hoped that they would have done?

MR. ODOM:  Something I just hoped that they would have done.

THE COURT:  And even still though, having lost your home you still feel maybe a little unhappiness with Washington Mutual as a result, is that fair?

MR. ODOM:  It is what it is.

1    THE COURT:  Okay.

2    MR. ODOM:  Life goes on.  You know, it's a water

3  under the bridge type of thing now, so --

4    THE COURT:  And luckily it's been six years now,

5  right?

6    MR. ODOM:  Yeah.

7    THE COURT:  And are you -- you currently have a

8  place, whether you own it or you're renting it?

9    MR. ODOM:  Correct.

10    THE COURT:  All right.  And again, is there anything

11  about that experience that you think could influence your

12  ability to be fair in this case?

13    MR. ODOM:  I can be fair.

14    THE COURT:  All right.  Thank you.

15    Is there anyone else who's had that experience of

16  foreclosure?  No one else is raising their hand.

17    We've spoken a little bit about foreclosure and quite

18  a little bit about loan modification.  Is there anyone else who

19  you themselves or their spouse, close friend, close relative

20  who went through the process of obtaining a loan modification

21  either that was successful or it wasn't but you went through

22  that process?  All right.  Pass the microphone back to Ms.

23  Lackey please.

24    MS. LACKEY:  We did receive a home loan modification.

25  I don't recall what year.  I'm guessing six years ago.

1    THE COURT:  About six years ago?  Okay.  Is your
2 lender that you worked with a lender that's involved in this
3 case?
4    MS. LACKEY:  No.
5    THE COURT:  Okay.  And anything about that process
6 that you think would impact your ability to be fair in this
7 case?
8    MS. LACKEY:  No.
9    THE COURT:  Sometimes loan modifications occur
10 because of medical bills or all different reasons.  Is there
11 anything about the reason that you needed the modification that
12 would impact your ability to be fair in this case?
13    MS. LACKEY:  No.
14    THE COURT:  Okay.  I guess what I'm trying to hit at
15 is did you feel like it was your lender's fault that you needed
16 that loan modification or was it just circumstances beyond your
17 control?
18    MS. LACKEY:  I don't ever remember who our lender
19 was.  We didn't have issues with our lender.  We just, for
20 financial reasons, needed to either sell our home or receive a
21 home loan modification so we went through that process first.
22 We received it and we stayed there a number of years longer
23 before we sold our home.
24    THE COURT:  Okay.  So you eventually sold it and you
25 don't live in that home anymore?

1          MS. LACKEY:  Correct.

2          THE COURT:  All right.  Thank you.

3          Anyone else in that situation with the modification?

4     All right.  No one has raised their hand.

5          Other than what we've talked about, have you, your

6     spouse, close friend or close relative ever defaulted on a

7     loan?  If so, if you'd raise your hand.  No one has done

8     that -- oh, one right in front of you.  Mr. Hemmis, No. 13.

9     Sir, you've indicated you --

10         MR. HEMMIS:  A family member.

11         THE COURT:  A family member --

12         MR. HEMMIS:  My son.

13         THE COURT:  Do you remember what type of loan that

14    was?

15         MR. HEMMIS:  He lost an apartment building and a

16    home.

17         THE COURT:  So he owned and apartment and a home and

18    he defaulted on both of those loans?

19         MR. HEMMIS:  Right.

20         THE COURT:  Do you remember was it as a result of

21    some financial pressure that caused that or some other reason?

22         MR. HEMMIS:  Yeah.  He was irresponsible with money.

23         THE COURT:  Okay.  Do you remember about how long ago

24    that was?

25         MR. HEMMIS:  Three years.

1          THE COURT:  All right.  During that process do you

2   feel like he was treated fairly?

3          MR. HEMMIS:  Oh, sure he was.

4          THE COURT:  Okay.  Is there anything about that

5   process that you think would impact your ability to be fair in

6   this case?

7          MR. HEMMIS:  No.

8          THE COURT:  It sounds like you hold your son

9   accountable for what went wrong, and maybe that's the parent's

10  prerogative, and maybe even your obligation.  Would you be able

11  to set that aside and judge this case fairly?

12         For example, the Cornejos were involved in a

13  foreclosure, but would you sit back and listen to the evidence

14  and decide those facts as opposed to saying hey, my son made a

15  mistake or he did something bad, they must've done something

16  bad?  Can you separate those things?

17         MR. HEMMIS:  Yes.

18         THE COURT:  Okay.  That's not even -- when I asked

19  you that your face went like why would she even ask that.  So

20  it sounds like that's not even something that would've occurred

21  to you?

22         MR. HEMMIS:  No, ma'am.

23         THE COURT:  All right.  Thank you.

24         Anyone else have that issue?  All right.  No one has

25  raised their hand.

1    Do you, your spouse, close friend or close relative

2  have any negative feelings or opinions about mortgage lenders,

3  mortgage servicers or non-judicial foreclosure trustees?

4  That's a lot of words.  Anyone have any opinions about those

5  types of entities that do that type of work?  All right.  No

6  one has raised their hand.

7    Have you, your spouse, close friend or close relative

8  ever had any training or experience in investigations at any

9  time?  All right.  Pass the microphone right behind you.  Oh,

10 Mr. Hemmis, you (indiscernible).

11    MR. HEMMIS:  Investigations you ask?

12    THE COURT:  Right.

13    MR. HEMMIS:  Yes.  In my former line of work.

14    THE COURT:  What was that?

15    MR. HEMMIS:  I was the ground safety manager at

16 Edwards Air Force Base.

17    THE COURT:  Okay.

18    MR. HEMMIS:  So we investigated mishaps.

19    THE COURT:  Related to aircraft?

20    MR. HEMMIS:  Related to everything.

21    THE COURT:  Okay.  So anything went wrong you'd

22 investigate to figure out what that was?

23    MR. HEMMIS:  Right.

24    THE COURT:  Okay.  Did you receive specialized

25 training to do that investigation?

1          MR. HEMMIS:  Yes.

2          THE COURT:  The training you received, did it relate

3    to -- is it a type of training that you could apply generally

4    or was it unique to the type of investigation you were doing?

5          MR. HEMMIS:  It was generally.  It -- OSHA training

6    is what it is, Occupational Safety and Health Administration.

7          THE COURT:  Okay.  All right.  So did your -- you're

8    a type of investigation was to figure out things that could

9    cause injury to somebody, or that actually did?

10         MR. HEMMIS:  Things that did.

11         THE COURT:  Okay.  So if you are presented facts in

12   this case that may implicate your investigatory skills, for

13   example, would you be able to set aside the training that you

14   received and again just evaluate the case on the evidence

15   presented here?

16         MR. HEMMIS:  Yes.

17         THE COURT:  The reason I say this is jurors are fact

18   finders.  That means you're going to be given evidence and you

19   have to decide the weight of the evidence, what evidence to

20   believe and what evidence not to believe.  Sometimes people

21   receive training on how to do that so that's kind of what we're

22   trying to figure out, if you've received that type of training.

23         Mr. Hemmis, you say that the training you received

24   would have no impact on your ability to be fair, is that

25   correct?

123

1   MR. HEMMIS:  That's correct.

2   THE COURT:  All right.  And behind you, Mr. McCloud I

3   think -- or no, Mr. Martinez.  You've had some experience in

4   investigation?

5   MR. MARTINEZ:  In my time in the military I was a

6   Navy hospital corpsman, but when I was stationed in Naples,

7   Italy they assigned me to security for the hospital.  So I was

8   sent through military law enforcement and various counter

9   terrorism type schools.

10   THE COURT:  Okay.  And did you ever actually hold a

11   role of investigation in the military police?

12   MR. MARTINEZ:  Not as a military police, but as the

13   Naval Hospital Master at Arms I was the primary security for

14   the hospital --

15   THE COURT:  Okay.  Where?

16   MR. MARTINEZ:  -- and I was -- I would do sort of

17   like bailiff's type duties as the master at arms for the

18   captain's mess and those sorts of proceedings.

19   THE COURT:  Okay.  The type of training that you

20   received may or may not have anything to do with what you hear

21   today.  Would you be willing to set that experience aside and

22   judge this case on the evidence presented?

23   MR. MARTINEZ:  Yes, ma'am.

24   THE COURT:  All right.  And any specialized skills

25   that you were given related to the evaluation of evidence,

would you be able to set that aside too and to rely only on the information presented here?  And what I mean is say, for example, you learn that people lie when they look one direction or the other, would you be able to evaluate the credibility of a witness based upon the totality of their presentation?

MR. MARTINEZ:  I hope so, yeah.

THE COURT:  All right.  (Indiscernible), right?  Okay.

Is there anyone else who's had some specialized training in investigation?  All right.  No one has raised their hand.

Has anyone -- yourself, your spouse, close friend or close relative ever worked in the home mortgage industry either as a loan broker, as a banker, anything like that, loan servicer?  All right.  No one has raised their hand.

Have you, your spouse, close friend or close relative ever fallen behind on your bills?  All right.  A couple people raised their hand.  If you would pass the microphone.

All right.  Mr. Hemmis, are we still talking about your son or --

MR. HEMMIS:  Yes, ma'am.

THE COURT:  Same thing.  All right.  We've dealt with that.  If you would pass the microphone back then.  I think Mr. Somerville also raised his hand.

Is this also the same thing we talked about earlier?

1    MR. SOMERVILLE:  I have relatives -- that like --

2    it's a broad statement on economy and losing jobs and finding a

3    job.

4            THE COURT:  Right.  So sometimes, for whatever

5    reason, you leave a job and that causes a financial crunch.

6    Has that situation been resolved now?

7            MR. SOMERVILLE:  No.

8            THE COURT:  Okay.

9            MR. SOMERVILLE:  It's actually -- it was resolved,

10   but it's kind of getting shaky right now.

11           THE COURT:  Okay.  That financial difficulty, did

12   that have something to do with the foreclosure or is it part of

13   the same?

14           MR. SOMERVILLE:  Yes.

15           THE COURT:  Okay.  Do you feel like the foreclosure

16   caused your current situation or is just part of your current

17   situation.

18           MR. SOMERVILLE:  Part of.

19           THE COURT:  Okay.  Can you also set aside your

20   current financial situation and judge the facts of this case

21   only on the facts of this case?

22           MR. SOMERVILLE:  I can, yes.

23           THE COURT:  All right.  Anything else about that

24   situation that you feel the parties need to know about in order

25   to be confident that you are a juror that should be on this

126

1  trial?

2          MR. SOMERVILLE:  No, not (indiscernible).

3          THE COURT:  All right.  Is there anyone else who

4  raised their hand?  All right.  Nobody has.

5          Have any of you had experience -- you, your spouse,

6  close friend or close relative ever had dealings with any

7  mortgage company, whether it's a defendant in this case, that

8  you think would impact your ability to be fair in this case?

9  If so, if you would raise your hand.

10          Mr. Somerville.

11          MR. SOMERVILLE:  Just with Bank of America and Fannie

12  Mae.

13          THE COURT:  Okay.  Were they also involved in the

14  original foreclosure or was there something else?

15          MR. SOMERVILLE:  Yes, they were.

16          THE COURT:  All right.  And what role did they play

17  that you feel could influence your ability to be fair in this

18  case?

19          MR. SOMERVILLE:  Well I think that the loan -- Bank

20  of America, because they can do -- did whatever they wanted to

21  do, was unfair and the class action lawsuit that really is a

22  slap on the wrist to Bank of America really didn't help out the

23  people that it was intended to help out.

24          THE COURT:  Were you part of a class that sued Bank

25  of America?

1      MR. SOMERVILLE:  Yes, I was.

2      THE COURT:  Did that also involve Fannie Mae?

3      MR. SOMERVILLE:  No, not directly.

4      THE COURT:  Okay.  So in that litigation, it sounds

5  like the class action was resolved in your favor, but the

6  result was not really something that you had hoped for, is that

7  fair?

8      MR. SOMERVILLE:  That's fair.

9      THE COURT:  All right.  Even though it was a

10  different bank, and we haven't talked about Fannie Mae either,

11  would you be able to set aside your feelings as to Bank of

12  America and judge this case on its facts only?

13      MR. SOMERVILLE:  I don't -- I think so, yes.

14      THE COURT:  All right.  And what's the situation with

15  Fannie Mae?  You said you also felt that Fannie Mae didn't

16  treat you fairly.

17      MR. SOMERVILLE:  Well they sell the loans so quickly

18  that you -- it seemed like you barely have time to know who has

19  your note at the time and I didn't think that -- well they

20  wanted -- they just decided that my money wasn't good enough

21  for -- they wanted less money.  I don't understand, but --

22      THE COURT:  Okay.  So you feel like Fannie Mae

23  should've either held your loan longer or should have maybe

24  done something differently in how they handled your loan, is

25  that fair?

128

1          MR. SOMERVILLE:  I think that's fair.  And on the

2     whole, I think there was a problem.

3          THE COURT:  Yeah.  As a result of your dealings with

4     Fannie Mae, can you set your feelings aside both for Fannie Mae

5     and Bank of America and judge this case only on the facts in

6     this case and set that other aside?

7          MR. SOMERVILLE:  I could certainly try, yes.

8          THE COURT:  And you commit to me that you will?

9          MR. SOMERVILLE:  Yes.

10         THE COURT:  All right.  Thank you.

11         Anyone else who's had that experience please raise

12    your hand.

13         Does anyone have any training, whether it's formal

14    education or on-the-job training in finance or accounting?  If

15    so, if you'd raise your hand.  Okay.  No one has done that --

16    oh, all right.  Mr. Lourenco.

17         MR. LOURENCO:  Yeah.  About 15 to 20 years ago I

18    worked for a small business and so I handled all the accounts

19    receivable, accounts payable.

20         THE COURT:  All right.  And did you receive formal

21    training on it or just on-the-job training for that?

22         MR. LOURENCO:  On-the-job training.

23         THE COURT:  Did you actually receive training or did

24    you just figure it out on your own?

25         MR. LOURENCO:  A little bit of both.

129

1        THE COURT:  Okay.  All right.  And is there anything
2   about that experience that you think could impact your ability
3   to be fair in this case?
4        MR. LOURENCO:  No.
5        THE COURT:  All right.  Has anyone had any sort of
6   formal education or on-the-job training in -- did I miss
7   something in the front row?
8        MS. SALLES:  No.  It wasn't me, it was my husband.
9        THE CLERK:  Microphone.
10       THE COURT:  Okay.  Let's -- and is it Salles?
11       MS. SALLES:  Salles.
12       THE COURT:  Salles.
13       MS. SALLES:  It's actually my husband who's an
14   accountant, not me.
15       THE COURT:  He's an accountant.  How long has he been
16   in that field?
17       MS. SALLES:  Thirty years.
18       THE COURT:  Okay.  Is he a CPA or just --
19       MS. SALLES:  CPA.
20       THE COURT:  Does he do taxes?
21       MS. SALLES:  He used to.  Now he -- he owns his own
22   business.  He does more computer consulting.
23       THE COURT:  Okay.  What area does he work in?  I
24   don't mean area of accounting.  I mean physical geographical
25   location.

130

1          MS. SALLES:  We're from Clovis, Fresno.

2          THE COURT:  Is that where his business is?

3          MS. SALLES:  Yes.

4          THE COURT:  All right.  Does he do forensic

5    accounting related to property values?

6          MS. SALLES:  No.

7          THE COURT:  Okay.  All right.  Does he talk to you

8    about his work?

9          MS. SALLES:  Sure.

10         THE COURT:  Some?

11         MS. SALLES:  Yes.

12         THE COURT:  Do you assist him in his work at all?

13         MS. SALLES:  No, I do not.

14         THE COURT:  All right.  Is there anything about your

15   husband's experience in accounting that you think would impact

16   your ability to be fair?

17         MS. SALLES:  No.

18         THE COURT:  All right.  Back to my question on

19   property appraisal.  Has anyone had experience or training in

20   property appraisal, whether it's you, your spouse, close friend

21   or close relative?  All right.  Mr. Lourenco.

22         MR. LOURENCO:  My mother-in-law was an appraiser

23   for -- well as long as I've been married, so that's 16 years.

24         THE COURT:  All right.  Is she still doing that work?

25         MR. LOURENCO:  No.  She's retired.

131

THE COURT:  All right.  And how long has she been retired?

MR. LOURENCO:  Maybe three years.

THE COURT:  And is she also in Fresno?

MR. LOURENCO:  Yes.

THE COURT:  Okay.  Was she working during sort of the economic crisis of the country?

MR. LOURENCO:  Yeah.  As far as -- as long as I've known her, and I've known her since 1997, she was an appraiser.

THE COURT:  When she was working at that time did she -- was she -- did she do appraisals primarily for financial institutions?

MR. LOURENCO:  Correct.

THE COURT:  All right.  Do you know if she worked for any of the companies that are involved in this case?

MR. LOURENCO:  I don't believe so.

THE COURT:  During the time when the country was experiencing this economic crises did she ever express any opinions to you about the cause of that crisis?

MR. LOURENCO:  No.

THE COURT:  Did she ever express any opinions to you generally about what has been termed as the mortgage meltdown?

MR. LOURENCO:  No.

THE COURT:  All right.  Is there anything about her experience as an appraiser that you think would impact your

ability to be fair in this case?

MR. LOURENCO:  No.

THE COURT:  This trial, as I mentioned, is going to be completed by the end of this week.  Is there anyone -- does everyone agree that you will wait to decide your verdict until after all the evidence is presented, counsel has argued the case and you're back in the jury deliberation room and conferring with your fellow jurors?  Will everyone agree to wait until that time before you form an opinion?  If you won't, if you'd raise your hand.  All right.  No one has done that.

Is there any member of the jury that has any moral belief -- or any belief at all, whether it's moral, religious or some other type of belief that makes it impossible for you to sit in judgment in this case?  If so, if you'd raise your hand.  No one has done that.

As you've heard, it would be your duty -- in fact, you'll have to swear to do this, to apply the law as I give it to you and that is whether you agree with the law or not or whether you think the law should be otherwise.  Is there anyone who feels that they would not be able to do so?  If that is you, please raise your hand.  All right.  No one has done that.

Some of you may have served on a jury in the past and at that time you've been given instructions I, the Judge, as to law to apply to that case.  Is everyone willing to set aside that previous jury experience and apply the law as I give it to

you regardless of whether it conflicts with what another judge

has told you?  Is there anyone who feels that they can't do

that?  If so, if you'd raise your hand.  No one has done that.

In this case the plaintiffs are seeking compensation

in this lawsuit.  Is there anyone who has a problem awarding

compensation to the plaintiffs if they've proved to you that

you should do that? If so, if you'd raise your hand.  No one

has done that.

Is there an amount of money above which you would not

award even if the plaintiffs have proven that they're entitled

to it?  If so, if you'd raise your hand.  No one has done that.

In this case there are damages available that is in

the form of -- or can be construed as for the purpose of

punishment.  Oftentimes you hear this described as punitive

damages.  Sometimes people have some feeling that punitive

damages should not be awardable in our system of justice.  Is

there anyone who has that feeling, that punitive damages should

not be able to be recovered no matter the facts presented?  If

so, if you'd raise your hand.  All right.  No one has done

that.

If you are selected on this jury and you decide based

upon hearing the evidence and your evaluation of it and hearing

arguments of counsel and you apply the law as I give it to you

and after all of that you come to the conclusion that

plaintiffs have not proven their case, would all of you be

willing to render a verdict in that instance in favor of the

defendants?  If you are not willing to do that, please raise

your hand.  All right.  No one has done that.

I've asked a lot of questions, but here is my big

one.  Is there anything about the nature of this case

whatsoever, whether I've asked you or it's just in the back of

your mind, that you think would prevent you from being fair or

impartial in this case?  If so, if you'd raise your hand.  All

right.  No one has done that.

At this point we're going to turn to some individual

questions.  I get just a little more biographical information

about you.  You're going to see those pop up on the screen in

front of you.  Does the front row have a sheet on your chair?

If you have good eyes you're going to be able to see it over

there on the big screen as well.  We're going to ask you to go

through those questions.

Let us start first with -- is it Mr. -- is it

Macchia, Ms. Macchia?  If you would answer those questions for

us.

MS. MACCHIA:  I live in Merced, California.

THE COURT:  Oh, I'm sorry.  Actually use the

microphone.

MS. MACCHIA:  I live in Merced, California.  I am

married and I have been a teacher for 30 years.  My employer is

Merced City School District.  My husband is -- he was a police

officer and now he's resource school officer at the high

school.  My level of education is -- I'm still going to school,

so --

THE COURT:  So you have at least a bachelor's degree,

probably have a fifth year for your credentials?

MS. MACCHIA:  Yes.

THE COURT:  Do you have a master's degree as well?

MS. MACCHIA:  No.  I'm working on my librarian

credential.

THE COURT:  Okay.

MS. MACCHIA:  I have never been on a jury service

before.

THE COURT:  Okay.  Is there any reason to doubt that

you would be fair and impartial in this case?

MS. MACCHIA:  No.

THE COURT:  All right.  Thank you.

Mr. Yang.

MS. YANG:  I live in Fresno, California.  I'm

married.

THE CLERK:  (Indiscernible).

MR. YANG:  Oh, I'm unemployed right now, so --

THE CLERK:  What does your spouse --

THE COURT:  Mr. Yang, are you not able to see those?

Are those not close enough for you?

MR. YANG:  Oh, yeah.

136

1      THE COURT:  You can actually pull that screen out so
2  it's closer to you.
3      MR. YANG:  My wife's a CNA and my level of education,
4  I just finished high school.  And never been on a jury and to
5  be fair, yes.
6      THE COURT:  All right.  And you indicated earlier
7  that you had previously worked in a restaurant, is that right?
8      MR. YANG:  Yeah.
9      THE COURT:  And how long ago was that?
10     MR. YANG:  I think eight years.
11     THE COURT:  It was about a year ago?
12     MR. YANG:  Eight years.
13     THE COURT:  I'm sorry, eight years?
14     MR. YANG:  Yeah.
15     THE COURT:  You worked there for eight years.  How
16 long have you not worked there?
17     MR. YANG:  Just unemployed this year.
18     THE COURT:  Okay.  And you were basically a chef at
19 that restaurant?
20     MR. YANG:  Yeah.
21     THE COURT:  Okay.  And your wife you said is a CNA.
22 She's a nurse?
23     MR. YANG:  Certified Nurse Assistant.
24     THE COURT:  Okay.  And where does she work?  Is it a
25 doctor's office, or a hospital, or some other --

137

1          MR. YANG:  Like a small clinic I think.

2          THE COURT:  Okay.  How long has she worked at that

3     clinic?

4          MR. YANG:  Three years, four years.

5          THE COURT:  Okay.  All right.  Thank you.

6          Is it Wamocha?

7          MR. WAMOCHA:  Wamocha.

8          THE COURT:  Wamocha.  All right, sir.

9          MR. WAMOCHA:  I live in Turlock, California.  My

10    marital status is I'm married, two kids.  Occupational history,

11    I'm an instructional aide at Sierra Vista Learning Center.  My

12    wife is a stay-at-home mom, so she's not working.  I have a

13    bachelor's degree in business management.  I've never had to

14    serve on jury duty before and I believe I would be fair in this

15    case.

16         THE COURT:  There's no reason to think that you could

17    not be fair, is that true?

18         MR. WAMOCHA:  Yeah.  There's no reason to think that,

19    no.

20         THE COURT:  And you said that you are an

21    instructional aide at Sierra Vista Learning Center.

22         MR. WAMOCHA:  That's correct.

23         THE COURT:  What type of instruction do you give?

24         MR. WAMOCHA:  Just work alongside the teacher, just

25    to assist the students both in and outside of the classroom.

1          THE COURT:  What level of students do you work with?

2          MR. WAMOCHA:  Our youngest student is six years old

3  and then -- so it's like six to fourteen.

4          THE COURT:  Are these students with developmental

5  disabilities or educational disabilities?

6          MR. WAMOCHA:  Yeah.  They have behavioral issues.

7          THE COURT:  Okay.

8          MR. WAMOCHA:  So they're the kids that are usually

9  suspended from, you know, regular public schools so they're

10  brought over to our school and we deal with them.

11          THE COURT:  Okay.  Is it in a classroom setting where

12  you have children of all ages from six to fourteen that you

13  have all in one classroom or is that the ages that you see over

14  the course of your day?

15          MR. WAMOCHA:  Well we have two classrooms.  It's a

16  small school, so we have less than 30 students.  We have three

17  classrooms, three teachers.  Like the classroom that I work in,

18  we have 10 students in our class.

19          THE COURT:  Okay.  All right.  Thank you.

20          Mr. Odom.

21          MR. ODOM:  I live in Modesto, California.  I'm

22  married.  I'm a facilities maintenance supervisor.  My wife

23  is -- oh, sorry.  I work at MedAmerica Billing Services as,

24  like I said, a maintenance supervisor there.  My wife is a LVN

25  with Community Hospice.  I've had some college education

139

courses.  I've never been on jury duty and I could be fair in
this case.

THE COURT:  All right.  Thank you.

Mr. Stanfield.

MR. STANFIELD:  Let's see, I live in Tehachapi.  I'm
single.  Occupational history is I work in aircraft design and
development.  Current employer is NASA.  Six doesn't apply, I'm
not married, not living with anyone.  Level of education, some
college, A&P license.  Have you ever been on a jury before?
I've been selected for jury, haven't served on a jury in over
15 years.  That was in Lancaster, California and it was state
court and yes on the verdict and no reason to doubt that I
could be completely fair.

THE COURT:  Do you remember whether that jury service
was on a criminal case or a civil case?

MR. STANFIELD:  Criminal case.

THE COURT:  And you said -- I think I might have
misunderstood.  Did you say you have your PE licence, your --

MR. STANFIELD:  A&P, Aircraft and Propulsion.

THE COURT:  Okay.  That sounds kind of impressive,
sir, like a rocket scientist.

MR. STANFIELD:  Well license to kill, yeah.

THE COURT:  Okay.  So don't ask him anything.  Thank
you, Mr. Stanfield.

Mr. Moore.

1    MR. MOORE:  I live in Wasco.  I am married.  I am a

2  plant manager for an almond plant.  Let's see, my spouse is a

3  physical education teacher.  I completed the twelfth grade with

4  multiple trade school.  I've never served on a jury before and

5  I have no reason to believe that I'd be -- that I would not be

6  impartial.

7    THE COURT:  Okay.  You said you work for an almond

8  company.  What company is that?

9    MR. MOORE:  Sungym LLC (phonetic).

10    THE COURT:  It's not harvest season at this time is

11  it?

12    MR. MOORE:  Yeah.

13    THE COURT:  It is harvest season?

14    MR. MOORE:  Yes.

15    THE COURT:  Do you -- in your plant, it actually is

16  processing the almond?

17    MR. MOORE:  Yes.  That's what we do.

18    THE COURT:  Okay.  All right.  Thank you.

19    MR. MOORE:  You're welcome.

20    THE COURT:  Let's see, Ms. Montero Pardo.

21    MS. MONTERO PARDO:  I live at Shafter.  I am single.

22  I am a correctional officer.  I work for McFarland Female

23  Reentry Facility.  I am currently in school.  I have certified

24  with PC 832 for both arrest and control and firearms.  I

25  haven't served on a jury and I could be fair in this case.

THE COURT:  Now you said that you -- I assume that you went to the corrections academy, right?

MS. MONTERO PARDO:  Yes.

THE COURT:  And now you're at a school -- I didn't quite follow what you're doing now.

MS. MONTERO PARDO:  I want to get my bachelor's degree.  I don't want to just be a correctional officer all the time.

THE COURT:  So you're -- I would assume it's something to do with your work, but it's completely separate. You're just working on completing your bachelor's degree then?

MS. MONTERO PARDO:  Yes.

THE COURT:  And what is the nature of your study or your main --

MS. MONTERO PARDO:  Criminal justice.

THE COURT:  Okay.  So kind of still related.

MS. MONTERO PARDO:  Still related.

THE COURT:  All right.  How long have you worked in corrections?

MS. MONTERO PARDO:  For about eight months now.

THE COURT:  And so have you worked at McFarland (indiscernible)?

MS. MONTERO PARDO:  Yes.

THE COURT:  Are you a CalState or DC?

MS. MONTERO PARDO:  CalState.

1    THE COURT:  All right.  Thank you.  If you'll pass
2  the microphone.  Thank you.
3    MR. LOURENCO:  I live in Fresno.  I'm married.  Been
4  a teacher for the last 15 years, work for Fresno Unified School
5  District.  My wife is an insurance agent.  She has been so for
6  the last 20 years.  I have a master's degree.  Never been on a
7  jury and no reason to doubt I couldn't be fair.
8    THE COURT:  All right.  And let's see, your wife is
9  an insurance agent.  Does she sell any products related to home
10  mortgages?
11    MR. LOURENCO:  Yeah.  Homeowner's insurance.
12    THE COURT:  Is there anything about that experience
13  you think would influence your ability to be fair in this case?
14    MR. LOURENCO:  No.
15    THE COURT:  Okay.  And your master's degree, is
16  that -- corrections -- is that education?
17    MR. LOURENCO:  Yeah.
18    THE COURT:  Sort of the same sometimes, right?
19    MR. LOURENCO:  Especially when you work at a
20  continuation high school.
21    THE COURT:  All right.  I'm sorry, how long did you
22  say you've been a teacher?
23    MR. LOURENCO:  Fifteen years.
24    THE COURT:  All right.  Thank you.
25    Mr. Somerville.

1    MR. SOMERVILLE:  I live in Fresno.  I am married, two

2    kids.  I was in the Marine Corps and now I work construction, a

3    fire sprinkler fitter.  My wife has been a stay at home wife.

4    She's trying -- currently trying to find a job now.  I

5    completed three years of college.  I've been on jury before,

6    was a criminal case and it was here -- it was in Fresno.  And

7    I -- there's no reason that I could [sic] be completely fair

8    and impartial in this case.

9    THE COURT:  No reason that you could not be fair --

10   or not be unfair -- or we need to say that a whole other way

11   (indiscernible).  You could be fair and impartial in this case,

12   is that right?

13   MR. SOMERVILLE:  That's correct.

14   THE COURT:  That's a terrible question isn't it?

15   It's just written bad, and I have to take credit for that.  So

16   you said that you were on jury duty before and you handled a

17   criminal case.  About how long ago was that?

18   MR. SOMERVILLE:  Probably seven years ago.

19   THE COURT:  All right.  Thank you.

20   Ms. Lackey.

21   MS. LACKEY:  I live in Clovis.  I am married.  I have

22   been employed by churches doing various things over the years.

23   Currently I'm a intern principal at a private school.  My

24   husband is a pastor and has been in ministry for several years.

25   Some college.  I've never been on a jury and I believe I could

be fair and impartial.

       THE COURT:  Thank you.

       Mr. Martinez.

       MR. MARTINEZ:  I'm from Modesto.  I am married.  I was in the Navy and currently work for Foreign Liquidators.  My wife is a cashier at Save Mart and I'm currently going to school for nursing.  I've never been on a jury before and there's no reason to believe I couldn't be fair and impartial.

       THE COURT:  How long have you been in nursing school?

       MR. MARTINEZ:  I'm on my last -- sorry.  I have one more prereq before I can apply.

       THE COURT:  Okay.  You're about two years in then.  Nice.  Okay.

       Mr. McCloud.

       MR. McCLOUD:  Yes.  I am here.  I live here in Bakersfield.  I am married.  I am retired, house husband.  My wife works for BC as a career counselor.  Let's see, I've never served on a jury before and I believe I could be fair and impartial.

       THE COURT:  And what type of work did you do before you retired?

       MR. McCLOUD:  I worked for, well, several companies.  Mostly in the television and communication industry.

       THE COURT:  Well that sounds pretty interesting.

       MR. McCLOUD:  It was challenging, yes.

1    THE COURT:  What type -- were you in movies or what

2    did you do?

3    MR. McCLOUD:  Well my -- I worked for a contractor,

4    or in this case, Nortel Communications.  Okay.  They were

5    basically the AT&T in Canada.  We would go out to several --

6    well we run the contract to work all over the place.  It was

7    basically high rise buildings down in Los Angeles.  You know,

8    I've worked for MGM, Allergan, B of A, Countrywide, Warner

9    Brothers; you name it, I was there at one point or another.

10   THE COURT:  Okay.  And so you were bringing to them

11   communications in -- T.V. communications?

12   MR. McCLOUD:  Well it would be television, it would

13   be video, it'd be computer interfacing; anything that involved

14   the computer chip I was basically involved in.

15   THE COURT:  Okay.  Wow.  We often have technological

16   difficulties, so we may have to turn to you.

17   MR. McCLOUD:  Okay.

18   THE COURT:  Thank you.

19   Mr. Hemmis.

20   MR. HEMMIS:  Are we skipping No. 1?

21   THE COURT:  Well you know, we know who you are, so we

22   are.

23   MR. HEMMIS:  All right.  Okay.  I live in Rosamond,

24   which is in southeast Kern County.  I'm married.  I retired as

25   the chief of ground safety at Edwards Air Force Base, so I'm

currently retired.

My wife is a teacher and she teaches reading intervention to third, fourth and fifth graders in the Rosamond school system.  My education level is associate's degree, so that's 14 years.  I've served on a jury in a criminal trial in April in Mojave in state court and yes.  And the answer to No. 9, there's no -- I don't have any doubt that I could be fair and impartial.

THE COURT:  Thank you, Mr. Hemmis.  I'm going to give you a little piece of advice, not for today, but going forward.  If you served on -- and maybe you all can use this.  If you serve on federal court, you should be able to -- well, let me do it the other way.  If you serve in a state court you're excused from federal jury service for a year.

MR. PRICE:  Oh.

THE COURT:  Uh-oh.  Well next time you'll (indiscernible).

MR. HEMMIS:  I thought I was called to this because I pissed the judge off in April.

(Laughter.)

THE COURT:  I do have a little picture of you back here (indiscernible).

(Laughter.)

THE COURT:  Mr. Price, it sounds like you've been on jury duty just recently.

1    MR. PRICE:  Yes, I have.  I live here in Bakersfield.

2  I'm married.  I work for a refuse and recycling company here in

3  town, which is Price Disposal.  My wife is a stay-at-home mom.

4  I have my bachelor's of arts and liberal studies.  Yeah, I was

5  on a jury here in town in May.  It was a criminal trial and of

6  course it was state court, and we did find a verdict.  And I do

7  believe that I can be completely fair and impartial.

8    THE COURT:  All right.  Thank you.

9    Ms. Beard.

10    MS. BEARD:  I live in northeast Bakersfield.  I'm

11  married.  I did computer mapping for the City of Bakersfield

12  and am currently retired.  My husband is a cattle rancher.  I

13  completed two years of college, plus job training for GIS Esri

14  training.  I've been on a jury, it was criminal, Bakersfield,

15  California and there was no verdict.  And yes, I can be

16  completely fair and impartial.

17    THE COURT:  And about how long ago was that jury

18  service?

19    MS. BEARD:  I missed it by a month.

20    THE COURT:  It's just over a year ago?

21    MS. BEARD:  Just over a year.

22    THE COURT:  All right.  Thank you.

23    MS. PECK:  All right.  I live Oakhurst, California.

24  That's north of Fresno.  I'm engaged.  Right now I stay at home

25  with my babies and prior to that I was an instructor at a

cosmetology school.  My fiance, he works for a trucking

brokerage company.  I'm supposed to remember what it's called

and I never can.  But I have a cosmetology license.  I did go

to some college.  I haven't served on a jury and there's no

doubt in my mind that I can be fair and impartial.

THE COURT:  All right.  Thank you.

Mr. Espinola.

MR. ESPINOLA:  I live in Atwater, California and I am

married.  My wife is a school teacher for Whitton School

District.  I am a radiologic technologist, an x-ray tech; been

that for 22 years.  Got my degree, ASRT, from Merced College.

Never served on a jury before.  A couple months ago I was at

this point and got sent away at the last minute and no reason

why I cannot be fair and impartial.

THE COURT:  All right.  Thank you.

Ms. Salles.

MS. SALLES:  I live in Clovis.  I am married.  I am a

registered nurse currently working for Central California

Endoscopy Center in Fresno.  My husband is a CPA/computer

consultant who owns his own business in Fresno.  I have a

bachelor's degree in nursing.  I have never served on a jury

before and I could be fair and impartial for this case.

THE COURT:  All right.  Thank you.

For the plaintiffs, Mr. Vitiello, Mr. Heenan, would

you like to inquire of the jury?

1        MR. VITIELLO:  Yes, we would, Your Honor.

2        THE COURT:  All right.  Go ahead.

3        MR. VITIELLO:  Shall we approach the lectern?

4        THE COURT:  Either way.  Whatever's more convenient

5   for you.

6        MR. VITIELLO:  I think it might be fine if I just

7   stand right here.

8        THE COURT:  Okay.

9        MR. VITIELLO:  I want to start out by saying thank

10  you to all of you for being here.  I learned earlier that there

11  were seven summoned jurors that didn't show up so you all

12  deserve a pat on the back for showing up.  It is a really

13  sacred duty that you guys are doing and I speak for I think all

14  of us when I say that we really appreciate it.

15       The Cornejos especially appreciate it because they

16  have been waiting a long time to get here and it requires a

17  jury to fix the problems that you're going to hear about.

18       We didn't cover whether anybody on the jury owns a

19  home or rents a home and I just want to see a show of hands.

20  Do we have homeowners, do we have renters?  Let's start with

21  homeowners.  We have a lot of homeowners.  Okay.  That's great.

22  Renters, by comparison, can I see a show of hands?  Okay.

23  Fewer renters.  Thank you.

24       I'll be honest with you, I went to law school,

25  probably was one of my worst classes and I didn't know a lot

about some of the terms that you've been hearing about;

mortgages, loan modifications, things like that when I was in

law school and I only really heard about them sort of later in

life and I just want to get an honest reaction from you.

Do any of these terms frighten you, do they make you

nervous?  How do you feel about some of these terms.  If I

could just go around the room.  Can I start with you up there

in the corner?

MR. McCLOUD:  What's your question?

MR. VITIELLO:  How do you feel about some of these

terms?  Are these tough terms for you or do you know what they

mean?  And she'll pass you the microphone.

MR. McCLOUD:  Yes, I understand all of the terms.

MR. VITIELLO:  Okay.  If I could move to Mr.

Stanfield.  Any difficulty with any of these terms?

MR. STANFIELD:  No.  I'm comfortable with those.

MR. VITIELLO:  And are you -- were you a homeowner,

sir?

MR. STANFIELD:  Yes.

MR. VITIELLO:  You were a homeowner and you have a

loan on your home?

MR. STANFIELD:  Yes, I do.

MR. VITIELLO:  Is that the only loan you have on your

home?

MR. STANFIELD:  Yes.

1          MR. VITIELLO:  And you're still paying it off?

2          MR. STANFIELD:  Of course.

3          MR. VITIELLO:  And how do you feel about that?

4          MR. STANFIELD:  I hope we live long enough to pay it

5     off.

6          MR. VITIELLO:  I think we all do.  We all do.  Do you

7     feel responsible for that payment that you make?

8          MR. STANFIELD:  Yes, I do.

9          MR. VITIELLO:  And do you harbor any ill will against

10    somebody who isn't able to make that payment because of

11    circumstances outside of their control?

12         MR. STANFIELD:  No (indiscernible).

13         MR. VITIELLO:  Okay.  Thank you.

14         You can tell that I'm asking questions and looking

15    for honesty mostly because we really need to know some of this

16    stuff about you guys to be able to pick the best jury here for

17    this type of case on both sides and it's really awkward to be

18    honest with you to be asking these very sensitive questions of

19    strangers and you guys have been really forthcoming with a lot

20    of the information.  I think the Judge has done a great job of

21    getting it out of you, but some of you really haven't spoken so

22    much so I want to kind of focus on some of those people if you

23    don't mind.  No offense to anybody who has talked for quite a

24    while, but I'd like to go, if I can, over to Mr. Yang.

25         MR. YANG:  (Indiscernible).

1      MR. VITIELLO:  You don't own a home.  That's not what

2  the question's about, but I appreciate you listening, yes.  My

3  question about you is really you raised an issue about language

4  earlier and I wonder if you've ever been frustrated by an

5  inability to communicate with anybody who didn't speak the same

6  exact language as you or maybe that had a kind of different

7  dialect to the way they spoke.  Is that an issue that you

8  suffer from a lot?  Do you experience that in regular life

9  often?

10      MR. YANG:  (Indiscernible).

11      MR. VITIELLO:  I'm sorry?

12      THE COURT:  Let's check that microphone.  For some

13  reason it's gotten quiet.

14      MR. VITIELLO:  Ever frustrate you that somebody can't

15  relate to you on a -- based on a language issue?

16     (No audible response.)

17      MR. VITIELLO:  You don't know?  That's a fine answer.

18  To be honest with you, it's an honest answer.  A lot of the

19  times people don't know things and we certainly don't want you

20  to guess.  You rent a home, is that right?

21      MR. YANG:  No.

22      MR. VITIELLO:  You don't rent?

23      MR. YANG:  No.  (Indiscernible) live with my in-laws

24  right now.

25      MR. VITIELLO:  You live with your in-laws?

1          MR. YANG:  Yeah.

2          MR. VITIELLO:  Okay.  Thank you very much.  That's

3     helpful information for us.

4          Can I move over to Ms. Peck down here?  If you could

5     pass the microphone down?  Thank you.

6          Hi.  How are you?  You said Oakhurst?

7          MS. PECK:  Yes.

8          MR. VITIELLO:  That sounds far.

9          MS. PECK:  It is.

10         MR. VITIELLO:  Is it?  How long did it take you to

11     get here today?

12         MS. PECK:  Two and a half hours.

13         MR. VITIELLO:  Two and a half hours.  I think we're

14     having a battery issue?

15         THE CLERK:  We are.

16         MR. VITIELLO:  Okay.

17         THE CLERK:  (Indiscernible).

18         MR. VITIELLO:  I'll just wait a second so we can get

19     a real good record here.

20       (Pause - technical difficulties.)

21         MS. PECK:  All right.  So two and a half hours.

22         MR. VITIELLO:  So we were talking about -- okay.  Two

23     and a half hours.  I think I heard that before.  Okay.  How did

24     that make you feel, coming all the way down here?

25         3MS. PECK:  I was kind of tired.

154

1      MR. VITIELLO:  Yeah.  I think a lot of us are tired
2  and that's fair.  Do you harbor any ill will against the system
3  or against anybody in the room for bringing you here?

4      MS. PECK:  No.

5      MR. VITIELLO:  That's fair.  I heard that you were
6  engaged.  Congratulations.

7      MS. PECK:  Oh, thanks.

8      MR. VITIELLO:  The issue that I have for you is you
9  heard that this is going to be a five-day trial which is, in
10  the grand scheme of things, actually quite a short trial.  But
11  you're going to have to either commit to driving two and a half
12  hours there and back everyday or staying here.  Have you made
13  an arrangement one way or another?

14      MS. PECK:  No, I have not made further arrangements
15  past today.

16      THE COURT:  Mr. Vitiello, just to interject, we've
17  addressed the issue of hardship.

18      MR. VITIELLO:  Fair enough, Your Honor, and I'll skip
19  ahead.

20      Were you a homeowner when you raised your hand?

21      MS. PECK:  No.

22      MR. VITIELLO:  You're a renter?

23      MS. PECK:  Yes.

24      MR. VITIELLO:  And how do you feel about your rental
25  arrangement?  Do you think your landlord is fair?

1          MS. PECK:  I love my landlord.  We have a three-year

2     lease with her and she's been pretty helpful and -- any issues.

3          MR. VITIELLO:  Three-year lease is pretty atypical,

4     at least where I come from.  Did you negotiate that?

5          MS. PECK:  Uh-huh.

6          MR. VITIELLO:  Who -- you're engaged, and was it you

7     doing the negotiating, or your fiance or both?

8          MS. PECK:  Kind of both.

9          MR. VITIELLO:  Kind of both.

10         MS. PECK:  She's an older woman that wants her home

11    taken care of, so we didn't go through like a rental company.

12    It's a private -- she had --

13         MR. VITIELLO:  So there's no go between.  You met

14    with her, sat down, signed some documents and --

15         MS. PECK:  Yeah.  She had somebody draw up some

16    paperwork for us.

17         MR. VITIELLO:  Okay.  Ever late on your rent?  And I

18    know that's an awkward question, but --

19         MS. PECK:  No.  It's like an automatic.

20         MR. VITIELLO:  An automatic debit comes out of your

21    account?  So it's taken every time?  What about if you don't

22    have any money, what happens then?

23         MS. PECK:  I guess we're going to give her a call.

24         MR. VITIELLO:  You would give her a call.

25         MS. PECK:  Or borrow it from family members or

156

1    something, but --

2            MR. VITIELLO:  Would you expect her to take your

3    call?

4            MS. PECK:  Yes.

5            MR. VITIELLO:  Would you have an issue if she didn't?

6            MS. PECK:  If she never returned my phone call or

7    just --

8            MR. VITIELLO:  Yeah.

9            MS. PECK:  Yes.

10           MR. VITIELLO:  How would it make you feel if --

11           THE COURT:  Counsel, we're getting close to argument.

12           MR. VITIELLO:  Sorry.

13           THE COURT:  You need to move on.

14           MR. VITIELLO:  I'll move on then.

15           If I could get maybe one minute with Mr. Price?  Hi.

16   How are you?

17           MR. PRICE:  Fine.  Thank you.

18           MR. VITIELLO:  We didn't hear a lot from you until

19   sort of the very end.  I heard you say that you work with Price

20   Disposal?

21           MR. PRICE:  Yes.

22           MR. VITIELLO:  You're Mr. Price.

23           MR. PRICE:  Yeah.  It's a family business, yes.

24           MR. VITIELLO:  It's a family business.

25           MR. PRICE:  Yes.

157

1      MR. VITIELLO:  Did you start that yourself?

2      MR. PRICE:  No.  My grandfather.

3      MR. VITIELLO:  Your grandfather.  And your

4   grandfather passed it to your father or your mother?

5      MR. PRICE:  Yeah.  Father, uncle, aunt.

6      MR. VITIELLO:  And they passed it on to you?

7      MR. PRICE:  Myself and cousins.

8      MR. VITIELLO:  Did you start working there as a

9   youngster?

10      MR. PRICE:  Yes.

11      MR. VITIELLO:  And do you have a sense of pride about

12   that business?

13      MR. PRICE:  Yes, I do.

14      MR. VITIELLO:  Is it a small business or a big

15   business?

16      MR. PRICE:  It's medium; about 50, 60 employees.

17      MR. VITIELLO:  That's no slouching business.  Ever

18   have tough times at the business?

19      MR. PRICE:  Oh, yeah.  There's always ups and downs,

20   ebbs and tides, but for the most part we've been blessed.  For

21   the last 20 years or so it's been pretty steady.

22      MR. VITIELLO:  Do you make decisions with respect to

23   like cost cutting if, you know, times are thin and you have to

24   maybe think about laying some people off or make any tough

25   decisions like that?

158

1      MR. PRICE:  Luckily we haven't had to make those

2  types of decisions of laying employees off, so we've been

3  blessed in that aspect, at least anything that I've been a part

4  of.

5      MR. VITIELLO:  You say lucky and blessed.  I mean is

6  it fair to say that you feel that that would be a tough

7  decision to make, having to lay people off, things like that?

8      MR. PRICE:  Yes.  If it came to that point, yeah, it

9  would be a tough decision.

10      MR. VITIELLO:  Okay.  You think you'll be fair for us

11  today?

12      MR. PRICE:  Yes.  Yes, I do.

13      MR. VITIELLO:  I think last maybe I'll hear from Ms.

14  Beard, right to your right.

15      We didn't get a lot of time with you either and were

16  you a homeowner when you raised --

17      MS. BEARD:  Uh-huh.

18      MR. VITIELLO:  How long have you owned your home?

19      MS. BEARD:  Seventeen years.

20      MR. VITIELLO:  Seventeen years.

21      MS. BEARD:  This one.  You know, we've had priors.

22      MR. VITIELLO:  You've had a prior one.  How many

23  prior homes did you have?

24      MS. BEARD:  Five.

25      MR. VITIELLO:  Five homes.  And did you raise

children in those homes?

      MS. BEARD:  Yes.

      MR. VITIELLO:  Do you have any special feelings about the home that you raised your children in?

      MS. BEARD:  No.

      MR. VITIELLO:  No.  Any mortgages on your current property?

      MS. BEARD:  Yes.

      MR. VITIELLO:  Are you getting close to paying those off?

      MS. BEARD:  Halfway.

      MR. VITIELLO:  How does that feel, halfway there?

      MS. BEARD:  That's life.

      MR. VITIELLO:  That's life, yeah.  Well it's neither good or bad I guess.  Ever been in any financial trouble with that mortgage?

      MS. BEARD:  No.

      MR. VITIELLO:  No.  Do you think if you were that you would reach out to your bank and try to talk it out with them?

      MS. BEARD:  Yes.

      MR. VITIELLO:  And you think they would take your call?

      MS. BEARD:  Yes.

      MR. VITIELLO:  Thank you.

      If I have anymore time I'll use it, Your Honor.

160

1       THE COURT:  If needed you may take it.

2       MR. VITIELLO:  Let's go back, if you can pass it back

3  up that way, to Mr. Moore again, one more time.  I'm sorry to

4  be coming back to you.

5       MR. MOORE:  It's all right.

6       MR. VITIELLO:  We didn't hear a lot from you either.

7  You're a manager of the almond factory?

8       MR. MOORE:  That's correct.

9       MR. VITIELLO:  Is that your almond factory?  I didn't

10  quite get the --

11       MR. MOORE:  No, sir, it's not.

12       MR. VITIELLO:  My almond experience is very limited,

13  so I wasn't sure.  The question I have for you is similar to

14  what I just asked.  Do you have to make any tough calls as a

15  manager with respect to laying people off, things like that?

16       MR. MOORE:  Yes, I do.

17       MR. VITIELLO:  You sign any documents at the company

18  for things like loans, things like financial decisions?

19       MR. MOORE:  Not -- no.  Not directly, I do not.

20       MR. VITIELLO:  Not directly.  So you're maybe more of

21  a personnel guy since you're responsible for people?

22       MR. MOORE:  Operations.

23       MR. VITIELLO:  Operations.  Do you feel it's a tough

24  call to make if you have to lay somebody off or make a judgment

25  call like that with respect to an employee you have?

161

1        MR. MOORE:  Yes, it is.

2        MR. VITIELLO:  You feel obligations to those

3  employees?

4        MR. MOORE:  Well it's an agricultural business, so we

5  take on a lot of employees during the season, lay a lot of

6  employees off.  So it's something that I'm accustomed to.

7        MR. VITIELLO:  Fair enough.  Thank you.

8        Just look at my notes for one second.

9        We had a show of hands for homeowners but no show of

10  hands for mortgages.  How many of you homeowners own your homes

11  free and clear; in other words, you don't have any mortgage?

12        Mr. McCloud.

13        MR. McCLOUD:  Yes.

14        MR. VITIELLO:  Also somebody that we happened to not

15  hear a lot from.  If you could pass that down?  Thank you.

16        How does that feel, owning your home free and clear?

17        MR. McCLOUD:  To be honest with you, I have no idea

18  what it would feel like to have a mortgage.

19        MR. VITIELLO:  Oh, you've never had one?

20        MR. McCLOUD:  Never had one.

21        MR. VITIELLO:  Interesting.  You mentioned that

22  you're a retired man?

23        MR. McCLOUD:  That is correct.

24        MR. VITIELLO:  Is it fair to say that you did well

25  for yourself professionally?

162

MR. McCLOUD:  Very well.

MR. VITIELLO:  And is that how you were able to afford your home free and clear?

MR. McCLOUD:  That and good -- that and good marrying.  I married a -- my wife used to be a broker.  She had her own company before it went belly up back in the '80s, in that area and she taught me how to budget and she invested my money, and I don't have to worry about a thing.

MR. VITIELLO:  That feels pretty good doesn't it?

MR. McCLOUD:  There again, I'm used to it.  I have no idea what it would be like to pay payments on anything.

MR. VITIELLO:  Okay.  That's some brutal honesty and I like that because that's why we're here.

Anybody else without a mortgage?  I think you were the only one, but I just want to be sure.  Can we pass it up please?  Thank you.

Wamocha, Mr. Barnard -- excuse me, is it Mr. Wamocha?

MR. WAMOCHA:  Yeah.  That's correct.

MR. VITIELLO:  You're a teacher, right?

MR. WAMOCHA:  Instructional aide.

MR. VITIELLO:  An instructional aide.  And you own your home free and clear?

MR. WAMOCHA:  Well I don't own a home.  I just -- I rent an apartment.

MR. VITIELLO:  Oh, but you -- my question was about

163

owning a home free and clear with no mortgage.  So you're a
renter?

MR. WAMOCHA:  Yeah.  I'm a renter.  So I guess -- so
I'm not really familiar with a lot of the terminology that is
out there, you know, the mortgage and the loans because I can't
really relate to that because I don't, you know, I don't own a
home or anything like that.  So I'm just kind of hearing from
what everybody else is saying about it and yeah, so kind of
learning it on the go.

MR. VITIELLO:  Do you feel challenged at all with
respect to -- this is obviously going to be a lot of the
subject matter.  The Judge has talked at length about property,
and loans, and foreclosure and loan modification has come up a
lot.  These are terms that are going to be -- every day these
are terms that are going to come up.  Do you think that
presents any specific challenges for you, somebody who doesn't
have that sort of experience?

MR. WAMOCHA:  I would say somewhat.

MR. VITIELLO:  Somewhat.

MR. WAMOCHA:  Yeah.

MR. VITIELLO:  Do you think you could overcome it if
we do a good job of explaining those things to you?

MR. WAMOCHA:  Possibly.

MR. VITIELLO:  I've got sort of one last thing I want
to hit, and the -- maybe the best way of doing it is just by

164

sharing a story that I have of myself.  I had a situation one

time when --

        THE COURT:  Counsel, I'm sorry, I'm going to

interrupt you.   If you have questions we'll do that, but not

statements.

        MR. VITIELLO:  I do have a question.  So the question

is going to be in dealing with any company, we all have to deal

with companies every day, but in dealing with any company, by a

show of hands, anybody been frustrated by dealing with red tape

or -- I mean that's kind of common providence, but bureaucracy,

you know, dealing with a challenging issue that a company has

that you just simply haven't been able to break through?

Anybody -- show of hands.  Mr. Lourenco, care to share anything

about that?

        MR. LOURENCO:  Just -- yeah.

        THE CLERK:  Microphone.

        MR. LOURENCO:  Just in general, in times, you know,

trying to get through to somebody to get a question answered,

to get clarification on something or whatever and banging your

head against the wall and leaving messages.  And you know, in

fact this specific court I left a message for that was never

returned.  I'm just saying that's the most recent one.

Frustrating when you don't get --

        THE COURT:  I'll just say I didn't get a call

(indiscernible).  I would've called you back.

1          MR. LOURENCO:  Okay.  We'll have to exchange numbers
2     later.
3          Just the frustration of not -- communication.  You
4     know, I reach out, try and get clarification, trying to do the
5     right thing and then those things don't get returned or
6     resolved is frustrating.
7          MR. VITIELLO:  Well of course the Court is always
8     right and infallible, but with respect to the other issue with
9     a company, do you recall which company that was that you were
10    having an issue?
11         MR. LOURENCO:  Not off the top of my head.  You know,
12    it hasn't happened in a while, but I can recall times just, you
13    know, trying to reach out to somebody whether it was a bank,
14    television service provider, cell phone service provider,
15    telephone company.  You know, I'm sure it's run the whole gamut
16    across my life span.  Just trying to communicate and trying to
17    get clarification and just not being responded to as promptly
18    as they wish that you respond to their prompts.
19         MR. VITIELLO:  Sure.  I understand.  I appreciate
20    that.  Thank you very much.
21         I saw Ms. Montero Pardo nodding her head while you
22    were talking.  Could you pass the mic to her?
23         What was your experience?
24         MS. MONTERO PARDO:  Yes.  My insurance.
25         MR. VITIELLO:  Insurance company?

166

1    MS. MONTERO PARDO:  Yeah.  My car was still in

2    earlier in August and it was totaled and I still haven't

3    resolved it.  I keep on leaving messages and messages and they

4    won't respond back.  So it's frustrating because I have a car

5    payment to do because I've only had less than $2,000 to pay off

6    my car and it got stolen and totaled.  So now I'm left off

7    paying those $2,000 and I'm like why is my insurance not giving

8    me a call back.

9    MR. VITIELLO:  So you said a lot there.  Do you mind

10   me asking what your purchase price of the automobile was?

11   MS. MONTERO PARDO:  Close to $20,000.

12   MR. VITIELLO:  Is that one of the most expensive

13   things you own?

14   MS. MONTERO PARDO:  Yes.

15   MR. VITIELLO:  Does it mean a lot to you?

16   MS. MONTERO PARDO:  Yes.  It was one of my first cars

17   under my name and not having my dad sign off for me.

18   MR. VITIELLO:  Does that means something to you,

19   having it in your name?

20   MS. MONTERO PARDO:  Yeah.  It was mine.

21   MR. VITIELLO:  And did your dad teach you that it is

22   important to have something in your name that you build and

23   that you own?

24   MS. MONTERO PARDO:  It shows responsibility.  Like I

25   had to do my payments and insurance, but now it's just

167

frustrating not to be able to have my own car and start all
over again.

MR. VITIELLO:  Starting all over again.  That's a
great analogy.  Do you feel that at some point you will be in a
position to get a car again, whether it's a replacement
automobile or work this issue out with your insurance?

MS. MONTERO PARDO:  I hope so.  I'm still waiting.

MR. VITIELLO:  Okay.  Thank you.  I appreciate your
honesty.

Mr. Somerville, you also raised your hands.  Is it
fair to say that the issue you're raising your hand is about
the foreclosure that's been discussed already?

MR. SOMERVILLE:  No, not necessarily.

MR. VITIELLO:  Do you have another company presented
you with a lot of red tape?

MR. SOMERVILLE:  A lot of red tape and a lot of
things they said were wrong and it was their book.

MR. VITIELLO:  Can I ask you who that company was?

MR. SOMERVILLE:  It was Granel (phonetic).

MR. VITIELLO:  And what was the issue?

MR. SOMERVILLE:  Just a certain design on their
systems.

MR. VITIELLO:  Could you go into it a little deeper?
Did you disagree with the design?

MR. SOMERVILLE:  I disagreed -- no.  I didn't

168

disagree with the design.  I disagreed with the way they read

their own paperwork.

MR. VITIELLO:  Thank you.  I appreciate that.

I think that's all, Your Honor.

THE COURT:  All right.  Thank you.

MR. VITIELLO:  Yeah.  Thank you.

THE COURT:  All right.  So Mr. Shatz or Mr. Paino,

would you like to inquire of the jury?

MR. SHATZ:  Yes, Your Honor.  One moment please.

(Pause.)

MR. SHATZ:  This spot?

THE COURT:  If that's comfortable for you, that's

fine.

MR. SHATZ:  Good afternoon.  My fear is the only

thing between lunch and you is me, so I apologize.

Mr. Moore, I think you raised your hand when you said

there was no -- the question was no mortgage.  Do you have a

home that's now paid off, or were you renting or did I not see

your hand go up properly?

MR. MOORE:  Yeah.  Both.  I currently have a mortgage

and then I have properties that are paid off.

MR. SHATZ:  Okay.  So you have -- back to inside

voice.  I apologize.  So you have more than one property?

MR. MOORE:  Yes, sir.

MR. SHATZ:  Some with mortgages, some without?

169

1      MR. MOORE:  One with mortgage and two without.

2      MR. SHATZ:  In your entire history ever had a problem

3  with your mortgage?

4      MR. MOORE:  No, sir.

5      MR. SHATZ:  In the back row, anybody ever had a

6  problem with their mortgage if they had one, ever at any time?

7      Middle row, problem with mortgage?  I understand Mr.

8  Somerville did.  No other problems.

9      And Mr. McCloud, I can't even begin to understand

10  what it's like living the dream of no mortgage ever.  Okay?

11      MR. McCLOUD:  Yes.

12      THE CLERK:  Microphone.

13      MR. McCLOUD:  I was raised if you can't afford it you

14  save it up and you buy it.

15      MR. SHATZ:  Okay.

16      MR. McCLOUD:  Period.  Okay.  That's the way it was.

17      MR. SHATZ:  Perfect.  That works.

18      Ms. Salles, did you have a mortgage now?

19      MS. SALLES:  Yes, I do.

20      MR. SHATZ:  Currently.  Ever have a problem -- oh

21  yes, I'm sorry.

22      MS. SALLES:  Yes, we have a mortgage.

23      MR. SHATZ:  Ever have a problem with the mortgage?

24      MS. SALLES:  No.  I mean we've refinanced, but --

25      MR. SHATZ:  I never thought of refinancing as a --

1    MS. SALLES:  -- you know, that's not a problem.

2    MR. SHATZ:  -- problem.

3    MS. SALLES:  Right.

4    MR. SHATZ:  You got a better rate?

5    MS. SALLES:  Yes.

6    MR. SHATZ:  Took more money out?

7    MS. SALLES:  Yes.

8    MR. SHATZ:  Paying it back?

9    And anyone up front here have a problem with their

10   mortgage, ever a problem with mortgage?  Doesn't appear to be.

11   Yes, Mr. Espinola.

12   MR. ESPINOLA:  I had the short sale, as I stated

13   earlier.

14   MR. SHATZ:  Right.  What was the lump sum problem?  I

15   didn't understand that one.

16   MR. ESPINOLA:  When our loan got sold to another

17   provider we got our first statement from them saying we owed

18   them $14,000 in lump sum for back payments we had missed.

19   MR. SHATZ:  And you made those payments?

20   MR. ESPINOLA:  I had documentation that went back

21   four years, showed every payment made.  I actually showed one

22   payment electronically that was made that they returned to us a

23   week later without even notifying us or telling us anything.

24   Went through that whole process, getting paperwork, doing this,

25   doing that, they didn't accept our paperwork so we ended up

short selling and actually just closed escrow last week on our

new home.

MR. SHATZ:  So now you're a new homeowner?

MR. ESPINOLA:  And my home is in shambles right now.

MR. SHATZ:  Did you buy it that way?

MR. ESPINOLA:  No.  It's just all the stuff that

we've brought with us.

MR. SHATZ:  So I'm going to make a small prediction

you will be totally unpacked just in time to move again.

MR. ESPINOLA:  No.  I'm waiting for my wife to unpack

everything while I'm here.

MR. SHATZ:  We are not going to extend the trial for

you.  Sorry.

I understand that the case here is about mortgages,

but there are many types of loans out there and we've all --

some of us have had issues with some of our lenders and

calling, for example, credit card companies or student loan

issues and things like that.  Has anybody had an issue with a

servicer of another type of loan?  Wow.  I'm the only one.

Okay.  No problem.

What about calling customer service representatives,

800, 866, 888, has anyone ever made a call to a customer

service representative period?  Some of you don't have your

hands up so you don't have T.V.s, you don't have cable, you

don't have credit cards.  That's fine.  No problem.  In those

calls to customer service, if you pushed less than three

buttons to get to a live person raise hand.  Okay.  For those

of you who had to push more buttons than three, was it a

problem?  Okay.  And other than the mortgage issue or -- Mr.

Somerville, or -- mortgage issue?

                MR. SOMERVILLE:  (Indiscernible).

                MR. SHATZ:  Okay.  What happened?

                MR. SOMERVILLE:  It didn't turn out the way I wanted

it to.  It was a AT&T -- it was a cell phone situation.

                MR. SHATZ:  Who's your current cell phone provider

today?

                MR. SOMERVILLE:  AT&T.

                MR. SHATZ:  Okay.  Has anyone ever eaten at La

Colonia Restaurant?  You have?  Did you like it?

                MS. BEARD:  Yeah.

                MR. SHATZ:  Have you ever seen Mrs. Cornejo before?

                THE CLERK:  Microphone.

                MR. SHATZ:  I'll try it again.

                MS. BEARD:  Yes, I've eaten at La Colonia.

                MR. SHATZ:  And did you like it?

                MS. BEARD:  Yes.

                MR. SHATZ:  Have you ever seen Mrs. Cornejo before?

                MS. BEARD:  No.

                MR. SHATZ:  Do you know -- have you ever seen Mr.

Cornejo before?

1    MS. BEARD:  Not that I know of.

2    MR. SHATZ:  Okay.  Mr. Somerville, I just wanted to

3  do a small touch of follow up because you had mentioned a

4  couple of things.  You had mentioned that your situation would

5  impact your ability to be fair.  You had mentioned that you're

6  still angry about it.  You had mentioned that you would commit,

7  as the Judge asked, and then you said however.  And then you

8  said I can try and set aside those feelings and yes I can

9  commit.  Is this unhesitatingly or are you still -- you're not

10 sure if this is a good case for you and perhaps a different

11 case might be better?

12    MR. SOMERVILLE:  I'm not sure.  Well this case is --

13 it is what it is.  I can set myself apart and have -- I'm

14 not -- I don't have anger issues that I'm still carrying with

15 me.  What it is, that water's under the bridge.  But another

16 case might be better for me.

17    MR. SHATZ:  I wasn't asking specifically about the

18 Cornejos and Ocwen and U.S. Bank.  I was asking about the

19 nature of the case, this being a mortgage foreclosure case.

20 Would you feel more comfortable on a different type of case?

21    MR. SOMERVILLE:  Sure I would.

22    MR. SHATZ:  And will this case, as the issues come

23 back and you hear about foreclosure again and communications

24 with various parties, bring up those feelings in you that may

25 impact your ability to make a fair and impartial decision?

1        MR. SOMERVILLE:  They may.  I can't not say that I
2    can stand apart from it.  I mean it is an experience that I've
3    already gone through.
4        MR. SHATZ:  Yeah.  It is a part of what's happening
5    in America.  Thank you.
6        Mr. Yang, similar types of questions with your
7    comfort level in that have you, not trying to single you out,
8    but you mentioned different languages.  Have you followed all
9    that's been going on or are you missing a part of some of the
10   things we're asking?
11       MR. YANG:  I follow it.
12       MR. SHATZ:  Oh, so then the level of English we're
13   using which is all we're going to be doing for the rest of the
14   case, you're very comfortable with it?
15       MR. YANG:  Yeah, but I kind of like -- some term I
16   don't really get it, so -- but I still understand it but
17   (indiscernible).
18       MR. SHATZ:  Okay.  Truly thank you all for
19   volunteering to be on our jury.
20       THE COURT:  Counsel, do you have challenges for
21   cause?
22       MR. SPEAKER:  Yes please.
23       THE COURT:  Let's do that at sidebar.
24     (Sidebar begins.)
25       THE COURT:  Challenges for cause.  Plaintiffs say

they have none.

MR. SHATZ:  Our first was Juror No. 20, Mr. Somerville.

THE COURT:  Okay.

MR. SHATZ:  He'll answer almost any question that we give him and in the end he will say yes he'll be fair and impartial.  He made several comments early on, even when you pushed he still kept coming back equivocal and some of them I said out loud.  He (indiscernible) definitely -- no, I said definitely.  I apologize.  This would impact his ability to be fair and he's still angry about it.

He agreed to commit to what you said when you asked him, then he said however.  And then I can try to set aside those feelings.  Can you commit?  Yes.  I have the feeling that mom was saying you're not going to reach in the cookie jar anymore and yes, I'm not going to reach in the cookie jar until later she leaves the room.

I'm sensing this is really not a good case for him. This mortgage case, it keeps bringing up feelings.  It appears to be in his face intangible, I'll grant, but he is not one who appears to be able to set aside his feelings and he has said that four times.

THE COURT:  All right.  Anyone else?

MR. YANG:  I only want to raise Mr. Yang and his ability to follow and understand what's going on.  So I'm not

176

1    sure that's a cause or hardship or other type of challenge.

2         THE COURT:  That'd be a cause.

3         MR. SHATZ:  Okay.  Then cause, No. 19, Mr. Yang

4    who --

5         THE COURT:  It's actually No. 2 at this point.

6         MR. SHATZ:  Oh, you've changed the numbers when they

7    move seats?

8         THE COURT:  He becomes No. 2, yeah.

9         MR. SHATZ:  Oh.

10        MR. VITIELLO:  We went over that at the very

11   beginning.

12        MR. HEENAN:  You even reiterated that.

13        MR. SHATZ:  (Indiscernible) the No. 2 spot.  I

14   apologize.  (Indiscernible).  He knows more than I do.  So I

15   raise that as a concern to the Court and counsel that I'm not

16   sure he's following and don't know if he can actually render a

17   verdict, whether he's fair or impartial.

18        MR. HEENAN:  (Indiscernible), Mr. Yang.

19        MR. VITIELLO:  What do you think, John?

20        MR. HEENAN:  I mean he just said he was.

21        THE COURT:  My view is it's contrived.  He took a

22   position that he couldn't understand English.  He's not going

23   to back away from that despite that he understands everything

24   that's been said.  He does indicate that he doesn't understand

25   all the terms, but that will be an issue for the plaintiffs to

177

explain the specific terms.  But he went all through school, he
did the high school exit exam in English.

MR. SHATZ:  (Indiscernible).

THE COURT:  I have no doubt he speaks English.

MR. SHATZ:  Okay.  That was -- I'm not pushing on
that.  I just wanted to raise that issue because --

THE COURT:  Anyone else?

MR. SHATZ:  No.

THE COURT:  All right.  I appreciate your concerns as
to Mr. Somerville, but he did commit.  I think he was
sufficiently rehabilitated.  As a result, the motion to -- for
cause is denied.

All right.  We'll be stipulating (indiscernible).

MR. SHATZ:  I have one question as to how it works so
I don't talk and embarrass myself.  Let's assume no one has any
strikes.  Do you sit numbers one through eight?

THE COURT:  Uh-huh.

MR. SHATZ:  And if someone has a strike, do you only
strike one thought eight or do you strike, for example, No. 32?

THE COURT:  Well if we had 32 (indiscernible) --

MR. SHATZ:  No.  It's not real.

THE COURT:  It's not going to impact -- it would be
one through eight.

MR. HEENAN:  Do you have us strike even outside of
the eight (indiscernible)?

178

1        THE COURT:  You can do that, but one through eight

2   are your focus.

3        MR. VITIELLO:  I understand.

4        MR. SHATZ:  Okay.  So if we like one through eight we

5   just say --

6        THE COURT:  Pass.

7        MR. SHATZ:  And if they pass we're done?

8        THE COURT:  Uh-huh.

9        MR. SHATZ:  If they strike someone, once someone

10  moves into that spot, then we can strike that spot -- have a

11  chance to strike that spot?

12        THE COURT:  Sure.  (Indiscernible).

13        MR. SHATZ:  (Indiscernible)?

14        THE COURT:  Right.  Yeah.  You can strike anybody.

15  And if they say you pass -- well it's up to the plaintiff

16  first.  They pass, you pass, jury.  If they strike somebody,

17  you pass, they pass, jury.  If they strike somebody, say No.

18  12, and you pass, they still can strike --

19        MR. SHATZ:  Okay.

20        THE COURT:  -- even though they're not hitting the

21  (indiscernible).

22        MR. SHATZ:  If Nos. 1 through 8 are not struck, fine.

23  If Nos. 1 through 8 are struck, do you bring in No. 9 to move

24  it up or you go to --

25        THE COURT:  Uh-huh.  They snake up at this point.

1    MR. SHATZ:  So it would be No. 9 next?

2    THE COURT:  Uh-huh.

3    MR. SHATZ:  And then No. 10?

4    THE COURT:  Uh-huh.

5    MR. SHATZ:  Okay.  Thank you.

6    (Sidebar ends.)

7    THE COURT:  All right.  Ladies and gentlemen, we're
8  actually going to be selecting our jury at this time.  If
9  you've been in state court before you've seen it done a little
10  differently.  Here in federal court what we do is circulate
11  what we call a strike sheet and at the end of that process
12  we'll have our jury.  So we will be off the record at that
13  time, so you were chatting a little bit while we were at
14  sidebar.  You're welcome to do that, stand up and stretch.
15  This should just take a few minutes and after that we will
16  excuse those of you who won't be on the jury.  Let's go off the
17  record.

18    (Recess from 12:38 p.m. to 12:50 p.m.)

19    THE COURT:  Ladies and gentlemen, if I call your name
20  I would ask you to go to the audience and I will give you
21  further instructions in just one moment.

22    First, Mr. Odom, if you would go into the audience
23  please.  Mr. McCloud as well.  Ms. Lackey, please go into the
24  audience.  Ms. Estrada -- I'm sorry, Mr. Somerville and Mr.
25  Lourenco.  Mr. Hemmis and Ms. Beard, Ms. Vance [sic], Mr.

180

Espinola and Ms. Salles -- I'm sorry, Ms. Peck.  I forgot one.
I forgot Ms. Vance was earlier (indiscernible).  All right.
From the perspective of the plaintiffs, is this the jury that
you selected?

MR. VITIELLO:  Yes, Your Honor.

THE COURT:  And defense, is this the jury you've
selected?

MR. PAINO:  Yes, Your Honor.

MR. SHATZ:  Yes, Your Honor.

THE COURT:  All right.  So the eight people in our
jury box, you will be our jury.  I will give you some
instructions in just one moment.

As to you out in the audience, thank you so much for
coming in.  I know today was a very big inconvenience to your
normal routine.  You are free to go.  I just ask that you call
the 1-800 number after 5:00 o'clock on Friday.

Mr. Lourenco, I'm going to look into that cell phone
call.  I apologize for that.  That's not something that you
typically see in federal court.  I don't want to cast
aspersions.  It's very common in other entities, but not in
this one, so I will check into that for you.  I apologize for
the inconvenience.

All right.  Thank you very much.  You all are
excused.

THE COURT:  You as well, Mr. Schallock.

181

1    MR. SCHALLOCK:  May I have my number (indiscernible)?

2    THE COURT:  Your juror number?

3    MR. SCHALLOCK:  (Indiscernible) I could not find --

4    THE COURT:  Ms. (Indiscernible) is our jury

5  coordinator.  She will assist you.

6    MR. SCHALLOCK:  Okay.  Thank you.

7    THE COURT:  Here or outside is fine either way, Mr.

8  Schallock.

9    MR. SCHALLOCK:  Okay.  It's fine out here.

10   THE COURT:  All right.

11     (Pause - excused jurors exit.)

12   THE COURT:  So we have the rest of our jury numbers.

13 I'm going to ask that you stand up and raise your right hand

14 and be sworn.

15                      JURY SWORN

16   THE COURT:  All right.  So what we will do now is

17 take a lunch break.  Part of that break is -- Ms. Hall is going

18 to show you to the jury deliberation room.  That's the place

19 that you will return every time you have a break.  You will be

20 getting an access card that will allow you to get into the

21 super secret back yard of the courthouse and she'll give you

22 some other information about your jury service.

23     So what I'm going to suggest is that we have a little

24 longer of a lunch period because as I mentioned earlier I do

25 have a couple of criminal matters to take care of at 2:30.  So

182

I'm going to ask if you would return to the jury deliberation
room at 2:45 and then we'll start.  I'll be honest, it'll
probably be a few minutes after that, but there's some waters
in there.  Some of you might want to get comfortable.

When you come back you're welcome to bring water into
the courtroom, but no other beverages.  That's how -- I have a
strict rule.  It still has the new car smell and we'd like to
keep it that way.  All right.  Thank you very much.  If you'll
go with Ms. Hall.

(Jury out at 12:54 p.m.)

THE COURT:  All right.  We're outside the presence of
the jury.  Anything to take care of at this time?  You're going
to have an extended lunch period as well obviously, so maybe
you can work out whatever issues you need to about the opening
statement.  When we get back I will give the jury their
instructions, the 10 that we talked about, so you'll want to be
prepared to discuss with me if there's any problems with those.

I do think there needs to be one deletion to
instruction No. 2.  I think we need to delete out the
penultimate sentence there that starts with they contend as a
result of the dismissal of the other claim, but I'm going to
ask you to look at those and be prepared to let me know if you
want any changes before we begin.

After that we'll go to opening statements.  What's
your time estimate for the opening statement, Mr. Vitiello?

1    MR. VITIELLO:  About 45, 50 minutes, Your Honor.

2    THE COURT:  All right.  For the defense?

3    MR. SHATZ:  Somewhere in the 30 to 45 range, trying

4    for shorter.

5    THE COURT:  Ideally that would be great.  It doesn't

6    look like we -- depending, I don't know, sometimes things go

7    short so I don't know if you have a witness prepared to begin.

8    You may need to.  We'll see.

9    MR. SHATZ:  We spoke on Friday and we were told the

10   first witness would be our witness and we had planned to meet

11   our witness last night and he's not here yet --

12   THE COURT:  Because of the travel problems?

13   MR. SHATZ:  Because of the travel problems.  I'm

14   hoping he'll be here.

15   THE COURT:  Okay.  All right.  So probably what we'll

16   do then is we'll skip -- even if we have time, jurors will have

17   to make hotel arrangements in any event, so giving them a

18   little extra time won't be bad.  So if there's other time that

19   we can use to address other issues we'll do that at that time.

20   Otherwise I'll see you back -- if you could be back at a

21   quarter till 3:00.

22   We will have a couple of criminal defendants at your

23   table over here on the defense, so you'll want to clear off

24   anything that -- actually, you'll want to clear off everything.

25   The marshals will do it for you if you don't, so we don't want

184

to (indiscernible) unnecessarily.

All right.  Anything else for the record?

MR. HEENAN:  No, Your Honor.

MR. SHATZ:  No, Your Honor.

MR. ANGWIN:  No, Your Honor.

THE COURT:  Thank you.

(Luncheon recess from 12:56 p.m. to 3:00 p.m.)

(Audio begins as follows.)

MR. HEENAN:  -- Your Honor.

THE COURT:  All right.  We're going to go ahead and do that.

Oh, any objections to instructions one through ten?

MR. SHATZ:  With the change that you talked about, no.

THE COURT:  Okay.  Do plaintiffs?

(No audible response.)

THE COURT:  For the plaintiffs, anything on the jury instructions?

MR. VITIELLO:  No, Your Honor.

THE COURT:  All right.

(Jury in at 3:02 p.m.)

THE COURT:  All right.  We have all of our jury members back in their places.  Thank you.  Everyone can be seated.

So the first thing we do this afternoon is I'm going

185

to give you some instructions that will assist you in
considering the evidence as it comes in.  With that we will
turn to opening statements by counsel.  If you can't hear me or
you need me to repeat please raise your hand and I will do
that.

PRELIMINARY JURY INSTRUCTIONS

THE COURT:  Ladies and gentlemen, you are now the
jury in this case.  It is my duty to instruct you on the law.
You must not infer from these instructions or from anything I
may say or do as indicating that I have an opinion regarding
the evidence or what your verdict should be.  It is your duty
to find the facts from all the evidence in the case, to these
facts you will apply the law as I give it to you.  You must
follow the law as I give it to you whether you agree with it or
not.

You must not be influenced by any personal likes or
dislikes, opinions, prejudices or sympathy.  That means you
must decide the case solely on the evidence before you.  You
will recall that you took an oath to do so.  In following my
instructions you must follow all of them and not single out
some and ignore others.  They are all important.

To help you follow the evidence I'm going to give you
a brief summary of the positions of the parties.  Frank Cornejo
and Dora Cornejo contend that the defendants improperly sold
their home at a foreclosure sale.  They contend they submitted

186

a completed loan modification application and provided all
required documents in a timely fashion and that was sufficient
to stop the foreclosure sale.  The plaintiffs contend they are
entitled to compensation as a result.

The defendants deny liability and contend that though
the Cornejos submitted a loan modification application they did
not submit it on time and it was not complete.  They contend
they were entitled to sell the home as a foreclosure sale and
as a result, the plaintiffs are not entitled to compensation in
this action.

In deciding the facts in this case you may have to
decide which testimony to believe and which testimony not to
believe.  You may believe everything a witness says, or part of
it or none of it.  Proof of a fact does not necessarily depend
on the number of witnesses who testify about it.

In considering the testimony of any witness you may
take into account (1) the opportunity and ability of the
witness to see, or hear or know the things testified to, (2)
the witness's memory, (3) the witness's manner while
testifying, (4) the witness's interest in the outcome of the
case and any bias or prejudice, (5) whether other evidence
contradicted the witness's testimony, (6) the reasonableness of
the witness's testimony in light of all the evidence and (7)
any other factors that bear on believability.

The weight of the evidence as to a fact does not

187

necessarily depend on the number of witnesses who testify about it.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw, or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks it is not permitted by the rules of evidence that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.

If I sustain the objection, the question may not be answered and the exhibit cannot be received.  Whenever I sustain an objection to the question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you're deciding the case you must not consider the evidence that I told you to disregard.

188

I will now say a few words about your conduct as jurors.  First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during your course of jury duty.  Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This means discussing the case in person, in writing, by phone or electronic means, via email, text messaging or any internet chatroom, blog, website or other feature.  This means this applies to communicating with your fellow jurors until I give you the case for deliberation.  It also applies to communicating with everyone else including your family members, your employer, the media or press and the people involved in the trial.

Although you may notify your family and your employer that you have been seated as a juror in this case, but if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been

ordered not to discuss the matter and to report the contact to the Court.

Because you will receive all of the evidence and legal instruction you properly may consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the internet or using other reference materials and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over.  Any jurors exposed to any outside information please notify the Court immediately.

At the end of the trial you will have to make your decision based on what you recall of the evidence.  You will not have a transcript of the trial.  I urge you pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember what witnesses said.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let note taking distract you so

that you do not hear the other answers by witnesses.  When you leave, your notes should be left in the courtroom.  Whether or not you take notes, you should rely upon your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes.

From time to time during the trial it may become necessary for me to talk with the attorneys out of the hearing of the jury either by having a conference at the bench while the jury was present in the courtroom or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course we have done what we can and will do what we can to keep the number and length of these conferences to a minimum.  I do not always grant an attorney's request for a conference and do not consider my granting or denying a request for a conference as any indication of my opinion of what the case -- of the case or what your verdict should be.

Trials proceed in the following way.  First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

1        The plaintiffs will then present evidence and counsel
2    for the defendant may cross-examine.  Then the defendant may
3    present evidence and counsel for the plaintiffs may cross-
4    examine.
5        After the evidence has been presented I will instruct
6    you on the law that applies to the case and the attorneys will
7    make closing arguments.  After that you will go to the jury
8    room to deliberate on your verdict.
9        Is plaintiff prepared to make their opening
10   statement?
11       MR. VITIELLO:  Yes, Your Honor.
12       THE COURT:  You may begin.
13       MR. VITIELLO:  Thank you.
14           PLAINTIFF'S OPENING STATEMENT
15       MR. VITIELLO:  On April 16th, 2015 Dora Cornejo woke
16   up excited.  She thought that was the day she was going to save
17   her home from foreclosure.  It was a three-bedroom house and
18   she and her husband Frank had owned it for 22 years.  They
19   raised their baby girls there.  That's where they planned to
20   grow old together.  It was right here in Bakersfield,
21   California.
22       What she didn't realize is that the defendant, Ocwen
23   Loan Servicing who I'll refer to as Ocwen, they were going to
24   trick them into thinking that their loan would be restructured
25   and as soon as their guard was down was going to sell it right

out from under them.  They would do so in a way that brazenly
violated California protective laws designed to prevent this
from happening.

        See, Frank and Dora were behind in their bills.  They
knew it.  They were embarrassed by it.  One of those bills was
their mortgage payment.  That's a tough payment to make with a
high interest rate and Ocwen was threatening to sell their home
on April 19th -- excuse me, April 29th.  She had 13 days from
the 16th to the 29th.  In that time Ocwen was going to consider
her for this loan modification.

        She had been told that she qualified for terms and
those terms would lower her mortgage payment and help her keep
her home.  Those terms were something her husband and her could
afford and they were willing to pay those terms.  She needed to
send Ocwen an application to receive them and April 16th was
the day she was going to do it.

        She had been introduced through a friend, Hernan
Ernie Cortez (phonetic) through church group affiliates.  They
were at St. Joseph's Catholic Church also right here in
Bakersfield and they connected because Ernie had been
successful in the past helping others that Dora knew through
church obtain loan modifications.

        The paperwork was complicated.  Dora knew that she
needed help so she turned to Ernie for this help.  Together in
his office they assembled paperwork, financial documentation

193

and they watched as page by page went through the fax machine over to Ocwen's office, at least one of its offices in Bangel (phonetic) or India where it would be reviewed and imaged by outsourced personnel.

She had that feeling that you get when you're nervous but you're excited at the same time because you're on the cusp of something potentially really good because she was taking that action.  She had been behind and now she was ready to get right with this mortgage.  She believed in her heart that she was on a track and that track was for her to keep her home. She didn't realize that Ocwen had her on a second track, one that would end with her losing her home to a public auction while her complete application sat on Ocwen's desk.

The evidence will show you how Frank and Dora, along with this help from Ernie sent Ocwen every document that it asked for, a complete application in order to prevent the foreclosure of the Cornejo's home.  Ocwen took that application under review, concluded that yes, the Cornejos qualified, they should be able to keep their home with terms that they can afford.  You're going to see that evidence.  It'll show you that Ocwen offered them new terms, new numbers on paper with a written agreement that they signed and paid.

The evidence will also show you that Ocwen foreclosed on the home anyway, that Ocwen lied to its own foreclosure agent about the status of that loan modification and tricked

194

them into selling the Cornejo's home.  The evidence will also
show you how, as a result of this conduct, the Cornejo's home
was actually auctioned off to a third party who became
unreasonable and wouldn't work with her to get it back.  In
fact, they evicted her from her own house and sent the sheriff
to lock her out forever.

But the Cornejos weren't the only California
homeowners to have this happen to them and have their lives
destroyed by a foreclosure that really should never have
happened.  The practice of dual tracking, which is a term
you're going to hear often through this trial, means putting
you on a track to keep your home while simultaneously putting
you on the track to lose it.  It's something that was so
widespread in California that California actually passed a law
against it in 2013 and that's why we're here.

The Judge is going to instruct you on that law.  It's
part of California's Homeowner Bill of Rights, another term
you're going to hear throughout this trial.  And before the
homeowner bill of rights became law Ocwen might have gotten
away with this.

Fortunately this conduct is now unlawful and at the
end of this trial the evidence will have shown you that Ocwen
was guilty of dual tracking when it sold the Cornejo's home;
it'll show you that it wasn't an accident, like an oops, sorry
we sold your home.  No.  It'll show you that this was willful,

that it was intentional and that it was reckless.  And your job
will be to weigh the evidence and to award money if you find
that Ocwen materially violated the law.

The stories about how Ocwen turned the Cornejo's
American dream of owning a home in Bakersfield, California into
an American nightmare.  But first, I do need to explain how we
got here so I'm going to give you some background on the
parties and the law that I just described.

So who's Ocwen?  It used to be the case that if you
wanted to borrow money you would go down to your neighborhood
bank, you'd shake hands with a loan agent there; maybe it's a
guy you've seen before because you bank there; maybe it's your
local credit union and you'd talk about the business you wanted
to open or the home you wanted to buy.  You'd sign some
paperwork, show some financial documentation and you'd be on
your way.

And maybe month by month you'd go back to that same
bank, you'd shake the same hand and make your mortgage payment
if you were inclined to go down there and do it or maybe you'd
just mail it in.  You might actually form a relationship with
the person that gave you the loan, have him over for coffee
occasionally, but it doesn't work that way anymore.

Eventually Wall Street decided that these mortgages
were big time investment opportunities.  They bundled them
together by thousands.  They sold off the entire bundle of many

1   thousands of loans to investment companies.  U.S. Bank National

2   Association, who we've talked about a little bit, is a trustee

3   of one of these bundles.  The trust owns an interest in a

4   bundle of loans and the Cornejo's loan was one little sliver,

5   one little tiny loan in that entire bundle of many thousands.

6          So that the way these loans are now bundled, again by

7   thousands, the neighborhood bank, they just can't service them

8   anymore.  It's impossible, or at the least, impractical.

9   There's too many loans in the bundle, they're all over the

10  country, rules are different everywhere and there's no direct

11  relationship with that borrower anymore.

12         So Wade, if you could pull up demonstrative No. 1?

13         Something pops up -- a new type of company pops up

14  and that company is called a mortgage servicer.  A mortgage

15  servicer's role really is to, we say service the loans by the

16  thousands, but really they're doing the day to day loan stuff

17  on behalf of who I described, U.S. Bank, as the trustee of this

18  bundle.  They do it on U.S. Bank's behalf, and in that sense,

19  they're an agent of U.S. Bank and there's no dispute about that

20  relationship.

21         This is a little diagram of how this relationship

22  kind of works and we have U.S. Bank at the top, Ocwen in the

23  middle as a servicer.  And the way it works is that they mail

24  statements down to the borrowers, the borrowers mail back money

25  in and Ocwen as a mortgage servicer would deal with the

Cornejos over the phone should there be an issue that they

needed to discuss.  But the actual party that holds this note

is at the way top, it's U.S. Bank.

And in the event that a company like Ocwen would need

to foreclose on a property because the borrowers couldn't pay,

they would contract with a third party.  In this case it's

Western Progressive who you have there on the right side, and

they would conduct a sale.

The agency of these parties is not in dispute.  Ocwen

takes a little fee for its work before money gets passed to

U.S. Bank and like I said, they have the obligation to

communicate with the borrower.  And sometimes that means

talking to them about loan modifications in the instance that

they would need one.

An interesting thing about this relationship is that

the Cornejos had never dealt with Ocwen before 2013.  They were

captive in this relationship.  These interests get changed all

the time and like I said, the neighborhood bank that you go to

originally to get the loan you may never hear from again

because the mortgage servicer all of a sudden becomes involved

and now you're captive in that relationship, whether it's a

good company or a bad company, or a good guy or a bad guy.

They have no choice over who their loan servicer is.

So before the economy crashes in 2007 and 2008, I

don't think I have to go into great detail about that, but at

198

that time Ocwen was a small time Florida mortgage servicer with
some offices in beautiful Palm Beach, Florida, but with most of
its work force eventually outsourced overseas to India and
Philippines to save money.

        At that time they're servicing a few hundred thousand
loans which is actually not that many in the grand scheme of
things for a mortgage servicer, but they're not a bank.  I want
to make that abundantly clear.  They're not a bank, they're
just this mortgage servicer with this very specific type of
relationship that I'm describing.  They send out statements and
they receive money basically, that's what they do.

        So in 2007 the economy's brought to its knees and
banks were failing, mortgage servicers were failing in large
part due to irresponsible lending practices and things like
that, and that all got exposed to us as the American public
really for the first time around then.  And a huge culprit in
the economy crashing was mortgage companies and those who dealt
with what we call subprime mortgages.

        You may have heard this term before, but subprime
loans are effectively loans with a high likelihood of failure;
the type that are likely to have borrowers fall behind or the
type that are likely to end up in foreclosure.  But a lot of
these loans begin to fail because the economy crashes, people
can't pay, Wall Street investments and the bundles, those many
thousands of loans together in a bundle, those also began to

199

fail.

        And what happened is that then the companies who had banked on those, who had invested in them were on the brinks of collapsing.  Ultimately our government, the U.S. government took a bunch of taxpayer money to bail those companies out.

        So after the economy crashes and with banks around them and mortgage servicers around them failing, Ocwen sees an opportunity to make a bunch of money.  They start purchasing up the rights to service these mortgages that are filled with subprime loans.  This opportunity is presented to them because banks are crashing, they don't want to service them anymore.

        Mortgage servicers now realize oh man, there's so many of these loans, we don't want to service those, let's get rid of them.  And the subprime loans that were likely to end up in foreclosure were just there for the picking and Ocwen picked.

        So they end up specializing actually in servicing mortgages that are likely to be foreclosed on.  Their claim to fame in fact becomes handling delinquent loans 70 percent cheaper than other servicers.  So they're out there effectively soliciting business on the basis that they can do this cheaply.  They can get your loan serviced and they can do it cheaply.  And they grow in that time from servicing a few hundred thousand loans to servicing over three million in just a few years.

1    Like I said before, they end up making that jump by

2  outsourcing thousands of jobs to India, to the Philippines and

3  the majority in fact of their employees are overseas because

4  that's where they can cheaply hire them.  That in and of itself

5  is not necessarily a bad thing until they get caught.  They get

6  caught having almost no control on oversight of those people,

7  on the quality of their service and what happens is that all of

8  that plummets.  They start getting into trouble over their

9  business practices, including issues of misdating letters with

10  sensitive timing deadlines.

11    MR. SHATZ:  Objection.  Relevance.

12    THE COURT:  Sustained.

13    MR. VITIELLO:  Ultimately in 2009 the government

14  passes the Troubled Asset Relief Program; that's a bailout that

15  we all know about.  Ocwen took $123 million on that deal.

16    MR. SHATZ:  Objection.  Relevance.

17    THE COURT:  Sustained.

18    MR. VITIELLO:  Their slogan becomes helping

19  homeowners is what we do.  It's on every one of their

20  documents.  The suggestion is that the primary form of help was

21  this type of loan modification that I'm describing to you and

22  that I've already told you that the Cornejos applied for.

23    Applying for this loan modification's not an

24  automatic process.  You have to qualify for it, you have to

25  have a certain degree of financial hardship, you have to have

enough income to support a new loan and mortgage servicers, in their discretion were there to decide if you qualify.  So that's Ocwen.

Where are the Cornejos?  Obviously important.  Frank Cornejo, who can't be with us because of medical issues, is a 67-year-old Mexican-American also from Bakersfield, California. He's a veteran.  He was called on our country to serve in a draft, made it to the Vietnam War where he served overseas and was honorably discharged.

MR. SHATZ:  Objection.  Relevance.

THE COURT:  Sustained.

MR. VITIELLO:  It's a VA loan, Your Honor.

THE COURT:  Is there a dispute on that point?

MR. SHATZ:  That it's a VA loan or --

THE COURT:  Correct.

MR. PAINO:  VA insured loan.

THE COURT:  All right.  The objection's overruled.

MR. VITIELLO:  His service to our country led him to obtain a loan sponsored by the Department of Veterans Affairs and he used that loan to purchase the home which is the subject of this case.

Dora Cornejo, his wife, who's seated here is 55, born and raised in Bakersfield, California also to a Mexican-American family.  She's a churchgoer, active at St. Joseph's, spiritual leader with the Archdiocese of Fresno, Girl Scout

leader, feeder of homeless and an active Goodwill donator.
She's the mother of two daughters that she has with her husband
Frank.

When they fell in love they opted to run the Cornejo
family restaurant and start a family.  For more than 30 years,
since 1984 the Cornejos have run a Mexican restaurant, La
Colonia, also in Bakersfield.

It's a mom and pop place, it's a staple of the
community and they themselves work at the restaurant every
single day along with the majority of their family.  She knows
most of their customers by their first names.  Their patrons
report that she's always smiling, that she treats them like
family.  Most of the staff, like I said, is family.  Her aunt
works there, her daughters work there.  Her sister-in-law works
there.  Frank works there.

In 1992 things are going pretty good so they go check
out 3425 Rancho Sierra in Bakersfield.  It's a quaint three
bedroom, two bath house with a view of the Panorama Bluffs,
called Panorama because of the view.  It's a perfect location
for them.  Why?  They have two kids at the time.  Monica is
five, Michelle is two and this place is close to Dr. Juliet
Thorner Elementary School, it's a magnet school, the best place
around to send them.  The home itself is on a cul-de-sac where
all the neighborhood families get together for holidays, 4th of
July, that sort of thing, barbeques, parties, it's perfect.

But they can't afford the house on their own.  They don't have enough in the bank.  And because of Frank's honorable discharge he gets his VA loan so they buy it, they raise their family there and they have a lot of memories there. Today Monica's 31, Michelle is 28 and Dora and Frank watched them grow up in that house.  They used to have Girl Scout meetings there, build forts in the living room with bedsheets and chairs stacked together.

Dora's father, Alex, grandfather to Monica and Michelle buried a rose garden in the back yard of that house right before he died.  That's the last memory that she has of him.  It's also the last place that she saw her dearest cousins alive.  But apart from those things, life was good.  Did they ever get behind on bills?  Of course.  Who hasn't?  But they're hardworking people, they worked to catch up.  They wanted to pay their debts and in fact on $113,400 loan that they took off [sic] to buy this house, they had actually paid over 200,000 of it back at the time that it was sold.

Before the market crashed they were living the American dream, but after the crash a lot changed for them. What happens?  Well the first thing that people stop doing when the market crashes is they stop entertaining themselves in an expensive way; that includes going to restaurants so the restaurant takes a dive.

To make matters worse, at the restaurant they have a

stove that blows, very expensive item to replace.  They can't cook food for people for a couple of days, the restaurant has to close down.  Things like that seem to happen to them over and over.

They get hit with a tax assessment from the IRS. They learn that they're behind on taxes.  They never got really good at having their paperwork in order with the IRS and the IRS had come for them.  So they entered into a payment plan with the IRS and they ended up paying some of that money back, but they could only pay some of it.  And they end up falling behind on the mortgage.  They catch up and they fall behind. And then they catch up and they fall behind.  They're struggling, but they're trying.

And although they had occasionally been behind in the past and caught up, when the financial crisis happened they found themselves in a real bind because they couldn't catch back up as easily as they had before.  They thought about laying off workers, try to cut corners at the restaurant or at least talked about it and they decided we're not going to do that.  We're not going to do that to our customers, we're not going to lay off our workers because their families depend on this income, a lot of them are our family, we can't do that.

They really took their role in the community seriously with respect to their small business.  And as a military and churchgoing family they knew that they had to pay

their debts.  That's not what this is about.  They just
genuinely couldn't pay them.

So they started to borrow money from family and
friends that they would try to reinstate the mortgage.  And
when I say reinstate I mean to bring it current.  Not to pay it
off completely, but to pay back what it is that you're behind.
But the longer it took Dora to drum up that money to pay back
what she was behind, what she found is that the mortgage kept
growing.  The amount that she owed kept growing and she wasn't
able ever to fully put that money aside that would get her
current.

So eventually she had to face the reality of the
situation that if she couldn't find a way to pay it back they
might lose their house.

So 2013 is this really critical time for this case.
I've already kind of given you a hint why.  But four very
critical things happened at the same time almost.  The first is
that Ocwen becomes the Cornejo's new loan servicer in 2013.
And like I said before, they were captive in that relationship.
They had no ability to pick who their mortgage servicer would
be.  They default on the loan in the way that I've described,
meaning they fell behind and California puts this homeowner
bill of rights into law.  The last critical thing that happens
is that the loan gets put into foreclosure.

I talked about it a little bit already before, but I

206

didn't tell you why the homeowner bill of rights was specifically passed, but during the mortgage crisis and the financial meltdown there was this issue that was very typical for mortgage servicers to do which was to foreclose on a home while telling a borrower that he or she was in the running for a loan modification.

MR. SHATZ:  Objection.  Argument, relevance.

THE COURT:  Sustained.

MR. VITIELLO:  Wade, can you pull up demonstrative piece No. 2?

MR. SHATZ:  Objection.  The Court instructs as to the law.

MR. VITIELLO:  This is the preamble, Your Honor, to the operative law.

THE COURT:  Not at this time.  We're not going to post the (indiscernible).

MR. VITIELLO:  Let's not publish then.

So California researches and decides to do some things.  They find that from 2007 to 2011 there were 900,000 foreclosures completed.  The top 38 of the top -- excuse me, 38 of the top 100 hardest hit zip codes were here in California. Those foreclosures affected property values.  It resulted in less money for public schools, public safety and other public services.

MR. SHATZ:  Objection.  Relevant and argument.

207

1          THE COURT:  Counsel, can we have a sidebar quickly?

2      (Sidebar begins at 3:33 p.m.)

3          THE COURT:  Sorry to interrupt you at this time.  Are

4  you going to be bringing any evidence on this topic?

5          MR. VITIELLO:  It's the preamble to the law.

6          THE COURT:  Right.  Are you going to be presenting

7  evidence on that?

8          MR. VITIELLO:  We weren't planning on it.  We didn't

9  think there would be an issue with the law that we're here to

10  talk about.

11          THE COURT:  The findings of the legislature is not

12  something that's going to be put into evidence.  So at this

13  time your opening statement needs to be confined to what the

14  evidence is going to be.

15          MR. VITIELLO:  Then I'll skip ahead.

16          THE COURT:  All right.  Thank you.

17          MR. VITIELLO:  Sure.

18      (Sidebar ends at 3:34 p.m.)

19          MR. VITIELLO:  So what we get in 2013 with Ocwen and

20  the Cornejos is an actual business policy that relies on dual

21  tracking.  We're going to show you letters confirming that

22  Ocwen employed a dual tracking strategy which was designed to

23  on the one hand review or offer to review borrowers for

24  alternatives to a foreclosure while at the same time pushing a

25  foreclosure forward.  They call it a dual path strategy in

those letters, but that's what it is.

When the Cornejos missed their payments they remained accountable for them.  Like I said, they worked to borrow money to get money together they could use to reinstate the mortgage for what they owed, but ultimately when they get into foreclosure they start to freak out a little bit, understandably.

How does foreclosure work in California?  Well it's almost as simple as Ocwen decides a price to fetch for the property, they notify the borrowers and the public with some notice and then they direct their foreclosure trustee to hold a sale.  And we've already described that.  In this case it's a company called Western Progressive and there's no dispute on this.

So Dora's panicking.  It's now February of 2015.  She learns that the house is going to be sold on March 27, 2015 and she doesn't think she's going to be able to borrow enough money in time.  She learns that Ocwen's going to auction the house for about $70,000, but it's worth $167,500.

So you've heard the circumstances that lead us essentially to the foreclosure in 2015.  The auction date's been set.  The Judge is going to instruct you on the specifics of that law, but what you're here to decide on is the part of the story that the Cornejos and Ocwen don't agree on.

So on April 16th, she's freaked, she realizes the

urgency of the situation, but she wakes up excited to take the reins and to apply for a loan modification finally when she hadn't before.  Her husband Frank trusts her with everything because well, she handles the stuff at the restaurant, she's got to be better than him with this paperwork.  He doesn't do it at the restaurant.  So she does it all with a friend, Ernie, who you'll hear from.

They reach out together to Ocwen and start talking and Ocwen takes some financial information from the two of them over the phone and tells her, lady, you've got to stop borrowing money.  You've got to apply for a loan modification because you're coming close.  You just got to send in this application.  Your financials look good.  Looks like you're going to get this.

So they allow her to apply.  They actually postpone the foreclosure sale from March 27th to April 29th, the date that I gave you earlier, specifically to give them time to apply for a loan modification.  We're going to show you those internal notes from Ocwen so you'll see that.

So Dora and Ernie, they complete this application together.  We're going to show you those documents as well.

Wade, if you could pull up Joint Exhibit 17.

And Your Honor, this is a joint exhibit.  Can we publish?

THE COURT:  Yes.

1       MR. VITIELLO:  So April 16th they fax this complete

2   application to Ocwen and Ocwen's own records will show you that

3   it was received.

4       Wade, if you could zoom in on the sent date for us.

5   April 16th, 2015.  Just go ahead and cycle through those pages

6   for me.

7       And you'll see all these records during trial.

8   There'll be testimony on them.  You'll see records establishing

9   without a doubt that this application was ultimately approved

10  when Ocwen offered new loan terms to the Cornejos that they

11  accepted and paid on, that Ocwen accepted their payment.

12  You'll see those records as well.  And something happens on

13  April 27th.

14      Ocwen calls Dora, tells her that they want three

15  additional documents apart from that which she submitted in her

16  April 16th application.  It's April 27th.  Her home's going to

17  be lost in two days.  All of a sudden the rug is yanked out

18  from under her.  She thought she was on the road, on the path,

19  on the track to this loan modification and now she's freaked

20  again.

21      The documents that Ocwen asks for are profit and loss

22  forms, and pay stubs, tax returns.  We'll show you all those

23  because she gathered them.  She sent them to Ocwen the very

24  next morning.  Drove all the way down to Porterville, which is

25  about an hour from where she is because she's a fighter.  She

wasn't going to lose this home.

Wade, pull up Joint Exhibit 18 on page two and zoom in on that fax banner for us.

Can we publish, Your Honor?

THE COURT:  Yes.

MR. VITIELLO:  Ocwen receives these documents on April 28th and the evidence will show from Ocwen's own records that these documents were received.  The same records will show you that Ocwen's outsourced employees in India, they began emailing each other about these documents, acknowledging that they had been sent and received.  Those emails will show you that the same representatives questioned whether the sale scheduled for April 29th should actually move forward in light of receiving these documents.

But on the morning of April 29th Ocwen directed its foreclosure trustee to sell their home at a public auction even though they had all these documents.  The loan modification application was there.

We're going to show you evidence establishing that it was complete.  We're going to show you evidence establishing that it was pending a decision on approval or denial and that there's no other alternative.  They're either approved or denied.  They were on the track to keeping this home and the evidence will establish for you that more likely than not this was dual tracking.  But it doesn't stop there.

212

1    The evidence will show you that Ocwen didn't just
2 allow this to happen by accident.  They'll show you that the
3 morning of the sale Ocwen's foreclosure trustee, Western
4 Progressive, the agent that they hired to sell the property
5 emailed them specifically asking to double check on whether the
6 sale should happen on the basis that is there loss mitigation
7 going on.  Because of course if there is, that's dual tracking.
8 We don't know whether Ocwen actually cared enough to check.
9 All we know is that Ocwen didn't tell the truth when it
10 responded.  The evidence will establish that Ocwen told the
11 trustee to proceed with the sale on the basis that there was no
12 loss mitigation pending.
13    And Wade, could you pull up Joint Exhibit 1521 and
14 show us the sent date on that?
15    Again, Your Honor, a joint exhibit.  Can we publish?
16    THE COURT:  Yes.
17    MR. VITIELLO:  So you see an email from April 29th in
18 the morning and let's read that email.  Down at the bottom it
19 says review completed, no loss mitigation in process and file
20 is good to go for sale.  File means home.  The home was good to
21 go for sale.
22    The evidence will show you that when the property was
23 sold it was bid on and it was purchased by a property investor
24 that once he acquired a deed to the property he exercised his
25 legal rights, now holding a deed to evict the Cornejos and

their family from their own home.  But all the while Ocwen was

telling the Cornejos that they were going to work this out.

Internally -- you're going to see notes on the inside

saying that they sent this issue up to something called a

recission department.  Effectively a department that handles

this sort of thing where the foreclosure action could be

reversed potentially.  And while it was in that department,

you'll see from Ocwen's records, that representatives were

prepped in case the Cornejos called them.  And they were told

to tell them that just tell them their loan terms are being

reviewed even though Ocwen knew that the property had already

been sold to somebody else.

The final twisted knife that you'll see from the

evidence is when Ocwen finally got around to taking a look at

the application that was sitting there the whole time, several

days later, they actually approved it.  They sent them back a

new loan agreement; better interest rate, new terms that they

could afford, congratulating them.

Wade, Joint Exhibit 19 please.

THE COURT:  You can publish that.

MR. VITIELLO:  Thank you, Your Honor.

Wade, if you could zoom in on the congratulations?

They got it in the mail, they signed it, sent it

back.  They paid on it.  Down below there's a little principal

and interest payment -- excuse me, an escrow payment that they

214

have to make.  Dora hustled to the bank, got a certified

cashier's check.  We'll show you that.  We'll show the proof of

the mailing.  All of it goes to Ocwen.  Ocwen receives it,

cashes it.  And then after all of this, Ocwen didn't even

exercise its power to reverse the sale.  The property stayed

with that third-party purchaser who, like I said, evicted her

and her family.

Because of what they did, the Cornejos lost the only

home that they've ever known together as a family.  From

economic damages, that means that they lost a certain amount of

equity that they enjoyed in that property.  But of course

that's really the smallest thing they lost.  They lost the

view, the rose garden, the memories, the forts, the Girl Scout

meetings.  Now it's replaced by sleepless nights, stress,

anxiety --

MR. SHATZ:  Objection.  The damages are not relevant

to -- this type of damages is not relevant to the case,

emotional distress.

THE COURT:  All right.  I'm going to overrule it at

this time.  Go ahead.

MR. VITIELLO:  Thank you, Your Honor.

They lost the American dream.  We expect the evidence

to show you that the application was complete, that Ocwen

received the complete application yet foreclosed anyway or dual

tracked.  And we expect the evidence to show that to this day

Ocwen has never actually told the Cornejos that the application was incomplete, that their April 28th submission of those last three documents was defective in some way and the evidence will show you that this sale should not have happened.

It'll show you that Ocwen considered a reversal of the sale supporting that the sale should not have happened, that several employees on the inside questioned whether this should've happened.  And the fact that Ocwen later approved their loan for modification shows that this should not have happened and they have a lot of hard work to do in this case to prove otherwise.

They need to convince you that despite all of these facts that they still didn't do anything wrong.  And to do it, they're going to blame everybody else.  They're going to reject all notion of accountability.  And the reason we're here is because Ocwen simply won't accept the fact that it failed the Cornejos and that it failed the homeowner bill of rights despite in its pledge to help homeowners as what it does.  So they've come up with some creative defenses and I want to tell you what I expect them to be.

First they're going to talk sweet to you.  They're going to tell you that foreclosure is an ugly business, that they don't want to do it but sometimes they have to.  And when it happens people lose their homes.  They might even say they're sorry, but it'll be the first time that the Cornejos

ever actually hear that from them.

They're going to blame the Cornejos.  They're doing something called a deadbeat defense.  These people were behind in their bills.  They don't deserve protection under the law. They're going to tell you they gave Dora and Frank chance after chance before things came to a critical time to apply, but really they're just trying to distract you from the fact that the homeowner bill of rights protects them as long as they provide the documents that Ocwen asks for.

They're going to try to say after the fact that no, no, no, application was never complete.  We're going to show you the approved loan modification so you'll know that's not true.  You'll see their records showing receipt of every single document that they asked for.

These are just creative arguments that they've come up with now.  They're going to try to tell you that the application wasn't on time, that it was too late.  But again, you will see from the evidence that they adhered to every time frame that Ocwen set out.  And that even when documents were asked for on the 27th of April, two days before the foreclosure sale, that Dora hustled to Porterville the very next morning and sent them.

Another defense they'll try to raise is actually to prey on the Cornejo's desperation in those last few hours when the sale was about to happen.  You're going to hear that the

Cornejos were so terrified that they ran to an attorney who

didn't do anything for them other than to produce a

manufactured fake bankruptcy notice on the basis that he

thought well, bankruptcy might slow them down, Ocwen that is.

But there was no bankruptcy.  Ocwen's records will show you

that they researched whether there was a bankruptcy and

concluded that there wasn't.  So there's not a lot to that

either.

        The last thing they'll try to show is that the

Cornejos could've mitigated their damages or they could've

suffered a little bit less, lost a little bit less money if

they were more careful.  Maybe now because they're renters they

could be renting a little bit of a cheaper place.  But they'll

never own a home again.

        They might try to blame the buyer, the guy who bought

the property, the property investor.  They're going to tell you

that that guy was unreasonable with the way he evicted them,

but all of that is to really distract from the fact that none

of that would've happened if Ocwen didn't sell this house.

They're going to try to paint a bad picture of that guy and

make him look like the enemy.  That's because they still won't

accept accountability.

        So what we're going to ask of you is to weigh this

evidence when you see it and decide was there a complete

application.  It's critical.  Was it timely, was it on time?

218

What we're going to ask you to do is to look past the Cornejo's embarrassing shortcomings and their ability -- excuse me, their inability to pay their mortgage because they're not on trial here.  Ocwen's on trial for what it did after the Cornejos couldn't pay and there's an important distinction there.

We're going to ask you to find that when Ocwen sold the home that doing so was material.  In other words, it affected the Cornejos in a substantial way that they would not have been affected without it actually happening, without the sale going through.  We're going to ask you to find that this was intentional, that it was willful and reckless what Ocwen did, especially given how many chances they had to stop it from ever happening and their chance to reverse it after it happened, but they didn't do that.

Ocwen already took their home and they can't give it back because now it belongs to somebody else.  So all the Cornejos are asking for is fair compensation for that.  The role of the jury, your job, it's a sacred one here.  You have the opportunity to be the Cornejo's heros and administer justice as long as it's supported by the evidence.  I appreciate your time and your service.  Thank you.

THE COURT:  And defense will make their opening statement at this time.

MR. SHATZ:  Yes, Your Honor.  May we approach for one moment, Your Honor?

1        THE COURT:  All right.

2    (Sidebar begins.)

3        MR. SHATZ:  I don't know how the Court does it, but I

4 want to move for nonsuit after their opening based on failure

5 to mention all of the elements.  We can argue it after the

6 jury's done for the day or now, however you want to do it, but

7 I don't want to waive my opportunity to raise it, so I'm going

8 to move for a nonsuit.

9        THE COURT:  All right.  We'll take that up outside

10 the presence of the jury.  Not now but after --

11        MR. SHATZ:  So I made the motion timely?

12        THE COURT:  Yes.

13        MR. SHATZ:  Thank you.

14    (Sidebar ends.)

15                DEFENDANT'S OPENING STATEMENT

16        MR. SHATZ:  Ladies and gentlemen of the jury, this is

17 a simple case.  It's a case about borrowers who fell behind on

18 their mortgage and despite their servicer's efforts to help

19 them bring their mortgage current, they did nothing.  They

20 didn't respond to letters or phone calls, and at the last

21 minute with less than two weeks to go before a sale, they woke

22 up and tried to save their house.

23        Had they been a couple of days earlier or gotten the

24 documents in earlier as requested, it's entirely possible the

25 house could have been saved.  But that they waited after

220

several years of being behind and not responding to calls and letters, unfortunately, their house was sold.

So let's share with you how this happened and what happened.

You've heard about the parties.  You've heard about Mr. and Mrs. Cornejo.  They're the ones who owned a home and they bought their home in 1992.  We're not going to go that far back.  We're not going to review the last 20 something years and they got a loan to buy that home and it was their home and they made payments on the loan.

And you've heard they owned a restaurant and they ran their restaurant.  They owned the property on which the restaurant sat.  It was theirs.  And the restaurant was enough of a success that they could raise their family and raise their kids.

And we'll show you that it may not have been enough of a success because the federal government recorded an IRS tax lien in 2010 for $50,000.  Taxes weren't being paid.  Okay.  It was a tough business.

Mr. Cornejo tried also to save his home by taking a reasonable action of leaving things to his wife, and his wife stepped up when Mr. Cornejo wasn't doing certain things to help save the home.

And you'll hear as we talk about these things how the family got in trouble.  Typical ways they got in trouble.

221

There were medical issues.  Don't know what they are, but there were medical issues.  Their income declined.  It happened during that time period, their income declined.

Sometimes when they spoke with Ocwen, they said they were able to pay all their other bills.  Other times when they spoke to Ocwen, they said they couldn't pay their other bills.  The story varied by day.

Before Ocwen began servicing the loan in 2013, the prior servicer, GMAC Mortgage Servicing, when the Ocwens fell behind in 2012 began sending the Cornejos letters.  We'll show you some of those letters.  For example, we'll have a letter in July 2012 that says you're behind.  Please call us for help.

There was a letter six months later in January 2013, we think you're behind, please call us for help.  We'll show you those letters.  January 2013, we have various loss mitigation options.  It lists the options including loan modification.  A February 13, 2013, letter does the same thing, and the Cornejos' response was not to make the call.  No call.  Try and solve it themselves.

In early 2013, Ocwen began servicing the loan.  At that time, the loan was in default.  The Cornejos were delinquent.  So when Ocwen began servicing the loan, it did what a servicer does when the borrowers are behind.  Yes, it tried to collect the debt, but it just didn't say pay or else or pay or die.  It sent a series of letters that said you might

be behind.  We have options to help you.  Please call us.

So we will show you a letter in February of 2013 identifying Ocwen, a letter in March of 2013 saying we're missing some payments.  If you don't make the payments, you could lose your home.  The Department of Housing and Urban Development has counselors who can help you with your finances. Here is a number to call them.

Oh, and if you want to contact us, we have people here who can help you if you default and try and resolve it. The next month, April 2013, Ocwen sent another letter saying you are still behind.  Same thing:  Here's the phone number for the HUD counselors.  Call us, we can help you.

In 2013, there were a whole series of letters that were sent.  Some were past due letters.  Some were sent to the Cornejos saying please call us, we can try and help you.

Ocwen even sent a letter saying -- May 9, 2013 -- we've written you several times and haven't received a payment. Foreclosure could mean you lose title to your home.  Call us to avoid foreclosure.

Ocwen sent seriously past due letters.  Ocwen in June 2013 even sent the Cornejos a modification application, fill this out and return it.  July, August, August, August, August, September, September, letters are sent.  There's a stack of mail.  I'm assuming it's being ignored.  We'll tell you what they said about it.  Modification applications are included.

The Cornejos have a chance to contact Ocwen early on, no
foreclosure is going on, help you save your home, the arrearage
is not that far.  If you keep missing payments, the arrearage
goes up.

In September 2013, Ocwen sends a letter saying your
payment is now more than 145 days past due.  We are here to
help.  Call us.  Here is a modification application package.
Fill it out and send it back.  The response was nothing.

Couple days later, we're here to help.  Here's an
information package.  October 2013, we have different mortgage
assistance programs, Ocwen writes.  We're here to help.  In
October 2013, Ocwen sends a letter we have helped 60,000 other
borrowers.  Call us.

October 29 and 30, Ocwen sends a modification package
in 2013 to the Cornejos.  Not returned.  November 27, 2013,
your loan is severely delinquent.  Please call the customer
care center.

The loan is in default from May 2012.  We're now a
year and a half past due.  Ocwen is not saying we're going to
foreclose.  Ocwen is saying you could be foreclosed, but call
us.  Call us.  Here's a mod package.  Fill it out, send it back
in.  We can help you with this.  Nothing.  No response.

2014, same thing.  In January 2014, Ocwen sends a
letter acknowledging the Cornejos' verbal request for
modification assistance.  A package is sent out.  It's not

returned.

February 2014, Ocwen sends a letter saying we're missing payments.  We have options available.  Please contact us to discuss loss mitigation alternatives.  February 2014, we need an application.  Here's a blank package.  Fill it out and return.

The Cornejos' financial hardship was broader than just not paying taxes.  In April 2014, a judgment against the Cornejos was recorded to the amount of $10,436.  State Farm had a judgment that was now recorded against the property.  They're further in debt.

Ocwen didn't track that.  Ocwen said in May letters we understand you've had trouble.  We want to work with you.  Please call us.  June 2014, your loan is severely delinquent.  Okay.  Two years delinquent.  We have options.  Please call us.  We're here to assist you.

In October 2014, more letters.  The response, nothing.  Nothing.  On October 22, 2014, more than two years after the default, Ocwen recorded a notice of default starting the foreclosure process.

At the time, the amount necessary to reinstate the loan was approximately $23,325.  That's not a sum that people can just write a check to reinstate with, but it's something that Ocwen could have worked with.

When the notice of default was sent, Ocwen then sent

1   a letter saying we started foreclosure.  Please apply for

2   assistance.  So then Ocwen began making phone calls.

3   November 25, Ocwen calls the borrowers, requests a return call.

4   December 1, 2014, Ocwen calls the borrowers, requests a return

5   call.  December 5, 2014, Ocwen calls the borrowers, requests a

6   return call.

7         December 9, 2014, Ocwen calls the borrowers, requests

8   a return call.  December 11, 2014, Ocwen calls the borrowers,

9   requests a return call.  Contact, December 15, 2014, Ocwen

10  called and actually speaks with Dora -- Mrs. Cornejo.

11        She explains they've had a loss of income,

12  self-employment, they've been behind with their income issues

13  since December 2012, they're behind on other bills, and loss

14  prevention options were discussed.

15        Ocwen's records say the Cornejos wanted to reinstate.

16  So Ocwen sent off a financial package and made an appointment

17  to call Mrs. Cornejo back on January 9, 2015.  So now the

18  package will be mailed out.  The Cornejos can review it, and

19  Ocwen's going to call on January 9 and help them fill it out.

20  And on December 16, 2014, the package was sent.

21        Now, we've had a chance to speak to the Cornejos

22  before we got to trial, and they have told us and they'll

23  probably tell you that they didn't get any of these letters.

24  None of them.

25        On January 9, Ocwen called.  They reached

226

Mrs. Cornejo.  She wanted to reschedule and the call was
rescheduled to January 16.  At that time, Mrs. Cornejo said she
wants a modification -- a repayment plan.  The reason for her
default was reduced income and illness of her spouse.

They had plans to talk January 20th.  There was a
call.  They were scheduled to go over the mod application.
Didn't happen.

In January, a Franchise Tax Board lien was recorded
for $36,000.  The State of California also hadn't been paid its
taxes and they recorded a lien.  $36,062.

January 29, Ocwen called Dora for their appointment.
There was no answer.  Ocwen left a message.  Okay.  So we want
to apply for a mod, calls are made, nothing is happening.

February 16th, Mrs. Cornejo calls in.  She explains
the reason for the default is unexpected medical expenses.
They've been in trouble since December 2012.  They can't afford
their payment.  They're now behind on other bills and she said
the package was mailed two weeks earlier.

We know this is not true.  We know it's not true
because in a declaration prepared by Mrs. Cornejo, she said she
first submitted the application on April 16th, two months
later.  But because nothing had been turned in yet, Ocwen was
now free to proceed with the notice of sale.

Despite that, on February 17th, Ocwen sent a letter.
We know you're facing difficulties.  We're here to help.

Here's a mortgage modification package.  Please send it in to us.

Three days later on February 20, Ocwen called Dora. Another appointment was made to fill it out and on that day, Mrs. Cornejo was told the foreclosure sale was set for March 27 and the notice of sale was recorded on February 23, one month earlier.

February 26, Ocwen calls.  Doesn't leave a message. February 26, Ocwen calls back, leaves a message.  March 10th, before the foreclosure sale, two weeks, the foreclosure review is conducted.  A package had not been received, but the sale was postponed to complete Ocwen's review.

And the trustee, Western Progressive, sends a letter to the Cornejos saying your sale is postponed from March 27 to April 29.  The date is now known.

On March 16th, Mr. Cornejo calls Ocwen.  They discuss mod options.  They discuss telephone numbers.  Mr. Cornejo who's on the phone with others confirms his home phone number is the same as Mrs. Cornejo's home phone number and Mr. Cornejo says change the cellphone number to what becomes Mrs. Cornejo's cellphone number.  So all the contacts now go through Mrs. Cornejo.

They are told that applying for a modification will not stop the sale.  Merely applying doesn't do it.  Mr. Cornejo stated that he was working with Save Your Home California.  He

228

also stated if the sale could not be stopped, he would file for

bankruptcy protection.

Two days later on March 18th, Ocwen called and spoke

with Mr. Cornejo who said they're working with Save Your Home

California and he will fax in the request for mortgage

modification application.  It wasn't received.

So for the next two weeks, March 27, March 28,

March 30, April 1, April 2, April 3, April 4, April 6, April 8,

Ocwen called the Cornejos at both home and cell numbers and

left messages.  No return calls.

On April 9, 2015, Ocwen called, reached somebody, and

the person hung up.  Don't know if it was male or female.

Person hung up.

Again April 14, April 16, called, left messages, no

contact.  On April 16, for the first time, Mrs. Cornejo and

Mr. Cornejo fax in an application package.  The sale is set for

April 29 with 13 days in advance.

The next day, April 17, Ocwen calls and asks about --

trying to reach the Cornejos.  Called and left message.  And

we'll show you when the package comes in, it is processed.  The

fax comes into a central number.  It's put into the document

repository for Ocwen and sorted by loan number so it can be

located by people working on it, and this process takes a day

or two to get through all the paperwork that comes in for

people applying for loan modifications, sorted by correct loan

229

number, documents reviewed, and then sent off to the

modification workout department to be fixed.

Three days after the letter was faxed to Ocwen, Ocwen

sends a letter acknowledging receipt of the application,

April 20.  The next day, the underwriter completed the initial

review of the application and found some documents were still

missing.  So a letter was sent to the Cornejos identifying the

missing documents, a most recent tax return, pay stubs, and a

profit and loss statement showing starting and ending dates and

amounts.

The words underwriting completes review and

determines application is deficient because the P and L

statement is missing a start and end date, the application is

missing the borrower's most recent tax returns, the application

is missing the borrower's two most recent pay stubs.  They

incorrectly identified employment income even though they were

self-employed.

But Ocwen just doesn't mail a letter.  On the same

day, they call the residence and don't get an answer.  On

April 22, Wednesday, Ocwen calls and leaves a message.  On

April 23, Thursday, Ocwen calls and leaves a message.  Friday,

April 24, Ocwen calls and leaves a message.

There's no communication on Saturday the 25th or

Sunday the 26th, but on the 27th, Ocwen resumes and calls and

reaches Mrs. Cornejo.  Six days after the underwriting review,

they finally reach Mrs. Cornejo and say we're missing some

documents.

Mrs. Cornejo said the documents were faxed on the

24th.  She was told it takes 24 to 48 hours for the records to

be available, so email the records, not fax them, and we'll get

back to you.  Later that day, Ocwen again calls and leaves a

message.

The next day, the 28th, Ocwen calls and reaches

Mrs. Cornejo, is told unexpected medical expenses led to the

default, they can't afford their bills, other bills are in

trouble.  There was another call later with Frank -- Mr.

Cornejo.  They were told the package wasn't yet complete, the

sale was scheduled for April 29th, and it was unlikely there

was enough time to postpone.

So Mr. Cornejo somehow attempted to file for

bankruptcy.  Rather than actually filing for bankruptcy, he

sent a bankruptcy notice to Ocwen faking a bankruptcy.  Now,

when a bankruptcy is filed, no collection efforts can take

place including foreclosure, and if a foreclosure sale takes

place during a bankruptcy, it's void and it gets set aside.

We'll spend more time and walk through the various

emails so you can see how the receipt of the documents being

faxed in at 10:00 in the morning were received in India at

12:30 and acknowledged in Florida at 1:30, all the same time

around the world, and how the documents were processed.

But when you send the documents in days after they were requested, days after they were due, days after they were needed, you run the risk of not having them processed in time. If you wait three years from the initial calls, four months from the initial solicitation packages, and days and days and days and days after the calls came through and hope that everything happens at the last minute, sometimes it doesn't.

The bankruptcy information came in on April 29 and it was looked at.  The sale took place.  So Ocwen had to spend some time to decide whether the sale was valid or not.  If there was a bankruptcy, the sale wouldn't be valid.  If there wasn't a bankruptcy, there really isn't a basis to cancel the sale because the person bought is the third-party, bona fide purchaser.

Ocwen looked for and couldn't locate the bankruptcy information.  There wasn't a bankruptcy.  It didn't happen.  It was made up.  But this wasn't known to Ocwen.  So after the sale took place on April 30 -- sorry -- after the sale took place on April 29, Ocwen acknowledged the receipt of the documents on April 28 by sending a letter.

A couple of days later on May 4th, Ocwen acknowledged receipt of a complete package because its records hadn't yet showed that the foreclosure sale was final because the bankruptcy issue was still out there.  It wasn't until May 5, the next day, that the bankruptcy issues were discovered, the

sale was confirmed as being valid, and the trustee's deed upon sale was issued.

Once the trustee's deed was issued, someone else owned the property and they brought the eviction action.  When the property was sold in April, some of the money paid off the existing lien.  I'm going to use round numbers -- $80,000.  So that was the amount of the Ocwen debt.

The next bit of money went to any other encumbrance on the property and the IRS tax lien at that time was, rounding, $39,000.  The State Farm abstract of judgment lien, rounding, was $12,000.  The Franchise Tax Board lien, rounding, was $36,000.

You have the loan of 80,000, liens of 87,000, for a total of $167,000 -- I'm rounding.  The property didn't sell for that much.  Not all the debt against the property was repaid.

The parties have agreed and we'll tell you that the value of the property was approximately $167,500.  There was no dollar equity in the property.

Ocwen can't force someone to apply for a modification, seek a short sale, seek other loss mitigation remedies.  Ocwen can make those materials available.  They're available on Ocwen's website.  They were available through the phone, mail, email, and fax.  You have to give up and ask.  That didn't happen here.

233

        Ocwen acted properly, didn't foreclose immediately,
took years to do so, tried to give the Cornejos time and
chances.  When the Cornejos said they would do certain things
and it didn't happen or didn't keep appointments, Ocwen
advanced the process and recorded the notice of default.  And
we'll show you all these things in much greater detail.

        But at the end of all of this, when you have a chance
to sit back and look, we think you'll find that Ocwen acted
properly and reasonably and properly completed the foreclosure
sale.  Thank you.

        THE COURT:  All right.  Ladies and gentlemen,
generally we would continue on this afternoon, but to give you
some time to go back to your homes or to make arrangements to
stay the night, we're going to go ahead and recess for the
evening.  We do ask that you are back to the jury deliberation
room tomorrow at 8:30.  Thank you very much for your service
today.

     (Jury out at 4:20 p.m.)

        THE COURT:  All right.  We're outside the presence of
the jury.  It's time -- the defense indicated a desire to make
a motion at this time.  Mr. Shatz, are you suggesting a Rule 50
motion?

        MR. SHATZ:  Hopefully.

     (Discussion of Rule 50 motion.)

        THE COURT:  I know you said a motion for nonsuit.  Of

course, it's not a question (indiscernible).  I think the
nature of your motion was you thought that there were not all
of the elements of the claims raised in plaintiff's opening
statement.  I don't want to put words in your mouth, so let
me --

          MR. SHATZ:  That is correct so far.

          THE COURT:  All right.  Were there other grounds for
a motion?

          MR. SHATZ:  No, Your Honor.

          THE COURT:  Plaintiffs have comment on that?

          MR. SHATZ:  Oh, I was happy to tell you it was begun.

          THE COURT:  Oh, I'm sorry.  Your --

          MR. SHATZ:  Oh, I thought you were asking -- I'm
sorry.  I misunderstood what you said.  Yes.  What I wanted to
suggest was that to state a cause of action under 2923.6 of the
California Civil Code, it's not just that you have to give the
documents to the servicer the debtor requested.

          If you have to give the documents to the servicer in
a reasonable -- as requested by the servicer in a reasonable
time and in this case, given the processes and how things work
in the real world, when documents are requested, if they're
provided at 10:37 on the day before a 10:00 a.m. foreclosure
sale, that's not a reasonable time for production and there was
no description or statements made in the opening statement as
to how that would be or could be reasonable and therefore, it

wasn't a complete application.  The basis for the claim goes
away.

THE COURT:  All right.  Under Rule 50 in federal
court, the Court is entitled to make a -- issue a directed
verdict at the close of the evidence.  The Court is required to
use great restraint in doing that and literally, it is
permitted only if there is a -- own admission by counsel that
makes proof of the claim impossible.

On the other hand, in federal court an opening
statement is not required, which means that parties are not
required to even make an opening statement or to address all
the elements of the claim.  The Ninth Circuit has ruled on that
I believe as early as -- well, that's a very old standard in
federal court.

So I'm afraid maybe what you're suggesting is under
maybe California Code of Civil Procedure 581.

MR. SHATZ:  Yes.

THE COURT:  That would be an appropriate motion for
the failure to address each of the claims because the proof --
the requirements -- procedure under California law are
different.  Obviously, this is a case (indiscernible) which
means the federal procedure applies.

So on that basis, the Rule 50 motion will not be
granted at this time.  All right.  Anything else for the record
or anything we can take care of?  Maybe I should suggest, there

236

is something we should address and that is the issue of
emotional distress damages.

And I'm (indiscernible) there is a way to handle this
maybe, and that is with a bifurcation of the issue.  If there
is a plaintiff's verdict on -- well, a plaintiff's verdict, we
could then reconvene for the purpose of presenting testimony on
emotional distress damage, let the jury deliberate on that
topic, then reserve to the Court whether or not to allow that
to be included in the judgment.

At this point -- and I'm going to allow additional
briefing, but on this point, I agree with the defense that, as
I indicated earlier, that does not appear to (indiscernible)
measure of damages of emotional distress.  It does kind of
address both issues.  One is on testimony (indiscernible), but
not to be presented at a time that would be potentially
prejudicial to the defense.  That's something maybe for you to
think of overnight.

We will need to know, I think, how to address that at
least by the time we get to Mrs. Cornejo's testimony.  So --

MR. HEENAN:  Your Honor, just to clarify, the
bifurcation would be the same jury?  If they check the box yes
as to liability, we bring them back in and present emotional
distress evidence so the Court has a complete record upon which
to rule?

THE COURT:  Not so much me, but to preserve for issue

1  of appeal --

2          MR. HEENAN:  Yes.

3          THE COURT:  -- which is what your suggestion was.

4          MR. HEENAN:  Yes.  Thank you, Your Honor.

5          MR. ANGWIN:  And, Your Honor, sorry to tag team, but

6  would we still present the evidence with regard to the

7  recklessness, willfulness, and intent --

8          THE COURT:  Right.

9          MR. ANGWIN:  -- in the first part?

10          THE COURT:  Right.

11          MR. ANGWIN:  Try to keep as much emotional distress

12  out as we can.  There's going to naturally be a little bit of

13  unintentional overlap, I think, but we will try.  And then

14  would the issues of actual emotional distress damages will then

15  be reserved.

16          THE COURT:  Would be -- right in a bifurcated

17  setting.  I think that might achieve everyone's issues.  The

18  one thing it does do, of course, is delay somewhat because

19  there would be duplication not so much of testimony -- and I

20  would not just hope for that.  That would be your goal that you

21  not present affirmative evidence in front of the jury before a

22  verdict.

23          It does cause the trial to go a little bit longer.

24  It is a greater inconvenience to the jury.  I don't know.  It

25  depends -- let's -- it just occurred to me that that's a way of

238

1    handling it.  I'm not going to ask you to make a decision on

2    that at this time, but maybe something to think of overnight.

3           MR. PAINO:  Okay.  We've actually sort of thought of

4    that as well.  Obviously, the ideal scenario is that the Court

5    make a determination that they're not recoverable and we don't

6    have to deal with that issue, but I understand what the Court's

7    trying to accommodate in coming up with that approach.

8           The other issue related to emotional distress damages

9    that we touched on in our trial brief was what the burden of

10   that proof would be.  The Ninth Circuit admittedly has

11   recognized that emotional distress damages can be proved by

12   mere testimony alone.

13          What I would submit to the Court is that this case

14   has very similar parallels to proving emotional distress

15   damages in bankruptcy cases.  In a bankruptcy context, the

16   Ninth Circuit has recognized that proof of emotional distress

17   in a bankruptcy context requires some differentiation between

18   the general anxiety and stress that an individual encounters by

19   virtue of the bankruptcy process and the specific emotional

20   distress attributable to, in particular, a stay violation.

21          And I would submit to the Court that this is a very

22   parallel scenario where we're dealing with borrowers who have

23   been facing foreclosure for the better part of 24 months.

24          The borrowers had significant other debt obligations

25   that were posing pressure on them.  So what I would submit,

Your Honor, is that there should be a burden in this case if emotional distress testimony is received, that there be some instruction to the jury that there needs to be some differentiation between the general distress that a borrower suffers when they're in default and the specific distress that they suffered as a result of the misconduct in this case.

THE COURT:  That seems to make some sense, although I don't necessarily appreciate the analogy to the bankruptcy proceeding.  What you're suggesting is there's a certain amount of stress that you're going to suffer -- certain amount of emotional distress you're going to suffer as a result of the process, and you're suggesting that their emotional distress damages are limited to the wrongful conduct by Cornejo, whether that begins 10, 12 days before or 10, 12 months before.

MR. PAINO:  That's the point, Your Honor, is there -- no doubt we understand that Mrs. Cornejo and Mr. Cornejo suffered general distress and anxiety over this past 24 -- now that we've been in this lawsuit, I think it's 36 months.

What I'm suggesting is exactly what the Court is stating is that in some sense it's unfair unless there's some differentiation between the general distress that had been ongoing for 24 months and the specific distress that they suffered as a result of my client's conduct in this case.

THE COURT:  All right.  Plaintiffs?

MR. ANGWIN:  Your Honor, I think we can probably

arrive at an instruction with defense counsel before
bifurcation that addresses that.

Our position is, of course, we are acknowledging that
the Cornejos had other stressors in their life, but the cases
that defense counsel's citing are basically the cases saying
you're in bankruptcy, you're already really stressed, one
little extra -- one more person or one less person in
bankruptcy doesn't affect you.  That's totally different than a
person losing their home.

We are not going to blame Ocwen for everything going
back to 2012, but, you know, we are going to make the claim
with regard to the wrongful actions and the foreclosure.
That's where the emotional distress damages will do it.

Now, of course, within that, Ms. Cornejo is going to
have to testify about what losing the home meant to her.  So
that will, of course, go back in time, but Ocwen will not be
blamed for that.

It'll be -- the basis for the emotional distress
damages will be the wrongful acts of Ocwen.  Was I clear on
that?

THE COURT:  Yes --

MR. ANGWIN:  I started clear and then I veered off of
it.

THE COURT:  I think I understand what you're trying
to say.  I don't know that we quite captured it, but I do think

a jury instruction can address that.  We're talking about, in essence, it's not consequential emotional distress from the process but only consequential emotional distress as to the wrongful conduct of Cornejo.

MR. ANGWIN:  That would -- yes, Your Honor.  That was it.  We're not going to say that two years ago there was some letter or something.  We're going to say when there was a foreclosure, they lost their home.

THE COURT:  Because again it has to be directed towards the material breach.

MR. ANGWIN:  That we are going -- we're going to tie the evidence to the materiality of the breach of the 2923.6 claim.

THE COURT:  All right.  So that's something that we can talk about further tomorrow.  Anything else to talk about tonight?

MR. ANGWIN:  Your Honor, I'm going to propose to defense counsel we discuss -- we're going to try and work on a different verdict form if that's okay.

THE COURT:  Yeah, I hope you will.

MR. ANGWIN:  By the way, excellent job on trying to synthesize two unwieldy statutory claims into a cogent and understandable verdict form.  You did a better job than we did.

THE COURT:  One thing I do need to find out is it did seem to me that the defendants, not only in their proposed but

242

also in their verdict form, suggested items in both that are

not under dispute.  The property was foreclosed on.  Ocwen

is -- the long paragraph description.  I mean I don't think

there's proof required on that, so I don't think there's a

dispute on it.  So I think what we need to be clear on is what

in dispute and what is not.  So --

MR. ANGWIN:  And, Your Honor, if I may.  I think --

we've worked with defense counsel on that.  To be candid,

there's a lot of issues that we have not quite reached a total

stipulation on, but we're very close.

What I propose is that we reach a stipulation with

defense counsel.  The jury doesn't need to know about those

stipulations.  Enter those in the record so we have a clean

record, but that would be -- you know, that it's a first lien

mortgage, you know, they were qualified under Hobart, over 175

foreclosures, that kind of thing, which were in the -- their

instructions.

Our proposal would be to focus just on the claim,

which is -- was -- did Ocwen foreclose on the Cornejos' home at

the time the complete application was pending, which tracks the

statutory language.

THE COURT:  Right.  And to the extent that you agree

to a verdict form, that's fine.  If you want -- I think a big

issue for appeal -- and sometimes counsel make that mistake --

is they group too many issues in one question to the jury.

243

1    That's up to you if you want to do that.  That's fine

2 with me.  In fact, it could just be as simple as who do you

3 find for and we can go with that, but that would be the error

4 that you would have to defend --

5    MR. ANGWIN:  And, Your Honor, can we get just a

6 guidance on that because I've looked at your original -- your

7 verdict form now, and the trouble with the claims -- not the

8 trouble.  The issue is there are two aspects to the claim.  One

9 is the documents I'm going to say complete, for lack of a

10 better word -- the completeness of the documents.  The other is

11 timeliness.

12    Timeliness then creates the question of

13 reasonableness and when it came in.  It's hard to get one

14 question that covers all that.

15    THE COURT:  Right.

16    MR. ANGWIN:  But when you break it out, then it

17 becomes a situation, for example, on your current verdict form

18 is that did the Cornejos supply the documents to Ocwen in the

19 time Ocwen designated.  That's a yes or no, right?

20    THE COURT:  Right.

21    MR. ANGWIN:  Next question, was the time reasonable.

22    THE COURT:  Right.

23    MR. ANGWIN:  If they check no to both, what have they

24 held?

25    THE COURT:  If they -- well, I think -- if I recall

244

what I envisioned doing, right, if they decide that it was not
timely, so, yes, they've submitted a complete but untimely
form.

           MR. ANGWIN:  Right.

           THE COURT:  Then they need to go and analyze whether
the time frame was reasonable.

           MR. ANGWIN:  Right.  But it's really -- I'm sorry,
Your Honor.   Go ahead, Your Honor.

           THE COURT:  So -- but if they decide it was
incomplete, it doesn't matter because you don't go any further.
If it's complete but not timely, then we need to know was the
time frame reasonable.

           MR. ANGWIN:  And that's the whole issue is we're
going to propose a single verdict form with instructions with
regard to what completeness, timeliness, and reasonableness
mean because that way --

           THE COURT:  No.  We don't have instructions on the
verdict form.

           MR. ANGWIN:  I'm sorry.

           THE COURT:  I'll give them the instructions.  They'll
have a copy of the instructions with them.  The verdict form
just has questions.

           MR. ANGWIN:  I meant in the instructions.  I'm sorry,
Your Honor.  I misspoke.

           THE COURT:  Yeah.  The instructions do have

245

application complete and timely as instructions based on a
format that I --

          MR. ANGWIN:  They do.  And one last question since I
talk way too much.  On your current verdict form, it leaves out
the word intent.

          THE COURT:  Right.

          MR. ANGWIN:  It says willful and reckless.  Is
that --

          THE COURT:  It's what I raised earlier, and it's
something we can work on as well.  Maybe it should say did they
act -- oh, did Ocwen act -- I guess it's what -- what's
troubling was that (indiscernible) was an intent an act -- an
intentional act as well as egregious and a willful, or a
reckless act.  So it doesn't make sense to me that you can have
liability for statutory damages for any of those.

          I can see willful and reckless because of they're
generally the same type of conduct.  Intentional, as we know
from law school, is a much different standard.  So I'm not sure
I understand what the Legislature intended.  Can it be merely
something other than negligence.

          MR. ANGWIN:  We will -- how about this.  Let's
discuss this with defense counsel and see if we can reach an
agreement on that.

          THE COURT:  All right.

          MR. ANGWIN:  I understand the Court's dilemma,

246

though.

THE COURT:  Yeah.  I know both sides have actually
suggested the intentional thing, but I just don't understand
how in practice you do intent, willful, or reckless because
that's a huge difference in conduct.

I mean we're not even talking about maybe a
deliberate indifference.  We're just talking about did you do
it.  And -- so that's what concerned me about the -- the whole
statute is very poorly written and I didn't see a lot of
interpretation anywhere on what that meant.

MR. ANGWIN:  It is.  You did a good job for --

THE COURT:  Well, we'll see maybe (indiscernible).

MR. ANGWIN:  -- being one of the first to interpret
it.

THE COURT:  Mr. Shatz.

MR. SHATZ:  Just housekeeping, if that topic is done.
I'm going to ask what time the courtroom closes because we can
take advantage of the next half hour if it's okay with the
Court.

THE COURT:  Not in the courtroom, but we can, you
know, give you the conference room outside --

MR. SHATZ:  Okay.  Then I spoke too narrowly.  I
apologize.  Is there a place where in the building we can stay
for a bit?

THE COURT:  Yes.  Do you need to spread out papers or

can -- or is it just okay to have a place to sit?

MR. SHATZ:  For part of it, it's papers because we need to go through some documents to get some numbers and that kind of thing.

THE COURT:  All right.  What I will do is you can use the conference rooms outside the courtroom.  The courtroom -- we will lock it no later than 5:15 -- 5:00.  Doors lock at 5:00.  But, of course, that will be under your scout's honor you're not going to reenter the courtroom.  You can stay in those conference rooms.  The room is under surveillance.  They will see if you come in.  I'm going to ask you not to come in.

MR. SHATZ:  Oh, no, no.  The only reason to come in is to leave the boxes and stuff, but if we don't come in, okay, then we'll take them.

THE COURT:  Do you -- no, no, no.  You can leave your boxes.

MR. SHATZ:  I was going to use the boxes and papers to talk to the --

THE COURT:  So you want --

MR. SHATZ:  -- folks at 5:00 o'clock and then put them back, but no, no.  If that's -- I can get to the hotel --

THE COURT:  The other thing you can do, though, is if you want to just -- the court security officers are in the building.  (Indiscernible.)  You just want to make contact with one of them and they'll let you back in the courtroom.

248

1      MR. SHATZ:  That's fine too.  Okay.

2      MR. ANGWIN:  I mean we're all at the Marriott anyway,

3  so --

4      THE COURT:  Yeah.  You might not want to slog it all

5  over there with you, though.

6      MR. SHATZ:  Yes, Your Honor.

7      THE COURT:  Okay.  All right.

8      MR. SHATZ:  These are young, strong people.  Old

9  farts don't do that, so --

10      THE COURT:  All right.  Is there anything else for

11  today then?

12      MR. PAINO:  Just one more housekeeping item, Your

13  Honor -- perhaps two more housekeeping items.  First is the

14  Court -- we spoke this morning about the supplemental briefing

15  on the statutory construction of the -- what I would call the

16  punitive provision in 2924(12)(b).  Am I understanding

17  correctly that the Court would like that by this evening?

18      THE COURT:  No, no.  I don't think we actually -- I

19  think it could wait until even Wednesday.  You know, I don't

20  think you need to go and have that to me tonight.  I'm not

21  going to read it tonight, so -- you know, if you have it, then

22  I'll read it in the morning.  If not, then I'll take a look at

23  that either Wednesday morning or Wednesday at noon or I might

24  toward the end of the day depending on how the trial proceeds.

25      If we go fast, which I really hope that we do, we may

249

1   need that sooner.  Or you may decide that what you've got is

2   sufficient.

3        MR. PAINO:  Well, I think -- we did spend a

4   significant amount of time on the issue, so I don't anticipate

5   have to expand much further on it, but I just want to make sure

6   I give the Court enough time since I'm sure --

7        THE COURT:  Right.

8        MR. PAINO:  -- lot of files being checked with right

9   now.

10        THE COURT:  Right.  And so for the plaintiffs, I

11   assume you're going to be hitting that issue maybe not tonight

12   but tomorrow sometime?

13        MR. ANGWIN:  Certainly, Your Honor, since we're not

14   winning that issue, we will hit it again.

15        THE COURT:  You might want to take a little extra

16   time on that then.  All right.  Anything else then at this

17   time?

18        MR. SHATZ:  Witnesses for tomorrow.

19        THE COURT:  Right.  Who do we have?

20        MR. ANGWIN:  We're calling Ocwen.  Is he going to be

21   available?

22        MR. SHATZ:  We are told he's in town now.

23        MR. ANGWIN:  Excellent.

24        MR. SHATZ:  And we're not going to hide him.  There's

25   no subpoena, but we're just going to bring him in.

250

1    THE COURT:  And who is that?  That's --

2    MR. SHATZ:  Rashad Blanchard.

3    THE COURT:  All right.  Mr. Blanchard tomorrow.

4  What's the time estimate on that?

5    MR. ANGWIN:  And that should go all day, Your Honor.

6    MR. SHATZ:  No.

7    MR. ANGWIN:  We'll -- with you guys.

8    MR. SHATZ:  Don't know what we're going to do.  It

9  depends on, in part, what you do.

10    MR. ANGWIN:  He will go at least through lunch.

11  How's that?  Is that fair?

12    MR. SHATZ:  Okay.

13    THE COURT:  Ideally, you will conduct your direct as

14  well, if that is feasible for you.

15    MR. SHATZ:  I see.  He was going to be here for the

16  remainder of the trial, if that makes a difference.

17    THE COURT:  All right.  Then it's up to you.  If he's

18  going to be available, he obviously -- is he your

19  representative?

20    MR. SHATZ:  Yes.

21    THE COURT:  Oh, okay.  All right.  So --

22    MR. SHATZ:  With the other witnesses, we would do

23  just what you said and we also told the plaintiffs that if one

24  of their witnesses has time issues because he's a limousine

25  service.  We said we would be willing to agree, if the Court

agrees, to stop and start testimony to get him in and out.

THE COURT:  Okay.  That's fine.  As to Mr. Blanchard, then I assume what you're saying is you'd like to wait on your direct on him because he will be in here -- in the trial and he will be your solo witness?

MR. SHATZ:  No.  I don't know what they're going to get and I want to reserve the ability to move for a directed verdict before I lay their entire case.

THE COURT:  Okay.  I see what you're saying.  To that extent -- all right.  Well we can work on that.  If Mr. Blanchard doesn't take all day, you're prepared with your next witnesses maybe?

MR. ANGWIN:  Yes, Your Honor.

MR. HEENAN:  We only have three witnesses, Your Honor.  We're going to move fast and get our case done.

THE COURT:  Okay.  So -- and it's not an issue of they're not going to be here.  So I assume it's  either Mr. Cortez or Ms. Cornejo will be --

MR. ANGWIN:  Correct.

MR. HEENAN:  Two and three.

THE COURT:  -- after Mr. Blanchard.  So hopefully we'll have a pretty good idea by the morning break whether we're going to -- do you think you'll know by then, Mr. Shatz, how much time you're going to take with Mr. Blanchard?

MR. SHATZ:  Yes.

1          THE COURT:  All right.  So hopefully then we can give

2  a heads-up and you can get your next witness prepared.

3          MR. SHATZ:  And the next witness is Ms. Cornejo?

4          MR. ANGWIN:  It would be Ernie.

5          MR. SHATZ:  Oh.

6          THE COURT:  Mr. Cortez?

7          MR. HEENAN:  Mr. Cortez, Your Honor.

8          MR. SHATZ:  Okay.

9          THE COURT:  I guess it's not too big of a mystery

10  now.  It will be one or the other.

11          MR. ANGWIN:  No.  That's one, two, three.

12          THE COURT:  Okay.  All right.  Anything else then?

13          MR. ANGWIN:  We're still trying to reach an

14  agreement -- we think we can -- with regard to the stipulation

15  on Western and we should have that done tonight.

16          THE COURT:  Okay.

17          MR. SHATZ:  Yeah.  In light of this, do you want the

18  verdict tomorrow or can we do that tomorrow night so I can work

19  on witness prep?

20          THE COURT:  Oh -- yeah.  We don't need that verdict

21  until we're actually going to give it to the jury, but it

22  sounds like what we're saying is -- I think we're hearing we

23  can give that verdict to the jury Wednesday?

24          MR. SHATZ:  Well, you know, in a -- our goal is to

25  end this and in a perfect world, which I've never been part of,

253

1   we'll be done with the testimony, if not tomorrow, then

2   Wednesday, but we'll see what happens.

3          THE COURT:  Then we need to be talking about the

4   verdict tomorrow for sure because if we plan to -- if we think

5   we're going to get it to the jury on Wednesday, then we need to

6   talk about it in advance.  So, yeah, we're going to need to do

7   that sometime tomorrow.  Does that make sense?

8          MR. SHATZ:  Yes.

9          MR. ANGWIN:  Everything you say makes sense, Your

10  Honor.

11         THE COURT:  Wow.  All right.

12      (Laughter; everyone speaks at once.)

13         THE COURT:  Okay.  Anything else now?

14         MR. ANGWIN:  No, Your Honor.

15         MR. HEENAN:  Thank you, Your Honor.

16      (Whereupon the trial in the above-entitled matter was

17  adjourned for the day at 4:43 p.m.)

                        --o0o--

18

19

20

21

22

23

24

25

254

## CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Jennifer Barris            December 28, 2016

Jennifer Barris, Transcriber

AAERT CET*668



/s/ Mary C. Clark            December 28, 2016

Mary C. Clark, Transcriber

AAERT CERT*D-00214