1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                            --o0o--

4    FRANK CORNEJO, et al.,        )   Case No. 1:15-cv-00993-JLT
                                   )
5                  Plaintiffs,     )   Bakersfield, California
                                   )   Tuesday, October 18, 2016
6         vs.                      )   8:28 A.M.
                                   )
7    OCWEN LOAN SERVICING, LLC,    )   Jury Trial - Day 2.
     et al.,                       )
8                                  )
                   Defendants.     )
9    _____)

10                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JENNIFER L. THURSTON
11           UNITED STATES MAGISTRATE JUDGE, and a jury.

12   APPEARANCES:

13   For Plaintiff:              GIANDOMINIC VITIELLO
                                 Katchko, Vitiello and Karikomi
14                               11500 W. Olympic Blvd., #400
                                 Los Angeles, CA   90064
15                               (310) 943-9587

16                               JOHN HEENAN, PHV
                                 Bishop Heenan & Davies
17                               1631 Zimmerman Trail
                                 Billings, MTT   59102
18                               (406) 839-9091

19                               EDWARD E. ANGWIN
                                 Angwin Law Firm
20                               827 Moraga Drive
                                 Los Angeles, Ca   90049
21                               (310) 471-2707

22   For Defendant:             SANFORD P. SHATZ
                                 BRIAN A. PAINO
23                               McGlinchey Stafford
                                 18201 Von Karman Ave., #350
24                               Irvine, CA   92612
                                 (949) 381-5811

25

ii

APPEARANCES (Cont.):

Court Recorder:                    OTILIA ROSALES
                                   U.S. District Court
                                   2500 Tulare Street, Suite 1501
                                   Fresno, CA   93721
                                   (559) 499-5928

Transcription Service:             Petrilla Reporting &
                                     Transcription
                                   5002 - 61st Street
                                   Sacramento, CA   95820
                                   (916) 455-3887

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

iii

1                                   INDEX

                                                                  PAGE
2    PRELIMINARY MATTERS                                             1

3    DISCUSSION RE: TIMING, PUNITIVE DAMAGES, VERDICT FORM         274

4

5                              WITNESS INDEX

6    FOR PLAINTIFF:            DIRECT   CROSS   REDIRECT   RECROSS

7    Rashad Blanchard          H- 42

8

9    LEGEND:   H = Heenan
               S = Shatz
10

11

12                             EXHIBIT INDEX

13   FOR PLAINTIFF:                            FOR I.D.   RECEIVED

     2                                                      77
14   6                                                      93
     11                                                    261
15

16   FOR DEFENDANT:

17   583                                                   169

18

19

20

21

22

23

24

25

1

1    <u>BAKERSFIELD, CALIFORNIA, TUESDAY, OCTOBER 18, 2016, 8:28 A.M.</u>

2

3         (Audio begins as follows:)

4              MR. HEENAN:  If I might approach?

5              THE COURT:  All right.

6              MR. HEENAN:  Thank you.

7              MR. SHATZ:  Thank you.  Is this one copy of three

8    documents?

9              MR. HEENAN:  It should be two separate documents.

10             MR. SHATZ:  You gave me three total documents.  Is

11   that a mistake?

12             MR. HEENAN:  No.  I must've gave you one too many.

13   One's judicial notice.  One's Rule 404(b).

14             MR. SHATZ:  Okay.  I have two judicial notice and

15   one -- do you have one more 404(b) by any chance?

16             MR. HEENAN:  No.  I have two of each.  I have three

17   copies of two separate -- does the Court have two separate

18   briefs?

19             THE COURT:  I have -- yes.

20             MR. SHATZ:  Okay.  We'll deal with it.

21             THE COURT:  But two of one.

22             MR. HEENAN:  Oh, then that's -- the heading looks

23   remarkably similar.

24             THE COURT:  In this case it looks identical.

25             MR. HEENAN:  Then I made a mistake, Your Honor.  If I

1   might approach again and --

2         THE COURT:  I have the judicial notice and then the

3   admissibility of the consent order.

4         MR. HEENAN:  Your Honor, maybe if you hand me back

5   those two and I'll -- I know these are different, so I can

6   trade you --

7       (Pause - counsel conferring.)

8         THE COURT:  I should have two?

9         MR. HEENAN:  You should have two separate briefs,

10  Your Honor.

11        THE COURT:  Okay.

12        MR. HEENAN:  And anticipating objections and heeding

13  the Court's trial order, I wanted to bring to the Court's

14  attention issues that I think are going to get raised through

15  this first witness so the Court can anticipate and rule on

16  objections.

17        Not cited in that brief, but plagiarized frankly, all

18  the part about admissibility of the consent judgment and the

19  consent decree, that whole Section A is frankly, Your Honor,

20  plagiarized without attribution to Judge Stanley who put that

21  language in Crawford v. City of Bakersfield, which is 2016

22  WestLaw 5870209, Eastern District of California, October 6th,

23  2016.

24        And another case, Your Honor, that didn't make it

25  into this brief, but I would tell -- you know, cite the Court

1    to at this time, <u>McCollough v. Johnson Rodenburg and Lauinger</u>.

2    That's 637 F.3d 939.  That's a Ninth Circuit decision from 2011

3    and basically the gist is, as I understand, the court's ruling

4    and our burden of proof with respect to recklessness and

5    willfulness, it's our obligation affirmatively as the

6    plaintiffs to put on evidence showing that these defendants --

7    or this defendants' conduct was more than just kind of mere

8    negligence.

9         And to telegraph it for the Court where we're going

10   to go is get into the systems that were in place at the time

11   they were dealing with the Cornejos, all of which led to the

12   violations of the California Homeowner's Bill of Rights that

13   brings us here today.

14        So I anticipate and I think can fairly tell the Court

15   that pretty quick into Ocwen's testimony we're going to be

16   talking about consent judgment where the California Attorney

17   General and 48 other state attorney generals prosecuted Ocwen

18   for committing the same systemic problems that brings us here

19   today.

20        And separately, the New York Department of Finance

21   brought a consent decree, or entered into a consent decree with

22   Ocwen that related to backdating of documents, failing to send

23   out letters, relying on outdated computer systems, relying on

24   foreign employees; all of which is part and parcel of this

25   case.  And so --

4

1          THE COURT:  What is the evidence that you have that

2      there was backdating of letters in this case?

3          MR. HEENAN:  The evidence is that the Cornejos --

4      well Mrs. Cornejo's going to testify that she didn't receive

5      modification packages and that she didn't receive one of these

6      critical letters.

7          THE COURT:  Is there evidence in the diaries of Ocwen

8      that those documents were sent?

9          MR. HEENAN:  In the diary it says letter sent, but

10     also in the diary there's communication documented by Ocwen

11     where Mrs. Cornejo is calling and saying in one instance I

12     never got any of these packets, in another instance saying I

13     never got this letter telling me that my application was

14     inadequate.

15         THE COURT:  How does Mrs. Cornejo's denial receipt

16     implicate backdating?  Because backdating would assume it was

17     sent on a different day then it was actually sent and what

18     you're telling me is really the issue is that it was never

19     sent.

20         MR. HEENAN:  Well with respect to that issue, it goes

21     to the systems that Ocwen had in place and so I intent to ask

22     Ocwen first how do we know these letters went out, how did

23     these packets -- how do we know these packages went out because

24     I don't think that this witness, and maybe I'm wrong, sent

25     them.

5

1          And then we'll get into that frankly, Your Honor, and

2     I think if it's well I know that Ocwen, when it says it sends a

3     letter that means it sent a letter, then I do intend to say

4     well wait a minute, haven't regulators called to task that you

5     say you sent things and you haven't?

6          THE COURT:  Once again --

7          MR. HEENAN:  That's the big --

8          THE COURT:  -- how do we get to backdating?  Because

9     again, backdating implies it was sent, just on a different date

10    that's reflected on the document.  I'm not sure I appreciate

11    that those are the same things and maybe I'm just seeing it --

12         MR. HEENAN:  No, Your Honor.  Well with respect to,

13    for instance, the April 21st letter, it's dated April 21st.  In

14    Ocwen's logs the first hey send a letter is at like after 10:00

15    o'clock at night -- after 7:00 o'clock at night and so there's

16    no way it went out on April 21st.  So at the earliest it went

17    out on April 22nd by regular mail from Florida, so at the

18    earliest it arrives on April 27th.

19         And so those are the types of things that I think we

20    need to get into, especially in light of Ocwen's counsel's

21    opening statement where basically the defense, as I understand

22    it, is -- well, not even as I understand it, I think verbatim

23    was the Cornejos sat on their hands, they were asleep, they

24    didn't wake up in time and it's their fault.  So --

25         THE COURT:  I guess still on that issue though I'm

6

1   not seeing how there's a failure in the system.  If their

2   documents say they sent a letter -- or I don't know what the --

3   if it says letter prepared, whatever, placed for -- in the

4   outgoing mail on April 21st at 7:00 p.m. I'm not seeing that as

5   a failure of a system, I'm just seeing that that's what the

6   evidence is.  And whether the jury finds that that's a

7   reasonable method of mailing.

8         I guess I'm not seeing -- what I hear what you're

9   saying is what we have is something they could've done better,

10   but what we want to do is impugn them based upon conduct that

11   occurred on other occasions.  I don't see this as absence of

12   mistake.  What I see is simply character evidence.

13        I mean you can call it what you want, but how would

14   you be using the prior conduct set forth in the settlement

15   agreement to demonstrate those topics?  Because what you've

16   described to me is not an absence of mistake.  They've

17   documented what they did.  Whether that's sufficient or not is

18   a question for the jury.

19        MR. HEENAN:  Let me give you a better example, Your

20   Honor, and I respect your backdating -- I mean to me the bigger

21   issue is frankly outsourcing of employees, inadequate computer

22   systems in place.  And so like for instance, the consent

23   judgment, failing to properly process borrower's applications

24   for loan modifications including failing to account for

25   documents submitted by the borrowers and failing to respond to

7

1   borrower's reasonable requests for information and assistance;

2   and as a result, denying loan modifications who are eligible.

3   So those are the types of things, Your Honor, that --

4           THE COURT:  That they did in the settlement.  What is

5   the evidence that they did those things here, and how does that

6   relate to having outsourced employees?

7           MR. HEENAN:  Well for instance, internally -- I mean

8   I think it's undisputed that internally the folks in India are

9   saying postpone the sale because we've received a completed

10  application --

11          THE COURT:  So how is it that that's a bad thing to

12  have employees wherever they are saying postpone?

13          MR. HEENAN:  Well the bad thing is, Your Honor, is it

14  never happens because internally whoever's next in the chain of

15  command never actually postpones the sale.  And so --

16          THE COURT:  And how is that related to whether they

17  have outsourced employees?

18          MR. HEENAN:  Because if there's someone down the hall

19  or a way to communicate within the organization, then this

20  never would've happened.

21          THE COURT:  Is that what the settlement agreement

22  says, that the fact that they had outsourced employees meant

23  that they discounted what those people said?  Because that

24  seems to be the issue here, right?

25          MR. HEENAN:  No, Your Honor.  It's a systemic

1  business issue, Your Honor.  It's --

2          THE COURT:  What I'm trying to get at is if you want

3  to use that evidence, that evidence can't be a substitute for

4  what happened here --

5          MR. HEENAN:  Absolutely not.

6          THE COURT:  -- because then that's just plain

7  character evidence.

8          MR. HEENAN:  Absolutely.

9          THE COURT:  So if you're telling me that you need

10 this settlement agreement to explain what happened here, to

11 provide a context for what happened here, then it has to tie.

12 The fact that you have employees -- because what I heard in the

13 opening statement is facts issued from Porterville, received in

14 India and in Florida at basically the same time in those time

15 zones, at the same -- maybe not the same instant, but within

16 minutes, just differences in time based upon time zone.  So

17 that doesn't say to me there's a problem with an outsourced

18 employee.

19         What you're saying -- what I understand your

20 explanation to be is because they're outsourced, Ocwen didn't

21 give credence to their opinions, but what is the evidence that

22 that's what happened here?

23         MR. HEENAN:  In a bigger picture, Your Honor, every

24 single thing that we're alleging here, every single thing that

25 Ocwen did to the Cornejos and the ultimate failure to postpone

1   the sale is all the same exact type of conduct that Ocwen was

2   committing in scores against consumers exactly like the

3   Cornejos right to and through exactly when they were dealing

4   with the Cornejos.

5          And so if we're in the position of having to pretend,

6   and pretend is what it would be, that this were a one-off

7   situation --

8          THE COURT:  No.  I'm not asking you to do that, but

9   what I'm suggesting is the evidence in this case stands or

10  falls on the evidence in this case.

11         MR. HEENAN:  Absolutely, Your Honor.

12         THE COURT:  You can't use the settlement agreement as

13  a substitute for evidence here unless there's some reason that

14  you can show me to do that.  But the conclusion that the

15  systems are the same doesn't help me at all to make a decision.

16  What I need to know is what happened here that is similar to

17  what happened in the settlement agreement.  Instead, just

18  telling me the systems are the same doesn't get me there.

19         MR. HEENAN:  For instance, you know, counsel talked

20  about yesterday about we kept trying to work with them.  Well

21  what's documented in these settlements is that all these phone

22  calls that are being placed to the Cornejos, these people in

23  India are required to read verbatim from a script.

24         And as Ocwen grew bigger and bigger they got more and

25  more scripts and these people in India were required to read

1   say script one, script 57, script 130 and now that the blame

2   has been laid at the Cornejos for you didn't -- we were trying

3   to work with you, I feel like it's directly part and parcel of

4   our case to show what Ocwen's trying to work with people looks

5   like internally and as from the Cornejos' perspective.

6           THE COURT:  What I need from you then at least is an

7   offer of proof, because what I heard again yesterday in the

8   opening statement was mostly call made, message left; call

9   made, message left; call made, message left.  What do the

10  scripts have to do with that?  Are you saying that in the

11  message left that they read from the script?

12          MR. HEENAN:  No, Your Honor.  They were

13  communications between Ocwen employees in India and the

14  Cornejos.

15          THE COURT:  So in the telephone calls that were

16  either made to the Cornejos or received from the Cornejos,

17  you're saying that they used a script?

18          MR. HEENAN:  Yes, Your Honor.

19          THE COURT:  And you're saying the settlement

20  agreement indicates that the use of scripts was improper?

21          MR. HEENAN:  Not just improper, but a direct cause of

22  people exactly like the Cornejos, failing to succeed in the

23  loan modification application process and losing their homes.

24          THE COURT:  Okay.  So what other issues are

25  implicated in the settlement agreement by the facts of this

1    case?

2             MR. HEENAN:  Yeah.  And let me be real clear.  It's

3    not my intention to say oh, you pay this much money or -- you

4    know, the punishment aspect, but Exhibit 44 which is the

5    California AG complaint providing false or misleading

6    information to consumers about the status of foreclosure

7    proceedings where the borrower was in good faith actively

8    pursuing a loss mitigation alternative offered by the servicer.

9             THE COURT:  All right.

10            MR. HEENAN:  In this case the evidence will be that

11   even after the sale occurred Ocwen was representing falsely to

12   the Cornejos that their loan modification was in process and

13   things were still working to help them stay in their home.

14            THE COURT:  Where on page -- in the Exhibit --

15            MR. HEENAN:  Sorry, Your Honor.  Well you don't have

16   the -- Wade, can you bring up Plaintiffs' Exhibit 44 --

17            THE COURT:  I have it right here in front of me.

18            MR. HEENAN:  Oh, I'm sorry, Your Honor.

19            THE COURT:  I just need the page --

20            MR. HEENAN:  Sorry, Your Honor.  Page 12(j).

21            THE COURT:  All right.  So I don't recall yesterday

22   in the opening statement, so you might have to apprize me of

23   the evidence that the Cornejos were given false information

24   about the status of their foreclosure proceeding.

25            MR. HEENAN:  Well --

1          THE COURT:  Are you saying that they were told that

2     the foreclosure proceeding or the sale on April 29th was not

3     going to go forward?

4          MR. HEENAN:  They were told that they were still in

5     review for a loan modification.  They were --

6          THE COURT:  Was that not true?

7          MR. HEENAN:  That was not true.  Well I mean we'll

8     find out today, but it's my understanding --

9          THE COURT:  From your perspective, are you going to

10    be -- are you going to be proffering evidence that when they

11    were told it was still under review that in fact it was not

12    under review?

13         MR. HEENAN:  I think it was under review, but I think

14    there's a glitch in the system if on the one part of Ocwen has

15    already sold their home and the other part of Ocwen is still

16    proceeding with a loan modification review and ultimately

17    approving them for the loan modification review.

18         THE COURT:  I see the ultimate harm.  I guess I'm

19    wondering what is the false or misleading information that was

20    given to the Ocwens -- I mean to the Cornejos?

21         MR. HEENAN:  Congratulations, you're approved, send

22    in this check.  Your loan's modified.  Your deficiency is now

23    removed and you get to stay in your home.

24         THE COURT:  All right.  Maybe I'm misreading this.

25    It says in (j) proceeding, false or misleading information to

13

1    consumers about the status of the foreclosure proceedings.

2    That's a case of information that was given after the

3    foreclosure was completed, correct?

4              MR. HEENAN:  That is, Your Honor.

5              THE COURT:  Had they been given information before

6    that that the sale was being set aside or that it was of no

7    effect or something that was untrue before that letter --

8              MR. HEENAN:  For instance -- yes, Your Honor.

9    There's another document that we're going to get into where it

10   tells the Cornejos that if they submit a completed application

11   the business day -- at midnight the business day before the

12   sale, that Ocwen will proceed to call off the sale.  That's a

13   misrepresentation of the Cornejos.

14             THE COURT:  All right.  I guess it's probably --

15   where is the settlement agreement?  Is that in the plaintiffs

16   exhibit?

17             MR. HEENAN:  It is, Your Honor.

18             THE COURT:  What is the exhibit number?  Is it 43?

19             MR. HEENAN:   It's the one either right before or

20   right after.

21             MR. PAINO:  Your Honor, before we get too far into

22   this I would note that these are not the documents or exhibits

23   that were exchanged by the exchange deadline, nor were the

24   exchanged during the course of discovery in the case, so I

25   would submit to the Court that the documents should be excluded

14

1  on that basis alone.

2        THE COURT:  Mr. Heenan, your comments?

3        MR. HEENAN:  We've provided these documents, I don't

4  know, several weeks before trial and I think it's certainly

5  been well known to Ocwen before we provided them with their own

6  legal documents that they entered into.  And I think frankly

7  it's going to be found to be a matter of common knowledge

8  within the legal department or Ocwen the fact of these

9  complaints and settlements.

10       THE COURT:  I'm sure you're right about that.  What

11 about your obligations under Rule 26?

12       MR. HEENAN:  I can only tell the Court that we

13 provided it as soon as we decided we were going to talk about

14 it, and no hide the ball here at all, but I certainly am not

15 arguing though that --

16       THE COURT:  I don't know that that would be agreed

17 because Rule 26 says it's not when -- you're supposed to

18 provide anything that you're going to rely upon to prove your

19 case and clearly you're saying that this is a cornerstone

20 toward the issue of statutory damages of your case.

21       MR. HEENAN:  In light of the cite and standard, Your

22 Honor, and you know --

23       THE COURT:  You think the heightened standard is this

24 issue, so if you have a preponderance you don't want this issue

25 anymore, you don't want this document anymore?

1      MR. HEENAN:  I think in light of the reckless or

2  willfulness standard that I understand we have to meet by the

3  clear and convincing evidence standard, that's -- so I mean

4  just to telegraph where we're going, I intend to ask Ocwen's

5  representative about the fact of these allegations by

6  regulators.  If he is unaware of them, then I'll put these

7  documents in front of him.  I don't need to move them into

8  evidence, but I do want to talk about them to the limited

9  extent that they bear on misconduct here that directly relates.

10      And what it is, Your Honor, it's not just -- it's not

11  character.  It's absence of mistake, it's knowledge, it's

12  intent, it's the way that this company does business.

13      THE COURT:  But what do we do with -- I've just

14  flipped to page eight of the document, of the consent decree

15  and it says that defendants don't admit the allegations of the

16  complaint.  What's the proof that in fact the allegations of

17  the complaint are true?

18      MR. HEENAN:  They entered in with consent judgment

19  the very day.

20      THE COURT:  But it's reserving your right to deny the

21  truth of the complaint.

22      MR. HEENAN:  And that's fine, and if their

23  representative wants to deny that that's not true -- I mean I'm

24  not going to try and prove another case.  He can say that.

25      THE COURT:  I guess I'm just really missing the

16

1  point.  But all right.  You're saying --

2         MR. HEENAN:  And I guess just, Your Honor -- sorry.

3  Not to -- but included in these point briefs are other federal

4  decisions where courts have taken judicial notice of consent

5  decrees and consent judgments.

6         THE COURT:  I'm not saying that this is not a

7  document that could not be judicially noticed.  I'm saying what

8  is the relevance to this proceeding, and what I've heard so far

9  is there have been -- there was a misrepresentation and that

10 they used scripts.  When I look at the settlement agreement

11 itself though, there's not determination of the truth of the

12 allegations in the complaint.  No court has said that, no trier

13 of fact has determined that those things occurred.  The

14 settlement agreement, like any other settlement agreement, it

15 says basically is to buy peace.

16        So I can certainly take notice of the fact that the

17 settlement agreement -- you're asking me to take notice of the

18 truth of the complaint.

19        MR. HEENAN:  No, Your Honor.

20        THE COURT:  Truth of the allegations?

21        MR. HEENAN:  No.  Just --

22        THE COURT:  You're not going to be taking the

23 position that the allegations made in the complaint were true?

24        MR. HEENAN:  I'm going to take the position that our

25 California Attorney General, as well as the Consumer Financial

1   Protection Bureau and 48 other state attorney generals made

2   these allegations against Ocwen.

3          THE COURT:  Then how does it demonstrate knowledge?

4   It demonstrates knowledge that the allegations were made.  It

5   demonstrates knowledge that they settled, but it doesn't

6   demonstrate knowledge of the truth, right, that those things

7   were actually occurring?

8          MR. HEENAN:  Yes, Your Honor.  And we're fine with

9   that.  What it demonstrates is, as a company, Ocwen is aware

10  that the federal government, our California Attorney General,

11  all these other attorney generals are looking into the same

12  exact type of conduct that we're discussing here.

13         THE COURT:  I agree that that's what it does, but

14  you're saying that this should be admitted for -- the Court

15  should take judicial notice to show their intent --

16         MR. HEENAN:  Yes.

17         THE COURT:  -- the absence of mistake, malice,

18  willfulness and reprehensibility.  How do we get that from

19  taking judicial notice of the settlement?

20         MR. HEENAN:  Because, Your Honor, by the time all

21  this stuff unfolded in 2014 and 2015 there's no way that Ocwen

22  couldn't have been aware of at least the concerns that

23  regulators had about this very conduct.  And so for them to say

24  basically this was just a one off or this was a mistake just

25  can't be fair.

18

1          I mean it's like someone that drives to work drunk
2     all the time but they never hit anybody until they do.  Well I
3     mean the near misses count too, and the people that are -- you
4     know, people who are in a position of power --
5          THE COURT:  But I guess the difficulty I'm having
6     with your explanation or even your example here is you're
7     saying the person was drunk, and so the -- until he hits
8     somebody that doesn't mean that their action until that point
9     doesn't count.
10          Here, it's not saying they were drunk.  They're
11     saying it appears to us that these things were happening, but
12     we don't know.  There's no proof that they were happening.
13     There's no proof they were drunk.  Do you see the difference?
14          MR. HEENAN:  Well then I guess, Your Honor, the
15     consent decree entered in with the State of New York, Ocwen
16     specifically in that decree admits to the charges brought
17     against it by the regulators.  So --
18          THE COURT:  All right.  And where is that in your
19     documents?  Let's look at that one then.
20          MR. HEENAN:  That is Exhibit 47.
21          MR. PAINO:  And once again, Your Honor, this is
22     another document they have not timely disclosed and it's one
23     thing to comment that these are documents that Ocwen is aware
24     of, but it's another thing for it not to be disclosed.
25          For a document to be disclosed, that's an issue of

1   fairness and for us to prepare for these types of arguments;

2   and when a document's not disclosed, we're not given an

3   opportunity to address these issues in advance.  And for it to

4   be sprung on us here for witness examination is extremely

5   prejudicial.

6          THE COURT:  All right.  So I have this document in

7   front of me.  Which part of it in particular do you feel raises

8   determinations of fact that are relevant here?

9          MR. HEENAN:  Fact one, the fact that Ocwen's grown

10  more than ten-fold in the last several years, that they've gone

11  from servicing 351,000 residential loans to 2.8 million

12  residential loans.

13         THE COURT:  How does that fact bear on the issues

14  raised here?

15         MR. HEENAN:  Because this is a business conduct case,

16  Your Honor, and the reason that the Cornejos fell through the

17  cracks is because Ocwen grew by 10 and didn't expand its

18  infrastructure, its customer relationships, its document

19  management, its customer service.  It didn't expand those

20  things to meet the huge growth of loans that it was servicing.

21         THE COURT:  I didn't get the impression that that's

22  the gist of your case.  I thought what you were saying from the

23  opening statement was that they submitted documents, it was

24  complete, it was timely.  And in fact, I think in the opening

25  statement yesterday there was an admission that Ocwen responded

1    within a couple of days with the letter of deficiency, then

2    the --

3              MR. HEENAN:  I'm sorry, Your Honor.  I wasn't

4    tracking for -- responded in a couple of days --

5              THE COURT:  From the initial --

6              MR. HEENAN:  Package being sent out?

7              THE COURT:  Right.  And said we're now missing these

8    documents.  The Cornejos then scrambled, got those documents

9    and sent them in; and despite that, the sale went through.

10   Despite the knowledge of Ocwen, hey aren't we in loss

11   mitigation, isn't that what's happening.

12             I'm not seeing why the size of the company makes a

13   difference here because it's not really a matter of being

14   slipped through.  It's a matter of somebody affirmatively

15   deciding despite what was happening we're going to sell the

16   house.

17             MR. HEENAN:  Well Your Honor, it has to do with an

18   organization that's so big with all these departments and the

19   left hand not knowing what the right hand's doing, and so on

20   the one team or part of Ocwen organization they're saying okay,

21   we've got a complete package, postpone the sale.  On another

22   side of the Ocwen team they're telling the trustee good to go,

23   not in loss mitigation, please proceed.

24             THE COURT:  I think you're maybe misrepresenting,

25   but -- because didn't what they say -- isn't what Ocwen said is

1    it's not complete, we need these other documents?  Did they

2    ever say it's complete; the one hand it's complete, stop the

3    sale?

4            MR. HEENAN:  Yes, Your Honor.  On April 28th,

5    internally, Ocwen tells somewhere in the chain we've got a

6    complete package, postpone the sale or send -- and I'll look at

7    my co-counsel because I sure don't want to misrepresent any

8    facts to this Court, but it's my understanding of the facts

9    that on April 28th internally they're saying we've got all

10   the -- we've got updated documents, we've got a package,

11   postpone the sale.

12           THE COURT:  And that was the one that was around

13   midnightish on the 28th?

14           MR. VITIELLO:  That's right.

15           THE COURT:  All right.

16           MR. HEENAN:  And then separately, Your Honor --

17           THE COURT:  Okay.  I think I understand that fact,

18   but I don't see how what's identified as fact one is pertinent

19   to the issues raised in this.  I think again what you're trying

20   to do is prove this case based upon something other that the

21   facts of this case and I would not -- that is not a basis for

22   me taking judicial notice.

23           MR. HEENAN:  Okay.

24           THE COURT:  What other facts do you see?

25           MR. HEENAN:  Paragraph six, Your Honor, (c) on page

1    four.  Ocwen was required in September of 2011 to implement a

2    system of robust internal controls and oversight with respect

3    to mortgage servicing practices performed by its staff and

4    third-party venders to prevent improper foreclosures and

5    maximize struggling borrowers' opportunities to keep their

6    homes.

7           THE COURT:  All right.  What other fact?

8           MR. HEENAN:  Paragraph eight, they've essentially

9    violated the 2011 agreement.

10          THE COURT:  What is the 2011 agreement?

11          MR. HEENAN:  That's between the New York Department

12   of Financial Services and Ocwen.

13          THE COURT:  Is that in your exhibits?

14          MR. HEENAN:  It's incorporated under paragraph six.

15   I mean that's what they're talking about.

16          THE COURT:  Is the 2011 agreement identified in your

17   binder of exhibits?

18          MR. HEENAN:  No, Your Honor.  And so then that leads

19   to --

20          THE COURT:  So in paragraph eight it says first they

21   failed to provide borrowers with direct contact information.

22   Is there going to be evidence of that in this case?

23          MR. HEENAN:  No, Your Honor, just (b) is what I think

24   is relevant, dual tracking.

25          THE COURT:  All right.

1          MR. HEENAN:  And then, Your Honor --

2          THE COURT:  Is there evidence that at the time of

3     this sale that these issues hadn't been resolved?

4          MR. HEENAN:  I'm sorry, Your Honor, I'm not --

5          THE COURT:  The settlement agreement I'm seeing is

6     dated December 19th of 2014.  What was the date of the sale?

7          MR. HEENAN:  For the Cornejos?

8          THE COURT:  Right.

9          MR. HEENAN:  April of 2015.

10         THE COURT:  Was there evidence that these issues

11    hadn't been addressed as of that time?

12         MR. HEENAN:  Was there evidence that the issues

13    contained in this consent judgment?

14         THE COURT:  Right.

15         MR. HEENAN:  I don't know.  That's what I intend to

16    find out, what did Ocwen do after this to fix the problems that

17    were identified between --

18         THE COURT:  All right.  So it's not so much a matter

19    of what their knowledge was, it's a matter of -- I'm going to

20    need more time on this.  This is not going to happen this

21    morning, just not, because -- a couple of things.

22         First, you had the opportunity to file motions in

23    limine.  In fact you did do that.  I don't understand first why

24    it's being presented to me on the morning, we have our jury

25    waiting for a half an hour because of this with your witness

1    pending.  Why did that occur?  Why did you not prepare in

2    advance?  You're telling me you decided weeks ago to use it.

3    Why did you not bring this to the Court's attention before now?

4            MR. HEENAN:  Well it's not a motion in limine, Your

5    Honor.  I'm --

6            THE COURT:  It is.  It should have been because this

7    is not something to decide in front of the jury.  Because if it

8    is, it's going to have to be at least this time deferred.  I

9    don't have time to decide it and I certainly am not going to

10   discuss this in front of the jury.

11           MR. HEENAN:  Well I'm just asking I guess as we stand

12   here, Your Honor, I just want direction from the Court as -- I

13   mean Ocwen's our witness, these are questions that I was going

14   to ask.  I can push it off till later.  I mean I respect --

15   believe me, I --

16           THE COURT:  It's still back to the same thing.  A

17   motion in limine is not only to exclude evidence, but to raise

18   issues to the Court that can be decided outside the presence of

19   the jury so you're not in the situation where we have a jury

20   waiting, we know an issue's going to be here.  So I guess I'm

21   not understanding why this was not brought as a motion in

22   limine.

23           MR. HEENAN:  Fair point, Your Honor.  I'm not going

24   to argue.

25           THE COURT:  In fact, as I see it, it is a motion in

limine just brought now.  At this point I'm not prepared to
rule that this is admissible for a couple of reasons.  One is I
am not -- except for the issue of use of scripts, and I'm still
not sure how that bears on this.  I haven't heard an offer of
proof how the use of a script somehow misled or caused
ultimately the issues.

The issue of dual tracking clearly has been out there
and I appreciate that addressing the issue of how much you've
been doing dual tracking is an issue that's not a surprise to
anyone.  On the other hand, you're going to be stuck, at least
at this point, if the witness says we don't do that and if we
did it in the past I don't know about it.  You're done.
There's nothing else to say on that topic because I'm not
prepared to deal with this issue.  So that's the corner you've
kind of backed yourself into.

MR. HEENAN:  Okay.

THE COURT:  Or the other issue too is I at least need
to see the 2011 agreement.  I'm not sure exactly what you're
asking for judicial notice in this case.

MR. HEENAN:  Well maybe I guess for just so the Court
can -- I mean I can keep -- I can run through and narrow down
with the Court right now and make my offer of proof with
respect to the New York banking consent --

THE COURT:  What you've asked me for judicial notice
is the order in the matter of Ocwen Financial, LLC from the

1    District of Columbia.  That's not the New York one we've been

2    talking about.  The one that we talked about first from the

3    District of Columbia doesn't establish any facts.  It certainly

4    establishes the fact of a settlement agreement, the fact that a

5    complaint was filed and raised certain issues.  But again, I

6    haven't had enough time to look at what exact issues were

7    raised there and how they bear on this case.

8         MR. HEENAN:  So just to get clarification from the

9    Court, can I ask about, for instance, Ocwen's computer systems,

10   Ocwen's coding systems, Ocwen's processes for dual tracking?

11        THE COURT:  You certainly can subject to objection.

12   At this point I would have no clue as to what the relevance

13   would be of a coding system, how that would bear on what went

14   wrong in this case if anything did.  How would that bear on

15   what went wrong in this case if anything did?

16        MR. HEENAN:  Clearly there was a lack of

17   communication between -- and not in messages, but in actual

18   phone communications and I think all --

19        THE COURT:  Does that have something to do with the

20   coding system?

21        MR. HEENAN:  Yes, Your Honor.  These employees were

22   required to read verbatim from scripts.  They had no

23   training --

24        THE COURT:  Maybe I'm misunderstanding what you mean

25   by computer coding system then because I hear coding as

1  something much differently than --

2       MR. HEENAN:  Sorry, Your Honor.  Let me clarify.

3       As I understand it, the Ocwen customer service people

4  in India have a script that they're required to read from

5  verbatim to the person on the other end of the call.  If that

6  person on the other end of the call has a question, they're

7  required to choose another script to read from to attempt to

8  answer that borrower's question; all of which creates

9  confusion.  I mean that's -- we all know that anytime we --

10      THE COURT:  Okay.  So you're saying that's coding?

11  That's what you mean when you say coding --

12      MR. HEENAN:  Yes, Your Honor.  I apologize.

13      THE COURT:  -- that they weren't given clear

14  instruction as to how to answer a question as opposed to using

15  standardized responses?

16      MR. HEENAN:  Yes, Your Honor.

17      THE COURT:  And is there evidence in this case that

18  the Cornejos were somehow misled as to their procedures as to

19  what they needed to do, when they needed to do it based upon

20  the script reading?

21      MR. VITIELLO:  Your Honor, Mrs. Cornejo's essentially

22  going to testify that she was told certain things over the

23  phone that ended up not being reflected in the notes because --

24      THE COURT:  And how does that bear on the liability

25  though?

1          MR. VITIELLO:  Well I would say it bears on the

2     question of whether there was dual tracking if she's submitting

3     paperwork that is acknowledged by somebody as complete over the

4     phone and then not reflected in the notes until many days

5     later, and then we end up in a situation where the application

6     is recognized as completed -- it's indisputable that it's

7     recognized as incomplete, but that recognition doesn't come

8     until days after the sale.

9          So we end up in an awkward position that almost the

10    statute kind of doesn't contemplate in a way.

11         THE COURT:  But as I understand it, the testimony's

12    going to be she said they told me it was complete.  What does

13    that have to do with reading different scripts?  Is there a

14    script for it's complete, it's not complete and they read the

15    wrong script?  What does the script have to do with anything?

16         MR. VITIELLO:  I would think that the issue of

17    there's a script entry for something called an ERM, which we

18    believe means escalation.  And so there's a question about how

19    does one get to the escalation department and how does one pick

20    from the script to send you there.

21         THE COURT:  Are you under the impression she was sent

22    to the escalation department?

23         MR. VITIELLO:  Yes.  The notes are robust about that.

24         THE COURT:  And the escalation -- okay.  She went to

25    an escalation department.  Somehow -- what does that have to do

1    with again them reading the wrong script, or reading a script

2    that didn't explain?

3         MR. VITIELLO:  There are related scripts that'll say

4    she's been sent to a recision department.  In other words, she

5    raises a couple of key words that somebody then clicks to

6    transfer her to --

7         THE COURT:  Which were the key words and what

8    happened?  Because I keep hearing very big generalities and

9    what I'm still not hearing is --

10        MR. VITIELLO:  Those key words being I submitted

11   those documents, but you sold my home; click, go to the

12   recision --

13        THE COURT:  This is after the sale.

14        MR. VITELLO:  -- department.

15        THE COURT:  After the sale.

16        MR. VITIELLO:  I would say before the sale, during

17   the sale and after the sale, sort of all in the same day.

18   There's dozens of entries on --

19        THE COURT:  Okay.  So you're saying on April 29th she

20   made calls --

21        MR. VITIELLO:  Yes.

22        THE COURT:  -- and when she said certain words she

23   was given a script, and you're saying -- I thought what you

24   said originally was she was told it was complete but they

25   continued on, then decided -- and that's not reflected in the

1    notes, and then something else happened.

2         Now you're saying the script reading issue comes

3    after or at least on the day of the sale.  Please, in very

4    basic language, tell me what the script reading issue has to do

5    with the issues of liability.

6         MR. HEENAN:  I can answer that.  Your Honor, there's

7    multiple conversations before and after the sale, live

8    conversations between Mrs. Cornejo or this Ernie Cortez and

9    someone at Ocwen, someone in India; someone in India who's not

10   going to be here to testify.  This gentleman is going to

11   attempt to interpret from Ocwen's notes what the person in

12   India said to the Cornejos.

13        And for us to not be able to present to the jury the

14   person in India was merely reading a script verbatim with no

15   training, experience or ability to deviate from that script,

16   especially when the defense is basically blame the Cornejos or

17   just --

18        THE COURT:  I understand and I think you can

19   certainly show -- I can't imagine that Mr. Blanchard is not

20   going to be able to know whether they read from scripts.

21        My question though is how did the scripts cause the

22   problem?  What happened about them reading the script that

23   caused the sale to go through, caused the documents not to be

24   processed properly, whatever theory of liability you're trying

25   to attach that to, what does the script reading, ultimately,

1  how does it cause what went wrong?

2          MR. HEENAN:  One of the reasons that thousands of

3  people in this state --

4          THE COURT:  No.  This case.

5          MR. HEENAN:  In this case, Your Honor, they're

6  supposed to have, and we'll go through all the documents about

7  you get your single point of contact, you get a specialist

8  who's going to help you stay in your house and what you see in

9  practice is multiple different people dealing with the

10 Cornejos, telling them who knows that --

11         THE COURT:  What does the scripts -- when did the

12 scripts happen, how did the scripts cause the liability?  Are

13 you saying the scripts meant they weren't given somebody who

14 was properly trained?

15         MR. HEENAN:  Yes.

16         THE COURT:  Okay.  Let's say that's true and I'll

17 give it to you right now, how did that cause what went wrong?

18 You're saying the evidence of the scripts, that they have

19 scripts is evidence that they didn't have a properly trained

20 person?  Is that the whole gist of the scripts?

21         MR. HEENAN:  Yes.

22         THE COURT:  It's not that they were misled by what

23 was said in the scripts, it's that that is evidence that the

24 person wasn't properly trained?

25         MR. HEENAN:  Yes.

1          THE COURT:  How then did the person at India who

2    you've told me said stop the sale, how did that person's poor

3    training contribute to the liability as you see it?

4          MR. HEENAN:  That's a different issue, Your Honor,

5    than what --

6          THE COURT:  Okay.  Then does it matter to the

7    liability, to the jury questions, whether the people in India

8    were trained or that they could only use -- okay.  Tell me how.

9          MR. HEENAN:  Because they're representing we help

10   people, help people is what we do, we're here to help.  We

11   heard all about it yesterday.  And everything that they got in

12   trouble for and everything that bears on this is they relied on

13   under trained people out of country to -- that have no ability

14   to deviate.  It'd be like if I were standing before the Court

15   and all I could say was 100 things.  I mean -- and whatever

16   question you asked I just had to say --

17         THE COURT:  I'm starting to feel that way a little

18   bit though because I keep asking you how does it bear on the

19   case in this liability and you're telling me well in general

20   this is proof of what a bad company this is.

21         What you've basically said to me, as I heard it, was

22   this is character evidence, we need to impugn this company

23   because you tell me that the people aren't trained and that

24   doesn't fulfill their mission as they've said in their mission

25   statement of providing you this, but how did that hurt the

Cornejos?

MR. HEENAN:  Because they lost their home, Your
Honor.

THE COURT:  I know that.  I know that.  How did it
cause the loss of their home, that the person in India who
you've told me was the one who said stop the sale, that that
person was so poorly trained that it caused the things that
went wrong?

MR. HEENAN:  Maybe that person did a great job, but
before, during and after --

THE COURT:  Okay.  Then if that's the case, what do
the scripts matter?  Because maybe it is that the people have
the scripts -- and I'm not saying you can't ask him about the
scripts, but what I'm trying to figure out is you have not ever
told me how the scripts was even a part of what ultimately went
wrong.  That's a question of relevance and --

MR. HEENAN:  Yes, Your Honor.

THE COURT:  -- if you can't tell me this now I'm not
sure how I'm supposed to be able to rule on an objection that
it is relevant.

MR. HEENAN:  I mean I'm not doing as good a job I
think as maybe like the New York Department of Financial
Services said when they articulate in paragraphs 17 through 19
how this is a problem, but what --

THE COURT:  I don't doubt it is a problem, but how is

34

1    it our problem?  How is it a problem in this case?  How did it

2    bear -- how does it bear on liability?  How is this a piece of

3    information that's going to make the jury go you know what,

4    that convinces me one way or the other as the questions I have

5    to decide?

6              MR. HEENAN:  Because they're supposed to be able

7    to -- the borrower is supposed to be able to talk to one person

8    who's able to help them solve their problem.

9              THE COURT:  Did the Cornejos not talk to that one

10   person who said here's the package, fill it out, they did and

11   that person said it's complete?

12             MR. HEENAN:  They talked to multiple people

13   throughout the -- I mean I'm looking at my co-counsel

14   because --

15             THE COURT:  But that's not scripts again, right?

16   That's multiple people.  That's something different again.

17             MR. HEENAN:  No.  That's the -- every time they're

18   talking to different people these people are reading off

19   different computer screens.

20             THE COURT:  Okay.  And that may be that they're

21   entitled to one person.  It doesn't say that to me under the

22   law, but let's say that is the case.  Different -- I'm not sure

23   why we're talking at cross purposes.  You tell me that scripts

24   is an issue, but then ultimately you say it meant that they

25   were talking to more than one person.  I don't know how having

35

1   a script means you talk to more than one person.

2          But if you're telling me the real issue is they

3   talked to multiple people, then I'm not sure that the D.C.

4   settlement talks about that.  Maybe it does and you just

5   haven't pointed it out to me.  Is it scripts?  Is it multiple

6   people?  If it's multiple people, was Mrs. Cornejo misled in

7   how she approached the attempt to modify the loan?  And if so,

8   what was that misleading statement?

9          MR. VITIELLO:  Your Honor, if I may?

10          THE COURT:  Yeah.

11          MR. VITIELLO:  Sorry to keep tag-teaming.  I think

12   what we'll get into from Ocwen's notes that Mr. Blanchard will

13   be interpreting is that even different internal people are

14   saying that notes are missing from this and that even they

15   can't interpret other notes because of the very same issue.

16   And so our --

17          THE COURT:  Because of this very same issue, what

18   very --

19          MR. VITIELLO:  Well that's what we intend to ask

20   about is is it because they can only pick from a drop down box

21   of certain notes or is it that they have some amount of leeway

22   to enter in different notations and things like that.

23          THE COURT:  And have you deposed Ocwen on this issue

24   before?

25          MR. VITIELLO:  Yes.

36

1          THE COURT:  What did they say?

2          MR. VITIELLO:  He didn't know what a lot of the

3   things meant and that's --

4          THE COURT:  Okay.  So that I assume is going to be

5   his --

6          MR. VITIELLO: -- where this becomes a problem.

7          THE COURT:  That's going to be his response I assume

8   today.  How again does that get us to scripts?  How again does

9   that get us to dual tracking?

10          MR. VITIELLO:  What I think is that we've veered off

11   into talking about bear liability, but really this is prompted

12   by what we've now learned to be the heightened standard for

13   what we're going to have to prove for intent --

14          THE COURT:  Heightened standard --

15          MR. VITIELLO:  -- willfulness, recklessness.

16          THE COURT:  You mean what the statute says?

17          MR. VITIELLO:  Yes.  But in particular with the clear

18   and convincing evidence standard.

19          THE COURT:  All right.  We're just going around and

20   around.  What you're going to need to do is on the break or

21   whatever opportunity you have I need to hear from you exactly

22   how taking judicial notice of the D.C. document or whatever

23   other document you're interested in bears on liability in this

24   case other than character and what I don't need is conclusions.

25   What I need is here is the fact as we see it, here is how it

1    bears on that topic because this generalized they failed to

2    meet their marketing mission, that doesn't get me to the

3    California law.  All right?

4          MR. HEENAN:  Okay.

5          THE COURT:  But at this point, that document is -- I

6    do not take judicial notice at this time.

7          And the other issue, truly you need to look at Rule

8    26 and explain to me why that wasn't met.

9          MR. VITIELLO:  Your Honor, if I could just say that

10   once we understood that these documents might come in based on

11   what Mr. Blanchard was not going to be able to testify to --

12         THE COURT:  All right.

13         MR. VITIELLO:  -- we did share these documents --

14         THE COURT:  So you're saying that you discovered this

15   at the time of his deposition?

16         MR. VITIELLO:  No.  But we shared these maybe a month

17   ago, around the time of the --

18         THE COURT:  Did you supplement your Rule 26

19   disclosure?

20         MR. VITIELLO:  We did not.

21         THE COURT:  What's the explanation for that?

22         MR. VITIELLO:  We just exchanged documents with Mr.

23   Paino.  He had exchanged some documents with us.  We responded

24   with additional documents.  Our intention, and specifically in

25   that response was hey, we're going to use these for

1    impeachment.

2            We weren't going to publish them to the jury.  It's

3    never been the intention to publish these to the jury.  But if

4    he's going to sit up there and say that he's never heard that

5    Ocwen's dealt with any of these issues anywhere else, what we

6    want to do is go into lines of questioning about some of these

7    other things.

8            THE COURT:  Then why do you need judicial notice if

9    it's impeachment?  Judicial notice is for purpose of

10   affirmative evidence.

11           MR. HEENAN:  Only just trying to be three steps

12   ahead, Your Honor, that if the witness said boy, no, I've never

13   seen this document.  That was the only reason.  So we wouldn't

14   ask the Court to take judicial notice unless he said I've never

15   seen this document until you put it in front of me and I don't

16   know what it is.

17           THE COURT:  And he -- let's say -- but you did ask

18   him these questions on his deposition, right?  Surely you did.

19           MR. VITIELLO:  Not verbatim.  What we asked about is

20   can you interpret what ERM stands for, can you interpret --

21           THE COURT:  But did you ask him whether the company

22   had encountered these problems in the past?

23           MR. VITIELLO:  Yes.

24           THE COURT:  And what did he say?

25           MR. VITIELLO:  I believe there was an objection and

1    he didn't really know about the details.

2         THE COURT:  Did he admit that he was aware of these

3    issues in the past, but whether he knows about the details or

4    not is something else?

5         MR. VITIELLO:  I didn't go into the specifics about

6    the New York Financial Bureau or the specifics about the CFPB.

7         THE COURT:  All right.  I don't know what Mr. Paino

8    has done, but what -- and maybe he hasn't complied with Rule 26

9    either, I don't know that.  But on this issue, you have not.  I

10   mean I think admittedly you had not.  The only other avoidance

11   of Rule 26 is if the documents are produced during discovery.

12   That didn't sound like that's happened either, so there is that

13   issue.

14        I don't consider that to be as significant of an

15   issue given what we're talking about, but you can use documents

16   for impeachment, but if you're asking him questions that are

17   not relevant to the trial, to questions of liability you're

18   never going to get there anyway.

19        So at this point we're going to have to reconsider

20   this issue -- or actually not reconsider, talk about this issue

21   at another time.  But you've heard me promise the jury we're

22   not going to keep them waiting.  We're now 45 minutes past that

23   point.

24        MR. HEENAN:  Apologize, Your Honor.

25        THE COURT:  All right.  So anything else, and I mean

1   that really not at all, before we bring the jury in?  Anything

2   crucial that we need to talk about right now?  All right.

3   Let's bring --

4          MR. HEENAN:  Your Honor, just not to get in trouble

5   here, can I ask this witness, you know, Ocwen's had problems

6   with dual tracking or dual tracking's been an issue for Ocwen?

7   Am I not allowed to ask those questions?

8          THE COURT:  I'm not saying you can't ask them.  I

9   just can't anticipate --

10         MR. HEENAN:  I understand.

11         THE COURT:  -- the objections at the -- well I assume

12  there will be an objection.  You're asking me to give you a

13  preview of what my ruling would be.  I think there is

14  sufficient showing that there is dual tracking in this case or

15  at least there's an inference of that.  Asking about dual

16  tracking I think is fair game.  You're getting pretty close to

17  didn't you do this to some other people, because I think the

18  statute doesn't require that they had repeated conduct.

19         What they are required to know is what the law is and

20  to comply with it.  So if they'd never done it before, but knew

21  the law and did it here, that's enough.

22         MR. VITIELLO:  That's enough for bear liability, Your

23  Honor.

24         THE COURT:  No, no.  That's enough for willfulness.

25         MR. HEENAN:  I just didn't want to ask a question

1    that got me in trouble with the Court.  So --

2         THE COURT:  You're not going to be in trouble with me

3    regardless of what you do.  Well I suppose there are issues,

4    but not for asking questions that you think legitimately bear

5    on the questions of liability.

6         MR. HEENAN:  Thank you, Your Honor.

7         THE COURT:  All right.  Let's go ahead and bring in

8    the jury.

9     (Pause.)

10         MR. SHATZ:  Your Honor --

11         THE COURT:  Yes.

12         MR. SHATZ:  -- can we quick bring up my screen?  I

13    want to make sure -- I was pulling up that document for you and

14    I just want to make sure that it's not up when we go right

15    to --

16         THE COURT:  There you go.

17         MR. SHATZ:  Yep.  Thank you.

18     (Jury in at 9:19 a.m.)

19         THE COURT:  Good morning.  We have all of our jury

20    members back in their places.  At this time is plaintiff

21    prepared to call their first witness?

22         MR. HEENAN:  We are, Your Honor.

23         THE COURT:  All right.

24         MR. HEENAN:  We would call Ocwen Loan Servicing.

25         THE COURT:  You mean Mr. Blanchard?

Blanchard - Direct                              42

1          MR. HEENAN:  Whoever Ocwen Loan Servicing's

2    representative is, is who we would call, Your Honor.

3          THE COURT:  I have a Mr. Blanchard on your witness

4    list.  Is that who you intended?

5          MR. HEENAN:  Yes, Your Honor.

6          THE COURT:  Mr. Blanchard, if you'll come forward and

7    be sworn.

8          RASHAD BLANCHARD, PLAINTIFFS' WITNESS, SWORN

9          THE CLERK:  If you'd please state your name for the

10   record?

11         THE WITNESS:  Rashad Blanchard.

12         THE CLERK:  Spell your last name please.

13         THE WITNESS:  B-l-a-n-c-h-a-r-d.

14         THE CLERK:  Thank you.

15         THE COURT:  Go ahead.

16         MR. HEENAN:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18   BY MR. HEENAN:

19   Q.   Mr. Blanchard, who is your employer?

20   A.   Ocwen Financial Corporation.

21   Q.   You understand you're not a party to this matter?

22   A.   Yes.

23   Q.   Do you have any personal knowledge of what transpired

24   between Ocwen and the Cornejos?

25   A.   My personal knowledge is based on the review of the

Blanchard - Direct                                    43

business records.

Q.   So in other words, you didn't handle the Cornejos' loan
modification application, right?

A.   Correct.

Q.   You have never spoken to the Cornejos on the phone?

A.   Correct.

Q.   Never had any conversation with the Cornejos?

A.   Correct.

Q.   You didn't process their application for a modification?

A.   Correct.

Q.   You had no personal involvement in the foreclosure sale of
their home?

A.   Correct.

Q.   You didn't become -- well when did you first become aware
of any issue related to the Cornejos and Ocwen?

A.   It would either be tied to a mediation or a deposition
that I might have been involved with sometime last year -- I'm
sorry, I believe 2015.

Q.   Okay.  And so the jury understands, what brought you to be
deposed in this case?

A.   What brought me to be deposed?

Q.   Yeah.  I mean given the fact that you weren't kind of --
didn't have any personal involvement in the Cornejos'
modification or the sale of their home, how is it that you were
deposed?

1          MR. SHATZ:  Objection.  Relevance.

2          THE COURT:  Sustained.

3    BY MR. HEENAN:

4    Q.   What's your -- what do you -- what sources of information

5    do you have that bears on this case?

6    A.   Access to the business records.

7    Q.   Okay.  Are you the only one at Ocwen that has access to

8    the business records?

9    A.   No.

10   Q.   Okay.  How did it come to pass that you were the one that

11   was selected to give testimony about Ocwen's business records?

12         MR. SHATZ:  Objection.  Again, relevance.

13         THE COURT:  Sustained.

14   BY MR. HEENAN:

15   Q.   Are you here as the representative of Ocwen for this

16   trial?

17         MR. SHATZ:  Objection.  Relevance.

18         THE COURT:  How is this relevant, Mr. Heenan?

19         MR. HEENAN:  Because I'm trying to understand where

20   this witness gets his information from, Your Honor.

21         THE COURT:  Sidebar please.

22       (Begin Sidebar.)

23         THE COURT:  Just to be clear, you identified this

24   witness and you're asking him questions, I presume it's because

25   you have information you want from him.  I'm not sure what

1    you're trying to establish, that they designated him at the

2    deposition for their company?

3            MR. HEENAN:  Why are you at this trial?  Is he the

4    one that's here on behalf of Ocwen or is he just --

5            THE COURT:  He's established his only personal

6    knowledge is from the records.  He didn't handle anything to do

7    with that.  Are you suggesting that there was somebody better

8    that you wanted to call?

9            MR. HEENAN:  No, Your Honor.

10           THE COURT:  What is the relevance of this line of

11   questioning?

12           MR. HEENAN:  I can move on, but the relevance as I

13   understand it is he's going to be the best mouthpiece for Ocwen

14   that we have to talk to.

15           THE COURT:  Well you could have asked for anybody you

16   wanted to, right?  So that would not be a true statement.

17           MR. HEENAN:  Well in deposition, Your Honor, we did a

18   30(b)(6) deposition of Ocwen --

19           THE COURT:  And he was produced?

20           MR. HEENAN:  -- and he was produced as the one with

21   the most knowledge.

22           THE COURT:  Did you issue any subpoenas to Ocwen for

23   trial testimony?

24           MR. VITIELLO:  Just from him.

25           THE COURT:  You requested he be present?

1          MR. HEENAN:  Personally?

2          MR. VITIELLO:  Yes.

3          MR. HEENAN:  Okay.

4          MR. VITIELLO:  It was his name.

5          MR. HEENAN:  Okay.  I'll move on, Your Honor.

6          THE COURT:  All right.  Thank you.

7       (End Sidebar.)

8   BY MR. HEENAN:

9   Q.   You were deposed in June of last year, is that correct,

10  Mr. Blanchard?

11  A.   I don't recall that actual date, but I -- you know, it

12  should be listed on whatever document -- that document at the

13  deposition.

14  Q.   Okay.  But in any event, previously you were deposed in

15  this case?

16  A.   Yes.

17  Q.   What additional information have you reviewed since your

18  deposition?

19  A.   Additional information, I wouldn't say that I reviewed --

20  I'm trying to think if there was any additional information I

21  reviewed from a year ago.  I just -- I don't believe there was

22  any new documentation or new information that I might have

23  reviewed in reference to that.  Oh, there is only -- the only

24  thing I reviewed that might be new is the -- certain

25  confirmations for mailings of letters that existed in this

1   case.

2   Q.   Okay.  Have you spoken to anyone at Ocwen that actually

3   communicated with the Cornejos?

4   A.   The only individual that I have spoken to is Stephanie in

5   reference to the file.

6   Q.   The folks that the Cornejos and the records had phone

7   conversations with, you haven't spoken to those people?

8   A.   No, I have not.

9   Q.   Okay.  Other than Stephanie, who else have you spoken to

10  at Ocwen?

11       MR. SHATZ:  Objection.  Vague as to time.

12       THE COURT:  Sustained.

13  BY MR. HEENAN:

14  Q.   In respect to this case, since you first -- well let's

15  clear that objection.  When was the first time you became aware

16  of the Cornejos' case?

17  A.   It would've been around the time there was a request for

18  the deposition and I vaguely remember some mediation

19  communication.  I'm not sure if I was a part of it or maybe I

20  was at one point.  So it would be around those times.

21  Q.   Okay.  So from now to when you first became aware of the

22  Cornejos' lawsuit, other than Stephanie, is there anyone else

23  at Ocwen that you've spoken to about this case?

24  A.   I haven't talked to anyone else in reference to any verbal

25  communications with anyone else besides Stephanie.

Blanchard - Direct                                              48

1    Q.    Is there anyone else at Ocwen, to your knowledge, that

2    knows more about this case than you do?

3    A.    No.  I don't know who would have more knowledge about this

4    case than I.

5    Q.    Okay.  You would agree with me since you have no personal

6    knowledge of what transpired, that your testimony is based on

7    the documents that you reviewed and the people that you've

8    spoken to at Ocwen?

9    A.    My testimony is based on our business records which

10   includes the documents, evidence of communications that -- both

11   verbally and written to the borrower, documents that the

12   borrower sent in in response to our requests and in reference

13   to communication -- communicating with the individual that I

14   spoke to.

15   Q.    And that's that Stephanie?

16   A.    Yes.

17   Q.    Okay.  So it's communications between the Cornejos and

18   Ocwen that are in a file or available to you as part of the

19   business records, right?

20   A.    I would say I have access to them, yes.

21   Q.    And the loan servicing notes at Ocwen that you have access

22   to?

23   A.    Yes.

24   Q.    And your conversation with Stephanie, correct?

25   A.    Right.  I don't know if that puts it all, but the complete

1    business records that I have access to, you know, that I can

2    see within the system and documents, correspondence, yes.

3    Q.    Yeah.  So just is it fair that if it's not in those

4    business records you don't know?

5    A.    To a certain extent, yes.

6    Q.    Can you clarify that for me please?

7    A.    I mean I could give you examples of I don't know if I

8    could -- because anything outside of that is going to be

9    conversations that I've had outside of that with our attorneys,

10   so I don't know if I can go into certain things that we

11   discovered after the fact.

12   Q.    Okay.  And we can't, so I don't want to know about your

13   conversations with Ocwen's attorneys.  I'm just trying to

14   understand kind of the universe of what you can testify to.  Is

15   that -- setting aside what you've spoken about with the

16   attorneys which is privileged, it's the business records and

17   the conversation with Stephanie, is that fair?

18   A.    Yes.

19   Q.    Okay.  And so is it fair that from what I'm asking you, if

20   it's not in the business records you can't testify to it?

21   A.    Correct.

22   Q.    What's your title at Ocwen?

23   A.    Senior Loan Analyst.

24   Q.    What department are you in?

25   A.    I'm in the legal department.

1   Q.   How many people -- well is one of -- well first let me ask

2   you, so you're in the legal department.  What do they do?

3   A.   Legal department does a number of things.  I'm not

4   involved in all the aspects of that.  I can tell you what I do

5   in the legal department if that's what you're asking.

6   Q.   Okay.  Why don't you tell me everything that you're aware

7   of that happens within the Ocwen legal department?

8            MR. SHATZ:  Objection.  Relevance.

9            THE COURT:  Overruled.  You may answer that.

10           THE WITNESS:  The legal department deals with the

11  attorneys, and research and analysis of different loans that

12  exist under Ocwen Servicing.

13  BY MR. HEENAN:

14  Q.   How many folks in the legal department?

15  A.   I do not know.

16  Q.   How many people are you aware of that work in Ocwen's

17  legal department?

18  A.   I believe there's maybe 13 other senior loan analysts --

19  or 12, I'm sorry.  I'm probably the 13th.  I am not aware of

20  how many in-house counsels they have.  I would say that it

21  matches the amount of loan analysts, if not more.

22  Q.   Is part of your job to give testimony in depositions and

23  in courts throughout the country?

24  A.   My job is to research and give an analysis sometimes on

25  certain loans.  Through the product of my work I might be

1  called upon to give testimony, just like you subpoenaed me to

2  be here.

3  Q.   Okay.  And so is it fair that part of your job is to give

4  testimony in depositions and in courts as part of your work at

5  Ocwen?

6  A.   It's not listed as part of my work, but as I deal with

7  the -- and give answers sometimes to this, I'm called upon to

8  testify or be at the deposition because no one else is going to

9  know as much about a certain individual accounts because I'm

10 the one that's put in the time and research in each matter.

11 Q.   How many times have you given testimony on behalf of

12 Ocwen?

13 A.   I don't know.  I've been there for six years, so there's

14 too many to even keep track of.

15 Q.   Over 100?

16 A.   Yes.

17 Q.   All across the country?

18 A.   Majority of the country, yes.

19 Q.   Okay.  I mean you work in Florida, right?

20 A.   That is where I'm based.

21 Q.   Okay.  Do you have a physical office in Florida?

22 A.   There is a physical office that I can go to.  Mostly I'm

23 traveling a lot and I work remotely.  I have access to the

24 complete system.

25 Q.   Okay.  And your traveling is in regards to giving

1    testimony in courts or in depositions?

2    A.    Some of it is, yes.

3    Q.    Okay.  Are you being paid by Ocwen to be here?

4              MR. SHATZ:  Objection.  Vague, relevance.

5              THE COURT:  Sustained.

6    BY MR. HEENAN:

7    Q.    Do you participate in a 401k, or profitsharing or any

8    other arrangement whereby your personal compensation is tied to

9    Ocwen's success or failure?

10              MR. SHATZ:  Objection.  Relevance, privacy.

11              THE COURT:  Sustained.

12    BY MR. HEENAN:

13    Q.    Would you agree with me, sir, that even if it's not listed

14    in your job description a large component of your day-to-day

15    work is giving testimony in courts of law and in depositions?

16    A.    I would say the bulk of my work is research.  Then would

17    come, you know, depositions and trials.

18    Q.    Okay.  Those depositions and trials, do they frequently

19    pertain to foreclosure matters?

20    A.    Yes.

21    Q.    Okay.  And is it fair we can just agree scores of times,

22    over 100 times that you've testified in your six years?

23    A.    Yes.

24    Q.    Okay.  How many of those scores of times have you given

25    testimony that Ocwen did nothing wrong based on your research?

1            MR. SHATZ:  Objection.  Relevance.

2            THE COURT:  Overruled.

3            THE WITNESS:  I'm sorry, I'm able to answer the

4    question?

5            THE COURT:  You may answer.

6            THE WITNESS:  Okay.  The -- my -- could you repeat

7    the question one last time please?

8    BY MR. HEENAN:

9    Q.    Sure.  You've testified lots of times, right?

10   A.    Yes.

11   Q.    On behalf of Ocwen, correct?

12   A.    Right.

13   Q.    And how many of those lots of times was your testimony

14   that Ocwen, based on your research, had done something wrong?

15   A.    Well I'm usually called as a fact witness, so it's not

16   my -- I don't make -- it's not for me to determine whether

17   something's right or wrong.  I just give the facts and explain

18   the records as we have it.  So I don't know that I can answer

19   that question.

20   Q.    Okay.  Let me ask it a better way.  I'm not asking you

21   from a legal standard.  I'm asking you from your perspective as

22   the legal department's senior loan analyst how many times after

23   you've researched the facts of what transpired you concluded

24   that Ocwen did something that is against its own business

25   practices?

Blanchard - Direct                                    54

1          MR. SHATZ:  Objection to the extent it seeks

2    information protected by the attorney/client privilege or his

3    attorney/client analysis, relevance.

4          THE COURT:  Sustained on those grounds.

5    BY MR. HEENAN:

6    Q.   Well let me I guess understand what do you -- you

7    research, right?  Is that your job?

8    A.   Yeah.  I research to explain the transactions that exist,

9    that happened.

10   Q.   Are you asked -- and you do that on behalf of the legal

11   department?

12   A.   Yes.

13   Q.   I mean are you asked to arrive at conclusions as part of

14   your research?

15   A.   No.  I'm just asked to explain exactly what happens.  It's

16   up to the attorneys and other individuals to determine where

17   they go with the information that I provide.

18   Q.   Do you write like reports?  How's your research

19   communicated to others?

20   A.   Usually if I do a recon it is a report that is -- a recon

21   is basic accounting and I show how distributions were handled

22   in the accounting.  That's usually the only time I actually

23   write something physical into that otherwise I might be

24   preparing to discuss a matter.  I don't like have, you know,

25   create like outlines and things of that nature.

1    Q.    Okay.

2    A.    Depending on -- it depends on the situation.

3    Q.    And so you're not called upon to give -- assist the legal

4    department in reviewing what transpired in a loan file and

5    determine whether there was conduct that deviated from what

6    Ocwen's standards are, or in conformity?

7    A.    The decisions in reference to that are left up to -- you

8    know, if there's some type of legal claim, it's left up to our

9    attorneys and certain individuals that are responsible in that

10   business unit.  I mean your question is really -- it's really

11   broad because there's different situations and there's no one

12   way to answer that.

13          The product of whatever my research might provide

14   might influence a decision, but I am not a decision -- I don't

15   make the decision to do or not to do, or make adjustments.  I

16   just show and explain exactly what has happened.

17   Q.    Okay.  So what does it look like when you explain what's

18   happened?  I guess I'm just not tracking you, sir.  I'm sorry.

19   A.    Well I guess -- I don't know -- your question is quite

20   broad.  Can you make it more specific?

21   Q.    Well I don't do your job and so I'm just trying to

22   understand so we can all kind of know what it means to do your

23   job.  So if you can kind of just walk us through.  You said you

24   generate a recon sometimes --

25   A.    Yes.

1    Q.    -- you do research.  Like what -- I mean how is that

2    helpful to anyone?  I mean what -- do you give an analysis?  Do

3    you draw conclusions?  Do you -- I mean what's kind of the --

4    A.    No.  I don't draw conclusions.  I stick to the facts.  So

5    if a document was mailed, I look to see where we can verify

6    that.  If payments were given, I look to see where the evidence

7    of the payment was and to see if I understand the distribution.

8    If not, I'll find out or I see why it was allocated a certain

9    way.  I don't modify anything.  I just answer it for whatever

10   the question calls for, just like you deposed me and I answered

11   questions concerning the history of what we have in our

12   business records.

13   Q.    Did you know that I didn't depose you?

14   A.    When I say you I'm speaking in general.

15   Q.    Okay.

16   A.    It was the individual sitting behind you from your group.

17   Okay.

18   Q.    Okay.  So as I understand that answer, sometimes you're

19   called upon to see whether documents are actually sent or not?

20   A.    Yes.

21   Q.    Has it ever, based on your research, you've reached the

22   conclusion that the documents were not sent?

23   A.    I have never come across a situation in my review that the

24   document was not -- that evidence of the document was not sent.

25   Q.    And sometimes, as I understand your previous answer,

1  you're called upon to determine whether funds are properly --
2  were properly allocated by Ocwen?
3  A.    Yes.
4  Q.    And have you ever reached a conclusion that Ocwen had not
5  properly allocated funds?
6  A.    There might be a disagreement as to why the allocations
7  were done, but there's different situations that occur that
8  might cause -- and it's -- there's too many formulas, there's
9  too many variables to say it's just one way.
10       Your question is very broad and doesn't apply to every
11  situation.  A recon was not something that was involved in this
12  situation because it wasn't a question of actual payment that
13  was brought up here.
14  Q.    Why don't you help me -- so you've given me the example of
15  whether documents were sent, that's something that you're asked
16  to look at.
17  A.    Yes.
18  Q.    You've given me the example of accounting.  What other
19  concrete examples can you give us about when you're called upon
20  to research a particular issue?
21  A.    There's a multitude of scenarios that I'm called upon
22  to -- I mean any -- basically anything that could be criminal
23  allegations of the borrower itself, the borrower being a
24  criminal and FBI wanting us to explain the terms.
25       I mean there's so many things that might not even involve

Blanchard - Direct                                    58

1   the actual mortgage that's -- could you be just more specific

2   as to your line of questioning?  Because it's very broad.

3   Q.   Right.  I'm just -- again, I don't do your job and so I

4   don't know what it means to -- when you say I research.  So

5   you've given us two examples.  Can you give me say two more?

6   A.   Two more examples?

7   Q.   What you're asked to research.

8   A.   Okay.

9   Q.   How long -- I'm sorry.  Let me ask a better question.

10  You've testified over 100 times, right?

11  A.   Yes.

12  Q.   And all that testimony was based on research that you were

13  asked to do, right?

14  A.   Yes.

15  Q.   So tell me the top three things that you're asked to

16  research in the cases that you testified in.

17  A.   I don't have a list of top three things because they're --

18  every situation is different.

19  Q.   Give me then the first three things that come to your mind

20  as concrete examples of what you're asked to research.

21  A.   I would say there's recons.  I would say there's

22  verifications.  So I sign documents, so it doesn't even involve

23  me coming to court.  That's -- I would say the verifications

24  are a lot.  It's going to be higher than any other request that

25  I have.  So I verify documents that are being submitted to the

Blanchard - Direct                                    59

1    court.

2    Q.   Okay.  Thank you.  Let's talk about Ocwen a little bit.

3    You don't have a physical office anymore?  Did I understand

4    that right?

5    A.   I have access to a physical office which is our

6    headquarters in West Palm Beach.  The majority of my work is

7    done remotely.

8    Q.   Okay.  You used to work at the West Palm Beach office I

9    understand?

10   A.   Yeah.  I used to have a physical cubicle there.

11   Q.   How many employees -- well I guess take me through what's

12   the West Palm Beach building look like?

13   A.   It's a one-story building with security.  You need a badge

14   to get in.

15   Q.   Is it the building that's approximately 52,000 square

16   feet?

17           MR. SHATZ:  Objection.  Lacks foundation and

18   relevance.

19           THE COURT:  Sustained as to relevance.

20   BY MR. HEENAN:

21   Q.   Does Ocwen maintain other facilities?

22   A.   Yes.

23   Q.   And those facilities are primarily in India and also the

24   Philippines?

25   A.   I am aware that they have India and Philippines, but we

1  have several United -- several locations that are within the

2  United States, such as Carpal.  I believe Fort Washington, but

3  there's also another place in Riviera Beach in Florida.  And

4  there's probably other centers that I'm not aware of, but

5  there's several U.S. locations as well.

6  Q.   Have you been to those locations in the United States?

7  A.   The only locations I have been to is the Riviera Beach and

8  West Palm Beach.

9  Q.   Have you had the opportunity to meet the employees that

10  work in those facilities?

11  A.   In the ones that I visited?

12  Q.   Yes, sir.

13  A.   Yes.

14  Q.   Okay.  And have you had the opportunity to meet the

15  employees that work in the facilities in Mumbai, India;

16  Bengaluru, India; Pune, India; Manila, Philippines?

17  A.   Actually I have on the occasions that they actually fly --

18  some would actually be here for physical training or they come

19  here for meetings, the ones that are higher up.  So I have met

20  those.  I've had some of those encounters in my six years

21  there.

22  Q.   Okay.  So you've met Indian employees when they come to

23  the United States for training?

24  A.   I have met individuals that have come for that within the

25  six years.  I mean that's just it.

Blanchard - Direct                                    61

1   Q.    Ocwen has approximately 10,000 employees?

2   A.    I don't know the number count for Ocwen's employees.

3   Q.    Okay.  Approximately 6,000 of Ocwen's employees are in

4   India and the Philippines?

5   A.    I have no idea as to the number count for the population

6   of each center individually.

7   Q.    Are you aware of what the farm based employees do for

8   Ocwen?

9   A.    The who?

10  Q.    The Indian and Filipino employees.

11  A.    Some of what I'm aware a lot of times they are assist

12  groups, but the same positions that are over there are over --

13  also over here as well.  Like if I look at a comment log I

14  can't tell you just by their name if that's an Indian rep or

15  not because we're a very diverse group and we hire all

16  cultures.  So a person with what might be considered an Indian

17  name could actually be sitting beside me in West Palm Beach.

18      The -- so yeah, I -- the positions they have there -- some

19  of those positions they have there they actually have here or

20  they're more like an assist group like with cashiering.

21  Obviously our cashiering group is here, your physical checks

22  are received here and they have certain assist groups within

23  India that assist with the verifications and things of that

24  nature, just to give you an example.

25  Q.    Are you aware that of Ocwen's farm based employees, more

1  than 80 percent are engaged in servicing operations?

2  A.   I -- no, I'm not aware of the percentages.  I can't give

3  you any number quotes like that.

4  Q.   Okay.  But servicing operations?

5  A.   What are you defining it as?  When you say servicing, I'm

6  thinking you're saying customer service or doing something

7  dealing with servicing the mortgage.

8  Q.   Okay.

9       MR. HEENAN:  Wade, if you can please bring up

10 Plaintiffs' Exhibit 37, page four.  This is not admitted.

11 BY MR. HEENAN:

12 Q.   Maybe first let me have you look at the first page.  Do

13 you have the physical binder in front of you, Mr. Blanchard, or

14 is it just --

15 A.   Is this the physical binder?  It says joint --

16 Q.   That's probably not it.  Sorry.

17 A.   There's other binders all laid out here.  This white one?

18       THE CLERK:  Yes.

19       THE WITNESS:  Okay.

20 BY MR. HEENAN:

21 Q.   Have you ever had the opportunity to review an Ocwen Form

22 10k statement?

23 A.   No.

24 Q.   Okay.  Well I just want to track with you because I don't

25 want to get too hung up on definitions, and so when I say --

Blanchard - Direct                                63

1    but I do want to ask you about Ocwen's business and you're

2    asking me about servicing.  Isn't that what Ocwen does, it

3    services loans?

4    A.   Okay.  I'm just going to ask for clarification.  Are we

5    talking about Ocwen Financial Corporation or Ocwen Loan

6    Servicing, LLC?

7    Q.   Why don't you explain for me.

8    A.   I don't know which one you're asking.  That's why I'm

9    asking.

10   Q.   Okay.  Who do you work for?

11   A.   I work for Ocwen Financial Corporation.

12   Q.   Okay.  And what's Ocwen Financial Corporation's

13   relationship to Ocwen Loan Servicing, LLC?

14   A.   Ocwen Loan Servicing is a indirect subsidiary of Ocwen

15   Financial Corporation.

16   Q.   Okay.  And can you explain for us what Ocwen Financial

17   Corporation does and what Ocwen Loan Servicing, LLC does?

18   A.   To my understanding, Ocwen Financial Corporation is the

19   mother company of Ocwen Loan Servicing.  Ocwen Loan Servicing,

20   LLC is the company that deals with the actual mortgage

21   servicing aspect and that's who services this loan.

22   Q.   Okay.  And so when -- I just -- so when I was asking about

23   farm based employees engaged in servicing operations, would

24   that help to kind of orient us that what we're talking about is

25   Ocwen Loan Servicing's function of servicing mortgage loans?  I

1    mean I get -- it's simpler -- I'm just saying my understanding

2    of servicing is basically they process the payments, they take

3    the money on behalf of another entity.  Is that your

4    understanding also?

5    A.   You're -- I understand you're trying to group it all

6    together, but I'm advising you you cannot.  You're asking me

7    about servicing, but then you're making it specific to foreign

8    -- a foreign location and I've advised you that it's -- Ocwen

9    is a team environment so there could be individuals that are

10   maybe say in India that work alongside individuals that are in

11   America in reference to different situations.

12       So I cannot differentiate, you know, servicing in India to

13   servicing in the United States.  Maybe I'm not understanding

14   your question.

15   Q.   No.  I'm sorry.  And I think I must -- I asked a bad

16   question or I'm -- because I'm not understanding your answer

17   and so I apologize.  If you just turn to where at the bottom it

18   says page 11, it says employees.

19           THE COURT:  I'm sorry, Mr. Heenan, not the Bates

20   stamp number?

21           MR. HEENAN:  No.  Sorry, Your Honor.  Go back -- hold

22   on.

23       (Pause.)

24   BY MR. HEENAN:

25   Q.   See where it says in the middle there employees?  We don't

1    need to -- I don't want to slow us down.  I'm just --

2    A.   Okay.  Yeah.  I do see it.

3    Q.   See where it says of our farm based employees, more than

4    80 percent are engaged in our servicing operations?

5           THE COURT:  Mr. Heenan, this document has not been

6    admitted.  That means that you are not to read from that

7    document.

8           MR. HEENAN:  Thank you, Your Honor.

9    BY MR. HEENAN:

10   Q.   Okay.  Look at the document.

11   A.   Okay.

12   Q.   And do you see the part that I was asking about?

13   A.   There is a section here under employees.

14   Q.   Right.  Do you see the specific part about farm based

15   employees?

16   A.   Yes.

17   Q.   And do you see the part about how they work in servicing

18   operations?

19   A.   Yes.

20   Q.   And so my question is just what does it mean to be

21   involved in servicing operations?

22   A.   Servicing could just -- like it's -- I believe it's along

23   the lines of what I have already explained.  They could be an

24   assist groups that service the actual function.  Again,

25   they're --

1   Q.   I'm sorry.  And I don't -- what's that mean, assist

2   groups?

3   A.   Well like in cashiering.  A check comes to a physical

4   location in the United States, it's logged and a copy of the

5   check is made.  We might have a individual let's say located in

6   India that looks at what's logged and compares it against the

7   images to make sure that they match up.  They're not actually

8   receiving the check.  They're just verifying that's a part of

9   the servicing aspect, you know, the allocation of your

10  payments.

11       There's the servicing I do -- I'm familiar with them also

12  being involved in maybe the customer service aspect, speaking

13  to the borrower or ordering things to be sent to the borrower.

14  Q.   So those folks in India handle customer service

15  communications with the borrower?

16  A.   Yeah.  But as I stated before, not all -- if you call, it

17  doesn't -- I don't know of a mechanism that says that it's --

18  you're definitely going to get a India rep.

19  Q.   I understand.

20  A.   Okay.  So these positions, these same customer service --

21  when it comes to customer service, those same customer service

22  positions exist in the United States.  So you could get someone

23  in the United States when you call, you could get somebody

24  that's in India.

25  Q.   Okay.  So Ocwen's customer service system, there's a 1-800

1   number?

2   A.   Yes.

3   Q.   And if I call that 1-800 number where does it go?

4   A.   It goes to whoever is available for that call.

5   Q.   Okay.  And wherever that person, he or she may be?

6   A.   Right.

7   Q.   Okay.  So we talked about customer service.  What about

8   processing foreclosures?  Do the people in India process the

9   foreclosures?

10  A.   It's a team environment.  You're going to have individuals

11  that might hold the same titles as somebody in the United

12  States.  So it could be somebody from America, it could be

13  somebody in India.  It's just whoever is assigned that piece.

14  Q.   Okay.  What type of training to the people in customer

15  service, be they in the United States or in India, receive from

16  Ocwen with respect to dealing with a borrower?

17  A.   Well our human resource department is -- they train --

18  they help with the training of the individuals for their

19  particular piece.  There's also up training that comes out and

20  it assigns you up training based on whatever it is that you're

21  function is.

22       So -- and I'll just say cashiering because that's a

23  familiar -- you know, every -- practically every mortgager

24  has -- I'm sorry, mortgage servicer has a cashiering

25  department.  If somebody is there trained for cashiering, they

Blanchard - Direct                           68

1   can receive -- if they receive up training they're going to get

2   up trained for things in cashiering.  They're not going to get

3   up trained for things dealing with like how to upload documents

4   and the vault if that's not their job function.  And that comes

5   out every -- every month you might get a reminder of something

6   that you have to go online and have to go ahead and do.

7        There's also specific job training that goes in when you

8   first get the job that is going to be specific to the duties

9   that that individual was hired for.

10  Q.   How about specifically with respect to -- because

11  cashiering, can we agree, is kind of like the easiest thing for

12  somebody to do?  I mean you're handling the money that comes

13  in, processing the payments, right?

14  A.   I don't -- I don't know if it's -- I can't -- I don't know

15  if I can label it as the easiest thing to do there.

16  Q.   Okay.  Let me ask a different question then.  Ocwen

17  maintains an escalations department doesn't it?

18  A.   Again, that's going to be a very broad thing.  There's

19  escalations for different things, so I don't know if you can be

20  more specific, but there's several different escalation

21  procedures and departments that exist.

22  Q.   Well what's the ERM department?

23  A.   ERM, and I believe this is something I went over with

24  Stephanie, and that's like an escalation management and things

25  are sent there when they're escalated.

Blanchard - Direct                                69

1   Q.   What's escalation mean to outside of the -- I mean what's
2   it mean in just common English?
3   A.   It's -- it would be similar -- if you call in and you ask
4   to speak to a supervisor it's escalated.
5   Q.   Okay.  Because you go right -- you go above kind of the
6   first line, kicked up to the supervisor stage?
7   A.   Yes.  Exactly.
8   Q.   Okay.  Let me back up just a little bit.  Ocwen's not a
9   bank, right?
10  A.   Ocwen Loan Servicing is not a bank.
11  Q.   Yeah.  And it services residential mortgages, right?
12  A.   Yes.
13  Q.   And by servicing what I mean is on behalf of another
14  entity it sends out bills and takes payments, is that your
15  understanding?
16  A.   That is part of it.
17  Q.   Okay.  And if the borrower doesn't make the payment, it
18  becomes Ocwen's job to attempt to collect the payment, is that
19  fair?
20  A.   That is part of it.
21  Q.   Okay.  And if the borrower doesn't make the payment,
22  Ocwen's in charge of working with trustee, other entities to
23  foreclose on the home if that's necessary?
24  A.   If that's the final outcome.
25  Q.   And Ocwen services primarily subprime loans, correct?

1    A.    We do have a large volume of subprime loans, but that's

2    not the only type of loans that they do.  I don't have a

3    percentage as to each of these type of loans.

4    Q.    Okay.  Explain to the jury what a subprime loan is please.

5    A.    It's not with a paper.  So it might be individuals that

6    would not be able to get a normal standard loan at the lowest

7    prevailing interest rates.

8    Q.    Okay.  Do subprime borrowers have a higher likelihood of

9    defaulting on their loan than non-subprime borrowers?

10            MR. SHATZ:  Objection.  Relevance.

11            THE COURT:  Could I have a sidebar please?

12        (Begin Sidebar.)

13            THE COURT:  Did the Cornejos have a subprime loan?

14            MR. HEENAN:  No.  It's an eight percent interest.

15            MR. VITIELLO:  It's an over eight percent rate.

16            THE COURT:  (Indiscernible) 1992, correct?

17            MR. HEENAN:  Right.

18            MR. VITIELLO:  That's right.  Yeah.  1992, eight

19    percent (indiscernible).

20            THE COURT:  It was above prime, wasn't it?

21            MR. SHATZ:  (Indiscernible) in '89 and I had 12

22    percent and we had a (indiscernible) because it was 12 percent,

23    it was so low.

24            THE COURT:  All right.  So you're suggesting it is a

25    subprime loan?

```
                        Blanchard - Direct                    71
```

1          MR. SHATZ:  No.  I was at a subprime borrower in '89

2   and it was 12 percent.  Theirs three years later, before the

3   recession his was eight percent.  That's still the same thing.

4          MR. VITIELLO:  I don't think the interest rate is --

5   and maybe there's a different way to ask the question.  I think

6   the idea is that a subprime loan is (indiscernible) foreclosure

7   because (indiscernible) payment history.

8          MR. HEENAN:  (Indiscernible).

9          THE COURT:  I couldn't hear both of you.  What were

10  you saying?

11         MR. VITIELLO:  I was saying maybe there's just a

12  different way of asking the question.  What we want to get at

13  is this is the type loan that was -- had a payment history that

14  was known to Ocwen to be rocky and that it was --

15         MR. HEENAN:  (Indiscernible) --

16         THE COURT:  The Cornejos --

17         MR. HEENAN:  (Indiscernible) --

18         THE COURT:  I assume the Cornejos' loan was a loan

19  which is known to be rocky?

20         MR. VITIELLO:  Yes.

21         THE COURT:  It is correct they had a VA loan, right?

22         MR. VITIELLO:  That's right.

23         THE COURT:  Is that a subprime VA loan or are you

24  saying that their loan in particular was rocky?

25         MR. VITIELLO:  That's what I'm saying is that --

Blanchard - Direct                          72

1         MR. HEENAN:  I'm going to assume their loan was
2    already in default, but I'll just move on.
3         THE COURT:  Okay.
4         MR. SHATZ:  (Indiscernible) --
5         MR. VITIELLO:  Which means take over the services.
6         MR. HEENAN:  (Indiscernible).
7         MR. SHATZ:  They did.
8         MR. HEENAN:  Yeah.
9         MR. SHATZ:  Yes.
10        (End Sidebar.)
11   BY MR. HEENAN:
12   Q.   Does Ocwen take over servicing of loans that are already
13   in default?
14   A.   Yes, they have.
15   Q.   And just so we're all clear on that, that means when Ocwen
16   takes over the servicing of the loan the borrower is already
17   behind on their payments?
18   A.   That's not the case in all cases, but there are occasions
19   when the borrower is in default and the servicing of the loan
20   transfers.
21   Q.   Okay.  And so when Ocwen takes over the servicing of a
22   loan that's already in default it knows what it's getting into,
23   is that fair?
24        MR. SHATZ:  Objection.  Vague.
25        THE COURT:  Sustained.

Blanchard - Direct                          73

1  BY MR. HEENAN:

2  Q.   The Cornejos were -- their loan was already in default

3  when Ocwen took over servicing, correct?

4  A.   Yes.

5  Q.   And let's explain that for a little bit for the jury.  How

6  does Ocwen take over the servicing of a loan?

7  A.   It's a service transfer.  Generally these loans come in

8  pools.  It's not individualized, so you have a population

9  that's current, you have a population that is in default and

10 you can have a population that it's satisfied, but you still

11 have to keep the account, keep some type of existing record in

12 reference to that.

13 Q.   How does Ocwen make money servicing a loan?

14         MR. SHATZ:  Objection.  Relevance.

15         THE COURT:  Sustained.

16 BY MR. HEENAN:

17 Q.   Did Ocwen make money here?

18         MR. SHATZ:  Objection.  Relevance.

19         THE COURT:  Sustained.

20         MR. HEENAN:  Can I have a sidebar please, Your Honor?

21         THE COURT:  All right.

22     (Begin Sidebar.)

23         THE COURT:  Are you suggesting they make more money

24 if the house is in foreclosure?

25         MR. HEENAN:  Yes.

1        THE COURT:  Why not ask that?

2        MR. HEENAN:  Well because it's more than that, Your

3   Honor.  They make more money when the house is in default.  The

4   insinuation yesterday in opening was we worked with these

5   borrowers for years.  All the while arrearage is racking up and

6   Ocwen knows that they get paid on all that.  And so when the

7   loan's current they receive like .05 percent.  When the loan is

8   in default, that accrues a bunch of fees and that's how they

9   make their money and that's --

10       THE COURT:  Okay.  But my question goes back to why

11  not just ask that then?

12       MR. HEENAN:  Why not just ask --

13       THE COURT:  Do you make more money when a loan goes

14  into default?  How do you make more money when a loan goes into

15  default?

16       MR. HEENAN:  Okay.

17       THE COURT:  Do you know what I want?

18       MR. HEENAN:  Yes, Your Honor.

19       THE COURT:  Because you're starting at a 30,000 foot

20  view.  I'm having a lot of difficulty in tying what you're

21  asking to this case.

22       MR. HEENAN:  Okay.  Yes, Your Honor.  Thank you.

23     (End Sidebar.)

24  BY MR. HEENAN:

25  Q.   Does Ocwen make more money when a loan is in default as

1  opposed to when it's not in default?

2  A.   I mean I don't know the financial backing of that, but

3  it's in -- I know there's -- it's more beneficial for us to

4  have a performing loan than it is to have a defaulted or

5  foreclosed loan.

6  Q.   Okay.  So on a performing loan, how does Ocwen get paid or

7  how much does it make?

8  A.   That's going to be dictated by the pooling and servicing

9  agreement for whatever pool that loan belongs to, so I wouldn't

10 be -- I don't know what it is in this particular instance.

11 Q.   Would you agree with me that it's a percentage of whatever

12 the monthly payment is?

13 A.   I don't know without looking at the agreement.  The

14 agreement would tell you exactly what it is.

15 Q.   Okay.  I'm not asking you what the percentage is.  I'm

16 just asking you if you'd agree with me that Ocwen gets paid a

17 percentage of what the monthly payment is to service the loan,

18 whatever that percentage is.

19 A.   I don't think I have enough information to be

20 knowledgeable about that.

21 Q.   Okay.  You researched the accounting of the Cornejos'

22 loan, correct?

23 A.   I looked at, you know, default.  I didn't go in and

24 perform a recon because it wasn't a question of payments that

25 was brought up here.

Blanchard - Direct                                        76

1   Q.   Okay.  Well when were the Cornejos in default?

2   A.   I believe in sometime in 2013 they -- I did see some

3   information, but we should have a default notice here that

4   would give us an outline of the exact --

5   Q.   Date.  Well I'll represent to you, and we'll get in the

6   documents because I want to move a little quicker, but Ocwen's

7   counsel told this jury yesterday that a period of years went by

8   from the time that Ocwen -- or the time the Cornejos were in

9   default until Ocwen ultimately proceeded with the foreclosure.

10  Are you aware of that?

11  A.   Yes.

12  Q.   Okay.  And so my question is -- and are we in agreement

13  that Ocwen took over the loan when the Cornejos were already in

14  default?

15  A.   Yes.

16  Q.   Okay.  And during all that period would you agree with me

17  that fees were racking up?

18  A.   That fees?

19  Q.   Yeah.

20  A.   Well if you don't pay -- I'm not -- it's specific to

21  whatever the laws are in the state.  So if the state allows for

22  delinquency fees to be assessed, there's going to be a

23  continuous delinquency fee that's assessed where the law

24  allows.

25       So yeah, there are fees that rack up on that -- that

Blanchard - Direct                        77

1   continue to accumulate according to whatever the mortgage

2   dictates that the borrower signed.

3   Q.   The Cornejos purchased this home for a hundred and -- oh,

4   here we go.  Plaintiffs' 2.

5           MR. HEENAN:  This is not in evidence yet, Your Honor,

6   I don't believe.

7   BY MR. HEENAN:

8   Q.   Have you seen this document, sir?

9           MR. SHATZ:  Objection, Your Honor.  It was

10  misidentified.

11          MR. HEENAN:  I don't understand.  I think I can cure

12  the objection by saying is this the deed of trust note?

13          THE COURT:  Thank you.

14  BY MR. HEENAN:

15  Q.   Have you seen the deed of trust note?

16  A.   Yes, I have.

17  Q.   Okay.  Is this it?

18  A.   Yes.

19          MR. HEENAN:  I'll move Plaintiffs' Exhibit 2, Your

20  Honor, and ask that it be published to the jury.

21          THE COURT:  Any objections to --

22          MR. SHATZ:  No, Your Honor.

23          THE COURT:  All right.  Plaintiffs' 2 will be

24  admitted.

25       (Plaintiffs' Exhibit 2 received into evidence.)

Blanchard - Direct                                    78

1    BY MR. HEENAN:

2    Q.    I just want to have you clarify the purchase price was

3    $113,400?

4              MR. SHATZ:   Objection.   Lacks foundation.

5              THE COURT:   (Indiscernible) sustained.

6    BY MR. HEENAN:

7    Q.    Do you know how much the Cornejos purchased their home

8    for?

9    A.    The purchase price and the loan amount could be different.

10   Q.    Okay.

11   A.    I can only tell you from this document how much the loan

12   amount was.   I can't tell you how much they purchased the

13   house.

14   Q.    Okay.  And I apologize.   I lack the real estate knowledge

15   that you have.   So let me ask this question.   What's the

16   113,400?  What's that mean to us?

17   A.    That would be the amount of the actual loan that was

18   issued.

19   Q.    Okay.  So the loan was for 113,400, correct?

20   A.    Yes.

21   Q.    Thank you.

22             MR. HEENAN:   And then if you could bring up the

23   interest rate and the payments please.

24   BY MR. HEENAN:

25   Q.    The interest rate on the loan was eight percent, is that

1   correct?

2   A.    I mean I can see from your screen it says the eight

3   percent there.

4   Q.    I mean is this same stuff part of what you researched,

5   sir, I mean when you were looking at the Cornejos' loan?

6   A.    When I -- I might have looked at the note, but I'm not

7   going to memorize the kind of percentage rate and things of

8   that nature.  I don't know if we had a list of titles.  I don't

9   even think this was asked in the deposition.

10  Q.    Okay.  So this isn't anything that you maybe would've

11  looked at before?

12  A.    It's something that I would've looked at in the file, but

13  if the -- my -- the borrowers are saying -- it never said that

14  they had an issue with the interest rate I'm not going to look

15  further than I see the interest rate here.

16  Q.    Okay.

17  A.    And the interest rate that's being applied on the loan,

18  but it's not something I would memorize.

19  Q.    Is there any reason for me to be wrong in understanding

20  looking at this document that their loan was eight percent

21  interest?

22  A.    No.  There wouldn't be anything wrong with you looking at

23  the document and reading the interest rate.

24  Q.    And the same question with respect to their monthly

25  payment, $832.09, would it be fair for us to be on the same

1   page that that was the Cornejos' monthly payment?

2   A.   At the time that the loan was issued as what the -- as

3   what it's identifying, yes.

4   Q.   And same question, is it fair that it looks like to us

5   that this loan was entered into in September of 1992?

6   A.   Where are you seeing September of 1992?  I'm sorry.

7   That's not when it was entered into.  That's the -- I believe

8   what you're looking at is the first payment.

9   Q.   Thank you for that clarification.  Okay.  And then if --

10  well let me ask this question.  So when did Ocwen assume

11  servicing of the Cornejos' loan?

12  A.   I would have to take a look at the servicing notes.  I

13  believe it's sometime in 2013, but I'd have to look at the

14  records to refresh my memory.

15  Q.   Do you have those in front of you?  I think they're Joint

16  Exhibit 2 -- or sorry, Exhibit 4.  My apologies.

17  A.   This comment log shows a -- the first comment in this

18  comment log shows in 2014.

19  Q.   If you tell us at the bottom, sir, it says JT4 dash

20  something, then we can pull it up onto the screen and we can

21  all kind of --

22  A.   JT4-1.

23  Q.   Okay.  Top, middle or bottom?

24  A.   Top.  That's the first note I see on here, so we can at

25  least say from November 2014 it was with Ocwen.  I don't know

1    that we could see the start date from that.

2    Q.   Okay.  That's the first collections log in Ocwen's

3    servicing notes?

4    A.   That's the first note I see in this exhibit.  I didn't

5    produce this particular document, so I don't know if this is

6    the first note ever implemented in the system.

7    Q.   Okay.  Do you know when Ocwen chose to commence

8    foreclosure proceedings against the Cornejos?

9    A.   There is a notice of default on October 22, 2014, it's

10   JT1.

11           MR. HEENAN:  Can you please bring that up?

12           And that's already in evidence, Your Honor, if we

13   could please publish to the jury?

14           THE COURT:  It's being published.

15           MR. HEENAN:  Thank you, Your Honor.

16   BY MR. HEENAN:

17   Q.   This is the document that's dated October 22nd, 2014?

18   A.   Right.

19   Q.   And at this point in time the Cornejos have an arrearage

20   of $23,325?

21   A.   Yes.

22   Q.   Does this document show us that Ocwen in October of 2014

23   has chosen to proceed with a non-judicial foreclosure?

24   A.   It is a notice of default and an election to sell under.

25   It does give an amount to pay and advised that amount is what

1   is to be cured and in order to not go through the process of

2   foreclosure.

3   Q.   Okay.  So that's actually -- this is just -- this is

4   telling -- this is, would you agree with me, kind of the first

5   step in what has to happen to proceed with the non-judicial

6   foreclosure?

7   A.   This is one of the first steps, yes.

8   Q.   Okay.  I mean I guess just in the simplest way, when Ocwen

9   starts servicing the loan the Cornejos are already behind,

10  right?

11  A.   Yes.

12  Q.   And Ocwen has options as the creditor at that point in

13  time, is that fair?

14  A.   What do you mean options?  I'm not sure --

15  Q.   I mean they could sue the Cornejos, right, for not paying

16  their mortgage bill?

17          MR. SHATZ:  Objection.  May call for a legal

18  conclusion, lacks foundation, relevance and --

19          THE COURT:  Mr. Blanchard, do you know the answer to

20  what he's asking you?

21          THE WITNESS:  I guess I was looking for

22  clarification.  Different states have different remedies.  So

23  when he's saying that -- I believe what he's saying, we can

24  start the foreclosure process if the borrowers are in default

25  at that time we have that option.

```
                        Blanchard - Direct                    83
```

1           MR. HEENAN:  Yeah.  Let me --

2           THE COURT:  Mr. Heenan, he doesn't understand the

3    question.

4           MR. HEENAN:  Okay.  So let me ask a different

5    question.

6    BY MR. HEENAN:

7    Q.   When Ocwen takes over servicing of the Cornejos' loan does

8    it know what their balance on the loan is?

9    A.   Yes.  That's all handled during the loan setup phase, yes.

10   Q.   Okay.  So at the moment kind of the loan is set up, they

11   know how much the Cornejos owe?

12   A.   Yes.

13   Q.   And do you know how much they owed when Ocwen started

14   servicing the loan?  Is there a --

15   A.   I wouldn't know that without looking at the payment

16   history --

17   Q.   Okay.

18   A.   -- and seeing the exact date that it came over to Ocwen.

19   But I mean all that's evident within the -- whatever business

20   records is there.

21   Q.   Okay.  Does Ocwen, as part of the servicing of the

22   Cornejos' loan, did it ever endeavor to find out what the value

23   of the home was?

24   A.   There are -- there would be valuations that go out once

25   the property's in default, yes.

Blanchard - Direct                                    84

1    Q.    Okay.   And that valuation is the way that Ocwen learns or

2    tries to find out what the value of the home is?

3    A.    Yes.

4    Q.    And that helps Ocwen to know whether there's equity in the

5    home or not?

6    A.    Yes.

7    Q.    And to the extent late fees and arrearage are

8    accumulating, knowing whether or not there's equity would help

9    Ocwen to know whether or not it would get paid as part of a

10   sale, is that correct?

11             MR. SHATZ:   Objection.   Argumentative.

12             THE COURT:   Overruled.

13             THE WITNESS:   I would disagree with that.   Ocwen

14   doesn't know how much it's going to get at a sale.   It doesn't

15   even know how much it's going to get in a REO.   Most often

16   it's -- they lose money through property vandalism and having

17   to eventually probably sell less than market.

18             It's more beneficial for us to have a performing loan

19   in my opinion, if that's what you're asking.   And that's why

20   after a default there's all these notices that go out to the

21   borrower of alternatives and numerous conversations that I had

22   in reference to alternatives to foreclosure.   It's not just

23   dealing with modifications.

24   BY MR. HEENAN:

25   Q.    My question though is when Ocwen proceeds with a

1   foreclosure does it know whether or not there's equity in the

2   home based on knowing what the appraisal value of the home is

3   and knowing what the borrower owes on it?

4   A.    We don't get an appraisal.  We have a drive-by BPO,

5   Broker's Price Opinion.  So we have no idea what the interior

6   condition of the property is from the majority of these BPOs.

7         So we basically -- we know at a glance what the properties

8   in the market go for without, you know -- and that's

9   practically what a BPO is.  It's some type of exterior

10  valuation.  It's not an in-depth appraisal and we would never

11  take it as such.

12  Q.    Ocwen must rely on those drive-by BPOs, right, to help it

13  understand what --

14  A.    It helps us understand and, you know, those BPOs are

15  utilized in future transactions, yes.

16  Q.    Okay.  If Ocwen began the foreclosure process in October

17  of 2014 and the Cornejos had already been in default for over a

18  year, why did Ocwen take so long to commence the foreclosure

19  process?  Or I guess first of all, would you agree with me that

20  over a year is a long time or not?

21  A.    That depends.  I mean there could be a series of events

22  that have taken -- I've seen things go longer.

23  Q.    Okay.

24  A.    I've seen things go shorter, so I can't say that's --

25  Q.    Well specifically based on your research with respect to

1    what happened to the Cornejos, what servicing note or business

2    record can we look at that helps us to understand why Ocwen

3    waited so long to commence foreclosure?

4    A.   Well we inherited this from a prior servicer.

5    Q.   Okay.

6    A.   So the prior servicer didn't complete a foreclosure.  We

7    took it on when it was in default.  We also tried to assist the

8    borrower in obtaining alternatives and we were soliciting

9    them -- we've even pushed back our own foreclosure sale to the

10   last one that actually transpired.

11   Q.   Yeah.  And we'll talk about that.  Go back then with me,

12   show me what's the first date of loan servicing on this loan

13   again, JT4-1?

14   A.   JT4-1 is the first notation.  I don't think that is the

15   first date of servicing on this loan.

16   Q.   Okay.

17   A.   So I don't see it in this comment log.

18   Q.   Are there any other -- well is this the first time that

19   Ocwen's business records show us that Ocwen is making

20   collection calls to the Cornejos?

21   A.   This is the earliest date that I see in this comment log,

22   yes.

23   Q.   Okay.  And that's again November 25th of 2014?

24   A.   Yes.

25   Q.   Okay.  And so what business record can we look at that

1   helps us see what Ocwen was doing in 2013 and through November

2   of 2014?  Is there any documentation that there were phone

3   calls placed to the Cornejos before this?

4   A.   We would have to look at whatever comment log was in place

5   at that point in time.  So a comment log would reflect that.

6   Other things that would evidence that are documents that have

7   gone out, the correspondence to and from the borrower.

8   Q.   Okay.  My question I guess is with respect to

9   communications.  Are there other documents in that exhibit

10  binder that we can look at that help us see prior

11  communications, specifically let's say phone calls?

12  A.   Okay.  Now I didn't put this binder together, but you're

13  asking me to find --

14  Q.   Sure.  Well I don't want to make you -- let me -- okay.

15       These are the servicing notes, as I understand it, that

16  Ocwen maintained once it became in default, is that your

17  understanding?

18  A.   I see these are servicing notes that existed in the

19  comment logs, yes.

20  Q.   Okay.  Are there more that you have access to than these

21  in terms of servicing notes?

22  A.   The servicing note that I would be looking for is the note

23  that shows, you know, the prior servicer information which is

24  evident in -- I just -- I don't see it in this particular

25  comment log.

1   Q.   Okay.

2            THE COURT:  I think we're going to -- let's go ahead

3   and take our morning break.  So if you will return to the jury

4   deliberation room at 20 minutes till.

5        (Jury out at 10:27 a.m.)

6            THE COURT:  All right.  We're outside the presence of

7   the jury.  Are we missing some documents?  Is that --

8            MR. HEENAN:  Sorry, Your Honor, what's that?

9            THE COURT:  Are we missing some documents?

10           MR. VITIELLO:  I can address that, Your Honor.  We

11  had actually agreed that to pare the binder down some of those

12  things would come out.  We expected Mr. Blanchard to have a

13  date in mind really for when Ocwen took over servicing of the

14  loan because it was an undisputed fact in their pretrial

15  statement.

16           MR. PAINO:  I think we can help with -- I think there

17  is a letter --

18           THE COURT:  Or we could just --

19           MR. SHATZ:  We can just say what the fact is -- what

20  the date is too.

21           MR. VITIELLO:  I think --

22           MR. HEENAN:  Well and that's the other -- and I

23  just -- I apologize, Your Honor, I didn't have the date of when

24  they assumed servicing to ask him either and so I didn't want

25  to waste --

```
                         Blanchard - Direct                  89
```

1          MR. SHATZ:  Well let's just look it up, we'll agree,

2     and you can tell him and we'll deal with it.  Let's just do it

3     that way.

4          MR. HEENAN:  That'd be -- yeah.  I just didn't want

5     to waste the jury's time, but --

6          THE COURT:  Thank you, but I think (indiscernible).

7          THE WITNESS:  Okay.  Thank you.

8          MR. SHATZ:  You said it was in the pretrial?

9       (Recess from 10:28 a.m. to 10:45 a.m.)

10      (Counsel discussing case.)

11         THE COURT:  All right.  Are we ready for the jury

12    then?

13         THE CLERK:  You're ready for the jury?

14         THE COURT:  Are we ready for the jury at this time?

15         MR. HEENAN:  Yes, Your Honor.

16         MR. SHATZ:  No objection, Your Honor.

17         THE COURT:  All right.  Mr. Blanchard, I'm going to

18    ask you to come back to the stand.

19         MR. SHATZ:  You're on the stand, sir.

20         THE WITNESS:  I'm sorry.

21      (Pause - Clerk and counsel conferring.)

22      (Jury in at 10:50 a.m.)

23         THE COURT:  All right.  We have all of our jury

24    members back in their places.  You may continue.

25         MR. HEENAN:  Thank you, Your Honor.

1    BY MR. HEENAN:

2    Q.    Sir, we've talked about Ocwen taking over the servicing,

3    but I don't think we made clear for the jury, did the Cornejos

4    have a say in who their servicer was?

5    A.    No, I don't believe so.

6    Q.    Okay.  Ocwen just became their servicer?

7    A.    There's a series of events that lead to that, but yes.

8    Q.    None of which -- the consumer has no say in those events,

9    is that fair?

10   A.    I don't believe they do when it comes to service

11   transfers.

12   Q.    Okay.  Do you have an understanding of what a non-judicial

13   foreclosure is?

14   A.    Yeah.  I mean in the -- I mean my basic knowledge, I'm not

15   an attorney, but you have judicial and non-judicial states and

16   the non-judicial, it doesn't necessarily take a -- it doesn't

17   have to go through court proceedings, they can just follow a

18   series of procedures.  But if it's disputed, obviously we end

19   up here.

20   Q.    In a non-judicial you can foreclose and sell a home

21   outside of the court system, is that fair?

22   A.    As long as it follows the laws of that state, yes.

23   Q.    Okay.  Do you have an awareness of what California is?

24   A.    California is a non-judicial.

25   Q.    Okay.  First let's look at Joint 16 please.

1          MR. PAINO:  Sorry, what number?

2          MR. HEENAN:  Sixteen.  Just the header please, Wade.

3          Your Honor, and I apologize if an exhibit's already

4     been admitted do I need to ask that it be published or am I

5     just bothering you by asking?

6          THE COURT:  No.  You're not bothering, but you don't

7     have --

8          MR. HEENAN:  Okay.  It's -- I looked dumb because

9     they're already looking at it.  Okay.  My apologies.

10    BY MR. HEENAN:

11    Q.   Is this the header that Ocwen used in sending

12    correspondence to the Cornejos?

13    A.   Yes.

14    Q.   And helping homeowners is what we do --

15    A.   Yes.

16    Q.   -- is that Ocwen's tag line?

17    A.   It's their motto.

18    Q.   And they've trademarked it looks like the motto helping

19    homeowners is what we do?

20    A.   If that's what the TM means, yes.

21    Q.   Is that your understanding?  And if you don't know, it's

22    fine.

23    A.   Yeah.  I don't know about the trademarking of company

24    mottos or sayings, so I don't know that.

25    Q.   Okay.  Thank you.

Blanchard - Direct                                    92

1          MR. HEENAN:  And then if I can have Plaintiffs'

2     Exhibit 6 please.

3     BY MR. HEENAN:

4     Q.   What's this document?

5     A.   This looks like a comment from a comment log in maybe a

6     printed out format.

7          THE COURT:  Mr. Heenan, didn't you say Joint Exhibit

8     6?

9          MR. HEENAN:  Sorry, Your Honor.  Plaintiffs' Exhibit

10    6.

11         THE COURT:  Okay.

12         THE WITNESS:  Oh, I'm on the wrong document here.

13         THE COURT:  I was too.

14         THE WITNESS:  Okay.  Plaintiffs', sorry.

15         MR. HEENAN:  Sorry, sir.  We've got all these

16    binders.  I'll do a better job.

17         THE WITNESS:  Okay.  This looks like -- this is a

18    document that says re -- it looks like an email.

19    BY MR. HEENAN:

20    Q.   Does this also -- does this document bear Ocwen's logo at

21    the top?

22    A.   This document that it's printed on does bear the logo on

23    top.

24    Q.   And would you agree with me that it's -- the second page

25    indicates that it's addressed by Ocwen Loan Servicing, very

1    truly yours?

2    A.    Yes.

3    Q.    Okay.  And it's sent to Western Progressive as reflected

4    on the first page?

5    A.    That's what the document appears to be.

6    Q.    Okay.  And is this the instructions that Ocwen gave to

7    Western Progressive with respect to how to conduct this

8    particular foreclosure?  I mean I don't see the Cornejos' name,

9    but in the re part.

10   A.    It appears to be communications between Western and Ocwen.

11   Q.    Okay.

12          MR. HEENAN:  I would move for the admission of

13   Plaintiffs' Exhibit 6.

14          MR. SHATZ:  No objection.

15          THE COURT:  All right.  That'll be admitted.

16       (Plaintiffs' Exhibit 6 received into evidence.)

17          MR. HEENAN:  Thank you.

18   BY MR. HEENAN:

19   Q.    And if we can go to page -- well, page two please, the

20   first paragraph, resolving loans.

21   A.    Yes.

22   Q.    Ocwen's number one priority is to keep customers in their

23   home, is that a fair statement?

24   A.    Yes.

25   Q.    Is it an accurate statement?

1    A.    Yes.

2    Q.    When the foreclosure is initiated a specialized

3    foreclosure coordinator is assigned to monitor the foreclosure

4    action that you have been engaged to perform.  Did I read that

5    correctly?

6    A.    Yes.

7    Q.    And is that an accurate reflection of Ocwen's business

8    practice as it relates to foreclosure?

9    A.    Yes.

10   Q.    And then Ocwen also assigns an experienced loan resolution

11   consultant who works with the customer to find a resolution

12   other than foreclosure based on the customer's ability to pay.

13   Is that an accurate reflection of Ocwen's business practices?

14   A.    Yes.

15   Q.    And then although Ocwen utilizes the dual path, our number

16   one priority is to find a resolution that keeps the customer in

17   their home.  Is that an accurate recitation of what Ocwen's

18   business practices are?

19   A.    Yes.

20   Q.    What does Ocwen mean when they say the dual path?

21   A.    Well they have the dual path.  And I think it explains it

22   here.  They have the foreclosure coordinator and they have a

23   loan resolution specialist.  So they have to go through the

24   process of the foreclosure as it's dictated throughout the

25   mortgage and throughout the laws of the state, but in the

1    meantime we are also trying to work on an alternative if we can

2    come to some type of agreement with the borrower to keep them

3    in their home.

4    Q.   Does Ocwen as a business practice utilize the dual path?

5    A.   Yes.

6    Q.   Okay.  Have you ever heard the dual path referred to as

7    dual tracking?

8    A.   I don't know that I have, but I will state that, you know,

9    it is -- there's two paths that they have on the loan and that

10   they're trying to resolve the matter, but they still have to go

11   through the process that their -- that's dictated within the

12   mortgage when there's non-payment.

13   Q.   Okay.

14        MR. HEENAN:  And if you can take that down.

15   BY MR. HEENAN:

16   Q.   I mean is it fair -- I'm just going to draw some lines on

17   my screen.  So never mind.  We'll skip the high tech.

18        There's one path and what's that path, sir?

19   A.   The ultimate goal is the keep the borrower in their home.

20   Q.   Okay.  And what's the second path then?

21   A.   Well there's the procedural foreclosure that has to be

22   initiated according to the mortgage.

23   Q.   Okay.  So before the break we looked at the fact that a

24   notice of default had been filed against the Cornejos' home.

25   Remember that October 2014 document we looked at?

Blanchard - Direct                                    96

1   A.   Yeah.  Can we look at it again if you're going to ask me

2   questions on it?

3   Q.   Sure.  Well, just -- we can.  It's JT1.

4   A.   Okay.

5   Q.   All right.  That's the document we looked at earlier,

6   right?

7   A.   Yes.

8   Q.   And then if we go to JT2, which I don't think we've talked

9   about yet, that's the notice of a trustee sale filing, correct?

10  A.   JT2?  Yes.  That's correct.

11  Q.   That's -- so when we talk about -- so is it fair that by

12  February of 2015 Ocwen had initiated at least one of the paths,

13  the foreclosure path, is that fair?

14  A.   Yeah.  This is evidence of one of the paths, yes.

15  Q.   Okay.

16          MR. HEENAN:  And can you go down a little bit please,

17  Wade?

18  BY MR. HEENAN:

19  Q.   There's a sale date set, correct?

20  A.   Yes.

21  Q.   And what's the date of the sale?

22  A.   That is -- the date of sale on your screen is 3/27/2015 at

23  10:00 a.m. and I see it here in the document.

24  Q.   Okay.  So that means the one path at this point in time

25  that the Cornejos are on is that their home's going to be sold

Blanchard - Direct                                       97

1   at the courthouse steps or city hall steps on March 27th,

2   correct?

3   A.   Are you asking me if that's the only path at this time?

4   Q.   I'm just asking that's one of the paths, correct?

5   A.   It's evidence of one of the paths, yes.

6   Q.   Yeah.  And then at some point they got put on another

7   path, right?

8   A.   Yes.

9   Q.   And what path was that?

10  A.   From the time they went into default of the -- well,

11  default is the legal term here for this note.  Before this

12  notice, there were several attempts to advise the borrower as

13  to alternate means to foreclosure, to try and get them in --

14  before this letter went out there's several letters the

15  borrower in reference to, you know, alternatives to

16  foreclosure.

17  Q.   Okay.  When does the alternative to foreclosure path

18  begin?

19  A.   It -- the alternative path, you know, they could send in a

20  full application, advise what they want to do and send in a

21  full complete application for that.

22  Q.   Okay.  So to orient us, in February of 2015 -- or maybe

23  let's back up a little bit.  Let me ask you, would you agree

24  with me that Ocwen, from the time that you started in 2010

25  until now has grown approximately ten-fold in terms of the

Blanchard - Direct                                      98

1   amount of loans that it's servicing?

2   A.   I don't know the -- I can say that they have grown.  I

3   don't have an actual number.  I'm not involved in that, but

4   they've grown in both servicing and population of employees.

5   Q.   Okay.  Would you agree with me that they've grown

6   significantly during your tenure there?

7   A.   I don't know how I would define significant for a mortgage

8   servicer.  I don't know the populations of other mortgage

9   servicers so I can't answer that question.

10  Q.   Okay.  You don't have any awareness of the amount of loans

11  that they service now versus when you started?

12  A.   I do know that they have experienced growth in the amount

13  of loans that they initially serviced from the time I was -- I

14  started.

15  Q.   Thank you.  How about one of the alternatives to

16  foreclosure is to have your loan modified, correct?

17  A.   That's one of the options.

18  Q.   And one of the modification programs is called HAMP.  Are

19  you familiar with that program?

20  A.   Yes.

21  Q.   What's that stand for?

22  A.   That's the Home Affordable Mortgage [sic] Program --

23  Q.   Okay.

24  A.    -- modification.

25  Q.   And does Ocwen participate in the HAMP modification

1  program?

2  A.   Yes.

3  Q.   And were the Cornejos considered for a HAMP modification?

4  A.   They were applying for it.

5  Q.   Okay.  Why does Ocwen participate in the HAMP program?

6  A.   Why do they participate in the HAMP program?

7  Q.   Yes, sir.

8  A.   It's a program that's been, you know, worked on that helps

9  borrowers stay in their home.  It's another tool.  It's for

10 modifying loans of those that are experiencing a hardship.

11 Q.   It's good for the borrowers, we can agree on that, right?

12 A.   To a certain extent, yes, I would say it is good for the

13 borrowers if they can go ahead and get their loan modified and

14 get it to affordable payments.

15 Q.   Yeah.  But what's in it for Ocwen I guess is my question?

16 A.   It's a method to actually get the loan performing.

17 Q.   Do you have an awareness that Ocwen is required to

18 participate in the HAMP program by virtue of the TARP funds

19 that are received from the U.S. government?

20 A.   That could be a scenario there that they are required.  I

21 don't know.  I don't have any knowledge of the -- of TARP funds

22 being received from Ocwen.  I wasn't involved in that.

23 Q.   Okay.

24      MR. SHATZ:  Objection -- late objection.  Lack of

25 foundation, calls for speculation, move to strike.

1          THE COURT:  It'll be stricken.

2    BY MR. HEENAN:

3    Q.    So let me be real clear.  Do you not have any personal

4    awareness of Ocwen's participation in the HAMP program or its

5    receipt of TARP funds?

6    A.    I know that --

7              MR. SHATZ:  Objection.

8              THE COURT:  Sustained.

9    BY MR. HEENAN:

10   Q.    Do you have awareness that Ocwen participates in the HAMP

11   program?

12   A.    Yes.

13   Q.    Do you have awareness that Ocwen has received TARP funds?

14   A.    I haven't seen documentation in reference to that.  I

15   don't know.  I'm not involved in if they did, so I don't know

16   if there was TARP funds received or as to how much if there

17   was.

18   Q.    Okay.  And my question isn't -- just so we're clear,

19   because counsel's made a foundation objection.  My question is

20   do you, sir, personally know or do you not that Ocwen has

21   received TARP funds from the U.S. government?

22   A.    Then I don't know.

23   Q.    Okay.  Thank you.  So you also don't know then what Ocwen

24   may have promised the U.S. government with respect to what it

25   would do under the HAMP loan?

1    A.   The HAMP program is very specific.  It has a -- it's the

2    same -- it's generally the guidelines are there for every

3    servicer and it's a public -- it's on their website, the MHA

4    handbook.

5         So a lot of that -- the decision-making process and things

6    of that nature plays into whatever the government or the

7    funding that's set up with the MHA.  So that's not -- HAMP is

8    not Ocwen's program.  That's a program that the government came

9    up with that Ocwen can institute.

10   Q.   And is it fair, just so we're on the same page and the

11   jury's tracking, that you know that Ocwen participates in that

12   HAMP program but you don't know why they've chosen to?

13   A.   I know that they participate in HAMP.  As to any receipt

14   of funds as you've stated, I don't know of any funds being

15   received for that.

16   Q.   Okay.  Do you know whether Ocwen is contractually

17   obligated to the U.S. government to participate in that

18   program?

19   A.   I believe once you are -- once you do participate in the

20   HAMP program -- and let's also make sure we're differentiating.

21   We are the servicer, so we could service someone that doesn't

22   participate in HAMP.  But as we are a participant in HAMP we

23   need to make an effort to try and utilize HAMP where the

24   opportunities present itself.

25   Q.   Do you have an awareness of why as a participant in HAMP

Blanchard - Direct                                          102

1    Ocwen has to fulfill obligations under HAMP?

2    A.   If that's an obligation, I don't know if there's any

3    penalties or something to that effect.  I just -- from my basic

4    knowledge, I only know if you participate in HAMP you have to

5    follow the HAMP guidelines as a servicer of HAMP.

6    Q.   Right.

7    A.   I don't know of any contractual obligations outside of you

8    actually being a participant and following their guidelines.

9    Q.   Okay.  And do you know whether Ocwen receives from the

10   U.S. government or any other entity money when it successfully

11   completes a modification?

12   A.   I believe there could be some type of something received

13   from the government for having successful HAMP modifications

14   and I think that's -- I've seen that on both the bar and the

15   servicer side.  I don't know of any percentage or amount they

16   benefit.

17        MR. SHATZ:  Objection again.  Lacks foundation, calls

18   for speculation.

19        THE COURT:  Sustained.

20        MR. SHATZ:  Move to strike.

21        THE COURT:  Stricken.

22   BY MR. HEENAN:

23   Q.   The dual path, have you ever heard it referred to as dual

24   tracking?

25   A.   I understand what you're stating.  I don't know that I've

1  heard it as dual tracking within my line of work, no.

2  Q.   Okay.  I'm just asking you personally.  Have you ever

3  heard the phrase dual tracking?

4  A.   No.

5  Q.   Okay.  Well if I told you that -- if I represented to you

6  that the phrase dual tracking means putting a borrower on one

7  track of foreclosing and taking their home and another track of

8  modifying or keeping them in their home would that sound

9  familiar to you as what Ocwen calls the dual path?

10 A.   That's --

11      MR. SHATZ:  To the extent it's argumentative, may

12 require the legal analysis, may interfere with the purview of

13 the Court for dual tracking when it comes to instructing.

14      THE COURT:  I think all of his testimony though, Mr.

15 Heenan, that he's testified what the dual path -- I mean are

16 you asking him to opine whether dual tracking is the same?

17      MR. HEENAN:  I'm providing him my definition of what

18 dual tracking is and I'm asking him if my definition is

19 consistent with what his understanding of what he knows to be

20 the dual path is.

21      THE COURT:  Objection sustained.

22 BY MR. HEENAN:

23 Q.   Are there risks to the homeowner with respect to Ocwen's

24 practice of dual pathing?

25      MR. SHATZ:  Objection to the extent it calls for

1   speculation.

2            THE COURT:  Do you know that, Mr. Blanchard?

3            THE WITNESS:  Is there, you said risk?

4            MR. HEENAN:  Yes, sir.

5            THE WITNESS:  I guess I don't understand what the

6   risk he's speaking in reference to.

7            THE COURT:  Could you clarify that, Mr. Heenan?

8            MR. HEENAN:  Sure.

9   BY MR. HEENAN:

10  Q.   The risk I'm talking about is the risk of a homeowner

11  losing their home.

12  A.   I actually believe with this, the opportunity to keep your

13  home exists.

14  Q.   Okay.  Are you aware of homeowners losing their homes

15  because they're placed on a dual path and the path of

16  foreclosure hits them before the path of modification?

17  A.   Am I aware of -- could you repeat that one more time?

18  Q.   Sure.  I mean you've worked at Ocwen for six years, right?

19  A.   Yes.

20  Q.   And you're in their legal department, right?

21  A.   Right.

22  Q.   And do you read the newspaper?

23  A.   I do.

24  Q.   And do you follow current events?

25  A.   Sometimes.  It's just a lot of what -- election news right

1   now.

2   Q.   I mean are you aware kind of either as an employee of

3   Ocwen or otherwise that there was an exponential amount of

4   foreclosures in this state over say the time you started

5   working at Ocwen until now?

6           MR. SHATZ:   Objection.  Vague as to exponential

7   amount.

8           THE COURT:   Sustained.

9   BY MR. HEENAN:

10  Q.   Have you ever heard the phrase mortgage crisis or mortgage

11  meltdown?

12  A.   Yes.

13  Q.   Okay.  And what's your understanding, if you have one, of

14  what that's talking about?

15  A.   Well if we go to my understanding, from what I've seen on

16  these shows, a mortgage meltdown is it came to a point where

17  the borrower basically could no longer afford the mortgage that

18  they agreed to take on.

19  Q.   Okay.  So just so I really -- so as an employee in Ocwen's

20  legal department you've never heard the phrase dual tracking,

21  right?  That was your testimony?

22  A.   I understand what you're stating and --

23  Q.   Sorry.  Let me -- my question specifically is as we sit

24  here today it's your testimony as a six-year employee of Ocwen

25  and someone that reads the newspaper that you've never heard

1   the phrase dual tracking, is that your testimony?

2   A.   Using those specific words, yes.

3   Q.   Okay.  And is it fair that, same question, you as an

4   employee in Ocwen's legal department and someone who reads the

5   newspaper have just kind of -- have what, no understanding or a

6   basic understanding or -- I mean have you ever read newspaper

7   articles about foreclosures in this state or nationally?

8   A.   I have read articles that pertain to foreclosures.

9   Q.   Specifically to the rise in foreclosures?

10  A.   To the rise and fall in foreclosures.

11  Q.   Okay.  So do you have an awareness that since you started

12  at Ocwen the amount of foreclosures rose?

13  A.   I don't have any specific numbers and I don't know what

14  time frame you're speaking of.

15  Q.   Just since you've been at Ocwen.

16  A.   I've seen a rise and fall since I've been at Ocwen.

17  Q.   Okay.  And no one in the Ocwen legal department ever has

18  discussed the risks of losing their home that a borrower might

19  face with respect to the dual path that Ocwen uses as a

20  business practice?

21       MR. SHATZ:  Objection.  Argumentative and calls for

22  attorney/client and a work product discussion if it's within

23  the legal department.

24       THE COURT:  Mr. Heenan, are you asking him if he's

25  had those conversations or are you asking him to opine as to

1    everyone in that --

2            MR. HEENAN:  If he's personally aware.

3            THE COURT:  If he knows if anyone in that department

4    has had that kind of conversation?

5            MR. HEENAN:  Let me -- I'll withdraw the question and

6    ask a better one.

7    BY MR. HEENAN:

8    Q.   Is there a common area at the West Palm Beach at Ocwen

9    where people get coffee, or get water out of a water cooler or

10   sit around and talk?

11   A.   Yes.

12   Q.   And as I understood your testimony from earlier this

13   morning, you've been to various facilities, you've met

14   employees in those facilities, you've had occasion to interact

15   with them, is that fair?

16   A.   Yes.

17   Q.   And you get a chance to talk to your co-workers, right?

18   A.   Yes.

19   Q.   And is it fair that be it over the phone or personally,

20   hanging around the water cooler you get to talk to your co-

21   workers at Ocwen?

22   A.   Yes.

23   Q.   And so then am I correct to understand that no one talks

24   about things like risks to homeowners of the dual path, or the

25   amount of people that have been foreclosed on or anything like

1   that?  I mean that's just -- that's not the talk that occurs in

2   the coffee room at Ocwen?

3   A.   There's not a subject of dual pathing risk that comes up

4   in the coffee room.

5   Q.   Okay.  Or anything related to -- okay.  As we sit here

6   today, can you contemplate the risks that a homeowner might

7   face when they're placed by Ocwen on the dual path?

8   A.   I see the dual path as a benefit to the borrower because

9   the only thing the mortgage actually calls for is an actual

10  foreclosure when there's non-payment.  The dual path with

11  having HAMP available -- HAMP's not mentioned in these

12  mortgages and things of that nature.  This allows for like an

13  added feature to save the home.  So I don't see it as a

14  negative as you refer to it.

15  Q.   Okay.  If I told you that one of the risks of dual pathing

16  is that it lulls homeowners into thinking they are no longer at

17  risk of having their home taken away would you disagree with

18  me?

19  A.   Yes.

20  Q.   Okay.  You've never seen that in all the testifying you've

21  given before?  You've never seen anyone that lost their home

22  after being placed on a dual path?

23  A.   What I have seen is constant communicaions that say hey,

24  you can apply, but this does not mean your -- this is going to

25  stop foreclosure.

1    Q.    Okay.  So in all those scores of times that you've

2    testified and you've researched what happened to people is it

3    fair that you've seen people other than the Cornejos who were

4    placed on the dual path and ended up losing their home?

5    A.    I've never had a case where this dual pathing is referred

6    to, as you stated, as -- I don't even know if this is an

7    alleged complaint of the foreclosure, this dual pathing, but

8    I've never seen it as the subject matter for a case, dual

9    pathing.

10   Q.    So in all the times you've testified the circumstances

11   never concerned someone who on the one hand was placed into

12   foreclosure and on the other hand was placed or at some stage

13   of the modification process?

14   A.    Yeah.  I mean there -- I've only seen where -- and it's

15   very common for us to continue to try to speak or get the

16   borrower to go down an alternative path for -- to avoid

17   foreclosure.  But in the end the attempts might fail and the --

18    results in a foreclosure.

19   Q.    So my question's different.  I'm just asking of all the

20   over 100 times you've testified, have the dual path that we've

21   been talking about, have those ever been the circumstances of

22   any of your other research or testimony?  Just yes or no.

23   A.    No, because you're -- again, you're using the specific

24   term that has not been a specific term that my other cases that

25   I've been involved in.

1  Q.   Didn't we just look at Ocwen using the language dual path?

2  A.   Okay.

3  Q.   I mean I'm not trying to put words -- you tell me what

4  Ocwen means when they say dual path I mean and then we'll just

5  go with it.

6  A.   Okay.  Now you're asking me what a document said.  Before

7  you were asking me about previous cases that I've gone to court

8  on.  So you know, if you're -- yes, that document does say dual

9  path and in my court cases no one's ever brought a defense of

10  dual path.

11  Q.   Okay.  So you've never in your court cases encountered a

12  circumstance where a homeowner was placed on one path of taking

13  their home and another path of trying to work with them to

14  modify their loan?  Yes or no.  I'm just -- because if it's no,

15  I'm going to just move on.

16  A.   Okay.  Now this is a little bit different, but first

17  you're saying -- okay.  I'll just answer the question.  Anyone

18  that goes into default, we are soliciting them to try and work

19  out alternative means.  It's up to the borrower whether they

20  want to take that option or not.  So that's any default where

21  it is allowed, we do our best to try and seek an alternative

22  and that -- it's not just modification.

23  Q.   And then I want to -- okay.  And so then I want to go back

24  to, because you said basically you give them this alternative

25  or a modification, right, and that's good for the borrower,

1   right?  I mean is that fair?

2   A.   We advise them of all the alternatives.

3   Q.   Okay.

4   A.   And it's up to the borrower to select and go -- advise as

5   to what option they wish to partake.

6   Q.   Okay.  And I know you said because we could just

7   foreclose, right?  I mean you could -- Ocwen could say well

8   we're just going to foreclose on your -- you know, Mr. and Mrs.

9   Cornejo, you're behind on your payments, bring it current or

10  we're going to take your house.  They can do that, right?

11  A.   I think you're mischaracterizing what I stated.  The only

12  thing that has to be done is whatever's stipulated in the laws

13  of that state and what's on the agreement they signed.

14  Q.   Sure.  I'm not trying to misstate anything, sir.  I'm

15  just -- if somebody doesn't make their mortgage payment, then

16  the lender can choose to foreclose the property, right?

17  A.   As long as the laws in that state are followed, yes.

18  Q.   Sure.  And that was always an option available to the

19  lender here, right?

20  A.   The option did exist to foreclose on the property, yes.

21  Q.   But if the lender or the servicer in this case says to the

22  borrower we're not going to work with you, we're just going to

23  foreclose on your house so bring your loan current or don't.  I

24  mean that's a path that the lender can take, right, or the

25  servicer?

1          MR. SHATZ:  Objection to the extent it calls for a

2     legal conclusion.

3          THE COURT:  Sustained.

4     BY MR. HEENAN:

5     Q.   As the servicer -- I'm not asking you the law.  I'm saying

6     a servicer can choose not to work with the borrower at all,

7     right?

8          MR. SHATZ:  Objection to the extent it calls for

9     legal conclusion.

10         THE COURT:  Sustained.

11    BY MR. HEENAN:

12    Q.   If a servicer chooses to proceed with just not working

13    with the borrower and taking the home, do you have an awareness

14    of what options the borrower has?

15    A.   Can you repeat that question?

16    Q.   Sure.  If the servicer says I'm going to one path and that

17    path is I'm going to foreclose the loan and take your property,

18    what options, if you know, does the borrower have?

19    A.   I don't know Ocwen to take that path.  So if you're

20    speaking about another servicer, I don't know.

21    Q.   I'm just talking in the most general terms without any

22    legal, without any -- just in the most general terms.  If a

23    lender says I'm going to foreclose on your property, do you

24    have an awareness of what options the borrower has?

25         MR. SHATZ:  Objection to the extent it calls for

1  legal conclusion, incomplete hypothetical.

2          THE COURT:  Mr. Heenan, as I understand, you're

3  suggesting outside the confines of the law and outside the

4  requirements of the mortgage?

5          MR. HEENAN:  Yes, Your Honor.

6          MR. SHATZ:  Objection.  Relevance.

7          THE COURT:  I'm having trouble with that.  Maybe we

8  should talk about this because I'm not understanding your

9  question.

10          MR. HEENAN:  I mean I can -- I'll ask some more

11  questions and then maybe that --

12          THE COURT:  It's up to you, Mr. Heenan.  We can do it

13  either way.

14          MR. HEENAN:  Okay.  Just trying to move on.

15  BY MR. HEENAN:

16  Q.   Do you have an awareness, sir, that if a servicer won't

17  work with the borrower the borrower can choose to bring the

18  loan current?

19  A.   Yes.  It can reinstate.

20  Q.   It can talk to people and borrow the money to bring it

21  current or reinstate it, right?

22  A.   I don't know where they'll get the money, but it is an

23  option.  A option to reinstate exists in the defaults, yes.

24  Q.   Yeah.  And they can file bankruptcy, right?

25  A.   Yes.

Blanchard - Direct                                   114

1   Q.   Okay.  If a borrower thinks that they're on the path

2   towards receiving a modification, is it a danger that they

3   might not pursue other options such as bringing the loan

4   current, reinstating or filing bankruptcy, if you know?

5   A.   Could you repeat that?  I'm sorry.

6   Q.   Sure.  If a borrower thinks that they're on the path

7   towards a modification, would you agree with me that they might

8   choose to not look at what other alternatives they have to

9   modifying their loan?

10  A.   The -- we give the borrower a list of options.  They

11  choose which one they wish to proceed on.  So I mean that is

12  all the decision of the borrower.  I can't tell you what a

13  borrower is thinking when he makes that option.

14  Q.   Okay.  And you've never heard a borrower specifically

15  dealing with Ocwen complain that they thought that they were in

16  the process of getting a modification only to instead have the

17  foreclosure process completed?  You've never heard of that

18  situation?

19  A.   I've seen where the borrowers apply and, you know, they're

20  declined for a modification and they couldn't find a valuable

21  alternative.  Not everybody that applies for a mod is approved.

22  Some people really can't afford to live in the house or take on

23  the loan that they've signed for.

24  Q.   Okay.  Let's talk about the modification process.  Is it

25  fair that the Cornejos were solicited for a loan modification?

Blanchard - Direct                                    115

1    A.    Yes.

2    Q.    Okay.  And is the first step being solicited?

3    A.    Yes.

4    Q.    Okay.  And then what's the second step?

5    A.    The borrowers send in a complete application.

6    Q.    Okay.

7              MR. HEENAN:  And what I'd like to do with the Court's

8    permission, Your Honor, is if I can leave the podium and go

9    draw some notes over there please?

10             THE COURT:  Sure.

11             MR. HEENAN:  Thank you, Your Honor.

12   BY MR. HEENAN:

13   Q.    So I made kind of a really ugly flow chart, but I thought

14   I'd try and clean up a little bit so we can understand this

15   process.  So first is solicitation, right?  Solicit the

16   borrower, is that fair?

17   A.    Right.

18   Q.    So then after solicitation, the ball jumps to the

19   borrower, right, and they have to -- what do they have to do?

20   A.    They make a decision on what option they wish to pursue.

21   Q.    Okay.  And what if they want to pursue modifying their

22   loan and bringing it current?

23   A.    They need to send in a full complete application.

24   Q.    Okay.  So --

25             MR. SHATZ:  Your Honor, we ask the witness to move

1    the microphone please.  Thank you.

2    BY MR. HEENAN:

3    Q.    So the borrower sends in an application, right?

4    A.    Yes.

5    Q.    And then it becomes Ocwen's job to determine whether it's

6    complete or not, right?

7    A.    Yes.

8    Q.    So we'll put question mark here.  Ocwen has to decide when

9    the borrower submits the application is it complete, yes or no,

10   right?

11   A.    Right.

12   Q.    And if it's no, then what does Ocwen have to do?

13   A.    After review they go back to the borrower and advise them

14   what is missing.

15   Q.    Okay.  And is that what's called a five-day letter?

16   A.    Yes.

17   Q.    Okay.  So if it's no, they send the five-day letter,

18   correct?

19   A.    Yes.

20   Q.    And just so we are all on the same page, what's the five-

21   day letter?

22   A.    Just states what is missing and documents to send in.

23   Q.    And what's the point of it?

24   A.    We can't proceed and move this into review for

25   modification until they have a complete application.

1   Q.   Okay.  Let's talk about that.  If it is a complete

2   application, then kind of what's the next step in the decision

3   tree?  It gets reviewed, is that fair?

4   A.   Yes.

5   Q.   Okay.  And so in the review what are the outcomes that can

6   happen?

7   A.   In the review it's either modify or decline.

8   Q.   Yeah.  Approve or decline?

9   A.   Yes.

10  Q.   Modify or decline.  And if you send the five-day letter,

11  then what's the next thing?  It's kind of up to the borrower

12  isn't it?

13  A.   Yes.

14  Q.   And the borrower's choices are to basically send in the

15  documents that Ocwen needs to make it complete or to not and

16  basically fall out, is that fair?

17  A.   They can either send in the documents or explain if

18  there's a discrepancy.  There might be a discrepancy as well.

19  Q.   Okay.  So it's basically after they send the letter then

20  it comes to the borrower's response, fair?

21  A.   Yes.

22  Q.   And if the borrower doesn't respond, no, then they're out,

23  right?  I mean if Ocwen sends a letter hey, you need to get us

24  this, this and this and the borrower throws it in the garbage,

25  then they're not going to ever get to this review, is that

1   fair?

2   A.   Yes.

3   Q.   The only way they can get to the review is if there's a

4   complete application?

5   A.   Yes.  A complete application.

6   Q.   So if the borrower responds, basically they get sent back

7   up to here, right?

8   A.   You're -- I see what you're doing here, but really

9   everything is in the completion -- complete application until

10  the underwriter says it is complete.

11  Q.   Yeah.

12  A.   So on the face value --

13  Q.   So -- yeah.  Go ahead.  Sorry.  I didn't mean to cut you

14  off.

15  A.   Face value, we get things in and from face value they look

16  at it and they see if that's a document that looks like it

17  matches, but the underwriter makes the ultimate determination

18  if this is a complete application or not.

19  Q.   Okay.  But yeah.  So basically if you say hey, send this

20  and this, the borrower sends this, this and this; and then it

21  could be that they're still missing something, and then -- is

22  that fair, it could be that they're still missing something?

23  A.   Yeah.  If they're still missing something, they still need

24  to complete that application.  Nothing gets pushed forward to

25  review.

1   Q.   They never get pushed forward to review until there's a

2   complete application, is that fair?

3   A.   Yes.  And I mean that the underwriter determines that it's

4   not a complete application, the borrower's advised and it stays

5   in the -- the complete application -- I mean that stage that

6   you're putting there.

7   Q.   Okay.  So we can -- in general terms that's kind of the

8   way the process works.  Can we agree to that?

9   A.   In general, yes.

10  Q.   Okay.  And just so -- I don't want us -- I don't know.  I

11  apologize if this is stuff everybody knows, but just so we're

12  all tracking.  The purpose of a modification is it basically

13  recaptures that arrearage and brings the loan current, is that

14  fair?

15  A.   It can capitalize the arrearage, yes.

16  Q.   Does it bring the borrower out of default?

17  A.   Yes.

18  Q.   And brings the loan current?

19  A.   Yes.

20  Q.   Okay.  And takes them out of the foreclosure path?

21  A.   Well there's more steps that need to happen, but you know,

22  there's the offer of the modification, and then there's the

23  payments that need to follow.

24  Q.   Okay.  So the review is basically should we offer them a

25  mod or decline them a mod, right?

Blanchard - Direct                                    120

1    A.    But there's also -- it can actually be with the

2    underwriter and the underwriter says that it's not complete, so

3    it's pushed back to complete, so maybe that's not a --

4    Q.    Okay.  And if the underwriter says it's not complete, then

5    they just come back to here and they get sent the five-day

6    letter and told to send more documents?

7    A.    Right.

8    Q.    Okay.  But kind of the final step here is just if there's

9    an offer of modification, because you're right, sir, then the

10   borrower again has to decide yes, I'll accept it or no, I

11   won't.  And if they accept it, then they sign the documents and

12   they have to make the payments, is that fair?

13   A.    That's -- in general, yes.

14   Q.    Okay.  For someone to be approved for a modification they

15   have to be internally reviewed, is that fair?

16   A.    Yes.

17   Q.    And for it even to reach the review stage there has to be

18   a complete application?

19   A.    Yes.  Except for what I stated, if the underwriter gets it

20   and they see that it's not complete.  Because when these

21   documents come in it's just face value.  There's no

22   verification.  There's just -- you know, it's a document that

23   states this and they submit it to the underwriter.  Now the

24   underwriter could come back and say no, this is not sufficient

25   so it's still incomplete.

1   Q.   And the -- just so everyone knows, Ocwen doesn't just take

2   the borrower at face value for what they fill in on an

3   application, is that fair?

4   A.   This -- well it's not just Ocwen.  Again, this is HAMP

5   guidelines.  If we don't have the supporting documents, Ocwen

6   could be fined by HAMP for letting somebody in the program

7   without sufficient approval documents that they -- because they

8   (indiscernible) for that.

9   Q.   And so for that reason they'll get the borrower's consent

10  to like pull their tax returns, pull the credit reports, look

11  at kind of other documentation to verify the information that's

12  being provided?

13  A.   Yes.  But the borrower sends up a -- sends in their own

14  4506 TD with their tax documents and things -- and tax filings,

15  profit and loss statements.

16  Q.   They give a release so that Ocwen can get like the credit

17  report -- can pull their credit report?

18  A.   I have seen credit report pulling in reference to that,

19  yes.

20  Q.   Okay.

21  A.   I don't know that the credit itself is a determining

22  factor.

23  Q.   But the only way -- I mean the only way Ocwen can look --

24  well I guess they could look anyway, couldn't they, even if the

25  borrower didn't give them permission?

Blanchard - Direct                                    122

1    A.    I'm not sure.

2    Q.    It doesn't matter.  I'll go back to my post here.  We've

3    looked at the sale date of March 27th, right?

4    A.    Yes.

5    Q.    And --

6              MR. HEENAN:  I apologize, Your Honor.  Can we have a

7    sidebar in front of you?

8              THE COURT:  Sure.

9         (Sidebar begins.)

10             MR. HEENAN:  Given the witness's answers about not

11   knowing what dual tracking is, at this point in time I would

12   like to impeach him with the documents that we referenced this

13   morning.  I'm very mindful of the way the Court left the

14   hearing before the jury came out, so I just don't want to -- I

15   don't want to lose my ability to make a record by not asking

16   the questions.

17             THE COURT:  I think what we're going to do -- what

18   we'll do is we'll let the jury go, you can ask those questions.

19   That'll give me a firmer understanding of what his responses

20   are going to be on that topic and you'll have a record.  If it

21   turns out it's something the jury should hear, we'll do it

22   again in front of the jury.

23             MR. HEENAN:  Thank you, Your Honor.

24             THE COURT:  All right.

25        (Sidebar ends.)

Blanchard - Direct                                    123

1    BY MR. HEENAN:

2    Q.    Okay.  So we looked at the document showing the sale date

3    was March 27th, right?

4    A.    Yes.

5    Q.    And we know that -- we're going to talk about in a minute

6    that the Cornejos' home was not sold on March 27th, is that

7    your understanding?

8    A.    Yes.

9    Q.    How come?

10   A.    I believe in reference to this I saw some notation in

11   reference to a solicitation process that had not been -- the

12   solicitation process was the reason for it being pushed back

13   again.  So they wanted that process to finish.

14   Q.    Okay.  Is it easy or hard for Ocwen to push off a

15   foreclosure sale?

16   A.    When given enough time, there is -- it's something that

17   can be done given enough time, but there's several things that

18   need to happen before it's actually pushed off.

19   Q.    Okay.  What are those things that need to happen before it

20   can be pushed off?

21   A.    Well there's communication to the trustee and an order to

22   stop and a reasoning to stop.

23   Q.    Okay.  So you need -- without kind of getting into what

24   the reason would be, in order to push off a sale you need a

25   reason, fair?

1   A.   Right.

2   Q.   And then you need to communicate to the trustee, correct?

3   A.   Right.

4   Q.   How's that communication achieved?

5   A.   A majority of communication is actual emails.

6   Q.   Okay.  So let's look at -- well let me just ask you, what

7   was the reason that the Cornejos' sale was pushed off from

8   March until April?

9   A.   The notation I saw was in reference to solicitation.

10  Q.   Okay.  Is that -- now let's have you look at the joint

11  binder in the servicing notes.  So it's Exhibit 4, I think page

12  28 please.

13  A.   Did you say -- what number?

14  Q.   The JT one, the joint one.

15  A.   Yes.

16  Q.   And it's tab 4, page 28.

17  A.   Okay.

18  Q.   Okay.  So does this document -- does this help us to know

19  the reason why the sale was pushed off?

20  A.   Yes.

21  Q.   And what was the reason?

22  A.   It said solicitation not completed.

23  Q.   Okay.  And so if we look at our chart that we made up

24  together, solicitation's kind of the first stage, is that fair?

25  A.   Yes.

1    Q.    No application has even been submitted?

2    A.    I don't know that I've seen the application before this

3    time frame.

4    Q.    And I guess I was thinking of solicitation like dear Mr.

5    and Mrs. Cornejo, we'd like to invite you to apply for

6    foreclosure alternatives.  Is that -- but I don't want to --

7    maybe Ocwen's understanding's different.  I guess I just --

8    what's that -- how can a solicitation not be complete I guess

9    is the better question?

10   A.    This was a decision that was made at that time by the

11   foreclosure department.  It might have something to do with the

12   date that the foreclosure notice was given because there's

13   several solicitations in my review from other documents that

14   had been going on since 2013 or even earlier, whenever the --

15   in my review of the correspondence sent to the borrower.

16   Q.    Okay.  So my question is, so do we agree this morning that

17   kind of the only -- your awareness is basically found in

18   whatever Ocwen's business records say, is that fair?

19   A.    Yeah.  My personal knowledge is based on review of the

20   business records.

21   Q.    Yeah.  You're not the one that chose to move the sale

22   date, right?

23   A.    Correct.

24   Q.    Right.  Who's the one that chose to move the sale date?

25   A.    It looks like Puga Shurshan (phonetic) had requested it.

1   Q.    Okay.

2   A.    He requested it and the parties that he requested it to

3   went ahead and ensured that it was done.

4   Q.    Okay.  And when did he make that request?

5   A.    This looks like this was made on March 10th of 2015.

6   Q.    Okay.  At 11:52 p.m.?

7   A.    Yes.

8   Q.    Okay.  And it's via email, and let me I guess before we

9   move on, the solicitation not completed, what's that mean when

10  Ocwen's business records say solicitation not completed?

11  A.    There's a certain solicitation time frame that they had

12  attached to this.  I don't know what that time frame is.

13  Q.    Well what -- what's solicitation time frame mean?

14  A.    It's just a -- they're saying the solicitation was not

15  completed, so there -- it might be a time period that they need

16  to have in place before they can actually do the actual

17  foreclosure.

18  Q.    So does that mean that whatever Ocwen's -- is it fair that

19  Ocwen doesn't proceed with the foreclosure until a solicitation

20  is completed?

21  A.    If they're in the act of the solicitation at that point,

22  they will push it -- they will move to push it back as long

23  as -- I mean it's not something that's going to keep occurring,

24  you know, every month or every day, but I have seen where

25  they've pushed it back for that.

1    Q.   What's the most amount of times that you've seen a

2    foreclosure sale date pushed back?

3    A.   I don't know.  I would say I've seen it pushed back

4    multiple times.

5    Q.   Yeah.  And just so that -- I mean just so we're not

6    misunderstanding, it's not like a one-shot deal, right?

7    A.   That depends on the investor.

8    Q.   Okay.  Do you have any awareness with respect to the

9    investor U.S. Bank in this case, that they directed to Ocwen

10   that it was only a one-shot deal?

11   A.   I don't know that I've seen the communication in reference

12   to that, no.

13   Q.   Okay.  So we wouldn't have any business record that we

14   could talk at -- look at together that would explain that

15   basically the Cornejos only got one extension?

16   A.   I don't know that -- I don't know all that's been provided

17   here, but you know, I've seen certain things like if it's the

18   investor -- you have the investor, but it could be, you know,

19   certain situations where it's a Freddie loan or something to

20   that and they have their own specific things that they allot to

21   go on.  Like you know, some say you can only get modified once

22   or, you know, things of that nature.  But I don't know what it

23   is in reference to this one.  I don't have the investor

24   guidelines.

25   Q.   Okay.  And -- but in any event, the reason it's pushed

1   down the road is because the solicitation has not been

2   completed, correct?

3   A.    Correct.

4   Q.    And that's on Ocwen, right, to complete the solicitation?

5   A.    Right.

6   Q.    Okay.  And so this email goes out on 11:52 on March 10th

7   and how long does it take before the trustee can process and

8   postpone the foreclosure?

9   A.    This -- well the next notation is March 11th at 6:16 a.m.

10  Q.    I'm sorry, March 11, 6:16 a.m.?

11  A.    Uh-huh.  Yes.

12  Q.    So basically within seven hours, is that fair?

13  A.    Yes.

14  Q.    Okay.  And my co-counsel's pointing out that I -- let me

15  go back with you to the 4-24.  Before the sale gets postponed,

16  it looks like on February 20th there's a contact or phone

17  communications between Ms. Cornejo and someone at Ocwen, is

18  that correct?

19  A.    Okay.  This looks like -- I mean I have to go to JT4-23 --

20  Q.    Okay.  Sure.

21  A.    -- to see the start of all the notes.  And this is just

22  a -- actually an example of where we make these appointments

23  for the borrower.  So like for appointments where we make in

24  reference to their modification.  And so there was a set

25  appointment for February 20th and Ocwen called the borrower.

1  It looks like the appointment was set up with Frank.  Call back
2  appointment completed, schedule conflict.  So yeah, it was an
3  actual appointment that Ocwen had set up with the borrower to
4  discuss the alternatives, and I can see that they were
5  discussing modification.
6  Q.   And what tells us that?
7  A.   The -- on 4-25 you see the middle notation?  It's notated
8  as a modification question and under that, on 4-25 you see the
9  agent notes and this is what they're actually typing in.  This
10 is not a script.
11 Q.   So if we look at the 4-25, agent reviewed notes and
12 determined accurate.  Advised borrower that we have not
13 received an RMA package, advised how to print package online
14 and provided a fax number to return, scheduled follow-up
15 appointment to go over package in detail.  Who's Jentle Eison
16 in there?
17 A.   And it also said advised of foreclosure sale date.
18 Q.   Yes.
19 A.   The Jentle Eison I believe is one of the relationship
20 managers that was assigned as a direct contact.  So usually
21 when these appointments are set they're set with the
22 relationship manager, so they have a -- like a direct point of
23 contact.  It could change throughout the loan, but I believe
24 Jentle Eison is one of them at this point.
25 Q.   That's a great point that I didn't close the loop on.  If

Blanchard - Direct                                    130

1    we could go back to Plaintiffs' Exhibit 6, basically as I

2    recall what that document looked like --

3              MR. HEENAN:  Page two please Wade.

4    BY MR. HEENAN:

5    Q.   -- and kind of the resolving loans part again.  So under

6    Ocwen's dual path there's kind of -- there's two people, right?

7    There's specialized foreclosure coordinator and then there's a

8    loan resolution consultant, is that fair, one for each path?

9    A.   Yes.

10   Q.   Okay.  So who was -- with respect to the Cornejos' loan,

11   who was their specialized foreclosure coordinator?

12   A.   That would be listed through -- in the -- if I go to the

13   comment logs in my system I can put contacts -- just press a

14   button that says contacts and it would list all the foreclosure

15   coordinators.  Other than that, it might be listed somewhere in

16   the comment logs if they specified as a foreclosure

17   coordinator.  It could change throughout the life of the loan.

18   It doesn't mean that the person you start with is the person

19   you end with.

20   Q.   Okay.  So is it fair as you sit here today, based on your

21   review of the business records, you couldn't tell me whether

22   there was one or multiple specialized foreclosure coordinators

23   and if there were, who those individuals were?

24   A.   I could look at the notes and see if I can determine that.

25   I don't have a name that comes to memory.

1  Q.   Okay.  Have you spoken with any of the people that were

2  designated as specialized foreclosure coordinators with respect

3  to the Cornejos' loan?

4  A.   Yes.  I spoke to a foreclosure coordinator.

5  Q.   Who's that?

6  A.   Stephanie.

7  Q.   Okay.  And what did Stephanie -- Stephanie, what's her

8  last name?

9  A.   I believe it's Winter [sic].  We should have something

10  here with her name on it.

11  Q.   Okay.  And that was after your deposition but before this

12  trial?

13  A.   Correct.

14  Q.   Okay.  And what did Stephanie say?

15  A.   I just talked to Stephanie about the process of the

16  foreclosure and the events surrounding the foreclosure at that

17  time.

18  Q.   Okay.  Was she the specialized foreclosure coordinator on

19  April 29th when the Cornejos' home was sold?

20  A.   Yes.

21  Q.   Okay.  And then who was the loan resolution consultant?

22  A.   I believe it's this Jentle Eison, but we can just take a

23  look at the last appointment and see -- make sure it never

24  switched.

25  Q.   Is Jentle Eison a man or a woman?

1    A.    I don't -- I can't tell you based off of the name.

2    Q.    Me either and that's why --

3    A.    Yeah.  I don't know.

4    Q.    Have you spoken to that person?

5    A.    No.

6    Q.    Okay.  Do you know where that person physically works

7    from?

8    A.    No.

9    Q.    Okay.  In your contacts program at Ocwen do you have the

10   ability if you wanted to talk to this individual to get their

11   phone number?

12   A.    Yes.

13   Q.    Okay.  So now if we can go back to the 4-24, 4-25.

14         MR. SHATZ:  That was plaintiffs?

15         MR. HEENAN:  Joint 24.

16         THE WITNESS:  Okay.

17   BY MR. HEENAN:

18   Q.    Well like on that note on the bottom, agent notes from

19   this Jentle Eison, follow up on RMA package.

20   A.    Yes.

21   Q.    What's RMA?

22   A.    It's the request for modification application.

23   Q.    And what's that mean follow up on?

24   A.    That's what the call back was in reference to.  They

25   called back and there's several calls.  They'll make a call and

1    discuss the RMA, to let the borrower know what is expected of

2    them and if they had any questions on things to cure on that

3    RMA they would advise or -- they can ask -- just basically can

4    ask any questions they want on the modification because this is

5    the individual that's responsible for helping them or assisting

6    them get the mod.

7    Q.   Is it fair that it looks like according to Jentle Eison's

8    notes that the Cornejos did not have an application at that

9    point in time?

10   A.   He did -- he or she did verify that the borrower has --

11   advised borrower that we have not received the RMA package from

12   the borrower at that point.

13   Q.   And Jentle is giving direction to Mrs. Cornejo about how

14   to print the package online?

15   A.   Yeah.  We try to make it as simple for the borrower as we

16   can.  You can go online and print it.  You can fax it in.  You

17   don't have to mail it in.

18   Q.   Okay.  And what's RMA?  Define that for me please.

19   A.   I believe that's request for a modification application.

20   Q.   Okay.  So then by February 27th anyway the sale date is

21   postponed because Ocwen's solicitation protocol has not been

22   completed?

23   A.   Right.

24   Q.   Okay.

25           THE COURT:  All right.  Ladies and gentlemen, let's

Blanchard - Direct                               134

1    go ahead and take our lunch break.  I'll see you back in the

2    jury deliberation room at 1:30.

3         (Jury out at 11:56 a.m.)

4              THE COURT:  All right.  We're outside the presence of

5    the jury.  As we talked about at sidebar, Mr. Heenan, you may

6    proceed as to the additional area that you were previously

7    indicating.

8              MR. HEENAN:  Thank you, Your Honor.

9              MR. SHATZ:  Your Honor, in this case without the jury

10   here, does my not objecting so we can get through the questions

11   cause me to waive my objections should he have to redo them?

12             THE COURT:  I want your objections at this time.

13             MR. SHATZ:  Thank you.

14             MR. HEENAN:  Bear with me please, Your Honor, I kind

15   of moved that packet off to the don't ask pile.

16        (Pause.)

17   BY MR. HEENAN:

18   Q.   Your testimony that you gave in front of the jury is that

19   you're not familiar with the phrase dual tracking?

20   A.   I haven't heard that brought up in any cases that I've

21   had, but I do understand what you mean by it.

22   Q.   Okay.  Are you aware of the fact that in December of 2014

23   Ocwen entered into a consent decree with the New York State

24   Department of Financial Services?

25             MR. SHATZ:  Objection.  Relevance, documents not

Blanchard - Direct                                    135

1    produced during the course of the case in a timely manner and

2    we're not in New York.

3              THE COURT:  The objection's overruled.  You may

4    answer.

5              THE WITNESS:  I guess I don't know what document

6    you're -- if you have a document in front of me you're

7    questioning me on, but I haven't reviewed this document if

8    that's what you're asking.

9    BY MR. HEENAN:

10   Q.   Okay.  You're aware, because you have in front of you,

11   Joint Exhibits and Plaintiffs' Exhibits and Defendants'

12   Exhibits, did you not have the opportunity to review the trial

13   exhibits that were designated in this matter?

14   A.   The trial exhibits, if it is in the exhibit binders I

15   won't say that I might not have glanced over it as it pertains

16   to this case, but I do not know the details of this agreement.

17   Q.   Okay.  Well just to cure the one objection, have you been

18   provided prior to today the exhibits that have been designated

19   for trial in this matter?

20   A.   Yes.

21   Q.   Okay.  Let me have you look at Plaintiffs' Exhibit 47.  As

22   an employee within the legal department at Ocwen Loan Servicing

23   were you aware of the fact of Ocwen entering into consent

24   judgment -- or sorry, consent decree with the New York

25   Department of Finance?

1    A.   My extent of the knowledge on that, I am aware of some

2    type of agreement that's placed with the Attorney General of

3    New York.  I'm not aware, nor was I a part of this deal of the

4    specific details in it.

5    Q.   I'm not asking that.  I'm just asking if you're aware of

6    the fact of this consent decree being entered into between your

7    employer and the New York Department of Financial Services.

8    A.   I know that there was an agreement reached with the

9    attorney general.  I don't know if this represents that

10   agreement in its entirety.

11   Q.   Okay.  And I mean, you know, your testimony in front of

12   the jury that you communicate with fellow employees, right?

13   A.   Okay.

14   Q.   Is that fair?

15   A.   Yeah.

16   Q.   The fact that a regulator, and your employer entered into

17   a deal where your employer's CEO had to resign as chairman of

18   the board, I mean that had to have been the type of thing that

19   people within Ocwen talked about didn't they?

20   A.   They would say in --

21        MR. SHATZ:  Objection.  Relevance.

22        THE COURT:  Mr. Heenan, I'm not sure what you're

23   trying to establish here.  If you're trying to impeach him -- I

24   guess I'm even kind of wondering where you're going.  Let's say

25   he admits that he's read this document or -- but what I'm

1    hearing so far is he has not read this document.  You're now

2    suggesting that he may have heard from other sources some

3    information about this document.  I just can't grasp where

4    you're going with that.  Let's say he admits he talked to his

5    co-worker about this document.  Where ultimately are you going

6    with this?

7            MR. HEENAN:  Is what happens from that point and why

8    aren't -- why doesn't he know what dual tracking is when it's

9    listed as one of the discreet violations.

10           THE COURT:  Let's cut to it then.

11           MR. HEENAN:  Yeah.  Okay.  Well I was trying to cure

12   a foundation objection, Your Honor.

13           THE COURT:  The lack of foundation still exists.  He

14   says that he may have seen this document, he doesn't know the

15   details of it.

16           MR. HEENAN:  Okay.

17           THE COURT:  But I don't think that means that you

18   want to stop your questioning.  It's not going to cure that

19   situation though.

20           MR. HEENAN:  Thank you, Your Honor.

21   BY MR. HEENAN:

22   Q.   Are you aware, sir, that one of the -- well are you aware

23   of the fact that Ocwen was under review by a compliance monitor

24   as it related to its conduct there?

25           MR. SHATZ:  Objection.  Vague, lacks foundation,

1   relevance.

2          THE COURT:  As to New York, Mr. Heenan, or some other

3   issue?

4          MR. HEENAN:  Yes, Your Honor.

5          THE COURT:  Do you know, Mr. Blanchard?

6          THE WITNESS:  Right.

7          MR. SHATZ:  Objection.  Relevance to New York and the

8   California law.

9          THE COURT:  Overruled.

10          THE WITNESS:  I'm not trying to be difficult, but you

11   might use certain terms that, you know, I might not have heard.

12   Like I am aware that that there was some type of agreement

13   reached with the attorney general in which there was certain

14   auditing that they did and certain things put in place.  I'm

15   not aware of the specifics of the allegations within the

16   document.  This was not circulated to me by Ocwen.

17   BY MR. HEENAN:

18   Q.   Okay.  Are you aware that a compliance monitor found

19   violations by Ocwen including pursuing foreclosure even while

20   modification applications were pending quote, dual tracking,

21   end quote?

22   A.   Again, I am not familiar with that term being used when

23   describing the attorney general, whatever their agreement is.

24   The specifics of the agreement is not something that we have

25   discussed and this is definitely not something that they walk

Blanchard - Direct                                    139

1   around in a coffee break room as you suggested and have a

2   discussion about.

3   Q.   How about this, I mean these are discreet concerns the

4   state regulator had about the way Ocwen was doing business with

5   respect to the dual path that you've talked about aren't they?

6   I mean look at --

7   A.   I don't know.

8   Q.   Well look at page six.  Let me ask this.  Your testimony

9   earlier in front of the jury was that you couldn't foresee what

10  problems there may be with the dual pathing protocol that Ocwen

11  uses.  Isn't this a document showing that a state regulator has

12  found discreet misconduct by Ocwen in quote, pursuing

13  foreclosure even while modification applications were pending,

14  dual tracking, end quote?

15          MR. SHATZ:  Objection.  Argumentative, relevance as

16  to this case.

17          THE COURT:  Overruled.  But you said at page six, 47-

18  6?

19          MR. VITIELLO:  It's at the top.

20          MR. HEENAN:  It's at the very top, the first bullet

21  point, Your Honor.

22          THE COURT:  Oh, starting it.  Okay.

23          THE WITNESS:  So you're just asking me the question

24  about what it reads on this document at the top of the page?

25          MR. HEENAN:  I don't -- I think my question was more

Blanchard - Direct                                    140

1   than is that what it reads.

2           THE COURT:  It is the question because that's how I

3   heard it too.

4   BY MR. HEENAN:

5   Q.   (Indiscernible) is that what it reads?

6   A.   I can I mean read the --

7           THE COURT:  The document's marked.  It's in -- if

8   need be, it's available on the (indiscernible) so you don't

9   have to do that.

10  BY MR. HEENAN:

11  Q.   Is that what it says?

12  A.   Do you want me to read the document?  So we're talking

13  about item No. 12 on this document?

14  Q.   Yes, sir.  Well I want you to read the first bullet point

15  on page six.

16          THE COURT:  Mr. Heenan, again, the document's before

17  us all, it's in the record.  It's not been admitted, but it is

18  available for purposes of appeal.  I don't think we all need

19  to -- we all have seen it.

20          MR. HEENAN:  Okay.  Thank you, Your Honor.

21  BY MR. HEENAN:

22  Q.   So my question is this, this is -- you have a state

23  regulator and Ocwen entering into a consent decree where Ocwen

24  acknowledges these discreet violations including dual tracking

25  with the state regulator.  This is in December of 2014 and it's

1   your testimony that as you sit here today you've never heard

2   dual tracking?  Am I -- does that lead me to understand that no

3   one within the legal department provided this document or a

4   summary to you as an employee within the legal department?

5           MR. SHATZ:  Objection.  Compound.

6           THE COURT:  There was a couple of questions there.

7           MR. HEENAN:  Sorry, Your Honor.

8           THE COURT:  Let me ask this question.  Mr. Blanchard,

9   were you ever aware that Ocwen had been subject to the consent

10  decree for their practice of dual tracking?

11          THE WITNESS:  Not that dual tracking was a charge.  I

12  am aware that they had a situation with the attorney general.

13  I didn't hear the term dual tracking as a part of it, but you

14  know --

15          THE COURT:  Were you ever aware that the consent

16  decree entered into with the attorney general as you've

17  described it criticized the practice of dual path?

18          THE WITNESS:  They never used that term.  So if we're

19  talking about the -- have I heard the term and the wording, no.

20  Now in reference to the actual allegations, maybe they might

21  have talked of some of the instances in here, but I never heard

22  the term dual tracking.

23          THE COURT:  Right.  But had you heard that they

24  were -- Ocwen was criticized for using a dual path?

25          THE WITNESS:  I never heard that term.

1        THE COURT:  In connection with this consent decree,

2   is that what you mean?

3        THE WITNESS:  Right.  I didn't know that -- I don't

4   know all the details of this particular agreement.  I was no

5   part of it and this was not circulated to me.

6        THE COURT:  Do you know of any sort of legal action

7   taken by the Department of Justice of any state where the

8   attorney general in the state had criticized Ocwen's practice

9   of dual path?

10        THE WITNESS:  Again, that term, they don't use that

11   term.

12        THE COURT:  Right.  But have you heard that?

13        THE WITNESS:  No.  Not that they're saying dual path.

14   I mean they might -- maybe they might state what it is they're

15   actually -- the allegation and not using that term.

16        THE COURT:  All right.  So have you heard the

17   Department of Justice of the United States and the attorney

18   general of any state criticizing the practice in which a

19   borrower is placed both on the path for foreclosure as well as

20   on the path for loan modification?

21        MR. SHATZ:  Objection.  Relevance to the Court's

22   question --

23        MR. HEENAN:  Overruled.

24        MR. SHATZ:  -- because the issue has never been

25   this --

Blanchard - Direct                              143

1          THE COURT:  I don't appreciate this.  We're making a

2     record here.  I'm trying to understand the extent of his

3     knowledge on this topic because so far my understanding is he's

4     unaware of any of it.

5          THE WITNESS:  Do I answer this?  I'm confused.  Okay.

6     Your Honor, that's what I was trying to point out.  Everyone

7     that is under Ocwen, they are solicited for alternative

8     measures.  So that's every single case.

9          THE COURT:  As I see it, Mr. Heenan --

10         MR. HEENAN:  Sorry, Your Honor, can I just pick up

11    where the Court left off and then --

12         THE COURT:  Let me just tell you where I'm at at this

13    point and that is he's admitted in testimony, you've shown a

14    document that Ocwen openly placed its borrowers on the path to

15    foreclosure at the same time as it's on the path for loan

16    modification; whether it's called dual tracking or something

17    else, doesn't that get you where you want to go?  What else are

18    you trying to accomplish with this document?

19         MR. HEENAN:  Well Your Honor, where I can go now,

20    based on the Court's better examining than I was fumbling

21    around, is to say no one within Ocwen sent you a memo, sir, or

22    otherwise made -- well made you or anyone else aware that

23    these -- this dual pathing that Ocwen openly (indiscernible)

24    has been criticized and been the subject of these various

25    regulatory actions.

1        THE COURT:  Mr. Heenan, now you're just arguing.  The

2    question he's already said, he's never heard about it, haven't

3    told him about that.  So now you're just summarizing it in

4    argument form.  Was there some sort of evidentiary issue you'd

5    like to raise or do you just want to make that argument to the

6    Court?

7        MR. HEENAN:  Well what I want to point -- what to me

8    is the crux of the willful and reckless, Your Honor, is here's

9    conduct that's almost immediately precedes what happens to the

10   Cornejos and all the testimony the jury's heard so far is yeah,

11   this is dual pathing and it's fine when we all know that that's

12   not fine and --

13       THE COURT:  But how do we know that?  Isn't it

14   because the California law says that?

15       MR. HEENAN:  That's one way, but the other way is we

16   know it is because the California Attorney General, a year

17   before --

18       THE COURT:  Don't get on that topic.  I think we're

19   now (indiscernible) --

20       MR. HEENAN:  Okay.  Sorry, Your Honor.

21       THE COURT:  -- but the law says, as I understand it,

22   you're not supposed to do dual tracking, right?

23       MR. HEENAN:  That's my understanding.  That's why

24   they --

25       THE COURT:  So then why is this document important

1     that came out of New York that he's unaware of?

2          MR. HEENAN:  Because it shows that they were

3     committing the same conduct, called to task on exactly the same

4     conduct and committed the same exact thing as it relates to the

5     Cornejos.

6          THE COURT:  Right.  He says he doesn't know about it.

7     He didn't know about this, so what further evidence do you want

8     to use on that topic?  Because it seems like what you're saying

9     is let me ask one more question to again ask do you know about

10    it because that was your last question.  Nobody sent you an

11    email or a memo telling you about that?

12         MR. HEENAN:  Yeah.  That's --

13         THE COURT:  If he doesn't know, he doesn't know.  You

14    could ask him did they send you a postcard with this thing, did

15    you send you a memo, did they send you an airplane flyover with

16    a flag behind it saying don't do this.  He's already said he

17    doesn't know, right?

18         MR. HEENAN:  Right.

19         THE COURT:  So I'm trying to figure out

20    (indiscernible) --

21         MR. HEENAN:  Then let me just elicit that testimony

22    in front of the jury and I'll stop right there.  We're not

23    still struggling with the relevance.  I mean reckless --

24         THE COURT:  Are you saying that you are withdrawing

25    your last question?  Because we're not talking about whether

1    you get to ask the questions this time.  What we're talking

2    about is is there any other questions as opposed to argument

3    that you would like to make with this witness?

4               MR. HEENAN:  Not with respect to dual tracking, Your

5    Honor.

6               THE COURT:  All right.

7               MR. HEENAN:  When we get into the computer stuff --

8               THE COURT:  Mr. Blanchard, you are excused for

9    lunch --

10              THE WITNESS:  Thank you.

11              THE COURT:  -- and you can take your lunch break.

12   You can stay here, you can stay in the courtroom or you can

13   leave; however you'd like to do that.

14              THE WITNESS:  Okay.

15              THE COURT:  What I am now aware of is that Mr.

16   Blanchard did not know about the criticism, either from the

17   State of New York or the attorney general on behalf -- in New

18   York or an attorney generals on the various states.  The issue

19   that we were discussing earlier though is whether these

20   documents should be -- whether the Court should take judicial

21   notice of them.

22              So let me hear from the defendants because it seems

23   to me it is a fair question to ask him, and the wording would

24   be something to work on, about whether the California law

25   permits dual tracking.

1    MR. PAINO:  Yeah.  I think in discussion with co-

2  counsel, California law doesn't prevent the practice of what

3  we've described as dual pathing and I think that's the struggle

4  here is the suggestion thus far has been that the practice of

5  dual pathing in and of itself is a prohibitive practice, and

6  under California law, practice of dual tracking is prohibited

7  only when there's a complete loan modification application.

8  That's the law.

9    THE COURT:  Right.

10    MR. PAINO:  And that's the struggle we're having here

11  is the relevance of this.  Dual pathing -- a suggestion that

12  dual pathing in and of itself is improper is not supported by

13  California law, and to the extent that there are other consent

14  decrees that talk about this practice -- and I would note that

15  most of these consent decrees were from the year prior to the

16  foreclosure sale in this case.  But even then, the issue in

17  this case, there's been suggestions that this somehow

18  demonstrates a level of recklessness, but the recklessness

19  determination for purposes of the Homeowner Bill of Rights is

20  still limited to recklessness within this specific instance.

21    And I don't think it's relevant that there may have

22  been prior instances in the past.  The critical inquiry in this

23  case is was there reckless conduct with respect to the review

24  of this specific loan modification application.

25    THE COURT:  And recklessness would be demonstrated by

Blanchard - Direct                          148

1   a showing that Ocwen was aware that they are prohibited to dual

2   track in instances in which there is a complete application but

3   continued regardless toward foreclosure, isn't that fair?

4           MR. PAINO:  I guess the difference is these

5   agreements don't reflect what the policy or the requirements

6   are in California.

7           THE COURT:  Are you taking the position that these

8   documents reflect, when they talk about dual tracking, that

9   it's something other than what California law prohibits?

10          MR. PAINO:  I think -- in California I think the --

11  without looking at the specifics of the documents, I think

12  there are -- in California, the law is specific.  The

13  prohibition on a foreclosure sale isn't triggered unless there

14  is a complete loan modification application and the statute

15  defines what a complete loan modification application is.

16          THE COURT:  The statute says anything that your

17  servicer requests within a reasonable time.

18          MR. PAINO:  All the documents that the servicer

19  requests within the reasonable time frame because I'm not sure

20  that the same language is -- and co-counsel may know that, but

21  I'm not sure if that's the same standard.

22          THE COURT:  Plaintiffs know that?

23          MR. ANGWIN:  Whether the New York standard is the

24  same --

25          THE COURT:  No.  Within the standard set forth in the

Blanchard - Direct                                    149

1   consent decree that came out of New York indicates what a

2   complete package is for purposes of dual tracking.

3          MR. ANGWIN:  I can look and find out, but my

4   understanding is their definition of tracking is the same as

5   every state's definition of dual tracking.  And I think what

6   counsel's trying to make is this is that -- and it's the point

7   that the witness is trying to make.  It's some -- it's one

8   level every borrower's on a dual path because the because

9   you're being considered for a loan modification, you also were

10  in some kind of danger of foreclosure.  So by definition,

11  everyone's on a dual path is what he said.

12         THE COURT:  Right.

13         MR. ANGWIN:  The prohibited practice is once the

14  borrower does certain things you can't do that anymore.  And

15  that's where the distinction is and that's what Ocwen's cited

16  for here.

17         And Your Honor, not only does his knowledge of this

18  go to willfulness and recklessness, his lack of knowledge also

19  goes to willfulness and recklessness.

20         THE COURT:  It does and it doesn't for a couple of

21  reasons.  One, maybe at the 30(b) deposition he was testifying

22  on behalf of the entity.  Here, despite the presentation at the

23  beginning of calling Mr. Blanchard, you asked for Mr.

24  Blanchard, right?

25         MR. ANGWIN:  Your Honor, and my understanding is

1    under Rule 45 -- the courts differ on this, but under Rule 45

2    we can't subpoena a witness under Rule 30(b)(6).

3                THE COURT:  Exactly.

4                MR. ANGWIN:  Right.  So --

5                THE COURT:  Right.  But you did ask for Mr.

6    Blanchard.

7                MR. ANGWIN:  That's because we were told he was the

8    most knowledgeable person and he would be testifying in that

9    capacity.

10                THE COURT:  And he may be on the categories that -- I

11   mean you didn't set forth categories in a Rule 45 subpoena.

12                MR. ANGWIN:  I don't think we can.

13                THE COURT:  I don't think you can either.  So when

14   you say we were told he's the person most knowledgeable, it

15   depends on what you're asking, right?  Because I guarantee

16   there's somebody at Ocwen who knows every detail about this

17   agreement.  If that was what you needed, then maybe a second

18   person was required to testify on that.

19                But even -- but what we're getting is the extent of

20   Mr. Blanchard's knowledge.  And if you're suggesting that if he

21   doesn't know, nobody knows and that's evidence that the entire

22   company failed to know this, then that's important information.

23   But as I understand Mr. Blanchard's role, he had no role in any

24   part of what happened to the Cornejos.  His understanding is

25   something later on and he's not even entitled to make

1    conclusions as to the character of the conduct buy op.  And so

2    I guess I'm trying to figure out what difference does it make

3    what Mr. Blanchard knows on that topic?

4           MR. ANGWIN:  Well Your Honor, a couple things.

5    Pardon me.  One is that the limitations placed upon a plaintiff

6    by Rule 45 are somewhat difficult to get around.  If Ocwen's

7    located in Florida, you know, there's a question whether --

8           THE COURT:  Except to be honest, you don't need Rule

9    45 in a trial, right?  Because they're employees of the entity.

10          MR. ANGWIN:  And we've had that discussion.  More

11   importantly, I think you went over this earlier when I was not

12   here, I apologize.  But this is not a consent decree where they

13   said okay, we're going to take a licking.  Ocwen agreed to all

14   these.

15          THE COURT:  Yeah.

16          MR. ANGWIN:  I mean they've said we agree to these

17   facts.  This is a fact.  If he's in the role he's in in the

18   legal department, if the legal department has not been

19   instructed about the illegality of dual tracking, doesn't that

20   get us to a place where we can ask what -- he's been in the

21   legal department six years.  If he's never heard of dual

22   tracking, isn't that something we can explore?

23          THE COURT:  I think you're mixing up a couple things.

24   First, as I read this --

25          MR. ANGWIN:  I often do.

Blanchard - Direct                                152

1          THE COURT:  -- the excerpt of the New York, it

2     doesn't say that anybody agrees to the facts.  In fact, it says

3     we deny this, we're not admitting that this is true, right?

4          MR. ANGWIN:  I think you're looking at the --

5          MR. HEENAN:  I think that's true with respect to the

6     consent judgment --

7          THE CLERK:  The microphone.

8          MR. ANGWIN:  Yeah.  Your Honor, there's a consent

9     judgment and a consent decree.  So I'm looking at page -- the

10    consent order which is Plaintiffs' Exhibit 47.

11         THE COURT:  Yeah.

12         MR. ANGWIN:  And on page two it says now therefore to

13    resolve this matter the parties agree to the following.

14         THE COURT:  All right.  And where does it say what

15    dual tracking is and what is at issue?  I see in paragraph

16    eight that they said there was a violation of some other

17    agreement related to dual tracking.  I don't see where it says

18    what they mean by that.

19         MR. ANGWIN:  Paragraph 12, Your Honor.  They agreed

20    to the contents of paragraph 12 which includes that they --

21         THE COURT:  But they're defining modification -- dual

22    tracking differently than the California law, do you agree with

23    that?  It's saying that pursuing foreclosure even while

24    modification applications are pending is considered dual

25    tracking.

1          Under California law as set forth by Mr. Shatz, it's

2     illegal if you have a complete application, right?

3          MR. ANGWIN:  I think it's illegal in both scenarios,

4     Your Honor, because you know, they know more about this law

5     than I do.  I think that once there's an application they have

6     to decide whether it's complete or incomplete before they can

7     move forward, is that correct?

8          THE COURT:  Well let's assume that's true, if they

9     decide it's incomplete --

10         MR. ANGWIN:  Yeah.  And Your Honor, I think we're

11    getting into semantics a little bit, and we'll be glad to --

12    why don't we do this, you know, we need to look at this issue,

13    but our argument is this, and I think that for purposes of the

14    appellate record which probably is, you know, no disrespect,

15    but these are novel legal issues.  Our argument is a pending

16    application is much more analogous to complete application.

17         Now the fact that they might have used one word

18    different, I think that still falls our way when this is a

19    party admission.  You know, I understand the Court's concern,

20    but this is not saying -- no court has ever said you can't do

21    anything -- and that's the whole reason that the dual tracking

22    litigation started was lenders were saying look, we can't just

23    not do foreclosure ever.

24         THE COURT:  Right.

25         MR. ANGWIN:  And so they said okay, we'll put

1   protections in there; you can't do multiple applications, you

2   can't do certain things, but once it gets to a certain point

3   you cannot do the foreclosure and I think that's what the New

4   York --

5           THE COURT:  As I understand 2923.6 specifically says

6   that they must submit a complete and timely application for

7   first loan -- first-time loan modification, right?  That is the

8   requirement of the statute.  It's not vague.  That's what it

9   says.

10          MR. ANGWIN:  No.  I'm not saying that that's vague,

11  Your Honor.  I'm --

12          THE COURT:  My point though is you're now saying well

13  maybe what that means is it could mean that it's pending.  It

14  doesn't mean that, right?

15          MR. ANGWIN:  No.

16          THE COURT:  You have to have submitted a complete and

17  timely application.

18          MR. ANGWIN:  No, Your Honor.  I'm saying what New

19  York might've meant by pending was complete.

20          THE COURT:  Right.  I'm trying to contrast what they

21  said that -- to what the California law requires because if

22  those terms don't mean the same, where does that leave us?

23          MR. ANGWIN:  But what if they do mean the same, where

24  does that leave us?

25          THE COURT:  Yeah.  Here's the trouble though, I don't

1    get to interpret that document.  You're not asking me to do

2    that, and in fact my interpretation of that document is

3    completely irrelevant.  What you're saying is let's show this

4    jury and let's tell this jury that they acted willfully because

5    this consent decree said if you have an application pending you

6    have --

7              MR. ANGWIN:  I'm sorry, Your Honor.  That was

8    disrespectful.  I thought I had the solution and I was --

9              THE COURT:  What I'm saying is there's no showing

10   that it's the same and you're saying well if they've got to

11   comply here, that equals a failure to comply here in

12   California.  But you're telling me you don't know what pending

13   means.  What am I to do?  Call up the judge and go what do they

14   mean by pending?  Is that the same?

15             Because it doesn't even -- at least the little tiny

16   bit I've seen doesn't say a complete and timely application.

17   It says (indiscernible) modification applications were pending.

18   That does imply to me they see dual tracking as you get that

19   application you're done with that foreclosure, you better stop

20   right now.  That sounds like something different than what the

21   California law says.

22             MR. SHATZ:  May I --

23             MR. ANGWIN:  And can I say one thing?  I apologize

24   for speaking while you were talking, Your Honor.

25             THE COURT:  No problem.  Go ahead.

1          MR. SHATZ:  New York is a judicial foreclosure state

2    and the process is very different, so that the foreclosure

3    complaint is filed, there's an answer, there may or may not be

4    motion work and then there's a mediation or modification

5    conference that takes place and we can't even schedule a sale

6    until that modification mediation process goes forward, and

7    then the sale can be noticed and set forth.  The processes and

8    procedures are very different between New York and California.

9          THE COURT:  Okay.  Do you know that (indiscernible)

10   modification application was pending?

11         MR. SHATZ:  No.

12         THE COURT:  All right.  I guess what I'm kind of left

13   with is I think it is fair game to say to Mr. Blanchard, have

14   you heard from any source -- or you've heard from sources,

15   haven't you, Mr. Blanchard, that it is not proper for you to

16   continue on the second path of foreclosure if you have a

17   complete and timely application, isn't that true.  And I expect

18   he'll say yes.

19         MR. ANGWIN:  All right.  And Your Honor, just so I'm

20   clear, if we're able to make a showing tomorrow, if Mr.

21   Blanchard's still here, that the New York finding is closely

22   analogous to the same finding that would be a violation of

23   California law, can we then reopen this issue?

24         THE COURT:  I guess the trouble I'm having with this

25   too is, and I tried to make it pretty inartfully earlier, is

1   I'm not sure why we care what Mr. Blanchard thinks on this

2   topic.  If this is a proper matter for the Court to take

3   judicial notice, that document comes in without further

4   testimony.  So I'm not sure why we're having all this trouble

5   with Mr. Blanchard because there's no showing at all that he's

6   the person who should know this.

7           MR. ANGWIN:  Your Honor, it's just if he's been in

8   the legal department six years and never heard about it and in

9   fact New York means about the same thing as California, we

10  think it's --

11          THE COURT:  That's argument though.  That's just

12  argument.

13          MR. ANGWIN:  But to make that argument we need some

14  foundation to argue it to the jury.

15          THE COURT:  You're saying that if you can show that

16  he doesn't know about that -- my recollection of his testimony

17  is there's like 13 of his type, there's at least that many

18  lawyers, but he doesn't know the full extent of that legal

19  department.  You're telling me that person should know the

20  requirements of Ocwen that were in place by a consent decree?

21  That seems a little hard for me to understand.

22          MR. ANGWIN:  No.  Your Honor, I'm saying if Ocwen's

23  violating the laws of New York, which I think has the second

24  most mortgages after California, in a substantial way that

25  they're continuing to do, that's something that they should

Blanchard - Direct                                    158

1    tell the people in the legal department to look out for when

2    they're doing reviews.

3         THE COURT:  Wouldn't that be something actually you

4    would tell people who are servicing the loan, those who are

5    actually making decisions oh boy, we've got a loan

6    modification, it's pending, stop the foreclosure if that in

7    fact is what Ocwen thought?

8         MR. ANGWIN:  I think you tell them both, but I think

9    the people (indiscernible) reviews would need to have that

10   information if indeed Ocwen thought it was relevant because if

11   you're doing the review and you're telling courts -- which is

12   what he does for a living -- if you're telling courts hey, we

13   didn't do anything wrong, you need to know that hey, this might

14   be wrong because if he doesn't know this is wrong, when he's

15   testified Ocwen never did anything wrong, then they basically

16   -- they've isolated him, you know, and not told him something

17   that's important.  I mean how do we get to the fact that that

18   Ocwen knows that?

19        MR. SHATZ:  Mischaracterizes --

20        THE COURT:  Well I suppose what I would've done if I

21   was prosecuting this case was to have -- maybe you did, maybe

22   your 30(b)(6) deposition notice said the person most

23   knowledgeable on the consent decree issued in this case in

24   which the attorney general found in dual tracking defined as

25   blah, blah, blah, I want to hear from that person.  Did you do

1   that?

2            MR. ANGWIN:  In candor, Your Honor, we were not aware

3   of it until after the deposition.

4            THE COURT:  You weren't aware of what?

5            MR. ANGWIN:  We were not aware of this document until

6   after the deposition of Mr. Blanchard.

7            THE COURT:  Was the discovery period over at that

8   time?

9            MR. ANGWIN:  Yes.

10           THE COURT:  Well I guess even if I had made that

11  mistake I think I would've sought relief from that.  But any

12  event, even going with what you're saying, you're telling me

13  you don't know if modifications were pending means the same

14  thing as what it means under California law.

15           So let's say that what he testified to, this dual

16  pathing is a complete and blatant violation of this consent

17  decree, wow, that'd be a great case if we were in New York, but

18  how does that bear on willfulness or recklessness under

19  California law that does not prohibit moving toward foreclosure

20  without a complete application?

21           MR. ANGWIN:  Your Honor, I agree there has to be some

22  similarity between the conduct.

23           THE COURT:  It has to bear on liability.

24           MR. ANGWIN:  Right.

25           THE COURT:  How does that bear on liability, that

1    they are not in compliance with the New York consent decree?

2            MR. ANGWIN:  If they're aware of their conduct and if

3    it is the same -- if dual tracking in New York is the same as

4    dual tracking in California.

5            THE COURT:  Well we don't know that.  We just know

6    what it says here.

7            MR. ANGWIN:  I mean if, if we could establish that.

8            THE COURT:  How would you do that?

9            MR. ANGWIN:  I could go back and research what they

10   did in this case before tomorrow.

11           MR. HEENAN:  Just to be clear, Your Honor, and having

12   listened to what the Court said, I think based on the witness's

13   testimony -- and I understand what the Court's saying about how

14   is it relevant to this employee of Ocwen, and you're correct

15   about the way that we've listed our witnesses, and so that's a

16   fair point on all that.

17           So if you can clarify what you think is the fair game

18   question and I guess we would still ask you to consider the

19   Rule 201 judicial notice of the document and not through this

20   witness and then we could argue it later or whatever, you could

21   redact that document so that it's only the discreet things

22   we're talking about, but --

23           THE COURT:  I would be closest to that point,

24   presuming there's a showing that what this language says is

25   somehow --

1        MR. HEENAN:  Tied to California --

2        THE COURT:  Not tied.  It's exactly California law,

3   that it bears on liability.  Because I mean the suggestion that

4   simply that they failed to comply with this consent decree,

5   that's character, that's all we're talking about and we're not

6   going to do that obviously.

7        But I'm not sure either -- you're asking for judicial

8   notice not of the document, not of the existence of the

9   document, not of the fact that the document was entered on a

10  particular date.  You're asking for a specific agreement

11  between the parties as to what was occurring at this time as an

12  admission I guess.

13       MR. ANGWIN:  Under 801 yes, Your Honor.  Because this

14  is different than a consent judgment where they say basically

15  we submit to jurisdiction and don't contest what you say.  In

16  this one they've agreed to all the terms.  Ocwen signed this.

17  Mr. Ferrous (phonetic), the CEO signed this.

18       THE COURT:  I see that.

19       MR. ANGWIN:  So under 801 I think we can get into it.

20       THE COURT:  Assuming, and that's a big assumption,

21  that applications were pending is the same thing as under

22  California law that there's a complete and signed application.

23       Yeah.  I -- Mr. Shatz, your comments on that topic.

24  I think where we're at, to kind of (indiscernible) is if this

25  means that you have a complete and signed application and Ocwen

Blanchard - Direct                                    162

1    continued to move toward foreclosure, that seems like similar

2    conduct that would demonstrate an absence of mistake.

3         MR. SHATZ:  I don't know what the New York stuff

4    means.  We had a New York office and I just sent an email

5    saying help.

6         MR. ANGWIN:  We did too.

7         MR. SHATZ:  Pretty close to what it said.

8         THE COURT:  If you can, and I don't want to try to

9    pin you down if you're not comfortable doing that at this

10   point, but I think you would agree if this -- if what this

11   means is, and that's not what it says, but if it means you have

12   to stop foreclosure proceedings if you have a complete and

13   timely application and Ocwen (indiscernible) to do that, that

14   seems to me of evidence of not only absence of mistake, but

15   knowledge of the requirements of law.

16        MR. SHATZ:  I would have a hard time arguing with

17   that one, Your Honor.

18        THE COURT:  All right.  So that's where we are.

19   We're going to take it from here.  It does not preclude you

20   from asking about Mr. Blanchard's understanding if you have a

21   good faith basis for it.  So that's your ethical obligation, to

22   verify that you do, that there is reason for him to know that

23   the process of the dual paths has been criticized or however

24   you want to phrase it by attorney's general of the United

25   States as well as various states.  All right.

1        MR. HEENAN:  And Ocwen.

2        THE COURT:  You can ask that question.  You would

3   have to ask it carefully and you would want to be sure you're

4   specific to California law requirement.

5        MR. HEENAN:  Thank you, Your Honor.

6        MR. ANGWIN:  Thanks.

7        THE COURT:  All right.  So be back at 1:30.

8     (Luncheon recess from 12:35 p.m. to 1:32 p.m.)

9        THE COURT:  Yesterday we were talking about

10   (indiscernible) a resolution related to Western Progressive.

11   Has that occurred?

12        MR. SHATZ:  Your Honor, the parties have agreed upon

13   issues related to Western, but we haven't finished the

14   documents.  We should have those done today.  The short version

15   is we've agreed to various facts related to what Western would

16   say if they were here and they will be dismissed.

17        THE COURT:  All right.  The other issue is one that

18   we raised yesterday related to the emotional distress damages.

19   I know (indiscernible) overnight.  What is your position

20   related to bifurcating that issue and taking the testimony, if

21   needed, after the first (indiscernible)?

22        MR. HEENAN:  Who do you want to hear from first, Your

23   Honor?

24        THE COURT:  What's that?

25        MR. HEENAN:  Who do you want to hear from --

Blanchard - Direct                                    164

1          THE COURT:  Well that depends.  I think plaintiffs

2     agree to that process.

3          MR. SHATZ:  Your Honor, we're on board.

4          THE COURT:  Okay.  So that will be (indiscernible).

5     All right.

6          MR. PAINO:  Just to clarify, Your Honor, the idea

7     would be that the Court will excuse the jury to decide all

8     issue other than the possibility of punitive damages and then

9     would come back and take testimony afterwards?

10         THE COURT:  No.  The jury would decide on liability

11    as well as willfulness, recklessness and whether there should

12    be statutory damages.  If they find in the plaintiffs' favor

13    on, at a minimum, the liability and the damage question, then

14    we would come for a second phase in which Mrs. Cornejo I

15    presume would testify as to the emotional damage suffered as a

16    result of the assumed breach.

17         The jury then would deliberate on that topic and

18    decide whether to award for emotional distress damages.  In

19    that event, then the Court would then consider whether those

20    are part of damages and as it indicated is not -- I believe

21    that they are, that the record would then be preserved

22    (indiscernible) appeal.

23         MR. PAINO:  Thank you, Your Honor.

24         MR. VITIELLO:  Your Honor, I have a question about

25    the examination of Mrs. Cornejo for that second phase.  I'm

1   going to be handling the examination and I think there's a, you

2   know, genuine issue potentially in unintended crossover in

3   responses to particularly direct questioning about the loan,

4   even just general background stuff that just needs to get out

5   might head into what I would call like emotional territory

6   and --

7           THE COURT:  I'm not sure I understand though what you

8   mean by that.  You mean the fact that her children grew up

9   there?

10          MR. VITIELLO:  I don't even think I would ask that,

11  to be honest with you, but I do have to ask certain questions

12  about the business to get to certain issues of financial

13  hardship and things like that, and I just don't know whether

14  that is going to trigger something --

15          THE COURT:  I'm sure you'll have a conversation with

16  Mrs. Cornejo about the limits of her testimony.  I appreciate

17  that there could be some slight overlap, but I think that that

18  can be managed because I think the questions you would be

19  asking clearly will be, you know, why'd you fall behind type of

20  questions, but I don't see how that relates to emotional

21  distress damages.

22          MR. VITIELLO:  I guess my question is not so much

23  what do we do if she gives an answer that goes to emotional

24  distress damages, it's more about whether she actually like

25  gets emotional and I wouldn't want any question about that to,

1  you know, give rise to any prejudice to the jury or anything

2  like that and I was thinking that a way around that is to just

3  get a little bit of leeway on some leading questioning to make

4  sure that, you know, doesn't cross over into any unintended

5  area that wasn't a part of the direct question.

6        THE COURT:  I think (indiscernible) first in if she

7  has emotional, she does.  People can be emotional and talk

8  about contract breach, so that I don't think has anything to do

9  with the emotional damage claim.  The jury is going to be

10  instructed to disregard any ideas of anything -- I mean they

11  are to decide on the facts.  They're not to be swayed unduly by

12  that type of thing.  So that's not my concern.

13        My concern is questions about how did this

14  foreclosure impact you.  That would be a proper question.

15        MR. VITIELLO:  I think that's a dangerous --

16        THE COURT:  That would be an improper question

17  because --

18        MR. VITIELLO:  Yeah.  That's a question that we're

19  not going to ask, except --

20        THE COURT:  Unless it's at a -- it would have to be a

21  question more like did this -- did you suffer any financial

22  setbacks as a result of this, what were those.  I don't think

23  -- I think there's -- depending on how you question, and I'm

24  sure you'll discuss with her the areas that you're intending to

25  examine her and about the areas that you aren't.

1      MR. VITIELLO:  I understand that.  And of course we

2  will prepare her, but I could foresee a situation that

3  unintentionally a question about, you know, what sort of

4  financial setbacks have you suffered gets answered in a way

5  that deviates from purely financial setbacks and I think that

6  perhaps a way around that is to say, you know, just go at the

7  financial setbacks; you know, you had to move from this

8  property didn't you and did you incur costs associated with the

9  move.  You know, kind of getting to some of the heart of those

10  issues in a cleaner way that leaves her with less ability to

11  get into an emotional area.

12      THE COURT:  All right.  Mr. Shatz or Mr. Paino, your

13  thoughts on that.

14      MR. SHATZ:  I appreciate counsel's sentiment and as

15  long as the intention is -- the intention and execution is

16  relatively pure, we're not going to object particularly for the

17  transition.

18      THE COURT:  Okay.

19      MR. PAINO:  I guess the only comment I have about the

20  leading questions is it sounds like what counsel's suggesting

21  is not necessarily a leading question, but perhaps a yes or no

22  type of question.  I don't really have an issue with a question

23  that can be answered yes or no.  What I would have perhaps a

24  question is with a question that suggests the answer.

25      THE COURT:  Oftentime the yes or no can, so -- but I

Blanchard - Direct                            168

1   appreciate your position.

2           All right.  So let's --

3           MR. VITIELLO:  I'm just asking for a little bit of

4   leeway really is all this --

5           THE COURT:  It sounds like you have it, and when you

6   go too far if they think so, they'll object at that time.

7           MR. VITIELLO:  Thank you.

8           THE COURT:  All right.  So let's get Mr. Blanchard

9   back on the stand.  I assume that's what our intention is then

10  at this time?

11          MR. HEENAN:  Yes please, Your Honor.

12          THE COURT:  All right.  Then let's go ahead and bring

13  in the jury.

14      (Jury in at 1:41 p.m.)

15          THE COURT:  All right.  All of our jury members are

16  in their places after lunch so, Mr. Heenan, you may continue.

17          MR. HEENAN:  Thank you, Your Honor.

18  BY MR. HEENAN:

19  Q.  Mr. Blanchard, I think your testimony this morning was you

20  weren't aware of what financial incentive Ocwen might have with

21  respect to completing a modification, is that fair?

22  A.  Yeah.  I don't know the exactness of it.

23  Q.  Okay.

24          MR. HEENAN:  Wade, if you can bring up Defendants'

25  Exhibit 583, page 143 of that exhibit.

1          And I would move it into evidence at this time, Your

2     Honor.

3          THE COURT:  Are there objections to DX583 being

4     admitted?

5          MR. PAINO:  No, Your Honor.

6          THE COURT:  I'm sorry, no?

7          MR. PAINO:  No, Your Honor.

8          THE COURT:  All right.  That'll be admitted.

9        (Defendants' Exhibit 583 received into evidence.)

10         MR. HEENAN:  Now Wade, if you can bring up the part

11    that I've marked please.

12    BY MR. HEENAN:

13    Q.   Does that help us to know, Mr. Blanchard, that Ocwen

14    has -- or receives money to get someone into a modification?

15    A.   The exhibit does read that there's a completed

16    modification incentive.

17    Q.   Okay.  Thank you.  And so basically that ranges from 800

18    to 2,000 according to this exhibit?

19    A.   Yes.

20    Q.   Thank you.  We were also talking this morning about dual

21    pathing.  Do you, sir, have reason to know that Ocwen's

22    practice of dual pathing/tracking has been criticized by any

23    federal or state regulators?

24         MR. SHATZ:  Objection.  Relevance.  Objection.  Time.

25         THE COURT:  Can you narrow it to a time frame, Mr.

1    Heenan?

2              MR. HEENAN:  Sure.

3              THE COURT:  Objection sustained on that ground.

4    BY MR. HEENAN:

5    Q.   As you sit here today, Mr. Blanchard, do you have reason

6    to know that say within the past two years Ocwen's practice of

7    dual pathing/tracking has been criticized by any federal or

8    state regulator?

9    A.   It seems that you're combining two terms.  I know you

10   meantioned dual pathing and now you said dual tracking and now

11   you're saying dual pathing/tracking.  So what does that mean?

12   I don't -- as you're using the term, I don't --

13   Q.   Okay.

14   A.   As it was defined in the document, I seen as dual pathing

15   is defined in the document and dual tracking is now, to my

16   understanding, a legal term on another document and I don't

17   know I know the legalities of that.  So --

18   Q.   Okay.  So just to be -- and I don't want to rehash the

19   point and I don't want to tread the same ground, but is it fair

20   that until we started talking this morning you'd never heard

21   the phrase dual tracking?

22   A.   Dual tracking?  No.  I've not heard of the dual tracking

23   terminology, no.

24   Q.   Until today when we started talking about it?

25   A.   Correct.

1   Q.   Okay.  So do you have reason to know that Ocwen's -- well,

2   sorry.  Strike that question.  But you did know about Ocwen's

3   dual pathing, right?

4   A.   I -- that's not referred to as that term within Ocwen.  I

5   see that you had it in your communication I was reading off of

6   the communication that you saw there and it's definitions, but

7   I do not discuss -- I don't say hey, you know, about -- what

8   about dual pathing.  It's either I'm checking on the

9   modification or I'm checking on the foreclosure, I'm checking

10  on the foreclosure and the modification, whatever state it is.

11       So -- but the actual term, that's what I'm saying, no one

12  uses the actual term dual pathing or this dual tracking; that

13  term, they don't actually say that is what I'm saying.

14  Q.   Okay.  That was a Ocwen document that we looked at that

15  called it dual pathing though.

16  A.   Right.  That's a -- what you saw was a communication

17  between Western Progressive and Ocwen, so it might be

18  particular to that particular department that deals with them.

19  Q.   Okay.  Let me avoid any confusion for you then.  Do you

20  have reason to know that Ocwen's practice of on the one hand

21  engaging in foreclosure proceedings and on the other hand

22  engaging in loss mitigation proceedings has been criticized by

23  any federal or state regulator?

24            MR. SHATZ:  Objection.  Relevance, lack of

25  foundation, authentication and improper summary of the law at

Blanchard - Direct                                  172

1    issue in this case.

2            THE COURT:  I think that the reference is to complete

3    in a timely.  The objection is sustained.

4    BY MR. HEENAN:

5    Q.  Do you have reason to know that Ocwen's practice of on the

6    one hand completing a foreclosure and on the other hand having

7    a complete and timely loan modification request has been

8    criticized by any federal or state regulators?

9            MR. SHATZ:  Objection.  Lacks foundation.

10           THE COURT:  Overruled.  You may answer.

11           THE WITNESS:  Having a complete and timely -- what --

12    is the -- I've seen complete applications that have been

13    declined and the foreclosure still goes through.  I've seen

14    applications that they're continuing to submit and it's

15    incomplete and the foreclosure goes through if that answers

16    your question.

17    BY MR. HEENAN:

18    Q.  I appreciate your answer, but it doesn't answer the

19    question that I asked and that question relates to your

20    personal knowledge of criticisms of your employer, Ocwen, by

21    any federal or state regulators with respect to the practice of

22    on the one hand proceeding and going forward with a foreclosure

23    sale while on the other hand having a complete, timely,

24    received modification request from the borrower.

25    A.  I have not seen a situation with a federal state by where

1    we've had a completed application that still proceeds to an
2    actual foreclosure.
3    Q.   And I'm sorry.  My question's still just a little bit
4    different I think.  My question relates to are you personally
5    aware of any federal or state regulators who have criticized
6    Ocwen's practice of proceeding with a foreclosure sale while a
7    completed, timely modification application was in place?
8          MR. SHATZ:  Objection again as to relevance and
9    authentication, and the objection's beyond the question.  Can
10   we approach?
11         THE COURT:  No.  The objection is overruled.  You can
12   answer that.
13         THE WITNESS:  I kind of think I already answered.
14   I'm not -- I guess I'm not -- could you word your question in a
15   different way?  I've said it's completed --
16         MR. HEENAN:  I can't, sir.  I need you to answer the
17   question that I've asked of you.
18         THE WITNESS:  Okay.  I haven't seen a criticism in
19   reference to where they have a completed application that's all
20   the way processed and there's a foreclosure proceeding that
21   still carries through.
22   BY MR. HEENAN:
23   Q.   Okay.  So your answer is no, you're not aware of any
24   instance where a federal or state regulator has criticized that
25   practice, is that your answer?

Blanchard - Direct                                    174

1    A.    The practice that you mentioned, yes.

2    Q.    Okay.  Do you have an awareness of complaints by borrowers

3    about Ocwen's practice of proceeding with a foreclosure sale

4    while a complete and timely loan modification request is

5    pending?

6    A.    I've heard all types of allegations from borrowers being

7    in the position that I am, so yes.

8    Q.    Okay.  Tell me about those.  Not all types of allegations,

9    the specific allegation that I'm asking you about, that I've

10   been calling dual pathing and dual tracking and have been

11   trying to modify my language so that you understand what I'm

12   talking about.

13   A.    Okay.  I don't know what your legal definition of dual

14   tracking is, so if you're going to refer to it as that I'm not

15   prepared to answer that.  As far as dual pathing, if it sits in

16   the realm of what was defined on that sheet you showed me

17   through Western Progressive, that -- no where in there does it

18   state you have a modification or a complete application and we

19   proceed to foreclosure.  That wasn't a list of those things in

20   the dual pathing that we stated.

21        Now if you're just asking me about what I've answered to

22   in reference to allegations of, you said completed

23   applications, borrowers tend to believe -- well not all

24   borrowers, but I understand their frustration.  HAMP requires

25   us to have specific documents and they have to be of a specific

1    time period.

2        And what happens is somebody might send in something and

3    we stipulate hey, you know what, we now need this tax

4    identification or we need this thing, and by the time they send

5    the next thing, one of the items that was good before under

6    HAMP's guidelines are now inadequate to proceed so we have to

7    ask for an updated document.  And some borrowers have taken

8    that as you know what, I already sent that in, I had a

9    completed application, what's going on.

10   Q.   So are you personally aware of instances like you've just

11   described where what they're being required to submit changes

12   or whatever and in the meantime they lose their home to a

13   foreclosure sale?

14   A.   If -- well that's how HAMP -- this is HAMP guidelines.

15   This is not Ocwen's guidelines.  If they don't have the

16   required documents in and they can't get the HAMP modification,

17   you know, they're -- you know, obviously other things might

18   transpire.

19   Q.   Well HAMP sets the guidelines for what's a completed

20   application, right?

21   A.   Yes.

22   Q.   Ocwen sets the guidelines for the dual pathing program

23   where it doesn't call off the foreclosure while the person's

24   trying to get their completed application in, isn't that true?

25   A.   Could you repeat that question?

1  Q.   Yeah.  I mean you're saying that people get frustrated

2  about the HAMP guidelines, that Ocwen basically has its hands

3  tied and has to follow the HAMP guidelines, right?

4  A.   Right.

5  Q.   But HAMP and the federal government doesn't make Ocwen

6  foreclose on people while they're in the process of being

7  considered for a HAMP loan modification does it?

8         MR. SHATZ:  Objection.  Relevance, incomplete

9  hypothetical.

10        THE COURT:  Sustained.

11 BY MR. HEENAN:

12 Q.   Are you aware of anyone other than Ocwen making the

13 business decision to proceed with foreclosures under the dual

14 path program?

15 A.   I don't work for other servicers, so I don't know -- I

16 don't know if you're asking me for something out of my company

17 and I only know dual pathing as it was defined in that document

18 you showed me.  Now you're saying dual pathing program.  I

19 don't know if that's something different.

20 Q.   No.  I'm talking about that document that we looked at

21 together.

22 A.   Okay.  I don't recall seeing it saying dual pathing

23 program.

24 Q.   What do you recall it saying?

25 A.   They said that they have a dual path and that there's the

Blanchard - Direct                    177

1   foreclosure, which I assume (indiscernible) believe that -- I

2   mean I assume they're stating it's the foreclosure coordinator

3   they're speaking about and HRC rep, which is the home retention

4   consultant or your relationship manager is the same difference.

5          MR. HEENAN:  Let's go back to Exhibit 6 please so

6   we're all on same page.  Plaintiffs' 6, sorry, page two,

7   top paragraph please.

8   BY MR. HEENAN:

9   Q.   Ocwen utilizes the dual path, right?

10  A.   Okay.

11  Q.   I'm asking you.  I mean you work at Ocwen, I don't.

12  A.   Right.

13  Q.   We looked at an Ocwen document this morning that says

14  Ocwen utilizes the dual path didn't we?

15  A.   Yes.

16  Q.   Okay.  So when I use the word dual path I'm just looking

17  at Ocwen's own document.  Is that --

18         THE COURT:  Question, Mr. Heenan.  Let's just move to

19  the question.

20         MR. HEENAN:  Thank you, Your Honor.  Now let's go

21  back to Defendants' Exhibit 583, page 88 please.

22         THE WITNESS:  What page are you saying, 583 what?

23         MR. HEENAN:  Page 88 please of Exhibit 583 which is

24  now in evidence.

25         THE WITNESS:  Okay.

1   BY MR. HEENAN:

2   Q.   Bottom part please.

3   A.   Okay.

4   Q.   This is the HAMP guidelines, right?

5   A.   Yes.

6   Q.   And under the HAMP guidelines, servicers are supposed to

7   protect against unnecessary foreclosures?

8   A.   Yes.

9   Q.   And what does it say here under 3.1.1?

10  A.   Servicer may not refer any loan to foreclosure or conduct

11  a scheduled foreclosure sale unless and until at least one of

12  the following circumstances exist.  Do I read on?

13  Q.   Yes please.

14  A.   The borrower's evaluated for HAMP and is determined to be

15  ineligible for the program or the borrower's offered TPP but

16  fails to make current trial period payments as set forth in

17  Section 83 provided.  However, if a servicer is evaluating a

18  borrower for a HAMP Tier II either automatically or upon

19  borrower's request, after the failure of HAMP Tier I, TPP the

20  servicer cannot refer the loan to foreclosure or conduct a

21  scheduled foreclosure sale until such evaluation is completed

22  and the borrower is determined to be ineligible for HAMP Tier

23  II --

24  Q.   Thank you.  That's good.  Thank you.  So isn't it -- under

25  the HAMP guidelines, a servicer is not supposed to refer a

1  foreclosure or conduct a scheduled foreclosure sale until such
2  time as the borrower can be evaluated for the HAMP and
3  determined to be ineligible or such time as they're offered a
4  temporary payment plan but they fail to make it?  I mean isn't
5  that what we're talking about on the board earlier?
6           MR. PAINO:  Objection, Your Honor.  Mischaracterizes
7  the exhibit.
8           THE COURT:  This does seem to refer to the trial
9  payment periods.  That was on the different one, Mr. Heenan,
10 and you're discussing earlier.
11          MR. HEENAN:  Fair point, Your Honor.  Thank you.
12 BY MR. HEENAN:
13 Q.   So as not to misrepresent anything, doesn't this,
14 specifically with respect to bullet one that's blown up,
15 doesn't this say a servicer is not to conduct a scheduled
16 foreclosure sale until the borrower is evaluated for HAMP and
17 determined to be ineligible for the program?
18 A.   That's what the first bullet says.
19 Q.   Thank you.  When we got sidetracked you were talking about
20 your awareness of complaints by other borrowers about having
21 their homes foreclosed while in the process of requesting a
22 modification.  Are you personally aware of instances where
23 borrowers have complained about that conduct?
24 A.   Yes.
25 Q.   By virtue of your job?

1  A.   Yes.  I mean it's -- the allegation -- an allegation might

2  be made of that just like it's in this case and, you know, I

3  have it there.

4  Q.   Okay.  Based on the research that you performed at Ocwen -

5  - now I'll go back to the beginning this morning, those types

6  of allegations, have you ever, based on your own research,

7  determined, you know what, what the borrower's alleging here

8  has some validity?

9  A.   What the borrower's alleging has some validity?  In

10 reference to a modification and receiving a full application

11 ahead of time, I've most often just found that there was

12 missing documents that were still needed in reference to the

13 review.

14 Q.   Wow.  When you say most often, that makes me wonder

15 whether one time or sometimes it wasn't the case.  So when you

16 say most often, is that sometimes it was the case or is it

17 always based on your review that you found that it was really

18 the borrower's fault and they were missing documents?

19 A.   Well there's other instances where they have the mod and

20 they haven't sent a payment, they decided not to do it and time

21 has run out, there's a time lapse.

22 Q.   Okay.  So those are all instances where the borrower did

23 something wrong, fair?

24 A.   Right.

25 Q.   So have you ever, based on your research and review, found

1    instances where Ocwen did something wrong?

2    A.    Yes.

3    Q.    Okay.  How many times have you found that?

4    A.    I don't know how many times.

5    Q.    Is it fair that almost every time you research your

6    conclusion is that the borrower did something wrong or is that

7    unfair?

8    A.    That's unfair.

9    Q.    Okay.  What percentage of the time?

10   A.    I don't have a percentage.

11   Q.    I mean just ballpark with me.

12   A.    I don't have a ballpark.  I'm a fact witness, so I tell

13   what it is.  Now if the payment or the interest rate is wrong,

14   I don't -- it's they can see what's on the document and I'd say

15   what is actually being implemented.

16   Q.    Okay.  Have you been called to testify in courts by Ocwen

17   that the borrower had done something wrong with respect to

18   their application?  And I don't mean to be pejorative about

19   wrong.  Maybe let me withdraw that.  Have you been called to

20   court to testify on behalf of Ocwen that the borrower's

21   application was incomplete?

22   A.    That the borrower's application was incomplete?  Yes.

23   I've had to look at what was sent in and see what the

24   underwriter's stating and see if that was actually -- they had

25   a document that cured that.

1    Q.    Have you been called by Ocwen to testify in cases where

2    the application was complete but Ocwen nevertheless foreclosed

3    on the borrower's home?

4    A.    There's situations where you have a complete application

5    but they don't proceed on the mod and -- or they're declined,

6    so yes.

7    Q.    So when you say proceed on the mod, is that what we were

8    talking about in our tree there about if the borrower doesn't

9    fill out the papers and make the payments?

10   A.    There's situations where yeah, they don't fill out the

11   papers and make the payments.

12   Q.    You testified just now about allegations by the borrowers

13   similar to the Cornejos' allegations.  Do you recall that

14   testimony?

15   A.    What are you speaking in reference to?

16   Q.    Well I'm just -- you used the word allegations.  Do you

17   remember using that word?

18   A.    I probably did when you asked me what type of cases have I

19   been involved in.

20   Q.    Okay.  And that is kind of -- that's a lawyer buzz word, a

21   legal buzz word isn't it, to use allegations?

22   A.    I don't know what else to call the opposing party's

23   viewpoints of the case when they're charging another party.

24   Q.    Okay.  So my question then is just have you ever been

25   called to testify in a trial where the testimony you give is in

1   favor of the borrower who's making the allegations against

2   Ocwen?

3   A.   Yes.

4   Q.   Okay.  When was that?

5   A.   I don't know.  I have a lot of cases under my belt.  I

6   don't know dates.

7   Q.   Okay.  How many foreclosures that Ocwen has done in the

8   State of California in say the last two years was the borrower

9   on the modification path at the time that they lost their home?

10  A.   When you say -- could you define modification path?

11  Q.   Well they'd been solicited for a loan modification and

12  they'd completed the application.

13  A.   You're asking if -- how many borrowers have been

14  foreclosed on while starting it off with something as like

15  solicitation?

16  Q.   No.  And have submitted a complete and timely application.

17          MR. SHATZ:  Objection.  Lacks foundation.

18          THE COURT:  Do you know that?

19          THE WITNESS:  I don't know.

20          THE COURT:  Sustained.

21  BY MR. HEENAN:

22  Q.   Okay.  Do you have an awareness of whether Ocwen tracks

23  the foreclosures that it does in the State of California?

24  A.   Yes.

25  Q.   Okay.  Do you have an awareness of what those figures are?

1  A.   No.

2  Q.   Okay.  Now I want to pick up where we kind of left off

3  with the Cornejos as kind of -- is it fair to summarize where

4  we left off is that Ocwen postponed the sale?

5  A.   Yes.

6  Q.   When they postponed it from March 27th to April 29th?

7  A.   Yes, they did.  And that was one of the bullet points

8  under the DX583-89.

9  Q.   And we looked at that document where the person's name who

10 I don't remember now, Eisen or whatever that we couldn't decide

11 whether it was a male or female, that person had spoken with

12 Mrs. Cornejo?

13 A.   Yes.  That person had arranged an appointment to discuss

14 the RMA packet and called the -- contacted the borrower.

15 Q.   And told her how to download it, it looked like from the

16 notes?

17 A.   Where she can see the information online if she had any --

18 and they discussed any modification question that the borrower

19 had at that time.

20 Q.   Okay.  And then the Cornejos submitted a modification

21 application, correct?

22 A.   Yes.

23 Q.   And that's, if you look at Joint Exhibit 17?  The first

24 page --

25 A.   Exhibit -- I'm sorry.

1   Q.   Sorry.  Joint Exhibit 17.

2   A.   Okay.

3   Q.   I do -- I know I've got so much paper in front of you.

4   I'm sorry to -- and I guess just so the jury has context, maybe

5   if we can start with Exhibit 16, if you can pull that up

6   please.  What's this document?

7   A.   I believe this is the document that was sent out to the

8   borrowers on December 16th of 2014.

9   Q.   Okay.  And how do we know it was sent to the borrowers on

10  December 16th, 2014?

11  A.   Not only is there -- this letter is dated for 2014, but I

12  saw the actual application that the borrower filled out which

13  they sent back to us in April.  It had the same dates on it.

14  Q.   Okay.  And we looked at, and I don't want to rehash, but

15  in February we looked at where someone at Ocwen was explaining

16  to the Cornejos how to download the application online, is that

17  fair?

18  A.   Yes.

19  Q.   So without -- whether it was sent or not, is it fair that

20  according to the notes it looks like as of February the

21  Cornejos didn't have it in hand for whatever reason?

22  A.   I don't know how to answer that question because I don't

23  know how they would have a December --  a mailing from December

24  sent in to us if they didn't receive it.

25  Q.   Okay.  Well you're limited by what the business records

1   say, right?

2   A.   Right.

3   Q.   And we looked at a business record this morning that says

4   in February someone at Ocwen was explaining to Mrs. Cornejo how

5   to download the application, right?

6   A.   That's part of the business record.

7   Q.   Yeah.  Okay.  Thank you.  And this is basically a blank

8   application?

9   A.   Yes.

10  Q.   It's 20 pages?

11  A.   Yes.

12  Q.   Okay.  We've talked about already this afternoon, but

13  because of guidelines imposed on Ocwen by the federal

14  government, would you agree with me that it's a fairly

15  voluminous application procedure?

16  A.   I don't consider it a voluminous application if it's going

17  to save my home.

18  Q.   Okay.  Let me ask this.  Are you aware that based on the

19  cases that you've researched and the testimony that you've

20  given on behalf of Ocwen, have you ever heard borrowers to

21  complain about this application process to be difficult from

22  their perspective?

23  A.   The major complaint is just the redundancy of having to

24  send updated documents.

25  Q.   Okay.  So now let's look at Exhibit 17, because the only

1   reason I wanted to show you that was to basically -- because

2   that was in order from pages 1 to 20.

3   A.   Okay.

4   Q.   Now let me have you look at Exhibit 17, which would you

5   agree with me that's the application that the Cornejos

6   submitted?

7   A.   Yeah.  That's the one that we sent them in December and

8   they sent it back to us in April.

9   Q.   Okay.  So does this first page tell us that Ocwen received

10  it April 16th?

11  A.   It looks like there's a fax confirmation on the top of the

12  page, yes.

13  Q.   Okay.  Thank you.  And then if we go to say the loan

14  servicing notes, which are Joint Exhibit 4, say like page 43 of

15  that document please.

16  A.   You said page 43?

17  Q.   Yes, sir.

18  A.   What is the -- it's Joint --

19  Q.   Joint 4 -- it's like 4-43.

20  A.   Okay.

21  Q.   Before I ask that or before we talk about that, you did

22  some college, you have a real estate license, correct?

23  A.   Yes.

24  Q.   The borrowers whose allegations you've investigated, have

25  there been instances where their educational level was -- and

Blanchard - Direct                                    188

1    knowledge of the real estate industry was below yours?

2    A.   There is no analysis that goes into a borrower's education

3    level.

4    Q.   I know that.  I'm saying -- because you testified

5    basically from your perspective, you do what you've got to do

6    to save your home or something to that effect, right?

7    A.   You asked me if the document was voluminous to send in and

8    I said I don't consider it voluminous.

9    Q.   Yeah.  Do you consider it complicated?

10   A.   Complicated?  I don't -- it's outlined.  It might, you

11   know, but it's just dealing with a mortgage and I don't know if

12   I would consider it complicated.  It's less complicated than

13   applying for a mortgage.

14   Q.   Okay.  And that's fair.  Okay.  So then if we look at 43,

15   does this show us internally, according to the servicing notes

16   that Ocwen has received the Cornejos' modification package?

17   A.   Yes.  There is notations in reference to the specific

18   items received.

19   Q.   Okay.  And we went through the kind of the decision matrix

20   this morning.  Is this the part -- you know, because it says

21   under review, is this under review by underwriting or by

22   another -- a different level that's just making sure that

23   there's a complete application?

24   A.   No.  This is just taking it at face value and uploading

25   the documents and sending it over to the underwriter.  So

1    they're just -- if it says (indiscernible) form, they're going

2    to type that in and submit it.  And you know, whatever you see

3    is what they're putting in here.  The underwriter will then

4    review that and make a determination if it's complete.

5    Q.    Okay.  And did that occur here?

6    A.    Yes.

7    Q.    And if we look at like 4-46 and 4-47, it's like the bottom

8    of 4-46.

9    A.    Okay.

10   Q.    Who's making this entry?

11   A.    Haren Crishna Murthy (phonetic).

12   Q.    And what department is that person in?

13   A.    I don't actually see from that.  I'm not sure.  It says

14   collections, but I'm not sure if this is -- I'm not sure I

15   can -- I'm not sure I can identify what department they're in.

16   It looks like this is -- this is a team effort, so this is a

17   part of the modification process when they're looking to see if

18   there's a completed application.

19   Q.    Sorry.  Go ahead.

20   A.    It looks like it's possibly an underwriter looking at the

21   file.

22   Q.    I'm sorry.  I didn't hear you.

23   A.    It looks like it's possibly an underwriter looking at the

24   file to make the determinations.

25   Q.    Okay.  So is Mr. or Mrs. Crishna Murthy, is that person in

1   underwriting?

2   A.   It would appear that they are based on the notation.

3   Q.   Okay.  And then if we go to the next page, 47, does that

4   kind of give us more clarification?

5   A.   Yes.

6   Q.   What's underwriting?

7   A.   It's where the documents are sent to for review to see if

8   they're sufficient to move it to the next stage and consider it

9   complete.

10  Q.   Okay.  Is it done in India?

11  A.   I don't know the actual location of this underwriting

12  individual.

13  Q.   Okay.  And then how about this, who's Max V.R. Up

14  (phonetic)?  What's that?

15  A.   It's MSXVRUP, that's --

16  Q.   Oh.

17  A.   -- this looks like system generated notation.

18  Q.   Okay.  And what's that telling us?

19  A.   It all ties into what Crishna is -- it's like a

20  continuation of Crishna's note.

21  Q.   Okay.  And under the notes, is that kind of the clearest

22  -- well let me back up.  Is it fair that the underwriting team

23  concluded that the Cornejos' application was incomplete?

24  A.   Yes.

25  Q.   Okay.  And specifically it looks like there's three pieces

1   of information that is making it incomplete, is that fair?

2   A.   There's three points that they're making on here.

3   Q.   Okay.  And what are they?

4   A.   The two most recent pay stubs within 90 days of validity

5   for the wage income for both the borrowers, so that's like two

6   stipulations; also received profit and loss does not list

7   income, does not list period so please provide the valid recent

8   quarter profit and loss with all the business income and

9   expenses mentioned on it; please send a copy of your most

10  recently filed 2013 tax return.

11  Q.   Okay.  Is it fair that the Cornejos don't know that their

12  application is incomplete until Ocwen tells them?

13  A.   Yeah.  I mean that's the only way that they would find

14  out --

15          MR. SHATZ:  Objection to the extent it calls for

16  speculation as to what the Cornejos knew.

17          THE COURT:  Sustained.

18  BY MR. HEENAN:

19  Q.   Would the Cornejos or any borrower have any way to know

20  what Ocwen deems to make it incomplete until Ocwen conveys that

21  information?

22          MR. SHATZ:  Objection to the extent it calls for

23  speculation.

24          THE COURT:  Sustained.

25  BY MR. HEENAN:

1    Q.    How -- well does Ocwen, as a policy, have a practice of

2    conveying -- well strike that.  Isn't that just what we were

3    talking about?  I mean aren't we back to our decision tree

4    again, sir?

5    A.    Yes.

6    Q.    Is it a complete application?  So let's apply it to the

7    Cornejos here.

8    A.    It's an incomplete application.

9    Q.    Yeah.  So they submit it on 4/16, Ocwen reviews it to

10   determine whether it's complete and what did they determine?

11   A.    It's incomplete.

12   Q.    Okay.  So since it's incomplete what obligations, if you

13   know, does Ocwen have to the borrower?

14   A.    In general we send out a -- we send out some type of

15   communication in reference to that.  Next time we get them on

16   the phone we will also communicate that to them as well.  But

17   sometimes borrowers will send in the application knowingly --

18   knowing that it's incomplete because they just don't have the

19   information at that time, such as the taxes.

20       There's previous notations on the taxes where she said she

21   needed to do something within two weeks early on in the year.

22   I don't know if that was something that just wasn't available

23   at that time why she didn't send it.  But that's it.

24   Q.    So we can agree still, like we did this morning, that if

25   it's an incomplete application Ocwen has to send a letter to

1    the borrower, right?

2    A.    The -- when there's incomplete application we sent some

3    type of notification to the borrower.

4    Q.    And that's pursuant to California law, right?

5    A.    I am not --

6              MR. SHATZ:  Objection to the extent it seeks legal

7    conclusion or legal opinion.

8              THE COURT:  Sustained.

9    BY MR. HEENAN:

10   Q.    Do you know whether the reason Ocwen sends the five-day

11   letter is because it's required to here in the State of

12   California?  If you don't know it's okay.

13   A.    I don't now if it's the law in the State of California law

14   in reference to the --

15   Q.    Okay.  How about from just a good business perspective?

16   Does it make good business sense for Ocwen to send some type of

17   notice to the borrower saying hey, we've looked at your

18   application and it's incomplete?

19   A.    We do send out the reasons for decline, yes.

20   Q.    Yeah.  And that's just good business practice, right?

21   A.    Yes.

22   Q.    And when Ocwen sends that letter to the borrower saying

23   hey, you need to send us this, this and this, do they impose a

24   time frame on the borrower so that -- to get it in and have it

25   considered completed?

1   A.   It might have its own time frame for that, but anything

2   that is communicated to the borrower you would find on the

3   actual notification.  You might find a time frame on there that

4   they're to return the itemization by.

5   Q.   Let me ask this.  So when the Cornejos' application is

6   reviewed it's April 21st, right, by underwriting?

7   A.   Right.

8   Q.   And now we're eight days away from the sale, right?  The

9   sale's now set for April 29th?

10  A.   Yes.

11  Q.   Does Ocwen have the power at that point in time to

12  postpone the sale to give the Cornejos additional time to

13  complete their application?

14  A.   Assuming there's no -- any investor restrictions, that is

15  a possibility that they have.

16  Q.   Are you aware of any facts or circumstances in this

17  particular case which would've prohibited Ocwen on April 21st

18  from postponing the April 29th sale in order to give the

19  Cornejos time to complete their application?

20  A.   The length of time on this particular matter from them

21  being in default when it's years and there's a incomplete

22  application still -- had the application been complete it

23  would've been a different story.

24  Q.   Okay.  So if it would've been completed, then what?

25  A.   If it was a completed application and it was pushed

1    through to the next phase, then they -- after it receives a

2    certification from the underwriter, you basically try to move

3    to mod it and attempt to stop any foreclosure sale that might

4    be there if it shows that, you know, they can be approved.

5    Q.    When Ocwen postponed the sale the previous month did it

6    ever communicate to the Cornejos that it was a one-shot deal?

7    A.    That it was a one-shot deal?

8    Q.    Yeah.  That it wouldn't be postponed again?

9    A.    No.

10   Q.    Okay.  And did Ocwen ever communicate to the Cornejos hey,

11   if you don't get us a completed application the first time on

12   April 16th we're not going to postpone the sale?

13   A.    Did they ever communicate to the borrower that they're not

14   going to postpone the sale?

15   Q.    Yeah.  Based on -- sorry, for the reasons that you just

16   said; hey, it's been going on too long, we've already continued

17   it once.  Did they ever say to the Cornejos it's been going on

18   too long, we've already continued it once so if you don't send

19   us everything right the first time we're going to proceed with

20   the sale?

21   A.    Not in that wording, but it does mention on any document

22   that we sent out to them, especially the ones that show what is

23   missing that hey, you know, the foreclosure will proceed if we

24   don't have a complete application.

25   Q.    And just to be real clear, Ocwen on April 21st had the

1   power to postpone the sale, it just chose not to?

2   A.   We didn't have a complete application, so the sale was not

3   postponed.

4   Q.   My question's different though, sir.  My question is on

5   April 21st -- I agree it's an incomplete application, right?

6   That's what you just said, right?

7   A.   Yes.

8   Q.   All right.  I agree with you.  But on April 21st is it

9   fair and can we agree that Ocwen had the power to postpone the

10  sale but chose not to exercise that power?

11  A.   There is -- they did not postpone the sale and I know --

12  I'm not a lawyer, but with different states -- some states they

13  actually say you can only set one date or two dates.  I don't

14  know what the laws are in California or if that played into the

15  decision here as well.

16  Q.   Okay.

17  A.   But yes, they did make a decision not to postpone the

18  sale.

19  Q.   Okay.  What document can we -- is there any of the

20  servicing notes on April 21st where it talks about -- or at all

21  where it talks about we're not going to postpone the sale again

22  because it's been going on too long or whatever other reason,

23  any reason at all like you just articulated?

24  A.   If you look at the acknowledgment letters it says that,

25  you know, the foreclosure proceedings will still proceed.  It

1   doesn't stop your foreclosure proceedings.  That's communicated

2   on several documents we sent out to the borrower.

3   Q.   Yeah.  And that's just kind of -- but my -- as I

4   understood you just testified, you gave reasons for why Ocwen

5   may have chosen not to postpone the sale again.  You said it's

6   been going on too long.  You said it'd already been postponed

7   once.  You said I'm not sure about what the law is in this

8   state.  Is there any document that we can look at where Ocwen

9   articulated any of the reasons that you've just testified to or

10  are you just speculating?

11  A.   It doesn't go into specific.  It just states that the

12  foreclosure proceedings will not be stopped.

13  Q.   Yeah.  And so you've given this jury possible

14  explanations.  Is it fair that that was speculation on your

15  part because there's no documents that you can look at that

16  would tell us?

17  A.   Well from what I see from the file, I see that there is an

18  incomplete application.

19  Q.   No one's arguing with you.

20  A.   Okay.  So I guess I'm not understanding your question.

21  Q.   You've just given this jury three possible explanations

22  for why Ocwen chose not to postpone the sale again and my

23  question is we started this morning with you saying you have no

24  personal knowledge, all you can do is look at the business

25  records.  My question is is what business record can the jury

Blanchard - Direct                                    198

1    and I look at that would show us any explanation for why they
2    chose not to postpone the sale again.
3    A.   The exact reason is not going to be -- the exact reason is
4    not like written out as far as everything I just stated, but
5    the incomplete application is something that is written out on
6    the document that said we will proceed to foreclosure and you
7    have numerous documents identifying that.
8    Q.   Okay.  So now take me to please Joint Exhibit 4-48.  This
9    bottom part.
10   A.   Okay.
11   Q.   Does this show us that a five-day letter was sent to the
12   Cornejos?
13   A.   This is an acknowledgment letter.  I'm wondering if we're
14   confusing five-day for a three-day notice.
15   Q.   Okay.
16   A.   But there should be a -- we should have that actual
17   document here.
18   Q.   We do.
19   A.   Okay.
20   Q.   But my question was going to be when was it sent.
21   A.   4/21.
22   Q.   At 6:52 p.m.?
23   A.   That's when it was ordered to be sent and, you know, it
24   goes in, it's printed and dropped in the mail.
25   Q.   Is there any way that Ocwen can send a letter before

1    anyone asks that it be ordered, and printed and dropped in the

2    mail?

3    A.   Can Ocwen send a letter before it requests it?

4    Q.   Right.  That's a bad -- let me just show you -- I don't

5    want to trick you up.  Let me just show you Defendant 578.

6    Ma'am, bear with me -- sorry, sir.  Sorry.  Let me go back to

7    the JT4-46.  I just want to make sure we're not confusing the

8    jury about the three-day acknowledgment letter and the five-day

9    letter.  This middle part here, that's a different entry for

10   the three-day acknowledgment letter, right?

11   A.   Okay.  Yes.

12   Q.   And that's generated by this individual, right?  What's

13   that person's name?

14   A.   Apijid Jougi (phonetic).

15   Q.   Okay.  And that person generates the three-day

16   acknowledgment letter, right?

17   A.   Yes.

18   Q.   And the three-day acknowledgment letter basically says

19   we've received -- dear borrower, we've received your

20   application, it's under review, is that fair?

21   A.   Yes.

22   Q.   It's not the one that says hey, supplement your stuff,

23   right?

24   A.   Let me just look at it.  I don't believe so, but I'll just

25   verify that.  Okay.  That's correct.

1    Q.    Oh yeah.  What's this mean where it says acknowledgment

2    letter sent, general AG?

3    A.    Where are you looking?  I'm sorry.

4    Q.    Sorry.  I just underlined it in red.  I guess you're

5    looking at the actual document.

6    A.    I'm looking at the document.

7    Q.    What's general AG?

8    A.    What page is that in this --

9    Q.    4-46, it's the middle entry.

10   A.    It's specific to the notation.  I'm not sure what the

11   abbreviation means, but the description is listed below.

12   Q.    Okay.  Thank you.  But we don't know what AG stands for,

13   is that fair?

14   A.    It would be tied into the description below it.  I don't

15   know the --

16   Q.    I'm not tracking you.  What's that mean, what you're

17   saying?

18   A.    When there's a notation it basically states that it's

19   defining -- it's saying three-day acknowledgment letter, this

20   document will be sent to the borrower.

21   Q.    Yeah.  I'm sorry.  My question is what does AG stand for

22   or mean.  I understand it's part of this note, but what -- is

23   that an abbreviation?  Is that --

24   A.    It's an abbreviation.  I'm not sure what the AG stands

25   for.

1   Q.   Okay.  Thank you.  Then if we -- sorry.  Now I'm going to

2   have you move in binders and -- but if we can go back to that

3   Defendants' 578.  And whatever's easier for you, he'll pull

4   them up on the screen too.  Whatever's --

5   A.   Okay.  578?

6   Q.   Yes, sir.  This is the five-day letter, right?

7   A.   Yes.

8   Q.   And it's dated April 21st, correct?

9   A.   Yes.

10  Q.   But the fact that no one at Ocwen ordered it to be sent

11  until after 6:00 o'clock at night, does that tell us that it

12  wasn't really sent or dropped in the mail on April 21st?

13  A.   No.

14  Q.   No, it wasn't?

15  A.   No.  It doesn't tell you that it wasn't sent.

16  Q.   Oh.  Based on the notation that it was ordered after 6:00

17  o'clock on April 21st would it be fair for us to understand

18  that this wasn't dropped in the mail until April 22nd at the

19  earliest?

20  A.   No.

21  Q.   Why not?

22  A.   Because they -- you know, as a mailing center, they go

23  ahead and print it and they put it in the outgoing mail.

24  Q.   How's it work at the mailing center?  Does the post office

25  pick it up after 6:00 o'clock?

1   A.   I'm not familiar of the time of the pickup or the location

2   of that particular mailing division.

3   Q.   How's it -- what mailing division did it come from?

4   A.   I don't know the specific location.

5   Q.   Where are the various mailing locations?

6   A.   I don't know of all the locations.  I know there's

7   probably one in Riviera Beach.

8   Q.   In where?

9   A.   Riviera Beach in Florida.  I'm not sure of other

10  locations.

11  Q.   Okay.  And so is it fair -- there's nothing that you can

12  look at in the business records that would indicate to us when

13  this letter was actually sent?

14  A.   The only other thing I've looked at, I did see in my --

15  that was one of the things I told you I looked at when --

16  between my deposition and now was extra verification of the

17  actual mailing going out, and these two letters were specific

18  ones that I had looked at as far as the verification of the

19  mailing.

20  Q.   Okay.  So what is it that you looked at that verifies that

21  the mail went out?

22  A.   It's just a -- it's like a business record, shows how many

23  pages were on the document, the loan that it belonged to.  Also

24  it has an exact -- it says mail by date and that's the date

25  that it was mailed.

Blanchard - Direct                                  203

1  Q.   Okay.  Did you bring that document with you so that we can
2  look at it?
3  A.   I didn't bring any documents on my person from Florida,
4  no.
5  Q.   Okay.  So you came here from Florida?
6  A.   Yes.
7  Q.   Okay.  And do you know, that document that you looked at,
8  did it tell you when it was actually mailed?
9  A.   Yes.  It says mailed.  The amount of pages and the mail by
10 date.
11 Q.   Does the mail by date mean when it's supposed to go out in
12 the mail or when it actually went?
13 A.   In my review of it it just says that's the mail date.
14 Q.   What was the mail date?
15 A.   It was the date that was stipulated on the -- I'm sorry,
16 the date that is notated on the documents themselves.
17 Q.   Okay.  So it's your testimony that this letter was mailed
18 on April 21st?
19 A.   As far as what I see in the business records, yes.
20 Q.   Okay.  And the business record that you're talking about
21 is the one that we looked at that's after 6:00 o'clock at
22 night?
23 A.   Yes.  I have this one and I also have the -- I also have
24 the other business record that I looked at as well.
25 Q.   Okay.  And then let's look at this -- the other business

1    record that you looked at but you didn't bring with you, right?

2    That's the other --

3    A.    I'm sorry.

4    Q.    The other business record that you looked at but didn't

5    bring with you to court is the other one that you're relying on

6    to tell me that this was sent on April 21st?

7    A.    And the notation right here.  I just did extra

8    confirmation in reference to those letters.

9    Q.    Okay.  Let's pull up just that first part.  So if it was

10   mailed from Florida on April 21st, what's the -- let me ask you

11   this.  Was it mailed via regular U.S. mail or was it expedited?

12   A.    It was regular U.S. mail and I don't know what location --

13   I don't recall what location it came from.  So I'm not saying

14   -- I came from Florida.  I don't know that that mailing center

15   was where it came from in Florida.  I don't recall.

16   Q.    Okay.  Does Ocwen have the ability to pay for overnight

17   mail with respect to urgent matters?

18   A.    Does it have the ability to pay?

19   Q.    Yeah.  I mean can it pay five or ten bucks to send

20   something via overnight mail?

21   A.    I think that would be a large cost considering how many

22   modifications that are going on, but I don't know if there

23   would be -- when you say it's not just -- you're not just

24   talking one account.  You're talking about every single thing

25   we process a modification on and I can't answer if there's a

1  financial budget for that.

2  Q.   Okay.  So are you aware, has Ocwen made a choice for

3  financial purposes not to expedite mailing of five-day letters

4  to people who are facing foreclosure because it just would cost

5  too much to Ocwen's bottom line?

6  A.   I don't know what's in that decision process.  You asked

7  me a specific question about it and I don't know.

8  Q.   Yeah.  So you're speculating, right?

9  A.   My answer was I don't know, so that would be speculating

10  about I don't know.

11  Q.   Right.

12  A.   Okay.

13  Q.   Okay.  But to your knowledge, does Ocwen have the -- did

14  Ocwen, on April 21st have the financial means to send this

15  letter via expedited or overnight mail?

16  A.   I don't know if it had a budget to send overnight mails to

17  everyone that applies for a modification.

18  Q.   That's not my question, sir.  Just the Cornejos because

19  they were only eight days out from a foreclosure.  Did Ocwen

20  have the ability to spend whatever it would cost to instead of

21  46 cents to put it in regular mail, five dollars to put it in

22  overnight or expedited mail?

23  A.   I'm not aware of any HAMP situation where they do

24  overnight, so I don't know if that's going to be something -- I

25  mean there's a lot more than just paying for it.  There's also

1    is there -- I don't know the answer to that question because I

2    don't know if there's any budget for that.  I don't know -- and

3    it goes around and it's going to also apply to several

4    accounts.  You're asking in reference to this individual

5    account.  I mean it is a large corporation that Ocwen is, but I

6    don't know the reasons behind not sending it overnight, but I

7    do know that it would affect every single modification

8    application out there and I believe that cost would be

9    exuberant.

10   Q.   Okay.  Are you aware of other servicers choosing to incur

11   the cost of sending certain time-critical documents via

12   overnight or expedited mail so that the borrower has sufficient

13   time to receive them?

14   A.   I don't know of any servicer that has expedited anything

15   in my last six years in reference to the modification in

16   reference to mail.  Now there's other things they do do.

17   There's calls.  Calls, you can look at your account online, you

18   can call us 24/7.  There's really not a need for this to be

19   mailed out that is something that can be communicated to the

20   borrower.

21   Q.   How about facsimile?  Does Ocwen have the power to send by

22   facsimile a time-sensitive document to the borrower?  That

23   doesn't cost any money.

24   A.   I would be assuming that they do, but I don't know if it's

25   something that's allowed.  I do recall seeing some type of

1   notification that went out to the borrower where the

2   relationship manager's not allowed to communicate back via

3   email.  It has to be a one on one call or it has to be some

4   type of written notification to the borrower.  So I don't know

5   what plays into that.

6   Q.   Okay.  But in any event, this letter gets mailed via

7   regular mail, correct?

8   A.   Yes.  This letter gets mailed via regular mail and the

9   borrower also talk to Ocwen in the interim.

10  Q.   Well that's two things.  So we'll unpack that in a minute.

11  But what's the earliest that the Cornejos could've received

12  this letter?

13          MR. SHATZ:  Objection to the extent it calls for

14  speculation, lacks --

15          THE COURT:  Sustained.

16  BY MR. HEENAN:

17  Q.   Are you aware that by placing a document in the mail in

18  Florida via regular U.S. mail the Cornejos would not receive it

19  the next day or the day after that?

20  A.   I mean you'd have to go by the post office's guidelines on

21  regular mail.

22  Q.   I'm just asking whether personally if you have any

23  knowledge and if you don't it's fine.

24  A.   I don't have any specific knowledge on that.  You know,

25  the postal service obviously they have their regular standard

1   mail time frame which I believe might be three days.  I don't

2   know.

3   Q.   Okay.  And I think the 27th was a Monday I think?

4          MR. SHATZ:  We'll agree with that, Your Honor.

5          THE COURT:  All right.

6   BY MR. HEENAN:

7   Q.   So there's a weekend in between, the 27th's Monday and it

8   sounds like Ocwen will stipulate to that.  But this letter's

9   not mailed out till the 21st at the earliest and then the due

10  date to complete it was the 19th, right?

11  A.   Yes.

12  Q.   So the due date that's being imposed on the Cornejos is

13  two days before this letter even gets sent in the mail, is that

14  true?

15  A.   This due date was there before they submitted their

16  documentation, so -- I mean it's clear that it's mailed two

17  days after the document was due.

18  Q.   Is that fair to the borrower when in the letter their due

19  date has already passed before the letter even goes out?

20         MR. SHATZ:  Objection.  Argumentative.

21         THE COURT:  Sustained.

22  BY MR. HEENAN:

23  Q.   Does it strike you as reasonable that a due date's imposed

24  on a borrower that precedes the date that the letter's even

25  dropped in the mail?

1    MR. SHATZ:  Objection.  Argumentative, still

2  mischaracterizes his testimony.

3    THE COURT:  Sustained.

4  BY MR. HEENAN:

5  Q.   Let me have you look at page four of this document please.

6  A.   Okay.

7  Q.   This bottom part tells the borrower please do not ignore

8  any foreclosure notice, correct?

9  A.   Correct.

10  Q.   And it specifically says if you're currently in

11  foreclosure, our evaluation in the foreclosure process may

12  proceed at the same time doesn't it?

13  A.   That's what it says, yes.

14  Q.   And this is a form letter that Ocwen sends to borrowers?

15  A.   Yes.

16  Q.   And what's being described there is what I've been calling

17  dual tracking and Ocwen's letters call dual pathing, isn't that

18  what's described in that sentence?

19  A.   I -- you know, I don't know what you're finding as dual

20  tracking again, and this is in reference to an incomplete

21  application, the acknowledgment and that's what's sent out,

22  yes.

23  Q.   Okay.  Based on -- and then let me -- based on your review

24  of the log notes, the servicing notes, when did the Cornejos --

25  where's the first time in the servicing notes where the

1    Cornejos are told of the incompleteness of the application or

2    what documents are needed or required to make it complete?

3    A.    Well after they submitted the application.  They submitted

4    the application on 4/17 and they were advised on -- I'm sorry,

5    4/16 and they were advised on 4/21.

6    Q.    Well wait, 4/21 it was still in underwriting.  Didn't we

7    just look at that?

8    A.    That's when -- 4/21 is when they made the -- I'm sorry,

9    that's when they made the determination that it's incomplete

10   and that's --

11   Q.    I understand that that's when Ocwen determined it to be

12   incomplete.  My question is where in the servicing notes is any

13   indication that the Cornejos have any knowledge that Ocwen has

14   deemed it to be incomplete.

15   A.    Okay.  Let me -- I just have to look at the notes.

16   Q.    Sure.  Take your time.

17   A.    I see there was an attempt to call the day right after the

18   decision was made, on 4/22; telephoned the residence and left

19   message to call.

20   Q.    In those -- in that message is the information that Ocwen

21   would've conveyed hey, Mr. and Mrs. Cornejos, sorry we missed

22   your call, we've received your loan application, it's

23   incomplete, please give us a call so that you can avoid having

24   your home sold at a foreclosure next week?

25   A.    I don't believe that information would've been in a

1   voice -- open voice message system, but they --

2   Q.   Okay.  So when you're looking at leaving voice mails, I

3   just don't want the jury to be misled or fill in a blank that

4   somehow that information would've been conveyed to the Cornejos

5   because it wouldn't, right?

6   A.   They would only be informed to call back.

7   Q.   Thank you.  Okay.  So keep looking in the log notes and

8   where can we see the Cornejos are actually informed about the

9   incompleteness of their application?

10  A.   Okay.  I see that we called them 4/21 -- I'm sorry, 4/22,

11  4/23.  I'm just trying to see when we --

12  Q.   Sure.

13  A.   -- got ahold of them.  Okay.  I see 4/24 another call out.

14  4/27 they finally got ahold of the borrower after trying and

15  they talked to Dora.

16  Q.   Let's bring up 4-51.  Okay.  So now we're two days out

17  from the foreclosure sale, right?

18  A.   That's correct.

19  Q.   And who's this person that's talking to Dora?

20  A.   Kimberly Pacer (phonetic).

21  Q.   Okay.  And does it look like at that point Kimberly

22  advised Dora that we're calling re missing docs, advised the

23  sale date, correct?

24  A.   Yes.

25  Q.   And what's this mean, said had sent missing docs?

Blanchard - Direct                                    212

1   A.   It looks like she's referring to the borrower saying that

2   she sent missing docs.

3   Q.   Why would the borrower say that she sent missing docs on

4   April 29th when it's only April 27th?

5   A.   I don't know if her interpretation is to the documents she

6   sent in from 4/17.  I don't -- I have no idea what the

7   borrower's perception is at that time.

8   Q.   Is it fair that it would be strange if this record was an

9   accurate recitation of the conversation between Mrs. Cornejo

10  and whoever at Ocwen?  I mean just would you agree with me it

11  doesn't make any sense?

12  A.   It makes sense to me.  I'm not sure what you're pointing

13  at.

14  Q.   Well because if this conversation occurred on April 27th,

15  would it make any sense for Mrs. Cornejo to say hey, I sent you

16  that document two days from now?

17  A.   I'm not understanding your question.  Are you asking why

18  does it say 4/29 again?

19  Q.   Yeah.

20  A.   Yeah.

21  Q.   No.

22  A.   No, the 4/29/15 is the sale date.  They could've just --

23  that could be a scribiner's error if they put 4/29 is when she

24  sent the missing docs.

25  Q.   Yeah.  That's my question.

1   A.   Yeah.  I don't --

2   Q.   That doesn't make any sense, can we agree about that?

3   A.   That she's saying that she sent the docs on 4/29, that

4   would be incorrect.

5   Q.   Yeah.

6   A.   But she's saying that -- what I gather from this notation

7   is that Kimberly spoke to her, advised her that the sale date

8   is 4/29 and the borrower is saying that -- said -- the SD said

9   had sent missing docs.  So -- and then made this --

10  Q.   And then if we --

11  A.   I'm sorry.  Go ahead.

12  Q.   Go ahead.  Then I was going to move to JT53.

13  A.   You said 53?

14  Q.   Yes, sir. JT4-53.

15  A.   Yes.

16  Q.   It's not up on my screen yet, but --

17  A.   Okay.

18          MR. HEENAN:  The bottom notation please, Wade.

19  BY MR. HEENAN:

20  Q.   Here's another phone call also on April 27th, correct?

21  A.   Yes.

22  Q.   And who's doing the talking on both ends?

23  A.   It looks like she talked to a Rajish Kumar Patwa

24  (phonetic) and it was actually an appointment rescheduled by

25  customer 4/27.  The appointment agent is showing is Izen Gen

1  (phonetic).  The notation looks like it's Rajish Kumar Patwa.

2  Q.   What's this -- sorry.  Go ahead.  I didn't mean to cut you

3  off.

4  A.   Yeah.  I think I answered the question.

5  Q.   Look on your screen -- sorry.  I'm talking about the wrong

6  entry.  You see that one, the 12:01?

7  A.   What page is that on?

8  Q.   It's also on that 4-53.  It's just the bottom entry on

9  that page.

10 A.   Okay.

11 Q.   What's happening there?  Who's talking to who?  What's

12 going on?

13 A.   That's Rajish Kumar Patwa and it's a phone call in from

14 the borrower, called in to inform that she had faxed the

15 missing docs on 4/24/2015.

16 Q.   And so when we look at --

17      MR. HEENAN:  Can you put these side by side, the 4-51

18 at the bottom and 4-53 at the bottom and blow it up for the

19 jury please?

20 BY MR. HEENAN:

21 Q.   It looks like there's two separate phone calls, right?  If

22 you look at the bottom entry of 51 and the bottom entry of 53,

23 or if you just look at --

24 A.   Oh, I'm sorry.

25 Q.   No, you're okay.

1   A.   51 and 53, yes.  Let's see.

2   Q.   Where's the single point of contact for the Cornejos at

3   this point?  Here we are, we're two days away from the sale,

4   two different people talking to Mrs. Cornejo and at least in

5   one part, material -- or in one part -- consistent in one part,

6   inconsistent information being recorded in the notes.  Do you

7   see that?

8   A.   Yeah.  I don't know at this point the availability of

9   Gentle Eison.

10  Q.   When Mrs. Cornejo talks to Rajish Kumar Patwa, does Rajish

11  Kumar give his or her real name or a different name to Mrs.

12  Cornejo to talk to?

13  A.   Does he give his real name?

14  Q.   He or she.  I mean --

15  A.   I mean it says it's booked by him.  I mean I didn't hear

16  the actual conversation, but yes, it would give his name that

17  is used all the time in customer service.

18  Q.   Does Ocwen customer service in foreign locations use names

19  other than their own when dealing with borrowers?

20  A.   I don't know that to be true.

21  Q.   Okay.  And would you agree with me that in these two

22  separate conversations 11 minutes apart it looks like Mrs.

23  Cornejo repeats in both instances that she had sent missing

24  documents?

25  A.   Okay.  What two entries are you speaking in reference to?

1  Q.   If you just look on your screen and I'll -- I just

2  butchered that.

3  A.   Yeah.  It looks like one is a phone call out -- the first

4  one is a phone call out at 11:50 and then she calls back in on,

5  you know, 12:01.

6  Q.   And do you see that in both instances Mrs. Cornejo is

7  indicating that no, this -- the borrower had called in to

8  inform that she had faxed the missing documents?  You see in

9  both instances she's saying that she had sent missing

10 documents?  Two different people, she's communicating to them

11 that she had sent missing documents?

12 A.   Yes.

13 Q.   And on one of them --

14 A.   Well I'm sorry.  Kimberly, yes.  That's correct.

15 Q.   Would you agree with me also with Rajish Kumar, that the

16 borrower called into inform that she had faxed the missing

17 docs?

18 A.   Yes.

19 Q.   And in one notation it says -- they're both April 27th.

20 One notation she says it was three days prior; one notation she

21 apparently says it's two days in the future.  Do you see that?

22 A.   Yeah.  I believe that is a -- I don't believe that is a --

23 I believe that's a misprint, like she must've pressed the

24 wrong -- she pressed a nine instead of a four.  I mean it's

25 clear that she didn't send the missing documents two days in

1  advance -- or in the future.

2  Q.   Right.  But in both instances, to two separate people,

3  they're reporting hey, these documents have been sent in,

4  right?

5  A.   This is simply a summarization of what the borrower is

6  telling Ocwen.  We're telling her we -- they have not received.

7  On the phone call out, we said we still haven't received them.

8  On the phone call in, we're telling her we still haven't

9  received them, but we are noting what the borrower is stating

10  and also in the one instance giving her alternate means to make

11  sure it comes into Ocwen.

12  Q.   Yeah.  So -- but would you agree with me that in both

13  entries Mrs. Cornejo is saying to whoever she's talking to hey,

14  I sent in missing documents?

15  A.   Yes.

16  Q.   And would you agree with me that between April 16th and

17  April 27th Ocwen has no record of additional docs being faxed

18  by Mrs. Cornejo?

19  A.   At 27, well the notification is to 21st, so I don't -- no,

20  there was no -- between that time frame, no.

21  Q.   Okay.  And when you say no, you're saying there's none in

22  Ocwen's business records that you've reviewed, right?

23  A.   Correct.

24  Q.   You're not saying no, Mrs. Cornejo didn't fax in the

25  documents as she represented to two different people, right?

Blanchard - Direct                                    218

1   A.   You're asking me if there was any evidence that Ocwen had
2   and the answer's no.
3   Q.   Right.  Because it's not in the business records, right?
4   A.   Correct.
5   Q.   Are you aware of federal or state regulators criticizing
6   Ocwen's practices with respect to document receipt and
7   retention?
8   A.   No.
9   Q.   Okay.  Are you aware of borrowers criticizing Ocwen's
10  practice of document receipt and retention and to specifically
11  it's claim that documents that borrowers say they sent in it
12  never received?  Have you ever heard a borrower complain about
13  something like that?
14  A.   That's the situation right now.
15  Q.   Right.  Any other times you've heard about borrower
16  complaining about something just like the Cornejos were?
17  A.   As I stated before, that's a common assertion by
18  borrowers.
19  Q.   Okay.  And when you say common assertion by borrowers, can
20  you expand on that please?
21  A.   As I stated before, they'll send in a document and we
22  communicate somewhere down the path that hey, the document is
23  not sufficient, we need it or they send us the wrong type of
24  document and they will say that I sent in that document already
25  or there might be some confusion in reference to that.

1  Q.   Okay.  And that's what's going on here, right, April 27th

2  Mrs. Cornejo's saying hey, I sent the document and Ocwen

3  doesn't have any -- isn't showing any receipt of the document,

4  is that fair?

5  A.   That's what she's stating.

6  Q.   Right.  And also you're saying that Ocwen doesn't have any

7  documentation showing it received the document, right?

8  A.   Correct.

9  Q.   Okay.  And now it's noon on April 27th, right?

10  A.   Correct.

11  Q.   And the sale's scheduled for 10:00 a.m. on April 29th,

12  correct?

13  A.   Yes.

14  Q.   At this point in time does Ocwen have the power to say

15  gees, the borrower called, she says she submitted more

16  documents, we're not finding them in the system, let's just

17  postpone the foreclosure sale by a couple weeks so that we can

18  figure this out?

19  A.   As the entity bringing the suit, yes.

20  Q.   And did Ocwen choose not to exercise that power on April

21  27th, to postpone the sale?

22  A.   I don't see a decision was made to postpone the sale.

23  Q.   Me either.  Thank you.

24       MR. HEENAN:  Then let's go back to Defendant 578,

25  page four please, Wade.

Blanchard - Direct                                      220

1   BY MR. HEENAN:

2   Q.   So this is the five-day letter that we were looking at

3   before, sir.

4   A.   I'm sorry, where are you?  Okay.  578 what?

5   Q.   Sorry.  Defendant 578, page four.

6   A.   Okay.

7            MR. HEENAN:  Can you bring up that top paragraph

8   please?

9            MR. SPEAKER:  The whole section or --

10           MR. HEENAN:  Yeah.  The whole section please.

11  BY MR. HEENAN:

12  Q.   This is -- again, to orient our jury, this is the five-

13  day letter that Ocwen sent April 21st that it looks like on April

14  27th is news to the Cornejos?

15  A.   I'm sorry.

16  Q.   Sure.  I just -- are you tracking me that this is the

17  letter that we already looked at --

18  A.   Yes.

19  Q.   -- the five-day letter?

20  A.   Yes.

21  Q.   Okay.  And is it fair that, at least based on what Mrs.

22  Cornejo is being told by Ocwen on the 27th, that's the first

23  indication that Mrs. Cornejo's become aware of additional

24  missing documents?

25  A.   This is the first written correspondence in reference to

1   the missing documents after her last application was received.

2   Q.   Okay.  And let me direct your attention to this paragraph

3   that I've -- it'd be the third paragraph down.

4   A.   Yes.

5   Q.   What's Ocwen telling the Cornejos?

6   A.   If we receive all the required documents no later than

7   midnight of the business day prior to your scheduled

8   foreclosure sale date we will take actions to suspend the

9   foreclosure sale to evaluate your request for available loss

10  mitigation options as long as suspension of foreclosure is

11  permitted by state regulations and approved by your loan's

12  investor.

13  Q.   Thank you.

14       THE COURT:  All right.  Let's go ahead and take our

15  afternoon break.  Let's come back at a quarter after 3:00.

16       (Jury out at 3:02 p.m.)

17       THE COURT:  All right.  Let's take a break.

18       (Recess from 3:02 to 3:15 p.m.)

19       (Jury in at 3:16 p.m.)

20       THE COURT:  All right.  Mr. Heenan, you may continue.

21       MR. HEENAN:  Thank you, Your Honor.

22  BY MR. HEENAN:

23  Q.   Okay.  Sir, we have Exhibit 578, which is the five-day

24  letter, correct?

25  A.   Yes.

1    Q.    On your screen.  And the third paragraph conveys to the

2    Cornejos if we receive all required documents no later than

3    midnight of the business day prior to your scheduled

4    foreclosure sale date we will take actions to suspend the

5    foreclosure sale to evaluate your request for available loss

6    mitigation options as long as suspension of foreclosure is

7    permitted by state regulations and approved by your loan's

8    investor.  Did I read that correctly?

9    A.    Yes.

10   Q.    Thank you.  Is there anything, to your knowledge, about

11   California law or regulations that would prohibit Ocwen, if it

12   received the required documents, to suspend the foreclosure

13   sale of the Cornejos' home?

14   A.    Not that I'm aware of.

15   Q.    Thank you.  And in order to get -- well let me ask this.

16   When Ocwen postponed the sale from March to April did they get

17   U.S. Bank trustee -- or U.S. Bank, whatever the entities -- the

18   investor's approval?

19   A.    Not that I know of.  That was in reference to one of the

20   guideline bullet points that -- I don't believe you went over

21   all the bullet points on that.

22   Q.    Okay.  Well I'm aware some investors won't approve, some

23   investors only do -- I mean wasn't that your testimony

24   previously, some investors only will do it once or a limited

25   number of times?  Again, we don't have any knowledge that this

1    investor was one of those entities, right?

2    A.   I don't know the restrictions of this investor.

3    Q.   Okay.  There's nothing in Ocwen's business records where

4    Ocwen's saying dear investor, can we please postpone the sale

5    and the investor says no, you may not?

6    A.   No.  I did not see that.

7    Q.   Okay.  Thank you.  Then let me have you look at Joint

8    Exhibit 18.  What's this document?

9    A.   I'm sorry.  This is 18 Joint you said?

10   Q.   Joint, yes.

11   A.   Okay.

12   Q.   Okay.

13          MR. HEENAN:  Maybe Wade, if you'll go -- maybe go to

14   like the second page please.

15   BY MR. HEENAN:

16   Q.   Would you agree with me that this is a fax?

17   A.   This looks like a fax sent on the 28th.

18   Q.   And was it sent -- let's give the -- let's look at the

19   fax.  What's the date and time that this fax is sent?

20   A.   4/28, 10:37 a.m.

21   Q.   Okay.  So now we're approximately 23 and a half hours from

22   the scheduled foreclosure sale, correct?

23   A.   Yes.  Well it's -- I think the foreclosure sale is booked

24   for 8:00 -- sometime around 8:00 a.m. the next morning.

25   Q.   Oh, I thought it was 10:00 a.m.  Am I wrong?

1    A.    Ten a.m., we could look back at the document.  I'm not

2    going to dispute that.

3    Q.    Okay.  In any event, less than 24 hours before the

4    scheduled foreclosure sale, correct?

5    A.    Yes.

6    Q.    Okay.  And did Ocwen receive this fax?

7    A.    Yes.

8    Q.    And so now let me have you look at Joint 5 please.

9    A.    Joint 5?

10   Q.    Yes, sir.

11   A.    Okay.

12   Q.    Is this part of Ocwen's business records?

13   A.    Yes.  It looks like a printout of -- an actual printout of

14   something from the comment log.

15   Q.    Is this part of the business records that you have access

16   to and can review?

17   A.    Yes.

18   Q.    And what's going on here?

19   A.    They're noting that there's some type of imaging that

20   needs to -- they're noting -- this is just a request to have an

21   attached image -- comment, image attached here document, so

22   it's an attached document that they're requesting to be imaged

23   and this is the --

24   Q.    And who -- sorry.  Go ahead.  I didn't mean to cut you

25   off.

1   A.    That was it.  They're just requesting an attached document

2   to be imaged.

3   Q.    Who's the person requesting the document to be imaged?

4   A.    Tobassum Asgar.

5   Q.    And what's Tobassum's role at Ocwen?

6   A.    He's a senior escalation specialist.

7   Q.    What's that mean?

8   A.    He's an escalation specialist.  He works with escalating

9   matters.

10  Q.    What's an escalated matter?

11  A.    Something that's requesting extra attention.

12  Q.    And if some -- can I deduce from his job title as senior

13  that he is higher than a regular escalation specialist?

14  A.    He's senior to his position, yes.

15  Q.    I mean your position -- your job title also starts with

16  the word senior doesn't it?

17  A.    Yes.

18  Q.    And does that connote a level of experience that you

19  wouldn't otherwise have?

20  A.    Yes.  I came from a loan analyst to a senior analyst, yes.

21  Q.    And that was a promotion, correct?

22  A.    Yes.

23  Q.    Okay.  And so does that help us know that within Ocwen

24  that Tobassum Asgar is higher than a regular escalation

25  specialist?

1    A.   I don't know if it would be considered a regular

2    escalation specialist or just a specialist.

3    Q.   Okay.

4    A.   So I would say he's higher than the entry level for his

5    particular department.

6    Q.   And specialist connotes someone that has particular unique

7    skill on some issue?

8    A.   Yes.

9    Q.   Okay.  And escalation is something that's basically above

10   and beyond kind of the normal stuff?

11   A.   Yes.

12   Q.   Like someone whose home was going to be foreclosed the

13   next day?

14   A.   That could be a reason.

15   Q.   Okay.  And the importance level of this request for

16   scanning -- imaging is high, right?  You see it where it says

17   importance high?

18   A.   Yes.

19   Q.   Okay.  So does that mean that the senior escalation

20   specialist considered this request to be high?

21   A.   That's how he labeled the email.

22   Q.   Okay.  Do you use like Microsoft Outlook?

23   A.   To the best of my knowledge, yes.

24   Q.   Okay.  There's like a little button you can click and if

25   it's something important you can label it important?

1  A.   Yes.

2  Q.   Okay.  Is that how Ocwen's email system works it looks

3  like?

4  A.   I'm only familiar with Outlook being the email system for

5  Ocwen.

6  Q.   Okay.  And this is April 28th at 2350, so does that tell

7  us it's 11:50 at night?  Oh, sorry.  Well help us understand

8  because here's something at the top says 2:20 p.m. and

9  something at the bottom says 2350, right?

10  A.   Yeah.  The -- it's my understanding that real servicing,

11  which is what this comment -- this is a email that was printed

12  within real servicing, so they put this in a comment and they

13  printed it.  So what you see at the top is the date by real

14  servicing, the comment date.  And then what you see in the body

15  of the email is the email date, the email time.

16  Q.   Can we agree that both those -- that this document

17  reflects that the Cornejos' fax has been received by Ocwen?

18  A.   We could -- I have no problem tying it in.  If it's --

19   that's the only image that was received at that time I would

20  say it's the same document.

21  Q.   Thank you.  And we agree that it's now firmly in the hands

22  of Ocwen before midnight on April 28th?

23  A.   Midnight -- you're saying midnight April 28th or midnight

24  April -- well midnight April 28th is 12:00 a.m. April 28th.

25  Q.   Well what's 2350?  You see where it says April 28th, 2350?

1    Let me just just -- I mean I'm trying to go fast.  Can we agree
2    that in any event it's received on April 28th?
3    A.    Yes.  We can agree that it's received on April 28th.
4    Q.    Thank you.  Now let me have you look at JT6 please.  And
5    again, I think the bottom is the one we were just looking at,
6    maybe not.  So it's a different email, but again this is
7    Tobassum Asgar communicating to who?
8    A.    Mohammad Maserden (phonetic).
9    Q.    And again, this importance level high, correct?
10   A.    Yes.
11   Q.    And then --
12   A.    I'm sorry, this is from Mohammad to Asgar; the top portion
13   is.  Is that what you're speaking of?
14   Q.    Start at the bottom, but yes, I -- and then Mohammad
15   responds, is that fair?
16   A.    Yes.
17   Q.    And what I want to -- does his email conclude with please
18   note that escalated issues are extremely time sensitive and the
19   24 to 48 hour turnaround time is required?
20   A.    What is your question about that statement?
21   Q.    Yeah.  Does Mohammad at the conclusion of this email note
22   with three stars, please not that the escalated issues are
23   extremely time sensitive and a 24 to 48 hour turnaround time is
24   required?
25   A.    Yes.

Blanchard - Direct                                      229

1    Q.   Okay.  So -- and this is what, 7:20 p.m.  So -- well let's

2    just keep going for a minute.  And then let me have you look at

3    JT7

4    A.   Okay.

5    Q.   Who's Stephanie?

6    A.   That's -- Stephanie was a foreclosure coordinator.

7    Q.   Is that the person that you talked to?

8    A.   Yes.

9    Q.   Okay.  And the senior escalation specialist is emailing

10   Stephanie, correct?

11   A.   Yes.

12   Q.   And what's he saying to Stephanie?

13   A.   Customer states that he would like to get a modification

14   instead of a sale tomorrow on a property.  He also informed me

15   that if sale cannot be postponed then they will file for

16   bankruptcy chapter seven.  Please review and advise me if there

17   are any changes for postponing of sale date.

18   Q.   What's CSD stand for?

19   A.   I believe that's sale date.

20   Q.   Okay.  So is the senior escalation specialist giving any

21   -- is he recommending that the sale date be postponed?

22   A.   He's sending a request to Stephanie advising that the

23   borrowers -- advising of the -- what the borrowers request.

24   Q.   Okay.  And again, that happens on April 28th?

25   A.   Yes.  This is April 28th.

Blanchard - Direct                                    230

1   Q.   And then if we look to JT461 -- 4-61, sorry, last entry.

2   Here's Mohammad again having a phone call with Mrs. Cornejo or

3   Mr. Cornejo?

4   A.   Okay.

5   Q.   Is that -- am I reading that correctly?

6   A.   Yes.

7   Q.   Okay.  And now we're the evening before the sale, right?

8   A.   Yes.

9   Q.   These issues have been sent to escalation within Ocwen,

10  right?

11  A.   Yes.

12  Q.   Ocwen has documents in hand where escalation is saying we

13  should continue the sale, correct?

14        MR. SHATZ:  Objection to the extent it

15  mischaracterizes his prior testimony.

16        MR. HEENAN:  Is that mischaracterizing?  I don't want

17  to --

18        THE COURT:  One second.  That's not for him to

19  decide.

20        MR. HEENAN:  Sorry, Your Honor.  I'm not sure what

21  regard.

22        MR. SHATZ:  He stated that Mohammad passed on the

23  customer's request, not that escalation was requesting the

24  postponement.

25        THE COURT:  All right.  Okay.  Sustained.

1   BY MR. HEENAN:

2   Q.   Okay.  Let's go back to the JT8 again -- no, JT9-1.

3   Sorry.

4   A.   Yes.

5   Q.   The email that we just looked at was an email between

6   Tobassum Asgar and Stephanie Wenner, correct?

7   A.   Yes.

8   Q.   And what's -- hold on just a second.  Sorry.  I just want

9   to make sure we're all on the same page.  This is an email from

10  Tobassum to Stephanie, correct?

11  A.   Yes.

12  Q.   On April 28th, correct?

13  A.   Yes.

14  Q.   And again, importance high, correct?

15  A.   Yes.

16  Q.   What's the subject line read?

17  A.   It's like 4965 request to postpone, CSD for 4/29/2015.  I

18  think that's confirm sale date.

19  Q.   Okay.  And so just so I'm clear, is Tobassum recommending

20  that the sale date be postponed or is it just the Cornejos who

21  are requesting that the sale date be postponed, or do you know?

22  A.   This is -- well when I read it I only see that he's

23  communicating what the borrower is communicating to him.  He

24  forwarded the request to Stephanie.

25  Q.   Okay.  So you're not aware of anyone within Ocwen

1   recommending that this sale be postponed?

2   A.    I do not see this recommendation here.

3   Q.    Okay.  Did Ocwen have the power to postpone the sale on

4   April 28th?

5   A.    The power to postpone?  I mean they have the power to

6   request.  But you know, obviously the sale is being handled by

7   the trustee.

8   Q.    The time in February when they postponed the sale or

9   requested that the sale be postponed, didn't we look at from

10  the time they made the request until it was instituted,

11  received and put in place was seven hours?

12  A.    You're talking about a totally different situation.

13  Q.    Why's that?

14  A.    Because the confirmed sale date wasn't the next morning.

15  Q.    Okay.  So it takes longer for Ocwen to email Western

16  because the sale date is the next morning?

17  A.    When you have a confirmed sale date, there are certain

18  things that are already rolling for the sale first thing in the

19  morning as opposed to sale that's whatever -- I think it was

20  maybe March 27th for the last one.  So that's -- that wasn't

21  the next day that that was scheduled for.  Like this was

22  already scheduled for the foreclosure sale the next morning.

23  Q.    Wasn't it already scheduled in March?

24  A.    Many days out.

25  Q.    I mean I don't want to go back to where we were this

1   morning.  Didn't we agree that Ocwen sent the request that
2   night, the next morning it had been processed?
3   A.    Yeah.   That's correct.
4   Q.    Okay.   But that couldn't have happened here?  It was out
5   of Ocwen's hands?
6   A.    You're stating as if it was the same thing where it's not.
7   That's all I'm stipulating.  But the request last time, it went
8   out and, you know, within 24 hours they had email confirming
9   that it was stopped.
10  Q.    Okay.   And the sale date -- let me have you pull up PX9-1
11  please.  And just first let me orient you because I want to
12  make sure we're all on the same page.  I just want to have you
13  confirm, this is when it got pushed off in March.  The new
14  date, would you agree with me, was 10:00 a.m. on April 29th?
15  A.    Yes.
16  Q.    Okay.   And then on April 28th documents were received by
17  Ocwen and had been imaged by Ocwen.  Ocwen had received a phone
18  call from the Cornejos or someone on their behalf saying please
19  postpone the sale.  And am I right to -- just let me make
20  clear, is it that Ocwen at that point in time didn't have the
21  power to postpone the sale or that it chose not to exercise
22  that power?
23  A.    There was no certification that there was a completed
24  package received by the underwriter at that time.  Yes, they
25  did have the power to stop or move the sale.

1  Q.   And if things would've went the way they went back in

2  March, had a request been made on the afternoon of March 28th

3  or even into the evening of March 28th [sic], the trustee

4  certainly could've postponed the sale the morning of the 29th?

5         MR. SHATZ:  Objection.  Incomplete hypothetical and

6  March 28 was probably misspoke.

7         THE COURT:  Sustained.

8         MR. SHATZ:  You said March 28, not April 28.

9         MR. HEENAN:  Sorry.

10 BY MR. HEENAN:

11 Q.   Certainly if things had gone the way they had in March,

12 where at night Ocwen says please -- by that email that we all

13 looked at, it says please postpone it and it's postponed by the

14 next day, had that kind of time line worked out, if Ocwen

15 would've on April 28th said please postpone the sale it

16 could've gotten postponed before 10:00 o'clock in the morning

17 on the 29th, correct?

18 A.   I don't know that because you're speaking of a confirmed

19 sale date that is already scheduled to be sold at the event in

20 the morning.  The other one didn't have that where it's

21 actually scheduled the very next morning.  So I would believe

22 there is a certain amount of -- there's a big difference in to

23 the abilities as it involves more than just Ocwen.

24 Q.   Okay.  Does the process get more convoluted because it's

25 closer to the sale date?  I mean it's still just an email isn't

1   it, to the trustee?

2   A.    It's a -- there is an email to the trustee and there's

3   other events that the trustee needs to do in order to do that,

4   but there's also -- you're speaking of also a confirmed

5   complete package that --

6   Q.    Sir, isn't the only thing the trustee has to do is not

7   show up and conduct the sale?  I mean isn't that all that has

8   to happen to make the sale not go forward?

9   A.    I'm not the trustee, so I can't answer for them.

10  Q.    Okay.  So then you're speculating about when you try and

11  inject and insinuate to this jury that somehow it's more

12  complicated for the trustee to call off the sale than simply

13  just not crying the sale in front of the courthouse?

14            MR. SHATZ:  Objection.  Argumentative.

15            THE COURT:  Sustained.

16            MR. SHATZ:  Move to strike.

17            THE COURT:  Stricken.

18  BY MR. HEENAN:

19  Q.    But based on everything you've just told us about how much

20  harder it is let's go back to Defendants' 578 please, page four

21  again.  Is this a form letter that we've been looking at?

22  A.    Yes.

23  Q.    Okay.  So the same letter the Cornejos got is the one that

24  all the other borrowers that are trying to modify on the one

25  path while they're being sent down the foreclosure path on the

1    other hand get this same letter?

2         MR. SHATZ:  Objection.  Argumentative.

3         THE COURT:  Sustained.

4    BY MR. HEENAN:

5    Q.   Why does Ocwen tell borrowers like the Cornejos that if we

6    received all required documents no later than midnight of the

7    business day prior to your scheduled foreclosure sale we will

8    take actions to suspend the foreclosure sale?

9    A.   That's what they told this individual borrower on this

10   form, but the borrower didn't submit the documents by midnight

11   of the prior business day.

12   Q.   Oh, and why's that?

13   A.   I don't know she didn't submit it by midnight of the prior

14   business day.

15   Q.   Oh.  So when she submitted it on -- well the 29th was a

16   Wednesday, right?

17   A.   Right.

18   Q.   Which is a business day?

19   A.   That's the day of the sale, right.

20   Q.   The 28th is Tuesday, right?

21   A.   That's the day prior to the sale.

22   Q.   And we looked at a fax that the Cornejos sent at 10:00

23   o'clock in the morning on the 28th, right?

24   A.   Right.

25   Q.   So why wouldn't Ocwen say to people like the Cornejos hey,

1   you're wasting your time to send us a fax at this point, we're

2   going to move forward with the foreclosure sale, it's too

3   convoluted because it's so close or whatever words to that

4   effect that you just told this jury?  Why don't they put that

5   in their form letter so that people like the Cornejos know

6   where they stand?

7              MR. SHATZ:  Objection.  Argumentative.

8              THE COURT:  Sustained.

9   BY MR. HEENAN:

10  Q.   The testimony that you just gave to this jury about all

11  the things that made it impossible to call of a foreclosure

12  sale the day before, how come none of that language is in this

13  form letter that the Cornejos and borrowers like them rely on

14  to try and figure out how to save their homes?

15             MR. SHATZ:  Objection.  Argumentative.

16             THE COURT:  Counsel, let's talk a moment at sidebar.

17        (Sidebar begins.)

18             THE COURT:  I'm hearing a lot of argument, not a lot

19  of questions (indiscernible) looked at the same paragraph, this

20  is the fourth time.

21             MR. HEENAN:  Your Honor, this witness is very

22  evasive.  He's not giving direct answers or complete answers.

23  He's just injected into this jury circumstances that are

24  nowhere to be found in the record and (indiscernible) to cure

25  the misinformation that this witness has given.

Blanchard - Direct                                    238

1          THE COURT:  I don't disagree that he's not

2   (indiscernible) witness.  In some ways you ask him to

3   speculate.  When he does, then you call him on it and that may

4   be part of the problem.  In any event, this jury's not stupid.

5   They've heard this now four times.

6          MR. HEENAN:  All right.  I'll move on.  I'm sorry,

7   Your Honor.  Thank you.

8          THE COURT:  But --

9          MR. HEENAN:  I'll withdraw the question and move on.

10          THE COURT:  All right.

11          MR. HEENAN:  Thank you, Your Honor.

12      (Sidebar ends.)

13          MR. HEENAN:  I withdraw my previous question.

14          THE COURT:  All right.

15   BY MR. HEENAN:

16   Q.   Sir, I don't want to leave any -- you're not trying to say

17   that when Ocwen tells borrowers the midnight of the business

18   day prior that really meant Monday here instead of Tuesday

19   morning are you?

20   A.   At 12:00 a.m. is 12:00 a.m. on the 28th.

21   Q.   Okay.  So you're saying that by 10:00 a.m. on the 28th

22   under this document it's too late?

23   A.   10:00 a.m. is after 12:00 a.m., yes.

24   Q.   Okay.  And so help me interpret this document.  What was

25   the deadline then for the Cornejos?

1   A.   Midnight of the prior business day.  Prior -- we both

2   agree that the prior business day is the 28th.  Twelve a.m. is

3   12:00 a.m. the 28th, not 12:00 a.m. the 29th.

4   Q.   So with respect to this sale that was scheduled for the

5   29th, is it your position on behalf of Ocwen that that means it

6   had to come in by the 27th?

7   A.   Twelve a.m. the 28th.  The first hour of the 28th is 12:00

8   a.m.

9   Q.   Okay.  And so what's -- I'm still not tracking.  It had to

10  be in by the 27th?

11  A.   It had to be in by 12:00 a.m., yeah.  So the --

12   logistically, it needs to be in 11:59, 12:00, that's the

13  cutoff time listed in here.  But regardless, their course was

14  pushed through to Stephanie to -- from the borrower to try and

15  see if something can be done.

16  Q.   I've read this document 300 times in the last two weeks

17  and never read it that way.  So would you agree with me that a

18  borrower might be confused by your interpretation of what that

19  deadline is?

20        MR. SHATZ:  I don't know if the question is pending.

21  If so, objection on the grounds of speculation.

22        THE COURT:  Sustained.

23  BY MR. HEENAN:

24  Q.   Sir, would you agree with me that midnight means night, it

25  doesn't say in this document 12:00 a.m.?

1            MR. SHATZ:  Objection.  Argumentative.

2            THE COURT:  Overruled.

3            THE WITNESS:  Midnight is 12:00 a.m. to me.

4   Midnight -- and it said -- it gave a specific day.  It said the

5   prior business day.

6   BY MR. HEENAN:

7   Q.    Do you think that Ocwen could've been a little clearer if

8   that's the deadline that they wanted to impose on borrowers?

9   A.    They could've put -- written out the actual time that

10  represents midnight instead of just using the word.

11  Q.    How many borrowers have lost their home like the Cornejos

12  because they sent in documents on the morning of the business

13  day before instead of 11:59 two business days before?  How many

14  people just like the Cornejos?

15           MR. SHATZ:  Objection.  Argumentative.

16           THE COURT:  Sustained.

17  BY MR. HEENAN:

18  Q.    Are you aware of other people who have suffered the same

19  fate as the Cornejos by virtue of Ocwen's interpretation of

20  this deadline?

21  A.    No.

22  Q.    Let's look at -- so does the sale go through on the 29th

23  as scheduled?

24  A.    Yes.

25  Q.    Ocwen doesn't do anything to postpone it, correct?

Blanchard - Direct                            241

1    A.   I don't see that the sale was postponed by Ocwen.

2    Q.   And Ocwen's the only one with the power to postpone it,

3    correct?

4    A.   The trustee can pull it for whatever reason they deem

5    necessary.

6    Q.   Okay.  Does the trustee communicate to Ocwen before the

7    sale?

8    A.   Yes.

9    Q.   And let's look at 15-21.

10            MR. SHATZ:  Plaintiff or Joint?

11            MR. HEENAN:  Oh, I'm sorry.  Joint 15-21 please.

12   BY MR. HEENAN:

13   Q.   Oh, I'm sorry.  Let's go back -- I apologize.  I just want

14   to keep us on the time line.  Let's go to 4-63 please -- Joint

15   4-63, and maybe let's pull up these two entries.  At 8:53 a.m.

16   the morning of the sale the Cornejos' modification is being

17   review in progress and it's been submitted to underwriting, is

18   that correct?

19   A.   Yes.

20   Q.   And you testified previously today underwriting's the one

21   that determines whether the application is complete?

22   A.   Yes.

23   Q.   Thank you.  Now let's go back to Joint 15-21 please.  Four

24   minutes earlier that loan note that we just looked at where the

25   Cornejos are being reviewed by underwriting for a HAMP

1    modification, what's going on here?

2          MR. SHATZ:  I'm sorry.  I'm in the wrong spot.  I

3    don't see it.  What page are you on?

4          MR. HEENAN:  15-21.

5          MR. VITIELLO:  Joint.

6          MR. HEENAN:  Joint.

7    BY MR. HEENAN:

8    Q.   Are you with me, sir?

9    A.   Yes.

10   Q.   You see --

11         MR. HEENAN:  Wade, please show the time.  Can you

12   highlight the time there?

13   BY MR. HEENAN:

14   Q.   This is going on four minutes prior to that servicing note

15   we just looked at where they're being -- the Cornejos are being

16   considered for a HAMP modification, right?

17   A.   Okay.

18   Q.   Would you agree with me?

19   A.   This is in reference to the sale, is that what you're

20   asking?

21   Q.   Yeah.  I'm just saying this is 8:49 a.m.  We just looked

22   at a note that said 8:53 a.m. didn't we?

23   A.   Yeah.  This is 8:49 a.m., but again, this is in -- I

24   don't --

25   Q.   My question right now, I'm just trying to move us along.

1    Would you agree that at exactly the same time or almost exactly

2    the same time that Ocwen is saying underwriting is reviewing

3    the Cornejos for a HAMP modification, someone is communicating

4    to Western Progressive on behalf of Ocwen about the sale that's

5    pending?

6    A.    Yeah.  And this is what I'm saying.  This is Outlook, so I

7    don't know if we're comparing this against another Outlook.  If

8    it's Outlook, I don't know what time zone they're in.  If it's

9    real servicing, it's Eastern Standard Time.

10   Q.    Well these are -- oh, is this not an Ocwen document?  Is

11   that -- it's not part of Ocwen's business records?

12   A.    This is not coming from real servicing.  This looks like

13   a -- this is dated by a email.

14   Q.    Okay.  Who's -- would you agree with me that the email's

15   dated [sic] 8:49 a.m.?

16   A.    Yes.  It does say 8:49 a.m.

17   Q.    Okay.  And what's the importance level?

18   A.    I don't know that I see an importance level at -- but we

19   would need to see the first email to see that.  No.  I don't

20   know.  I don't see anything saying high here.

21   Q.    Okay.  Look on your monitor, it's highlighted.

22   A.    Oh, importance, high.  Okay.  I didn't see that.

23   Q.    And this is a communication from Ocwen to the trustee --

24    or actually, I apologize, from AltaSource, is that right?  No.

25   It's communicated to AltaSource.

1  A.    Yeah.   It's from -- basically from Ocwen to Western

2  Progressive or to AltaSource, their agents.   I don't know.

3  Q.    Okay.   And what's this message say?

4  A.    It says review completed.   No loss mitigation in process

5  and file is good to go for sale.

6  Q.    Okay.   Is the representation that no loss mitigation is in

7  process true?

8  A.    Yes.

9  Q.    Okay.   Even though we just looked at a servicing note that

10 said underwriting at that exact moment was considering them for

11 HAMP?

12 A.    It said that it was sent to underwriting for review, but

13 at that time underwriting had not reviewed the file yet.

14 Q.    Okay.   What does loss mitigation in process mean then?

15 A.    Loss mitigation in process means that there's an --

16  they're actually working on a mod at that time for whatever it

17 is that they've completed an application for.

18 Q.    So what the Cornejos had faxed in was not loss -- well

19 let's just break it down even more.   What's loss mitigation,

20 sir?

21 A.    Loss mitigation is the -- is choosing to do some type of

22 mitigation in reference to like when it comes to the servicing

23 world, that's mods, that's deed in lieus, that's short payoffs,

24 short sales.

25 Q.    So at this point in time where the Cornejos kicked off of

1   the loss mitigation or mod path or track?

2   A.   I don't know what you mean by track.  I've said that

3   several times throughout this process.

4   Q.   And I understand your testimony.

5   A.   Okay.

6   Q.   But --

7   A.   But if we're just speaking in general, the -- as far as

8   the modification is concerned, this had not -- this has not

9   been reviewed by a underwriter and determined that the package

10  was complete or terms worked out.

11  Q.   Does in process, is that the same as completed?

12  A.   The loss mitigation is not in process until we deem --

13   until the underwriter says there's a complete application.

14  Q.   Okay.  File is good to go for sale, right?

15  A.   Yes.

16  Q.   So internally, and we've looked at -- and I won't belabor

17  her, but internally there's all kinds of emails about the

18  borrower requesting a postponement, documents received, high

19  importance, image these documents; now it looks like on that

20  end all that's occurred and the documents have been imaged,

21  they're being considered, underwriting's looking at it and yet

22  Ocwen is directing the trustee good to go for sale, is that

23  correct?

24            MR. SHATZ:  Objection.  Argumentative.

25            THE COURT:  Sustained.

1          MR. SHATZ:  Motion to strike.

2          THE COURT:  The question?

3          MR. SHATZ:  Yeah.

4          THE COURT:  Overruled.

5   BY MR. HEENAN:

6   Q.   Is Ocwen directing its trustee that the file is good to go

7   for sale?

8   A.   That Ocwen department is advising the trustee that it's

9   okay to sell.

10  Q.   Wasn't the exact language used by Ocwen good to go?

11  A.   That is what is written here, yes.

12  Q.   Okay.  And a little bit further, under where it says

13  Wenner, Stephanie, doesn't it also say good to go?

14  A.   You said underneath Stephanie it says good to go?

15  Q.   If you look at the highlight -- see, twice right there it

16  says good to go doesn't it?

17  A.   Yeah.  I do see a notation there that says good to go

18  after Stephanie's name is (indiscernible).

19  Q.   What's good to go mean?

20  A.   As I interpret this, it's saying it's good to go for sale

21  meaning that it's okay to sell.

22  Q.   Thank you.  And then let's go to 15-16 please.

23  A.   What page are we going to now?

24  Q.   Page 16 please.

25          MR. HEENAN:  And maybe from here down please?

1        THE WITNESS:  7-16?  Page 16 of 15, JT15-16?

2        MR. HEENAN:  Yes, sir.

3    BY MR. HEENAN:

4    Q.    There's back and forth isn't there, sir, between the

5    trustee saying should we proceed and Ocwen affirmatively saying

6    proceed, good to go?  Is that the one word --

7    A.    I'm just looking at the email.

8    Q.    No.  Take your time.

9    A.    As you can see, I'm a little bit confused with the

10   chronology of it because it's in Outlook.  The email that it's

11   responding to is at 12:43 p.m.  The email that follows it is at

12   10:00 a.m., so there's different time zones here.  But

13   nevertheless, please provide response.  I believe that is

14   answering to that -- I believe the 10:00 a.m. email on 4/29 is

15   responding to the 12:43 p.m. email on 4/29.

16   Q.    Okay.  Then let's look at the top note there.

17   A.    Okay.  That's another email that's for a 3:49 -- 3:37 p.m.

18   email, because you're reading up and the further up you go the

19   later the email, or it's supposed to be.

20   Q.    And that's indicating that an interested third party

21   called to check in on the status, right, and they told that

22   third party the sale's set for today and provided the bid

23   amount, correct?

24   A.    I'm sorry.  Where do you see that -- okay.  You're going

25   two emails up.  And so now you're speaking in reference to -- I

1   just want to make sure I'm speaking about the right email.

2   Q.   Sure.   Take your time.

3   A.   We're talking about the email that is dated May 1st, 2015

4   at 11:42 a.m.?

5   Q.   Yeah.

6   A.   Okay.   So the May 1st email, it does say interested third

7   party called to check the sell status, informed this property

8   was sold to a third party and provided the sold amount.

9   Q.   How much did the Cornejos' house sell for, if you know?

10  A.   I don't have that --

11  Q.   We'll look in a minute when we look at the breakdown and

12  stuff.

13  A.   Okay.

14  Q.   I want to go to JT12-2 please.

15  A.   You said 12-2?

16  Q.   Yes, sir.

17  A.   Okay.

18  Q.   And I specifically want to direct your attention, this is

19  an internal Ocwen email, is that fair?

20  A.   Yes.

21  Q.   All these people, Moserat Sayid, Ashley Tabosom, those are

22  all Ocwen employees, right?

23  A.   I would say so from the nature of the email, yes.

24  Q.   And what is Moserat reporting to Ashley?

25  A.   We're talking about -- sorry, maybe I'm on the wrong --

1    I'm not the wrong page.  Which one is this one?

2    Q.   12-2.  It's the only email on that page.

3    A.   Okay.  I was on the wrong page.  Sorry.

4    Q.   No.  You're okay.

5    A.   Okay.  So --

6    Q.   Long day, lot of documents.  I apologize.

7    A.   Okay.  I'm on 12-2 and we were talking about this email

8    that's an Outlook dated 4:29, 11:54 a.m.?

9    Q.   Right.  So do we know is this before the sale or after the

10   sale that everyone at Ocwen's getting this email from Moserat?

11   A.   I don't know because this is Outlook.  This is -- but hold

12   on.  This looks like a notation placed in the system, so this

13   is actually in the comment log at -- if 12-1 attaches to 12-2,

14   it's actually being placed in the comment log on 4:29 at 7:50

15   p.m. eastern time.

16   Q.   Well 7:50's the response isn't it?

17   A.   That might be the whole email in there, because this looks

18   like a -- I don't know if this is a continuation of that

19   comment.

20   Q.   Let's put 12-1 and 12-2 side by side and blow them up so

21   the jury understands.  So the jury knows, these are actually

22   kind of torture to try and read on the paper, right?  I mean

23   it's so tiny?

24   A.   Yes.  It's very tiny.

25   Q.   So you might save your eyes a little bit to look at the

1  screen.

2  A.   It's tiny on my screen too though.  It's even worse.

3  Q.   We'll make it bigger because I can't even read that.  So

4  it looks to me, but you correct me if I'm wrong, it looks to me

5  like Moserat Sayid emails Ashley and says, Ashley, on the above

6  mentioned loan number there is a CSD for today, which CSD is

7  sale date postponement or something like that, is that what

8  that means?

9  A.   Confirmed sale date.

10 Q.   So there's a request for a confirmed sale date for today.

11 We have received the modification documents on the account, is

12 there a way to postpone the sale date as customer has sent the

13 documents.  Email was sent on 4/28 to seek assistance if the

14 sale can be postponed.  Kindly look into this on priority.  Is

15 that the email that Moserat sends to Ashley?

16 A.   Yes.

17 Q.   And we don't know whether this request is before or after

18 the sale occurs, right?

19 A.   It says 11:54 a.m. on the 29th, so --

20 Q.   The sale date was 10:00 a.m., right?

21 A.   Right.  I mean I'm thinking it's after because the last

22 date would be on the west coast.

23 Q.   And where does Moserat Sayid office?

24 A.   I don't know.

25 Q.   If he's sending this email from -- or she is sending this

1   email from Mumbai, India what time is it there?

2   A.   I don't know.

3   Q.   If it's 11:54 a.m. in Mumbai, India, what time is it in

4   California?

5   A.   I don't know.

6   Q.   Okay.  In any event, Ashley McLain doesn't respond until

7   the following day, is that correct, at least according to this

8   email?

9   A.   Yeah.  It says 4/30.

10  Q.   And we don't know whether 1:05 is -- well I imagine that's

11  1:05 a.m., but I'm guessing about that.  But in any event, is

12  it fair that Ashley basically says it's too late?

13  A.   She's saying there's some difficulty in reference to stop

14  a sale so close to the confirmed date is what I'm reading and

15  then she's asking if she should document the system or try

16  to -- or if it will automatically be stopped by the BK filing,

17  which there was some BK filing information the borrower sent

18  that, you know, looks like that would've trumped.

19  Q.   And is she saying here, just to be clear, it appears they

20  filed a bankruptcy today according to the account notes, right?

21  A.   Yes.  The borrower -- I believe the borrower at some point

22  advised that they were filing bankruptcy or submitted some

23  bankruptcy documentation.

24  Q.   And if -- and not asking lawyer -- I mean just is it your

25  understanding that if a bankruptcy had been filed that would've

1   stopped the sale?

2   A.   If a bankruptcy would've been -- not necessarily that it

3   would've stopped it, but the sale would've been deemed invalid

4   at some point in time.

5   Q.   That's a better answer.  Thank you.  And if this filing

6   does not stop the foreclosure sale, then Ashley's offering to

7   provide her approval to try and postpone the sale, right?

8   A.   Correct.

9   Q.   So even after the sale, Ocwen has the power to rescind it

10  or no?  How can she postpone the sale after it's already

11  occurred I guess is what I'm asking.

12  A.   She says should she note the document in the system to try

13  to stop the sale or if the sale will already be stopped by the

14  BK filing.  That's what she says.

15  Q.   Yeah.  But what power does she have to postpone the sale

16  at this point?  I provide my approval to try to postpone the

17  sale.  How would that work even?

18  A.   She's not -- when I read this email, I don't see any

19  confirmation that she's guaranteeing that if she puts in the

20  request it's going to be stopped.  It says she can try and

21  she's asking if she should put that in or if it's going to be

22  stopped by the BK.

23  Q.   Yeah.  I'm just -- I guess I'm just not tracking.  What

24  ability does Ashley have at this point to postpone a sale

25  that's already occurred?

1   A.   I don't know.  This is -- again, this is Outlook, so I
2   don't know the time frame here.  I don't know where she's
3   located.  I don't know what ability she's -- if it is that --
4   if it is after the sale, I don't know what ability she has and
5   she might be speaking in reference to trying to do a
6   rescission, but other than that I don't know what she's
7   speaking in reference to if it's after the sale.
8   Q.   Ocwen has a whole department called the rescission
9   department doesn't it?
10  A.   We do have a department that does rescissions, yes.
11  Q.   Just like the legal department, just like the escalation
12  department, there's a whole department called the rescission
13  department, right?
14  A.   Yes.
15  Q.   And the rescission department's job, I'm assuming, is to
16  rescind foreclosure sales?
17  A.   To assist in the process, yes, or to do -- act that out,
18  yes.
19  Q.   Okay.  And so even after the sale, Ocwen had the power to
20  rescind it, is that fair?
21  A.   No.
22  Q.   Why not?
23  A.   Because it went to a third party.
24  Q.   Okay.  What's rescind?  What's that mean?
25  A.   Make it as if it -- reverse the sale and put it back in

1    the hands of the -- of where it was before.

2    Q.   Thank you.  Okay.  So then let me have you look at JT4-75,

3    day after the sale.

4    A.   Okay.

5         MR. HEENAN:  And if we look at -- maybe, Wade, if

6    you'll bring up the top and the bottom ones?

7    BY MR. HEENAN:

8    Q.   Basically it looks like Ocwen concludes, tell me if I'm

9    wrong, on April 30th, the day after the sale, no active case

10   found through SSN search and case details mentioned in

11   bankruptcy comment -- or BKRP -- I don't onw what that stands

12   for -- are not reflected in PACER.

13   A.   That's bankruptcy comment.

14   Q.   Okay.  I didn't want to presume what that acronym meant.

15   So does that first one tell us that the day after, Ocwen has

16   searched the PACER system for whether or not the Cornejos had

17   actually filed a bankruptcy?

18   A.   Yeah.  They searched PACER system.  They didn't find it

19   with the case number or whatever was provided by the borrower

20   and then it states to please provide correct case number and

21   file date.

22   Q.   And so the jury understands, the PACER system is an online

23   portal where you can punch in anyone's name and see whether or

24   not they're filed a bankruptcy?

25   A.   If I believe you have enough information of the person

1    filing bankruptcy PACER is a system that they go to to look at

2    the filing.

3    Q.   Right.  So for instance, if we got on the federal PACER

4    system we would know that the Cornejos are suing Ocwen because

5    it would show up in a search?

6    A.   I don't know that PACER would show that they're suing us.

7    I think PACER is particular to bankruptcy.

8    Q.   Okay.  Thank you.  Okay.  And then the bottom notation,

9    underwriting reviewed loan for modification and submitted for

10   QC, did I read that right?

11   A.   Underwriting reviewed loan -- yes.

12   Q.   Okay.  The comment does not indicate the loan has been

13   approved or denied.  If a borrower calls in, kindly inform the

14   borrower that the terms of the loan are being reviewed,

15   correct?

16   A.   Yes.

17   Q.   So Ocwen's still reviewing the Cornejos' modification

18   request two days after their home has been sold, correct?

19   A.   Yes.

20   Q.   And that sale, as I understand your testimony, could not

21   be rescinded?

22   A.   It was not rescinded.

23   Q.   My question's different.  Do I understand your testimony

24   to be that the sale could not -- not was not, could not be

25   rescinded?

1   A.   I believe in that instance if you have an agreement

2   between all the parties because there's a third party involved

3   if -- it could be rescinded.  If there was a bankruptcy, it

4   would just trump everything and --

5   Q.   Sure.  But now we know the bankruptcy was not going to

6   trump everything, right?

7   A.   I don't think at this point Ocwen knew anything about the

8   bankruptcy other than the borrower submitting bankruptcy

9   information.

10  Q.   Okay.  So I want to make real clear -- put the bankruptcy

11  aside for a second.  I want to be real clear, is there a way

12  that even after the sale was conducted Ocwen could have

13  rescinded it and kept the Cornejos in their home?

14  A.   With cooperation from the other parties or an actual

15  bankruptcy.

16  Q.   Okay.  Do you think the Cornejos would have cooperated in

17  working to do something to rescind the sale?

18          MR. SHATZ:  Objection to the extent it calls for

19  speculation.

20          THE COURT:  Sustained.

21  BY MR. HEENAN:

22  Q.   Did Ocwen endeavor to rescind the sale by working with the

23  purchaser?

24          MR. SHATZ:  Objection.  Lacks foundation.

25          THE COURT:  Overruled.  You can answer.

1        THE WITNESS:  This is where I was not involved, but I

2    believe like getting into the communications with the third

3    party would be -- waive our attorneys, so I don't know if I can

4    answer that.

5    BY MR. HEENAN:

6    Q.   Okay.  Let me ask you this question.  You think if Ocwen

7    would've given the third parties some money they would've

8    worked with Ocwen to give the home back to the Cornejos?

9    A.   I don't know what the new buyer was thinking, but I've

10   seen many occasions where they don't want to do that.

11   Q.   Okay.  Have you seen many occasions where they do want to

12   do it as long as Ocwen gives them the right amount of money?

13   A.   Yeah.  I mean I guess is -- for an investor -- if it's an

14   investor, they could have a buy off amount.

15   Q.   Okay.  How many occasions?

16   A.   I don't know.

17   Q.   How many times has this happened where a sale goes through

18   and then Ocwen tries to work with the third-party purchaser to

19   rescind the sale?

20   A.   It's not just our sales.  I find it more so in tax sales

21   where somebody buys the tax sale and we have to get the

22   property back from the -- there's still an existing mortgage.

23   It had nothing to do with the mortgage.  It's just unpaid taxes

24   and we have to try and work out with that individual, like I've

25   seen them be difficult even with money being offered.

Blanchard - Direct                    258

1   Q.   Okay.  Specifically with a third-party purchaser of

2   someone's home, how many times have you seen that happen where

3   Ocwen tried to work with a third-party purchaser to get the

4   house back to the original owner?

5   A.   I don't have a number count.  It's going to be very --

6   it's a very small, minute amount of occurrences when it's just

7   dealing with the mortgage and it's different to the situation.

8   I haven't had a situation where it's exactly like this.

9   Q.   Okay.  So just to be -- just so we're all on the same

10  page, so even after the sale has occurred, was it feasible or

11  possible that Ocwen, had it chosen to, could've endeavored to

12  rescind the sale and restore the property to the Cornejos?

13          MR. SHATZ:  Objection.  Incomplete hypothetical.

14          THE COURT:  Sustained.

15  BY MR. HEENAN:

16  Q.   Even after the sale, could Ocwen have endeavored to

17  rescind the sale and restore the Cornejos to ownership of their

18  home?

19          MR. SHATZ:  Objection.  Same objection, same

20  question.

21          THE COURT:  Overruled.  You can answer that.

22          THE WITNESS:  With the cooperation of other parties,

23  yes.

24  BY MR. HEENAN:

25  Q.   So how come after the sale Ocwen is continuing to review

Blanchard - Direct                                    259

1   the Cornejos' loan for modification?

2   A.   The -- they had received documents in reference to the mod

3   and it was approved after the sale.

4   Q.   Okay.  So even after the sale occurred Ocwen continued to

5   work on its decision tree, correct?

6   A.   They continued to work on the decision for a mod, yes.

7   Q.   Thank you.  This note says if a borrower calls in kindly

8   inform the borrower that the terms of the loan are being

9   reviewed, the borrower should be informed of a decision

10  approval or denial on their application only after an alias

11  code for approval or denial is updated, correct?

12  A.   Yes.

13  Q.   How come nowhere in the notes is saying -- well strike

14  that.  If the Cornejos called and got this information, doesn't

15  that convey a level of hope that maybe was not accurate or

16  real?

17          MR. SHATZ:  Objection.  Calls for speculation.

18          THE COURT:  Overruled.

19          THE WITNESS:  The modification is one facet that they

20  were still trying to -- well they just didn't reach a decision

21  until 5/1 and generally speaking, these foreclosure sales

22  usually end up back in our hands.  It's not that often you have

23  a third party -- I don't have number of that, but just from my

24  experience -- they generally end up in our hands.  Had it ended

25  up in our hands and we have this mod worked out, we -- it's

1    easier to rescind when it's in our hands, but it went to a

2    third party at that time.

3    BY MR. HEENAN:

4    Q.   But Ocwen knew it had gone to a third party as of May 1st,

5    right?

6    A.   Yeah.  I mean --

7    Q.   I mean they knew who they sold it to, right?

8    A.   I'm sorry.

9    Q.   Ocwen knew on April 29th who they sold the property to,

10   right?

11   A.   Yes.

12   Q.   Okay.  Let me have you look at Plaintiffs' Exhibit 11-1

13   please.

14   A.   Okay.

15   Q.   This is another three-day letter, correct?

16   A.   You said JT11-1?

17   Q.   Sorry.  PX11-1.  Plaintiffs'.  It's the white binder.

18   A.   Okay.  11-1.

19   Q.   Is this correspondence from Ocwen to the Cornejos?

20   A.   Yes.

21   Q.   Is it part of Ocwen's business records?

22   A.   Yes.

23          MR. HEENAN:  I would move the admission of

24   Plaintiffs' Exhibit 11 at this time, Your Honor.

25          THE COURT:  Any objections?

Blanchard - Direct                                     261

1           MR. PAINO:  No objections, Your Honor.

2           THE COURT:  All right.  That'll be admitted.

3      (Plaintiffs' Exhibit 11 received into evidence.)

4           MR. HEENAN:  Thank you.

5  BY MR. HEENAN:

6  Q.   And what's Ocwen telling the Cornejos here at the

7  beginning of this letter?

8  A.   We acknowledge receipt of your loss mitigation application

9  and we thank you for submitting a request for assistance.  You

10 want me to read on?

11 Q.   For a little bit please.

12 A.   Okay.  At this time, your application is complete.  You

13 have provided all the documentation needed to evaluate your

14 loan for each modification option or other foreclosure

15 alternative solution for which you are eligible.  In the event

16 additional documentation is needed based on additional review

17 of the file we will contact you.

18 Q.   That's good.  Thank you.  So basically is it fair that

19 Ocwen's conveying to the Cornejos that at this time your

20 application is complete?

21 A.   Yes.

22 Q.   And you have provided all the documents needed to evaluate

23 your loan for each modification option, et cetera?

24 A.   Yes.

25           MR. HEENAN:  So if I can approach please, Your Honor,

1   to my board?

2           THE COURT:  Yes.  Go ahead.

3   BY MR. HEENAN:

4   Q.   So in the decision tree that we looked at a long time ago,

5   where are we at?

6   A.   Well according to your tree we would be in review.

7   Q.   Okay.  Application's complete?

8   A.   Yes.

9   Q.   Have the -- and they're being -- basically they're being

10  reviewed and they're going to find out whether they get a

11  modification or they're going to be declined?

12  A.   Right.  Or they -- or if they need more documentation.

13  It's also --

14  Q.   If they need more documentation then it kicks us back into

15  whether it's complete or not, right?

16  A.   Right.

17  Q.   Okay.  So that letter indicates that yes, complete, being

18  reviewed by Ocwen, correct?

19  A.   Yes.

20  Q.   Thank you.  And then let's look at Joint 20-1 please.  Do

21  you have that?  I know we're moving binders again.

22  A.   Okay.

23  Q.   This is again the letter from Ocwen?

24  A.   Yes.

25  Q.   Congratulations, your request for a loan modification has

1    been approved, right, subject to conditions?

2    A.    Yes.

3    Q.    And those conditions are in receipt of zero dollars,

4    right?

5    A.    Yes.

6    Q.    Receipt of a signed and notarized or witnessed loan mod

7    agreement and attachments, correct?

8    A.    Yes.

9    Q.    And receipt of clear title if applicable?

10   A.    Yes.

11   Q.    So does this document tell us on our decision tree, as of

12   May 14th, 2015 where the Cornejos stood?

13   A.    Does this what?  I'm sorry.

14   Q.    Yeah.  I mean based on this letter, sir, it's -- we're at

15   mod aren't we?

16   A.    Yes.

17   Q.    That's the ending, right?

18   A.    Correct.

19   Q.    And then if you look with me at 20-5.

20   A.    Okay.

21   Q.    That's the actual loan modification agreement that was

22   sent to the Cornejos, correct?

23   A.    Yes.

24   Q.    And if we look at 20-8, that's the Cornejos executing this

25   document, correct?

1   A.   Yes.

2   Q.   And then if we look at 20 -- JT21, sorry.  That's the

3   Cornejos making their first payment under the modification that

4   they've been given by Ocwen?

5   A.   Yes.

6   Q.   And did Ocwen cash that check?

7   A.   I believe that was put in suspense and then sent back to

8   the borrower.

9   Q.   How long did it -- when I say cashed the check, it

10  couldn't have gotten put into suspense unless the check was

11  cashed, is that fair?

12  A.   Right.

13  Q.   Okay.  So they did cash the check?

14  A.   Yes.

15  Q.   And how long did Ocwen maintain receipt of that money

16  before it -- what did it do with it?  Put it in a suspense

17  account.

18  A.   It went to suspense.  I don't now the duration of time it

19  stayed on the account off hand.  I would have to see the

20  payment history to refresh my memory.

21  Q.   Okay.  But in any event, they cashed the check, kept it in

22  an account for some period of time.  What's a suspense account?

23  A.   It's just -- a suspense account is just a bucket that sits

24  by itself.  It's untouched money.  It's like almost -- I would

25  say it's similar to an escrow account.  It's not applied

1    against anything until they -- the system knows what the

2    individuals that control that know what to do with it.

3    Q.    Thank you.  Let's go back a little bit, JT14.  This is a

4    May 5th email.

5    A.    Okay.

6    Q.    Oh, I'm sorry.  Let me -- we don't need to pull the

7    document back up unless we need it, but the modification that

8    the Cornejos were given, if you look at JT20 --

9    A.    Okay.

10   Q.    -- the interest rate went from eight percent to four

11   percent, right?

12   A.    Let's see.

13            MR. HEENAN:  Yeah.  Maybe just pull it back up, Wade.

14            THE WITNESS:  It does reflect four percent.

15   BY MR. HEENAN:

16   Q.    Is four percent interest rate lower than the eight percent

17   interest rate that the Cornejos had previously?

18   A.    Yes.

19   Q.    Would this loan modification have brought the Cornejos'

20   loan current?

21   A.    That's what modifications do, they bring it current.  They

22   just reset the due date.

23   Q.    And basically all the arrearage that the Cornejos had

24   accrued over that two-year time that they weren't making their

25   payments, that gets kind of rolled into the modified loan, is

1   that fair?

2   A.    Yeah.  It's either capitalized or there's a deferred

3   balloon or some sort.

4   Q.    I mean the Cornejos under the modification weren't getting

5   something for nothing were they?

6   A.    Something for nothing?

7   Q.    Yeah.  I mean Ocwen's counsel told this jury yesterday

8   about all the time that they spent not making their payments.

9   The modification agreement that they entered into with Ocwen

10  recaptured those payments and the Cornejos would've been

11  obligated to pay under the modified agreement, right?

12  A.    Eventually they would be paying back money.  If there

13  was -- only thing they might've gotten is if there was any

14  discount and they knocked some balances off of the loan in the

15  process.

16  Q.    Okay.  So -- but under the modification how long would it

17  have taken Ocwen and its investor to get paid off, paid back?

18  A.    It says August 1st of 2032.

19  Q.    So it's basically 17 years, right?

20  A.    Yes.

21  Q.    And when the third-party sale goes through how long does

22  it take Ocwen to get paid?

23  A.    Get paid whatever money that they get from the sale?  I

24  don't know the time frame, but I would just be assuming it's

25  however long it takes for the trustee to submit those payments

1   to us.

2   Q.   Do you have an understanding that that's a matter of days,

3   not years?

4   A.   I would say it's not a year, yes.

5   Q.   Yes.  Thank you.  If the loan were current would it be out

6   of foreclosure?

7   A.   Yes.  If it's modified and they continued to make their

8   payments they would be taken out of foreclosure.

9   Q.   Thank you.  So is it fair that this modification agreement

10   was a real benefit or could be perceived as a real benefit to

11   the Cornejos?

12   A.   I see it as something that would allow them to be current

13   as of today, but the borrower has to make the determination if

14   that is something that is a benefit to them.

15   Q.   But at least based on the Cornejos executing the document

16   and sending in the check, it seems like they considered it to

17   be beneficial to them, is that fair?

18   A.   I could see that they're agreeing to the terms, yes.

19   Q.   Yeah.  Okay.  Fair point.  Now let's go to JT14 please.

20   A.   Okay.

21   Q.   Now I'm going back a little bit on you and I apologize,

22   but we're back to May 5th, so we're six days after the sale and

23   Lolita Llorente, she's -- is she higher or lower than the other

24   folks that were the escalation specialists?

25   A.   I don't know if the escalation specialists are the same

Blanchard - Direct                              268

1    department.  She's the same -- she's escalations relationship

2    manager, so she would be higher than, is it Jentle, the last

3    relationship manager.

4    Q.   And is she saying we have received the loan modification

5    documents on the foreclosure sale date which is 4/29/2015.

6    Kindly review and advise if this sale was valid or were we

7    supposed to postpone the sale date as we had received the

8    modification documents?  Did I read that accurately?

9    A.   Yes.

10   Q.   And she's presenting that as a question?

11   A.   Yes.

12   Q.   And she's sending it to whom?

13   A.   The rescission team.

14   Q.   Okay.  And the rescission team, their job is to

15   investigate and, if necessary, rescind sales?

16   A.   Rescind or attempt to put together the rescission.

17   Q.   Thank you.  Now if we look at JT4-87.

18   A.   Dash what?  I'm sorry.

19   Q.   Sorry.  4-87.  Well let me ask you this.  Let's just make

20   sure we cover this.  At the time of the foreclosure sale, sir,

21   was -- had the Cornejos submitted a complete application?

22   A.   It was deemed completed after the foreclosure sale if

23   that's what you're asking.

24   Q.   My question is at the time of the foreclosure sale had the

25   Cornejos submitted a completed application?

Blanchard - Direct                                    269

1   A.   At the time of the foreclosure sale?  Well I don't see any

2   documents sent in between, so I can only put together the

3   assumption that the documents that they sent were actually

4   sufficient.

5   Q.   Okay.  So just so we're on the same page, they didn't

6   submit -- well let me ask -- based on your review of the file,

7   do you see that there -- that it would be viable or appropriate

8   for Ocwen to assert that the Cornejos had failed to submit a

9   completed application at the time of the sale?

10           MR. SHATZ:  Objection to the extent it calls for

11  legal conclusion or speculation.

12           THE COURT:  Overruled.

13           THE WITNESS:  At the time of the sale, Ocwen -- the

14  way it's set up, the underwriter has to determine whether it's

15  complete or not.  So it wasn't until after the sale that the

16  underwriter had determined that it was complete.  Now complete

17  and timely is two different things.  So it wasn't received

18  timely but yes, it was deemed that it was complete at some

19  point in time.

20  BY MR. HEENAN:

21  Q.   Well I'm not with -- my question's a little more specific.

22  It's not when did Ocwen deem it to be complete, just

23  objectively, at the time of the sale was there a complete

24  application submitted by the Cornejos?

25           MR. SHATZ:  Objection to the extent it seeks a legal

Blanchard - Direct                                        270

1   conclusion.

2            THE COURT:  Overruled.

3            THE WITNESS:  At the time of the sale, the documents

4   that we had was what was used for the complete application, so

5   it wasn't deemed complete at that time by the underwriter, but

6   the documents after the fact was proven to be sufficient but

7   not timely.

8   BY MR. HEENAN:

9   Q.   Okay.  You said sufficient.  Will you agree with me that

10  -- well will you agree with me that not only were the documents

11  that the Cornejos submitted sufficient, but they were

12  sufficient enough to make a complete application at the time of

13  the sale?

14           MR. SHATZ:  Objection.  Incomplete hypothetical,

15  argumentative.

16           THE COURT:  Sustained.

17  BY MR. HEENAN:

18  Q.   My question is at the time of the sale had the Cornejos

19  submitted a complete application?

20           MR. SHATZ:  Objection.  Argumentative and incomplete

21  hypothetical.

22           THE COURT:   Was this a different question than you

23  just asked him?

24           MR. HEENAN:  It's the same question, trying to get an

25  answer to my questions.

1    THE COURT:  This question has been answered.  You can

2  move on please.

3    MR. HEENAN:  Thank you, Your Honor.

4  BY MR. HEENAN:

5  Q.   Is it your position, based on your review, that Ocwen --

6  or that the Cornejos' application was untimely?

7  A.   Yes.

8  Q.   And is that based on what?

9  A.   The -- I believe the MAJ guidelines are seven days before

10 your foreclosure sale.  We -- there was a date of 4/19 that was

11 communicated as a deadline date and then even going further

12 into whatever extension was being advised on the last document

13 you pointed out, it wasn't received by that date.  I don't see

14 any dates that were ever communicated to the borrower being

15 met.

16 Q.   Okay.  Including the midnight business day?

17 A.   Correct.

18 Q.   Okay.  And the deadline was May 19th [sic] and the May

19 21st documents that we've already looked at, is that fair?

20 A.   No.  The 21st document was advising that your deadline had

21 already passed.  It wasn't telling them that hey, your deadline

22 is the 19th.  It's telling that your deadline already passed,

23 but you know, try and send us -- basically it's still an effort

24 to try and modify after deadlines are not being met.

25 Q.   Okay.  So what was the -- so May 19th -- or sorry, April

1    19th was the deadline based on your review of the file?

2    A.   That one letter communicated that the deadline had passed

3    on April 19th and on the communication that we had looked at.

4    Q.   Okay.  And the midnight date was just kind of fluff?

5    A.   The midnight date was something that they were advising to

6    the borrower in that last document.  I'm kind of wondering if

7    it was the same document.  That is actually the same document.

8    Q.   Oh, perfect.  So in the same document -- you're right.  In

9    the same document they're telling the Cornejos that the

10   deadline's April 19th and they're also telling them it's

11   midnight of the business day before the -- you and I can agree

12   to disagree what that means, right?

13          MR. SHATZ:  Objection.  Argumentative, misconstrues

14   what the letter said and what the testimony was.

15          THE COURT:  Sustained.

16          We're going to go ahead and take our evening break at

17   this time.  Ladies and gentlemen, we'll see you back in the

18   morning, let's say 8:45.  Thank you.

19      (Jury out at 4:40 p.m.)

20          THE COURT:  All right.  We're outside the presence of

21   the jury.  What's the (indiscernible) time estimate with

22   plaintiffs  Mr. Blanchard?

23          MR. HEENAN:  Sorry it went so long, Your Honor.  An

24   hour.

25          THE COURT:  Another hour?

1        MR. HEENAN:  Half hour, I don't know.

2        THE COURT:  Your best guess.

3        MR. HEENAN:  An hour.

4        THE COURT:  All right.  And Mr. Shatz, have you made

5   a determination on if you're going to continue with Mr.

6   Blanchard tomorrow?

7        MR. SHATZ:  Yes, I will.

8        THE COURT:  All right.  Mr. Blanchard, you may step

9   down.

10        THE WITNESS:   Thank you.

11     (Witness steps down.)

12        THE COURT:  Counsel, I have done further research on

13   the issue of the standard of proof on the statutory damages.

14   It would indicate that they appear to be more in line with the

15   punitive damage award.  I did spend quite a lot of time

16   researching it.  I've also had a (indiscernible) do that as

17   well.  I have come to think that maybe my initial observation

18   was not correct, so I'm alerting you to that fact to allow you

19   some more time to look at it.

20        But at least your trial brief, I was convinced

21   (indiscernible) that it is (indiscernible) punitive, but I came

22   to the conclusion (indiscernible) independently come the same

23   conclusion and recommended to me that under the Homeowner's

24   Bill of Rights you are entitled also to bring a claim of

25   punitive damages.

1        Do you disagree with that?  Because the statute

2  specifically does say that -- 2924.12 is in addition to and

3  independent of any other remedies, which implies that punitive

4  damages could be awarded, which seems to differentiate with the

5  damages from the statutory damages, the trouble [sic] damages

6  of $50,000.  That leads me to conclude that that higher

7  standard is supposed to be reserved to punitive damages brought

8  under the civil code.  I'm going to put that in your ear and

9  let you look at that overnight.

10        We were going to be talking about verdict form

11  tonight.  I didn't see another one filed or lodged, is that

12  fair?

13        MR. SHATZ:  That is correct, Your Honor.

14        THE COURT:  We are not going to the jury tomorrow, is

15  that what you're telling me?

16        MR. SHATZ:  Probably not, Your Honor.

17        MR. ANGWIN:  Your Honor, I'm sorry, given the

18  testimony today, can -- do we need to revise the verdict form

19  to take out the issue of completeness and limit it only to

20  timeliness because --

21        THE COURT:  No.  I don't think so.

22        MR. ANGWIN:  Well maybe I misunderstood.  I thought

23  he said all the documents were in, the question is whether they

24  were in within the time frame.

25        THE COURT:  You know, (indiscernible) is it sounds

1   like we're not certain it's not going to go to the jury
2   tomorrow, so you all need to be here tomorrow 8:00 o'clock
3   sharp with whatever proposed verdict form you have and we're
4   going to talk about that.  I need you to bring me what you tell
5   me you're going to bring me.  I thought we were going to be
6   talking about that this afternoon.
7           If you're taking the position that completeness is
8   not an instruction that's required, then we'll need to talk
9   about that.  The verdict form as it reads now just simply
10  tracks the language on the statute.
11          MR. ANGWIN:  Correct, Your Honor.  And that's where
12  we had the -- we actually have discussed this.  The issue
13  becomes is if you have a single instruction that tracks the
14  statute, it inherently talks about two or three different
15  elements.  It talks about the documents produced, did they
16  submit everything in time, submit everything asked for.  Then
17  the timeliness and then the reasonableness.  So we've been
18  going back and forth about is that one instruction that's sort
19  of a compound instruction or --
20          THE COURT:  Let me just ask, are you talking about
21  instruction or are you talking about verdict form?
22          MR. ANGWIN:  I'm sorry, verdict form.  I apologize.
23  I was up rather late working on those briefs that were not too
24  good.
25          THE COURT:  That's the nature of trial.

1          MR. ANGWIN:  It is, Your Honor.

2          So on the verdict form, the question becomes is there

3     a single question -- and maybe the Court can give guidance on

4     this.  Would you prefer a single question that tracks the

5     statutory language or would you prefer a multitude of

6     questions; for example, did Ocwen provide the time frame, was

7     that time frame reasonable, did the Cornejos commit all the

8     documents to Ocwen and were those documents submitted within

9     the time frame that Ocwen provided?  The trouble is when you

10    have four blanks, there's such a danger of inherently

11    contradictory verdict that I was trying to find a way around

12    that.

13         MR. HEENAN:  Why don't we just take it back -- get

14    the verdict form (indiscernible) look at it?

15         MR. ANGWIN:  I was hoping for a little guidance.

16         THE COURT:  It's your verdict form.  I'm going to

17    look at it for correctness.  If you want one question that does

18    it all, then -- and there's no objection to that, then that's

19    what we'll do.  If you want something different and there's no

20    objection, that's what we'll do as long as that is legally

21    correct.

22         I am not inclined to tell you what your verdict form

23    should look like.  I'll tell you what it shouldn't look like

24    and that's what we had before.  Clearly the verdict form as I

25    attempted it no longer is correct because of the

277

1    (indiscernible) claim.  But if you're telling me that the
2    defendants no longer dispute the issue of completeness, then I
3    agree we don't need to ask the jury about that.
4           The testimony I heard today, I don't know that it
5    necessarily says to me that's the issue, but that's not for me
6    to decide.  The defendants can choose their own legal position.
7           So you need to work on that.  Can you have that filed
8    this evening?
9           MR. ANGWIN:  That's fine with me.
10          THE COURT:  Also, you brought me some documents I
11   noticed you have not filed.  (Indiscernible) need to be filed
12   if you want those on the docket.
13          All right.
14          MR. ANGWIN:  And Your Honor, one last question.  I'm
15   sorry.  I know we're all tired.  With regard to the issue of
16   the New York Financial Regulator thing, did you still want that
17   briefed?  Because I'd found some -- when I left for an hour I
18   found some additional information on that that might be at
19   least useful to the Court.
20          THE COURT:  What is it that you have?
21          MR. ANGWIN:  What I have is, although there is no New
22   York State definition of that, there are federal cases which
23   refer -- from New York which refer back to the CFPB regulations
24   and I think probably Mr. Shatz, who's an expert on RESPA can
25   tell us how the Dodd Frank Act defines dual tracking which I

278

think is the exact way or close to the exact way the NMS
settlement defines it which is what all the courts have
followed, which is basically whether you call it a completed
application, or a submission, or a completed submission, they
all mean the same thing.  It's got to be everything that's
asked for, and that's what stops it.  Because once you have
everything to them, that's what then triggers the you've got to
look at it.

THE COURT:  So what you're suggesting then is I think
the fact that it's (indiscernible) what you said earlier then,
they had everything at the time of the sale.

MR. ANGWIN:  And that's what dual tracking is, is
when you have --

THE COURT:  So your suggestion is that once it's
provided, regardless of what Ocwen determined or until they
determined, it is still complete.

MR. ANGWIN:  Yeah.  And that's really -- I think ours
is more in line.  Of course they're going to argue timeliness,
but if you look at the definition under the Homeowner's Bill of
Rights it says complete means all the documents they requested
and then a time frame.

THE COURT:  And it sounds like the evidence is that
-- actually it's sort of a backward -- kind of backing into it
because it was complete on the say after, then it must've been
complete on the day before because there were no additional

279

1    documents provided.

2        How does that still get us to taking judicial notice

3    of that document in light of the fact that there is still

4    (indiscernible) dispute as to timeliness?  Are you suggesting

5    that for the few hours of after the documents are received and

6    the time of the sale that that is an illegal dual tracking at

7    that point?

8        MR. ANGWIN:  That is an excellent question I have not

9    thought all the way through.

10       THE COURT:  That's kind of a key point to whether

11   that -- the violation of the New York consent decree has any

12   bearing here doesn't it?

13       MR. ANGWIN:  Yes, Your Honor.  And what I'd like to

14   do is we need to work on the verdict form.  I just wanted to

15   advise the Court if it would like to, we'll get that additional

16   information to it as well on the dual tracking part.  I just

17   didn't want to waste the Court's time if it did not want to

18   look at that issue.

19       THE COURT:  No.  That issue's -- if you want me to

20   look at it I'm going to look at it, but what I need from you is

21   the cites to whatever you're looking at, if you have -- but I

22   don't want that orally.  I do want you to give that to me in

23   writing.  I need to have it so that it is -- it's got to be to

24   me, either you're going lodge it or you're going to file it.  I

25   recommend you file it on the docket so that it's at least on

1   the docket by 5:00 a.m.

2        MR. ANGWIN:  Certainly, Your Honor.

3        THE COURT:  And I assume, Mr. Shatz, you also

4   (indiscernible) that issue, or are you just going to let -- see

5   how that plays out?

6        MR. SHATZ:  No.  I spent lunch hour talking to New

7   York and the short version, when you look at the New York GFS

8   consent order, it relates to and specifically cites to New York

9   practices and talks about the New York foreclosure procedure.

10  New York is a judicial foreclosure state that includes extra

11  borrower protections, for example, nothing can go to sale till

12  a judge signs off.

13       So if there's an issue as to completeness of the

14  application or whether the pre -- you can't get to sale in New

15  York until you go through a mod review hearing and if once that

16  hearing's finished and that's all done, then you get to the

17  next step, but there is no definition of dual tracking under

18  New York law and the DFS regs don't have a definition of dual

19  tracking.

20       So New York relies on the federal system which is

21  REGX 12 C.F.R. 1024.41 and they talk about a complete

22  application being received by the servicer -- the complete

23  portion is all of the documents required by the servicer to

24  make a decision -- 38 or more days before the sale.  If the

25  documents are received 37 or fewer days before the sale,

1  there's no reason for the servicer to take action on them

2  unless the servicer chooses to do so.

3          I also noticed in looking at the New York consent

4  decree -- the consent order, I apologize, that the only place

5  dual tracking was mentioned was in the list of things that may

6  have been there.  But the rest of the consent order dealt with

7  other things as to how loans were worded, how policies and

8  procedures were to be set.  There is nothing in there about

9  dual tracking.  It's almost as if it was dicta to implement a

10  whole bunch of other non-related things.  The dual tracking

11  foreclosure issue is not even at issue in the consent order.

12          THE COURT:  All right.  Are you going to file

13  something on that then?

14          MR. SHATZ:  Probably.

15          THE COURT:  All right.  Anything else that we need to

16  talk about in the morning?

17          MR. HEENAN:  No, Your Honor.

18          MR. VITIELLO:  We've got stipulations that have been

19  pending for a while, but I mean can we do that today?

20          MR. SHATZ:  You really weren't paying attention.  We

21  were going to meet at 5:00 if you can join us.

22          MR. ANGWIN:  Your Honor, in addition to the verdict

23  form that is.

24          MR. SHATZ:  We weren't doing that at 5:00.

25          MR. ANGWIN:  Okay.  (Indiscernible) the Court, Your

282

Honor, we're trying to get stipulations in with regard to all

the preliminary issues to bring the Homeowner's Bill of Rights

claims (indiscernible) side has to go through those with

witnesses because they're not in dispute.  But we still need to

have those in the record to ensure that if this goes up on

appeal and plus to let the Court know that all the statutory

requirements have been met.

            THE COURT:  Okay.

            MR. ANGWIN:  And we've had that pending for a while.

Everybody's been busy.

            THE COURT:  Okay.

            MR. SHATZ:  We also were talking about Western as we

suggested to you, and then further testimony of our witness, we

were looking for a way of shortening it.  We may have a

proposal.

            THE COURT:  This witness?

            MR. SHATZ:  Yes.

            THE COURT:  Okay.

            MR. ANGWIN:  Excellent.

            THE COURT:  All right.

            MR. SHATZ:  Thank you.

            THE COURT:  See you at 8:00 o'clock in the morning.

I do have an 8:15 matter, but I imagine you can use that time

while I'm doing that (indiscernible).  All right.

            MR. HEENAN:  Thank you, Your Honor.

283

1        MR. ANGWIN:  Thank you, Judge.

2     (Whereupon the trial in the above-entitled matter was

3  adjourned for the day at 4:53 p.m.)

4                    --o0o--

5                  CERTIFICATE

6     I certify that the foregoing is a correct transcript from

7  the electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10  /s/ Jennifer Barris                December 28, 2016

11  Jennifer Barris, Transcriber

12  AAERT CET*668

13

14

15

16

17

18

19

20

21

22

23

24

25