1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                              --o0o--

4    FRANK CORNEJO, et al.,        )   Case No. 1:15-cv-00993-JLT
                                   )
5                   Plaintiffs,    )   Bakersfield, California
                                   )   Thursday, October 20, 2016
6         vs.                      )   8:04 A.M.
                                   )
7    OCWEN LOAN SERVICING, LLC,    )   Jury Trial - Day 4.
     et al.,                       )
8                                  )
                    Defendants.    )
9    _____)

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JENNIFER L. THURSTON
11         UNITED STATES MAGISTRATE JUDGE, and a jury.

12   APPEARANCES:

13   For Plaintiff:              GIANDOMINIC VITIELLO
                                 Katchko, Vitiello and Karikomi
14                               11500 W. Olympic Blvd., #400
                                 Los Angeles, CA   90064
15                               (310) 943-9587

16                               JOHN HEENAN, PHV
                                 Bishop Heenan & Davies
17                               1631 Zimmerman Trail
                                 Billings, MT   59102
18                               (406) 839-9091

19                               EDWARD E. ANGWIN
                                 Angwin Law Firm
20                               827 Moraga Drive
                                 Los Angeles, CA   90049
21                               (310) 471-2707

22   For Defendant:             SANFORD P. SHATZ
                                 BRIAN A. PAINO
23                               McGlinchey Stafford
                                 18201 Von Karman Ave., #350
24                               Irvine, CA   92612
                                 (949) 381-5811

25

ii

APPEARANCES (Cont.):

Court Recorder:                OTILIA ROSALES
                               U.S. District Court
                               2500 Tulare Street, Suite 1501
                               Fresno, CA   93721
                               (559) 499-5928

Transcription Service:         Petrilla Reporting &
                                 Transcription
                               5002 - 61st Street
                               Sacramento, CA   95820
                               (916) 455-3887

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

iii

INDEX

                                         PAGE

| | PAGE |
|---|---|
| PRELIMINARY MATTERS, JURY INSTRUCTIONS, ETC. | 1 |
| COURT READS PARTIES STEPS TO CERTAIN FACTS (JOINT 22) | 153 |
| RULE 50 MOTION | 164 |
| DISCUSSION OF JURY INSTRUCTIONS | 170 |
| PARTIAL DEPOSITION OF FRANK CORNEJO READ INTO RECORD | 194 |
| COURT READS JURY INSTRUCTIONS | 197 |
| PLAINTIFF'S CLOSING ARGUMENT | 205 |
| DEFENDANT'S CLOSING ARGUMENT | 231 |
| PLAINTIFF'S REBUTTAL ARGUMENT | 254 |
| FINAL JURY INSTRUCTIONS | 256 |
| COURT SECURITY OFFICER SWORN | 258 |
| SPECIAL VERDICT; HOUSEKEEPING | 259 |

WITNESS INDEX

| FOR PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dora Cornejo | | S- 80 | V-149 | |

LEGEND:   V = Vitiello
           S = Shatz

EXHIBIT INDEX

| JOINT: | FOR I.D. | RECEIVED |
|---|---|---|
| 22 | 127 | 153 |
| FOR DEFENDANT: | | |
| 3 | 194 | |

1

BAKERSFIELD, CALIFORNIA, THURSDAY, OCTOBER 20, 2016, 8:04 A.M.

1

2

3       THE COURT:  All right.  We're back on the record in

4  the case of Cornejo v. Ocwen, et al., Case No. 1:15-cv-00993-

5  JLT.  So I've given you this morning a couple of corrected

6  instructions for the first phase as well as instructions as I

7  see them for second phase as well as a special verdict for this

8  second phase.

9       Were there instructions that the parties have

10  reviewed that they feel need to be changed?  For the

11  plaintiffs.

12       MR. ANGWIN:  Your Honor, within the instructions --

13  we were just conversing with defense counsel because I don't

14  think either side plans to use interrogatories or --

15       THE COURT:  Right.

16       MR. ANGWIN:  -- requests for admissions.  I think we

17  were trying to nail it down to ones that were actually going to

18  be relevant so the jury was not confused.  If they're told

19  about something they're not going to do, they might -- there's

20  just no reason.

21       THE COURT:  Well, they won't be.  It's just at this

22  point, I couldn't tell whether that was going to -- those

23  topics were going to be at issue, but if you're telling me

24  you're not going use interrogatories, we'll just go ahead and

25  delete No. 12.

2

1          MR. ANGWIN:  Yeah.  We don't plan to, Your Honor.

2          THE COURT:  The defense either?

3          MR. PAINO:  Nor do we, Your Honor.

4          THE COURT:  All right.  So 12, we'll delete.  Also as

5     to 13, no admissions?

6          MR. ANGWIN:  That would be our position, Your Honor.

7          MR. PAINO:  Same with us, Your Honor.

8          THE COURT:  All right.  13, we'll drop as well.

9          MR. ANGWIN:  With regard to 14, Your Honor, we were

10    going to ask for your guidance on where we stand on judicial

11    notice.  We have asked for the Court to make judicial notice of

12    two documents.  They were somewhat referred to.  I know you're

13    not going to admit those.  We just don't know as to what extent

14    they can referred to or if the Judge -- the Court took judicial

15    notice or --

16          THE COURT:  I have not because there hasn't been a

17    showing that the action at issue in the New York consent decree

18    is the same as here.  We had that discussion the other day.

19    Mr. Shatz gave his views based upon the differences between the

20    New York judicial foreclosure state in fact that this is not a

21    judicial foreclosure state.

22          I did give the opportunity to the plaintiffs to

23    provide me authorities on that and I have no received anything

24    back, so at this time, the Court will not take judicial notice.

25          So unless and until that happens, that instruction

3

1    also will not be given.

2              MR. ANGWIN:  Thank you.

3              THE COURT:  If there is a change, though, I'm not

4    going to cut it out at this point.  There may be a change

5    before we conclude.

6              Same thing as to charts and summaries received into

7    evidence.  I don't think we have any charts or summaries.  I

8    don't know if you intend to have any.

9              Mr. Shatz, come on in.

10             MR. SHATZ:  Thank you.

11             MR. PAINO:  We don't intend to have any charts or

12   summaries, Judge.

13             THE COURT:  All right.  Plaintiffs.

14             MR. ANGWIN:  No, Your Honor.

15             THE COURT:  All right.  So 15 we won't use.  16 also

16   we don't have that situation either.  Anything else then for

17   the plaintiffs?

18             MR. ANGWIN:  Yes, Your Honor.  On the -- these may be

19   -- let me ask you, first of all, Your Honor, on 22 --

20             THE COURT:  Yes.

21             MR. ANGWIN:  -- is the mailbox rule still something

22   we need to have the jury instructed on?

23             THE COURT:  Was is the defendant's position on that?

24             MR. PAINO:  I don't think it's -- I think it's more

25   intended for the 2924 claim that dealt with whether or not

4

1    notices were provided.

2             THE COURT:  All right.

3             MR. PAINO:  I don't think we need that any longer.

4             THE COURT:  All right.  So we won't give 22.

5             MR. ANGWIN:  Your Honor, on 23 on damages, we'd like

6    to talk about the first portion of that which refers to the

7    difference between -- I'm sorry, Your Honor.  I was looking at

8    the old damage instruction.  I apologize.

9             THE COURT:  Okay.

10            MR. ANGWIN:  I'm sorry.

11            THE COURT:  I've given you two sets.

12            MR. ANGWIN:  And I apologize, Your Honor.  I'm slow

13   in the mornings.

14            THE COURT:  That's okay.  No.  I mean I left two sets

15   on your table so that you would be able to better share.

16            MR. ANGWIN:  But, Your Honor, with regards to damages

17   Instruction 23 on the economic damages --

18            THE COURT:  Right.

19            MR. ANGWIN:  -- we would like to discuss with the

20   Court No. 1 because while we certainly understand that the

21   defendants are going to discuss that there were outstanding

22   liens, the way it's written here, I think it's going to be

23   confusing to the jury to think that -- they have already been

24   told how to find them versus they can make a determination on

25   how to find them.

5

1       THE COURT:  Well, except this morning at 7:30, I

2   received your stipulations of fact in which you did indicate

3   that that is a stipulated fact.  In fact, I think that's

4   stipulation 27.

5       MR. ANGWIN:  Your Honor, we don't dispute the liens

6   are outstanding, but the question is I don't think they

7   presented proof they were paid.

8       THE COURT:  I don't think that's their point.  I

9   think their point is -- you mean the suggestion that they have

10   not been paid.

11      MR. ANGWIN:  No.  Your Honor, I'm saying that they --

12   they can argue that there were liens on the property.  That's

13   fine.  But they can't sit there and say and checks went to

14   these people because of this because we didn't hear from the

15   trustee or anyone else with regard to where the money went.

16      THE COURT:  I think the point is, is that the

17   plaintiffs can't claim the full value of the property as

18   damages if they have liens against it, unless you're suggesting

19   that this judgment, if there's one in their favor, that the

20   liens would now be payable out of the judgment.

21      MR. ANGWIN:  Your Honor, I think our position is we

22   can talk about the valuation of the property.  We can mention

23   there are liens.  They can mention there are liens, but they

24   can't sit there and fill out checks and say look what's paid,

25   look what's paid, look what was paid because I don't think they

6

1  presented that.  Am I correct that goes in evidence through
2  Mr. Blanchard?
3          THE COURT:  Are the defendants taking the position
4  that the liens would be payable out of the judgment?  Or what
5  is your -- I assume what you're saying is the plaintiffs can't
6  recover the value of the liens, but Mr. Angwin makes a good
7  point that if they have paid the liens or if the liens were
8  paid off in foreclosure --
9          MR. ANGWIN:  Your Honor, I think that they -- I'm
10 sorry to interrupt, but I think I can clarify it.  They
11 certainly can say Ocwen got paid their $80,000.  That was
12 established.
13          I think what they're going to try and do is say there
14 was an IRS lien on the property and we paid the IRS lien.
15          THE COURT:  I think there might be two issues.  I
16 think is the fact that it was not listed on their application,
17 if I recall.  I think the second issue might be the plaintiffs
18 are asking for damages here and the damages they're asking for,
19 as I understand it, is the value of the house or the equity in
20 the house.
21          The equity in the house, though, is not simply sales
22 price minus mortgage.  It's sales price minus mortgage plus all
23 applicable liens because that's what they lost.
24          MR. ANGWIN:  And I think our position, Your Honor, is
25 that there's not evidence in front of the jury on that right

now.  I think that we stipulated to the fact that there were

liens on the property.

       THE COURT:  I think we're talking cross purposes

then.  So what do you think the measure of damages is as to the

lost house?

       MR. HEENAN:  Can I answer that?

       THE COURT:  Yeah.

       MR. HEENAN:  Is that okay?  Thank you, Your Honor.

Your Honor, I think our economic damages are what would the

Cornejos' financial position have been had the modification

gone through and had they made the payments over the 17 years

versus the situation they find themselves now basically where

they're going to be renting for at least the next 17 years.

       THE COURT:  I'm not suggesting that's not the case,

but you're going to ask the jury for a certain amount of money

for the lost house, correct?

       MR. ANGWIN:  Correct, Your Honor.  And what we

would --

       THE COURT:  And as I recall, there was evidence

presented by Ms. Cornejo that she had equity.  Are you claiming

you're not asking for the equity to be reimbursed to her?

       MR. ANGWIN:  No, Your Honor.  I think our position's

going to be that the house is worth a stipulated 167,500,

stipulated it sold for 140,200, so there was $27,000 in equity.

Because we will stipulate -- agree that the 140- went to pay --

1   will we stipulate to that?

2          THE COURT:  We're kind of talking about two different

3   things because if you're saying the difference is about

4   $27,000, then you are presuming the liens were paid.

5          MR. VITIELLO:  I think the point is that the liens

6   could only be paid up to the amount of money that Ocwen

7   actually received from the sale.  In other words, Ocwen didn't

8   dig into its pocket and pay out liens between 140- and 167,500.

9   Those liens presumably either stayed with the property or maybe

10  some entity could sue Mrs. Cornejo and Mr. Cornejo directly for

11  recovery of whatever that lien was tied to, but --

12         THE COURT:  Well, I think the trouble -- the

13  suggestion you're making is that IRS liens don't stay with the

14  property.  They stay with the person.

15         MR. VITIELLO:  They sure do.

16         THE COURT:  You can't wipe them out by foreclosure.

17         MR. VITIELLO:  And I think that would be actually the

18  first lien paid out.  I think really what we're talking about

19  is probably the last two liens in line which is --

20         THE COURT:  The State Farm lien.

21         MR. VITIELLO:  -- a judgment lien -- just a plain

22  judgment lien and a --

23         THE COURT:  What about the Franchise Tax Board, is

24  that --

25         MR. VITIELLO:  The Franchise Tax Board lien was

9

1   actually against the restaurant.  I don't know what the

2   recourse is there.  I know that the lien was attached to the

3   property, but I don't know that that makes it like a

4   nonrecourse where they can't go after the restaurant.

5          THE COURT:  It can't be attached to the restaurant

6   property or -- because this is, you've agreed, is attached to

7   this property --

8          MR. VITIELLO:  That's what I meant.  I meant the

9   subject property.

10         MR. ANGWIN:  Your Honor, I think what we can argue --

11         THE COURT:  Let me just finish my thought.  So if --

12   what is your position as to whether the Franchise Tax Board

13   lien was wiped out by the foreclosure?

14         MR. VITIELLO:  I think the facts of this -- and they

15   can talk better to it -- is that there was 140,000 some odd

16   dollars to use.  Ocwen took its 80-ish thousand dollars.  The

17   IRS got paid.

18         THE COURT:  Did the IRS get paid because the IRS --

19   it's not wiped out in foreclosure.  I'm seeing various -- I'm

20   seeing nod and shake on the -- three people, I getting three

21   responses that are different.

22         MR. VITIELLO:  No.  I think the IRS lien actually

23   must have been paid.  I think it was paid first.  The reason

24   that I think that is because, well, I know the IRS a little bit

25   and I know that they made a claim, but even that 40 something

1    thousand dollar lien, Mrs. Cornejo actually -- I don't know

2    that she presented evidence about it, but I know from dealing

3    with this case that she was a dispute in fact with the IRS for

4    a chunk of money that she had paid already toward that lien and

5    she's right now embroiled in a circumstance with the IRS that

6    she has a credit back for the IRS being overpaid.

7              So she actually has a sitting credit with the IRS

8    right now.

9              THE COURT:  So then your position as to the losses

10   attributable to the house is the agreed value of the house

11   minus the 86 -- 61589 minus the 394439.

12             MR. VITIELLO:  And, Your Honor, we're not agreeing

13   that the --

14             THE COURT:  Is that what you're saying?

15             MR. VITIELLO:  That comes -- that alone using those

16   figures comes up to about 120- or so if you do that math.  I

17   think really where we're going is that even if any of those

18   other liens were paid, between 120- and 140,200 that there's

19   nothing after that, that the difference between 167,500 and

20   140,200 was just clean equity.

21             THE COURT:  So you're -- okay.  All right.  I see

22   what you're saying.

23             MR. ANGWIN:  And, Your Honor, within that, so the

24   Court is clear, we're not stipulating that they were entitled

25   to the 80 some odd thousand dollars.  We're just stipulating

1    that they got paid that.  We're stipulating --

2         THE COURT:  Yeah.  I get that, otherwise we wouldn't

3    be here.  So then as to damage instruction and point number 1,

4    do the defendants agree then that language should be modified

5    to delete out the reference to the liens unless there's showing

6    that the measure of damages to the house is simply not the

7    difference between the sales price and the evaluation price.

8         MR. PAINO:  Our position, Your Honor, is that the

9    instruction's correct.  The equity is determined by the number

10   of liens on the property at the time of the sale -- the IRS

11   liens on the property, the Franchise Tax Board liens on the

12   property, and then the --

13        THE COURT:  Right.  But do you agree that the IRS

14   lien had to have been paid before Ocwen got paid?

15        MR. PAINO:  No.  An IRS lien would not have been

16   priority under California law.  The consensual first priority

17   lien of my client would have been paid first.

18        THE COURT:  And then the IRS.

19        MR. PAINO:  And then the IRS.

20        THE COURT:  Which is an amount less than the sales

21   price when you put those together.

22        MR. ANGWIN:  Correct.

23        THE COURT:  Right?

24        MR. PAINO:  That would be -- yes.  I believe that's

25   right.

1          THE COURT:  The fair market value -- so maybe it

2     should say the difference between the sales price -- where's

3     the -- okay.  You're saying a -- all right.  Stipulation No. 26

4     is the fair market value.  What bothers me about this because

5     your stipulation says the fair market value is 167,500 minus --

6     this would be minus -- actually we don't even account for the

7     mortgage in here, though, do we?

8          In paragraph 1, the difference in fair market value

9     and all outstanding liens, I mean truly a mortgage is a lien,

10    but I don't know that we've explained that.  Wouldn't it be

11    more clear as to fair market value minus the amounts owed on

12    the mortgage plus the IRS lien or something like that?

13         MR. PAINO:  I think we could clarify the liens.  I

14    guess I'm still struggling with the treatment of the judgment

15    and the Franchise Tax Board lien.

16         THE COURT:  Well, I guess the issue then is did you

17    pay that?  Was that paid by Ocwen out of the sales proceeds?

18         MR. SHATZ:  Okay.  We're mixing concepts.  So Ocwen

19    doesn't pay anything.  Western, the trustee, administers all

20    surplus proceeds, and, yes, Western distributed all of the sale

21    proceeds.  So out of the $140,200, Ocwen was paid its first

22    position lien and they were paid $80,615.89.

23         The next priority lien was the IRS lien and they were

24    paid $39,044.39.  The next lien was the State Farm abstract of

25    judgment and they were paid $12,352.48.  There was still money

1  left over.  The next lien was the Franchise Tax Board lien.

2  They were owed $36,062.74, but there wasn't enough of the

3  surplus proceeds left over so the Franchise Tax Board got all

4  of the remaining surplus proceeds.

5          THE COURT:  Is there going to be a showing that

6  occurred?  How will the jury know that that occurred?

7          MR. SHATZ:  There was not necessarily going to be a

8  showing of that occurring.  I thought through this stipulation

9  we had established the value and the leftover equity in the

10  property because the concept we're discussing, the fair market

11  value minus the debt against the property showing how much

12  equity there is, says that the Cornejos' --

13          THE COURT:  Right.

14          MR. SHATZ:  -- home was underwater at the time of the

15  sale.

16          THE COURT:  Right.

17          MR. SHATZ:  The fact that the sale didn't have enough

18  dollars to satisfy all the liens --

19          THE COURT:  Right.  Yeah, I got turned around.

20          MR. SHATZ:  -- doesn't change --

21          THE COURT:  I agree with you.  They had to have paid

22  everything before you had leftover.  You can't have a judgment

23  on the property and when it fell, the judgment's not paid.  You

24  have to pay them in priority and Mr. Shatz is exactly right.

25          If there was leftover, that's what was left to the

14

1    Cornejos.

2          MR. ANGWIN:  And, Your Honor, that's -- I was

3    inarticulate.  What they're going to argue -- what we don't

4    want the jury to think is this, is we're going to argue the

5    property is worth 167,050.  They sold it for 140,200.  That was

6    $27,000 more that should have gone to the benefit of the

7    Cornejos.

8          THE COURT:  Well, yes and no.

9          MR. ANGWIN:  What they're going to argue is --

10         THE COURT:  I haven't done the math, but it's still

11   whatever's left over if you add up all of these things, not

12   just they get to walk away with the 27- because they would have

13   had to pay that 36-.

14         MR. ANGWIN:  Eventually, Your Honor, but what they're

15   trying to do is get benefit from it both ways.  They're trying

16   to say we paid that out of this money, but, by the way, if we

17   paid more -- or if there had been more that would have gone

18   somewhere else, the fact that they're indebted and it's on the

19   property, that lien was extinguished when the property was

20   sold.  It's still -- they might resolve it somewhere else.

21         THE COURT:  So you're trying to get it both ways too

22   because they received a benefit by the extinguishment of the

23   remainder of the lien, assuming in fact that the Franchise Tax

24   Board lien was extinguished.

25         MR. ANGWIN:  I don't think it was extinguished, but

15

1    it's like if they owed a $27,000 credit card bill, it doesn't

2    matter.  What matters is they sold that property for 20

3    whatever thousand dollars less than it was worth and we --

4              THE COURT:  But you're ignoring the benefit that they

5    received from it because if what you're saying is -- and I

6    don't know the number -- the tax lien to the tax board was

7    36,000 and through this process, 26,000 was paid and there's a

8    $10,000 remaining balance, didn't they a benefit of that being

9    paid as well?

10             MR. ANGWIN:  Everything that was paid we will agree

11   that they got a benefit for.

12             THE COURT:  Right.  And you agree I think -- or at

13   least your co-counsels' heads were nodding that you can't sell

14   a property -- foreclose on a property without property

15   judgments being paid.

16             MR. ANGWIN:  We never -- I'm sorry if I was

17   inarticulate.  We didn't say that.  What I was saying is that

18   the property sold for 27,000 approximately dollars less than

19   the fair market value.

20             THE COURT:  Have you done the math on this?  I mean

21   tell me what's left over.

22             MR. ANGWIN:  160,500 --

23             THE COURT:  No.  The full math.  167-

24             MR. ANGWIN:  -500 --

25             THE COURT:  -500 minus 140,200 minus --

1          MR. ANGWIN:  27,300.

2          THE COURT:  I'm sorry?

3          MR. ANGWIN:  27,300?

4          THE COURT:  And that's after you subtract out the

5     liens as well -- that were paid?

6          MR. ANGWIN:  That's subtracting out all the liens

7     that were paid because the liens that were paid equaled the

8     amount of the purchase price because the purchase price was

9     chewed up by the liens.

10          THE COURT:  All right.

11          MR. ANGWIN:  There was nothing left from the purchase

12     price to pay anyone else.  Ocwen got paid.  The IRS got paid.

13     State Farm got paid and to some extent, the Franchise Tax Board

14     got paid.

15          THE COURT:  What was -- that's what I'm trying -- I'm

16     mean just -- let me just add it up myself.

17          MR. ANGWIN:  Right.

18          THE COURT:  I guess the point I'm trying to make,

19     though, is the Cornejos can't say they didn't receive a benefit

20     also.

21          MR. ANGWIN:  We're not going to argue that, Your

22     Honor.  We're going to stipulate -- and I thought we had --

23     that --

24          THE COURT:  But you started out that -- they can't

25     argue that these were paid.  I guess you've abandoned that

17

1  argument?

2          MR. ANGWIN:  I'm going to abandon -- I was arguing

3  they haven't been proved they've been paid, but I think --

4          THE COURT:  I think they have to be though.  I think

5  we all agree on that.

6          MR. ANGWIN:  That's fine, Your Honor.

7          MR. SHATZ:  Does the Court have Exhibit Book 1 for

8  defendants?

9          THE COURT:  Yes.

10          MR. SHATZ:  Do you want to see the payments?

11          MR. ANGWIN:  Your Honor, we're not going to say the

12  payments weren't made.  We're arguing now about the $27,300

13  difference between the fair market value and the amount the

14  house sold for.  That's where our discussion is because we want

15  to be able to argue that by selling it through this process,

16  the Cornejos benefitted from far less than they would have

17  benefitted through an ordinary sale.

18          THE COURT:  So what you're saying is fair market

19  value minus all the liens --

20          MR. ANGWIN:  Which were paid.  To the extent they

21  were paid.  And we're not going to argue that, you know, they

22  don't have to come in here and jump up and down and show an IRS

23  check.  If they want to say it was paid, we're not going to

24  dispute that.

25          It's just they can't get benefit for things that

18

1    weren't paid.

2         THE COURT:  And so your point is what do they have  a

3    continuing obligation to pay the IRS that is not something that

4    should be deducted.  And so I think that's ultimately your

5    point about paragraph 1 is they can't go beyond the $140,200

6    that was at issue at the time of the purchase.

7         MR. ANGWIN:  Yeah, Your Honor, I think that the

8    issue -- and I can finally articulate it because -- I think

9    I've put it all together is the defendants want to argue that

10   there were liens there that exceeded $140,000.

11        THE COURT:  Right.

12        MR. ANGWIN:  Therefore, even if the house had sold

13   for more, there was no, quote, equity.

14        THE COURT:  There was nothing left over.

15        MR. ANGWIN:  Yeah, for example, what they're going to

16   argue technically is that if the house had sold for 167,500,

17   there was about 167,500 in liens included in the full Franchise

18   Tax Board; therefore, there was no, quote, equity.

19        Our argument is the converse, which is that that

20   might be well and true, but you sold the house for $27,000 less

21   than you should have sold it for, so that $27,000 is actually

22   damages.

23        THE COURT:  Well, yes and no.  I think what you're

24   saying is they wouldn't have sold, so they wouldn't have paid

25   those liens, but when I do the math, actually the house --

19

1    you're saying was 167,500, when you add up the mortgages and

2    the liens, the number's 168,075.50.  So they actually were --

3    they owned $1,000 more than the value of the house.

4            MR. ANGWIN:  And in one sense, they were underwater,

5    Your Honor, but the other sense, because the house sold for

6    $27,300 less than it should have, they lost that 27,300.

7    That's what we want to argue.

8            THE COURT:  Right.  I get it.  So what were --

9            MR. ANGWIN:  And it's difficult because in one sense,

10   they were upside down, but because they sold the house for far

11   less than market value, the Cornejos lost the benefit of that

12   difference.

13           MR. SHATZ:  There's a concept again that we're

14   confusing.  It is not Western's responsibility to sell the

15   house for fair market value.

16           THE COURT:  Well, I think then the language we're

17   using is a little fallacious because fair market value is what

18   ready and willing buyers will pay and that was 140- --

19           MR. ANGWIN:  But we've already stipulated to the

20   value, Your Honor.

21           THE COURT:  I know.  I know, but it's -- I think it's

22   the looseness of the language that we're using.  In any event,

23   you stipulated that the property, I guess, if marketed in a

24   different situation would have sold for $167,500.

25           MR. SHATZ:  What we're stipulating -- the way the law

20

1    works in California is there is no requirement for a trustee --

2           THE COURT:  Right.

3           MR. SHATZ:  -- to market and sell the house, broker

4    it, et cetera.  What the trustee's required to do is give

5    notice of the sale and if no one bids and this house had sold

6    to the beneficiary, U.S. Bank, for 80,615.89, the value of the

7    property may still be 167,500, but the sale is proper and there

8    was no equity for the borrowers.

9           THE COURT:  Right.

10          MR. SHATZ:  In this case, the sale [sic] sold for

11   more.  There was competitive bidding.  We didn't need to bring

12   the trustee in to talk about that because the parties have now

13   agreed that as of the date of the sale, the property had a

14   certain value, and these were the debts against the property.

15          THE COURT:  Right.  On the other hand, I think -- I

16   appreciate -- the plaintiffs' point, though, to is these liens

17   were not paid.  Had the foreclosure not occurred and they had

18   sold it on a normal market, then they could have obtained

19   167,500.  That was the value of the asset the day before the

20   sale.

21          The day of the sale, there's a reduction as a result

22   of exactly what you said because the mortgager does not have to

23   sell it in that same manner.

24          MR. SHATZ:  And nothing prevented the Cornejos from

25   either marketing and selling the property on their own or

1  getting people to show up to the sale to bid and buy.

2          THE COURT:  Right.

3          MR. SHATZ:  And as you know, no foreclosure purchaser

4  is going to pay what we've agreed is the fair market value

5  because by the time they finish paying their expenses and costs

6  of rehabilitating the property, they won't make any money.

7          THE COURT:  I agree with that, and yet there is still

8  a loss.  It's a loss in the situation.  Had the foreclosure

9  sale not occurred, I don't think anyone disputes they could

10 have an agent -- and exactly what you said.  They could have

11 hired an agent.  They could have done it in the two years

12 approaching that and sold the house for $167,000.

13         Had they done it, then they could have chosen --

14 well, they wouldn't have chosen.  They would have had to pay

15 for -- I guess that's the trouble.  They would have had to have

16 paid all of this.

17         MR. SHATZ:  They would have had to have paid all of

18 it.

19         MR. ANGWIN:  Correct, Your Honor, but they would have

20 had an additional $27,000 that would have been paid to the

21 Franchise Tax Board.

22         THE COURT:  No, no.  As I said and I read, when you

23 added this all up, they owed $1,000 more than the house was

24 valued at.

25         MR. ANGWIN:  Correct, but if they sold the house for

22

1   fair market value --

2           THE COURT:  At $167,500, they would have had to have

3   paid to do that $168,075.50.

4           MR. ANGWIN:  Correct, Your Honor, but they would have

5   owed the Franchise Tax Board today $27,300 less.

6           MR. PAINO:  But that's a different showing, Your

7   Honor, than --

8           MR. ANGWIN:  Your Honor, they want it both ways.

9           THE COURT:  You do too, though.  You do too because

10  had they sold it on the open market, yeah, they would have been

11  clear with the Franchise Tax Board --

12          MR. ANGWIN:  Right.

13          THE COURT:  -- and you're saying now they are not or

14  that it was wiped out?

15          MR. ANGWIN:  It wasn't wiped out.  They still owe

16  that.

17          THE COURT:  Okay.  I mean I hear you saying that.  I

18  don't know that there's evidence of that and I'm confused at

19  this point.  I know the IRS lien, you can't do anything to

20  avoid that.  I don't know about these --

21          MR. HEENAN:  Your Honor, if we can, I mean I just

22  think that this instruction, everything past in determining

23  telling the jury which portions of economic damages to consider

24  obviously creates confusion and so to me, the simplest thing is

25  to strike everything -- these 1, 2, and 3 so the jury can go

1    back there and determine what the economic damages are.

2         THE COURT:  I would be more comfortable with that if

3    there was evidence that there's still a Franchise Tax Board

4    lien.  Do you have any evidence of that anywhere?  Can you get

5    it?

6         MR. ANGWIN:  We can get it by the end of the day,

7    Your Honor.  To be honest with you, I did not think that would

8    be an issue because just like the IRS lien, a Franchise Tax

9    Board lien as far as I know don't go away.  Mr. Shatz is an

10    expert on this, but -- do those get extinguished ever?

11         MR. SHATZ:  That I cannot answer.  But I can say it's

12    no longer against the property --

13         THE COURT:  Right.

14         MR. SHATZ:  -- because the foreclosure sale by the

15    senior elected out.

16         MR. ANGWIN:  And, Your Honor, I --

17         MR. SHATZ:  We didn't bring in additional evidence

18    either because of our understanding of equity in the property

19    is value minus debt and rather than bring in the trustee to

20    say, yes, these were the liens, here's the copy of what we

21    obtained from title, we have the exhibits in the book.  Our

22    authentication person didn't come in because of our

23    stipulation.

24         There's lots of things we can do in this case, but

25    there was no equity in the property for the Cornejos.

24

1          THE COURT:  At this point, this is the correct

2    statement of law and I don't think you even dispute that.

3          MR. ANGWIN:  We don't dispute that --

4          THE COURT:  It's just a matter of what liens

5    continued after the foreclosure and that's why I'm having

6    trouble because I haven't been given evidence of that.

7          MR. SHATZ:  The term of art -- using the word lien,

8    are you referring to debt?  Because there is no lien on the

9    property.  It's done.  It's over.

10          MR. ANGWIN:  She paid it off, I believe, Your Honor.

11          THE COURT:  I'm using the language that you used in

12    your stipulation, the outstanding liens.

13          MR. SHATZ:  And they're gone.  They're over.  I

14    agree.  Once the foreclosure takes place --

15          THE COURT:  I appreciate your correction.  I

16    appreciate the nuance of the vocabulary as well.

17          MR. ANGWIN:  Your Honor, can I clear this up?

18          THE COURT:  I doubt it because there's no evidence on

19    the topic.

20          MR. ANGWIN:  That's what I was going to say.  If we

21    present evidence that the Franchise Tax lien either was paid

22    separately or still exists, is that what the Court's looking

23    for?

24          You want to show that they didn't get a benefit by

25    extinguishment; am I correct?

25

1          MR. HEENAN:  Well, isn't that their burden to show --

2     isn't it the defendants' --

3          THE COURT:  No.  It's your -- are you going to prove

4     damages?  If you want to prove damages, then this is the

5     correct statement of law that they -- the value is the market

6     price minus the debts and lies.

7          MR. ANGWIN:  The debts and liens that were paid.

8          THE COURT:  The debts and liens attached to the

9     property.

10         MR. ANGWIN:  And that's where we get the issue, Your

11    Honor, is what if the Cornejos argue this, and I think this is

12    our position, like I think you said.  If we'd been able to sell

13    the house through the regular process, we would have made

14    $27,000 more.  Now, during that --

15         THE COURT:  Well, you wouldn't have.  You would have

16    lost another $1,000 plus the costs of escrow and agents because

17    they owed $1,000 more.

18         MR. ANGWIN:  Right.  What I'm -- how about can we

19    have through the end of the day to present evidence?

20         THE COURT:  You can have until you close.

21         MR. ANGWIN:  Okay.  We did not know this would be an

22    issue either.  The difficulty with our thing is that they want

23    to take benefit of saying assume that the Franchise Tax Board

24    lien was extinguished somehow because it's no longer in its --

25    of course the property's not there anymore.

26

1          The reality is, the way I understand it, small
2    businesses have to pay the Franchise Tax within a short time or
3    their doors are closed.
4          THE COURT:  Well, then are their doors closed?
5          MR. ANGWIN:  No, because they paid it off.  But I did
6    not think that would be an issue because it was not --
7          THE COURT:  So the plaintiffs bear the burden of
8    proof on damages.  They just do.  You know that.
9          MR. ANGWIN:  Yes, Your Honor.
10          THE COURT:  So I appreciate the defendants are taking
11    advantage of the sale you approved, but that's exactly the role
12    of defendants.
13          MR. ANGWIN:  All right.  We will get you more
14    evidence on that if we can, Your Honor.
15          THE COURT:  It's up to you.
16          MR. ANGWIN:  If we can move down to our question with
17    regard to -- it appears that by articulating three things, we
18    are concerned that the jury will think those are the only three
19    things they can award economic damages for.
20          THE COURT:  So No. 3 is other out-of-pocket losses
21    caused by defendants' conduct.
22          MR. ANGWIN:  Okay.  Things that drew other economic
23    losses?
24          THE COURT:  If you like.  I think out-of-pocket is
25    more understandable, but you certainly can if you --

27

1          MR. HEENAN:  Well, economic -- economic, please, Your

2     Honor.

3          MR. ANGWIN:  Yeah, and the reason is because we've

4     used the term economic throughout.  I think it's --

5          THE COURT:  I don't think you've used it at all.  I

6     mean here and even economic damages --

7          MR. ANGWIN:  It's in the instruction --

8          THE COURT:  -- are defined as out-of-pocket losses

9     that occurred in the past and are reasonably certain to occur

10    in the future.

11         MR. ANGWIN:  And I was just saying that throughout

12    the instruction it refers economic damages, and so I think it

13    should --

14         THE COURT:  So do you want to delete the definition

15    because to me, it's a more difficult concept to say -- suggest

16    economic losses as opposed -- people understand what's

17    out-of-pocket, but -- I'll change it if you like.

18         MR. HEENAN:  Thank you, Your Honor.

19         MR. ANGWIN:  Thank you, Your Honor.

20         MR. HEENAN:  Why are we changing it?

21         THE COURT:  And any comment by the defendants?

22         MR. SHATZ:  I think the -- either -- the

23    out-of-pocket came from our -- I think it's user friendly than

24    the term economic for --

25         THE COURT:  I think so too, but the plaintiffs bear

1    the burden and they're saying they are more comfortable with
2    economic as opposed to the what I think and you think is the
3    more clear language.
4              MR. SHATZ:  How do we define economic then, Your
5    Honor?  The amount of economic damages must include an award
6    for all out-of-pocket losses.
7              THE COURT:  I think what they're saying is they don't
8    want that language at all.  So just -- it's self-defining.
9              MR. ANGWIN:  I think it's in the definitional portion
10   of the second paragraph, Your Honor.
11             THE COURT:  Which definitional portion is that?
12             MR. ANGWIN:  Of the damages where it says economic
13   damages refers to out-of-pocket losses suffered by the
14   plaintiffs in the past and those that are reasonably certain to
15   be suffered in the future.
16             THE COURT:  Oh, okay.  Because I thought you just
17   said you didn't want that there anymore.
18             MR. ANGWIN:  We would like to change the
19   out-of-pockets to economic.
20             MR. HEENAN:  All right.  Well, I think the simplest
21   thing would be to strike everything after in determining the
22   plaintiffs' economic damages through the bullet point 3 and --
23             THE COURT:  You don't want to give them any guidance
24   at all as to what that means.
25             MR. HEENAN:  Well, I think they're instructed what

29

1   economic damages is by the first three paragraphs.

2        THE COURT:  I'm sorry, but I disagree with you

3   especially on point 1.  I think that that would be clearer

4   error.  In fact, this language is taken from the California

5   Jury Instructions.  If you were to delete that, I find that --

6   I would completely disagree that that's not error.

7        MR. ANGWIN:  Your Honor, I think we're changing the

8   out-of-pockets to economic and then --

9        THE COURT:  And when you say the out-of-pockets,

10  you're referring only to paragraph 3?

11       MR. ANGWIN:  Bullet point 3 is also in the definition

12  of paragraph 2.

13       THE COURT:  Then how do you -- how would you like

14  that definitional sentence, the last sentence of paragraph 2 to

15  read?

16       MR. ANGWIN:  Because if we economic damages are

17  economic damages, it's a little difficult.

18       THE COURT:  I'm asking you for the language that you

19  think that that should be.

20       MR. HEENAN:  I think it should say economic damages

21  refers to losses by the plaintiffs in the past and those that

22  are reasonably certain to be suffered in the future.

23       THE COURT:  All right.  Do have any problem with that

24  for the defendants?

25       MR. PAINO:  To me that's not qualified at all.

30

1          MR. ANGWIN:  Can we say monetary losses then?

2          THE COURT:  If you like.  Does that --

3          MR. ANGWIN:  I think that clears it up.  I think what

4    they want is to make sure that it's no some open ended thing

5    saying it's not limited to money.

6          THE COURT:  I don't think that's -- this is taken

7    from the CACI instruction except that I had to modify it.  They

8    did not give me this language.  I've given this to you all, so

9    I don't think it's fair to -- to the defendants.

10          I think you're causing more confusion, but because

11   this is your issue to prove, then I am happy to defer to you on

12   this topic.  I'm making the record very clear, though, that I

13   am doing it at the plaintiffs' request.

14          Economic damages refer to monetary are you saying or

15   no language there at all?

16          MR. PAINO:  Monetary, please, Your Honor.

17          MR. ANGWIN:  And that would be in the third paragraph

18   as well, Your Honor, change out-of-pocket to monetary.

19          THE COURT:  All right.  All right.  As to -- I gave

20   you also a changed 25 because there were the two section marks.

21   That's been changed.

22          MR. PAINO:  Your Honor, before we leave No. 23 --

23          THE COURT:  Yeah.

24          MR. PAINO:  -- damages, the only other comment that I

25   would add is we were hoping to include a statement after it

1  says your award must be based upon evidence and not upon

2  speculation, guesswork, or conjecture.  California law also

3  recognizes a reasonableness requirement.

4           So we think it would be appropriate to add a sentence

5  after that indicating additionally the damages must -- you must

6  determine -- you must find that the damages were reasonable.

7           MR. ANGWIN:  Your Honor, don't think that that was

8  mitigation or some -- well --

9           MR. PAINO:  Cal. Civil Code 3359 says damages must in

10  all cases be reasonable.

11           THE COURT:  I'm sorry.  You say CACI 3359?

12           MR. PAINO:  Civil Code Section 3359.

13           MR. ANGWIN:  Your Honor, it already says reasonably

14  and fairly compensate in the --

15           THE COURT:  Reasonably and fairly compensate for

16  future losses.  It doesn't say anything about past losses.  I'm

17  having some trouble with that concept because that's not

18  something you ever see in jury instructions that your award

19  must be reasonable.  Reasonable seems --

20           MR. PAINO:  It's not necessary the award itself, but

21  the claimed damages.  So, for instance, we think in this case,

22  perhaps there are some damages that are being claimed that were

23  necessarily reasonable.

24           And in this case, the plaintiffs are claiming damages

25  for having to rent storage units.

1          THE COURT:  You're suggesting a causal connection.

2          MR. PAINO:  That's right.

3          THE COURT:  Do we need a causation instruction?

4     Because I -- I thought it was odd that we didn't have one, but

5     neither side was requesting one.

6          MR. HEENAN:  I think the causation is the second

7     sentence of the second paragraph of this instruction where it

8     says --

9          THE COURT:  Right.  Caused by the defendants, but we

10    don't tell them what standard of cause is required.

11         MR. ANGWIN:  It says reasonably and fairly.  I mean

12    if you want -

13         THE COURT:  We don't have an instruction on causation

14    which generally you do.  Cause can be, you know, a but for

15    cause.  It could be a substantial cause.

16         MR. ANGWIN:  If the Court think -- we're fine with

17    the regular causation instruction.

18         THE COURT:  I don't know.  Is that -- do you think

19    that would address your issue, Mr. Paino?

20         MR. PAINO:  I think that -- in part, but I still

21    think there's an issue of whether the damages that are being

22    claimed are reasonable and there isn't really any instruction

23    to the jurors -- the jurors aren't instructed that, hey, if the

24    plaintiffs are claiming damages -- unreasonable damages,

25    then --

1          THE COURT:  But I think what you're saying is if

2     there's no causal connection, it's unreasonable.  If there's a

3     causal connection, regardless of whether it's anticipated by

4     the defendants, then they're entitled to that.

5          MR. PAINO:  Maybe that would resolve it.  Maybe

6     that --

7          THE COURT:  Let's look at the -- and I assume the

8     parties agree the causal connection is a substantial cause?

9          MR. SHATZ:  Yes, Your Honor.

10          THE COURT:  I don't use CACI instructions that often.

11     Do you happen to know offhand, Mr. Paino, what the CACI number

12     is on that?

13          MR. PAINO:  Unfortunately, Your Honor, I don't.

14       (Pause.)

15          THE COURT:  It's going to be a causation 430 -- CACI

16     430, I think.  A substantial factor is -- in causing harm is a

17     factor that a reasonable person would consider to have

18     contributed to the harm.  It must be more than remote or a

19     trivial factor.  It does not have to be the only cause of the

20     harm.

21          Conduct is not a substantial factor on causing harm

22     if the same harm would have occurred without that conduct.

23     Yes?  Do the plaintiffs agree with that as well?

24          MR. ANGWIN:  We're fine with that, Your Honor.

25          THE COURT:  All right.  So add a causation

34

1    instruction.  Probably would make sense to include that

2    probably after the material defined instruction.

3          All right.  So anything else then as to the

4    instructions --

5          MR. ANGWIN:  Your Honor, does adding that sort of get

6    rid of the need for the mitigation damage instruction because

7    we weren't actually sure ever what the mitigation went to?

8          THE COURT:  It depends on what the evidence is at

9    this point.  I don't know that there's a showing of a lack of

10   mitigation yet.

11         MR. ANGWIN:  And if there's no showing of lack of

12   mitigation, then I think it's confusing to give instructions to

13   the jury on issues --

14         THE COURT:  That's what -- we're not quite able to

15   determine that yet.  If there's no evidence of a failure to

16   mitigate, then I won't give that instruction.

17         MR. ANGWIN:  Thank you, Your Honor.

18         THE COURT:  So the verdict form I've -- I don't see

19   any change that should occur at this time unless there is

20   something else that the parties have identified.

21         MR. PAINO:  Your Honor, we identified one potential

22   issue.  I did have a couple other comments and hopefully I can

23   do this quickly -- on the jury instructions.

24         THE COURT:  Okay.

25         MR. PAINO:  One is with respect to Jury Instruction

35

1    No. 20.   The instruction puts the burden on Ocwen to prove that

2    its time frame were reasonable.   Our position would be that the

3    reasonableness part is an element of plaintiffs' claim and it

4    would be the plaintiffs' burden to prove that the time frame

5    was unreasonable.

6           THE COURT:   I think as the statute requires that

7    Ocwen may impose a reasonable time period -- time frame.   And

8    you're suggesting that it is presumptively reasonable that the

9    plaintiff has to overcome the presumption.   I didn't see that

10   in the statute.

11          MR. PAINO:   I guess the reading here is almost

12   suggesting it the other way, that the presumption is that it's

13   unreasonable and the burden is on us to prove reasonableness

14   that --

15          MR. SHATZ:   No.   And the reason I say no is I am

16   looking 2923.6 subdivision h.   Let me know when.

17          THE COURT:   All right.

18          MR. SHATZ:   For purposes of this section, an

19   application shall be deemed complete when a borrower has

20   supplied the mortgage servicer with all documents required by

21   the mortgage servicer with in the reasonable time frame

22   specified by the mortgage servicer.

23          Well, there's no restrictions on what a servicer

24   thinks is reasonable or the time frame that the servicer says.

25   If the borrower wants to contest them then it's the borrower's

36

1    burden to do so.

2         We have guidance in this case that we're needing to

3    rely on or use.  Federal Regulation S 12 CFR sub 24.41

4    specifies a 37-day requirement.  The California Civil Code

5    specifies a five-day requirement in that a servicer has five

6    days to review documents after they're provided.

7         Ocwen's letter said seven business days, but in this

8    case, Ocwen went until midnight of the business day before the

9    sale and the question is, is that way shorter than federal

10   requirement and shorter than state requirement reasonable.  The

11   burden shouldn't be on Ocwen to say.  We're lessening the time

12   required by the fed and the state and we now have to prove

13   that's reasonable.

14        It's -- this is our standard and it's the borrower --

15   the challenger who must prove that it's unreasonable.

16        Your Honor, I misspoke.  I told you five days in

17   California.  I was wrong.  It's five business days.  Civil Code

18   Section 2924.10(a) --

19        THE COURT:  Right.

20        MR. SHATZ:  Okay.

21        THE COURT:  I'm trying to think this through.

22        MR. ANGWIN:  And, Your Honor, most of the statutory

23   sections, of course, are restrictions on the defendant on what

24   they can do.  I mean you can't do things before these dates.

25   It's not some limit that -- it's sort of an outside limit.

37

1          But our position is this, is that they have to
2     establish a time frame.  That's what the statute says.  There's
3     an initial burden on them to establish a reasonable time frame.
4     That's --
5               THE COURT:  Okay.
6               MR. ANGWIN:  You know, that's -- I think that's what
7     this instruction says.
8               We, of course, implicitly have to argue it's
9     unreasonable, but if you say the plaintiff has the burden of
10    proving it's unreasonable, then you're asking the jury to
11    presuppose it is reasonable.
12              THE COURT:  Well, it isn't -- isn't that what happens
13    in any negligence action?
14              MR. ANGWIN:  Unless you have a statutory duty to
15    establish a time frame.  Our position is this they have to say
16    this is our time frame --
17              THE COURT:  Okay.  Let's stop -- let's stay with your
18    first example.  If there's a statutory obligation to set a
19    reasonable time frame, who bears the burden of establishing
20    it's not when the plaintiff is bringing an action?
21              MR. ANGWIN:  I think -- our position is this, Your
22    Honor --
23              THE COURT:  I know, but let's not think about this
24    case.  Let's think about other situations --
25              MR. ANGWIN:  Okay.

38

1          THE COURT:  -- because I don't think I'm going to

2    get --

3          MR. ANGWIN:  Okay.  In other situations -- I think

4    that the defendants in general under the California Homeowners

5    Bill of Rights, they have to establish a time frame.

6          THE COURT:  Right.

7          MR. ANGWIN:  Okay?

8          THE COURT:  That's been done.  There's evidence of

9    that.

10          MR. ANGWIN:  Okay.  We'll discuss that but --

11          THE COURT:  Well, there is evidence of a time frame.

12          MR. ANGWIN:  Correct.  And then --

13          THE COURT:  So there's evidence that Ocwen

14    established time frames, right?

15          MR. ANGWIN:  There's evidence of time frames, yes,

16    Your Honor.

17          THE COURT:  Okay.

18          MR. ANGWIN:  The problem I have if you shift it to

19    the defendant's position, then it's placing a somewhat heavy

20    burden on the plaintiff which presupposes -- it's almost like

21    the Court saying the time frame's reasonable, now prove it's

22    not reasonable versus the Court being neutral and saying they

23    have to establish a reasonable time frame.  Now you have to

24    establish it's unreasonable.

25          Maybe you can say something to the extent of Ocwen's

39

1    got the initial burden of showing it's reasonable, but then the

2    plaintiff must rebut that somehow, you know --

3              THE COURT:  Well, okay.  Let's -- that is how

4    procedurally you see that happening because I think that there

5    is evidence that Ocwen has presented evidence and whether the

6    jury believes or not, that the time frame they established was

7    reasonable, right?

8              MR. ANGWIN:  And are we talking the time frame here

9    for Ocwen to do some action or the time frame they give the

10   plaintiffs to provide documents?  And that's the distinction on

11   some of these.  A lot of the time frames they refer to --

12             THE COURT:  And yet -- yeah.  I'm not seeing that.

13   But let's say you're right.  I'm sort of a McDonnell shifting

14   burdens thing.  They -- there is evidence that they've

15   presented reason for the deadline, right?

16             They said we need this amount of time to do whatever

17   we need to do.  There was also some evidence, well, wasn't that

18   just a little bit short of 24 hours to do that.

19             Even on the shifting burdens under -- in an

20   employment law test, it's always the plaintiff's burden.

21   That's a burden of production not proof, right?   Under

22   McDonnell Douglas?  I'm not asking you.  I'm actually telling

23   you that is the law.  It's a shifting burden of production.

24             MR. ANGWIN:  No.  I was thinking that's -- trying to

25   find a way to get around your logic.

40

1      THE COURT:  Okay.  So -- and then what I'm thinking

2  of there some negligence action, a reasonable person standard

3  is the plaintiff's burden.  The plaintiff must prove that the

4  defendant failed to act reasonably.

5      I'm looking at case authority.  I'm not seeing any

6  that says that.

7      MR. ANGWIN:  Your Honor, can we just remove the

8  burden language period?

9      THE COURT:  We can.  In essence, that would place the

10  burden on the plaintiff because the plaintiff bears the burden

11  in all instances.

12      MR. ANGWIN:  True, but then if there's a further

13  instruction for the Court saying the plaintiff bears the

14  burden, the jury might think that that's --

15      THE COURT:  Okay.

16      MR. ANGWIN:  -- being extra emphasized for some

17  reason.

18      THE COURT:  Any problem with that?

19      MR. SHATZ:  No.

20      MR. PAINO:  I don't think we have a problem with

21  that, Your Honor.

22      THE COURT:  All right.  20 will be modified in that

23  way then.  Mr. Paino, other comments?

24      MR. PAINO:  I'm sorry.  One last comment was in

25  connection with Instruction No. 26.  I went ahead and took a

41

1   look at the Court -- the cited decision that the Court has

2   here, the Rich v. Schwab decision, and I'm really focusing on

3   the second sentence.

4        The purposes of these statutory damages are to

5   motivate compliance with the law.  What I would request is that

6   it go one step further and say to motivate compliance with the

7   law and punish wrongdoers and moderate some language or punish

8   noncompliant which is similar to the language in Rich v. Schwab

9   with reading from Rich v. Schwab, it says, thus, by both

10  exemplary damages and statutory damages serve to motivate

11  compliance with the law and punish wrongdoers.

12       So I think what I'm asking is that we include

13  similar -- include the punishment provision in this

14  instruction.

15       THE COURT:  I think the difficulty that they're

16  talking about two types of damages and it's whether they're

17  saying -- I read it to mean that -- that case to mean that you

18  have statutory damages, you have exemplary damages.

19       Statutory damages have a different burden of proof

20  than exemplary.  Maybe I'm reading it differently than you do.

21       MR. PAINO:  No.  I think that that -- I wasn't

22  getting into the burden of proof issue, but I think inherently

23  the damages under the second clause of the statute are intended

24  not just to compel compliance, but also to -- or not compel

25  compliance but to motivate compliance, but also --

42

1          THE COURT:  To punish the failure to comply.

2          MR. PAINO:  -- to punish and I think that that's an

3     important point for a juror to understand.

4          THE COURT:  Are you specifically looking at page 816

5     or at a different page of which --

6          MR. PAINO:  Yeah, it looks like it was from 816.

7          THE COURT:  Yeah.  I see what you're saying.

8     They're -- yeah, I see what you're saying.  I guess I'm

9     wondering -- I see what you're doing.  I guess I'm trying to

10    wonder why we need to do that except to -- in doing that, it

11    increases the culpability of the defendant in order to have a

12    statutory damage award imposed, I think.  Because a failure to

13    comply with the law must already be willful and reckless.

14         Well, before I say too much more, what do the

15    plaintiffs think of that?

16         MR. ANGWIN:  Your Honor, the difficulty -- if they

17    want to do something, of course, we're going to listen to any

18    suggestion.  The trouble is this.  When we start getting into

19    punishment, we start getting in that gray area as to whether

20    these are statutory or punitive, and what I don't want to do is

21    back into an issue where an appellate court feels that you

22    instructed on punitives, but did not give them a clear and

23    convincing thing, and of course, we don't think clear and

24    convincing applies.  So it sort of --

25         THE COURT:  If that was the case, though, that would

43

1    still be to your advantage.  That wouldn't be reversible.

2         The defendants are asking me to include this.  The

3    error I think if any would be in -- if there is error, would be

4    toward not the burden because the burden is going to be

5    established by preponderance.

6         MR. ANGWIN:  Right.

7         THE COURT:  But do they have to convince themselves

8    that Ocwen is in need of punishment as opposed to failure to

9    comply.  In some ways, though, willful and reckless requires a

10   level of culpability that is more than just -- as I said

11   before, more than just the traditional concept of intentional

12   act.

13        I think if we're going to conclude punishment in this

14   language, it should say to motivate compliance with the law and

15   to punish wrongdoers.  That's the exact language of Rich.

16        MR. ANGWIN:  Your Honor, we're going to let you have

17   that one.

18        THE COURT:  All right.  So you don't have an

19   objection to that change?  All right.  Hearing none, I will

20   change it to include statutory damage is to motivate compliance

21   with the law and punish wrongdoers.  All right.

22        Mr. Paino, anything else?

23        MR. SHATZ:  When the Court changed Instruction 20 or

24   removed a specific statement as to who bears the burden of

25   establishing, the Court left it in in Instruction No. 19.  Did

44

1   the Court mean to do that and make the two sections no longer

2   parallel?

3           THE COURT:  Yeah.  We might as well delete off of 19

4   as well.  Is that what you're asking, Mr. Shatz?

5           MR. SHATZ:  Yes, Your Honor.

6           THE COURT:  Any problems with that?

7           MR. ANGWIN:  If we're removing the language that says

8   the plaintiffs bears the burden of establishing that the

9   application was complete?

10          MR. SHATZ:  No.  No.  It's --

11          MR. ANGWIN:  I think that's -- that's what he said.

12          THE COURT:  Maybe I misunderstood.  I thought that's

13  what you said too.

14          MR. SHATZ:  I think that's what I said too.   I

15  should have gotten up earlier this morning.

16          MR. ANGWIN:  We agree with that one.

17          MR. PAINO:  Yeah.  We would agree with that one --

18          THE COURT:  On 19, to delete that second sentence?

19          MR. SHATZ:  No.  Leave it in.

20          MR. PAINO:  I think it's fine as is, Your Honor.

21          MR. ANGWIN:  And, Your Honor, that gets back to an

22  interesting question as to isn't completeness something that

23  both sides have to prove?  I mean now that they brought this

24  up --

25          THE COURT:  The case authority that you cite, that

45

1   second sentence comes from your authorities.  Completeness does

2   not depend solely on -- the loan modification application was

3   complete.  I would be hesitant to leave that in without some

4   comment about --

5        MR. ANGWIN:  Your Honor, we bear the burden of proof

6   on all elements, so I think it's fine to leave it in.

7        THE COURT:  All right.  All right.

8        MR. PAINO:  So leave it then.

9        THE COURT:  All right.  Anything else, Mr. Paino?

10       MR. PAINO:  That's all I have, Your Honor.  Unless

11  the Court is inclined to reconsider its position on the clear

12  and convincing standards, I have nothing further on the

13  instructions.

14       THE COURT:  All right.  I do --

15       MR. ANGWIN:  Your Honor, we have an issue with the

16  instructions if we can.

17       THE COURT:  Okay.

18       MR. ANGWIN:  We talked last night and went through a

19  question and this -- we'd like the Court's guidance.  We think

20  that the jury is going to need to determine what midnight

21  means.  And the difficulty of that, Your Honor, is

22  Mr. Blanchard knew nothing about trademarks, with TM, but he

23  certainly knew the legal definition of midnight.

24       THE COURT:  Is there a legal definition?  Is there --

25  maybe there's a Civil Code section on midnight.

46

1        MR. ANGWIN:  The Rules of Civil Procedure talks about
2   it.

3        THE COURT:  It defines it?

4        MR. ANGWIN:  Well, let me ask you this, Your Honor.
5   The Rules of Civil Procedure don't define it.  They say a day
6   ends at midnight.  For example, if I --

7        THE COURT:  Okay.

8        MR. ANGWIN:  -- were filing something here, I'd have
9   to file it by midnight.

10       THE COURT:  You want an instruction that a day ends
11  at midnight?

12       MR. ANGWIN:  Yes, we do.  We have a proposed
13  instruction right here.

14       THE COURT:  A day ending at midnight, isn't that
15  exactly what the defendants are saying, that --

16       MR. ANGWIN:  No.  They say the day begins at
17  midnight.

18       THE COURT:  Well, as I understand their theory of the
19  case, the documents were due -- I think what Mr. Blanchard
20  said, it was 11:59, 12:00 o'clock, that's midnight.

21       MR. ANGWIN:  Actually he said midnight starts the
22  next morning.  If I can give Your Honor an example, I think I
23  can clear it up.

24       THE COURT:  Aren't they saying that the documents had
25  to be there by 11:59:60 in essence on the 27th?  Isn't that

1  their theory?  Wouldn't that be the end of the day of the 27th?

2          MR. ANGWIN:  Yes, but the 27th is not the business

3  day before the sale.  The 28th is the -- what they're saying is

4  business day before the sale really means the day before the

5  business day because that day starts at midnight, so it's the

6  day before that day.  That's what they say.

7          THE COURT:  As I understood it, they're saying you

8  have the 27th.  You go through all of the hours.  You're now at

9  11:59.  Sixty seconds go by.  The clock strikes midnight.  That

10  is when the documents had to have been there.

11          Now we go to the day of the 28th and --

12          MR. ANGWIN:  Isn't the 28th the last business day

13  before the sale?

14          THE COURT:  I don't decide that fact.

15          MR. ANGWIN:  And that -- the trouble is, Your Honor,

16  Mr. Blanchard testified about something.  We didn't have an

17  expert witness to talk about what midnight means, and to be

18  candid, he was not qualified to mention that.  But --

19          THE COURT:  Midnight is something within the

20  experience of all of us, though, right?

21          MR. ANGWIN:  Your Honor, it's actually not because

22  the question I had was this.  If a judge who gives much less

23  clearer than yours told me, he said we have a hearing on the

24  29th.  I would like your brief filed by midnight the business

25  day before.  When am I to file the that?

48

1      THE COURT:  I guess we would have to go ask that

2  judge, but --

3      MR. ANGWIN:  And, Your Honor, that --

4      THE COURT:  I don't decide the facts of this case.  I

5  am willing to give an instruction.  Tell me what you think it

6  should be or do you have a stipulation with the defendants as

7  to what that means.

8      MR. ANGWIN:  We have two proposals, Your Honor,

9  and --

10      THE COURT:  Because I don't think the dispute is

11  midnight.  I think the dispute is --

12      MR. ANGWIN:  What midnight --

13      THE COURT:  -- prior business day.

14      MR. ANGWIN:  Our dispute's what midnight means.  Does

15  midnight end the day or begin the day?

16      THE COURT:  In fact, my understanding it does both

17  because it strikes midnight 12 times, right?

18      MR. ANGWIN:  And that's -- I did a lot of research on

19  this, Your Honor, and as you know, I am truly trying to be

20  truthful and honest and a fair representation of the law when I

21  talk to the Court.

22      There are cases which say, consistent with the

23  rules -- well, actually most of the cases say don't use

24  midnight because we don't know what it means.

25      THE COURT:  Okay.

49

1          MR. ANGWIN:  But there are cases which are consistent

2     with the federal rules, which I can -- which we have cited here

3     and which I brought today -- saying if you have to file

4     something by midnight on a certain date, it's by midnight of

5     that date.  That's what Rule 6 says.  That's what courts have

6     said.  The courts say midnight ends the day.  Midnight doesn't

7     begin the day.

8          So it's either one of two things, Your Honor.  Either

9     it's a term we think the Court needs to define or it's an

10    ambiguous term and we think the Court needs to instruct the

11    jury that it's an ambiguous term and the jury needs to --

12          THE COURT:  All right.  Let's say you're right and

13    it's something the Court needs to define.

14          MR. ANGWIN:  Right.

15          THE COURT:  I don't make the law.  You either have to

16    give me evidence of that or you have to give me some sort of a

17    legal maxim or some sort of stipulation of counsel.  I don't

18    get to create it.  I can tell you what I think, but that

19    doesn't mean anything.

20          MR. ANGWIN:  Your Honor, can I approach and we

21    have --

22          THE COURT:  Have you shared this with your opponent

23    because the other thing now is procedurally what are you asking

24    me to do?

25          MR. ANGWIN:  I'm asking you under Rule 51 to allow us

50

1   to submit a late instruction because the evidence --

2           THE COURT:  I have no problem with the instruction.

3           MR. ANGWIN:  Right.

4           THE COURT:  What I'm asking is what is the authority

5   for that because it's not for submitting instructions for

6   midnight.  Where do I get that?

7           MR. ANGWIN:  I've got the authority right here.  What

8   I would suggest is let me give it to defense counsel and speak

9   with them and then see if we can reach --

10          THE COURT:  Yeah.

11          MR. ANGWIN:  And I'll give it to the Court as well.

12          THE COURT:  All right.

13          MR. PAINO:  Your Honor, we're not talking about

14  midnight in a statutory or a legal sense.  We're talking about

15  what is -- the open question, what does the jury believe that

16  that writer meant when they said midnight, and I don't think

17  that that's something that requires an instruction.

18          THE COURT:  I don't know that it does either, but I

19  don't think that there's anything wrong in considering what

20  they're saying.  I -- like I said, I think we've all had

21  midnight.  We all know what midnight is.  We've been here on

22  New Year's Eve.  We know what midnight is.

23          I don't know -- you're trying to not only -- if it

24  ends the day, it does, but you still have the dispute as

25  whether that means they meant the end of the day on the 27th or

1    the end of the day of the 28th.

2        MR. ANGWIN:  And, Your Honor, we might cure that.  We

3    have a suggested instruction that just -- it's from CACI.

4        THE COURT:  What about the thought, though, that

5    Mr. Paino has just suggested that it's not a legal definition.

6    It is plaintiffs' -- or the defendants' reasonable time frame.

7    They define that.

8        And I guess your argument being, well, it's not

9    reasonable because we can't figure out what it means.

10       MR. ANGWIN:  Well, Your Honor, our argument's this.

11   It's not just what they mean.  It's conveyed to borrowers

12       THE COURT:  Right.

13       MR. ANGWIN:  And the question becomes what -- not

14   just what do they mean, but how is that conveyed to the

15   borrowers.  If they want it to be clear -- but when it says

16   midnight, we would ask for an instruction that the Court does

17   not want to decide what it means and we'd ask that the jury be

18   instructed that.

19       If there's an ambiguity, it's construed against the

20   drafter.

21       THE COURT:  It's not a contract, right?

22       MR. ANGWIN:  It's not a contract, but that's been

23   applied to other -- first of all, it's close to a contract.

24       THE COURT:  Let's go back, though, to the argument

25   that Mr. Paino's -- and what the statute says is that Ocwen

52

1    establishes the reasonable time frames.

2            MR. ANGWIN:  Correct.

3            THE COURT:  If I determine midnight as you say is the

4    end of the day, which quite frankly as I understand what the

5    defendants are saying too --

6            MR. ANGWIN:  Actually, I think -- sorry.

7            THE COURT:  -- how does that determine the issue

8    whether the time frame was reasonable?

9            MR. ANGWIN:  Your Honor, if it's midnight -- first of

10   all, it's vague.  But --

11           THE COURT:  It may be, but, you know --

12           MR. ANGWIN:  Let's agree with this.  It's either

13   precise or it's vague.

14           THE COURT:  Okay.

15           MR. ANGWIN:  If it means something, then we say,

16   what -- let's just use logic.  What was the business day before

17   the date of the sale?

18           THE COURT:  Why don't you just say that?  Isn't that

19   argument at all?  Isn't that just argument?

20           MR. ANGWIN:  It's argument, but we're afraid that

21   they're going to say you heard Mr. Blanchard give this

22   testimony and we were caught unawares on that, that there would

23   be a definitional --

24           THE COURT:  You didn't -- you weren't.  I have a lot

25   of problem with you telling me you were caught unaware of

53

1  anything when you've had a year of discovery.  That's the point

2  of discovery.  Tell us what midnight means in your deposition

3  for whoever.

4          You're in this situation for reasons I don't know,

5  but it's not that they came to trial and -- unless you're

6  telling me that document wasn't produced at some point.

7          MR. ANGWIN:  We're not --

8          THE COURT:  In any event, I will look at your

9  authorities.  I'm going to ask you to share those with the

10 defendants, but I'll tell you I think Mr. Paino's argument that

11 it doesn't matter what the law says midnight means.  It only

12 matters what they meant and if you're going to take the

13 position, hey, that's confusing, you know, they did what they

14 thought they understood that to mean and, jury, you decide

15 that, that's the whole point to argument is so both sides can

16 do that.

17         What you're trying to do is establish what the law

18 may think that means, but if that's not what they mean, then

19 I'm not sure how it advances either --

20         MR. ANGWIN:  I was proposing alternatives because I

21 wasn't sure how the Court would look at it.  I didn't know if

22 the Court would look at it saying midnight's actually a term.

23 It means something and I'm -- like other terms --

24         THE COURT:  That would mean that's not disputed.

25 There is no dispute, which I would think would be a legal

54

1   maxim, but it wouldn't be analogous situations for me to take

2   judicial notice -- I think you're saying that because you're

3   saying that's the law.

4          MR. ANGWIN:  I'm saying it's either a legal maxim or

5   it's ambiguous.

6          THE COURT:  What is the citation to a legal maxim

7   then that would be under the Civil Code in California?

8          MR. ANGWIN:  There is no -- I've cited to Federal

9   Civil Procedure 6 and to a New York case which discusses this

10  very issue, and I've got those forward so the Court and counsel

11  know --

12         THE COURT:  I guess I'm still -- let me just look at

13  your authorities, but what you're going to have to overcome is

14  the question that California law allows them to set the

15  reasonable time frame.

16         MR. ANGWIN:  Right.

17         THE COURT:  And if they say we want it and they make

18  up some time and they call it middle of the night and that's

19  their reasonable time frame and the borrowers are going, hmm,

20  middle of the night, that could mean anytime it's dark, I

21  guess.  Well, that's what I'm going to do.

22         So I don't see how it makes any difference what the

23  law says it is.  It's not a contract, and I guess I'm not quite

24  sure why you want to clear that up.

25         MR. ANGWIN:  We want to clear it up because right

55

1   now, the position is that midnight starts the day.  That's

2   based solely upon Mr. Blanchard's I guess personal thoughts.

3   We would like to inform either -- be able to advise the jury

4   that's just what Mr. Blanchard said because he's not -- he was

5   not speaking as Ocwen's legal representative.  He was talking

6   about specific things.

7          He's a historian as he said.  He can't give a

8   determination or interpretation of contractual terms.

9          THE COURT:  Yet he was asked to do that and he did.

10  Maybe I'm making too much of this.

11         Do the defendants disagree that the -- you say it

12  starts the day?

13         MR. ANGWIN:  No.  I say it ends the day.

14         THE COURT:  Do the defendants have a dispute that

15  midnight is the strike of 12:00 on the 27th in this case?

16         MR. ANGWIN:  That's not what we said, Your Honor.  We

17  said it ends the day.

18         THE COURT:  I know, but they're saying the end of the

19  day too.  Your dispute is not whether it's the end of the day.

20  Your dispute is on what day.

21         MR. ANGWIN:  Is that our dispute?

22         MR. SHATZ:  We think in this case with an April 29

23  sale, the documents had to be in at midnight of the April 27

24  going to April 28.

25         THE COURT:  The end of the day, the very last second

56

1   of April 27th.

2          MR. ANGWIN:  Which was the business day before the

3   business day.

4          THE COURT:  Well, we're not talking about that.

5   You've made that clear.  We're only talking about what midnight

6   is.

7          MR. ANGWIN:  Correct.

8          MR. SHATZ:  Well, I was going to argue that it

9   started the day.

10          MR. ANGWIN:  And that's the point, Your Honor.

11   That's what his testimony was.

12          THE COURT:  Well, I think the point of midnight,

13   though, isn't that -- is that it's the second between both.

14          MR. SHATZ:  Right.

15          THE COURT:  It's the breath you take before it

16   strikes -- leans over toward the 28th and it's not on either.

17   That's kind of theory behind midnight, right?

18          MR. SHATZ:  Yes.

19          THE COURT:  It's the chicken or the egg.

20          MR. ANGWIN:  And we'd be fine with that instruction.

21          THE COURT:  Wow.  Okay.  I'm not going to give that

22   instruction.  So I'll --

23          MR. ANGWIN:  Your Honor, let me tell you just how we

24   look at it briefly -- just one minute.

25          THE COURT:  I do understand it.  I guess I just can't

57

1    figure out what difference that makes because we understand the

2    concept.  Either it's that it's still on the 27th or it's on

3    the 28th.  I think it's that millisecond in between.

4              MR. ANGWIN:  I've seen -- there are several

5    authorities which say it's both days.

6              THE COURT:  Well, then there's really no way I can

7    say it starts the day, right?  It starts the day, it ends the

8    day, it does both.  It ends the day of the 27th.  It starts the

9    day of the 28th.

10             MR. ANGWIN:  And so within that, Your Honor, because

11   I think you've agreed that it's a very ambiguous term, we would

12   ask for an instruction --

13             THE COURT:  I don't think it's ambiguous.  I think we

14   all have it in our common experience.  I don't think that's

15   something that I would even an expert witness to come in and

16   testify on.  We all do it every day.

17             MR. ANGWIN:  Right.  And, Your Honor, could we have

18   an instruction then that the terms are to be construed and

19   written for the least sophisticated consumer and our

20   instruction would be just, in determining the meaning of terms

21   used in any documents, you need to take into account whether

22   the least sophisticated consumer would likely be misled by the

23   terms.

24             THE COURT:  Let's assume that's true.  What's the

25   evidence of misleading in this case?

58

1      MR. ANGWIN:  I think the evidence of misleading in

2  this case is that it's -- if you're told there's a midnight

3  deadline the business day before and you think that's the

4  day -- midnight right before --

5      THE COURT:  I understand what maybe somebody --

6  there's no evidence in this case that that's what occurred.

7      MR. ANGWIN:  All right.

8      THE COURT:  Am I misstating it?

9      MR. ANGWIN:  I don't believe -- are you asking us

10 whether Ms. Cornejo's been asked what she thinks midnight

11 means?

12     THE COURT:  No.  I'm asking you is there evidence

13 that the reason that the information was sent when it did was

14 because there was an understanding that it could have been

15 provided as late as a second past midnight on the 29th.

16     MR. ANGWIN:  And, Your Honor, I don't think we have

17 to show reliance because the --

18     THE COURT:  I'm not talking about reliance.  I'm

19 talking about evidence for the purpose of instruction.

20     MR. ANGWIN:  Right.  And what we're getting to is

21 this, Your Honor.  If the deadline's actually midnight the 28th

22 as we propose, then it's undisputed that the documents were

23 sent before that.

24     THE COURT:  I think we're just circling back and once

25 again, my impression of what you're saying is you don't dispute

1    what midnight means.  You dispute which day that is referring

2    to.

3              MR. ANGWIN:  If Your Honor's clear that midnight

4    means the end of the day.

5              THE COURT:  It doesn't matter what my state of

6    knowledge is.  I don't decide the facts of this case.  What I'm

7    suggesting to you is you haven't demonstrated to me that that

8    is a fact that can't be determined by the jury in their

9    experience -- their common experience or that there's

10   justification for the instruction.

11             So I'm still back to the point of I'll look at your

12   authorities, share them with the defendants, and we can talk

13   further, but I'm not, at this point, seeing a need.

14             Now, the other issue to talk about is the

15   stipulations that were provided to me.  As I understand this,

16   you're suggesting that the jury needs to hear each and every

17   one of these stipulations?

18             MR. ANGWIN:  That was -- our position was it could be

19   given to the jury, Your Honor.

20             THE COURT:  What --

21             MR. ANGWIN:  There are just too many jury --

22             THE COURT:  What's the defendants' position?

23             MR. SHATZ:  Our original thinking when we picked a

24   few was to have them read, Your Honor, but --

25             THE COURT:  Is that what you'd like?

60

1    MR. PAINO:  We kind of recognize, Your Honor, this

2    is -- before we exchanged separate lists and -- we weren't

3    expecting to have as many even after paring it down.  Some of

4    this stuff has come in in other ways, so I don't know that

5    every single one of these needs to be read, but there are one

6    or two I think from our perspective that we may want to have

7    read to the jurors on a couple of specific issues and one of

8    those issues deals with the plaintiffs' claim that there was

9    equity in the property, and we've already discussed that issue.

10   MR. SHATZ:  How does the Court typically do these?

11   THE COURT:  Generally, stipulations are read to the

12   jury, but I've never had a request for 48 -- actually, your 28

13   was just blank -- 48 stipulations to be read.  We can do it

14   either way.  It doesn't matter to me.

15   I have put them in a format that is not on pleading

16   paper.  It doesn't have any attribution to it -- that we could

17   submit to the jurors as well, but if there are key

18   stipulations, I think it's easy for them to not be considered.

19   If this gives you a basis to argue that -- if, for

20   example, you think it's important that, you know,

21   Stipulation 20, whatever, be aware -- the jury know that, then

22   it would be more effective for them to be aware of it rather

23   than just argue it.

24   They will be instructed that what you say is not

25   evidence.  They've already been instructed in that.  So if you

61

1   argue that and go there are stipulations you're going to hear,

2   that's -- we can do that.  There is the -- Instruction No. 11

3   provides for stipulations to be provided as an exhibit.

4            It's up to counsel to decide if you think that's most

5   effective or if you want them read.  Either way is fine.  We

6   just need to decide that quickly.

7            MR. SHATZ:  If we can I guess read them and then give

8   a copy to the jury.

9            MR. ANGWIN:  I think that will be the easiest thing,

10  Your Honor.

11           THE COURT:  All right.

12           MR. SHATZ:  And we need to look up and see what

13  inadvertently was left out of No. 28, Your Honor.

14           THE COURT:  All right.

15           MR. SHATZ:  Sorry about the issue, Your Honor.

16           THE COURT:  That's all right.  All right.  So I can

17  read them all or we can split them in half and counsel for

18  plaintiffs can read the first 24 and defense can read the next

19  24, either way.

20           MR. SHATZ:  I'm happy if the Court reads them.

21           THE COURT:  At what point?

22           MR. SHATZ:  There was a jury instruction that said, I

23  thought, the parties have stipulated to the following facts.

24           THE COURT:  What I would do if we give it to them now

25  is read it to them now with that instruction.

62

1          MR. SHATZ:  That's fine, Your Honor.

2          THE COURT:  Do you want it now or do you -- does it

3     make more sense to do it after Mrs. Cornejo is complete?

4          MR. SHATZ:  Oh, oh.  No.  At the conclusion of the

5     testimony, Your Honor.

6          THE COURT:  All right.  Anything else then before we

7     bring in the jury?

8          MR. ANGWIN:  Your Honor, one quick question on the

9     verdict form.  I know what the Court's doing on Question 7

10    which is about the tripling.  We had just raised in our trial

11    brief the issue that if the jury knows about tripling that they

12    factor that into their calculations.

13         However, I understand the Court's concern there and

14    I'm not sure how to address is, but I'd just -- every case that

15    I've read -- most of the cases would say that when a jury knows

16    they're going to triple something, they go back and divide by

17    three, and that's the reason that juries are normally not told

18    about doubling or tripling simply because that's not the

19    measure of damages.  That's the Court's increasing those

20    because of the violation.

21         THE COURT:  I struggled with that as well because

22    there's not an ability to refuse to provide the greater of

23    those two.

24         MR. ANGWIN:  Right.

25         THE COURT:  When I include it, I just thought, well,

63

1   it avoids having to have an amended judgment, but it doesn't

2   matter to me if that's there or not.

3          MR. ANGWIN:  And let me ask again, Your Honor.  What

4   I don't want -- and I think that the Court stated the law

5   clearly.  I'm afraid the jury might get confused and what if

6   they write a number in that box that is not three times, but is

7   also not $50,000.

8          THE COURT:  Then I don't call you back.  We send it

9   back to them and they fix it.

10         MR. ANGWIN:  Okay.  Just want to make --

11         THE COURT:  The Court always reviews the verdict for

12  irregularity before it's published, so -- but I agree, there is

13  that issue.  What's the defendants' thought?

14         MR. ANGWIN:  We don't want to change, Your Honor.  I

15  just wanted to bring it up.

16         THE COURT:  You don't want to change it?

17         MR. ANGWIN:  No.  I've been told to stop.

18         THE COURT:  It doesn't matter.  Either way.

19         MR. PAINO:  Our preference would be to leave it.

20         MR. ANGWIN:  That's fine, Your Honor.  I'm sorry.

21  I'm sorry.  Let Mr. Vitiello talk because I can't understand

22  whispers.

23         MR. VITIELLO:  I'm sorry.  I was just telling him to

24  allow you to make your decision.  Our position is that we do

25  want that language taken out for the same reason that the Court

64

1  cited that -- you were struggling with it and we believe that

2  it should come out.

3              THE COURT:  You all want it in, I assume.

4              MR. PAINO:  We want it in, Your Honor, because at the

5  end of the day, that determination is discretionary and we

6  think -- in understanding of --

7              THE COURT:  Well, the amount is not discretionary.

8              MR. PAINO:  The amount's not discretionary, but --

9              THE COURT:  Question No. 6 is they must decide.

10  Question No. 7, there's no discretion at all.  It must be the

11  greater of those two things.  So in essence, it is simply -- I

12  included it simply to avoid having to have an amended judgment

13  because the Court would be obligated to choose 50,000 or three

14  times the damages.

15              MR. ANGWIN:  To that point, it's just math.

16              THE COURT:  Exactly.

17              MR. ANGWIN:  And perhaps we could get to the point is

18  you could say -- statutory damages check yes.

19              THE COURT:  Yeah.  That's Question 6.

20              MR. ANGWIN:  And then sign here and turn in the

21  verdict form.

22              THE COURT:  Since the plaintiffs have expressed that

23  concern and I do agree that there's no -- this is not a

24  question that the jury actually needs to resolve, I will delete

25  Question 7.

65

1          MR. PAINO:  I cross-referencing that, Your Honor,

2     with the jury instructions, is the jury aware of what the --

3          THE COURT:  No.

4          MR. PAINO:  The jury is simply making a determination

5     that we think they should be either punished or that -- they

6     may never have any consideration of the actual --

7          THE COURT:  Correct.

8          MR. PAINO:  -- amount.

9          MR. ANGWIN:  Your Honor, I think the jury's supposed

10    to decide willfulness, recklessness, and intent -- with your

11    instructions.

12         THE COURT:  Well, again, that statute is poorly

13    written because I think the defendants are right, that it says

14    the Court does that, but I think that it's a factual question

15    that the jury should decide.  So -- all right.  Anything else

16    then before we call the jury?

17         MR. PAINO:  Regrettably, Your Honor, we did have one

18    other issue with the verdict form.  In reviewing it, the first

19    question asks in some ways a conjunctive, whether or not all

20    the documents were required within the time frame specified by

21    Ocwen and what we envision as a possible scenario where the

22    answer to that question is no.  There are a few parts to it,

23    required documents in a time frame, but the follow-up question,

24    if the answer to this was no --

25         THE COURT:  If the answer is no --

66

1              MR. PAINO:  The follow-up question only asks whether
2      the time frames are reasonable, but it doesn't give
3      consideration to --
4              THE COURT:  Whether it's --
5              MR. PAINO:  -- whether or not the application was
6      complete.
7              THE COURT:  I wasn't sure because I actually pretty
8      much used your question on that.  I was taking that to mean
9      that you no longer had that dispute.
10              MR. SHATZ:  We had three -- we wrote this into three
11      questions, Your Honor.
12              THE COURT:  Let me pull yours up so that we're on the
13      same page.
14              MR. SHATZ:  Me too.  Here we are.
15              MR. ANGWIN:  And, Your Honor, that's why we had it as
16      one question because it does get to --
17              THE COURT:  Yeah.  I didn't like your question.  Your
18      question I think was not --
19              MR. ANGWIN:  Well, it just tracked the statute.
20      That's what we're trying to do.
21              THE COURT:  I think there was too much in it.
22              MR. SHATZ:  Your Question 2 is our Question 3.  Your
23      Question 1 is our Questions 1 and 2.
24              THE COURT:  Right.
25              MR. SHATZ:  We broke out all of the documents and

67

1   time frames.  Then Question 3 is reasonable.

2          THE COURT:  So the defendants are still disputing

3   that all documents were supplied?

4          MR. SHATZ:  Yes.

5          THE COURT:  What's the evidentiary support for that?

6          MR. SHATZ:  We haven't finished yet cross-examining

7   Ms. Cornejo, but the evidence is, one, as of our determination

8   date -- as of the foreclosure sale date, we weren't aware that

9   we had all of the documents needed because the last three that

10  came on the 28th may or may not have been complete.

11         They were later found to be sufficient to make a

12  decision, but also the application says if there's fraud or

13  misstatements or wrong information, then at any time, the

14  application can be canceled or the loan mod can be canceled and

15  we're arguing given the plethora of misstatements and wrong

16  information provided in the application, the whole thing could

17  be set aside and come undone because it's not complete.

18         THE COURT:  Let's say that's correct and I don't

19  disagree with you.  That's a different issue than whether they

20  supplied everything that was required by Ocwen, right?

21         MR. PAINO:  I think our position, Your Honor, would

22  be as follows.  If the application requires, you know, it to be

23  complete and everything to be truthful and an application comes

24  in and it's not complete -- complete's probably not a good

25  term.

68

1          If an application requires that they list liens, they

2    list other properties that they, you know, not misrepresent

3    hardship and if proven that they've done or two or three of

4    those things, then the application can't -- inherently can't be

5    complete because they haven't complied with the application.

6          THE COURT:  So you're saying that if they give you

7    every piece of information requested by Ocwen but they really

8    didn't have a hardship, that that was a lie, that it is no

9    longer complete, or that there's grounds to deny it?

10          MR. PAINO:  I think we -- our argument would be that

11    it's not -- it can't complete until you've completely given us

12    all the information that is asked for.

13          THE COURT:  If you give all the information that is

14    asked for, it is complete.

15          MR. PAINO:  If the information is inaccurate, what

16    we're -- we're suggesting that it's not complete.

17          THE COURT:  That's not what the statute says, though,

18    right?  Complete under the statute is everything that's

19    requested by Ocwen --

20          MR. PAINO:  It says all of the documents and our

21    position is that one of documents is the request for mortgage

22    assistance form, and that request for mortgage assistance form

23    requires the borrowers not only to include truthful information

24    and accurate information, but to certify that they have.

25          THE COURT:  Right.

69

1          MR. PAINO:  And so our position is if they hadn't

2    done that, they haven't complied with -- they haven't supplied

3    that request for mortgage assistance form in a way that it was

4    asked.

5          THE COURT:  I still see that as two different things

6    because you can provide a complete document that is untruthful

7    and would be grounds to make you ineligible for it, but I think

8    ineligibility is different than complete and I think even the

9    process is -- well, as I understood it from Mr. Blanchard is

10   completeness is a different issue than eligibility for the

11   modification.

12          In fact, completion is just that preliminary showing

13   before you get evaluated for whether you're eligible.  I see it

14   as a different issue.  That's why I felt like, wow,

15   Mr. Blanchard, as I understood his testimony, I think it was

16   very -- it was convincing to me that we knew on this date after

17   the sale or at some point contemporaneous, we had everything we

18   need to make that decision.

19          Nothing had changed between that date and the time of

20   the sale.  It's just a simple logic formula that it must have

21   been complete at that time.

22          So -- and I don't mean complete.  I'm using the wrong

23   word.  They had supplied everything.

24          MR. PAINO:  I understand what you're saying, Your

25   Honor, and I guess with respect to the omissions, an

70

1    application -- to complete an application in literal sense

2    requires that you include all of the information requested and

3    we believe there's evidence that that did not happen here.

4            MR. ANGWIN:  And, Your Honor, if I may address that

5    briefly.

6            THE COURT:  If that's the case, though, doesn't

7    that -- isn't that belied by Ocwen's conduct in finding it

8    complete?

9            MR. PAINO:  The question is if there's an omission or

10   a misrepresentation, how long do we have to discover that.  We

11   wouldn't necessarily know if somebody omits something or

12   misrepresents something.

13           THE COURT:  You're talking about an after required

14   evidence type thing, right?  That you didn't discover that

15   until the institution of litigation because Ocwen had

16   determined that what was provided was sufficient to offer the

17   modification?  Whether that was ever effective, it was offered

18   based on a finding of completeness and eligibility.

19           MR. PAINO:  And we don't dispute that, but our

20   position is that --

21           THE COURT:  What you found out later was it wasn't

22   accurate.

23           MR. PAINO:  I think I've taken it on an even more --

24   a more basic level and that level is in a snapshot of time,

25   we're looking at the date of the sale and at that time, had the

1    plaintiffs provided all the information that we requested and

2    we believe there's evidence that they did not.  They didn't

3    disclose certain items.

4            THE COURT:  Um-hmm.  Yeah.  I hear your argument.

5    Trouble is the way complete is defined in the statute.  I'm not

6    seeing that as an issue of completeness.  I'm seeing that as a

7    different issue that you haven't asked for instruction on and I

8    think if you need it on the verdict form, we've got to have

9    instructions on it and the verdict form would have to have some

10   other issue separate from complete.

11           MR. ANGWIN:  Your Honor, just so I'm clear.  Is he

12   making an allegation that they have an affirmative defense of

13   fraud which has not been pled?

14           THE COURT:  Not so much fraud as --

15           MR. ANGWIN:  And if it's after acquired, it's -- I

16   mean to be candid, Your Honor, it's a little late in the game

17   to be bringing up a defense.

18           THE COURT:  Well, except I remember the same argument

19   for the motion for summary judgment.

20           MR. ANGWIN:  And I -- and at that time, it was -- I

21   mean was this presented in a pleading?  I'm just worried about

22   a related affirmative defense issue.

23           THE COURT:  I think what he's saying is it's a

24   failure of the prima facie showing.

25           MR. ANGWIN:  And, Your Honor, I think that the issue

72

1    becomes, as you said, the question is whether all the documents

2    were submitted which is what the statute says and I don't think

3    that's in dispute.  In fact, I think we could actually move for

4    judgment as a matter of law on that.

5            The question is if they've got some argument -- a

6    legal argument as to how it's a voidable contract I guess,

7    which is what I think what they're saying.

8            THE COURT:  No.  I don't think so.  I think what

9    they're saying is it's not complete because there was

10    information that was not correct.

11            MR. ANGWIN:  Ocwen -- well, our position has always

12    been it was approved.  They've never indicated it wasn't

13    approved.  It was complete under the statute.  If Ocwen's now

14    trying to say we agreed it was complete, but now because we're

15    getting sued, we're going to try and find a clever way to say

16    it wasn't complete, but I guess they can argue that, but that

17    doesn't affect what the statute says.

18            THE COURT:  Well, obviously, we're going to -- if

19    there's going to be a Rule 50 motion on either side, we're

20    going to need to talk about that issue.

21            I'm going to have to hear the rest of the evidence

22    before I can decide whether you need that Question 1 and 2

23    separately because the way I heard the testimony so far that

24    seems to be uncontradicted is that the Cornejos supplied

25    everything that was requested.

73

1      I agree that maybe there's issues of what -- the

2 content of those documents.

3      MR. ANGWIN:  And I would agree.  I think thus far

4 that issue has not really been broached with any of the

5 testimony, so I would --

6      THE COURT:  All right.  We'll hold off on that issue

7 then.  All right.

8      MR. VITIELLO:  Your Honor.

9      THE COURT:  Yes.

10     MR. VITIELLO:  One last thing just with respect to

11 further questioning this morning.

12     THE COURT:  Yes.

13     MR. VITIELLO:  Given that the scope of my examination

14 yesterday was so limited really on two fronts by the motion in

15 limine and the avoidance of emotional distress damages and

16 stuff like that, I really just wanted to raise to the Court.

17 Our intention is to, of course, have Ms. Cornejo crossed,

18 redirected if necessary, and the we rest.  If they intend to

19 call her for direct examination, they can do that, but what we

20 didn't want to do is merge a cross-examination with counsel's

21 direct examination.

22     THE COURT:  For purposes of what?  I guess I'm

23 wondering what harm are you seeking to avoid.

24     MR. VITIELLO:  Well, I think the scope of my direct

25 was limited by the Court and that counsel's cross-examination

74

1    should be similarly limited.

2            THE COURT:  If they expand on the direct, you get

3    to -- your scope of cross-examination would be greater.

4            MR. VITIELLO:  And that's true, but they can do that

5    if they want to.  I don't know what questions they're going to

6    ask.  I know what questions I had to ask yesterday and I just

7    want the same standard applied to their cross-examination.

8            THE COURT:  From -- I'm trying to avoid the jury

9    being confused by that because -- and not to -- and to avoid

10   the waste of time because what you're suggesting is you want

11   them to have to recall her and I guess I'm not sure what

12   difference that makes.

13           If you're saying the Court is unable to appreciate

14   the issue on a Rule 50, I assure you that this is my routine

15   and I can differentiate the evidence.  If -- but other than

16   that, I guess I'm not seeing what you see as the prejudice by

17   simply allowing direct -- a cross-examination that exceeds

18   your --

19           MR. HEENAN:  If I can address that point, Your Honor.

20   We're the plaintiffs in this case.  We get to present our case.

21   We've presented our case, and so to the extent defendants want

22   to raise a defense, which frankly as we've just argued we don't

23   think is relevant at all to our claims under Hobarth, we want

24   to have that preserved in a way that we get to put on our case,

25   we get to rest, and then defendants are in a position of if

75

1   they want to try and put on evidence of a claim that we don't

2   think is at issue, then it's squared up correctly procedurally

3   that we can object at that point in time and the Court can

4   decide.

5            THE COURT:  Why couldn't you object even if he does

6   it at the same time?

7            MR. HEENAN:  Because then it's merged in our case in

8   chief, Your Honor.

9            THE COURT:  It doesn't convert it.  It's still what

10  it is.  If it's irrelevant, it's irrelevant.  I'm not seeing

11  the point, why you think the act of saying we rest somehow

12  transmutes the evidence.

13           MR. HEENAN:  Because I think we get to put on the

14  case that we want to put on and then we get to rest and if

15  there's defenses the defendant wants to raise, then they can

16  put on their defense as they see fit.  But it's unfair and

17  prejudicial to us to have as part of our case in chief --

18           THE COURT:  Yeah, yeah, stop right there.  Tell me

19  what the prejudice is.

20           MR. HEENAN:  The prejudice is we're talking about

21  completeness and now for our last witness, the defendant's

22  going to try and frankly inject dishonesty and try and smear

23  her and --

24           THE COURT:  Yeah, but isn't bias always at issue?

25  Isn't the credibility of a witness always at issue?  Wouldn't

1    acts of prior -- telling the truth under penalty of perjury be

2    an issue that goes to the witness's credibility and that's

3    not -- they can do that regardless of whether we follow your

4    procedure or not.

5           MR. HEENAN:  Well, I think it -- I mean to the extent

6    the Court thinks it goes to bias or prejudice, of course, but

7    to the extent it goes to defenses that weren't part of our case

8    in chief and weren't made part of the scope of counsel's

9    examination, it's beyond the scope.  I want them to have to --

10          THE COURT:  Right.  What I'm saying, though, is I'm

11   going to allow them to conduct their direct examination at the

12   same time for the purposes of time savings.  There's just --

13   this is a routine process, but it -- you saw it earlier with

14   Mr. Blanchard.

15          So I'm just not seeing how that prejudices the

16   plaintiffs at all.  So the request to require them to follow

17   that procedure at this time is not going to be granted.

18          All right.  Anything else?

19          MR. ANGWIN:  Your Honor, one final thing.  Sorry.

20          THE COURT:  Yes.

21          MR. ANGWIN:  We had an agreement with defense counsel

22   they would let us know who they're calling and I'm not sure

23   where we stand on that?

24          THE COURT:  Did you notify them as to Mr. Ablin?

25          MR. SHATZ:  Yes.  We sent them an email last night,

77

1   Your Honor.

2          MR. ANGWIN:  They told us Mr. Ablin --

3          THE COURT:  All right.

4          MR. ANGWIN:  But then I think they said they were

5   going to read deposition transcript and we received nothing.

6          THE COURT:  You're not going to read those deposition

7   transcripts?

8          MR. SHATZ:  You asked us if there were objections.

9   Our plan is to read Mr. Cornejo, page 31, line 23, through

10  page 34, line 16.

11         THE COURT:  There are no objections in that period?

12         MR. SHATZ:  No.

13         THE COURT:  Those objections that were lodged of

14  course at that time is form of the question so that means that

15  if there are any additional objections, you may make those at

16  this time.

17         MR. ANGWIN:  Your Honor, the difficulty is is because

18  they did not designate those pages.  We just now have heard

19  those.  We need to go back and look.

20         THE COURT:  You can do that.  I guess my point is,

21  though, they're offering it as if it were live testimony, so

22  you have the freedom to object as you would if he was

23  testifying here in court.

24         MR. ANGWIN:  I understand, Your Honor.  My practice

25  has just been that counsel will designate in reasonable time to

78

1    let us look at what they designate to see if we want to counter

2    designate and that -- we were somewhat caught unawares right

3    now because --

4            THE COURT:  We're going to not get to that till after

5    the break anyway.  Maybe you'll have some opportunity.  Is that

6    the only deposition transcript you're going to read?

7            MR. SHATZ:  Yes, Your Honor.

8            THE COURT:  You're not going to read --

9            MR. SHATZ:  We're not using Mr. Cortez, Your Honor.

10           THE COURT:  I need that deposition transcript lodged

11   then at this time, the original.

12           MR. ANGWIN:  And, Counsel, what was it?  31, 23 to

13   34?

14           MR. SHATZ:  16.

15           MR. VITIELLO:  And with respect to Lance Ablin, Your

16   Honor, I think the email that we got was that you don't intend

17   to call him for this phase, but that you're reserving your

18   right to call him for the second phase.

19           THE COURT:  Correct.

20           MR. VITIELLO:  So we still don't actually know for

21   sure whether that's going to happen?

22           MR. SHATZ:  I don't know either.

23           MR. VITIELLO:  Okay.

24           THE COURT:  All right.  Let's go ahead and call in

25   our jury.  Again 31, 23 to 34, 16; is that correct?

1           MR. SHATZ:  Yes, Your Honor.

2           THE COURT:  All right.  Thank you.

3      (Jury in at 9:40 a.m.)

4           THE COURT:  All right.  Good morning, ladies and

5    gentlemen.  Sorry to keep you waiting this morning.  This is

6    not a typical thing, but it does mean that we are getting

7    closer to the end.  That means that there's a lot more things

8    that the Court and counsel have to discuss outside your

9    presence.

10          We are going to work through the lunch hour as needed

11   so that we don't waste your time any further, but I do thank

12   you for returning this morning.

13          THE COURT:  Mrs. Cornejo, if you would return to the

14   stand, please.

15          Mrs. Cornejo, we've gone overnight.  I just do want

16   to remind you that you are still under oath.  Do you understand

17   that?

18          THE WITNESS:  Yes.

19          THE COURT:  All right.  Thank you.  Now if you'll

20   just take a seat.

21          All right.  Mr. Shatz, you may continue -- or you may

22   begin actually.  You haven't begun yet.

23          MR. SHATZ:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you.

25      DORA CORNEJO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

1

BY MR. SHATZ:

2

Q.   Good morning.

3

A.   Good morning.

4

Q.   You submitted to Ocwen a complete loan modification

5

application, right?

6

A.   Yes, I did.

7

          MR. VITIELLO:  Object.  Outside the scope.  Calls for

8

a legal conclusion.

9

          THE COURT:  As to the legal conclusion, that is

10

sustained.

11

          MR. SHATZ:  Belated motion to strike all of

12

Ms. Cornejo's testimony from yesterday where she said she

13

submitted a complete loan mod application.

14

          THE COURT:  Overruled.

15

BY MR. SHATZ:

16

Q.   You submitted a modification application to Ocwen,

17

correct?

18

A.   Yes, I did.

19

Q.   On April 16, 2015?

20

A.   Yes, I did.

21

Q.   That would be Joint Exhibit 17 and supporting

22

documentation?  Third page.

23

A.   I'm sorry.  I forgot my glasses.  May I get my glasses?

24

          MR. SHATZ:  Yes.  Yes.

25

Cornejo, D. - Cross                              81

1          THE COURT:  Can someone bring her her glasses,
2   please.
3          THE WITNESS:  They're in my purse in my glass case.
4          THE COURT:  Maybe you need to stop and get those.
5          THE WITNESS:  Okay.  Thank you.  Will you repeat the
6   question, please?
7   BY MR. SHATZ:
8   Q.   Is this the application you submitted?
9   A.   Yes.
10  Q.   And you also submitted other documents too on April 16,
11  2015.
12  A.   Yes.
13  Q.   Where did you get this application?
14  A.   I don't recall at this time.
15  Q.   You didn't get it online.
16  A.   No.
17  Q.   It came in the mail.
18  A.   Yes.
19  Q.   From Ocwen.
20  A.   Yes.
21  Q.   In December 2014.
22  A.   I don't recall the date.  Yes.
23  Q.   Look at the top left of the form on this page where it
24  says Ocwen and there's a date below it and then making home
25  affordable program.

Cornejo, D. - Cross                                    82

1    A.    Yes, I see it.

2    Q.    Look a little bit further.  Two more lines.  There you go.

3    Did you type that date in?

4    A.    No, I didn't.

5    Q.    When you got the form from Ocwen, the date was there?

6    A.    Yes, it was.

7    Q.    Do you have any reason to believe that's not the date the

8    form was created?

9    A.    No, I don't.

10   Q.    Looking down at the Section 2 where it says borrower

11   information all the way through mailing address if different,

12   click here, right there.  Do you see where the typewriting

13   Frank Cornejo is there?  Second line.

14   A.    Yes, it is.

15   Q.    You didn't type that in, did you?

16   A.    No, I didn't.

17   Q.    It says Dora Cornejo.  You didn't type that in?

18   A.    No, I didn't.

19   Q.    Property address, you didn't fill that in?

20   A.    No, I didn't.

21   Q.    Filled in by Ocwen?

22   A.    They -- yes.  I suppose.

23   Q.    It wasn't filled in by you.

24   A.    No, it wasn't.

25   Q.    Wasn't filled in by Mr. Cortez?

Cornejo, D. - Cross                          83

1    A.    No.

2    Q.    And the handwriting on page 1, the whole page --

3    A.    Is it --

4    Q.    -- your handwriting.

5    A.    It was written by Mr. Cortez.

6    Q.    This is Mr. Cortez's handwriting.

7    A.    Yes, it is.

8    Q.    Is the information on this page accurate?  For example,

9    under home phone number for Dora Cornejo; do you see that?

10   A.    Yes, I do.

11   Q.    Is Ms. Cornejo's home phone number 661-747-8943?

12   A.    No, that's not my number.

13   Q.    Is the cell number for Ms. Cornejo 661-747-8943?

14   A.    No, it's not.

15   Q.    Maybe I wasn't clear.  As of the time this form was filled

16   out in April 2015, were those your telephone numbers?

17   A.    No, they weren't.

18   Q.    Were they Mr. Cornejo's telephone numbers?

19   A.    No, they weren't.

20   Q.    So at this point, the information in the form is

21   inaccurate.

22   A.    That is the phone number that Ernie was using because he

23   was helping.

24   Q.    I'm sorry.  This is not Mr. Cornejo's phone number, is it?

25   A.    No, it's not.

Cornejo, D. - Cross                                    84

1    Q.   It's not Mrs. Cornejo's phone number.

2    A.   No, it's not.

3    Q.   So at this point in time, the form is inaccurate.

4    A.   Like I said before, the phone number was because he was --

5    Q.   I'm not asking why.  I'm asking is this accurate.

6    A.   No, it's not.

7    Q.   Looking at the next page, JT17-4.  Under the property

8    information form, as of April 2015, other than the mortgage at

9    issue in this case, were there any other liens recorded against

10   your property that you were aware of?

11   A.   Not that I was aware of.

12   Q.   You didn't know about the IRS lien.

13   A.   I wasn't aware that I had liens on them.

14   Q.   Looking at JT5, the next page of the application, let's

15   look at Section 5.  I'm sorry I can't read.  It's the next

16   section up.  This section asks for other properties owned.  My

17   understanding was in 2015, you and your husband owned a

18   restaurant.

19   A.   Yes, we do.

20   Q.   And the restaurant was on land.

21   A.   Excuse me?

22   Q.   The restaurant was sitting on dirt.

23   A.   Yes, it was.

24   Q.   Dirt is real property.

25   A.   Yes, it is.

1   Q.   Is it listed here?

2   A.   This is residence.

3   Q.   You must provide information about all properties that you

4   or the co-borrower owned other than your principal residence.

5   Is the restaurant listed here?

6   A.   No, it's not.

7   Q.   It's real property, isn't it?

8   A.   Yes, it is.

9   Q.   The form is incomplete, right?

10          MR. VITIELLO:  Objection.  Calls for a legal

11   conclusion.

12          THE COURT:  Sustained.

13   BY MR. SHATZ:

14   Q.   The form is missing information, correct?

15   A.   Yes.

16   Q.   Looking at Section 6, next section down on this page, this

17   section lists household assets and expenses.  At the time the

18   form was completed, did you have $4,000 in your checking

19   account?

20   A.   I don't recall at this time.  That was a year and a half

21   ago.

22   Q.   Was it approximately $4,000?

23   A.   I cannot say.  I don't recall.

24   Q.   Would you put information in the form that's inaccurate?

25   A.   No.  If I wrote that then, that was then.  I can't

Cornejo, D. - Cross                              86

1    remember.

2    Q.   This is Mr. Cortez's handwriting.

3    A.   Yes, it is.

4    Q.   Did he get the information from where, you?

5    A.   Yes, he did.

6    Q.   Would you provide Mr. Cortez inaccurate information?

7    A.   No, I wouldn't.

8    Q.   Okay.  So if it says $4,000 in this form, it's likely that

9    you had $4,000 in your checking account.

10   A.   Yes.

11   Q.   And it's likely you had $4,000 in your savings account.

12   A.   Yes.

13   Q.   And it's like you had $5,000 in cash on hand.

14   A.   Yes.

15   Q.   Under the mattress?

16   A.   No.

17   Q.   In your purse?

18   A.   No.

19   Q.   What is cash on hand?

20   A.   What we had at work.

21   Q.   Okay.  For total assets of $13,000.

22   A.   Yes.

23   Q.   Monthly expenses, you had no monthly expenses?

24   A.   Yes, we had monthly expenses.

25   Q.   They're not listed, are they?

Cornejo, D. - Cross                              87

1   A.   No, they're not.

2   Q.   Okay.  It says food, household supplies.  Did you eat at

3   the restaurant?  Is that why it's not listed?

4   A.   I'm there a lot, yes.

5   Q.   Okay.  Utilities, did you have utilities to the house?

6   A.   Yes.

7   Q.   Running water?

8   A.   Yes.

9   Q.   Electricity?

10  A.   Yes.

11  Q.   Gas?

12  A.   Yes.

13  Q.   Not filled in.  Correct?  It's blank?

14  A.   Yeah.

15  Q.   Look at the next page, please, JT17-6.  At the very top of

16  the page above Section 7 in the top left corner, we have Ocwen

17  and the date.  The date was provided on the form when it was in

18  your hands at some point, correct?

19  A.   Yes.

20  Q.   You didn't fill it in?

21  A.   No.

22  Q.   Looking down then at the monthly income form section, to

23  the best of your understanding, this section is accurate also,

24  correct?

25  A.   Yes.

Cornejo, D. - Cross                          88

1   Q.    And you and your husband were hired approximately

2   January 10, 2009.  For my purposes, you've been working there a

3   long time, right?

4   A.    Um-hmm.

5   Q.    Yes?

6   A.    Yes.

7   Q.    Okay.  And according to the form, base salary -- base paid

8   salary, Mr. Cornejo made $2,000 a month, right?

9   A.    Yes.

10  Q.    And you made $1,500 a month.

11  A.    Yes.

12  Q.    And those numbers are accurate?

13  A.    To the best of my knowledge.

14  Q.    That was the base pay.  If you had a really good month,

15  there might be more.  If you didn't have a really good month,

16  there might be less, but your base pay was $3,500.

17  A.    Yes.

18  Q.    And all the other entries until you get to the total

19  column are zero.

20  A.    Yes.

21  Q.    So there was no changing of your base pay.  That was the

22  base pay.

23  A.    Yes.

24  Q.    And the very bottom when you add all these numbers up, the

25  number in your column adds the 1,500.

1    A.    Yes.

2    Q.    And the number in your husband's column adds the 2,500.

3    A.    Yes.

4    Q.    Where did the extra 500 come from?

5    A.    I'm not aware of that now.  I don't know.

6    Q.    A mistake in the form.

7    A.    I assume, yes.

8    Q.    Looking at page JT17-7.  I'm looking at from Section 8

9    through the first box profit and loss statement.  Do you see

10   this?

11   A.    Yes.

12   Q.    When you read the form, you understood that Ocwen needed

13   certain information if you were self-employed.

14   A.    Yes.

15   Q.    Such as three monthly profit and loss statements or one

16   for the most recent quarter?  Do you see that?

17   A.    Yes.

18   Q.    A copy of the business-related gross net income and

19   itemization expenses.

20   A.    Yes.

21   Q.    Copy of the most recently filed tax return.

22   A.    Yes.

23   Q.    And K-1 if applicable.

24   A.    Yes.

25   Q.    Do you have a K-1?

Cornejo, D. - Cross                                    90

1   A.   No.

2   Q.   Okay.  Copy of two most recent consecutive bank statements

3   dated within 90 days.  Do you see that?

4   A.   Yes.

5   Q.   Were those four items provided to Ocwen on April 16, 2015,

6   when the application was sent in?

7   A.   To my knowledge, everything had been sent in.

8   Q.   Is that a yes?

9   A.   Yes.

10  Q.   Looking at the next page, JT17-8, Section 9, please.  Oh,

11  no, no, no, no.  You are correct.  The whole section.  My

12  fault.  Can you see this?

13  A.   Yes, I can.

14  Q.   Okay.  And the statement year is blank.  What statement

15  year was this for; do you recall?

16  A.   No, I don't.

17  Q.   Do you recall what three-month period this was for?

18  A.   No, I don't.

19  Q.   Looking at the numbers, is this a one-month period or a

20  three-month period?

21  A.   I don't recall.

22  Q.   Okay.  Back in April 2015, where it says rent or lease,

23  for example, Section 12, you don't need to go there, but the

24  middle right side here -- see if I can figure out how to do

25  this.  Okay.  Rent or lease, do you see that section?

1    A.   Yes.

2    Q.   Was your vehicle, machinery, and equipment lease $600 a

3    month or for three months?

4    A.   I don't recall.

5    Q.   Okay.

6    A.   I can't remember.

7    Q.   No problem.  And you have advertising.  Was it $2,000 a

8    month you were spending on ads, $2,000 a quarter, $2,000 a

9    year?

10   A.   I can't remember, but we do advertise.

11   Q.   Oh.  No one is saying you can't advertise.  We're just

12   trying to figure out if these are expenses for a month, a

13   quarter, or a year.

14   A.   I don't know.

15   Q.   At the time this form was submitted, are these numbers

16   accurate?

17   A.   To my knowledge, yes.

18   Q.   Well, you and Mr. Cortez put this together, right?

19   A.   Yes, we did.

20   Q.   Did Mr. Cortez make up the numbers?

21   A.   No, he didn't.

22   Q.   You provided the numbers.

23   A.   Yes, I did.

24   Q.   Mr. Cornejo wasn't involved, right?

25   A.   No.

1  Q.   So the numbers all came from you.
2  A.   Yes.
3  Q.   And you would provide accurate numbers.
4  A.   Yes, I would.
5  Q.   Okay.  Under 8, interest, mortgage, other, were you paying
6  $800 a month interest on your mortgage?
7  A.   I don't remember if that's correct or not.
8  Q.   Was that mortgage for the restaurant or mortgage for the
9  home?
10 A.   Not for that -- not for the -- the restaurant.
11 Q.   Okay.  Do you what the other 1,700 is?  Do you recall?
12 A.   No, I don't.
13 Q.   Okay.  Office expenses, 2,200.  Is that for a month, a
14 quarter?
15 A.   I don't know if it was -- I don't know what time frame is
16 that for.
17 Q.   Okay.  Pension and profitsharing plans, who had a pension?
18 A.   I don't recall at this time.
19 Q.   Does anybody have a pension at the restaurant?
20 A.   Not at this time no more, no.
21 Q.   Ah.  A year and a half ago, April 2015, was there a
22 pension?
23 A.   These -- this happened a year and a half ago.  I don't
24 recall.  When I keep saying I don't recall, I don't remember
25 that.

Cornejo, D. - Cross                                    93

1    Q.   That's fine.  That's an answer.  Was there a profitsharing

2    plan a year and a half ago?

3    A.   I can't remember what date.

4    Q.   Was there ever a profitsharing plan at the restaurant?

5    A.   I don't remember what date.

6    Q.   Is it fair to say that in looking at Section 9 on the

7    profit and loss form, it's very difficult to tell the period

8    for which this profit and loss form relates?

9    A.   What?

10   Q.   The whole page, you can't tell if this is a one-month,

11   three-month, or one-year listing, can you?

12   A.   No.

13   Q.   Okay.

14   A.   It doesn't say.

15   Q.   Looking at page 17-9, this is the IRS Form 4506T.  Do you

16   see this?

17   A.   Yes.

18   Q.   Okay.  Looking at the bottom signature section, just to

19   cut to it, you signed your husband's name, right?

20   A.   Yes, I did.

21   Q.   Okay.  With his permission, of course.

22   A.   Yes, I did.

23   Q.   Page 17-10.  This is the hardship statement.

24   A.   Yes, it is.

25   Q.   Okay.  On the left side towards the top where it says

Cornejo, D. - Cross                                           94

1    reason for hardship, check all that apply, three boxes are
2    checked.  You only have to go halfway across.  That's good
3    enough.  Fine, fine, fine, fine, fine.  Are these the
4    hardships?
5    A.   Yes.
6    Q.   I'm not cutting you off because on the next page, it says
7    other.  So there could be more hardships.  So I'm not saying is
8    this the only hardships, but these are your hardships.
9    A.   Yes.
10   Q.   You checked these boxes?
11   A.   Ernie checked them for me.
12   Q.   Okay.  But you directed Ernie to check these boxes.
13   A.   Yes, he did.
14   Q.   And the reason for the hardship had been resolved by this
15   point in time, right?  The hardship was over?
16   A.   The hardship was over?
17   Q.   Yes.
18   A.   It goes and it comes.
19   Q.   So the hardship's still ongoing.
20   A.   Yes.
21   Q.   The hardship wasn't resolved then at this time.
22   A.   No.
23   Q.   Let's go up to the previous box above it where it says
24   Section 11 through I and we are -- there you go.  See the line
25   that says has the reason for your hardship been resolved.  See

1    where the box is checked yes?

2    A.    Yes.

3    Q.    So that would suggest to someone reading this that it's a

4    past hardship and going forward, it's over, right?

5    A.    Yes.

6    Q.    Is this accurate?

7    A.    It was signed, yes.

8    Q.    Well, I know it was signed.  Is it accurate?

9    A.    No.

10   Q.    Looking at the next page, 17-11.  In the middle of this

11   page, there's a section -- check box other hardship, describe

12   below.  Let's bring that up, please.  No, right there.  Where

13   the check box is, other hardship, describe below, perfect.

14   When you checked the box other hardship, describe below,

15   Ocwen's requesting a written explanation describing the

16   details.  Do you see that?

17   A.    Yes, I do.

18   Q.    Okay.  Was that provided on April 16?

19   A.    I don't recall.

20   Q.    Okay.

21   A.    I can't remember.

22   Q.    Then let's go to page 17, the bottom has consent for

23   release of information.  Page 17 -- I said the wrong thing.

24   17-12.  I apologize.  Put you on the wrong page.  The bottom

25   box, Section 14.  This section asks you and your husband to

1    sign so that Ocwen can obtain certain information.

2    A.   Okay.

3    Q.   It does not appear to be signed.  Is there a signature and

4    it just wore out?

5    A.   No.

6    Q.   Was it signed?

7    A.   No.

8    Q.   No.  Why not?

9    A.   I don't remember.

10   Q.   The form wasn't fully filled in then, was it?

11   A.   No.

12   Q.   Looking at page 13 -- 17-13.  Let's start with

13   paragraph 1.  Could we make that a little bit bigger.  There we

14   go.  Is that what I'm going to get when I make it bigger?  No.

15   I want to be able to read it -- I was 20 years younger.  Okay.

16   I guess that's -- can you read that, Ms. Cornejo?

17   A.   Yes, I can.

18   Q.   Oh, good.  Can you read that to us, please?

19   A.   I certify that all information in this packet is truthful

20   and the hardships identified above, all contributions,

21   submission of this request for mortgage relief.

22   Q.   In essence, what's provided in the package and the

23   information you send to Ocwen is all accurate.

24   A.   To my knowledge, yes.

25   Q.   And we found that some information in the form is wrong

Cornejo, D. - Cross                                      97

1    already.

2    A.   Yes, it was.

3    Q.   So paragraph 1 was not complied with, right?

4    A.   No, it wasn't.

5    Q.   Go to paragraph 4.  Can you read this one, please?

6    A.   I understand that if I have intently defaulted on any

7    existing mortgage, engaged in fraud, or it is determined that

8    any of my statements or information contained in the

9    documentation that I provide are materially false and that I

10   eligibly for assistance under MHA or any other mortgage relief

11   program, the service -- the USA Department of Treasury, if

12   applying for MHA program, or their respective agent may

13   terminate my participation in MHA or any mortgage relief

14   program, including any right to further benefits and incentives

15   and otherwise would have been able under the program or also

16   may seek other remedies available at law and equality such as

17   returning any benefits of incentives previously received or

18   pursuing foreclosure.

19   Q.   And at the time you signed the form, this paragraph was

20   included in it.

21   A.   Yes, it was.

22   Q.   Let's go to the next page, JT17-14.  Let's look at

23   paragraph 2 in Section 15.  Can you read this one, please?

24   A.   I understand in order to review for a foreclosure

25   alternative, all required documentation is to be received no

1    later than seven business days prior to the scheduled

2    foreclosure sale date exception for California.  As required

3    state law, if your property is located in the State of

4    California and the scheduled foreclosure sale is within seven

5    business days, the review of your loan for a foreclosure

6    ultimately is subject to different time frames, please contact

7    us at phone number -- and there's no phone number -- to

8    discuss.

9    Q.   The and there's no phone number wasn't in here --

10   A.   No.

11   Q.   -- was it?

12   A.   No, it wasn't.

13   Q.   You were just editorializing.

14   A.   Yeah.  I was just saying there's no phone number.

15        MR. SHATZ:  We move to strike.

16        THE COURT:  That will be stricken.

17   BY MR. SHATZ:

18   Q.   This form was sent to Ocwen more than seven business days

19   before the sale, right?

20   A.   I don't -- I don't remember the date.

21   Q.   Okay.  You said it was sent in on April 16th and the sale

22   was April 29th.  So the form was sent in more than seven

23   business days before the sale, right?

24   A.   I sent the forms on April 16th.  I do recall that.

25   Q.   Yes.

1    A.    Yes.

2    Q.    Okay.  You never asked Ocwen what the California time

3    frames were, did you?

4    A.    I complied with --

5    Q.    You never asked Ocwen what the California time frames

6    were, did you?

7    A.    I did not.

8    Q.    Two paragraphs down, it says the undersigned certifies.

9    Nope.  One line down.  Yep.  You see it says the undersigned

10   certifies under penalty of perjury that all statements in this

11   document are true and correct.

12   A.    Yes.

13   Q.    And at the time you signed the form -- and we'll come to

14   that in a second -- this paragraph was in the form, right?

15   A.    Yes, it was.

16   Q.    Let's go to the signatures, starting with the signatures.

17   There is a typed box that says Frank Cornejo.  That was there

18   when you got the form, right?

19   A.    Yes.

20   Q.    And a typed box that says Dora Cornejo, that was there

21   when you got the form?

22   A.    Yes, it was.

23   Q.    And you signed your name.

24   A.    Yes.

25   Q.    That's your signature.

Cornejo, D. - Cross                                    100

1    A.   Yes, it is.

2    Q.   And you put the date in?

3    A.   Yes -- no.  Ernie put the date in.

4    Q.   Okay.  Ernie is Mr. Cortez?

5    A.   Yes, it is.

6    Q.   And where it says Frank Cornejo, you signed Mr. Cornejo's

7    name.

8    A.   Yes, I did.

9    Q.   And Ernie put in the date.

10   A.   Yes, he did.

11   Q.   Did he accurately put in the date?

12   A.   I don't remember the date the paperwork was filled out.

13   Q.   Didn't you tell us you -- well, did you -- how much time

14   was there between filling out the paperwork and faxing it to

15   Ocwen?

16   A.   I don't remember the time frame there.  I remember the

17   date we sent it up.

18   Q.   Okay.  Look, please, at JT16.  And this is the blank

19   packet that you filled out that became JT17; is that correct?

20   If you need to look through the pages, I'll hand you the book

21   so you can look at it.

22   A.   That would be fine.

23            MR. SHATZ:  May I approach?

24            THE COURT:  Yes.

25            THE WITNESS:  Thank you.

1    BY MR. SHATZ:

2    Q.   So -- and you look at Exhibit 16 --

3    A.   Page 16?

4    Q.   No, no.  Exhibit 16.  It's approximately 20 pages.

5    A.   Okay.

6    Q.   This is the blank form that you used to fill out

7    Exhibit 17, right?

8    A.   Okay.

9    Q.   I'm sorry.  Yes?

10   A.   I'm not trying to -- can you explain what you're asking of

11   me?

12   Q.   Yes.  Okay.  So we'll do it this way.  The first page of

13   the form you filled out was JT17-3.

14   A.   Okay.

15   Q.   Let's put that on the right side, if it's possible.  And

16   on the left side, let's put up JT-5.

17   A.   Hold on.  I'm not there.  Hold on.

18   Q.   16-5.

19   A.   Okay.

20   Q.   So Exhibit 16 on the left is the blank form.  Exhibit 17

21   on the right is the one you filled in.

22   A.   Yes.

23   Q.   And I can go page by page if you'd like so you can

24   compare, whichever's faster.  My real question is Exhibit 16 is

25   the blank form that you had at the time you prepared

Cornejo, D. - Cross                                      102

1   Exhibit 17; is that correct?

2   A.   Okay.  I'm a little confused.

3   Q.   Okay.  No problem.  Let's just look at Exhibit 16 and

4   we're talking about Joint Exhibit 16.  So look at the first

5   page of Joint Exhibit 16.

6   A.   Okay.

7   Q.   There we go.  It's on the left side.  This is the first

8   page of what you were sent to the mortgage application, right?

9   A.   Okay.  Yes.

10  Q.   Page 2 is the second page.

11  A.   Okay.

12  Q.   Yes?  I need words.  I'm sorry.

13  A.   Yes.

14  Q.   Page 3 is the third page.

15  A.   Yes.

16  Q.   Page 4 is the fourth page.

17  A.   Yes.

18  Q.   And page 5 is the application -- is the fifth page, but

19  it's the application you start filling out; do you see that?

20  A.   Yes.

21  Q.   And you see on the right side of your screen Exhibit --

22  Joint Exhibit 17-3, you and Mr. Cortez have filled it out.

23  A.   Yes.

24  Q.   Okay.  Look at Exhibit 16 and the third page.  You see

25  where to send your application?

1   A.   Yes.

2   Q.   You can highlight there.  There's a big phone number

3   there, right?

4   A.   Yes, there is.

5   Q.   Did you ever call that number?

6   A.   Many times.

7   Q.   So you knew how to get ahold of Ocwen.

8   A.   Yes, I did.

9   Q.   Okay.  Looking at the signature in Joint Exhibit 17, and

10  that was 17-14 -- no.  I don't have it.  I'm sorry.  Mr. Cortez

11  was a mortgage modification assistant?

12  A.   No, he wasn't.

13  Q.   He was experienced mortgage expert?

14  A.   No, he wasn't.

15  Q.   He was a real estate broker?

16  A.   No, he wasn't.

17  Q.   A real estate agent?

18  A.   No, he wasn't.

19  Q.   Other than having a driver's license, do you know if he

20  had any other licenses from the State of California?

21  A.   I'm not aware of that.

22  Q.   He was just a friend?

23  A.   Yes, he was.

24  Q.   And you knew him for ten years?

25  A.   No.

1   Q.   One year?

2   A.   No.

3   Q.   One week?

4   A.   For a few weeks.  We knew of him.

5   Q.   You knew of him.

6   A.   Yeah.

7   Q.   When was the first time you met him?

8   A.   At a function at church.

9   Q.   How much before April 16?

10  A.   I can't recall the date -- the time frame.

11  Q.   Within a couple weeks?

12  A.   I guess, yes.

13  Q.   Let's turn to Exhibit Joint 18.  First page, don't need to

14  do anything.  Who's Tabu (phonetic)?

15  A.   It's someone in Ocwen, department somewhere.

16  Q.   What's this fax number?

17  A.   Fax number to Ocwen.

18  Q.   Does it go to the main Ocwen fax area or just go straight

19  to Tabu?

20          MR. VITIELLO:  Objection.  Speculation.

21          THE COURT:  Her understanding of that, Mr. Shatz?

22  BY MR. SHATZ:

23  Q.   What did you --

24          MR. SHATZ:  May I change the question?

25          THE COURT:  Yes.

1   BY MR. SHATZ:

2   Q.   What is your understanding of that fax number?

3   A.   It was sent -- a fax that was sent over to Ocwen.

4   Q.   Okay.  Let's look at page Joint 16-3, the where to send

5   your application section?

6   A.   Yes.

7   Q.   If you're following Ocwen's directions to send in forms,

8   what fax number does something get sent to?

9   A.   The number on the screen.

10  Q.   Which is?

11  A.   407-737-6352.

12  Q.   And Joint Exhibit 18 was sent to what number?

13  A.   To the number that they had given us to fax it over to.

14  Q.   A different fax number, right?

15  A.   Yes, it was.

16  Q.   Okay.  Do you know if it was received?

17  A.   By the banner on the fax paper, I assume it did.

18  Q.   Let's look at the second page of Joint Exhibit 18-2.  Who

19  prepared this letter?

20  A.   Franklin and Associates.

21  Q.   When was it prepared?

22  A.   I have to see the date there.

23  Q.   Oh, let's make the date bigger, please.  Stop.  There you

24  go.

25  A.   April 28th.

1  Q.   Are the contents of the letter -- let's go from to who it
2  may concern to should you have any.  Are the contents of the
3  letter accurate?
4  A.   Yes.
5  Q.   And looking back at the page Joint Exhibit 17-6, towards
6  the top where it says the base pay section --
7  A.   Yes.
8  Q.   -- there you go.  Yeah.  You can see the base pay was
9  3,500, 2,000 plus 1,500.
10  A.   Yes.  Well, 2,000.
11  Q.   2,000 for Mr. Cornejo and 1,500 for you?
12  A.   Yes.
13  Q.   For a total of $3,500.
14  A.   Yes.
15  Q.   So the letter is accurate.
16  A.   Yes.
17  Q.   The letter of explanation prepared April 28th.
18  A.   Yes.
19  Q.   Look at the next page.  Joint Exhibit 18-3, can you see
20  this?
21  A.   Yes.
22  Q.   Who prepared this letter?
23  A.   Franklin and Associates.
24  Q.   At the same time they prepared 18-2, the letter of
25  explanation?

1    A.    Yes.

2    Q.    Why is it dated 12 days earlier?

3    A.    Well, because Ocwen kept asking for different things and

4    the packet that was sent complete, they kept calling and

5    calling and saying we need this, we need that.  So this letter

6    is another piece of -- that was sent to them.

7          MR. SHATZ:  Objection.  Move to strike -- objection.

8    Nonresponsive.

9          THE COURT:  Sustained.

10         MR. SHATZ:  Move to strike.

11         THE COURT:  That'll be stricken.

12   BY MR. SHATZ:

13   Q.   Why was the letter dated 12 days earlier than the other

14   letter?

15   A.    I don't -- I don't recall that.

16   Q.    So Franklin and Associates prepared the letter with your

17   help --

18   A.    Yes, they did.

19   Q.    You provided input to the letter?

20   A.    Yes.

21   Q.    And as far as you know, the letter's accurate.

22   A.    Yes.

23   Q.    When did you and your husband try to refinance your home?

24   A.    I don't remember the dates.

25   Q.    How about the years?

1    A.   I don't remember the year.

2    Q.   And you couldn't refinance, could you?

3    A.   I don't remember the outcome.

4    Q.   Well, let's read the first paragraph.  We'll make the

5    first paragraph bigger, please.  Go ahead.

6    A.   Please be advised that Frank Cornejo and Dora Cornejo have

7    tried to refinance our home to lower our interest rate, to

8    lower our monthly payment, but have been unable to because we

9    are currently upside down in our mortgage and our credit rating

10   has dropped.

11   Q.   And the reason you couldn't refinance then is because

12   you're upside down and your credit rating dropped.

13   A.   Correct.

14   Q.   What does it mean credit rating dropped?

15   A.   The bookkeeping person who made it, they used their terms

16   to explain that we were -- had money issues.

17           MR. SHATZ:  Objection.  Nonresponsive.

18           THE COURT:  Sustained.

19           MR. SHATZ:  Move to strike.

20           THE COURT:  That'll be stricken.

21   BY MR. SHATZ:

22   Q.   What does it mean to you credit rating has dropped?

23   A.   I -- I'm not sure what it means.  I just know that it --

24   our credit was not good.

25   Q.   And when it says currently upside down, what does that

1   mean to you?

2   A.   That we were in debt.

3   Q.   You were in debt more than the value of the property?

4   A.   I wouldn't know that.

5   Q.   That's why I want to know what upside down means.

6   A.   I don't know.  I don't recall what that meant.

7   Q.   Okay.  The next paragraph, please.  Where you talk about

8   the reason you fell behind, the second line says, and you had

9   to pay the IRS over $50,000.

10  A.   Yes.

11  Q.   At that point in time, had you paid the IRS $50,000?

12  A.   I had.

13  Q.   You paid them $50,000.

14  A.   I was making payments to them.

15  Q.   Different question.  You owed them money, right?

16  A.   Yes.

17  Q.   You hadn't finished paying it yet.

18  A.   No.

19  Q.   You still owed the IRS something.

20  A.   Yes.

21  Q.   Do you know how much?

22  A.   I'm not aware.

23  Q.   More than $39,000?

24  A.   I'm not aware.

25  Q.   At the bottom of the page, there are signatures.

Cornejo, D. - Cross                                    110

1    A.   Yes.

2    Q.   You only went to Franklin and Associates once, right?

3    A.   Various times.

4    Q.   Okay.  When was the first time?

5    A.   I can't remember the date.

6    Q.   Under Dora Cornejo, is that your signature?

7    A.   Yes, it is.

8    Q.   Under Frank Cornejo, is that his signature?

9    A.   No, it's not.

10   Q.   Your signature.

11   A.   Yes.

12   Q.   Let's look at the Exhibit 18-4.  Can you see this?

13   A.   Yes.

14   Q.   Do you want me to blow it up?  You can, okay.

15   A.   I can see it.

16   Q.   When was it prepared?  Bottom left.

17   A.   April 22nd.

18   Q.   Why was this prepared?

19   A.   Because Ocwen had asked for another paper.

20   Q.   So on April 22, you knew that Ocwen wanted more paper.

21   A.   Yes, I was aware of that.

22   Q.   How'd you know that?

23   A.   Through a phone call.

24   Q.   So you got a phone call before April 22 or on April 22?

25   A.   Probably on April 22 -- I can't recall the dates.

Cornejo, D. - Cross                                    111

1   Q.   No problem.  Within a very short period of time before
2   this was prepared?
3   A.   I don't recall.
4   Q.   Well, you didn't get a call a year in advance saying, hey,
5   sometime in the next year, give me a profit and loss statement,
6   did you?
7   A.   No.
8   Q.   And you got this call after you submitted the package,
9   Joint Exhibit 17, right?
10  A.   Yes.
11  Q.   So after you submitted Joint Exhibit 17, you received a
12  phone call from Ocwen.  Yes?
13  A.   Yes.
14  Q.   And they wanted a profit and loss statement.
15  A.   Yes.
16  Q.   And on April 22, you had this prepared.
17  A.   Yes.
18  Q.   And as far as you know, this statement is accurate.
19  A.   Yes.
20  Q.   Can we highlight the top where it goes from La Colonia
21  Restaurant through the dates.  That line, yes.  In looking at
22  this statement, this is for the first quarter of 2015, right?
23  A.   Yes.
24  Q.   January 1, 2015, to March 31, 2015?
25  A.   Yes.

Cornejo, D. - Cross                                          112

1   Q.   And you and the bookkeeper signed it at the bottom left?

2   A.   Yes.

3   Q.   We can pull the heading down.  And as far as you know

4   then, the information in here in accurate.

5   A.   Yes.

6   Q.   And it's accurate for three months.

7   A.   Yes.

8   Q.   That is January to March 2015.

9   A.   Yes.

10  Q.   Did you look at this before it was sent to Ocwen?

11  A.   I don't remember if I did or didn't.  It was sent off.

12  Q.   Oh.  Okay.  Did the bookkeeper make up the numbers?

13  A.   No, she didn't.

14  Q.   She got them from you.

15  A.   She got them from our file, yes.

16  Q.   Well, you provided the file.

17  A.   They do my bookkeeping.

18  Q.   Okay.  And you didn't make up numbers to put in the file

19  when you asked the bookkeeper to prepare this form?

20  A.   No, I didn't.

21  Q.   So these were real numbers.

22  A.   Yes, they were.

23  Q.   Can you pull up at the same time -- we'll go back and

24  forth JT18-4, which is the one that's up, and JT -- Joint

25  Exhibit 17-6.  That's the wrong one.  Let's try it again.

Cornejo, D. - Cross                                             113

1   JT17-8.  If you need me to help get you oriented, JT17-8 is the
2   page that you sent to Ocwen on April 16.
3   A.    Okay.
4   Q.    And the one on the left side, JT18-4, is the one that was
5   sent to Ocwen on April 28.
6   A.    Okay.
7   Q.    Because of the way we cut the form, the fax header -- how
8   did I do this -- doesn't appear down here.  If you need to see
9   it to confirm it was sent on April 28, we can have that pulled
10  up.  Was it sent April 28 or do you want us to show you that?
11  A.    You could show me.
12  Q.    Yes, please.  I don't know how he does it.  It'll
13  magically appear.  You see where it says -- thank you.  Do you
14  see where it says April 28 down here?
15  A.    Yes.
16  Q.    Okay.  So can we agree that JT18-4 was sent to Ocwen on
17  April 28?
18  A.    Yes.
19  Q.    And JT17-8 was sent on April 15?
20  A.    Yes.
21  Q.    Comparing the forms, for example, on the form that was
22  sent April 15, advertising is listed as $2,000.
23  A.    Okay.
24  Q.    Do you see that?
25  A.    Yes.

1   Q.   And for the form sent April 28, advertising is listed as

2   $95.50.  Do you see that?

3   A.   Yes.

4   Q.   So on April 28, you're spending approximately $95.50 every

5   three months for advertising.

6              THE COURT:  Mr. Shatz, I think you're misreading

7   that.

8              MR. SHATZ:  I'll go with misreading it.

9              THE COURT:  I'm reading it as $895.50.

10             MR. SHATZ:  Oh, I thought that was a dollar sign.

11  Okay.

12             THE COURT:  I have my glasses on.

13             MR. SHATZ:  No, no -- I apparently don't.

14  BY MR. SHATZ:

15  Q.   So we have -- let me start all over again.  I don't want

16  to have this bad.  On April 28, advertising is $895.50.

17  A.   Um-hmm.

18  Q.   Do you see that?

19  A.   Yes.

20  Q.   And the advertising here is $2,000.

21  A.   Yes.

22  Q.   So that would suggest -- it would suggest approximately

23  six and a half, seven months of advertising on JT17-8, correct?

24  A.   I'm confused.

25  Q.   Okay.  Is you're spending $895.50 in three months --

1    A.   Okay.

2    Q.   -- then in six months, you're spending approximately

3    $1,791.  I just doubled the number.

4    A.   Can I explain?

5    Q.   No.  We'll get to it.

6    A.   Okay.

7    Q.   So the number on the right, JT17-8, is for at least six

8    months of advertising; is that correct?

9    A.   I don't know that.

10   Q.   You don't know that.

11   A.   Okay.  Then -- can we -- on the right where it says

12   expenses and figures, just take that portion of the box.  There

13   we go.  Okay.  Bank fees.  Looking at contract labor on 17-8.

14   Do you see where labor costs appear on the left side?

15   A.   Yes, I do.

16   Q.   How much are they?

17   A.   It says 6,000

18   Q.   Oh, you were looking at the 17-8.  On 18-4, is there an

19   entry for labor -- for workers -- payroll?  That's payroll

20   taxes.

21   A.   I'm lost.  You have three papers here and you're

22   underlining something in red and I'm confused.

23   Q.   Okay.  Let's get rid of this box here.  Repairs and

24   maintenance.  On the form here, Franklin and Associates

25   suggests that repairs and maintenance are $1,085.95.  Did I

1  read that one correctly?  Yes?  $1,085.95 in three months.  The
2  form you provided has at some period of time -- if you can get
3  rid of my thing -- $800.
4  A.   Okay.
5  Q.   Is that for half a three-month period?
6  A.   Can I answer that?
7  Q.   Yes.  Is it for half a three-month period?
8  A.   I don't know how much it is.  It varies.  In a
9  restaurant --
10  Q.   Was it for half a three-month period?
11  A.   I don't know.
12  Q.   To your knowledge sitting here, is there anything on
13  page 17-8 under the expenses section that's accurate?
14  A.   I don't know.
15  Q.   And looking at the section above, gross receipts, did the
16  restaurant earn any receipts that you told Ocwen?
17  A.   Did I provide Ocwen with any receipts?
18  Q.   Did you tell Ocwen how much the restaurant earned when the
19  form was sent in on April 16, 2015?
20  A.   No, it wasn't.
21  Q.   Looking at Exhibit JT18, the next page, which is JT18-5 --
22  you can get rid of everything else.  18-5.  This is your 2013
23  tax return, right?
24  A.   Yes, it is.
25  Q.   And these were provided to Ocwen on April 28.

Cornejo, D. - Cross                                    117

1    A.   Yes, they were.

2    Q.   Were they -- do you remember when they were completed?

3    A.   No, I don't remember.

4    Q.   Look at the next page.  At the bottom where it says sign

5    here, see the signature?

6    A.   Yes.

7    Q.   Is that your signature?

8    A.   Yes.

9    Q.   And below that is your husband's signature?

10   A.   My signature.

11   Q.   You signed for your husband.

12   A.   Yes.

13   Q.   And is the date accurate?

14   A.   Yes, it is.

15   Q.   And it says under penalty of perjury, I declare, et

16   cetera.  You see that?

17   A.   Yes.

18   Q.   Did this get signed on April 13, 2015?

19   A.   Yes, it did.

20   Q.   Is that when the returns were prepared?

21   A.   Yes, they were.

22   Q.   Or at least finalized so you could look at them and sign?

23   A.   Yes, they were.

24   Q.   When were the 2014 returns prepared?

25   A.   I don't recall.

1  Q.   Before or after this?

2  A.   I don't recall.

3  Q.   I want to change topics a little bit.  We talked yesterday

4  about the unlawful detainer judgment.  Remember there was an

5  eviction action?

6  A.   Can you explain what that is?

7  Q.   Yes.  After the property was sold at foreclosure, somebody

8  bought the property, and they evicted you and your family.

9  A.   Yes.

10  Q.   And there was a lawsuit about that.

11  A.   Yes, there was.

12  Q.   And as part of that lawsuit, you and your husband were

13  sued.

14  A.   Yes, we were.

15  Q.   And you had to appear in court.

16  A.   I appeared at court.

17  Q.   Well, he was named, wasn't he?

18  A.   Yes, he was.

19  Q.   And you were named.

20  A.   Yes, we were.

21  Q.   And you either had to file some type of response in court

22  or you got defaulted.

23  A.   Yes.

24  Q.   And he filed a response.

25  A.   I don't remember.

Cornejo, D. - Cross                                      119

1   Q.   You filed a response.

2   A.   I don't remember.

3   Q.   Do you know if he paid filing fees?

4   A.   I don't remember.

5   Q.   I'd like to show you a document to see if this refreshes

6   your recollection.

7              MR. VITIELLO:  Can we see, Counsel?

8              MR. SHATZ:  Yes.

9              MR. VITIELLO:  Thank you.

10             MR. SHATZ:  It is from the document production that's

11   attached to the deposition.

12             MR. VITIELLO:  Is it a trial exhibit?

13             MR. SHATZ:  No.

14             MR. VITIELLO:  We still haven't seen it, so --

15             THE COURT:  He's simply asking to refresh her

16   recollection.  He's not asking to admit it.

17             MR. SHATZ:  Correct.

18   BY MR. SHATZ:

19   Q.   Can you look at page 288?

20   A.   In which binder?

21   Q.   The big fat one.  Under Exhibit Tab 24, it is KVK000288.

22   A.   Can you repeat that?

23   Q.   Yes.  KVK000 --

24   A.   Okay.  Where do you look at the K at?

25   Q.   Don't do anything.  I'll be right there.

1          THE COURT:  Mr. Shatz, you're going to have to come

2   right here then too as well because you said Tab 24?

3          MR. SHATZ:  Tab 24.

4          THE COURT:  There's only one page behind Tab 24.  I

5   have --

6          MR. SHATZ:  No.  I grabbed the wrong deposition, Your

7   Honor.

8          THE COURT:  Mine says Dora Cornejo.

9          MR. SHATZ:  That's the one we need.

10  BY MR. SHATZ:

11  Q.   Under Exhibit Tab 27, page 288.  Want me to come over or

12  you got it?

13  A.   Got it.  Okay.

14  Q.   Do you see that the order granting a fee waiver was

15  entered?

16  A.   Okay.

17  Q.   Look at page -- in this exhibit, Exhibit 27, page 282, how

18  many people were in your family in April 2015?

19  A.   Three people.

20  Q.   Are you on page 282?

21  A.   Okay.

22  Q.   You see under box 5B, it provides the limit for family

23  income.

24  A.   5B, okay.

25  Q.   Do you see the limit for three people to get a fee waiver

1    is $1,988.55?

2    A.    Okay.

3    Q.    Was your family income in April 2015 less than $1,988.55?

4    A.    Okay.  You guys find where you're going.  I don't

5    understand what you're telling me.

6    Q.    Okay.  Was your family income -- the monthly income in

7    your family --

8    A.    Yes.

9    Q.    -- in April 2015 less than $2,000?

10   A.    No.

11   Q.    The judgment in the unlawful detainer action that you

12   eventually had to pay --

13   A.    Um-hmm.

14   Q.    -- or you're in the process of paying, that judgment, the

15   amount was for the rental value of the property you stayed in

16   between the foreclosure sale and the time you left, right?

17   A.    Yes.

18   Q.    You put your furniture into storage.

19   A.    Yes, I did.

20   Q.    Did you have a storage unit at your house before the

21   foreclosure?

22   A.    At my house?

23   Q.    Yes.

24   A.    I had a shed.

25   Q.    You had a shed -- some kind of shed.  How big was the

Cornejo, D. - Cross                                    122

1    shed?  Ten by ten?

2    A.   About the size that I'm sitting in.

3    Q.   The size of your chair or the size of the jury box?

4    A.   No.  Just the jury box.

5    Q.   Okay.  Like eight feet by eight feet?

6    A.   I don't know measurements, but I guess.

7    Q.   Okay.  And the shed was full?

8    A.   Yes, it was.

9    Q.   And you transferred the contents of the shed to one of the

10   storage units?

11   A.   I transferred everything from the house to a storage unit.

12   Q.   Including the contents of the shed.

13   A.   No.  The shed stuff stayed.

14   Q.   Oh, okay.  When did you first get the storage unit?

15   A.   I don't recall the date.

16   Q.   After you were evicted?

17   A.   It was -- I can't remember dates right now.  It was too

18   hard to remember these dates.

19   Q.   Can't remember?

20   A.   No.

21   Q.   Okay.  I'm looking for the storage unit exhibit that we aw

22   yesterday.  Here we go.  Can you pull up Plaintiff's 15-1?  You

23   moved out of your house in approximately August, correct?

24   A.   Yes, I did.

25   Q.   You had the storage unit -- looking at the very top three

1    lines say.  Starting May 11th.

2    A.    Yes.

3    Q.    Who prepared Exhibit 15?

4    A.    Who prepared?

5    Q.    Who prepared?

6    A.    The -- the people who I rent from.

7    Q.    Oh, this is a storage unit document.

8    A.    Yes.

9    Q.    Okay.  And you began renting starting May 11.

10   A.    Yes.

11   Q.    Look at Joint Exhibit 19, please.  19-1, I want to be --

12   do you see where this talks about what the modified payment

13   will be?

14   A.    Yes.

15   Q.    And it talks about $817.29.

16   A.    Yes.

17   Q.    But it says -- and the payment is principal and interest.

18   Yes?

19   A.    Yes.

20   Q.    And escrow.

21   A.    Yes.

22   Q.    What is escrow?

23   A.    I don't know.

24   Q.    The escrow is the portion for taxes and insurance that the

25   lender collects so it can pay.  Does that sound familiar to

1    you?

2    A.    Okay.  Yeah.

3    Q.    This amount -- do you see where it says this amount is not

4    your new regular payment as an escrow analysis will run upon

5    receipt and execution of this offer.  Do you see that?

6    A.    Yes.

7    Q.    Was the final regular payment ever determined?

8              MR. VITIELLO:  Objection.  Speculation.

9              THE COURT:  Sustained.

10   BY MR. SHATZ:

11   Q.    Do you know if the final regular payment was ever

12   determined?

13   A.    I got this letter, congratulations, I got happy.  That was

14   my new payment.

15             MR. SHATZ:  Objection.  Nonresponsive.

16             THE COURT:  Sustained.

17             MR. SHATZ:  Move to strike.

18             THE COURT:  That'll be stricken.

19   BY MR. SHATZ:

20   Q.    Do you know whether the final regular payment was ever

21   determined?

22             MR. VITIELLO:  Objection.  Speculation.

23             THE COURT:  Overruled.

24             THE WITNESS:  I don't know.

25   BY MR. SHATZ:

Cornejo, D. - Cross                                   125

1   Q.   Do you know whether it would be higher or lower?

2   A.   I don't know.

3          MR. VITIELLO:  Objection.  Speculation.

4          THE COURT:  Sustained.

5   BY MR. SHATZ:

6   Q.   Do you know whether it would be higher or lower.

7          MR. VITIELLO:  Objection.  Foundation.

8          THE COURT:  Next question, Mr. Shatz.

9   BY MR. SHATZ:

10  Q.   Did you have any indication how the regular payment would

11  be determined?

12  A.   They were going to look at my complete packet, give me a

13  modification, and this would be my new payment.

14         MR. SHATZ:  Objection.  Nonresponsive.

15         THE COURT:  Sustained.

16         MR. SHATZ:  Move to strike.

17         THE COURT:  That'll be stricken.

18  BY MR. SHATZ:

19  Q.   Do you know how the escrow analysis would be conducted?

20  A.   No, I'm --

21  Q.   You shared with us some receipts for furniture.

22  A.   Yes, I did.

23  Q.   You had to buy twin firm mattress, a twin set, a daybed,

24  and a nightstand, right?

25  A.   Yes.

1   Q.   And I'm assuming you shared that with us because you're

2   saying that was part of your damages for having to leave your

3   old house and move to your new home.

4   A.   I had to leave my mattresses in my old house to get new

5   mattresses, yes.

6            MR. SHATZ:  Objection.  Nonresponsive.

7            THE COURT:  A little bit.  Everything after I had to

8   leave my mattresses will be stricken.

9   BY MR. SHATZ:

10  Q.   And you're seeking these damages from Ocwen.

11  A.   Yes.

12  Q.   And I'm assuming that if you move into a bigger house,

13  you'll then give the mattresses and bed set to Ocwen if the

14  jury finds that Ocwen has to pay you for these.

15           MR. VITIELLO:  Objection.  Argumentative.

16           THE COURT:  Sustained.  We're going to go ahead and

17  take our morning break.  We did start a little bit later, but

18  I'm sure you probably would still like to stretch.  So if

19  you'll come back in about 15 minutes.

20       (Jury out at 10:47 a.m.)

21           MR. VITIELLO:  And, Your Honor, can she step down for

22  a minute?

23           THE COURT:  Yeah.  We're on break.  So we are outside

24  the presence of the jury.  I'll just note that I'm going to

25  mark the undisputed facts that we'll read to the jury later on

Cornejo, D. - Cross                    127

1    as Joint Exhibit 22.  That'll be next in order.

2         (Joint Exhibit 22 marked for identification.)

3              THE COURT:  All right.  Anything at this time before

4    we take our break?

5              MR. VITIELLO:  Are we 15 minutes, Your Honor?

6              THE COURT:  Yes, please.  Unless there's something we

7    need to talk about, then we're going to have to take a quick

8    break and come on back.

9              MR. VITIELLO:  Not at this time, Your Honor.

10             THE COURT:  All right.  Thank you.

11        (Recess from 10:47 a.m. to 11:02 a.m.)

12             THE COURT:  Let's go ahead and I'll bring the jury

13   back.

14        (Jury in at 11:03 a.m.)

15             THE COURT:  All right.  We have our jury members back

16   in their places.  Mrs. Cornejo, if you'll return to the stand,

17   please.

18                    CROSS-EXAMINATION (CONTINUED)

19   BY MR. SHATZ:

20   Q.   Good morning.

21   A.   Good morning.

22   Q.   You run a restaurant.

23   A.   Yes, I do.

24   Q.   You've had it for years.

25   A.   Yes, I have.

1    Q.   Are you in charge?

2    A.   Somewhat, yes.

3    Q.   You and your husband?

4    A.   Yes.

5    Q.   Who handles the administration of the restaurant?

6    A.   I have a bookkeeper.

7    Q.   Who orders the food?

8    A.   Frank does.

9    Q.   Who orders the supplies?

10   A.   Frank does.

11   Q.   Who pays the employees?

12   A.   Frank does.

13   Q.   At some point in time, there was a fire in the restaurant.

14   A.   Yes.

15   Q.   Somewhere between 2013 and 2014 if I recall?

16   A.   Yes, sometime in there.

17   Q.   What was damaged?

18   A.   Little bit of the wall, little bit of furniture.  Just

19   different things.

20   Q.   Did the restaurant have insurance?

21   A.   Yes, we did.

22   Q.   Did the insurance cover the loss?

23   A.   Somewhat.

24   Q.   When you were closed, did the insurance for the loss of

25   business?

1    A.    They paid for somewhat, partial.

2    Q.    50 percent?  75 percent?

3    A.    I don't recall the numbers.

4    Q.    And we're not saying Ocwen caused the fire, right?

5    A.    No, they didn't.

6    Q.    They didn't damage the fridge?

7    A.    No.

8    Q.    Didn't damage the stove.

9    A.    No.

10   Q.    Didn't cause the restaurant to close.

11   A.    No.

12   Q.    Does the restaurant have any licenses?

13   A.    Yes.

14   Q.    Who arranges for the licenses?

15   A.    They would -- those were done years ago.

16   Q.    You just renew the licenses.

17   A.    Yes.

18   Q.    The restaurant have any permits?

19   A.    Yes, they do.

20   Q.    Is that the same thing from your point of view?

21   A.    I don't know the difference.

22   Q.    Okay.  Me either.  I was going to ask you.  And the

23   restaurant has these and they just renew every period of time.

24   A.    Yes, they just get a bill.

25   Q.    Do you take care of that?

1   A.   Depending.

2   Q.   Well, who else would do it?

3   A.   Me or my daughter or Frank.  It depends.

4   Q.   And does the bookkeeper pay the bills?

5   A.   No.

6   Q.   Who pays the bills?

7   A.   We do.

8   Q.   Who's we?

9   A.   Me and Frank.

10  Q.   Before Ocwen began servicing the loan in 2013, GMAC

11  Mortgage was servicing the loan, right?

12  A.   I believe so.

13  Q.   Do you need me to show something to refresh your

14  recollection or can you accept my representation?

15  A.   I could accept your representation.

16  Q.   At the time that the end of GMAC's service, the end of

17  2012/early 2013, you were behind on the mortgage, weren't you?

18  A.   Yes, I was.

19  Q.   And GMAC had sent you and your husband some letters.

20  A.   Yes, I believe so.

21  Q.   I'm not asking if you read them, but they sent you some

22  letters.

23  A.   Yes.

24  Q.   And among other things, some of the letters offered help

25  in you needed assistance.

Cornejo, D. - Cross                                131

1    A.   I don't recall.

2    Q.   For example, let's look at Defendant's 501.  Does this

3    look like a letter from GMAC Mortgage?

4    A.   Yes, it does.

5    Q.   In the top left, can you see that it's addressed to you

6    and your husband?

7    A.   Yes, it is.

8    Q.   At your home address?

9    A.   Yes, it is.

10   Q.   And on the bottom left, does it talk about alternatives to

11   avoid foreclosure?

12   A.   Yes, it does.

13   Q.   So the July 11, 2012, letter discusses alternatives to

14   foreclosure.

15   A.   Yes.

16   Q.   And on the second page of Exhibit 501 -- to discuss your

17   options, there's a phone number for you to call.

18   A.   Yes.

19   Q.   Okay.  And after the servicing was transferred in 2013,

20   only 2013, Ocwen also sent you a series of letters.

21   A.   Yes.

22   Q.   And in some of those letters, there was a discussion of

23   options to avoid foreclosure, right?

24   A.   I don't remember.

25   Q.   Okay.  Let's just take a look at one for example.  Let's

Cornejo, D. - Cross                          132

1   look at Defendant's Exhibit 13.

2            THE COURT:  513?

3            MR. SHATZ:  Defendant's Exhibit 513.

4   BY MR. SHATZ:

5   Q.   Do you see this is a letter from Ocwen?

6   A.   Yes.

7   Q.   June 10, 2013?

8   A.   Yes.

9   Q.   And different options to foreclosure are discussed?

10  A.   Yes.

11  Q.   Could we see the second page, please.  And there's a phone

12  number to call to discuss options.

13  A.   Yes.

14  Q.   And in this case, on the third page of Exhibit 513,

15  there's a pamphlet, a brochure, information on how to avoid

16  foreclosure.  Do you see that?

17  A.   Yes.

18  Q.   And on the seventh page of Exhibit 513, we have a form for

19  the borrower to fill out to be in a loss mitigation review

20  process.  Do you see that?

21  A.   Yes.

22  Q.   So in 2013, can we agree that Ocwen sent you and your

23  husband some letters concerning that you might be a little

24  behind and were offering help?

25  A.   Yes.

1  Q.   Let's skip ahead to 2014.  You don't want me to go through

2  every letter, do you?

3  A.   No.

4  Q.   Okay.  Looking at 2014, all of 2014, at some point in

5  time, again Ocwen sent you letters.

6  A.   Yes.

7  Q.   And you were behind in 2014.

8  A.   Yes.

9  Q.   In fact, your last payment was somewhere in May or June

10 2013.

11 A.   Yes.

12 Q.   And Ocwen sent you letters in 2014.  Some of them offered

13 loss mitigation, loan modification assistance.

14 A.   Okay.  Yes.

15 Q.   And you received some of those letters.

16 A.   Yes.

17 Q.   And Ocwen also called you and your husband in 2014.

18 A.   Yes.

19 Q.   And they left messages sometimes.

20 A.   Yes.

21 Q.   And on October 22, 2014, a notice of default starting the

22 foreclosure process was recorded.

23 A.   Okay.  Yes.

24 Q.   And after the notice of default was recorded, a letter was

25 sent to you saying that foreclosure had started.  That would be

Cornejo, D. - Cross                                    134

1   Exhibit 537, Defendant's 537.  Do you see that this letter is
2   dated October 25?
3   A.    Yes.
4   Q.    And it begins foreclosure activity has been initiated on
5   your property?
6   A.    I don't recall that letter.
7   Q.    Do you see that it says that?
8   A.    Yes.  I see the date.
9   Q.    And apply for assistance, please call us?
10  A.    Yes, it does.
11  Q.    Do you have any reason to believe this letter was not sent
12  to you?
13  A.    I don't remember reading this letter.
14          MR. SHATZ:  Objection.  Unresponsive.
15          THE COURT:  Sustained.
16          MR. SHATZ:  Move to strike.
17          THE COURT:  That'll be stricken.
18  BY MR. SHATZ:
19  Q.    Do you have any reason to believe this letter wasn't sent
20  to you?
21  A.    No.
22  Q.    And Ocwen continued after October to make calls and leave
23  messages for you or Frank and the rest of 2014 at least at some
24  time; is that correct?
25  A.    Yes.

Cornejo, D. - Cross                                135

1    Q.   And at some point in time, at the end of 2014, in

2    December, you and a representative of Ocwen had a phone call,

3    right?

4    A.   Yes.

5    Q.   Okay.  It was during that call among other things that you

6    told Ocwen you had a loss of income.  Do you recall that?

7    A.   I don't remember my conversation.

8    Q.   Ah.  After that conversation, you were sent a loan

9    modification packet, right?

10   A.   Yes.

11   Q.   And Ocwen made an appointment with you to discuss the

12   packet in January.

13   A.   I don't remember the dates.

14   Q.   Okay.  After the packet was mailed -- let me try it again.

15   Let me start over.

16        In December 2014, during that phone call, Ocwen said they

17   would send you the packet and they made an appointment in

18   January with you to discuss the packet to help you fill it out.

19   Do you remember that?

20   A.   No.  I remember having an appointment, but I don't

21   remember the dates.

22   Q.   Ah.  So at some point in time, you made an appointment to

23   talk to Ocwen or --

24   A.   Yeah.

25   Q.   -- Ocwen made an appointment to talk to you.

1    A.   Yes.

2    Q.   And Ocwen then called you at that time.

3    A.   I believe so.

4    Q.   And the appointment was rescheduled?

5    A.   Yes, it was.

6    Q.   And Ocwen called again.

7    A.   Yes, they did.

8    Q.   And the appointment was rescheduled?

9    A.   Yes.

10   Q.   And Ocwen called again.

11   A.   Yes.

12   Q.   But in -- in the first part until April 16th, you didn't

13   send in the modification packet.

14   A.   I don't recall.

15   Q.   Okay.  Do you recall receiving more than one modification

16   packet from Ocwen before you faxed it to Ocwen on April 16th?

17   A.   I don't remember.

18   Q.   Okay.  Two months before the ultimate sale, one month

19   before the for sale date, Ocwen picked a sale date.  Do you

20   recall being told that?

21   A.   I don't recall.

22   Q.   Do you know that the first sale date was March 27, 2015?

23   A.   I believe so.

24   Q.   Do you know that the sale was postponed once from March 27

25   to April 29, 2015?

1    A.   It was postponed twice.

2    Q.   Okay.  Does that mean there were two different sale dates

3    or there were three different sale dates to postpone this?

4    A.   There was two postponements.

5    Q.   Three sale dates.  First sale date postponed to a new sale

6    date postponed to a new sale date?

7    A.   I don't recall the -- the dates.

8    Q.   Okay.  And you were given a letter -- or a letter was sent

9    to you telling you the sale was postponed from March 27 to

10   April 29.

11   A.   Yes.

12   Q.   And that was mailed by Western Progressive, the trustee,

13   right?

14   A.   I don't recall I got a letter.  It was just a

15   conversation.  I've never received any mail from Ocwen not to

16   this day.

17   Q.   Okay.  Looking at Exhibit -- Defendant's 540.  Does this

18   letter look familiar to you?  Do you need me to enlarge it?

19   A.   Yes, please.

20   Q.   I can't do it actually.  Is this helpful, or do you need

21   it broken up?

22   A.   I see the letter.

23   Q.   Okay.  Do you remember receiving this letter?

24   A.   No, I don't.

25   Q.   Okay.  And the letter is dated March 11, 2015.  Do you

1    have any reason to believe it wasn't mailed about that time?

2    A.   I -- I have no reason why not.

3    Q.   Okay.  Was this the letter that you know of that triggered

4    Frank's call to Ocwen on March 16, five days later?

5    A.   I don't recall.

6    Q.   Do you know that at some point in time, you or your

7    husband called Ocwen and changed the phone numbers for Ocwen to

8    use to contact you?

9    A.   I don't remember that.

10   Q.   You don't remember the date or you don't remember it

11   happening?

12   A.   I don't remember the date -- the numbers being changed.

13   Q.   Were you or your husband also working with Save Your Home

14   California?

15   A.   Yes, we were.

16   Q.   Prior to sending in the package on April 16, do you recall

17   receiving a series of telephone messages from Ocwen to either

18   you or your husband?

19   A.   Possibly, yes.

20   Q.   And on April 16 -- we already looked at it.  I can show it

21   to you again if you need, Joint Exhibit 17, page 3, please.

22   You sent in the modification package.

23   A.   Yes.

24   Q.   Between the time of Joint Exhibit 17, the April 16

25   modification package, and Joint Exhibit 17, the fax from

Cornejo, D. - Cross                                        139

1   Franklin and Associates, you don't remember dates and what
2   happened, right?
3   A.   No.
4   Q.   Looking at Exhibit 5 -- Defendant's 577, based on what you
5   said, you don't recall receiving this letter, right?
6   A.   I'm not sure if it's the same letter you showed me earlier
7   or not.
8   Q.   Ah.  This one I have not shown you.  You are correct.  I'm
9   not trying to pull a fast one.  I haven't shown you this one
10  yet.  Do you recall receiving it?  It's dated April 20.
11  A.   I don't remember.
12  Q.   Okay.  Is it fair to say that the first time you remember
13  seeing this document is during the course of this lawsuit?
14  A.   Hmm.
15  Q.   Well, let me try it differently.  Have you ever seen this
16  document?
17  A.   I don't remember.
18  Q.   Okay.  Looking at Exhibit 578 -- Defendant's 578, this
19  one's dated April 21.  Do you remember seeing this letter ever?
20  A.   I don't remember.
21  Q.   Do you remember the contents -- oh, no.  Have to get
22  there.
23       At some point in time before the foreclosure sale, you
24  hired a bankruptcy attorney, right?
25  A.   Yes.

Cornejo, D. - Cross                                    140

1   Q.   Without telling me your conversation with the attorney,
2   what was the purpose of hiring the attorney?
3   A.   Like can you rephrase the question again?  I maybe --
4   answered --
5   Q.   No.  What I -- I don't want to know what you and the
6   attorney discussed.
7   A.   No.  The question before that.
8   Q.   At some point in time, you hired a bankruptcy attorney.
9   A.   Yes.
10  Q.   All right.  I just want to know why, but I don't want you
11  to tell me what you and the attorney said.
12  A.   Because they were taking me to court.  No.  Wait.
13  Q.   A bankruptcy attorney.
14  A.   Bankruptcy attorney?
15  Q.   Yes.
16  A.   No, no, no.  I -- I didn't get the --
17  Q.   Who got the bankruptcy attorney?
18  A.   Okay.  Can you explain the question a little bit more
19  because I didn't -- never hired a bankruptcy lawyer.
20  Q.   In 2015, did you or your husband ever consult a bankruptcy
21  attorney?
22  A.   No, we didn't.
23  Q.   Any time prior to the foreclosure sale, did you ever hire
24  a bankruptcy attorney?
25  A.   I didn't.

Cornejo, D. - Cross                                141

1    Q.   Do you know if your husband ever hired a bankruptcy
2    attorney?
3    A.   I do not -- I can't answer for him.  No.  I don't recall.
4    Q.   Do you know if Mr. Cortez hired a bankruptcy attorney on
5    behalf of you or your husband?
6    A.   Yes.  He had a conversation, yes.
7    Q.   Can you tell me about that conversation, please?
8    A.   I'm a hard working woman and I've always worked from
9    morning to night to pay my bills.  I was desperate.  I was
10   desperate.
11   Q.   Let me stop you.
12        MR. SHATZ:  I want to move to strike that portion as
13   nonresponsive.
14        THE COURT:  That'll be stricken.
15        MR. SHATZ:  I -- to object.  Object, okay?  Move to
16   strike.
17   BY MR. SHATZ:
18   Q.   Tell me about the conversation between Mr. Cortez and the
19   bankruptcy attorney -- let me try again.  Do you know what was
20   said?
21   A.   I don't.
22   Q.   Do you know why Mr. Cortez consulted a bankruptcy
23   attorney?
24   A.   Because it was the last thing that we could do to save my
25   home.

Cornejo, D. - Cross                                    142

1   Q.   Can you look, please, at Exhibit -- Defendant's
2   Exhibit 587.
3   A.   Yes.
4   Q.   What is this?  Oh, excuse me.
5   A.   It's a document.
6   Q.   I notice of filing with the court in the bankruptcy court?
7   A.   I don't know what it is.  It's a document.
8   Q.   A bankruptcy document?
9   A.   I don't know what a document -- a bankruptcy document
10  would look like.
11  Q.   Okay.  Let's look at the top.  Do you see where it says
12  United States Bankruptcy Court?
13  A.   Yes.
14  Q.   You see where it says filed April 28, 2015?
15  A.   Yes.
16  Q.   Does that suggest that this document was filed in the
17  bankruptcy court --
18          MR. VITIELLO:  Objection.  Foundation.
19          THE COURT:  Sustained.
20  BY MR. SHATZ:
21  Q.   Do you know if this document was filed in the bankruptcy
22  court?
23  A.   I don't know.
24          MR. VITIELLO:  Objection.  Speculation.
25          THE COURT:  Overruled.

1    BY MR. SHATZ:

2    Q.   Who is Desiree?  Sorry.  Who is Destine (phonetic)?

3    A.   That's the limousine company that Ernie Cortez owns.

4    Q.   Is that's Ernie's fax number?

5    A.   Yes, it is.

6    Q.   Can you read that upside down date?

7    A.   No, I can't.

8    Q.   April 29, 2015?  Want me to turn it over?

9    A.   Okay.  I see the date.

10   Q.   Did you know this was being faxed to Ocwen before it was

11   faxed?

12   A.   I know Ernie was going to fax something over, yes.

13   Q.   And at any point in time, did you tell Ocwen that a

14   bankruptcy had been filed?

15   A.   I don't remember the conversation.

16   Q.   At any point in time, did you tell Ocwen that a bankruptcy

17   had been filed?

18   A.   Ernie had told them, yes.

19   Q.   Ah.  When Ernie told them, did Ernie tell Ocwen that he

20   was Mr. Cornejo?

21   A.   With my -- my husband's permission and mine, yes.

22   Q.   So you knew that at some point in time, Mr. Cortez said he

23   was Mr. Cornejo and told Ocwen that Mr. Cornejo filed a

24   bankruptcy petition.

25            MR. VITIELLO:  Objection.  Mischaracterizing the

1    testimony.

2              THE COURT:  Overruled.  You may answer.

3              THE WITNESS:  It was a desperate call, yes.

4    BY MR. SHATZ:

5    Q.   If I can turn your attention to Exhibit 588, please.  Do

6    you recognize this document?

7    A.   Yes.

8    Q.   Looking at the fourth page of the document, is that your

9    signature?

10   A.   Yes, it is.

11   Q.   Looking at the first page, is this a declaration of you?

12   A.   Yes, it is.

13   Q.   Based on your personal knowledge?

14   A.   Yes, it is.

15   Q.   Filed in this court on July 29, 2016?

16   A.   Yes.

17   Q.   Page 2, please.  And you submitted the declaration in

18   opposition to a motion?

19   A.   I don't understand that.

20   Q.   Well, what does it say?  It says this declaration is

21   submitted in support of plaintiff's opposition.  You're a

22   plaintiff, right?

23   A.   Yes.

24   Q.   Okay.  And you were submitting it in support of your

25   opposition.

Cornejo, D. - Cross                          145

1    A.    Yes.

2    Q.    And you said the following facts are within your personal

3    knowledge and therefore you're competent to testify.

4    A.    Yes.

5    Q.    Page 4, please.  And we have here I declare under penalty

6    of perjury of the laws of the State of California that the

7    foregoing is true and correct to the best of my knowledge.  Do

8    you see that?

9    A.    Yes.

10   Q.    And we have, as you said, your signature.

11   A.    Yes.

12   Q.    Page 3, please.  Out of panic, I hired a bankruptcy

13   attorney who prepared some bankruptcy documents on our behalf.

14   A.    Yes.

15   Q.    Okay.  A few seconds ago, you told me that you didn't hire

16   a bankruptcy attorney.  My question is did you or didn't you?

17   A.    I gave permission to Ernie.  Ernie's the one that did it.

18   I never spoke to him.  I didn't have any contact with the

19   person.

20   Q.    When the package was sent in to Ocwen on April 28, the day

21   before the foreclosure sale --

22   A.    Can you rephrase that question because --

23   Q.    Absolutely.  Absolutely.  Absolutely.  Look at Joint

24   Exhibit 18.

25   A.    Which one?

1   Q.    Joint Exhibit 18.

2   A.    What book are you looking at?  What book are we looking

3   at?

4           MR. SHATZ:  May I approach?

5           THE COURT:  Yes.

6           THE WITNESS:  Okay.

7   BY MR. SHATZ:

8   Q.    At any time before or after this packet was sent to

9   Franklin and Associates -- sorry -- let me try it again.

10          At any time before -- that makes no sense.

11          At any time after Franklin and Associates sent this fax to

12  Ocwen -- look to the third page so we can see it -- do you see

13  that?

14  A.    The hardship letter, yes.

15  Q.    Yeah.  Look at the second page.

16  A.    Yes.

17  Q.    Do you see it?

18  A.    Yes.

19  Q.    Just try to get in your mind what this document is.

20  A.    Okay.

21  Q.    Okay?  At any time after this document was sent to Ocwen,

22  did you tell Ocwen I sent this document?

23  A.    I don't remember the conversation.

24  Q.    Okay.  Now at the time in 2015, you had a cellphone?

25  A.    Yes, I did.

1   Q.   And the phone number was 661-330-7713?
2   A.   Yes, it is.
3   Q.   And nobody else in your house used that phone.
4   A.   No.
5   Q.   And your primary method for communicating with Ocwen was
6   telephone.
7   A.   Yes.
8   Q.   Although sometimes you or someone on your behalf would
9   send a fax.
10  A.   Yes.
11  Q.   Okay.  Your husband's health, does that prevent him from
12  working?
13  A.   It prevents him because he works, but he's limited to
14  where he has to work.  He comes in early and he's there for
15  three or four hours before people are coming in to -- he just
16  has to be careful.
17  Q.   Now, in your trying not to get your husband's health --
18  excited or problems, you and Ernie didn't let your husband know
19  that you were trying to get a modification.
20  A.   Somewhat, but not -- you know, not to extent.
21  Q.   You didn't tell him you were filling out a modification
22  application.
23  A.   Yes, I did.
24  Q.   Oh, you did.
25  A.   Like I said, somewhat.

1  Q.   Okay.

2  A.   I can't recall the details, but because I'm trying to

3  prevent -- you're asking me a question that's so vague because

4  in certain situations, I would say one thing or another.  We're

5  talking a year and a half.  I can't remember the conversations.

6          MR. SHATZ:  Objection.  Nonresponsive.

7          THE COURT:  Sustained.

8          MR. SHATZ:  Move to strike.

9          THE COURT:  That'll be stricken.

10 BY MR. SHATZ:

11 Q.   Was Mr. Cornejo ever present when you and Mr. Cortez

12 called Ocwen?

13 A.   Yes.

14 Q.   At various times, I think you said you borrowed money from

15 either friends at church or the church; is that correct?

16 A.   In what situation?

17 Q.   Let's just say any situation.

18 A.   I had.

19 Q.   Did you ever borrow money from those folks to help bring

20 your mortgage current or make mortgage payments?

21 A.   Possibly.

22 Q.   Did you ever pay that money back?

23 A.   Yes.

24          MR. SHATZ:  May I have a moment, Your Honor?

25          THE COURT:  Yes.

Cornejo, D. - Redirect                                      149

1          (Pause.)

2              MR. SHATZ:  We have no more questions at this time.

3    Thank you.

4              THE COURT:  All right.  Mr. Vitiello, do you have

5    additional questions for Mrs. Cornejo?

6              MR. VITIELLO:  We do, Your Honor.

7              THE COURT:  All right.  Mr. Vitiello, I don't want to

8    interrupt you, so I just want to give you a little heads-up

9    that I do intend to finish at about 10 to 12:00, and so --

10             MR. VITIELLO:  I can beat that, Your Honor.

11             THE COURT:  Oh, all right then.  I just didn't want

12   to have to interrupt you.  I just wanted to give you a

13   heads-up.

14             MR. VITIELLO:  Thank you.

15                      REDIRECT EXAMINATION

16   BY MR. VITIELLO:

17   Q.   It is almost afternoon, Mrs. Cornejo.

18   A.   Good afternoon.

19   Q.   Do you know what escrow means?

20   A.   No.

21   Q.   Is there a binder behind you?  Do you know -- the packet

22   behind you.

23   A.   This?

24   Q.   Do you know what that is?

25   A.   No.

Cornejo, D. - Redirect                                    150

1    Q.    Do you remember having your deposition taken?
2    A.    I do.
3    Q.    Do you have any understanding of whether that is your
4    deposition?
5    A.    No.
6    Q.    Do you remember how long your deposition lasted?
7    A.    Eight hours.
8    Q.    Were you there for Frank's deposition?
9    A.    Yes, I was.
10   Q.    How long was that?
11   A.    It was that long or -- somewhat.
12   Q.    Is this Frank's deposition?
13   A.    I don't know.
14   Q.    You know how your bookkeeper keeps your books?
15   A.    I gave all my bills to them.  They do their -- they have
16   to do.
17   Q.    Can we go back to 587 -- Defendant's 587?  Do you have any
18   understanding of what this document is that we're looking at?
19   A.    No.
20   Q.    Can we go to 588-3?  This was a declaration that counsel
21   just went over.  I want to get the rest of this paragraph
22   because he didn't read the whole thing.  It says I have no
23   understanding of what was prepared or its legal effect.  It
24   refers to the bankruptcy documentation mentioned the sentence
25   before.

Cornejo, D. - Redirect                          151

1      Is it still true that you have no understanding of what
2  was prepared or its legal effect?
3  A.   Yes.
4  Q.   Are you a liar, Mrs. Cornejo?
5           MR. SHATZ:  Objection.  Argumentative.
6           THE WITNESS:  No.
7           MR. VITIELLO:  Thank you.  No further questions, Your
8  Honor.
9           THE COURT:  All right.  Anything else then?
10 Mr. Shatz.
11          MR. SHATZ:  Was there a ruling on my objection?  I
12 missed it.
13          THE COURT:  The objection's sustained.
14          MR. SHATZ:  Are you a liar, Mrs. Cornejo, and then I
15 objected.
16          THE COURT:  Right.  I said sustained.
17          MR. SHATZ:  Move to strike.
18          THE COURT:  That'll be stricken.  Any other
19 questions, Mr. Shatz?
20          MR. SHATZ:  None, Your Honor.  Thank you.
21          MR. VITIELLO:  Thank you, Your Honor.
22          THE COURT:  All right.  Well, we do have a few more
23 minutes.
24          MR. VITIELLO:  Your Honor, the plaintiffs will rest.
25          THE COURT:  Actually, you had some stipulations you

152

1    wanted to introduce before that, I assume?

2             MR. SHATZ:  Yes.  Thank you, Your Honor.

3             MR. VITIELLO:  Let's do that, Your Honor.  That might

4    be important.

5             MR. SHATZ:  Was this related to the documents?

6             THE COURT:  No.  You can step down now.

7        (Witness steps down.)

8             THE COURT:  It's the stipulations that counsel have.

9             MR. VITIELLO:  Your Honor, we also wanted to make

10   sure that the -- we had reached certain stipulations regarding

11   admission of evidence.  I want to make sure that all of those

12   were moved into evidence.

13            THE COURT:  Those have been.

14            MR. VITIELLO:  Thank you.

15            THE COURT:  All right.  So, ladies and gentlemen,

16   there are a number of facts to which the parties have agreed.

17   So these are facts that you do not need to determine.  In fact,

18   you must assume that they have been proved.

19            I will instruct you the parties have agreed to

20   certain facts to be placed into evidence as Joint Exhibit 22.

21   Again, you have -- the parties have agreed to certain facts to

22   be placed into evidence as Joint Exhibit 22, and you should

23   therefore treat these facts as having been proved.

24            I'm going to read those facts to you now.  In

25   addition, I'm going to have them displaced on the document

1    camera so that they are -- you can follow along.

2         This exhibit I am going to admit at this time and

3    they will be provided to you in the jury room when you begin

4    your deliberations.

5         (Joint Exhibit 22 received in evidence.)

6         THE COURT:  First, by February of 2013, Ocwen

7    acquired the contractual right and responsibility to service

8    the loan from GMAC Mortgage LLC.

9         Two:  Plaintiffs, defaulted under the loan in or

10   about June of 2013 and remained in continuous default through

11   April 29, 2015.

12        Three:  As a result of Plaintiffs' default on

13   September 11, 2013, Ocwen sent plaintiffs a demand letter

14   wherein it notified them that they were in default under the

15   loan.

16        Four:  On or about October 22, 2014, Western

17   Progressive caused a notice of default and election to sell

18   under the deed the trust -- notice of default, in parens as

19   well as in quotes, to be recorded against the property.

20        The notice of default was properly mailed to

21   plaintiffs.

22        Five:  Ocwen's records do not reflect receipt of

23   completed loan modification application from plaintiffs at any

24   point in time prior to April 16, 2015.

25        Six:  During a January 24, 2014, call between Dora

1    Cornejo and an Ocwen representative, (a) Mrs. Cornejo explained

2    to Ocwen that plaintiffs suffered a financial hardship caused

3    by a slowdown in their business; and (b) Ocwen agreed to

4    provide plaintiffs with a loan modification application.

5            Seven:  On February 20, 2015, an Ocwen representative

6    spoke with Dora Cornejo via telephone at which time the

7    representative informed Mrs. Cornejo that Ocwen had not

8    received any loan modification application from plaintiff.

9            Eight:  On or about February 23rd, 2015, Western

10   Progressive caused a notice of trustee sale, paren, quote,

11   notice of sale, end quote, end paren, to be recorded against

12   the property.  The notice of sale was properly mailed to

13   plaintiffs and posted on the property.

14           Nine:  The foreclosure sale of the property was

15   originally scheduled for March 27, 2015, and then postponed to

16   April 29th, 2015.  Western Progressive mailed a written notice

17   to plaintiffs advising them of this postponement.

18           Ten:  During a March 16, 2015, telephone conference

19   between Ocwen and Frank Cornejo, Mr. Cornejo was advised that

20   merely applying for a loan modification of a loan -- I'm

21   sorry -- applying for modification of the loan would not stop

22   the scheduled sale.

23           Eleven:  At the time plaintiffs' submitted their loan

24   modification application on April 16, 2015, paren, quote,

25   subject application, end quote, paren, (a) the property was

1    encumbered by the deed of trust, a lien in favor of the

2    Internal Revenue Service, a lien in favor of the California

3    Franchise Tax Board, and a judgment lien in favor of State Farm

4    Automobile Insurance Company; and (b) Frank Cornejo owned a

5    separate parcel of real property located at 1809 Potomac

6    Avenue, Bakersfield, California, referred to herein as the

7    Potomac property.

8         On April 16, 2015, loan modification application

9    submission included the standard profit and loss form requested

10   by Ocwen, although the statement year, start date, and end date

11   and the gross receipts, business income sections were left

12   blank.

13        Thirteen:  By April 17, 2015, Ocwen's records

14   reflected receipt from plaintiffs of a home affordable

15   modification program financial form, IRS Form 4506T and HOA

16   slash condo dues, Dodd Frank certification, hardship statement,

17   profit and loss statement.

18        Fourteen:  On April 21st, 2015, Ocwen reviewed the

19   subject application and determined that it was deficit as (i)

20   the profit and loss form was missing a start and end date; (ii)

21   it was not accompanied by tax forms, and (iii) it was not

22   accompanied by pay stubs to support the income identified in

23   Section 7 of the application.

24        Fifteen:  On April 22, 2015, Ocwen set foreclosure

25   instructions, and therefore was proceeding with foreclosure.

1     Sixteen:  Ocwen logs reflected that during an

2  April 27, 2015, call, Dora Cornejo raised a dispute with Ocwen

3  and contended that the profit and loss form and tax returns had

4  already been submitted, but defendants deny that Ocwen received

5  any supplemental documents in support of the subject

6  application before April 28, 2015.

7     Seventeen:  On April 28, 2015, Ocwen received a

8  22-page facsimile entitled here is supplemental submission from

9  plaintiffs containing (a) a letter of explanation, (b) a

10 hardship letter, and (c) a profit and loss statement, and (d) a

11 copy of plaintiffs' 2013 tax returns.

12     Eighteen:  On April 28, 2015, Ocwen employee Tabassum

13 Asgar sent an internal email, marked high importance,

14 identifying that the requested loan modification application

15 documents had been received.

16     Nineteen:  On April 28, 2015, Ocwen employee Tabassum

17 Asgar sent an email, marked high importance, to Ocwen's

18 foreclosure coordinator, Stephanie Wenner, entitled 965 request

19 to postponed CSD for 04/29/2015, which identifies loan

20 modification as under review.

21     Twenty:  Prior to that, recording of the notice of

22 default, notice of sale, and conducting the foreclosure sale,

23 Western Progressive sent an email to an email box designated by

24 Ocwen asking whether the loan was in consideration for loss

25 mitigation or other foreclosure alternatives.

157

1          Each time Ocwen responded by email and informed
2  Western Progressive that there was no active loss mitigation.
3          Twenty-one:  Western Progressive does not have access
4  to Ocwen's loss mitigation files and therefore relies on Ocwen
5  to determine whether any step in the foreclosure process must
6  be placed on hold due to a loss mitigation review.
7          Twenty-two:  On April 29, 2013, an Ocwen
8  representative spoke with Dora Cornejo at which time
9  Mrs. Cornejo advised Ocwen that Frank Cornejo filed for
10  bankruptcy.
11          Twenty-three:  On April 29, 2015, Ocwen received a
12  notice of filing report of no distribution via facsimile which
13  purported to reflect that Frank Cornejo was a debtor in a
14  bankruptcy case pending in the U.S. Bankruptcy Court for the
15  Eastern District of California.
16          Twenty-four:  On April 29, 2015, the property was
17  sold at public auction entitled the foreclosure sale here,
18  pursuant to the power of subrevisions under the deed of trust.
19          Twenty-five:  At the foreclosure sale, the property
20  was purchased by a third party, Kai Czak for $140,200.
21          Twenty-six:  At the time of the foreclosure sale, the
22  fair market value of the property was $167,500.
23          Twenty-seven:  At the time of the foreclosure sale,
24  there were four liens recorded against the property.  The
25  holder of each lien and the amount of the debt on the date of

158

the foreclosure sale were as follows:

(a) a first position lien evidenced by a deed of
trust which is serviced by Ocwen and had an outstanding balance
of the amount of $80,615.89; (b) a lien recorded by the
Internal Revenue Service in the amount of $39,044.39; (c) a
lien recorded by State Farm Mutual Automobile Insurance Company
in the amount of $12,352.48; (d) a lien recorded by the
California Franchise Tax Board in the amount of $36,062.74.

Twenty-eight:  On April 30, 2015, Ocwen employee
Ashlee McLane internally emailed and provided authority to
cancel the foreclosure sale, but it was too late as the sale
had already completed.

Twenty-nine:  Title to the property was conveyed to
Kai Czak through a trustee's deed upon sale that was recorded
on May 7th, 2015.

Thirty:  Plaintiffs were not debtors in a bankruptcy
case at the time of the foreclosure sale of the property.

Thirty-one:  None of the letters that Ocwen sent to
plaintiffs in connection with the submitted application were
returned as undeliverable.

Thirty-two:  Ocwen never denied plaintiffs' loan
modification application.

Thirty-three:  Ocwen can deny a loan modification
application on the basis that the application is incomplete,
terminating a review.

159

1        Thirty-four:  Ocwen can deny a loan modification
2   application on the basis that the application is untimely,
3   terminating a review.
4        Thirty-five:  Ocwen records reflect that foreclosure
5   coordinator Stephanie Wenner never responded to internal Ocwen
6   emails requesting to postpone the sale.
7        Thirty-six:  Ocwen continued to review plaintiffs'
8   loan modification application candidacy from April 16, 2015,
9   through May 13, 2015.
10       Thirty-seven:  As of May 1st, 2015, Ocwen's records
11  reflect that it had received all the requested documents and
12  information in connection with the subject application by April
13  28th, 2015.
14       Thirty-eight:  Ocwen had neither approved nor denied
15  plaintiffs' loan modification application at the time the
16  property was sold at auction.
17       Thirty-nine:  On May 1st, 2015, Ocwen advised the
18  foreclosure trustee that the loan was not involved in loss
19  mitigation and authorized post-foreclosure procedures despite
20  the fact that the account was still being reviewed for
21  modification.
22       Forty:  On or about May 14, 2015, Ocwen sent
23  plaintiffs a letter congratulating them on qualifying for and
24  obtaining a loan modification and representing that the new
25  loan would commence on June 1st, 2015, as long as plaintiff's

1   returned the signed documentation and initial payment of

2   $817.29.

3          Forty-one:  Within 14 days of the offer, plaintiffs

4   signed and returned the first lien loan modification agreement

5   to Ocwen together with the payment in the amount of $817.29,

6   thereby accepting the offer.

7          Forty-two.  The loan modification for which the

8   plaintiffs qualified provided objectively more favorable loan

9   terms given the borrower's financial hardship.

10          Forty-three.  On or about May 6, 2015, plaintiffs

11   received for eviction by the new owner of the property in the

12   unlawful detainer case, Kai Czak, Inc., versus Frank Cornejo,

13   et al, Case No. S-1500-cl-29163.

14          Forty-four.  In the unlawful detainer case, Kai Czak

15   sought monetary damages from plaintiff for the reasonable

16   rental value of the property.

17          Forty-five.  Plaintiffs were evicted from the

18   property by the new owner in August of 2015.

19          Forty-six.  The new owners of the property obtained a

20   judgment against plaintiffs for $5,607.31 which represents the

21   reasonable rental value of the property during plaintiffs'

22   post-foreclosure occupancy of the premises.

23          Forty-seven.  Plaintiffs entered into an agreement

24   with Kai Czak to settle the judgment for $5,161.

25          Forty-eight.  Plaintiffs would have materially

1    benefitted from the loan modification if it was received before

2    the foreclosure was completed because they would have kept a

3    home.

4            All right.  At this time, plaintiffs rest?

5            MR. VITIELLO:  Yes, Your Honor.

6            THE COURT:  All right.  And any further evidence from

7    the defendants?

8            MR. SHATZ:  Yes, Your Honor.

9            THE COURT:  All right.  We're going to take that up

10   then after lunch.  Ladies and gentlemen, I'm going to ask that

11   you come back at 2:00 o'clock, a little longer today so that we

12   don't hold you in the jury deliberation room while we're doing

13   some work.  You're welcome to come back earlier, if that's your

14   choice, but don't count on us calling you before 2:00.  Okay.

15   Thank you.

16       (Jury out at 11:55 a.m.)

17           THE COURT:  All right.  So we are outside the

18   presence of the jury.  I do have a 12:00 o'clock matter I need

19   to attend to, so I can't talk with you at this time.  I'm going

20   to ask that you come back -- can you be back by 12:45?  Is that

21   enough time to grab something?

22           MR. HEENAN:  Yes, Your Honor.

23           THE COURT:  The young folks say yes.

24           MR. ANGWIN:  We'll be back -- whenever you say to,

25   we'll be back.

1          THE COURT:  And even though this is absolutely

2     against my policies, if you grab something, you can come back

3     and eat while we work, if that would make it easier.

4          MR. HEENAN:  We don't want to --

5          MR. SHATZ:  Can we just use those rooms or is it not

6     in the courthouse at all is your policy?  We're going to

7     respect that.  I just need to know what it is.

8          THE COURT:  You can eat in the hallway if you wanted.

9          MR. SHATZ:  That's fine.

10         THE COURT:  Or, yeah, I'll let you have those

11    conference rooms if you want.  My thought, though, is not that

12    I want to give you a place to eat, I want you to be here so

13    that we can work and if you want to eat while we're doing that

14    is my thought.

15         MR. SHATZ:  Your Honor, we understand.

16         THE COURT:  Okay.  All right.  So I'll see you back

17    then.

18         COUNSEL:  Thank you, Your Honor.

19       (Luncheon recess from 11:56 p.m. to 1:14 p.m.)

20         THE COURT:  All right.  So we're back on the record.

21    I've given you --

22         MR. SHATZ:  May I ask one question?

23         THE COURT:  Yes.

24         MR. SHATZ:  You mentioned you had to leave, so we

25    didn't do anything at the close of their case.  We would like

1    to make the Rule 50 motion.  I just want to tell you that and

2    we'll do it at your convenience.

3            THE COURT:  We could do that after talk about jury

4    instructions or we can do it now.  I don't care either way.

5            MR. ANGWIN:  It might actually affect the jury

6    instructions, Your Honor --

7            THE COURT:  All right.  Let's go ahead and --

8            MR. ANGWIN:  -- at least one of the ones we're going

9    to ask about.

10           THE COURT:  Who has the Rule 50 motion, the defense?

11           MR. SHATZ:  Defense does.

12           THE COURT:  Yes.

13           MR. ANGWIN:  We'll have one as well, Your Honor.

14           THE COURT:  The defense has not rested.

15           MR. ANGWIN:  I thought under Rule 50, at any time in

16   the trial, you could move if you thought that there was no way

17   that there would be any question about a fact.

18           THE COURT:  The rule says that at any time when the

19   party has fully been heard.  The defense has additional

20   evidence.

21           MR. ANGWIN:  You're correct, Your Honor.  I forgot

22   Mr. Cornejo's deposition.

23           THE COURT:  All right.  Mr. --

24           MR. SHATZ:  Shatz.

25           THE COURT:  Yes, I know.  I just needed to get paper

164

1    before I actually asked you to start speaking.  Go ahead now.

2            MR. SHATZ:  We wish to move for judgment overall on

3    the grounds that under 2923.6, the application was not either

4    complete as defined in the statute as of the time of the

5    foreclosure sale or complete as defined in the instructions

6    with all of the information provided as required by Ocwen and

7    that the information submitted was not timely within the time

8    required by Ocwen so it could evaluate the information and

9    determine if it was all present.

10           If the Court determines that that was the case, then

11   we wish to move on that portion that the actions by Ocwen were

12   not willful, reckless, or intentional in that that phase should

13   be dismissed from the case.

14           THE COURT:  Anything else on topic?

15           MR. SHATZ:  That's it, Your Honor.

16           THE COURT:  Plaintiffs' opposition?

17           MR. ANGWIN:  Your Honor, with regard to the

18   instructions from Ocwen, I'm not sure how Ocwen's instructions

19   with regard to what's complete in any way affect the statutory

20   question.  Whatever Ocwen thinks it's complete isn't the issue

21   here.  The issue is 2923.6.

22           So that extent, we think that's -- if you want me to

23   address that, I will, but I just don't think that's an issue

24   that can be ruled on under Rule 50.

25           THE COURT:  Any further argument?

1        MR. ANGWIN:  Of course.  Your Honor, with regard to

2   the completeness, I actually think the undisputed testimony is

3   that the documents requested by Ocwen had been submitted at the

4   time of the sale.  I believe that through Mr. Blanchard's

5   testimony it was clear that no document came in after the 28th.

6        It doesn't matter whether Ocwen actually -- the

7   statute doesn't require that Ocwen approve it or Ocwen even

8   say, you know, hey, we're about to approve it.  The statute

9   says you must submit all the documents requested.  Then you go

10  the time when it is.

11       So we think that they have certainly -- we have

12  certainly shown and there's at least a factual question that a

13  jury could have a legal basis -- a legally sufficient basis to

14  find that all of the documents had been supplied.

15       THE COURT:  You're taking the position that sounds

16  like that sending a document in blank with a signature would be

17  sufficient.

18       MR. ANGWIN:  I'm not, Your Honor.

19       THE COURT:  Okay.

20       MR. ANGWIN:  I'm taking the position that when Ocwen

21  gets documents -- and of course, you know, the statute as we

22  have to admit is -- I think what they meant to do in the

23  statute is to say you can't send in serial incomplete

24  applications.

25       But once you send in everything, then you've done

1    your part, borrower.  The party you've sent it to can't rest on

2    the fact that we didn't review it fast enough to avoid

3    liability.  So in our position, the Cornejos had an

4    obligation, send in everything Ocwen requests, which they did,

5    either -- you can call it 16th, the 28th.  At least by the

6    28th, that had all been sent in.  I think that's undisputed.

7         Now, I don't think that sending in an application

8    with just something written on it -- that would -- you know,

9    that gets back to the decision tree.  IF that was an incomplete

10   application, then Ocwen would have acted appropriately.

11        Ocwen never said it was incomplete.  Ocwen approved

12   it.  So almost by definition they had all the documents that

13   they had requested.

14        I think the time frame of course is a factual

15   question, which I'll address next, but would you like to

16   discuss more about the document part?

17        THE COURT:  Whatever argument you have in opposition,

18   I'm happy to hear.

19        MR. ANGWIN:  All right.  Moving onto timelines, Your

20   Honor.  Our position is that the midnight deadline is at best

21   ambiguous.  We think the jury will understand that midnight

22   means midnight, but I think that's a fact question for the

23   jury.

24        The standard under Rule 50, as you know, is extremely

25   high.  The question is whether a jury -- a reasonable jury

1    could have any legally sufficient basis and I think that as to

2    both counts, with regard to the -- I'll call it completeness on

3    this admission for document part as well as the timeliness,

4    there are significant factual questions.

5        Our position is -- it's just this.  If the prior

6    business day is the 28th and midnight means the end of the

7    28th, I think the evidence is undisputed the documents were in.

8    They can argue whatever they want to argue, but that is before

9    the jury and I think it's reasonable.

10       The testimony from Mr. Blanchard was we had requested

11   three things after the 16th.  We requested pay stubs or an

12   explanation letter, which they got.  We requested the tax

13   returns, which we got, and we requested a profit and loss,

14   which we got.

15       None of those were deemed to be insufficient.  In

16   fact, all those documents were later deemed to be sufficient.

17   What Ocwen's doing is it's conflating its definition of

18   complete with the statutory definition of complete and somehow

19   sort of trying to amalgam that into meaning it wasn't complete.

20       And then I think what truly happened now is they've

21   seen they have all the documents, they approved it, so now

22   they're doing what I referred to as post-claims underwriting.

23   They're coming back in trying to find a reason we would have

24   denied it if we had denied it.

25       But again, that's a factual question.  First of all,

1   they've never denied it.  That's a stipulated fact.  So it's

2   hard for me to understand how they can say we approved them, we

3   never denied the modification, we never asked for additional

4   documents, but you didn't send us everything we asked for.

5           THE COURT:  Okay.  Mr. Shatz, any --

6           MR. SHATZ:  Yes, Your Honor.  Plaintiffs are picking

7   and choosing statutory snippets without realizing the statute's

8   to be read as a whole.  So the legislature didn't have an

9   extremely long 2923.6(g) that lists everything that's going on.

10  It has 2923.6(g), 2924.10(a), and other portions.

11          One of the things that happened on April 29 is there

12  was a foreclosure sale, and on May 5, the trustee's deed was

13  issued and on May 7, the trustee's deed was recorded.  And the

14  loan was then paid off.  It was finished, and at that point in

15  time, Mr. and Mrs. Cornejo were no longer borrowers and this

16  statutory scheme no longer applied to them, and therefore, no

17  denial letter was required under the code.

18          We didn't get that far because we didn't need it in

19  this case.  That wasn't the issue.  If we have to brief that,

20  we can brief it.  So the homeowner bill of rights after May 7

21  or after May 5, once the Cornejos are no longer borrowers, the

22  loan is paid off, is not an issue.

23          And completeness is defined not as receipt of the

24  documents.  It's defined as receipt of -- I want to read the

25  right thing here.  It's defined as the borrower supplies the

1    mortgage servicer with all documents required by the mortgage

2    servicer and the mortgage servicer is given in the statute five

3    business days to determine if that's the documents they want.

4              Hence, the various schemes that are set up.  In

5    California, because the lender, Ocwen, has more time to change

6    and postpone sales, it gives the borrowers the benefit and says

7    look we can do this if you give us a whole business day to look

8    at it.  We'll have a chance to look at it and that's where the

9    completeness argument comes in in this case.

10             We have evidence of Ocwen's procedures undisputed.

11   We have evidence of an incomplete package on April 16.  We have

12   evidence -- it's not even filled out.  We have evidence on the

13   28th that a fax came in and given Ocwen's procedures, it takes

14   time for that to get to the right people to evaluate and

15   therefore, our timing is not only reasonable, it makes sense

16   given our practices.

17             It's better than the national practice.  It's better

18   than the state practice and it didn't happen by the foreclosure

19   date.  The borrowers were told at several points that if you

20   don't get it on time, we can't guarantee that things will

21   happen.  You have to get it to us in time.

22             That didn't happen here.  There is no evidentiary

23   dispute on that issue.

24             THE COURT:  All right.  Under the Rule 50 standards,

25   I am going to consider the arguments of counsel as well as the

170

1    evidence presented thus far and I'll take that motion under

2    submission.

3           As to the other issues we need to deal with now --

4    and that is jury instructions -- I've given you another set,

5    deleted out those that I think should not any more be included,

6    although I was -- well, on Instruction 2, I'm not sure about

7    the need for Instruction 2.

8           MR. PAINO:  Yeah, we talked about this, Your Honor.

9    I don't -- there hasn't really been any showing whatsoever

10   regarding U.S. Bank's culpability in any of this.  While we've

11   acknowledged the agency relationship, our position that does

12   not give rise to separate liability -- or statutory liability

13   for U.S. Bank.

14          MR. ANGWIN:  Your Honor, to be clear, we're only --

15          THE COURT:  The liability is joint and several,

16   right?

17          MR. PAINO:  My reading of the statute is use of the

18   disjunctive or.  If the jury finds the beneficiary, the

19   servicer, and the trustee -- it uses the term or.  If one of

20   those three commits a violation, then the jury may find --

21   shall find them liable.

22          My reading would be limited to the one that actually

23   commits the violation.

24          THE COURT:  But the whole point to agency

25   relationship is that there is liability if your agent acts

1    improperly, right?

2           MR. PAINO:  Generally speaking, yes.

3           THE COURT:  As to Instruction 2 then, do you want

4    that instruction or no?  I don't really think we need it.

5           MR. ANGWIN:  Your Honor, the plaintiffs don't feel

6    that we need it and since we only have one line for damages on

7    the -- I think the main concern from defense counsel's

8    discussions with this previously was they did not want two

9    lines, one for U.S. Bank and one for Ocwen and we have not

10   requested that and the verdict form does not have that.  So --

11          THE COURT:  Right.

12          MR. ANGWIN:  I thought that allayed their fears.

13          MR. PAINO:  It's not worth making a big issue out of

14   it, Your Honor.  I'm comfortable I guess if you want to remove

15   this.

16          THE COURT:  All right.  I took out the evidence

17   related to credibility on conviction of a crime and testifying

18   falsely under oath previously because I didn't see that we

19   had -- first, I think clearly we have nobody who's been

20   convicted of a felony.  Secondly, I'm not sure that we're

21   seeing that there's evidence to impugn Mrs. Cornejo at this

22   point based upon prior statements.  It's up to you, though.

23          I mean we still have the credibility instruction in

24   here which does require the evaluation of the credibility of

25   the witness, but it did not seem to me that necessarily that

1    other instruction should be given.

2         MR. SHATZ:  Are you referring to former

3    Instruction 9, Your Honor, impeachment evidence, witness --

4         THE COURT:  Yes.

5         MR. SHATZ:  -- evidence?  Yeah, we want that one.

6         THE COURT:  And what is the evidentiary showing that

7    would support it?

8         MR. SHATZ:  We have a declaration that says one

9    thing.  We have testimony under oath today that says the

10   opposite.  For example, we have false statements in a loan

11   application signed under penalty of perjury.

12        If the Court was asking about evidence of a crime, I

13   have nothing.  That's not what we're doing.  Okay.  It's just

14   lying under oath.  The evidence of Ms. Cornejo, whether it's

15   intentional or unintentional, she has signed documents under

16   penalty of perjury, both a declaration filed in this court and

17   declarations provided to the mortgage servicer, and she

18   testified under oath in this court all differently.

19        THE COURT:  Comments from counsel for plaintiff?

20        MR. ANGWIN:  Your Honor, with regard -- I think

21   they're looking at two things.  One, with regard to the

22   declaration she filed, I don't think she testified

23   inconsistently.  I mean he's trying to do a nuance on who hired

24   the bankruptcy attorney and she said clearly in her declaration

25   she knows one was hired --

1          THE COURT:  Her declaration doesn't say I know one

2    was hired.  It said I hired.

3          MR. ANGWIN:  But she says she didn't know anything

4    about anything else, and then here she said I talked to Ernie

5    and he hired him.  I'm just not sure they reached the

6    threshold.  I know what they're trying to do.

7          THE COURT:  Let's say you're right on that.  What

8    about the statements made in the application under oath?

9          MR. ANGWIN:  I don't -- referring to the fact where

10   she thought her advertising was 2,000, but it might have been

11   900?

12         THE COURT:  No.

13         MR. ANGWIN:  I'm just not sure -- I mean if he can

14   give me a specific example of something he thinks was actually

15   a contradiction that's enough to rise to the level of fraud,

16   this jury --

17         THE COURT:  It doesn't have to rise to the level of

18   fraud.  It's just simply giving --

19         MR. ANGWIN:  I'm sorry, lied under oath.

20         THE COURT:  -- false testimony under oath.

21         MR. ANGWIN:  If he can just give me, I'm just --

22   because I didn't hear any.

23         THE COURT:  Mr. Shatz, what are you relying upon --

24         MR. ANGWIN:  I apologize.  I didn't hear any.

25         THE COURT:  -- for that?

174

1          MR. SHATZ:  You were out of the room?  The

2   application that was submitted --

3          MR. ANGWIN:  I heard everything.  I didn't hear any.

4          MR. SHATZ:  -- contained information that wasn't true

5   and she said so.

6          THE COURT:  She did say so.  In particular --

7          MR. ANGWIN:  About her phone numbers?

8          THE COURT:  -- she said -- yeah, telephone numbers

9   are incorrect.  The handwriting is Cortez's.  She didn't list

10  the restaurant property, filled in the monthly expenses -- but

11  that's not really a -- that's not a statement under oath.  It's

12  just blank.  She signed her husband's name she claims with his

13  permission.

14          Mr. Shatz, what in particular stands out to you that

15  was not an omission but was an active misstatement?

16          MR. SHATZ:  I'm just grabbing my documents, Your

17  Honor.  For example, in the application, Joint Exhibit 17, we

18  have the household assets, checking account, savings account,

19  and then cash on hand.

20          THE COURT:  Right.

21          MR. SHATZ:  Unknown if it's accurate.  We have the --

22          THE COURT:  Wait, wait, wait.  Let's stop there.

23          MR. SHATZ:  -- page 5.

24          THE COURT:  She says in the application there was

25  $13,000, as you've indicated, savings, checking, cash on hand.

1    Where has been a showing that she didn't have that money?

2            MR. SHATZ:  No showing.

3            THE COURT:  Okay.

4            MR. SHATZ:  We have the income on page 6.  We have

5    2,000 and 1,500 on the top, 2,500 and 1,500 on the bottom.

6    That may be inconsistent, but we have a different income level

7    shown in Exhibit 18 that was submitted and then we have a

8    different income level submitted to the unlawful detainer court

9    in order to get a fee waiver.

10           MR. ANGWIN:  And can you clarify the time frame on

11   those?

12           THE COURT:  One second.  That document wasn't signed

13   and that was a statement -- it was with Frank Cornejo's name on

14   it.

15           MR. SHATZ:  I wasn't looking at the document where he

16   certified, et cetera, but in order for the Court to grant the

17   order, it has to be filed and signed.  Because it's a

18   confidential document, I can't get it.

19           The standard in the unlawful detainer court to get a

20   fee waiver, you have to earn income less than X.

21           THE COURT:  All right.  So you're asking to impeach

22   Mr. Cornejo, not Mrs. Cornejo, with that.  Mrs. Cornejo,

23   there's no representation whatsoever that she signed or even

24   proffered a fee waiver, is there?

25           MR. SHATZ:  Oh, she -- there's even an order --

1          THE COURT:  There's an order that waived the fee.

2     It's referencing Frank Cornejo that --

3          MR. SHATZ:  I also have an order where -- or her --

4     we also have the order where she got the fee waiver.

5          THE COURT:  I haven't seen that.  Where is that?

6          MR. ANGWIN:  And, Your Honor, if I may, even if he

7     proves that, with the restaurant business -- her situation

8     varies by week, so when he's saying in August or whenever that

9     was she made a different --

10         THE COURT:  Have you seen this document?  I don't

11    want you to say something that maybe you'll be sorry about

12    later because those documents just don't usually say what did

13    you earn this week.  It usually requests your monthly income

14         MR. ANGWIN:  It can vary month to month,

15    significantly.  Thank you, Your Honor.

16         MR. SHATZ:  You have the Frank exhibits there on your

17    floor?

18         THE COURT:  I do if you tell me the number.

19         MR. SHATZ:  I will do that.  In this one,

20    Exhibit 24 -- now I have to hunt because I packed my notes.

21         THE COURT:  I'm sorry.  You said 524?

22         MR. SHATZ:  No.  Exhibit 24 in the Frank deposition

23    exhibits.

24         THE COURT:  Oh.

25         MR. SHATZ:  That's that blue thingy that was

1    originally to the right of your floor.

2         THE COURT:  Right.  What's in evidence, though?

3         MR. SHATZ:  Oh, there's nothing in evidence.

4         THE COURT:  What is -- what you had her attest to was

5    that she had a fee waiver despite the showing that she had

6    income less than what she was representing here.

7         MR. SHATZ:  She had a fee waiver which requires

8    income less than she's representing here.

9         THE COURT:  I know the state court procedures on that

10   topic, but what you don't have is the statement under oath from

11   Mrs. Cornejo, that I saw, in evidence.  At most what you showed

12   me was a document that Mr. Cornejo may or may not have

13   submitted signed.  I also know procedures in state court that

14   it's very -- I can't say it happens every day, but it is not

15   uncommon to submit it unsigned and have it granted.

16        MR. SHATZ:  Oh, and I can't access it because it's a

17   confidential document.

18        THE COURT:  You didn't obtain it from the unlawful

19   detainer attorney?

20        MR. SHATZ:  He doesn't get them either.

21        THE COURT:  She.

22        MR. SHATZ:  Whoever the unlawful detainer attorney --

23   I was thinking of --

24        THE COURT:  She would have prepared it, had it

25   signed, and submitted it.

178

1        MR. SHATZ:  Oh, oh, sorry, sorry.  You're thinking of
2   the Cornejos' attorney.
3        THE COURT:  No.  I'm thinking about Mrs. McCormick
4   who represented the --
5        MR. SHATZ:  Kai Czak.
6        THE COURT:  Yeah.
7        MR. SHATZ:  He wouldn't get -- she wouldn't get a
8   copy of it.
9        THE COURT:  Right, right, right.  You're right.  I
10  mean -- you're right, the plaintiff's attorney.
11       MR. SHATZ:  Right.  Plaintiff's attorney wouldn't
12  have it.  It's the defense attorney who would have it.  The
13  unlawful detainer defendant --
14       THE COURT:  We're talking across purposes.
15       MR. SHATZ:  -- is the borrower.
16       THE COURT:  This plaintiff's attorney in the unlawful
17  detainer would have had it, right?
18       MR. SHATZ:  No.  The plaintiff's attorney in the
19  unlawful detainer is the person who owns the property --
20       THE COURT:  Mrs. Cornejo is the plaintiff here.
21       MR. SHATZ:  Yes.
22       THE COURT:  Did you inquire of Mrs. Cornejo's
23  attorney who represented her and the defendant in the unlawful
24  detainer action?
25       MR. SHATZ:  No.

179

1          THE COURT:  Okay.  So that doesn't do it for me

2    because I don't know for a fact that it was signed.  I know for

3    a fact that the state court granted it.

4          MR. SHATZ:  Yes.  And I can't tell you that it was

5    signed.

6          THE COURT:  Okay.  So back on Mrs. Cornejo,

7    statements under oath that -- I do see I'm looking at JT17-6 at

8    the top.  They list Frank Cornejo's income as 2,000.  The

9    bottom number appears to be -- I'm not sure -- 2,500 --

10   something 500.  Maybe 3,500.

11         MR. SHATZ:  I'm happy to go 2,500.

12         THE COURT:  And you're attributing that then it would

13   be to Mrs. Cornejo because she's the signatory for both?

14         MR. SHATZ:  If you look then -- well, yes.

15         THE COURT:  Okay.

16         MR. SHATZ:  And if you look at, for example, JT18.

17         THE COURT:  Okay.

18         MR. SHATZ:  This matches as the -- JT18-4 showing the

19   three-month profit or loss --

20         THE COURT:  Right.

21         MR. SHATZ:  -- of approximately 3,500 a month.  The

22   math works out.  Yet when you get to the --

23         THE COURT:  3,500 per month, where are you seeing

24   that?

25         MR. SHATZ:  What we're looking at is net profit/loss

180

1    of 10,727.

2              THE COURT:  I see what you're saying.

3              MR. SHATZ:  That's for three months.

4              THE COURT:  Okay.

5              MR. SHATZ:  If you -- the Form 18-4 doesn't match the

6    17-6.  So on 18-4, for example, that was now submitted under

7    the penalty of perjury as part of the whole RMA, you can see

8    advertising 895 for three months.

9              THE COURT:  Right.

10             MR. SHATZ:  And Ms. Cornejo on 17-8 has it down as

11   2,000.

12             THE COURT:  All right.

13             MR. SHATZ:  You can have insurance under 18-4.

14             THE COURT:  I've looked at those numbers.  Was there

15   any other part of the application that you felt was --

16             MR. SHATZ:  Looking at 17-9.

17             THE COURT:  Okay.

18             MR. SHATZ:  The 4506 TEZ.

19             THE COURT:  Okay.

20             MR. SHATZ:  From Ocwen's perspective, it's signed by

21   Frank.  It's not.

22             THE COURT:  Right.

23             MR. SHATZ:  Looking at 17-10.  I'm assuming this

24   one's an oversight -- hardship statement.  Has the hardship

25   been resolved?  Yes.

181

1      THE COURT:  Right.

2      MR. SHATZ:  That leads to a different underwriting

3  decision than if the hardship's still persisting.

4      THE COURT:  All right.  Let me tell you, Mr. Angwin,

5  what bothers me about the application, you have a signature at

6  the bottom -- especially because I have read the excerpt of

7  Mr. Cornejo's statement where he seems to indicate he does give

8  her permission --

9      MR. ANGWIN:  I think it -- we have counter

10  designations if that's necessary.

11      THE COURT:  In any event -- with her permission, in

12  any event, she's representing to Ocwen that Frank is

13  representing that he's providing this under penalty of perjury.

14  That didn't occur.  Frank did not do that without doubt.

15      When I look at the expenses, yeah, the numbers

16  completely don't make sense when you look at what the

17  accountant or the bookkeeper provided.  Not only are the

18  numbers not the same, in some circumstances, she actually

19  provides a lower number than in the Franklin and Associates

20  document, but clearly overall, she -- it's a much lower number,

21  but that to me isn't that significant.

22      The bigger issue is I think the signatures.

23      MR. ANGWIN:  Your Honor, we would ask then if you're

24  considering doing that, that counsel be limited when he talks

25  about this area to say that the allegation that she lied under

182

1  oath is because she signed her husband's name.  I don't want

2  him to have a broad-based -- he just can't take that and go

3  on --

4         THE COURT:  He's going -- let me be frank.  He's

5  going to get up there and he's going to call her a liar.

6         MR. ANGWIN:  Right.  But when he calls her liar --

7         THE COURT:  Credibility entirely is at issue.  All of

8  the factors of credibility are at issue.  This is just one

9  instruction.  I'm not in any way suggesting that Instruction

10  No. 8 should come out.  That's needs to be there, so -- this is

11  in addition to No. 8.  I'll include No. 9 back --

12         MR. ANGWIN:  And, Your Honor, just so I'm clear, the

13  issue of -- they relate solely to her signing her husband's

14  name with permission or whether it's --

15         THE COURT:  No.  That's what I find most persuasive

16  to support that instruction.  If there's something that counsel

17  has, they can argue that as well.

18         MR. SHATZ:  We had asked that prior 9 be put back in.

19         THE COURT:  Yeah.  That's going to happen.

20         MR. ANGWIN:  But not convicted of a crime?

21         MR. SHATZ:  I don't need the convicted of a crime.

22         THE COURT:  No, that's not going to be there, so

23  yeah.  So as to -- I made the correction requested on No. --

24  I've added the substantial factor causation instruction,

25  deleted off the burden on the reasonableness of the time frame,

183

1    made the correction to damages.

2          MR. ANGWIN:  I'm sorry, Your Honor.  Which

3    instruction number?

4          THE COURT:  Damages was 15.

5          MR. ANGWIN:  Your Honor, can we go back to the

6    materiality issue?

7          THE COURT:  All right.

8          MR. ANGWIN:  I thought we stipulated that -- to

9    taking out the language material.  I think that was the last

10   stipulation.

11         THE COURT:  I'm sorry, what?  Is there a stipulation

12   that there was a material violation?  I find that hard to

13   believe.

14         MR. ANGWIN:  No, no.  I just think that there's a

15   stipulation that if they cured, it is material.  I don't think

16   materiality is a question anymore.  Am I wrong on that?  Yeah.

17   And -- 48 is that if they -- if the sale of the property had

18   occurred while a complete application was pending, it

19   materially affected them.

20         THE COURT:  I need to look it up.

21         MR. ANGWIN:  All right.  Maybe I'm confused, Your

22   Honor, again.

23         THE COURT:  Oh, no.  I think you're right.  I think,

24   though, that's not what they're saying.  They're not agreeing

25   that that occurred.  They're taking a position that it wasn't

184

1    complete or timely, but that if it was complete and timely and

2    a foreclosure sale -- or maybe I'm wrong on that.

3              MR. ANGWIN:  Your Honor, I think if we prove our

4    case, we, by definition, have proved materiality.  That's why I

5    think it might be confusing to the jury to have an extra step

6    of materiality because if we prove that they violated --

7              THE COURT:  Well, you said that as if you proved your

8    case, then you've proven material -- part of your case is

9    material.  They need to be instructed on what that means unless

10   the plaintiffs are -- I mean the defendants are giving up, but

11   I just didn't see it that way.

12             MR. ANGWIN:  Maybe I misunderstood Stipulation 48.  I

13   thought the original material instruction's there because we

14   had the 2924.10 claim where the five-day letter would have had

15   to have been material.

16             THE COURT:  48 is plaintiffs would have materially

17   benefitted from the loan modification if it was received before

18   the foreclosure was completed because they would have kept

19   their home.  I'm not seeing that as the same, but maybe the

20   parties intended that to be the same.

21             Mr. Paino, did you intend that to be the same?

22             MR. PAINO:  I don't think we intended to concede that

23   element.  I think it was our intention that the jury still be

24   instructed on that.

25             MR. ANGWIN:  All right.  Maybe I misunderstood, Your

1    Honor.

2          THE COURT:  All right.  So what else on instructions?

3          MR. SHATZ:  One moment, Your Honor.

4          MR. ANGWIN:  Your Honor, in the second paragraph of

5    the damages, the fourth line down says economic damages refers

6    to out-of-pocket losses.

7          THE COURT:  Oh, gosh.  I gave you the wrong copy.

8    Yeah.  I made that change.

9          MR. ANGWIN:  And we might have the wrong -- and since

10   we have so many copies here, Your Honor, maybe I picked up the

11   wrong one.

12         THE COURT:  No.  You have it.  I've given you the

13   wrong copy on that.

14      (Pause.)

15         MR. SHATZ:  When you're ready, Your Honor, I have a

16   question.

17         THE COURT:  Okay.  Go ahead.

18         MR. SHATZ:  Instruction No. 11.

19         THE COURT:  Okay.  Yep.

20         MR. SHATZ:  I'm not sure why we have the second

21   sentence there.

22         THE COURT:  That's the case authority.

23         MR. SHATZ:  That's case authority?

24         THE COURT:  Um-hmm.

25         MR. ANGWIN:  And, Your Honor, I think it's necessary

1    because otherwise, when they keep talking about complete, it's

2    unclear if they're talking about Ocwen's version of complete

3    versus the statutory version of complete.  If we all agreed

4    upon a definition of complete, it would be simple, but we

5    don't.  So I think the jury needs to know completeness does not

6    depend on whether Ocwen think it's complete because they

7    actually think it's not complete.

8         MR. SHATZ:  Actually, it does.  If Ocwen gets

9    documents and says we need to see a P and L and the P and L

10   comes in, Ocwen will look at it and say, ah, the P and L raises

11   new issues, I need more documents, you're still not complete.

12   It is precisely what the statute says.

13        MR. ANGWIN:  And that would be true if that were the

14   facts here.

15        MR. SHATZ:  When a borrower -- do not interrupt me.

16   When a borrower has supplied the mortgage servicer with all

17   documents required by the mortgage servicer.

18        THE COURT:  Right.  But the authority that I saw

19   talks about a situation in which the servicer holds the

20   documents until a time later on and says oh, yeah, now it's

21   complete because they didn't deem it complete until that time.

22   So Courts have -- or at least one Court said --

23        MR. SHATZ:  Okay.

24        THE COURT:  -- wait, wait, wait.  It's not for you

25   to, you know --

187

1          MR. SHATZ:  I don't know that case off the top of my

2     head, but I know that within the code section, the servicer has

3     five days to review.

4          THE COURT:  Um-hmm.

5          MR. SHATZ:  We can easily argue or -- if the servicer

6     doesn't say within five days it's complete, then it's complete

7     because the servicer didn't say what else is needed.  But the

8     servicer is the one who makes that decision.  If the servicer

9     wants to wait, after five days, we're done.

10         THE COURT:  Right.  But as I see the authorities from

11    the California Court, it is that that fact is not one that

12    servicer determines that --

13         MR. SHATZ:  Which fact?

14         THE COURT:  Completeness -- that when a jury must

15    consider the topic -- because otherwise it would happen exactly

16    what you say.  Every -- they would get to the fifth day and all

17    of a sudden, now it's complete, and the jury gets to consider

18    whether is that really operative time or could have been

19    determined earlier.

20         Do they get to wait until they, you know, bless it as

21    complete?  Is that what we're looking for, the servicer's

22    blessing?  No.

23         MR. SHATZ:  Well, yes.

24         THE COURT:  No, I disagree with you on that.  I think

25    there is argument to be made here that -- well, the arguments

188

1    are obvious what I think will be said, but in particular, you

2    can't be a little bit pregnant.  Either you are at month three,

3    you probably were at month two too.

4           And so I think that's the theory behind this is

5    complete doesn't occur upon some formal pronouncement of that.

6    I think that's what the Court was attempting to --

7           MR. SHATZ:  In that particular case, did the servicer

8    wait more than five business days --

9           THE COURT:  I don't --

10          MR. SHATZ:  -- because if the servicer -- I'm sorry?

11          THE COURT:  Go ahead.

12          MR. SHATZ:  If the Court -- if that was the case,

13   then the Court is completely correct.  What the Court has said

14   is you asked for documents, you got them, you waited the five

15   business days, well, too bad, they're now complete, and the

16   reason complete matters is protections for the borrower kick in

17   when the application is complete.

18          So if the application is not complete, then the

19   protections don't kick in.  If the servicer wants to sit and

20   see what they can do in the evil, nefarious thing that you're

21   thinking of, well, after five days, the borrower gets the

22   protection.

23          THE COURT:  It wasn't that type of case.  It wasn't

24   deemed complete by operation of the failure to comply with the

25   five days.  It was a question of whether it was complete in a

189

1    time frame shorter than five days.

2         (Pause.)

3         THE COURT:  All right.  Anything else on jury

4    instructions?

5         MR. ANGWIN:  Your Honor, you were going to revisit

6    the issue of mitigation once you heard all the evidence, not to

7    ask what they're doing, but if all they're going to do is

8    present Mr. Cornejo's deposition through -- testimony through

9    deposition, I think you actually will have looked at all of it.

10        THE COURT:  Right.  Mr. Cornejo's deposition

11   testimony doesn't change that.  After hearing Mrs. Cornejo's

12   testimony and looking at the evidence that was presented, there

13   are questions in my mind as to whether there was mitigation --

14   whether she took sufficient action to mitigate the damages.  So

15   I think that instruction's appropriate.

16        MR. ANGWIN:  All right.  Thank you, Your Honor.

17        THE COURT:  Anything else on the instructions?

18        MR. ANGWIN:  Can you give us one moment, Your Honor?

19        THE COURT:  Okay.

20        MR. PAINO:  I don't believe that we have anything

21   further, Your Honor.

22        THE COURT:  Okay.

23        MR. ANGWIN:  Your Honor, if we could ask one

24   procedural question.  Because the verdict form's going to be

25   somewhat complex, will that be published to the jury before

190

1    closing?

2            THE COURT:  I won't do that.

3            MR. ANGWIN:  Are we allowed to?

4            THE COURT:  If you -- I have no problem with that.

5    In fact, I imagine both sides would want to do that.  I don't

6    know if the defense intended to do that, but that --

7            MR. SHATZ:  No objection, Your Honor.

8            THE COURT:  -- common thing.  All right.  So as to

9    the special verdict, let's talk about that.  I have been

10   convinced after hearing the completion of the testimony of

11   Mrs. Cornejo that Question 1 needs to be included back.

12   Question 2 is basically the same as what I had as Question 1

13   before.

14           MR. ANGWIN:  And, Your Honor, are we on the special

15   verdict form with regard to the first --

16           THE COURT:  Right.

17           MR. ANGWIN:  Yeah.  All right.  Thank you.

18           MR. HEENAN:  Your Honor, the new Question 1

19   essentially -- is the new Question 1 and 2 the old Question 1?

20           THE COURT:  Correct.

21           MR. ANGWIN:  Right.  Your Honor, on Question 2, I

22   think we can suggest that the -- that you change to Frank and

23   Dora Cornejos play all the required documents because I think

24   we're talking about documents throughout and I just didn't want

25   to be inconsistent.  I think that's what the statute says --

1    instead of information.

2         MR. SHATZ:  I believe that's correct, but let me pull

3    it up.  It says documents, Your Honor.

4         THE COURT:  All right.  I'll change that to

5    documents.  All the required documents, is that what you want?

6         MR. ANGWIN:  That's fine with us, Your Honor.

7         THE COURT:  Mr. Shatz?

8         MR. SHATZ:  Yes, Your Honor.

9         THE COURT:  All right.

10        MR. SHATZ:  Oh, I didn't look at the S and L's.  I'm

11   sorry.  I want --

12        THE COURT:  No.  That's fine.  Go ahead.

13        MR. SHATZ:  -- to make sure it goes --

14        THE COURT:  Go ahead.

15        MR. ANGWIN:  Your Honor, if we can have theoretically

16   because we're not telling the jury to skip certain questions,

17   they could answer some of the internal questions

18   inconsistently.  For example, they could say --

19        THE COURT:  Um-hmm.  Go ahead.

20        MR. ANGWIN:  For example, where they said we supplied

21   all the documents within the time frame, but then they said the

22   time frame was not reasonable.  I don't --

23        THE COURT:  Right.

24        MR. ANGWIN:  I'm not sure that creates an issue, but

25   I just wanted to broach it.

192

1           THE COURT:  What --

2           MR. SHATZ:  No, they didn't.  No, it doesn't.

3           THE COURT:  I'm not sure what issue you're raising,

4     Mr. Angwin.

5           MR. VITIELLO:  I think I can explain.  Our concern is

6     that if they return a verdict yes on Question 2, Cornejos

7     supplied all the required documents within the time frames,

8     they're not instructed to skip Question 3 if they've answered

9     yes.  It says if you answered yes, answer Question 4, but if

10    they answer Question 3 by accident yes, the next instruction --

11          THE COURT:  There's no accident.  If they -- if I get

12    it back and they've not skipped what I need to skip, it goes

13    back to them.

14          MR. ANGWIN:  Okay.  So under your version, Your

15    Honor, they answer all the questions.  They don't skip any.

16          THE COURT:  It depends on what their answers are.

17    For example, if they answer Question 2 as a no -- I'm sorry --

18    as a yes, then they skip No. 3 and go to the No. 4.

19          MR. ANGWIN:  Could we say that?  Could we have the

20    instruction to that effect to say if you answered yes, then

21    skip No. 3 and go to No. 4?

22          THE COURT:  If you answer yes, answer Question 4.  If

23    you answer no, answer Question 3.

24          MR. ANGWIN:  All right.  I guess --

25          THE COURT:  I'll tell you that the --

```
 1              MR. ANGWIN:  You're right.

 2              THE COURT:  -- skipping instructions -- for one

 3    thing, skip is a bad word.

 4              MR. ANGWIN:  I'll withdraw my question.  I think you

 5    answered it, Your Honor.  Sorry.

 6              THE COURT:  All right.  Let me give you some more

 7    time to take a look at that, whatever.  Let me know if there's

 8    something else.

 9         (Pause.)

10              THE COURT:  Anything else on the verdict form then?

11              MR. ANGWIN:  Not with that one change, Your Honor.

12    Plaintiffs are fine with it.

13              THE COURT:  Okay.  Good.  So I'm -- we need to supply

14    you a different copy of the pdf?

15              MR. ANGWIN:  Please.

16              THE COURT:  Okay.  The previous one should just be

17    deleted then.

18              MR. SHATZ:  Do I have time for a personal moment?

19              THE COURT:  Yes.  Go ahead.  Go ahead and go off the

20    record.

21         (Recess from 2:00 p.m. to 2:07 p.m.)

22         (Jury in at 2:07 p.m.)

23              THE COURT:  All right.  We have all our jury members

24    back in their places.  Mr. Shatz, further evidence?

25              MR. SHATZ:  Yes, Your Honor.  We wish to read a
```

1    portion of the deposition of Frank Cornejo.

2         THE COURT:  All right.  Ladies and gentlemen, you're

3    going to be hearing testimony now that was given under oath at

4    another time before trial.  It's called a deposition

5    transcript.

6         You are to treat this testimony as if it were given

7    here by a live witnesses and to afford it the same

8    consideration as any other evidence.

9         Okay.  Mr. Shatz, you may continue.

10        MR. SHATZ:  Thank you.

11        Your Honor, we're going to read from page 31, line

12   23, through page 34, line 16.

13        THE COURT:  All right.  You may begin.

14        MR. SHATZ:  The deposition refers to an Exhibit 3.

15   Exhibit 3 is in this case as Joint Exhibit 17.

16        THE COURT:  All right.  Thank you.

17      (Partial deposition of Frank Cornejo read by Mr. Shatz.)

18        MR. PAINO:  I'm going to hand you what I'll mark as

19   Exhibit 3.  I'm also handing a copy to your counsel.

20      (Defendant's Exhibit 3 marked for identification.)

21   BY MR. PAINO:

22      Question:  Turning to the second page of what we've marked

23   as Exhibit 3 -- let's go to the next page -- next page -- have

24   you seen this document?  Take your time.

25      Answer:  You're asking if I remember seeing this document?

195

1      Question:  That's correct.

2      Answer:  Yes.

3      Question:  Have you ever seen the document before?

4      Answer:  I don't remember.

5      Question:  How about -- if you could turn with me to -- it

6 looks like it's the eighth page of the exhibit, and at the

7 bottom, it says page 11 of 20.

8      Answer:  Which one again are we looking for?

9      Question:  At the bottom, it says 11 of 20.

10     Answer:  Oh, 11.  Okay.  Yes, I see that.

11     Question:  And you see at the bottom of the page, there's

12 a signature next to the words sign here.

13     Answer:  Oh, yes, I see that.

14     Question:  Is it your signature?

15     Answer:  No.

16     Question:  Do you know whose signature that is?

17     Answer:  I do not.

18     Question:  Have you ever authorized anybody to sign

19 documents on your behalf?

20     Answer:  I'm not sure.  I believe there was a time when I

21 gave a lawyer -- I don't remember what lawyer -- what do you

22 call it?

23     Question:  Power of attorney.

24     Answer:  Power of attorney, yes.

25     Question:  Could this document have been signed by the --

196

1    by your attorney?

2        Answer:  It may have.  I don't know.

3        Question:  If you'll turn with me -- excuse me -- if

4    you'll turn with me to page -- to the last -- it looks like

5    it's the last page of the exhibit and at the bottom, it says

6    page 16 of 20.

7        Answer:  Yes.

8        Question:  And you'll note in the middle of the page,

9    there's an arrow that says sign here.

10       Answer:  Yes.

11       Question:  Next to that arrow is a line and underneath the

12   line is typed in initial case Frank Cornejo.  Do you see that?

13       Answer:  Yes.

14       Question:  And above that line, there's a signature.  Do

15   you see that?

16       Answer:  Yes.

17       Question:  Is that your signature?

18       Answer:  No.

19       Question:  Do you know whose signature that is?

20       Answer:  I do not.

21       Question:  Would you have authorized anybody to sign your

22   name on that document?

23       Answer:  I'm sure I did.  I believe so.

24       Question:  Do you know who you authorized to sign your

25   name?

197

1      Answer:  I do not.

2      Question:  Is there any document that might refresh your

3  recollection as to who you may have authorized to sign the

4  document?

5      Answer:  I don't believe so.

6      (End of reading of partial deposition of Frank Cornejo.)

7          THE COURT:  All right.  Thank you.   Mr. Shatz, do

8  you have any further evidence?

9          MR. SHATZ:  No, Your Honor.

10          THE COURT:  Defense rests at this time?

11          MR. SHATZ:  Yes, Your Honor.

12          THE COURT:  Plaintiff have any rebuttal evidence?

13          MR. HEENAN:  No, Your Honor.

14          THE COURT:  All right.  At this time, this is the

15  completion of the presentation of evidence in this case.  At

16  this time, it is my obligation to give you instructions as to

17  the -- the instructions that will control your deliberations.

18          I'm going to be reading these to you.  We're going to

19  display these on your screen as well.  If you can't hear me

20  reading them to you, please raise your hand and I will repeat

21  them.

22                    JURY INSTRUCTIONS

23          THE COURT:  Members of the jury, now that you've

24  heard all the evidence, it is my duty to instruct you as to the

25  law of the case.  A copy of these instructions will be sent

198

1    with you to the jury room if you request.

2           You must not infer from these instructions or from

3    anything I may say or do as indicating that I have an opinion

4    regarding the evidence or what your verdict should be.

5           It is your duty to find the facts from all the

6    evidence in the case and to those facts, you will apply the law

7    as I give it to you.  You must follow the law as I give it to

8    you whether you agree with it or not and you must not be

9    influenced by personal likes or dislikes, opinions, prejudices,

10   or sympathy.  That means you must decide the case solely on the

11   evidence before you.  You will recall that you took an oath to

12   do so.

13          In following my instructions, you must follow all of

14   them and not single out some and ignore others.  They are all

15   important.

16          You should decide the case as to each defendant

17   separately.  Unless otherwise stated, the instructions apply to

18   all parties.

19          The parties are equal before the law.  A limited

20   liability or a national banking association is entitled to the

21   same fair and conscientious consideration by you as any party.

22          Under the law, a corporation is considered to be a

23   person.  It can act only through its employees, agents,

24   directors, or officers.  Therefore, a corporation is

25   responsible for the acts of its employees, agents, directors,

199

and officers or fall within the scope of that authority.

A corporation is entitled to the same fair and impartial treatment that you would give to an individual, and you must decide this case with the same fairness that you would use if you were deciding the case between individuals.

The evidence you are to consider in deciding what the facts are consists of (1) the sworn testimony of any witness; (2) the exhibits which have been received into evidence; and (3) any facts to which the lawyers have agreed or stipulated.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will list them for you.

(1) Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements, what they will say in their closing arguments, and what they have said at other times is intending to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe the question is improper under the rules of evidence.  You should not be influenced by the objection or the

200

1   Court's ruling on it.

2           (3) Testimony that has been excluded or stricken or

3   that you have been instructed to disregard is not evidence and

4   must not be considered.  In addition, sometimes testimony and

5   exhibits have been received only for a limited purpose.  Where

6   I have given a limiting instruction, you must follow it.

7           (4) Anything you may have seen or heard when court

8   was not in session is not evidence.  You are to decide the case

9   solely on the evidence received at trial.

10          Evidence may be direct or circumstantial.  Direct

11  evidence is direct proof of a fact such as testimony by a

12  witness about what that witness personally saw or heard or did.

13          Circumstantial evidence is proof of one fact -- one

14  or more facts from which you could find another fact.  You

15  should consider both kinds of evidence, and the law makes no

16  distinction between the weight to be given either direct or

17  circumstantial evidence.  It is for you to decide how much

18  weight to give any evidence.

19          By way of example, if you wake up in the morning and

20  you see that the sidewalk is wet, you may find from the fact

21  that it rained during the night.  However, other evidence such

22  as a turned on garden hose may provide a different explanation

23  for the presence of the water on the sidewalk.

24          Therefore, before you decide a fact that has been

25  proved by circumstantial evidence, you must consider all the

1    evidence in the light of reason, experience, and commonsense.

2          In deciding the facts in this case, you may have to

3    decide which testimony to believe and which testimony not to

4    believe.  You may believe everything a witness says or part of

5    it or none of it.  Proof of a fact does not necessarily depend

6    on the number of witnesses who testify about it.

7          In considering the testimony of any witnesses, you

8    may take into account:  (1) the opportunity and ability of the

9    witness to see or hear or know the things testified to; (2) the

10   witness's memory; (3) the witness's manner while testifying;

11   (4) the witness's interest in the outcome of the case and any

12   bias or prejudice; (5) whether other evidence contradicted the

13   witness's testimony; (6) the reasonableness of the witness's

14   testimony in light of all the evidence; and (7) any other

15   factors that bear on believability.

16         The weight of the evidence as to a fact does not

17   necessarily depend on the number of witnesses who testify.

18         Evidence that a witness has lied under oath on a

19   prior occasion may be considered along with all other evidence

20   in deciding whether or not to believe the witness and how much

21   weight to give the testimony of the witness and for no other

22   purpose.

23         Where a party has the burden of proof on a claim or

24   affirmative defense by a preponderance of the evidence, it

25   means that you must be persuaded by the evidence that the claim

202

1    is more probably true than not true.  You should base your

2    decision on all of the evidence regardless of which party

3    presented it.

4          The plaintiffs contend the defendants violated

5    California Civil Code Section 2923.6.  To establish a violation

6    of this section, the plaintiffs must prove all of the following

7    by a preponderance of the evidence: that they submitted to

8    Ocwen a complete and timely application for a first lien loan

9    modification; (2) that the defendants sold the plaintiffs'

10   property before the first loan modification was approved or

11   denied; and (3) the violation of the California Civil Code

12   Section 2923.6 was material.

13         An application is complete when the borrower has

14   supplied the mortgage servicer with all the documents required

15   by the mortgage servicer.  Completeness does not depend solely

16   on whether Ocwen agreed and the loan modification -- let me

17   start that over.

18         Completeness does not depend solely on whether Ocwen

19   agreed that the loan modification application was complete.

20   The plaintiffs bear the burden of establishing that the

21   application was complete.

22         The application is made timely if it is provided

23   within a reasonable time frame set by Ocwen.

24         A violation of California Civil Code Section 2923.6

25   is material if it affected the loan modification review

203

1   process.

2         A substantial factor in causing harm is a factor that

3   a reasonable person would consider to have contributed to the

4   harm.  There must more than a remote or trivial factor.  It

5   does not have to be the only cause of the harm.  Conduct is not

6   a substantial factor in causing harm if the same harm would

7   have occurred without that conduct.

8         It is the duty of the Court to instruct you about the

9   measure of damages.  By instructing you on damages, the Court

10  does not mean to suggest for which party your verdict should be

11  rendered.

12        If you find for the plaintiffs on their claim, you

13  must determine the plaintiffs' economic damages.  Damages means

14  the amount of money that will reasonably and fairly compensate

15  the plaintiffs for the economic losses or economic damages you

16  find were caused by the defendant.

17        Economic damages refers to monetary losses suffered

18  by the plaintiffs in the past and those that are reasonably

19  certain to be suffered in the future.  The plaintiffs have the

20  burden of proving economic damages by a preponderance of the

21  evidence, but they do not have to prove the exact amount of

22  damages.  The amount of economic damages must include an award

23  for all monetary losses that were caused by the defendant even

24  if a particular harm could not have been anticipated.

25        In determining the plaintiffs' economic damages, you

204

1    should consider the following: (1) the difference between a

2    fair market value of the plaintiffs' property sold by the

3    defendant and the amount of all outstanding liens against the

4    property if any as of that date; (2) the reasonable cost of any

5    moving expenses that the plaintiffs incurred to relocate after

6    the property was sold; and (3) other monetary losses caused by

7    the defendant's wrongful conduct.

8            Your award must be based upon evidence not upon

9    speculation, guess work, or conjecture

10           Plaintiffs have a duty to use reasonable efforts to

11   mitigate their damages.  To mitigate means to avoid or reduce

12   damages.

13           Defendants have the burden of proving by a

14   preponderance of the evidence that plaintiffs failed to use

15   reasonable efforts to mitigate their damages and the amount by

16   which damages would have been mitigated.

17           If you decide that the defendants committed a

18   material violation of California Civil Code Section 2923.6, you

19   must decide whether the defendants' acts constituted reckless

20   or willful misconduct.  Let me read that one more time.

21           If you decide that the defendants committed a

22   material violation of California Civil Code Section 2923.6, you

23   must decide whether the defendants' acts constituted

24   intentional, reckless, or willful misconduct.

25           Defendant's conduct is intentional, willful, or

1    reckless if: (1) the defendant knew of the requirements of law

2    and purposely failed to comply with those requirements; or (2)

3    the defendant showed complete indifference to the requirements

4    of law.

5            The plaintiffs must prove the defendants acted

6    willfully or recklessly or intentionally by a preponderance of

7    the evidence.

8            If you find the defendants committed willful or

9    reckless conduct, you may but are not required to award

10   statutory damages.  The purposes of these statutory damages are

11   to motivate compliance with the law and to punish wrongdoers.

12           All right.  At this time, are the plaintiffs prepared

13   to make their closing argument?

14           MR. HEENAN:  We are, Your Honor.

15           THE COURT:  All right.  Please proceed.

16           MR. HEENAN:  Thank you, Your Honor.

17       (Pause.)

18                   PLAINTIFF'S CLOSING ARGUMENT

19           MR. HEENAN:  I guess I want to begin by thanking each

20   of you so much, not just for being here because as you all know

21   now, in a way you had to.  I mean you were subpoenaed to be

22   here.  But frankly, there's two kinds of jurors, the ones that

23   are angry to be here and they nod off, they don't pay

24   attention, and then there's you guys.

25           And we've been watching you and we've been watching

1    you pay attention and to be really candid with you, as you've

2    seen, this isn't the kind of trial where we can look at bullet

3    holes and blood and pass a gun around, I mean it's a lot of

4    documents and we've been working through documents.  And so

5    that's -- it's been a slug.  I know it's been a slug.

6          And quite honestly, we knew it was going to be a slug

7    coming in here because, as you've seen, we've basically had two

8    witnesses, Ocwen and the Cornejos.  And we had a story to tell,

9    but you've observed from Mrs. Cornejo -- she's not a good

10   historian.

11         We knew that we weren't going to be able to tell the

12   Cornejos' story through Mrs. Cornejo.  So we had to tell it

13   through Ocwen's corporate representative and I hope that was

14   apparent to you.

15         Ocwen's corporate representative on behalf of his

16   employer Ocwen had very little interest in letting us tell the

17   Cornejos' story.  And the reason for that is, I think, fairly

18   obvious because the story showed that Ocwen violated the law

19   here.

20         So quite honestly -- Wade, if you'll bring up I guess

21   Instruction No. 8, please, first.

22         We could have been out of here a long time ago, but,

23   as I hope you've observed, nothing came easy when I was asking

24   questions of Ocwen's witness and the reason for that, ladies

25   and gentlemen, is because that's his job.

1    I don't hold against him.  I've never met the
2    gentleman before.  That's just his job.  He's a professional
3    witness.  He came here from Florida to give testimony against
4    the Cornejos.  Last week it was against a different borrower.
5    Next week, it'll be against another borrower, the O'Connors,
6    whoever, and that's his job.
7         And as he told you, there's 12 or 13 other people
8    just like him and they get paid by Ocwen.  They don't even have
9    a physical office.  They just fly all over the country giving
10   testimony to jurors like you.
11        And that testimony is always we did nothing wrong.
12   The documents justify what we did.  The borrower's lying.  The
13   borrower's making up allegations.  This isn't true.
14        MR. SHATZ:  Objection.  Argumentative, exceeds the
15   evidence.
16        MR. HEENAN:  If you can please bring up --
17        THE COURT:  Overruled.
18        MR. HEENAN:  Thank you, Your Honor.
19        MR. HEENAN:  -- Instruction No. 8.
20        You're going to have all these instructions and I
21   just have a minute and I just want to highlight I guess what I
22   consider some of the important ones for you to look at.
23        And this is an important one because right at the --
24   really, there's only two witnesses.  And so you need to
25   consider Ocwen's representative's testimony and some of the

1    things that he did and said.

2          The opportunity and ability of the witness to see or

3    hear, know of the things, you heard me ask at the beginning,

4    this gentleman has no personal knowledge.  He doesn't know what

5    happened here.  He didn't have any involvement.

6          All the people that had involvement, they're in India

7    and wherever else, but they certainly haven't been through this

8    courtroom to give testimony to you.

9          The witness's manner while testifying:  Did you

10   observe the way that he gave answers to me as compared to how

11   he gave answers to Ocwen's counsel the next day?  If he would

12   have given answers to me the way that he gave answers to

13   Ocwen's counsel, his entire testimony would have taken three

14   hours -- two and a half, three hours.

15         And I hope you observed that and talk about it,

16   please.

17         The interest in the outcome of the case, bias or

18   prejudice, professional witness doing his job and this is the

19   job that Ocwen has.  They have an entire legal department made

20   up of people like this gentleman sent around to give testimony

21   to jurors like you.

22         And whether the other evidence contradicted the

23   witness's testimony:  You recall -- well, it was yesterday, so

24   I hope you recall.

25         You know, Ocwen's counsel was asking questions and

209

1    all of a sudden, the date changed and now instead of it being

2    the 28th, it became the 29th and I had to say now, wait a

3    minute, sir.  That's not the right date, and that's what you

4    represented to this jury.  You all heard that.

5            So that's what you need to consider in weighing the

6    evidence.

7            And now let me just kind of dive in with you.  In a

8    minute here, you're going to get to work and you've got a job

9    to do and that's -- well, really two jobs.  One is to sort out

10   whether or not Ocwen violated the law and the other is, if you

11   think they did, what's their compensation to the Cornejos.

12           So I'd like to put up the verdict form, please.

13           There are seven questions and I'll just run through

14   them and give you my two cents and -- but we trust you and we

15   trust you to get to work.

16           First question:  Did the Cornejos supply Ocwen with

17   all the documents required by Ocwen in connection with their

18   loan modification.  And so that goes to the issue of

19   completeness, whether the Cornejos supplied a complete loan

20   application.

21           And -- so, Wade, if you can, please, bring up

22   Instruction No. 11.  Her Honor has defined for you what

23   completeness means.

24           We talked about and you heard me, through Ocwen's

25   representative, finally achieve agreement that this is how the

1   consideration of a loan modification works, and if it's not

2   complete, it never gets to the review stage.

3           So if it's incomplete, they have to send a letter.

4   They send a letter.  The borrower responds.  They get

5   considered again.  If it's not complete -- I mean that can keep

6   going, but only if it's complete can it be reviewed within

7   Ocwen for a loan modification.

8           And the only way someone can receive a loan

9   modification is if they've had a complete application.  And so

10  that's why reluctantly -- and recall the testimony.  I'm not --

11  you know, recall what Ocwen's representative told you.

12          But the Cornejos' application couldn't be complete.

13  It had to be complete for them to be considered for a loan

14  modification, and they were considered.

15          Wade, if you'll bring up Joint 19, please.

16          First paragraph, we've looked at this a lot.

17  Congratulations, your request for a loan modification has been

18  approved subject to the following.  That's the letter that the

19  Cornejos got after the foreclosure sale, after they had lost

20  their home.

21          It's a smoking gun.  It's a smoking gun document that

22  absolutely closes the door on Ocwen's ability to say that this

23  was an incomplete application.  How could it be incomplete and

24  they still got approved.  It makes no sense.

25          So that's what we have.  And so we have the smoking

1    gun document.  Their representative admitted to you that it was

2    complete.  And so what are they left with?

3          Well, counsel has to try and unwind it through

4    Mrs. Cornejo who doesn't remember things and she's not a

5    banker.  She's not -- I think we can all agree -- not a

6    sophisticated party to this transaction.

7          And counsel can try and needle Mrs. Cornejo about,

8    well, you put this number in wrong or you didn't fill in this

9    blank or you didn't date this blank.  Well, that's lawyer

10   arguments.  That's clever bank lawyer stuff after the fact

11   trying to justify why they didn't break the law.

12         And if it was anything other than that, we'd have

13   some business records for Ocwen's representative to look at and

14   show us where internally they're saying, oh, this isn't

15   complete or, oh, they missed this or Mrs. Cornejo put this

16   number wrong or this should have been different.

17         Make no mistake, there's nothing in any of these

18   records.  If Ocwen had them, they'd show them to you.  There's

19   nothing in those records.  So that's just -- it's just smoke.

20   It's just smoke trying to make an excuse when there is on

21   excuse.

22         And the other thing I'd ask you to look at, that big

23   list of stipulations that the Judge read to you, Stipulation

24   No. 34 says Ocwen denies a loan application if it's incomplete.

25         So if the Cornejos had done anything other than

212

1    submit a complete application, Ocwen would have denied it.

2    They didn't deny it.  They accepted it and gave them a

3    modification.

4            So of course -- so I'd ask you to hopefully kind of

5    swiftly get past Question No. 1 and move onto Question 2.

6            And that question -- if you can bring it up, please,

7    Wade -- says basically, okay, if the Cornejos submitted all the

8    documents, did they do it within the time frame specified by

9    Ocwen.

10           Maybe if you just leave that up and then we can run

11   through the other stuff.  I don't know because then I'd also

12   like you to bring Instruction No. 12, please.

13           So Her Honor again has told you what timely means and

14   you heard from the evidence, timely here in California is the

15   reasonable time frame set by Ocwen.  And first they tried to

16   make that 37 days and then they tried to make it 7 days and

17   then they tried to make it 5 days, but we showed you again,

18   there's documents that says midnight business day before.

19           And, Wade, maybe if you'll pull up that document,

20   Defendant's 578.  Page 4, please.

21           I know we've looked at it a lot and quite honestly,

22   again, I thought this is kind -- you know, there's stuff that

23   kind of reasonable minds can argue about and there's stuff that

24   you really can't and you shouldn't have to.

25           But you, ladies and gentlemen of the jury, that gets

213

1    tasked with determining what midnight is and what submitting

2    documents the business day before midnight means.

3            And I think any of us -- well, I mean here's a good

4    example that my co-counsel had.  If Her Honor would have said,

5    you know, when you got your jury duty notice, if it said text

6    by Friday at midnight or text by the business day before the

7    trial at midnight that you're not able to make it, what day

8    would you think that was?  Would you think it was the day

9    before or would you think it's two days before?

10           And I would submit there's just kind of no other

11   reasonable interpretation of what midnight means.  And with

12   respect to that, Mrs. Cornejo is not the one that drafted this

13   document.  Ocwen is, Ocwen and their lawyers, their legal

14   department, or whatever else.

15           So Ocwen as the servicer under California law gets to

16   pick whatever deadline they want and they can make it as clear

17   as they want.  And the fact that they've chosen to give this

18   deadline, which I can't understand how it could be interpreted

19   to be anything other than -- the foreclosure sale was

20   Wednesday.  This means the documents had to be in no later than

21   Tuesday night at midnight.

22           But if somehow Ocwen wanted to do a different

23   interpretation of that, that was on them to make it more clear.

24   They're the one that drafted this document.

25           And actually, I mean the reality is this idea that

1    midnight doesn't really mean midnight, again, that's just

2    clever bank defenses.  The kind of argument you never see out

3    of Ocwen is, ladies and gentlemen, we did something wrong.

4    Here we are to pay for it.  You know, we're liable.  We're

5    responsible.

6          Of course not.  So this is one of the defenses.

7    Midnight doesn't mean midnight.

8          And in response to that question, I would ask you to

9    consider, hopefully pretty swiftly, that the Cornejos did

10   supply all the documents within the time frame of midnight the

11   day before.  You heard the evidence.  We looked at that fax a

12   hundred times.  It was 10:38 a.m. the day before.

13         If you answer yes to that question, you skip No. 3

14   because that bears on were the time frames set by Ocwen

15   reasonable.  But if you guys go back there and say no, we don't

16   think midnight means midnight, we think it means midnight two

17   days ago, then you go to Question No. 3 and then you got to ask

18   yourself is that fair.  Is that a reasonable interpretation

19   that Ocwen gave to that document?  Does that bear on people

20   like the Cornejos who -- you know, the clock's ticking on them

21   to avoid losing their home.

22         And the other thing I would say to the reasonable --

23   were the time frames set reasonable is reasonableness is a

24   two-way street.  You know, you heard the evidence.  The

25   Cornejos sent the first batch or the first application on

215

1    April 16th and Ocwen sits on it for five days and then on

2    April 21st, they drop in the mail a notice -- this notice

3    letter that says your package is incomplete.

4              So if you could go to page 1 of Defendant's 578,

5    please.

6              And we can agree to disagree about whether it went

7    out the 21st or went out the 22nd, but the reality is it either

8    showed up on the 25th or the 27th of April, and it tells

9    them -- just pull up that part, please -- that the due date is

10   the 19th.

11             The letter doesn't even get sent til the 21st and

12   it's telling them that their deadline is the 19th.  How is that

13   reasonable?  It's not.  It's not fair.

14             And so if you conclude that midnight doesn't mean

15   midnight and you have to answer Question No. 3, I would ask you

16   to submit that the answer to that is no.  Ocwen's deadlines

17   weren't reasonable.  They failed to do the two-way street of

18   communicating with the borrower.

19             And you heard.  It was whatever it cost to overnight

20   a letter or two-day express a letter.  That's not reasonable.

21             So that brings us to Question No. 4, was it a

22   material violation.

23             Do you have the ability to bring up the stipulations

24   or no?  Okay.

25             Well, let me tell you what -- won't don't you bring

1   up Instruction No. 13, please.

2           There's a stipulation, Stipulation No. 48, that goes

3   to this and it basically -- I don't want to look at it, but it

4   basically says, yeah, if you lose your home in a foreclosure

5   sale when they should have considered your loan modification,

6   that's material.  I mean that, frankly, is as significant or as

7   material as it could be.

8           And so here's what material means under California

9   law.

10          Number -- oh, sorry.  I'm probably one off now.

11          Material for the effect of the loan modification

12  review process.  And, of course, because what we know here is

13  the Cornejos were approved.  They got their loan modification.

14  They found the willing solution.  Remember those buzz words,

15  the winning solution.

16          But it wasn't such a winning solution for the

17  Cornejos because they were already out of their home.  So

18  that's material.

19          So I would ask again that you consider agreeing that

20  that was material, answer that yes, and that brings you to

21  Question No. 5.

22          Question No. 5 relates to the amount of economic

23  losses cause by Ocwen's conduct.  And if you can bring up

24  probably Instruction No. 16 now maybe, the damages instruction.

25  If you can bring up just those first three paragraphs, please.

1          So basically, economic damages is monetary losses

2     suffered by the plaintiffs in the past and those that are

3     reasonably certain to be suffered in the future.  That's just

4     what's the amount of money that the Cornejos lost because of

5     this conduct.

6          And so I guess what I'd like you to consider is what

7     the Cornejos anyway and I and certainly my co-counsel on behalf

8     of the Cornejos which there was the magic eraser.  We wish

9     there was a way that, frankly, we didn't have to be here.  I

10    know Mrs. Cornejo doesn't want to be here.  I know you all have

11    lives and better things to do than be here going through

12    documents with us.

13         And if we had the magic eraser, right, we'd just push

14    off the foreclosure sale a week, a month, whatever.  The

15    Cornejos would have received their loan modification and they

16    would have been making their new payments.

17         And we saw -- what's the document that shows what the

18    new payments were?

19         MR. VITIELLO:  Joint 19.

20         MR. HEENAN:  Joint 19, please.  The new payment was

21    $817 a month, and if you look at that Joint 19 -- so $817 a

22    month and it was a 17-year loan.  It was a 17-year modified

23    loan and the reason for that was, as you'll recall, the

24    Cornejos had paid for 22 years on a 30-year loan, but they also

25    had arrearage and so that arrearage got recaptured into the

218

1   loan.

2           So if they would have gotten the modification -- they

3   don't get something for nothing.  They don't get to live in

4   their house for free.  They would have had to recapture and pay

5   every single month that they had missed for the two years that

6   they hadn't paid.

7           But the rate went from 8 percent to 4 percent.  The

8   payments went way down and it was a good deal for them.  It

9   really was.

10          So $817 a month times 12 months times 17 years is --

11  and check me on this, but about $166,000.  And of course, at

12  the end of that 17 years, they would have had their home.  But

13  to be candid, I mean you've heard about an IRS tax lien, you've

14  heard about a California tax lien.

15          Those liens would have stayed with the home and if

16  the Cornejos hadn't paid those liens in the 17 years, then if

17  they tried to sell the home, if they passed and their children

18  inherited the home -- whoever took that home over was going to

19  take it subject to those liens.

20          So the IRS was going to get paid.  California revenue

21  department was going to get paid.  But they -- Frank in his

22  late 70s -- mid-70, Dora much younger -- would own a home free

23  and clear, the home that they've had for the last 22 years.

24  And that would cost them $166,000.

25          You've also heard kind of what happened because we

219

1    don't have a magic eraser and what we don't -- because we don't

2    have the magic eraser, you saw that the Cornejos live in a much

3    smaller apartment for $1,300 a month.

4            And you also saw and the evidence is -- you'll have

5    the chance to look at in the jury room.  They pay $293 a month

6    for storage -- two storage sheds to hold their furniture and

7    stuff that doesn't fit in their new apartment -- or their new

8    house.

9            So if you run these numbers through, the $1,300 a

10   month comes out to -- you know, 1,300 a month times 12 times 17

11   is $265,000.  And the storage comes out to about 60,000 under

12   the same thing, times 12 times 7.

13           And so -- yeah, 325.  Sorry.  325.

14           So because of what Ocwen did, because of the fact

15   that they lost this modification -- or had the modification,

16   just didn't have the house to go with it, these are their

17   economic damages.  325,000.

18           Because, of course, the punch line on this -- the

19   real stinger, right, is after 17 years of making rent payments,

20   Cornejos don't have any equity.  They don't have a home to show

21   for it.  They will have paid somebody else who owns that home.

22   They'll pay rent.  That's the way rent works.

23           And the Cornejos leave completely to your discretion

24   and collectively and -- you know, I know that you guys know how

25   to work through this and maybe -- probably way better than I'm

220

1   doing, but 325, no house, 166, the house they've had.  That's

2   the difference.

3        And I don't know whether you subtract the 166 from

4   the 325.  I don't know if you only subtract part of it because

5   here they get their house, here they get nothing.  The Cornejos

6   leave that completely to your discretion.

7        We trust you and we trust you to do what's right and

8   that question just requires you to collectively arrive at

9   what's fair economic compensation for their loss.  And that's

10  all they want.  Nothing more, nothing less.

11       And the other things I guess need to get added to

12  that and you've seen evidence, they're small, but they matter.

13  You heard about how the Cornejos got sued by the purchaser.

14  They had to hire an attorney.  They lost in court.  They had a

15  judgment entered against them.  That judgment's approximately

16  $6,000 -- 5,956.

17       You heard about their moving expenses.  They had to

18  buy smaller beds because the big beds didn't fit in the house.

19       But you heard Ocwen's counsel challenge Mrs. Cornejo

20  on that and ask whether Ocwen was going to get the beds back.

21  And so again, we defer to you.  You know, if you think the $40

22  for the twin beds is not fair because -- for whatever reason

23  that's too much, don't give them the $40.  We trust you.

24       And the other thing, it's a small amount of money,

25  but it matters and I think it's significant and I hope it's

1   significant to you.

2           As you'll recall from the testimony, you know, the

3   Cornejos get the congratulations, you're approved, send us the

4   check and fill out the papers.  So they pay to get the papers

5   notarized and they send the check in and Ocwen cashes the check

6   and Ocwen still hasn't paid the Cornejos back that money.  It

7   never returned the money to them.  That's $883.

8           So that's our damages that we think fairly were

9   caused by the way that Ocwen chose to handle themselves and

10  chose to conduct themselves in this action.  Because to Ocwen,

11  this is just business and this is just a transaction.  To the

12  Cornejos, this is their home.  This is everything.

13          Any of us that have ever owned a home know that your

14  home is different than everything else that you own.  It's not

15  a pair of shoes.  It's not a binder.  And Ocwen took that from

16  them.

17          And you saw the way in the corporate world of Ocwen,

18  things like that don't matter.  You saw the emails.  Good to

19  go.  Good to go, proceed.

20          And -- so let's move on and let me talk about that a

21  little bit.  Question No. 6, please, Wade.

22          This question says did Ocwen in the way that -- in

23  failing to postpone the foreclosure sale of the Cornejos' home,

24  did they act intentionally, willfully, or recklessly.

25          So that's the -- you know, in the car accident world,

1    that's the difference between, you know, driving through the

2    light because you're not paying attention or driving through

3    the light because you're texting or -- I mean it's a heightened

4    standard.  Is it reckless?  Is it intentional?  Is it willful?

5         And again, Her Honor has defined that and that's

6    probably Instruction No. 18.  And I'll read it to you and then

7    we'll hope it shows up on the screen.

8         But there's two ways that conduct meets that

9    heightened requirement.  It's whether Ocwen knew the

10   requirements of the law and purposely failed to comply.  So

11   basically they go, yeah, we know what the law is, but we're

12   going to do it our way.

13        Or whether they just say we don't care what the law

14   is, we're just going to do our way.  And frankly, it's one or

15   the other, it's both, or it's either.  We don't have to show

16   you both.

17        But I think the facts support both.  I really do.

18   And let me start with Plaintiff's Exhibit 6, page 2, top

19   paragraph, please.  Remember this at the beginning?  Dual

20   tracking.

21        We all know what dual tracking is.  It has been all

22   over the news.  Anyone that lives in this state knows that

23   people have been hurt since 2009 and the financial crisis and

24   the mortgage meltdown.  Everybody knows what dual tracking is,

25   except apparently Ocwen.

1          Ocwen's representative, he'd never heard of that,

2    dual tracking.  That's a phrase I've never heard.

3          Dual tracking is illegal and it's illegal for a

4    reason and the reason is when you're put on one path towards

5    foreclosure and another path towards modification and saving

6    your home and a servicer like Ocwen is allowed to play fast and

7    loose with what the requirements are, what the deadlines are,

8    anything else, then it lulls the borrower to sleep.

9          It makes the borrower go well, I don't need to worry

10   about this because I'm on this path.  I've been talking to

11   people.  I'm submitting documents.  I've got them what they

12   need.

13         And when a servicer chooses to engage in dual

14   tracking, they know that without question people are going to

15   get hurt.  People are going to lose their homes.  It's not a

16   matter of will it.  It's a matter of how many will.

17         And the Cornejos were two of the many and the fact

18   that even after everything that's happened with the law, all

19   the issues, the fact that internally Ocwen still says we do

20   dual pathing.  We like -- we utilize the dual path.

21         It's not an accident what happened here.  It's the

22   natural consequences of the way that this company does

23   business.

24         And these are people's homes.  These are valuable

25   possessions.  It's not just paper shuffling.  Real people, like

224

1    the Cornejos, really get hurt when a company chooses to engage

2    in this type of conduct.

3          Because -- you know, the defense is always, well, you

4    didn't pay your bills, so what did you think was going to

5    happen.  Well, take that off the board and say to the Cornejos,

6    you don't pay your bill, we're going to kick you out the house.

7          Okay.  Well, then they know where they stand.

8    They'll get kicked out the house if they don't pay their bill.

9    They'll file a bankruptcy.  They'll do something else.

10         But when you inject this, then that lulls the

11   borrower to sleep.  And then when they come in at the last

12   minute and do the foreclosure, you're stuck.

13         Some other things that I would submit to you bear on

14   your consideration of willful or reckless conduct that we've

15   heard in this trial.  They rely on people in India and all over

16   the world.  They have what Ocwen's representative referred to

17   as teamwork and teamwork is just more corporate buzz word for

18   we got so many employees everywhere, we don't know who's doing

19   what at any given time.

20         And Her Honor has told you -- Instruction No. 4,

21   please.

22         Corporations are people.  You don't hold Ocwen to a

23   different standard than any other person.  Corporations are

24   people under the law.

25         And what will we say about a person sitting over

1    there and a person's conduct the way Ocwen has here.  The left

2    hand not knowing what the right hand's doing, people all over

3    the world, not talking to one another, not knowing what's going

4    on.  It's their business.

5         It's the way that they're set up.  It's the way that

6    they make money.

7         And then how about with respect to the Cornejos here.

8    You saw the scenario where they get the modification.  Under

9    that scenario, Ocwen gets paid back after 17 years.

10        But when they got the call, hey, there's a

11   third-party purchaser looking at buying this property --

12   because understand, so when Ocwen, what they normally do when

13   they foreclose and they get the property, well, now they need

14   to sell it.  It's REO.  It's distressed.  It's -- you know,

15   hiring whoever to sell the property for them.

16        But once the third-party purchaser calls, they go

17   cool.  We'll get paid.  We'll get our cut.  We'll pay back the

18   investors.  Done deal.

19        And Ocwen knew that.  When all this was going down,

20   Ocwen said cool, there's a third-party purchaser.  They're

21   going to pay more than what the value of the loan is.  We have

22   an opportunity to get paid.

23        And you saw those documents.  Ocwen got paid right

24   away, within a month.  And had they given the Cornejos the

25   modification, they would have gotten paid a little bit each

1   payment for 17 years.

2          Well, that's indifference in violation of the law.

3   And how about the comment it'd be too much money to overnight

4   or express mail a letter.  You know, Ocwen deals with hundreds

5   of thousands of borrowers.  If we had to bear the costs of

6   sending an overnight letter to every borrower that was three

7   days or five days or a week towards losing their home, that's

8   too much money.

9          Well, that's an intention business decision, ladies

10  and gentlemen.  Ocwen chose to say, yeah, instead of spending a

11  little extra to make sure that we're giving notice to people

12  like the Cornejos, we'll just keep that money instead.  We'll

13  just have that go to our profits.

14         How about no special fax line.  We hard Ocwen's

15  representative tell you about the imaging center and kind of

16  this giant fax machine and vaguely all these people getting

17  faxes all the time and thousands of faxes.

18         What if they had a special fax line just for people

19  that were a week out from a foreclosure and train people maybe

20  in the United States to handle that fax line and make sure that

21  if something came through the way the Cornejos came through on

22  the 28th, there were trained people on the other end in the

23  imaging department to say, hey, this is high priority.

24         Instead of just sending emails around that says high

25  priority, high priority, what if Ocwen really took that phrase

1  seriously.  What if Ocwen said, yeah, high priority should mean

2  something to people that are week out from losing their home.

3          That's recklessness, ladies and gentlemen.  That is

4  indifference.  That is the definition of corporate

5  indifference.

6          So I would submit or ask you to consider, please,

7  with respect to the question of whether their conduct was

8  intentional, willful, or reckless, please consider checking

9  that box yes.

10          And then the last question, if you can bring it up

11  please, Wade.  If you think it's reckless or willful and you

12  checked next -- or you checked yes -- sorry -- then the last

13  question should the plaintiffs be awarded statutory damages.

14          And Her Honor's told you -- and if you could up the

15  statutory damages instruction which should be towards the end.

16          Statutory damages aren't to compensate the Cornejos.

17  They are to motivate compliance with the law within Ocwen and

18  to punish wrongdoing.  Thank you.

19          That's the purpose.  We talked about the economic

20  loss and those are the numbers that make the Cornejos whole or

21  as whole as they can be if we're just doing our accounting,

22  putting pencil to paper, and crunching numbers.

23          The statutory damages are how do we motivate Ocwen to

24  give a rip.  How do we motivate Ocwen to actually care about

25  the carnage that it has created on this family and this woman

228

1    and her husband.  How do we motivate them.

2            In the last three days, we've heard all the corporate

3    buzz words, helping people is what we do, the winning solution,

4    a team of single points of contact.  They've even trademarked

5    the helping people.

6            Well, words are cheap and that's all Ocwen is and

7    that's all it has is cheap words.  It doesn't back it up.  And

8    everything you seen on display over the last four days now is

9    the way that Ocwen does business, attack the homeowner, blame

10   everybody else, blame, blame, blame.

11           How much responsibility has Ocwen taken for its own

12   conduct here.  None.  How much accountability.  None.  It's

13   everyone else's fault.

14           The only thing -- if Ocwen were being honest with

15   you, the only thing that it regrets about the way that it

16   handled this matter, the way that it handled the Cornejos' home

17   is sending them that congratulations letter because that was

18   the evidence that they shouldn't have foreclosed on their home.

19           If Ocwen were being honest, that's truly the only

20   thing that they regret.  Gosh darn it, if we wouldn't have sent

21   that letter, we'd have a whole bunch more defenses to avoid

22   accountability, avoid responsibility.

23           Ocwen's never going to change their conduct on their

24   own.  They're never going to hold themselves accountable.

25           The reason that we have a civil justice system and

229

1    the reason that us and you, Her Honor, everyone is here today

2    is because we're dealing with a company -- a defendant that is

3    absolutely incapable of saying we broke the law, we're sorry

4    for what we've done, ma'am, here's what we're going to do to

5    fix it.

6              They're absolutely incapable of doing that for

7    themselves.

8              Mrs. Cornejo and Mr. Cornejo can't make Ocwen follow

9    the law.  They can't make Ocwen be held accountable.  They

10   can't make Ocwen say we're sorry, ma'am, for what we did to

11   you.

12             And when Dora was up there testifying yesterday and

13   Ocwen's representative -- and I don't know if you saw it -- is

14   over there on his computer not looking up because he's got his

15   phone and his WiFi hotspot, that tells me that Ocwen doesn't

16   get it.  They're not going to accept responsibility on their

17   own.

18             And the Cornejos, they're little.  They're nothing to

19   Ocwen.  They're not going to get Ocwen to change the way that

20   they do business and Mr. Vitiello and I, all we can do is try

21   and help the Cornejos get their day in court, but we can't do

22   anything.

23             It really is the eight of you that I -- you know,

24   here you are.  Here you are and here's the process that we

25   have, but the way this system works and what makes it so

230

1   wonderful for people like the Cornejos and what makes it so

2   fear inspiring to companies like Ocwen is now you, ladies and

3   gentlemen, the eight of you collectively get to serve as the

4   conscience of this state.

5        You get to serve as the conscience of this community

6   and you get to check a box that says to Ocwen, hey, wake up,

7   knock it off.

8        So please consider checking that box.

9        I'll have a quick minute to respond to whatever

10  Ocwen's counsel says, but I promise the emphasis will be on

11  quick.  Thanks.

12       THE COURT:  All right, ladies and gentlemen.  I think

13  we probably would like a break before we have our next

14  argument.  So why don't you go ahead and take about 15 minutes.

15  I'll see you back here at 25 minutes after.

16       (Jury out at 3:11 p.m.)

17       THE COURT:  All right.  We're outside the presence of

18  the jury.  Break time.

19       (Recess from 3:11 p.m. to 3:26 p.m.)

20       (Jury in at 3:26 p.m.)

21       THE COURT:  All right.  We have all of our jury

22  members back in their places.  Mr. Shatz, are you prepared to

23  make your closing argument?

24       MR. SHATZ:  Yes, Your Honor.

25       THE COURT:  All right.  Thank you.

1              DEFENDANT'S CLOSING ARGUMENT

2         MR. SHATZ:  Ladies and gentlemen of the jury, thank

3    you.  You volunteered.  Thank you for being here and thank you

4    for listening for the week.  This will not surprise you that I

5    actually like this and the people in my office think I'm nuts.

6    My wife once sat on jury duty two Christmases ago and thought

7    it was interesting and I hope you do too.  When you leave here

8    and tell stories, I hope you will share good stories about

9    watching the American justice system at work.

10         When we began on Monday, I shared with you that this

11   was a simple case and it still is a relatively simple case.  We

12   have a case where there's borrowers, Mr. and Mrs. Cornejo, who

13   had a loan, and they knew they had a loan and they knew they

14   were in trouble.

15         And there was a loan servicer, Ocwen, and Ocwen knew

16   that the borrowers were in trouble, so Ocwen reached out to the

17   Cornejos.  And eventually, less than 13 days before the

18   ultimate foreclosure day, the Cornejos woke up and said we

19   better do something, and they tried to do something, and

20   because of their delay, despite Ocwen's efforts, they weren't

21   able to act in time and save their home from foreclosure.

22         They obtained the loan in 1992.  They made payments.

23   It was their home.  Taxes, insurance, mortgage, lawn, upkeep,

24   other things along those lines and sometime in 2012, as far as

25   we know and you've been shown, that they got in a bit of

232

1    trouble and started falling behind.

2         And Ocwen began servicing their loan in February

3    2013.  Before Ocwen serviced the loan, GMAC -- G-M-A-C --

4    Mortgage serviced the loan and they sent the Ocwens [sic] a

5    series of letters.  We put them in the exhibits -- Defendant's

6    Exhibits 501 through 504, just a selection.  You'll have a

7    chance to read them in the jury room.

8         The loan was transferred to Ocwen who began servicing

9    it, and Ocwen works as a team of people.  It's not just one

10   person who the borrower can't reach if they're going home at

11   night or they're ill or they're talking to another borrower,

12   but it's a team of people so that if the borrower calls in or

13   something happens, someone can take care of the borrower's

14   concerns.

15        And the Ocwen people are trained.  You heard that

16   people from foreign countries who work for Ocwen have come to

17   America for training and when in America for training, they met

18   Mr. Blanchard, among others.  These are Ocwen employees.

19        Now, during the opening statement given by

20   Mr. Vitiello, he told you -- and I have a copy -- he said at

21   least one of its offices in Bangalore, India, where it would be

22   reviewed and imaged by -- here's the words -- outsourced

23   personnel.

24        Other than his statement, there's no evidence it's

25   outsourced personnel.  They're Ocwen employees trained, as

233

1    Mr. Blanchard, said in how to do things.  Even co-counsel said

2    they rely on people in India and all over the world.

3          Ocwen's proud of that.  We have people who work

4    around the globe, around the clock, so when concerns happen,

5    Ocwen can address them and deal with them.  If a fax comes in

6    at 8:00 p.m. at night in America, that's a different time zone

7    somewhere else and it could be worked on because at

8    8:00 o'clock at night, 11:00 o'clock in Florida, the offices

9    should be closed.

10          We get to 2013.  You will have the exhibits to look

11   at and you will see in 2013 there were more than 25 letters

12   that Ocwen sent to the Cornejos.  Ms. Cornejo told you today

13   that she got some of them.  Nothing happened.  No payments were

14   made.  She didn't ask for anything.  She didn't respond to the

15   applications to fill out for mortgage assistance.  Just

16   nothing.

17          We get to 2014.  You'll have a chance to look again

18   at the exhibit pile.  There were two calls where there was

19   contact made.  We talked about Ocwen actually spoke with

20   Ms. Cornejo in January 2014 and December 15th, 2014.

21          You will see when you look through the records there

22   were at least 40 plus calls made and a message left with no

23   return call.  You will see more than ten letters that were sent

24   by Ocwen to the Cornejos saying, hey, you're behind, we can

25   help, here are different options, please let us know what you

234

1    want to do.

2          When Ocwen heard nothing -- radio silence, crickets,

3    however you want to word it.  When they heard nothing, Ocwen

4    recorded a notice of default starting the foreclosure process.

5          If Mr. Heenan's theory is correct, when the

6    foreclosure process started, there should have been nothing

7    else going on on a potential modification side because his idea

8    of this dual stuff is unfair to borrowers.

9          Not responding, not paying their mortgage has to

10   trigger a result of some type.  Okay.  Foreclosure is started.

11   Yes, we know we started foreclosure, but you can do something

12   about it and we can help you.  You have to apply.

13         Well, you actually don't have to apply.  If you want

14   help, you have to apply.  If you don't apply, we're going to

15   foreclose and we come to 2015.

16         And you'll see in the first three months when you

17   remember the records, there were seven telephone calls with

18   Ocwen and either Mrs. Cornejo or Mr. Cornejo.  But what we

19   learned today is it wasn't Mr. Cornejo talking.  It was

20   Mr. Cortez.  Ernie Cortez with Mr. Cornejo's permission telling

21   Ocwen that he was Frank Cornejo and talking on his behalf.

22         You will see there were many messages -- at least a

23   dozen messages left.  Hello, we're calling, please call us

24   back.  There was even a hang up, all in the first three and a

25   half months.

1          Mr. Blanchard explained the process for handling the

2   documents.  When stuff comes in, it's put into the right place.

3   It's put into the right loan so it can be accessed by other

4   Ocwen personnel and there's a notification that something is

5   happening in the file, start looking at it.  You remember that

6   process.  We talked about it.

7          So a fax comes in.  We talked about it going into the

8   fax box.  The fax box personnel send it to imaging.  It's get

9   sent to the right department.  It's uploaded.  All of the

10  documents are listed.  The department, in this case

11  underwriting, would look at it and say whether or not the

12  package was complete, and if not, a letter would go out.  And

13  if so, it would then go on for underwriting.  And that was the

14  process.  As with any process, it takes time.

15         We have a series of coincidences -- small

16  coincidences, timing coincidences.  Some of them have been

17  explained.  We have an October 22, 2014, notice of default.

18  Nothing happened.  A notice of default apparently is not enough

19  of a trigger to have a borrower react in this case.

20         Finally, on December 16th, Ocwen reaches

21  Mrs. Cornejo.  They discuss the issue and a mod package is sent

22  out.

23         Now, let's see this one in a bit of detail.  The

24  conversation was actually -- I apologize -- December 15th.

25  Mrs. Cornejo explained she was a little behind.  She wanted to

236

1    reinstate, but she would be willing to apply for a mod.  The

2    mod package went out.

3            An appointment was set for January 9, 2015.  Ocwen

4    called.  Mrs. Cornejo wanted to reschedule.  Okay.  It was

5    rescheduled, January 20, new appointment.  Ocwen called back.

6    They wanted to reschedule.  Okay.  January 29th, Ocwen called

7    back.  No answer.  Left a message.

8            Mod package, December conversation, January 9,

9    January 20, January 29.  It's not moving forward.  Ocwen says

10   okay, let's release the file and record a notice of sale.

11           So in February, the file was release.  Mrs. Cornejo

12   calls in February 16th.  We talked about that conversation.

13   The reason for the default then wasn't a slowdown in the

14   economy.  It was unexpected medical expenses.  She is not

15   behind on other bills.  She said the package was mailed in two

16   weeks earlier.

17           Okay.  She was told there was a foreclosure set and

18   it was set for March 27th.  She asked for the fax package.  The

19   package she sent in two weeks earlier wasn't actually sent in.

20   The stipulated facts show that nothing happened till

21   April 16th, and she even told you nothing happened till

22   April 16th.

23           So the next day, Ocwen sends out a letter on

24   February 17th.  It's in your packet, Exhibit 538.  Nothing

25   happened.  Ocwen doesn't give up.

1      February 20th, they call.  Notice of sale is recorded

2  on February 23rd setting the sale for March 27th.  Ocwen

3  continues to call and send letters.

4      February 26, called borrower, no message left.

5  February 26, call back borrower, left message.  Ocwen says

6  okay.  Let's postpone this.  The solicitation -- let's do more

7  solicitation.  So on March 10, a decision is made to postpone

8  and Western, March 11, sends a letter saying the sale is

9  postponed from March 27 to April 29.

10      Nothing.  No response.  Notice of default.  Notice of

11  sale.  Letters.  Phone calls.  A letter postponing the sale.

12  Nothing.  Nothing.  If you look at the records, Joint

13  Exhibit 4, pages 35 through 42, March 27, Ocwen called, left

14  message.  March 28, Ocwen called, left message.  March 30,

15  Ocwen called, left message.  No answer.

16      April 1, Ocwen called, left message.  April 2, Ocwen

17  called, left message.  April 3, Ocwen called, left message.

18  April 4, Ocwen called, left message.  April 6, Ocwen called,

19  left message.  April 8, Ocwen called, left message.  April 9,

20  Ocwen called, person answered, hung up.

21      April 10, Ocwen called, left message.  Can't explain.

22  April 16, Ocwen calls and leaves a message, and on that day,

23  the package is faxed in.  Don't know how it happened, but I do

24  know what we were told.

25      Mr. Vitiello told us on April 16, 2015, Dora Cornejo

238

1   woke up excited.  She thought that was the day she was going to

2   save her home from foreclosure.  He told us later in his

3   opening, so on April 16, she's freaked.  She realizes the

4   urgency of her situation, but she wakes up excited to take the

5   reins and to apply for a loan modification finally when she

6   hadn't before.

7          The Ocwen phone call triggered this.  Nothing else

8   happened that we heard about that would possibly be a trigger

9   for why finally, less than two weeks to go before sale,

10  something has to happen.

11         Is there a process in place?  Of course.  Ocwen sends

12  letters.  Ocwen makes calls.

13         Mr. Vitiello also told us that her husband Frank

14  trusts her with everything because, well, she handles the stuff

15  at the restaurant.  She's got to be better than him with the

16  paperwork.  He doesn't do it at the restaurant, so she still

17  does it all with a friend Ernie who you'll hear from.

18         And what is it they do?  We have an application.

19  You've seen it and it's filled in.  The application is the part

20  that starts the process.  We can't have a complete application

21  and all the supporting documents until we have the application.

22         The application instruction, Joint Exhibit 16, you'll

23  see them there, say it's got to be full and complete, fill in

24  all the appropriate blanks.  It has to be accurate.

25         Starting just on page 1, Section 2 -- not a problem.

1   Incorrect information so if Ocwen were to change its phone

2   number, it would never reach the Cornejos.  Go to page -- next

3   page, please.  More information.  Next page, please.

4        What we have is all of the assets that are listed and

5   no expenses making it difficult to evaluate the package.  Next

6   page, please.  We have a list here of the monthly income form,

7   so we know how much the Cornejos make, which version, okay.

8   Well, we have that problem.  Next page, please.  One more.

9        We have an income and expense declaration executed

10  under penalty of perjury, supposed to be true.  We're not sure

11  if anything in here is correct.  She said she didn't know who

12  the sources were, didn't know where it came from, she had the

13  documents, she and Mr. Cortez went through them, and she filled

14  it in.

15       If you look at Exhibit 18, please -- Joint

16  Exhibit 18.  I think it's page 4 -- page 5.  Page 4.  The

17  accountants provided information.  They don't match.  You will

18  have these exhibits in the jury room.  You can compare them

19  back and forth.  All of the information is verified to be

20  accurate as part of the modification process.  You will see

21  that in the form and we're getting different stuff.

22       The April 16th package was reviewed.  Ocwen got it.

23  Ocwen uploaded it.  Ocwen looked at it and on April 20th, sent

24  an acknowledgement letter.  Two business days later -- Joint

25  Exhibit -- we received the documents.  You'll have a chance to

240

1    see.

2         The next day, the missing document letter goes out,

3    incomplete.  Okay.  Mr. Heenan had a question about this.  Can

4    you blow this up?  This is not a letter going out on April 21

5    saying your stuff is due two days earlier.  This is a letter

6    going out saying your stuff was due two days earlier.  We've

7    received it.  Even though it's late, we're going to look at it.

8    We have your package, and as part of this package -- I think

9    it's the fourth page -- we need some -- we're still willing to

10   look at your package, can you send us the stuff.

11        Ocwen didn't give up.  They kept working.  They

12   didn't take Mr. Heenan's advice and say, hey, we're in

13   foreclosure, too bad, nothing else.  They said, hey, you're in

14   foreclosure, get it to us, we can still help you.  We're going

15   to work with you.  Not only are we going to work with you,

16   we're going to call you and on April 21, we called you.  And on

17   April 22, we called you.

18        Ms. Cornejo told you she got a call and she knew the

19   P and L was missing.  So she went to Franklin and on April 22,

20   they did the P and L we just showed you, Exhibit 18-4, Joint

21   Exhibit 18-4.

22        Mrs. Cornejo told you today she didn't just wake up

23   and say I think I'll give Ocwen the P and L.  She got a phone

24   call.  Ocwen reached out to her.  Made the phone call.  Reached

25   out to her and Franklin and Associates provided the information

1   and they sent it off to Ocwen.

2          They sent it off to Ocwen six days later, but they

3   sent it off to Ocwen.  Ocwen didn't quit on the 21st and 22nd

4   when they reached Ms. Cornejo and they called on the 23rd and

5   they called on the 24th and they even spoke on the 27th.  We

6   told you about those things.

7          The Ocwen records reflect that on April 27,

8   Ms. Cornejo called in.  According to the Ocwen records

9   contemporaneously made on April 27th, Ms. Cornejo said that

10  three days earlier on April 24th, she sent in documents.  There

11  was no evidence introduced in this trial that those documents

12  were sent in on April 24th.  The only documents we know about

13  that came in were on the 28th.

14         Now, counsel said she was very excited.  She spoke on

15  April 27th.  They spoke, Ms. Cornejo and Ocwen, we talked about

16  it, on April 28th.  The call was at 9:30 west coast time, 12:30

17  Florida time.  She never said I'm going to fax the documents in

18  an hour, be on the lookout for them.  She just faxed them in.

19         First page of Joint Exhibit 18, please -- first page.

20  To this fax number.  Make a note, if you're writing,

21  407-381-6943.  Let's go back to Exhibit 16 -- Joint Exhibit 16,

22  second page, third page.  That's the main fax number.

23         It could go in the five-day cue or not.  So where we

24  are, this is the case.  You have to decide was the application

25  package complete as defined by the Court before the foreclosure

1   sale took place.  Remember the elements of a complete package.

2   I believe it's Instruction 10, please.  The key part

3   here is number 1.  This is what we're talking about.  That they

4   submitted to Ocwen a complete and timely application for a

5   first lien loan modification.  You will have all the documents.

6   You will see them.  You will look at them.  You will have a

7   chance to decide was the application fully filled in and all

8   the documents provided within the time required so Ocwen would

9   be able to review it.  The next instruction, please.

10  An application is complete when the borrower has

11  supplied the mortgage servicer with all documents required by

12  the mortgage servicer.  This is not saying here's an

13  application that's blank, I've signed the bottom.  This is you

14  have to actually complete it.

15  Timely -- next instruction.  The application is made

16  timely if it's provided within the reasonable time frame set by

17  Ocwen.  Yes, you heard about 37 days.  Yes, you heard about

18  seven business days.  In this case, it was one business day.

19  Ocwen said in California we need one day to evaluate whether

20  it's complete.  We need you to get us this stuff in enough time

21  for us to look at it so that we can determine and make a

22  decision because if it's not complete, we're going to

23  foreclose.  If it is complete, we can push things off.

24  It's not just that the information came in.  The

25  information that came in that Ocwen was wrestling with was a

243

1   bankruptcy notice.  Remember what happened.

2        If there's a bankruptcy on file, the sale either is

3   stayed -- doesn't happen -- or if it happens, it's set aside.

4   So knowing if there's a bankruptcy -- huh -- this won't go

5   forward.  The Cornejos still have the property.  Maybe we can

6   work something out.  Ocwen kept trying.  They didn't give up.

7        Turns out that wasn't the case.  Exhibit 578, page 4.

8   Let's look at the midnight thing.  That paragraph.  You've seen

9   this.  We've talked about it, so I want to share two thoughts

10  with you.

11       The first thought:  family life, December 31st, we're

12  not going to talk about ages.  I'm a fan of Guy Lombardo, but

13  that doesn't happen anymore.  I also liked Dick Clark.  I don't

14  get Ryan Seacrest, but my kids like it, and this is what we do

15  on December 31st, okay, again, I do it at 9:00 o'clock east

16  coast time because I don't -- midnight's not that easy, but my

17  kids do it till midnight and they're there and there's a whole

18  bunch of people and it's 10:00 o'clock and they're eating and

19  doing whatever they're doing and it's 11:00 o'clock and they're

20  eating and whatever they're doing.  It becomes 11:00, 11:15,

21  11:30, 11:45.  I get woken up at 11:50 or 11:55.  I come

22  downstairs.  11:57, 11:58, 11:59, and you can hear them as

23  they're getting ready to have the ball drop as we get midnight.

24       The countdown begins 10, 9, 8 -- and you can see the

25  people are partying.  It's doing well -- 4, 3, 2, 1.

1          Under plaintiffs' theory of the case, it's not the

2     next day.  We can't have a new year's celebration.  It's not

3     new year's day.  It's not the next day.  It's not January 1st.

4     It's still December 31st.  You have to wait a whole day.  That

5     makes no sense.

6          It makes no sense particularly in this context.  And

7     this particular context works because you heard about the

8     process.  Documents come in and Ocwen has to get them, put them

9     in the right loan file, and look at them, and they need at

10    least a day to do that.  They actually need more time to do

11    that.  That's why there's five -- seven business days and the

12    37 days you heard about, but they need time to do that.

13          If it was actually midnight as being described by the

14    Cornejos, with the sale ten hours later at 10:00 a.m., there

15    wouldn't be time to look at the documents and if it wasn't for

16    India and the Philippines, there wouldn't even be people in

17    America to look at them until an hour or two or three before

18    the sale and it truly would go to foreclosure.

19          So that's what happens.  Our language is if we

20    receive all required documents no later than midnight of the

21    business day prior to your scheduled foreclosure sale -- but

22    the issue in this case isn't midnight.  The issue in this case

23    is they came in the next day at 10:37, clearly after midnight.

24    Could Ocwen process them in time?

25          And this can't be binding on the Cornejos because

1  they don't remember seeing it.  They never said they saw it.

2  Ms. Cornejo told you this morning, Ocwen never sent me any

3  correspondence.  They never sent me any letters.  Well, I don't

4  remember seeing them.

5       What we have is being told in the application.  We

6  need time to process it.  You've got to get your stuff to us

7  early.  The process works.  This is where we are.

8       So what do you have to do?  You have to decide.  You

9  have to decide if the application was complete and timely.

10      Things happened after the sale took place.  There was

11  an evaluation to look at, possible bankruptcy, documents came

12  in.  They were still acknowledged because the sale wasn't

13  final.  You saw the emails going back and forth and Ocwen, what

14  happened with the sale is with the third party.  Is the sale

15  valid.

16      That was still being discussed and while the

17  foreclosure group was working out their issues, the loss

18  mitigation group was working out their issues.  They were still

19  trying to work it out because if the sale could be set aside,

20  an offer could be made and worked.

21      So you have to believe or not believe people and see

22  what happens.

23      You heard from Mr. Blanchard.  He has a name.  He's

24  Mr. Blanchard.  He works for Cornejo -- he works for Ocwen, and

25  Ms. Cornejo and Mr. Cornejo have names too.  They're not the

1    borrowers.  We call them by their name.  We refer to them by

2    their name.

3         Mr. Blanchard told the story.  You saw that he said

4    he just interprets the facts and tells you what the facts are.

5    He did say that while he was testifying he came across

6    situations where Ocwen didn't do it right.  The facts said this

7    could be a problem.  He just provides the findings.  He doesn't

8    set the policy.

9         Mrs. Cornejo's testimony was different.  It was

10   almost as if she would say anything to save their home.  I need

11   a financial statement on April 16th.  Let's fill in some

12   numbers and fax it in.  I never got any letters.  The very

13   letter she never got, the December 16th financial aid

14   package -- the financial package was the one she sent in on

15   April 16th.  We saw the dates.

16        Six days later on April 22, the accountant fills out

17   different numbers.  Ms. Cornejo told you today she didn't hire

18   an attorney.  She told you -- a bankruptcy attorney.  She told

19   you that under penalty of perjury.  She files a declaration

20   with this court saying she hired a bankruptcy attorney.

21        Whatever's necessary at that moment is what we're

22   going to say.  I need to have more income.  Okay.  I have more

23   income.  I need to have less income.  Okay.  I have less

24   income.  She doesn't even tell Ocwen, with a power of attorney,

25   that she has the authority to sign on behalf of her husband who

247

1    no evidence said he even saw the numbers and could verify them.

2          She acted on his behalf.  She signed his name.  The

3    authority -- okay, they're married.  Community property estate.

4    I'm not sure that's the real authority.  Is the application

5    complete?  Did Mr. Cornejo actually submit an application.

6          Even Mr. Cortez acted on behalf of Mr. Cornejo and

7    Mr. Cortez is not licensed, registered, regulated, or a

8    mortgage specialist.  He's just a friend.  No problem.  But he

9    didn't say hi, Ocwen, I'm a friend of the Cornejos.  I'm here.

10   He said I'm Frank Cornejo.

11         I don't know the number of exhibits.  You'll probably

12   be close to somewhere around 75 or 100 exhibits.  You should

13   look at them.  We had to look at them.  You'll enjoy them.

14   You'll say wow.  These are exhibits.  This could have been a

15   Sequoia.

16         You only need four to decide the case.  Take a look

17   at Joint Exhibit 16.  This is the December 2014 letter and

18   application for a mod.  That was returned as Joint Exhibit 17,

19   the filled-in application.

20         Take a look at the Defendant's Exhibit 578, the

21   letter and its terms because the blank RMA says you have to

22   act.  You may lose protections if you're late.  The filled-in

23   RMA wasn't filled in.  The letter said we need more documents,

24   you got to get them to us.  Phone calls were made.  And then

25   take a look at Joint Exhibit 18.  Let's pull that one up.

1        The April 28th fax.  Skip two pages.  Back-dated

2   documents, front-dated documents, different documents, kind of

3   tough to figure out what to believe and what there was.  The

4   constants.  Ocwen continually reached out.  When documents were

5   given to it, it acted on them and sought what it needed so it

6   could do the job.

7        Because things came in far, far, far, far at the last

8   minute to make it work, it was difficult for anything to

9   happen.

10       So what is it you have to do?  Well, you have to fill

11  out the special verdict.  Let's go to the first question.

12  Mr. Heenan went through this with you.  You read the questions.

13       Your first question is were all the documents

14  required provided?  Did Frank Cornejo and Dora Cornejo supply

15  Ocwen with all the documents required by Ocwen in connection

16  with the loan modification application.

17       This isn't asking about time.  This is were all the

18  documents provided.  Not some of the documents, not half the

19  documents, but all of the documents.  Doesn't matter when they

20  came in.  Were they provided.  Doesn't matter when they were

21  looked at.  Were they provided.

22       We're going to tell you no.  We're going to tell you

23  no with a straight face because they weren't totally filled in.

24  And all of the other information wasn't provided.  You'll see

25  there was a 2014 tax return not provided, for example.

249

1          But the fact that there's no complete loan
2     modification application doesn't mean that Ocwen can't offer a
3     mod.  It just means there's no complete loan modification
4     application and therefore no protection to the borrower against
5     the foreclosure.
6          Only with a complete modification application is
7     there a bar on foreclosures.  So here we don't have complete
8     applications.  Next question.
9          Did Frank Cornejo and Dora Cornejo supply all the
10    required documents within the time frame specified by Ocwen?
11    If it was midnight the business day prior, then no.  And it
12    would have to be midnight the business day prior for Ocwen to
13    have time to look at them.
14         Stuff came in later and it wasn't even flagged.  It's
15    as if they didn't care enough.  We'll send a fax.  We know it
16    takes 24 to 48 hours to review because -- and you'll see in
17    servicing records when you look, they were told that.
18         Ms. Cornejo was told it takes time to look at the
19    documents.  So she sends it in but doesn't tell anybody.  But
20    if it wasn't within the time frame specified by Ocwen -- next
21    question -- were Ocwen's time frames reasonable.
22         In 49 states, the Ocwen forms require seven business
23    days.  We can expedite it here, but we still need time to look.
24    Question 4.
25         You'll have to ask whether the violation was

250

1    material.  The Court will define or has defined that for you.

2    It's in the instructions.  You'll have a chance to take a look.

3         I'm not really seeing a violation when stuff comes in

4    at the last minute and Ocwen's hustling to process it.  In this

5    case, coming in one or two days earlier or even saying, hey,

6    it's there, look for it, see if you can find it might have made

7    the difference.  Let's go to Question 5.

8         If you find that Ocwen actually violated the statute,

9    you have to make a decision as to compensation to the Cornejos.

10   Okay.  Some of these things are not written down and I can't

11   argue with them.  So, yes.  I hate to say it, but the Cornejos

12   did have a notary and signed the modification agreement and

13   incurred expenses to mail it back.

14        So if you find that Ocwen acted wrongly and violated

15   the statute, yes, that's an expense they incurred.  And, while

16   not asked for here, there was evidence that there were moving

17   expenses.  Sorry about that.  They were.

18        But they're asking for compensation for an unlawful

19   detainer judgment.  The parties have agreed that for the

20   unlawful detainer judgment, that was the rental value of the

21   property.  They have to live somewhere.  They have to pay

22   somewhere to live.  It's not damages caused by Ocwen.

23        The amount stated by Mr. Heenan was 5956.  The

24   evidence in front of the court was it was compromised down to

25   5161.  It doesn't work.

1          They're asking for 17 years of storage costs.  If

2     they're really going to be out of the house, 17 years is not

3     reasonable.  I understand after you move out you put your stuff

4     in storage and you want to get a place for a year and to match

5     your year lease.  That's what they did.  I don't have a lot to

6     say.  It's wrong and you can't think about it.

7          But at some point in time, you -- you're just not

8     going to let the stuff sit in storage for 17 years and

9     deteriorate however it sits in storage.  And the same thing

10    with the rental savings, the difference in rent and price.

11    There's no guarantee or assurance that this would continue.

12         Remember what happened.  There was a foreclosure

13    sale.  At the foreclosure sale, the price was $140,000 and the

14    parties have agreed that Ocwen's loan was paid off to the tune

15    of approximately $80,000, the 27 factual stipulations.

16         The money that's left over doesn't go to Ocwen.  It

17    goes to the junior debt.  So $39,000 went to the Internal

18    Revenue Service lien.  I'm rounding.  $12,000 went to the State

19    Farm lien.  The remaining money went to the Franchise Tax

20    Board.

21         So all 120,000 of the purchase price -- that's the

22    wrong number.  All 140,000 of the purchase price was paid out

23    to either Ocwen for the lien or the Cornejos' other debts.  The

24    Cornejos don't have those debts now.  They can afford the rent

25    easier.

1      In addition, during the two years between the time of

2  their default in June 2013 and the foreclosure sale in April

3  2015, the Cornejos weren't paying Ocwen money for mortgage and

4  they weren't paying the property taxes.  Ocwen was paying the

5  property taxes.  They weren't paying anything and that money

6  went somewhere presumably to live with their debts and they

7  were having trouble affording what was happening.  They had

8  three big liens.

9      Yes.  They have to pay more in rent for a smaller

10  property, but they can look around and find something more

11  suitable and appropriate if they need to do that.

12      The Court has instructed you on mitigation,

13  Instruction 16 I hope.  There you go.  Let's make that bigger.

14  You just don't get to claim damages.  You have to use

15  reasonable efforts to mitigate your damages and reasonable

16  efforts is not 17 years and it's not 15 years.

17      And, yeah, if the foreclosure sale was in violation

18  of the law, there was harm, but it's not this harm.  Go to

19  Question 6.

20      You've heard discussions.  Is there a way to leave

21  this up and put up Instruction 17?  It was the next

22  instruction.  There you go.  And let's do this part and put

23  back up the -- you have it.

24      A defendant's conduct is intentional, willful, or

25  reckless if the defendant knew of the requirements of law and

1    purposefully failed to comply with those requirements or showed

2    complete indifference to the requirements of law.

3          That would be almost as if, yeah, the fax came in and

4    you called us and told us the fax came in.  We don't care.

5    What happened in this case, April 16, the first pack comes in.

6    It's incomplete.  Ocwen begins calling and calling and calling

7    and calling and when things came in, they tried to act on it,

8    and you saw the emails flying around at the end.

9          It just was not enough in time.  It wasn't not only

10   not purposefully failed to comply.  It was tried real hard to

11   comply, but didn't have enough time, and there was no

12   indifference.  Ocwen tried to make it work and after the fact,

13   had the possibility of making it work -- had the possibility.

14         We're hoping you don't find intentional, willful, or

15   reckless conduct in this case, but if you do, then you come to

16   the question of the damages, Question 7.

17         I'm not sure what the motivation would be.  Is the

18   motivation make two calls a day?  Is the motivation send

19   someone -- and say would you please fill out the documents and

20   get them back to us?  You don't really want to be harassed by

21   your mortgage lender.

22         We're hoping one call a day is sufficient.  We're

23   hoping the chance to try and save your home and take action is

24   sufficient or something you want to do.

25         We are certain you're going to do the right thing.  I

254

1   won't have a chance to address you again after Mr. Heenan has

2   his final comments.  But I hope you'll have a chance to go back

3   to the jury room and think, hmm, this is what happened, this is

4   why it happened, and yeah, Ocwen acted properly.

5            Thank you.

6            THE COURT:  Mr. Heenan, your rebuttal argument.

7            MR. HEENAN:  Thank you, Your Honor.

8                  PLAINTIFF'S REBUTTAL ARGUMENT

9            MR. HEENAN:  I just want to clear up because while

10  everyone's getting called a liar over at Ocwen's table, I got

11  thrown into the mix too about the unlawful detainer.

12           The numbers $5,956 which is the judgment which was,

13  as counsel points out, $5,161, plus the attorney the Cornejos

14  had to hire to try and help them stay in their house, albeit

15  unsuccessfully, right now, they're 795.

16           So no one's padding the bill on you on our table.

17           Counsel, told you that this is -- here's Frank's

18  deposition.  Dora's was even longer.  Frank and Dora don't

19  think this is fun at all.  And you know why?  You see the way

20  that they do it.  Clever arguments, clever bank, parsing

21  through all this stuff trying to find something in here to make

22  the person look like a liar.

23           Look at the definition, please, of complete.  It says

24  the documents that the servicer requested.  Go back if you need

25  to to Ocwen's witness who took us through this and said this is

1   what complete looks like and you can't get a modification till

2   it's complete.

3          Not once did counsel raise the smoking gun document,

4   congratulations you're approved and you know why?

5          Because like I told you, Ocwen wishes that document

6   didn't exist because then they could raise these kinds of

7   garbage arguments.  But they can't because there's a document

8   that says congratulations, you're approved.

9          I also wanted to point out that fax we keep looking

10  at that says send to Tabu and now apparently it's Dora's fault

11  for sending it to the wrong fax number, well, Dora didn't just

12  pick Tabu and a phone number out of the air.

13         We looked at all those emails and go back and look at

14  them.  He's the guy in India within the escalation department

15  that was trying to tell the people somewhere else cancel the

16  sale.  So Dora sent those documents to him.  So I don't

17  understand why it's fair -- that somehow that's more of the

18  blame that's being laid on Mrs. Cornejo.

19         And with the reasonableness, you know, counsel just

20  made frankly our argument for why -- how can it be reasonable.

21  If they want to say 24 hours, put 24 hours.  If they want to

22  say five days, put five days.  They're the ones that did the

23  document.  Don't make it vague and ambiguous.

24         And finally, I guess I'll just -- you know, the one

25  thing that we really do agree on is we do trust you to do the

256

1    right thing and if you think that Dora Cornejo is a liar, go

2    back there and pour us out and pour us out quickly.  If that's

3    what you think.

4            If you think they were gaming the system, if you

5    think the bad guy is Dora Cornejo, kick us out of court.  But

6    if you don't -- if you don't then say, wait a minute, who's the

7    real bad guy here then and I think -- I think we all know.

8            Everybody knows what's going on.  Everybody.

9            Thank you for your time.  Please get to work.  We

10   look forward to hearing from you.  Thank you.

11           THE COURT:  All right.  Ladies and gentlemen, I have

12   a few more instructions.

13                   FINAL JURY INSTRUCTIONS

14           When you begin your deliberations, you should elect

15   one member of your jury as your presiding juror.  That person

16   will preside over the deliberations and speak for you here in

17   court.

18           You will than discuss the case with your fellow

19   jurors to reach agreement if you can do so.  Your verdict must

20   be unanimous.

21           Each of you must decide the case for yourself, but

22   you should do so only after you have considered all the

23   evidence, discussed it fully, and listened to the views of your

24   fellow jurors.

25           Do not hesitate to change your opinion if the

257

1    discussion persuades you that you should.  Do not come to a

2    decision simply because other jurors think it is right.

3           It is important that you attempt to reach an

4    unanimous verdict, but, of course, only if each of you can do

5    so after having made your own conscientious decision.

6           Do not change an honest belief about the weight and

7    effect of the evidence simply to reach a verdict.

8           A verdict form has been prepared for you.  After you

9    have reached unanimous agreement on a verdict, your presiding

10   juror will fill in the form that has been given to you, sign

11   and date it, and advise the Court that you are ready to return

12   to the courtroom.

13          If it becomes necessary during your deliberations to

14   communicate with me, you may send a note through the court

15   security officer signed by your presiding juror or one or more

16   members of the jury.  No member of the jury should ever attempt

17   to communicate with me except by a signed writing and I will

18   communicate with any member of the jury on anything concerning

19   the case only in writing or here in open court.

20          If you send me out a question, I will consult with

21   the parties before answering it, which may take some time.  You

22   may continue your deliberations while waiting for the answer to

23   any question.  Remember that you are not to tell anyone

24   including me how the jury stands numerically or otherwise until

25   after you have reached a unanimous verdict or you have been

258

1    discharged.  Do not disclose any vote count in any note to the

2    Court.

3          At this time, can we have our court security officer

4    be sworn.

5        (Court security officer sworn.)

6          THE COURT:  All right.  Ladies and gentlemen, in just

7    a few minutes, I'm going to ask you to go with our court

8    security officer to the jury deliberation room.  Because you do

9    that, I do want to give you a little bit of information.

10          The building does close at 5:00 o'clock.  Except for

11   that, you can establish your own hours.  So if tomorrow you

12   want to come in at 10:30, that is up to you to decide.  You set

13   your own hours from now on.

14          But other than that, if you have questions or

15   something, I've told you how to do that.  So at this point, I'm

16   going to ask you to go with our court security officer.  Thank

17   you.

18        (Jury out at 4:19 p.m.)

19          THE COURT:  All right.  So we're outside the presence

20   of the jury.  You may wish to wait in the courthouse at least

21   until 5:00 o'clock.  Otherwise, you can leave your contact

22   information and Susan will let you know when we have a verdict.

23   I will expect that you are able to get back here within a

24   reasonable time, hopefully not more than about 15 minutes.  So

25   either way?  Anything --

259

1        MR. HEENAN:  Your Honor, so do I understand in your
2   comments to the jury that if they don't have a verdict by 5:00,
3   then they go home and they'll let us know basically when
4   they're going to start tomorrow?
5        THE COURT:  We will let you know that.
6        MR. HEENAN:  Okay.
7        THE COURT:  If you want to go away to the hotel, we
8   will let you know when they have retired tonight.  We'll let
9   you know when they've returned in the morning.
10        MR. HEENAN:  Thank you, Your Honor.
11        THE COURT:  Anything else?
12        MR. HEENAN:  No, Your Honor.
13        THE COURT:  All right.  Thank you.
14        MR. SHATZ:  No, thank you.
15        THE COURT:  Oh, well, one thing.  We do have the
16   other issue.  I would like for you to look at the other
17   instructions and verdict sheet because if we come back on that
18   phase, we're hot going to have a lot of time to deal with that.
19   So --
20        MR. SHATZ:  Oh, were there instructions for the other
21   phase?
22        THE COURT:  Yes.
23        MR. SHATZ:  Oh, he's got them.  Thank you.
24        THE COURT:  Yes.  So that's something that you would
25   need to do because when you come back, I really need for you to

260

1    be able to tell me right then what you think on that.  All

2    right?

3         MR. HEENAN:  Thank you, Your Honor.

4         THE COURT:  Thank you.

5    (Whereupon the hearing in the above-entitled matter was

6    concluded at 4:21 p.m.)

7                         --o0o--

8                        CERTIFICATE

9         I certify that the foregoing is a correct transcript from

10   the electronic sound recording of the proceedings in the above-

11   entitled matter.

12

13   /s/ Mary C. Clark                    December 28, 2016

14   Mary C. Clark, Transcriber

15   AAERT CERT*D-00214

16

17

18

19

20

21

22

23

24

25