1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF CALIFORNIA

3                           --o0o--

4  FRANK CORNEJO, et al.,        )  Case No. 1:15-cv-00993-JLT
                                 )
5                 Plaintiffs,    )  Bakersfield, California
                                 )  Friday, October 21, 2016
6        vs.                     )  12:37 P.M.
                                 )
7  OCWEN LOAN SERVICING, LLC,    )  Jury Trial - Day 5.
   et al.,                       )
8                                )
                  Defendants.    )
9  _____)

10                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JENNIFER L. THURSTON
11        UNITED STATES MAGISTRATE JUDGE, and a jury.

12  APPEARANCES:

13  For Plaintiff:              GIANDOMINIC VITIELLO
                                Katchko, Vitiello and Karikomi
14                              11500 W. Olympic Blvd., #400
                                Los Angeles, CA   90064
15                              (310) 943-9587

16                              EDWARD E. ANGWIN
                                Angwin Law Firm
17                              827 Moraga Drive
                                Los Angeles, CA   90049
18                              (310) 471-2707

19                              JOHN HEENAN, PHV
                                Bishop Heenan & Davies
20                              1631 Zimmerman Trail
                                Billings, MT   59102
21                              (406) 839-9091

22  For Defendant:             SANFORD P. SHATZ
                                BRIAN A. PAINO
23                              McGlinchey Stafford
                                18201 Von Karman Ave., #350
24                              Irvine, CA   92612
                                (949) 381-5811

25

ii

1    APPEARANCES (Cont.):

2    Court Recorder:              OTILIA ROSALES
                                  U.S. District Court
3                                 2500 Tulare Street, Suite 1501
                                  Fresno, CA   93721
4                                 (559) 499-5928

5    Transcription Service:       Petrilla Reporting &
                                     Transcription
6                                 5002 - 61st Street
                                  Sacramento, CA   95820
7                                 (916) 455-3887

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

iii

INDEX

PAGE

PRELIMINARY MATTERS                                        1

READING OF VERDICT                                        1

DISCUSSION RE: PHASE 2 INSTRUCTIONS AND VERDICT FORM       5

PLAINTIFF'S CLOSING ARGUMENT                              29

DEFENDANT'S CLOSING ARGUMENT                              31

JURY INSTRUCTED BY THE COURT                              31

SECURITY OFFICER SWORN                                    34

DISCUSSION RE: AFFIRMATIVE DEFENSE, ETC.                  34

READING OF SPECIAL VERDICT                                57

JURY POLLED                                               58

DISCUSSION OF JUDICIAL NOTICE OF DOCUMENTS                61

WITNESS INDEX

| FOR PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Dora Cornejo | V- 23 | S- 26 | | | |
| FOR DEFENDANT: | | | | | |
| Rashad Blanchard | | S- 52 | | | A-39 |

LEGEND:   V = Vitiello
          S = Shatz

EXHIBIT INDEX

| FOR THE COURT: | FOR I.D. | RECEIVED |
|---|---|---|
| 1   Jury Note | 1 | |
| 2   Jury Note | 56 | |

1

1    BAKERSFIELD, CALIFORNIA, FRIDAY, OCTOBER 21, 2016, 12:37 P.M.

2

3         (Call to order of the Court.)

4              THE COURT:  All right.  We're back on the record in

5    the case of Cornejo, et al., vs. Ocwen Loan Servicing, LLC,

6    et al., Case No. 1:15-cv-00993-JLT.  We have the same

7    appearances as we have had:  Mr. Shatz, Mr. Paino for the

8    defense; Mr. Vitiello, Mr. Heenan, Mr. Angwin for the

9    plaintiffs.

10             We have received a special verdict.  I'll mark the

11   jury note as Court's Exhibit 1.  Anything before we bring the

12   jury in?

13             MR. ANGWIN:  No, Your Honor.

14             MR. SHATZ:  No, Your Honor.

15             THE COURT:  All right.  Ask for the jury to come in.

16        (Jury in at 12:39 p.m.)

17             THE COURT:  All right.  We  have all of our jury

18   members back in their places.  Thank you very much.  We will

19   ask the courtroom deputy to publish the verdict.

20                        READING OF VERDICT

21             THE CLERK:  In the matter of Frank Cornejo vs. Ocwen

22   Loan Servicing, LLC, Case No. 1:15-cv-00933-JLT, we the jury in

23   the above-entitled action find the following verdict on the

24   questions submitted to us.

25             Question 1:  Did Frank Cornejo and Dora Cornejo

2

1   supply Ocwen with all of the documents required by Ocwen in

2   connection with their loan modification application.

3        Answer:  Yes.

4        Question 2:  Did Frank Cornejo and Dora Cornejo

5   supply all of the required documents within the time frame

6   specified by Ocwen?

7        Answer:  Yes.

8        Question 4:  Did the defendants commit a material

9   violation of California Civil Code Section 2923.6 when they

10  failed to postpone the foreclosure sale once the Cornejos

11  submitted all the documents required by Ocwen?

12       Answer:  Yes.

13       Question 5:  What amount, if any, do you award the

14  plaintiffs for their economic losses caused by the defendants'

15  conduct?

16       Response is $39,642.

17       Question 6:  When the defendants failed to postpone

18  the foreclosure sale of the Cornejos' home, did they act

19  intentionally, willfully, or recklessly?

20       Answer:  Yes.

21       Question 7:  Should the plaintiffs be awarded

22  statutory damages?

23       Answer:  Yes.

24       Signed and dated October 21st, 2016, by the jury

25  foreperson.

1          THE COURT:  All right.  Does either side wish to have

2     the jury polled?

3          MR. SHATZ:  Yes, Your Honor.

4          THE COURT:  All right.  Ladies and gentlemen, you've

5     heard your verdict published here in open court in that there

6     was a finding in favor of the plaintiffs in this case.  I --

7     and you've heard it read by Ms. Hall.  If the verdict that was

8     just read is your true verdict, then your answer to my question

9     will be yes.  The question I will ask you is, is this your true

10    verdict.  If it is not your finding and you disagreed with what

11    was read in court, then your answer to my question is no.  Does

12    everyone understand that?  All right.  Everyone's shaking their

13    head.

14          Let me ask Ms. Macchia, is this your true verdict?

15          MS. MACCHIA:  Yes, Your Honor.

16          THE COURT:  All right.  Mr. Yang, is this your true

17    verdict?

18          MR. YANG:  Yes.

19          THE COURT:  Mr. Wamocha, is this your true verdict?

20          MR. WAMOCHA:  Yes, Your Honor.

21          THE COURT:  Mr. Stanfield, is this your true verdict?

22          MR. STANFIELD:  Yes, Your Honor.

23          THE COURT:  All right.  Thank you.  Mr. Price, Juror

24    No. 8, is this your verdict?

25          MR. PRICE:  Yes, Your Honor.

4

1          THE COURT:  All right.  Ms. Montero-Pardo, Juror

2    No. 7, is this your true verdict?

3          MS. MONTERO-PARDO:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Martinez, Juror No. 6, is

5    this your true verdict?

6          MR. MARTINEZ:  Yes, Your Honor.

7          THE COURT:  All right.  And Mr. Moore, Juror No. 5,

8    is this your true verdict?

9          MR. MOORE:  Yes, Your Honor.

10          THE COURT:  All right.  At this time, ladies and

11   gentlemen, this case does involve a second phase which means

12   that there is additional evidence that you would need to hear

13   and to deliberate further.  So what I'm going to do is ask for

14   you to take your break at this time and -- take your lunch

15   break and return at a quarter to 2:00.

16          In the meantime, you have deliberated part of the

17   case and come to a verdict on issues that have been presented

18   to you.  You will be hearing additional evidence when you

19   return.  So I'm going to ask you at this time, while -- of

20   course, while you're separated, you are not to discuss the

21   case.  You can only discuss this case when you are together as

22   a group.

23          So when you go on your way to lunch, I'm going to ask

24   that you not discuss the case, don't allow anyone to discuss

25   the case with you, don't conduct any investigation of your own,

5

1   and to have a nice lunch and we'll see you back at a quarter

2   till 2:00.

3        (Jury out at 12:44 p.m.)

4        THE COURT:  All right.  We are at the stage of

5   emotional distress damages.  The Court's opinion as to the

6   availability of those damages has not changed.  I will allow

7   you to make your record on the topic.

8        First, let's turn to the jury instruction that would

9   be used for that phase.  Is there any changes to occur?

10       MR. ANGWIN:  None for the plaintiff, Your Honor.

11       MR. PAINO:  Your Honor, just a couple comments.  With

12  respect to the second sentence of paragraph -- looks like it's

13  the third paragraph starting with the amount of damages must

14  include an award for the emotional or mental harm that was

15  caused the defendants.  We would request that it read the

16  emotional or mental harm that the plaintiffs prove were caused

17  by the defendants.  I guess our concern is the mandatory must.

18       THE COURT:  Right.

19       MR. PAINO:  I don't want to give the impression

20  that --

21       THE COURT:  Probably makes sense to just delete out

22  that second -- although, you do -- you know what, we probably

23  need to include the causation instruction as well --

24  substantial cause instruction.

25       MR. PAINO:  We would agree, Your Honor.

6

1          THE COURT:  I think probably if we delete that

2    sentence then and add the causation instruction, that should

3    take care of that problem.

4          MR. ANGWIN:  And, Your Honor, just to make our

5    record, our position is that the discretionary portion for the

6    jury was whether or not they were going to award statutory

7    damages.  Now that they've decided to award them, then they

8    must award the damages which are established.  The discretion

9    for the jury was with the -- whether they order --

10         THE COURT:  They're not going to decide that.  That's

11   not a question to be decided.  It's simply $50,000 or the

12   greater of three times what was awarded.  There's nothing for

13   them to determine on this.  This is simply now the emotional

14   distress phase.

15         MR. ANGWIN:  Right.  We --

16         THE COURT:  I -- I'm sorry.  Go ahead.

17         MR. ANGWIN:  I'm sorry, Your Honor.  Yeah, our

18   position is that the actual damages under the statutory damages

19   include the emotional distress.

20         THE COURT:  I'm aware of that.  I've already ruled on

21   that topic, though.  I disagree with you.

22         MR. ANGWIN:  I know that, Your Honor.  I was just

23   saying that our position, respectfully -- I know you disagree.

24   It's just that if we are correct, then our position is that the

25   jury must award those damages.  Because they've already found

1    statutory damages are there, they must then award those

2    statutory damages.

3         THE COURT:  I --

4         MR. ANGWIN:  The discretion was in whether to award

5    the statutory damages or not.  They decided to.  This is just

6    what the statutory damages include and our position.

7         THE COURT:  I think I'm clear on your position.  I

8    don't think that that affects the language here because as I

9    told you, the Court is not going to permit emotional distress

10   damages to be a part of that.

11        So in any event, the determination of whether the

12   jury feels that emotional distress damages should be awardable,

13   they will make that determination.  They were not obligated to

14   award emotional distress damages.  This is simply an element of

15   actual damages if your argument is correct, not statutory

16   damages.  Does that make sense?

17        MR. ANGWIN:  Yep.

18        THE COURT:  That's why this language should not be

19   mandatory because if they choose an amount, then your argument

20   on appeal will be it should be this plus that times three.

21        MR. ANGWIN:  Correct.

22        THE COURT:  But they still are not obligated to award

23   emotional distress damages.

24        MR. ANGWIN:  All right.  We understand your position.

25   Can you explain -- I'm sorry.  I wasn't quite following what

8

1    you're doing to change the instruction then.

2         THE COURT:  Deleting the second sentence of the third

3    paragraph and adding the causation -- substantial cause

4    instruction, which will be -- becomes Instruction 2.

5         MR. ANGWIN:  All right.  Thank you, Your Honor.

6         THE COURT:  And then -- anything else then for us to

7    instructions?

8         MR. PAINO:  The only other thing that I would ask,

9    Your Honor, under California law, there are authorities that

10   say to be compensable, emotional injuries have to be

11   substantial or enduring and not trivial or transitory, and we

12   would ask, perhaps add a sentence stating that.

13        And the proposed sentence to be exact, we would say

14   to be compensable, the plaintiffs' emotional injuries must be

15   substantial or enduring, not trivial or transitory, and our

16   authority for that would be -- is a California Court of Appeals

17   case, Commercial Cotton Company v. United California Bank.

18        THE COURT:  Your -- can you give me the cite on that?

19        MR. PAINO:  It is 163Cal.App.3d511 and it looks like

20   the page reference is 517.

21        MR. ANGWIN:  And, Your Honor, isn't covered already

22   with your new causation instructions?

23        THE COURT:  The causation instruction does not

24   address that.

25        Mr. Paino, I'm seeing this case as discussing the

1    emotional distress damages that may be awardable on breach of

2    the covenant of good faith and fair dealing, and it's saying

3    specifically under that tort that the injuries must be severe.

4    More akin to an intentional infliction of emotional distress,

5    which is this is garden variety emotional distress.

6              MR. PAINO:  And I guess my reading, Your Honor, was

7    just more in a general proposition -- or more for a general

8    proposition.

9              THE COURT:  Yeah.  As a general proposition, I don't

10   think that's a correct statement of law because you could have

11   an event that's emotionally distressing that doesn't last

12   beyond a limited period and still be entitled to damages for

13   that event.  So I don't see that as applying, plus I am

14   Shepardizing that case now.

15             It does have criticism.  It's actually technically

16   overruled, although it appears to me to be on a different

17   topic.  But it does relate to the tort remedies available on an

18   insurance policy context.

19             I just don't see that -- in fact, I think that's

20   inconsistent -- requiring an enduring injury is inconsistent

21   with California law as to emotional distress damages.  I think

22   it's even -- it's inconsistent even with the intentional

23   infliction of emotional distress claims which does not require

24   endurance.

25             It does require, of course, severe emotional

1   distress, which can be either so substantial or long lasting.

2   Given that, I don't think that the case cite that you provided

3   me should be included.

4           All right.  As to anything else to the instructions?

5           MR. PAINO:  That's all we had, Your Honor.

6           THE COURT:  All right.  As to the verdict form then,

7   comments on that?

8           MR. ANGWIN:  Plaintiff's have no objection to the

9   verdict form, Your Honor.

10          THE COURT:  All right.  Mr. Paino, for the special

11  verdict?

12          MR. SHATZ:  Your Honor, we were wondering why you

13  broke out past and future noneconomic damages.

14          THE COURT:  Probably just because that's the way the

15  instruction -- I mean the instruction reads, but I imagine your

16  position then is that the emotional distress is not anticipated

17  into the future.

18          MR. SHATZ:  It was more just I was wondering what the

19  Court was thinking.  That's all.

20          THE COURT:  Just that -- that I haven't heard the

21  evidence on that.

22          MR. SHATZ:  Okay.

23          THE COURT:  All right.  So when the jury returns, we

24  will turn to that topic, introduction of that evidence.  In the

25  meantime, my recollection is, Mr. Paino, you wish to present

11

1   evidence related to the affirmative defense.  Do you still wish

2   to do that?

3          MR. PAINO:  Your Honor, we do have limited evidence.

4   I think it's pretty straightforward.  I don't have the exhibit

5   reference exactly.

6       (Pause.)

7          MR. PAINO:  Your Honor, in volume three of the

8   defendants' exhibits, Exhibit 584, we have an order approving

9   an asset purchase agreement.

10         THE COURT:  All right.  Is there objection to

11  foundation of that?

12         MR. ANGWIN:  I'm not sure what the foundation is,

13  Your Honor.  I haven't heard the foundation.

14         MR. PAINO:  We believe this is a judicially

15  noticeable and we'd offer the document.

16         THE COURT:  And it is being offered to demonstrate

17  that GMAC was a signatory to that settlement agreement?

18         MR. PAINO:  Yes.  For purposes of the Homeowner Bill

19  of Rights.  Not a direct signatory, but our position is that

20  they are bound by the -- this agreement demonstrates that Ocwen

21  in purchasing assets from GMAC Mortgage agreed to be bound by

22  the consent judgment.

23         THE COURT:  All right.  Do you have a specific page

24  reference for that?

25         MR. PAINO:  I do, Your Honor.  Let's see.  It would

1   be Section 6.16 of the actual purchase agreement which is

2   page 133.  And this reference ties into a second page of the

3   document.

4          THE COURT:  All right.  As I read 6.6, it says that

5   the parties were going to agree to develop an amendment to the

6   agreement to address the treatment of the consent decree, so --

7          MR. PAINO:  That's correct.  So the second reference

8   would be page 160, is that amendment and in particular

9   Section 6.16(a) which is the amendment.

10         THE COURT:  Mr. Paino, what's your understanding of

11  the exclusion which is 6.6 capital A sub b sub 1?

12         MR. PAINO:  My reading of that, Your Honor, is that

13  it does not extend to --

14         THE COURT:  Their agreement doesn't extend to any

15  loans except for those that they are assuming under this

16  agreement?

17         MR. PAINO:  That's correct.  Except for the loans

18  purchase the debt.

19         THE COURT:  It seems maybe that for a full analysis

20  of the issue then, it would require judicial notice of 6.16

21  capital A, that entire section?

22         MR. PAINO:  Which is -- and this is all part of the

23  Bankruptcy Court approved purchase agreement.

24         THE COURT:  Do you agree that that entire section,

25  though, is at issue?

1          MR. PAINO:  Yes, Your Honor.

2          THE COURT:  Is there any other section of the

3   amendment or the original agreement that you believe is at

4   issue?

5          MR. PAINO:  I believe those are the applicable

6   provisions, Your Honor.

7          THE COURT:  All right.

8          MR. ANGWIN:  And, Your Honor, sorry to interrupt, if

9   you're looking at it, we cited to Section 2.3 of the agreement

10  in our trial brief.

11         MR. SHATZ:  Do you know what page that's on?

12         MR. ANGWIN:  I do not.

13         MR. PAINO:  Page 94.

14         THE COURT:  Thank you.

15         MR. ANGWIN:  And, Your Honor, the portion we cited in

16  our brief was that --

17         THE COURT:  Let me go ahead and read this first.

18     (Pause.)

19         THE COURT:  All right.  Go ahead, Mr. Angwin.

20         MR. ANGWIN:  Your Honor, we have raised several

21  issues with regard to this.  First of all, it appears that it's

22  an affirmative defense that I guess they're raising now.  They

23  certainly raised this in the motion for summary judgment, but

24  they never brought up this evidence.  So --

25         THE COURT:  Wait.  We're now talking about the

14

1    introduction of the evidence through judicial notice.

2            MR. ANGWIN:  I'm sorry.  I apologize, Your Honor.

3    I'm still not -- are they saying you can judicially notice

4    documents from other courts?  Is that the basis for it?

5            THE COURT:  A fact or ready determination or the

6    court's docket.  I assume that's your basis, Mr. Paino?

7            MR. PAINO:  That's our basis, Your Honor.

8            THE COURT:  So I guess at this point, Mr. Angwin, I'm

9    certainly not excluding you from the argument that this

10   affirmative defense doesn't apply, but just for completeness,

11   you would want to point out to me Section 2.3, the entirety of

12   that section of is it particular portions of it or just the

13   entirety of it?

14           MR. ANGWIN:  I think the entirety of it, Your Honor,

15   because we can parse out the sentences, but I think for

16   completeness and understanding, you need to look at the

17   entirety of it.  It looks like it's only about ten lines long.

18           THE COURT:  Oh, 2.3 I was reading that as going to --

19   from 94 to 96.

20           MR. ANGWIN:  I'm sorry, Your Honor.  We -- I list it.

21   So because -- I think it's easier to add the whole thing if

22   you're going to judicially notice simply because we have to

23   sort of parse out which sentences and which lines don't fit in

24   because they're in the middle.

25           THE COURT:  Mr. Paino, have you taken a look at

1    subsection I?

2          MR. PAINO:  I have, Your Honor, and in the context of

3    this agreement, paragraph 2.3 is referring to assets not

4    obligations.  Our position is the obligation to perform under

5    the consent judgment is different and distinct from any

6    categorization of the purchase agreement -- or I'm sorry -- of

7    the consent order being an asset.  This paragraph is referring

8    to excluded assets.

9          THE COURT:  All right.  On this topic then, is there

10   additional evidence that you believe the Court needs to have in

11   order to evaluate that affirmative defense?

12         MR. PAINO:  On the signatory issue, no.

13         THE COURT:  Okay.  Is there a description in the

14   portions you've cited me that tell me that this loan was part

15   of this agreement -- or how can I come to that understanding?

16         MR. PAINO:  That, Your Honor, we believe we put on

17   evidence that --

18         THE COURT:  GMAC was the original?

19         MR. PAINO:  -- GMAC was --

20         THE COURT:  Is there a showing in this document that

21   all of the assets of GMAC transferred to Ocwen?  I mean in

22   particular the loan such that the evidence you presented

23   demonstrates that this loan was part of the assets?

24         MR. PAINO:  I don't believe there's anything

25   specifically in here that would refer to all the loans.

1          THE COURT:  How do -- what is that gap or how do we

2     address that gap then?  There was evidence presented that this

3     loan was originally from GMAC.  GMAC sold assets to Ocwen.  I

4     guess what I need to know then, did it sell all the assets of

5     all of the loans of the type the Cornejos' or is there a way

6     for me to determine that gap?

7          MR. PAINO:  That, Your Honor, I'm not sure.  I'd have

8     to look more closely at the purchase agreement.  I -- and then

9     the evidence has been closed.  That witness perhaps would have

10    been able to testify as to that -- as to whether this loan was

11    from the ResCap Group.

12         THE COURT:  You're not precluded from presenting

13    additional evidence.  I specifically indicated that we would

14    address this if we needed to.  So if you need a witness to

15    testify on that, then we can do that.

16         MR. PAINO:  I think I had to have -- but I think we

17    would have witness testimony establishing that this was loan

18    that was part of the ResCap purchase.

19         THE COURT:  All right.  I would like -- here's the

20    problem that I have.  I anticipated this trial was going to be

21    completed before the end of the day today.  I am out of the

22    state from the beginning of the next week.  If we have to come

23    back, we have to come back on Wednesday.

24         So ideally, we will complete and give it to the jury

25    today.  Can that occur today, Mr. Paino?

17

1          MR. PAINO:  I think that could occur today, Your

2     Honor.

3          THE COURT:  You need to have a conversation with

4     Mr. Blanchard?

5          MR. PAINO:  I'd like to have a conversation with

6     Mr. Blanchard.  I guess if I were to make an -- if that were an

7     offer of proof that I could make, would the Court -- does the

8     Court have an opinion on whether or not this agreement -- this

9     purchase agreement is enough to render Ocwen a signatory within

10    the meaning of the Homeowner Bill of Rights?

11         THE COURT:  See, I think that was a couple of

12    different questions.  I think this document establishes -- or

13    could establish, assuming that I understood that this loan is

14    part of this purchase, that Ocwen obtained the obligations of

15    the consent decree.

16         The next question then is what was the intention of

17    the State Legislature in enacting that statute and when it says

18    the signatories, did it mean and their assigns and that would

19    be -- on its face, that statute does not appear to allow for

20    that interpretation which would be my first step in analyzing.

21         But before -- I would need the foundational showing

22    before I could get to the analysis.  So it appears to me at

23    this time this does show that Ocwen purchased assets of GMAC.

24    What I'm not clear on is did it -- the assets that were

25    purchased, did that include either generally all of the

18

1    mortgages that GMAC had at the time or more narrowly, did it

2    include a package of assets that included the Cornejos' loan.

3          So I don't know that it's going to be -- I'm going to

4    hazard a guess that it does say the Cornejos' loan in this

5    agreement, but is there language that would allow me to

6    understand that it does include the Cornejos loan.  That's

7    where I'm wondering.

8          I think the document itself could be judicially

9    noticed for that purpose, but if it doesn't give me that

10   additional step, then I think there would be a failure to

11   evidence.

12         How much time would you need to speak with

13   Mr. Blanchard?  Because here's the other wrinkle, I do also

14   need to deal with a criminal matter that's going to take a

15   couple of minutes.  I will be prepared to go with the jury at

16   2:45.  So at 2:30, I will handle the criminal matter.  Can we

17   give you a few minutes to talk with Mr. Blanchard and then come

18   right back or do you think you'll need more time to do that?

19         MR. SHATZ:  We will talk to Mr. Blanchard for a few

20   minutes and give you a report.  Did you say 1:45 or 2:45 we

21   come back?

22         THE COURT:  I need the jury back at 2:45.

23         MR. SHATZ:  Oh, I thought you had said 1:45, come

24   back in an hour.

25         THE COURT:  Did I say 1:45?

19

1      MR. SHATZ:  I'm not saying you did or didn't.  That's
2  what I thought I heard, and I'm tired.  I apologize.
3      THE COURT:  My brain was thinking 2:45 because I need
4  to handle that criminal matter.  So we may have them back early
5  then.
6      MR. SHATZ:  I didn't mean to cause problems.  I'm
7  sorry.
8      THE COURT:  No.  It sounds like I caused the problem.
9  Well, in any event let's let you take a few minutes to speak
10  with Mr. Blanchard.  We'll go off the record for about ten
11  minutes and if you need a few more minutes, let me know.
12     (Recess from 1:11 p.m. to 1:49 p.m.)
13      THE COURT:  All right.  We're back on the record.
14  Mr. Shatz, it would be my intention to turn back to this issue
15  after we complete this.  So I don't mean to say you have to be
16  ready now.
17      MR. SHATZ:  Okay.
18      THE COURT:  We can turn back to that.  All right.  So
19  at this point, we will call our jury back in and I need
20  estimates because I have given you free rein up to this point.
21  We don't have that anymore.  What's your time estimate,
22  Mr. Vitiello, Mr. Heenan?
23      MR. VITIELLO:  I think have 15 minutes, Your Honor.
24      THE COURT:  All right.  Mr. Shatz, I suppose it will
25  depend or do you have --

20

1          MR. SHATZ:  It will depend, but we're in the same

2    ballpark, Your Honor.

3          THE COURT:  All right.

4          MR. ANGWIN:  We don't have an understanding yet of

5    whether they intend to call the purchaser.

6          THE COURT:  That's a good question.  Do you think

7    you'll be calling Mr. Ablin?

8          MR. SHATZ:  I don't know.  It depends on what she

9    says.

10          THE COURT:  Is he on-call?  Well, I guess the

11    question is, is he in the courthouse?

12          MR. SHATZ:  He's not in the courthouse, no.

13          THE COURT:  Is he prepared to be --

14          MR. SHATZ:  He is prepared to.

15          THE COURT:  All right.  How much notice are you

16    giving him?

17          MR. SHATZ:  I told him we would call him at lunchtime

18    and have not yet done that.

19          THE COURT:  All right.  Because if she's going to be

20    30, maybe even an hour at most, we need him to be here.  We

21    don't have time to wait for him.  Can we make that call?

22          MR. SHATZ:  Yes.

23          MR. HEENAN:  Your Honor, procedurally, put on the

24    evidence and then we get a short argument related to just this

25    issue?

1      THE COURT:  Yes.  And I'm going to tell you, you can

2  agree upon what that time frame or I'll impose one on you

3  because we just don't have a lot of time to do that.

4      MR. HEENAN:  Yeah, either way, it's -- whether the

5  Court makes us or not, we'll go real fast.

6      THE COURT:  All right.

7      MR. SHATZ:  And the issue is just emotional distress.

8      THE COURT:  Just emotional distress.

9      MR. HEENAN:  Five minutes.

10      THE COURT:  All right.  Mr. Shatz, how much?

11      MR. SHATZ:  Again in that range.  If you would give

12  me two seconds, I'm going to speak with Mr. Paino and then

13  we'll be --

14      THE COURT:  Okay.

15      MR. HEENAN:  Thank you, Your Honor.  But, Your Honor,

16  just -- like no like opening statement about -- right?  I mean

17  just put on the evidence?

18      THE COURT:  No, no, no.  We're going to go -- we've

19  done opening statement.

20      MR. HEENAN:  Yeah, yeah.  Thank you, Your Honor.

21      MR. SHATZ:  You said you were going to be about five

22  minutes.

23      MR. HEENAN:  For closing.

24      MR. SHATZ:  Oh, closing.

25      MR. HEENAN:  Yeah.

1        MR. SHATZ:  Okay.  I misunderstood.  I thought that
2   was the testimony.
3        THE COURT:  Oh, no.  I've got it sounds like about 15
4   minutes for --
5        MR. SHATZ:  Okay.  I'll be right back.
6        MR. HEENAN:  Ideally, if we can get it done before
7   your 2:30 and then the jury could --
8        THE COURT:  That would be ideal.
9      (Pause.)
10       THE COURT:  We'll have the testimony of Mrs. Cornejo.
11  That will take I'm understanding about 30 minutes.  Then
12  we'll go directly to closing argument.  I'll instruct at that
13  point.  So I don't know that we're going to get that done
14  before 2:45, but that's our goal.  All right.  So let's go
15  ahead and bring the jury in at this time.
16       I should say I have considered the issue again.  Does
17  anyone have any heartburn one way or the other if we don't --
18  if we delete out the future and past/present damages and just
19  lump it as one?
20       MR. HEENAN:  Whatever the Court's preference is, Your
21  Honor.
22       THE COURT:  Do you have a preference, Mr. Shatz?
23       MR. SHATZ:  No, Your Honor.
24       THE COURT:  All right.  I think we'll just -- unless
25  the defendants have any preference, then I think we will just

Cornejo, D. - Direct                                    23

1    drop out past and present and go with just distress damages.

2            MR. PAINO:  We're fine with that, Your Honor.  I

3    guess the other question I had was with respect to the -- there

4    were two lines, one for Frank and one for Dora.

5            THE COURT:  Yeah.

6            MR. PAINO:  Will there be any evidence for Frank?

7            THE COURT:  Doesn't sound like it, but if there's

8    not, then we'll have to deal with that issue.

9        (Jury in at 1:56 p.m.)

10           THE COURT:  All right.  Once again, we have our jury

11   members back in their places.  Mr. Heenan, you may call your

12   first witness.

13           MR. VITIELLO:  Your Honor, we'll call Dora Cornejo.

14           THE COURT:  Mr. Vitiello, thank you.

15           MR. VITIELLO:  Thank you.

16            DORA CORNEJO, PLAINTIFF, PREVIOUSLY SWORN

17           THE COURT:  Mrs. Cornejo, you were sworn earlier in

18   this case.  I do want to remind you that you still are under

19   oath.  Do you have any questions about that?

20           THE WITNESS:  No.

21           THE COURT:  All right.  Thank you, ma'am.  If you'll

22   take your seat.

23                        DIRECT EXAMINATION

24   BY MR. VITIELLO:

25   Q.   Welcome back to the stand.

Cornejo, D. - Direct                              24

1   A.    Thank you.

2   Q.    I have to ask you just a few more questions so the jury

3   can fully understand how losing your home affected you.  Can

4   you tell us what owning your home meant to you?

5   A.    I go to take you back to when I was living with my

6   parents.  I was brought up with hard-working family that worked

7   in the fields and I have a brother and a sister and we had to

8   put our money together to buy a home.  That's just the way it

9   was.

10       So I learned from the very beginning growing up that

11  family, home means everything.  So purchasing our first home

12  meant a lot to me and our family.

13  Q.    How about losing that home?

14  A.    When you stand as mother and you hurt your children and

15  have a sick husband by you and you have to tell them that you

16  got to walk away because as hard as you work, things weren't

17  ending up right, but I felt a betrayal because there were lies.

18  They said things that if they weren't going to comply with they

19  shouldn't have said.  It was a promise -- a false promise.

20  Q.    Did those --

21            MR. SHATZ:  Objection.  Nonresponsive.

22            THE COURT:  Sustained.

23            MR. SHATZ:  Move to strike.

24            THE COURT:  That'll be stricken.

25  BY MR. VITIELLO:

Cornejo, D. - Direct                                    25

1   Q.   I have to ask it in a different way.  Did losing your home
2   affect you mentally?
3   A.   Definitely.
4   Q.   How so?
5   A.   It put a strain on our relationship, our family.
6   Physically, you know, my hair was falling out.  I thought I was
7   sick, you know, but my hair would fall off and at nighttime
8   after a 10-, 12-hour-a-day job, I would go home and -- and it
9   wasn't my home anymore.  I left home.  I walked away from it.
10  I had a house and Frank -- Frank needed help.  There was many
11  times he called and said I'm -- to the house.
12  Q.   Are you describing after having moved to the home?
13  A.   Yes.
14  Q.   From the home, I mean.  Sorry.
15  A.   Yes.
16  Q.   Do you understand that this jury just awarded you your
17  economic damages?
18  A.   Yes.  So grateful.
19  Q.   Told you you're not a liar.
20       THE COURT:  Mrs. Cornejo, I'm going to ask you to
21  limit your comments to the questions.
22       THE WITNESS:  Okay.
23  BY MR. VITIELLO:
24  Q.   What do you plan to do with that award?
25       THE COURT:  Mr. Vitiello, does this impact your

Cornejo, D - Cross                                  26

1  emotional distress damage?
2          MR. VITIELLO:  I'm getting to the future, Your Honor.
3          THE COURT:  It should not have anything to do with --
4  the question is improper.  I'm going to ask you to move to the
5  next one.
6          MR. VITIELLO:  No problem, Your Honor.
7  BY MR. VITIELLO:
8  Q.  Will your feelings change?
9          MR. SHATZ:  Objection.  Calls for speculation.
10 BY MR. VITIELLO:
11 Q.  If you know?
12         THE COURT:  Sustained.
13 BY MR. VITIELLO:
14 Q.  Do you ever think this will go away?
15 A.  No, because the home my kids grew up is gone, no longer
16 going to be.  I lost all the memories and everything that goes
17 with home.
18         MR. VITIELLO:  Thank you.
19         THE WITNESS:  You're welcome.
20         MR. VITIELLO:  No further questions, Your Honor.
21         THE COURT:  All right.  Cross-examination.
22                     CROSS-EXAMINATION
23 BY MR. SHATZ:
24 Q.  Good afternoon.
25 A.  Good afternoon.

Cornejo, D - Cross                                27

1   Q.   Prior to the foreclosure sale, you had fallen behind on

2   the mortgage, right?

3   A.   Yes.

4   Q.   And some of the financial difficulties were attributable

5   to other debts.

6   A.   Yes.

7   Q.   Including owing money to the Internal Revenue Service?

8   A.   Yes.

9   Q.   And the Franchise Tax Board?

10  A.   Yes.

11  Q.   And other things impacted you such as your husband's

12  health?

13  A.   Yes.

14  Q.   And you were worried about your kids growing up?

15  A.   Yes.

16  Q.   You were a normal mom worried about the family.

17  A.   Yes.

18  Q.   And you cared for everyone else first, as you said, right?

19  A.   Yes.

20  Q.   Prior to the foreclosure sale, you didn't really have any

21  medical issues, did you?

22  A.   Myself?

23  Q.   Yourself.  You personally.

24  A.   No.

25  Q.   And in June of this year, we took your deposition; do you

1  remember that?

2  A.   Yes.

3  Q.   And told us after the foreclosure sale or at the time of

4  the deposition you had no current medical issues.

5  A.   Well, losing my hair is not a medical issue.  I didn't go

6  to the doctor to get a medical claim that I lost my hair.

7           MR. SHATZ:  Objection.  Nonresponsive.

8           THE COURT:  Sustained.

9           MR. SHATZ:  Move to strike.

10           THE COURT:  That will be stricken.

11  BY MR. SHATZ:

12  Q.   And again at the deposition in June this year, you told us

13  you didn't have any medical issues.

14  A.   Yes.

15  Q.   And you hadn't seen any physician since the sale.

16  A.   No.

17  Q.   When you told us a few minutes ago the memories are gone,

18  you still have your memories, some of them raising the family?

19  A.   Yes.

20           MR. SHATZ:  I need one moment.  Thank you.

21           THE WITNESS:  You're welcome.

22           THE COURT:  Any redirect?

23           MR. VITIELLO:  Nothing further, Your Honor.  Thank

24  you.

25           THE COURT:  Any further evidence on this topic?

1          MR. VITIELLO:  Nothing further.

2          THE COURT:  All right.  Mrs. Cornejo, you may step

3  down.

4      (Witness excused.)

5          THE COURT:  Defense have any evidence -- plaintiffs

6  rest at this time on this topic?

7          MR. HEENAN:  Yes, Your Honor.

8          THE COURT:  Any affirmative evidence from the

9  defendants?

10          MR. SHATZ:  One moment, Your Honor.

11          THE COURT:  All right.

12          MR. SHATZ:  Nothing further, Your Honor.

13          THE COURT:  All right.  Defense rest at this time?

14          MR. PAINO:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Vitiello, would you like

16  to make a closing argument?

17          MR. VITIELLO:  I'll defer to co-counsel, Your Honor.

18          THE COURT:  All right.  Mr. Heenan.

19          MR. HEENAN:  Thank you, Your Honor.

20              PLAINTIFFS' CLOSING ARGUMENT

21          MR. HEENAN:  Well, we lost our tech support so --

22  and all of the instructions to put for you, but your job now is

23  a pretty simple one.  You're going to get one instruction that

24  deals with emotional distress.  Her Honor will tell you what

25  the law is in that regard, but my co-counsel, Mr. Vitiello,

1   told you at the beginning of this case that the economic loss

2   was the smallest thing.

3          And in the Ocwen world, it's all just how much money

4   can you put on a piece of paper and how much money can you make

5   and how much money can you lose and what's your profit margin,

6   but fortunately, here in California  under our law -- and Her

7   Honor will instruct you about that law in a second, it says --

8   you know, we're not in the corporate world of Ocwen.  We get to

9   compensate people for things that go beyond economic.

10         We get to compensate the Cornejos for more than how

11  much was the unlawful detainer, how much is their rent, how

12  much is their storage.

13         Now, frankly, we're here to talk about what we've

14  wanted to talk about the whole time, and I guess where I should

15  have started this now, but let me end with, Mrs. Cornejo

16  started to say that she's grateful.  She is and Mr. Cornejo is

17  grateful.  We're grateful.

18         You guys -- we just can't thank you enough and we

19  trust you.  Just like we trusted you before, we trust you now.

20  So what you need to do now is use your collective experience

21  and wisdom and thoughts and figure out what's fair compensation

22  for the Cornejos for their noneconomic damages, which is the

23  big thing.

24         That's the real thing.  That's the real reason we're

25  here.  You can't put this woman and her husband back in their

31

1   home, but you can figure out what's fair compensation for Ocwen

2   having taken it from them, willfully and recklessly and

3   intentionally as you've now found.

4           So I'm going to get out of your way.  We're going to

5   get out of your way and we appreciate your continued work and

6   continued hard work.  Thank you.

7           THE COURT:  Mr. Shatz, would you like to make a

8   closing argument?

9           MR. SHATZ:  Yes, please.

10                  DEFENDANT'S CLOSING ARGUMENT

11          MR. SHATZ:  Good afternoon.  You're going to be asked

12  to find the amount of past and future mental suffering,

13  inconvenience, anxiety, humiliation, and emotional distress

14  suffered by Mrs. Cornejo and Mr. Cornejo.

15          We know you're going to sit there and you'll look at

16  what happened as a result of her life and as a result of

17  Ocwen's actions.  You'll be fair.  You'll do it right.  We

18  thank you for your time.

19          THE COURT:  Mr. Heenan, any reply argument?

20          MR. HEENAN:  No, Your Honor.

21                         JURY INSTRUCTED

22          THE COURT:  All right.  Ladies and gentlemen, it is a

23  duty of the Court to instruct you about the measure of

24  noneconomic damages.  Since you have for plaintiffs on their

25  claim, you must determine the plaintiffs' noneconomic damages.

32

1          Damages means the amount of money that will

2    reasonable and fairly compensate the plaintiffs for any

3    emotional or mental injury you find were caused by the

4    defendants.

5          The plaintiffs have the burden of proving damages by

6    a preponderance of the evidence, but they do not have to prove

7    the exact amount of damages.

8          In determining the plaintiffs' noneconomic damages,

9    you should consider the following:  (1) Mental suffering,

10   inconvenience, anxiety, humiliation, and emotional distress.

11   No fixed standard exists for deciding the amount of these

12   noneconomic damages.  You must use your judgment to decide a

13   reasonable amount on the evidence and on your commonsense.

14          To recover for future mental suffering,

15   inconvenience, anxiety, humiliation, emotional distress, the

16   plaintiffs just prove that he or she is reasonably certain to

17   suffer that harm.

18          Your award must be based upon evidence and not upon

19   speculation, guesswork, or conjecture.

20          A substantial factor in causing harm is a factor that

21   a reasonable person would consider to have contributed to the

22   harm.  It must be more than a remote or trivial factor.  It

23   does not have to be the only cause of the harm.

24          Conduct is not a substantial factor in causing harm

25   if the same harm would have occurred without that conduct.

1      When you begin your deliberations, you should elect

2  one member of the jury to act as your presiding juror.  That

3  person will preside over the deliberations and speak for you

4  here in court.  You will then discuss the case with your fellow

5  jurors to reach an agreement if you can do so.

6      Your verdict must be unanimous.  Each of you must

7  decide the case for yourself, but you should do so only after

8  you've considered all the evidence, discussed it fully, and

9  listened to the views of your fellow jurors.  Do not hesitate

10 to change your opinion if the discussion persuades you that you

11 should.

12     Do not come to a decision simply because other jurors

13 think it is right.  It is important that you attempt to reach a

14 unanimous verdict, but of course only if each of you can do so

15 after having made your own conscientious decision.

16     Do not change an honest -- about the weight and

17 effect of the evidence simply to reach a verdict.

18     A verdict form has been prepared for you.  After you

19 have reached a unanimous verdict -- or unanimous agreement on a

20 verdict, your presiding juror will fill in the form that has

21 been given to you, sign and date it, and advise the Court that

22 you are ready to return to the courtroom.

23     If it becomes necessary during your deliberations to

24 communicate with me, you may send a note through the court

25 security officer, signed by your presiding juror or by one or

1    more of the members of the jury.

2           No member of the jury should ever attempt to

3    communicate with me except by a signed writing.  I will

4    communicate with any member of the jury on anything concerning

5    the case only in writing or here in open court.

6           If you send out a question, I will consult with the

7    parties before answering it which will take some time.  You may

8    continue your deliberations while waiting for the answer to any

9    question.

10          Remember that you are not to tell anyone, including

11   me, how the jury stands numerically or otherwise until after

12   you have reached a unanimous verdict or have been discharged,

13   and do not disclose any vote count in any note to the Court.

14          All right.  Would you swear the in-court security

15   officer.

16                 IN-COURT SECURITY OFFICER SWORN

17          THE COURT:  Ladies and gentlemen, if you will return

18   to the jury deliberation room.  Thank you very much.

19       (Jury out at 2:12 p.m.)

20          THE COURT:  All right.  We're outside the presence of

21   the jury.  From the evidence that was presented, I didn't hear

22   a statement attributed to Mr. Cornejo.  I did not hear evidence

23   of emotional distress as to Mr. Cornejo.  Counsel have comment

24   on that on behalf of the plaintiffs?

25          MR. ANGWIN:  Your Honor, we will, if you will give us

1  leave to file a brief pointing out that in certain situations,
2  emotional distress --
3           THE COURT:  Susan -- Susan -- wait.  I'm sorry.  Go
4  ahead.
5           MR. ANGWIN:  If you'd like --
6           THE COURT:  I'm just going to ask her to wait.  Go
7  ahead.
8           MR. ANGWIN:  Okay.  That emotional distress can be
9  presumed because of the severity of the conduct.
10          THE COURT:  Defense.
11          MR. PAINO:  I'm not sure -- Your Honor, I'm not aware
12 of the authority that counsel's referring to.  It's not
13 something that we've briefed in advance.  There's been no
14 offering of proof or any evidence whatsoever of the emotional
15 distress suffered by Mr. Cornejo.
16          THE COURT:  And you may have authority to that
17 extent.  I've never seen that.  In fact, proof of emotional
18 distress may oftentimes be presumed from certain conduct, but
19 we haven't heard from Mr. Cornejo at all.
20          We haven't heard any information about how this event
21 impacted him.  The extent of what we have heard from
22 Mr. Cornejo was his testimony in his deposition yesterday.  I
23 don't find any grounds to ask the jury to award him emotional
24 distress damages.
25          MR. ANGWIN:  And, Your Honor, we'd be fine changing

1    the verdict form to have a single line for Mrs. Cornejo.

2         THE COURT:  All right.  All right.  Anything else at

3    this time?

4         MR. HEENAN:  Your Honor, would it be more -- could we

5    have the verdict form just say plaintiffs like it did on the

6    last one, recognizing the Court's ruling --

7         THE COURT:  I think that would clearly be error.

8         MR. ANGWIN:  Your Honor, let me go --

9         THE COURT:  Once more, emotional distress damages are

10   unique to a person.  If we were to do that, not only would it

11   be error, I think it would cause problems as to who owns that.

12        MR. ANGWIN:  Your Honor, what he said, just put not

13   in front of it.

14        THE COURT:  All right.  Anything else then?  All

15   right.  We'll go off the record.

16      (Recess from 2:14 p.m. to 2:51 p.m.)

17        THE COURT:  All right.  So we're back on the record

18   in the Cornejo matter.  We are still discussing the issue of

19   the affirmative defense.  I've had an opportunity to look

20   further at the documents cited to me.  Is there going to be

21   other evidence?

22        MR. PAINO:  Your Honor, we -- our witness is prepared

23   to testify that this loan was part of the ResCap purchase

24   agreement.

25        THE COURT:  All right.

1        MR. SHATZ:  We can do it by testimony or an offer of

2   proof.

3        THE COURT:  Let's hear the offer of proof.

4        MR. SHATZ:  The offer of proof, Your Honor, consists

5   of the fact that when this loan came from ResCap to Ocwen, it

6   came over on a new servicing system by FiServe.  FiServe was

7   the Rescap GMAC servicing system and at the time that Ocwen

8   bought the GMAC servicing rights, it also bought the FiServe

9   System.  So FiServe didn't exist in Ocwen's life prior to this

10  ResCap deal.

11        Many loans that came over bordered on the

12  REALServicing platform directly.  Because it was such a large

13  purchase, not every loan boarded at the same time and some

14  loans were left on FiServe.

15        Mr. Blanchard was given access to FiServe at the time

16  of the transfer and actually worked on FiServe as well as the

17  document imaging system -- the optical imaging system called

18  something and they also got the optical imaging system for

19  that.  That was in February 2013.

20        By August 2013, the loans transferred from FiServe,

21  the old GMAC ResCap system, into the REALServicing System.

22        So the Court order was November.  The loans

23  transferred in February.  Mr. Blanchard can testify that

24  100 percent of the loans that came over in February 2013 from

25  ResCap to Ocwen came over as part of the deal and the servicing

1    records that we have in front of you and if you look, for

2    example, at Joint Exhibit 4-27, reference ResCap.

3           If it was a different deal such as Litton or someone

4    else, it would reference a different deal, and if it wasn't

5    part of the ResCap deal, it wouldn't contain the ResCap

6    reference.

7           That would be the offer of proof.  He will testify to

8    that.

9           THE COURT:  All right.  Are plaintiffs willing to

10   accept that offer or do we need to hear that directly from --

11          MR. ANGWIN:  Your Honor, we would like to voir dire

12   him on his personal knowledge.

13          THE COURT:  All right.

14          MR. ANGWIN:  And the trouble for us, Your Honor, is

15   they're referring to documents we've never seen and some system

16   we've never seen.

17          THE COURT:  The documents have been seen.  They've

18   been marked.

19          MR. ANGWIN:  But not this FiServe and this -- he's

20   testifying, the way I understand it, that there's this whole

21   set of internal documents that gets us from A to C and we don't

22   know what that is.

23          THE COURT:  Actually, to be honest, to me the

24   operative fact was the weren't any servicing agreements that

25   were excluded in the agreement with GMAC ResCap.  To me that's

1    the important fact because when I look at the agreement, it

2    says it will be everything except for those things that are

3    excluded.  He's filled that little gap that said nothing was

4    excluded.

5              MR. ANGWIN:  Can we voir dire him then on his

6    personal knowledge on that?

7              THE COURT:  Sure.

8              MR. SHATZ:  You want me to take the -- I'm fine here.

9    It depends what the Court wants to do.

10             THE COURT:  It doesn't matter.  He's fine to be

11   there.

12             MR. SHATZ:  You're under oath and testifying, just so

13   you know.

14      RASHAD BLANCHARD, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

15             THE COURT:  Yeah, Mr. -- it's fine to sit there,

16   Mr. Blanchard.  You were sworn earlier in this matter.  You are

17   still under oath.  Go ahead, Mr. Angwin.

18                       VOIR DIRE EXAMINATION

19   BY MR. ANGWIN:

20   Q.   Mr. Blanchard, I'm somewhat at a disadvantage because I

21   don't know the systems you're talking about.  Can you take me

22   back through in 2013 what your job title was at Ocwen?

23   A.   Loan analyst.

24   Q.   Okay.  And in your job as loan analyst, were you doing the

25   same thing that you're doing here today?

1  A.    Yes.

2  Q.    Was the  majority of your time spent testifying in court?

3  A.    That was -- I would be called to testify in court, but the

4  majority of my work was verification and research.

5  Q.    All right.  With regard to the ResCap, can you point to

6  any documents which will allow us to look at sort of the paper

7  trail showing how this loan came to be serviced by Ocwen?

8  A.    I don't know all the documents that are here, but I was

9  also questioned in my testimony in reference to REALServicing

10  comments that are in something I was questioned about.  I don't

11  know what exhibit it is, but maybe they can -- and I was

12  directly asked what does this notation mean in reference to

13  ResCap and I gave the answer and I did advise them that it came

14  over from ResCap and that's why that notation was there.  Okay.

15  So it's JT4-27.

16  Q.    Did any loans come from ResCap to Ocwen prior to this

17  agreement?

18  A.    Not to my knowledge, no.

19  Q.    But you don't know, do you?

20  A.    As I was previously advised, there has been no other

21  transfers that came from ResCap.

22  Q.    Who advised you of that?

23  A.    That would be internally in Ocwen.  We have -- we have --

24  basically they advise us about how the deals came over and we

25  have summaries of how the deals came over.

1   Q.   Was that a document or a person you're referring to?

2   A.   Both.

3   Q.   Has that document been produced here?

4             MR. SHATZ:  Can we let the witness answer the

5   question before the next question starts, Your Honor.

6             THE COURT:  Yes.

7             MR. ANGWIN:  Your Honor, he answered the question.  I

8   said was it --

9             THE COURT:  I know.  I think he's just asking if you

10  allow him to finish before you start on the next question.

11            MR. ANGWIN:  Thank you, Your Honor.  I'm trying to

12  speed through.

13            THE COURT:  No need to do that.  Let's just give him

14  the time to have a complete record.

15            MR. ANGWIN:  All right.

16  BY MR. ANGWIN:

17  Q.   With regard -- am I correct that it's possible some loans

18  came into possession of Ocwen through purchases that would be

19  titled ResCap that were not part of the agreement that we're

20  referring to today?

21  A.   Not that I know of.  Not to my knowledge.

22  Q.   But you don't have knowledge, do you?  Are you saying you

23  don't know or it didn't happen?

24  A.   I was at Ocwen at the time that this transfer came over.

25            MR. ANGWIN:  Move to strike as nonresponsive.

1        MR. SHATZ:  Objection again.  Can you let him finish
2   his answer before the objection and next question?
3        THE COURT:  Mr. Angwin, again, let's let him finish.
4   If it's suitable to be stricken, we can handle that afterwards.
5        MR. ANGWIN:  I apologize, Your Honor.  I'm a little
6   excited.
7        THE COURT:  All right.  Mr. Blanchard --
8        MR. ANGWIN:  I will not do that again.
9        THE COURT:  -- do you need the question repeated?
10       THE WITNESS:  Yes, please.
11  BY MR. ANGWIN:
12  Q.   Yes.  Do you have personal knowledge whether any loans
13  came over that would have been titled ResCap in the Ocwen
14  system that were not part of the GMAC agreement we're referring
15  to today?
16  A.   There are no ResCap loans that came over prior to this
17  deal.
18  Q.   That's your personal knowledge, right?
19  A.   That's my personal knowledge.  As I've been there, I have
20  not witnessed any loans that came over from ResCap before this
21  deal.
22  Q.   Within your job duties, would you be advised of all ResCap
23  loans that came over?
24  A.   Of all, we would be advised of transfers -- large
25  transfers at the time that they happen, yes.

Blanchard - Voir Dire                                    43

1   Q.   You said we.  I asked about you.

2   A.   Yes.

3   Q.   So you -- every loan that came over from ResCap, you were

4   personally advised about?

5   A.   Not individually.  We would be advised of a deal.

6   Q.   And when you said we, I'm --

7   A.   I'm sorry.

8   Q.   I'm getting confused.

9   A.   I would be --

10            MR. SHATZ:  You're doing good.

11            THE WITNESS:  Forgive me.

12            THE COURT:  Mr. Shatz --

13            MR. SHATZ:  Let him finish --

14            THE COURT:  Yeah.

15            MR. SHATZ:  -- then talk.

16            THE COURT:  Mr. Angwin, is your question finished?

17            MR. ANGWIN:  Let me re-ask it, Your Honor.  I'm just

18   not sure.

19   BY MR. ANGWIN:

20   Q.   You've used the term we a couple times, sir.  I appreciate

21   that.  I'm asking about your personal knowledge.  Do you have

22   personal knowledge that no loans which would be labeled ResCap

23   in the Ocwen system came over which were outside of the GMAC

24   agreement we're talking about today?

25   A.   Do -- yes, I have knowledge.

Blanchard - Voir Dire                                    44

1  Q.   I'm asking if you have personal knowledge.  So you're

2  saying that you have personal knowledge of every ResCap loan

3  that came over.

4  A.   Personal knowledge of every ResCap loan?  No.  We -- no.

5  We have -- I'm advised of the deals when they happen.  So like

6  how this ResCap deal -- when this ResCap deal was happening,

7  we're advised -- I am advised of it.  You know, obviously, I'm

8  in a group that we're all advised together.  So but --

9  hopefully, that answers your question.  I'm not sure what

10 you're asking on this.

11 Q.   It's a little difficult because I haven't seen the

12 documents.  Let me ask you this.  Did different loans come over

13 to Ocwen for servicing at different times and you're referring

14 to those all as ResCap or was there one ResCap transfer?

15 A.   I'm only aware of the one ResCap -- a ResCap purchase that

16 happened.  I don't know of any other deal that involved ResCap.

17 Q.   Okay.  And so am I correct, you're not sure if there are

18 other loans which would be titled ResCap that are in Ocwen's

19 files?

20 A.   I know of no other ResCap deals that -- in my employment

21 at Ocwen.

22 Q.   How would you come to have knowledge of the ResCap loans?

23 Would there be like a -- would there be a document given to

24 you?

25 A.   Yes.  We did receive -- we did receive a memo.  This was a

1  pretty large purchase.  I also was given access to FiServe and

2  Looking Glass because as part of my research when I had to look

3  at these loans that we're now servicing and have access to

4  their database.

5  Q.   Okay.  Now, I apologize here.  We're trying to -- I'm

6  trying to figure this out, so I hope this question makes sense.

7  When you were advised of the ResCap loans coming in, was that

8  just in the form of a memo saying hey, we just bought a big

9  package of loans?  Is that -- am I characterizing that

10 properly?

11 A.   Not so much.  There also had to be training on how to

12 access the files on FiServe and Looking Glass.  We also

13 acquired several employees of ResCap that came over and started

14 working for -- under the Ocwen umbrella.

15 Q.   Okay.  I'm just asking about your personal knowledge as

16 to -- with regard to how you learned that the ResCap loans had

17 come into Ocwen's servicing.  Was that in a memo?

18 A.   A memo was part of it, yes.

19 Q.   Was there anything besides a memo that advised you that

20 ResCap had come -- the ResCap loans had come over?

21 A.   Yes.  I started working on the ResCap loans and had

22 access -- gained access to their systems and training on them.

23 Q.   I think I'm a little dense right here.  I'm trying to

24 figure it out.  The way I'm hearing you just -- I'm not trying

25 to tell you this is your testimony.  I'm trying to say this is

1    my understanding of your testimony -- is that you get a memo

2    saying we just purchased a group of loans -- servicing rights

3    to a group of loans called ResCap.

4    A.   Yes.

5    Q.   And then after that, you were trained to how to look at

6    some of those loans; is that correct?

7    A.   Yes.

8    Q.   Okay.  Did you ever look at the Cornejo loan to ensure it

9    was in the ResCap file before you became involved in this

10   litigation?

11   A.   Yes.  I always look to see where the loan came from.

12   Q.   You looked at the Cornejo loan before this litigation?

13   A.   Not before this litigation, when I became involved in this

14   litigation.

15   Q.   And your -- am I correct, the basis for your belief that

16   this loan was in that is that there's a ResCap notation

17   somewhere in the file?

18   A.   Yes.  There are several.

19   Q.   Okay.  And can you testify to this Court unequivocally

20   that every ResCap loan -- every loan labeled ResCap would have

21   been in that single purchase that you're talking about?

22   A.   Yes.  This is -- there was only one purchase from ResCap

23   and that -- that group is bankrupt.  There's no more purchase

24   through -- you know, so, I --

25   Q.   Are you through?

Blanchard - Voir Dire                                    47

1   A.   Yes.

2   Q.   I'm just -- I thought you said that was the only one you

3   knew of, but are you now saying that I would know if there was

4   another one and there is no other one?  Those are different?

5   A.   I don't think I said that at all.

6   Q.   Maybe I misunderstood.

7             THE COURT:  Mr. Angwin, I know you don't have the

8   defendants' exhibits in front of you --

9             MR. ANGWIN:  And that's the difficulty, Your Honor.

10  They --

11            THE COURT:  I don't know what you did with the

12  defendants' exhibits, but it's in the third binder.

13            MR. ANGWIN:  I know it says ResCap, Your Honor.

14            THE COURT:  Let me finish my comment.

15            MR. ANGWIN:  I'm sorry.

16            THE COURT:  It's an order of the Bankruptcy Court

17  disbursing the entire assets.

18            MR. ANGWIN:  Oh.

19            THE COURT:  So I don't know if that relieves your

20  mind or if you want an opportunity to take a look at that.

21            MR. ANGWIN:  That relieves some -- I apologize we

22  have taken our files back, so --

23  BY MR. ANGWIN:

24  Q.   Let me ask you how U.S. Bank was involved in the purchase

25  of this loan.  Do you have personal knowledge about that?

1   A.   How U.S. Bank was involved in the purchase?

2   Q.   And by the way, let me -- I mean the U.S. Bank trust at

3   issue in this case.

4   A.   This is a -- this was --

5         MR. SHATZ:  Objection.  Relevance, Your Honor.

6         THE COURT:  Mr. Angwin, one more time, the bankruptcy

7   proceeding related to ResCap/GMAC, it -- in that order of the

8   Bankruptcy Court, it indicates that these assets, specifically

9   the servicing agreements, were transferred to Ocwen.  There's

10   no mention of U.S. Bank.  Am I misstating that, Mr. Shatz?

11         MR. SHATZ:  That is correct, Your Honor.

12         MR. ANGWIN:  And, Your Honor, maybe I misspoke.  We

13   were discussing loans.  Maybe I'm -- we're talking about

14   servicing rights here, right?

15         THE WITNESS:  Yeah, we're only talking servicing

16   rights?

17         MR. ANGWIN:  Okay.  I was confused, Your Honor.  I'm

18   sorry.

19         THE COURT:  Yeah.  I think it's clear that Ocwen

20   doesn't ever -- Ocwen is never the beneficiary or the owner of

21   the loan.  It's the servicer.  Okay.  Anything further then on

22   the topic?

23         MR. ANGWIN:  Your Honor, I'll just say we're at

24   somewhat of a disadvantage that this has not been produced

25   earlier.  They've known for a couple weeks that this issue

1    would come up and this last minute stuff's a little prejudicial

2    to us.

3            THE COURT:  Well, to address that, this was

4    identified in the joint pretrial statement.  This document was

5    marked.  It's been at least in front of me the entire time I

6    had the binder.  I assume that's been the case for you as well.

7    The issue was initially raised in the motion for summary

8    judgment which was about -- what was that, eight weeks ago-ish?

9    Six, eight weeks ago?  This issue isn't new.

10           The document is different maybe.  But I don't know

11   the state of your discovery.

12           MR. ANGWIN:  And, Your Honor, perhaps I was vague.

13   What I meant was we did not know that they'd be offering

14   testimony today.  Our position was the same as yours which is

15   that they had not shown that -- they just hadn't shown the

16   connected trail.  We just assumed they were going to rest upon

17   the documents they'd already provided, which was just the

18   documents we've seen.

19           And now they're offering testimony today about

20   something we're not really -- we haven't really considered

21   about this whole, you know -- he's offering new testimony and

22   new evidence today that we have not seen before.

23           THE COURT:  The new evidence to me I think

24   Mr. Blanchard may have clarified some of your concerns.  Again,

25   the questions you didn't ask about which I accept on the offer

1   of proof is that all of the servicing agreements within the

2   ResCap/GMAC ownership transferred with this.  He's clarified

3   nothing was excluded.  The agreement permitted exclusions and

4   he is clarifying only that none were.

5           Was there some other -- I'm not sure the extent of

6   your prejudice.  If you want to make a record on that, I

7   certainly will be happy to hear that, but I'm also interested

8   in how that can be cured and how the production of this

9   document ten weeks ago would have made that different -- or 20

10  weeks ago.

11          MR. ANGWIN:  Is there another document?  I mean we --

12  I'm sorry.  Which document are you referring to?

13          THE COURT:  The one that you're referring to saying

14  that you feel prejudiced because this document wasn't produced

15  earlier and I clarified for you that in fact it was marked in

16  the joint pretrial statement.  It was produced and marked in

17  this case, and the issue raised here was one that's been raised

18  before this Court, at least as of the filing of the motion for

19  summary judgment which had to have been at least ten weeks ago.

20          MR. ANGWIN:  Your Honor, perhaps I again was unclear.

21  I'm not claiming prejudice because of the previously produced

22  documents and we're certainly not claiming surprise that this

23  issue is before the Court.

24          THE COURT:  Okay.

25          MR. ANGWIN:  What I'm saying now is we did not know

1   he would be testifying as a witness that -- I truly thought

2   that there was just going to be no proof that this --

3           THE COURT:  Okay.  I get that.  I'm trying to drill

4   down -- now you've been hit with this.  This has happened.

5   Explain to me the nature of your prejudice.

6           MR. ANGWIN:  We are not prejudiced by the fact

7   that -- I am not claiming prejudice with regard to the previous

8   documents.  What I would like to do is if we'd known about

9   this, perhaps we could have had him produce documents to show

10  whether there were other documents labeled ResCap because I

11  don't know what ResCap means within the Ocwen system.

12          If he's saying -- I think what he's saying is

13  everything that came over was ResCap.  We call all of it ResCap

14  and therefore we know this was, you know, taking it back this

15  came through here.  And that might well be true, but it's

16  just -- I don't think there's enough foundational basis for

17  that right now.

18          THE COURT:  Well, let's say you're right about that.

19  What -- are you saying that this should be an issue decided by

20  the jury then as to whether ResCap is ResCap because that's the

21  only difference we're talking about because this was an issue

22  teed up at the beginning of this trial.

23          I determined looking at it that the question really

24  was an authentication of the documents issue.  I didn't see

25  questions for the jury.  Are you suggesting there are jury

1    questions?

2              MR. ANGWIN:  We are not.

3              THE COURT:  All right.  Then anything else -- I

4    assume your voir dire is complete.  Anything else?

5              MR. ANGWIN:  It is, Your Honor.

6              THE COURT:  Mr. Shatz, with your offer of proof and

7    with the clarification by Mr. Blanchard, anything further?

8              MR. SHATZ:  The only perhaps clarification to the

9    examination is Mr. Blanchard -- do you want an offer of proof

10   or just statement -- I mean offer of proof or question?

11             THE COURT:  Is this an issue that is directed toward

12   questioning raised by Mr. Angwin?

13             MR. SHATZ:  Yes.

14             THE COURT:  All right.  Go ahead and question.

15                          CROSS-EXAMINATION

16   BY MR. SHATZ:

17   Q.   So when this loan came over, it was on the FiServe system.

18   A.   Yes.

19   Q.   And the FiServe system was part of the ResCap deal.

20   A.   Yes.  And we acquired access to the FiServe system and

21   only -- the FiServe was specific only to the ResCap deals.

22   There's no other loans that were being serviced at that time

23   that transferred on FiServe.

24             MR. SHATZ:  Thank you.

25             THE COURT:  All right.  I think that was testimony

Blanchard - Cross                          53

1   you have already given.  Am I right, Mr. Blanchard, in your

2   examination before the jury?

3           THE WITNESS:  Yes.  I was asked about this -- about a

4   ResCap notation made by Ocwen and I explained that it came from

5   this -- that it came from ResCap.

6           THE COURT:  I remember that testimony.  Anything else

7   then on the topic?

8           MR. PAINO:  Nothing further, Your Honor.

9           THE COURT:  All right.  So as to this issue, I've

10  seen some briefing on it.  Are counsel requesting additional

11  briefing on that topic or no?

12          MR. SHATZ:  One moment, Your Honor.

13          MR. PAINO:  From us, Your Honor, we addressed this in

14  our trial brief and I would -- I don't have much to add to

15  that.

16          THE COURT:  Let me give you an idea, though.  I'm not

17  intending to rule on this today.  I will be issuing a written

18  order.  So I guess my question is do you want an opportunity to

19  sum it up or do you just want to submit on the record at this

20  point.  It's up to you.

21          MR. SHATZ:  What would be most helpful to the Court?

22          THE COURT:  I don't think I need more from you, but I

23  don't want to deny that option as well as to the plaintiffs and

24  if you don't, the plaintiffs still can.  So maybe we should

25  hear -- Mr. Angwin, do you wish to file anything additional on

54

1   the topic?

2          MR. ANGWIN:  At this time, I think we will, Your

3   Honor.

4          THE COURT:  You will.

5          MR. ANGWIN:  Yes.

6          THE COURT:  All right.

7          MR. PAINO:  We would likely file something as well

8   then, Your Honor.

9          THE COURT:  All right.  So you can file further

10  briefing on the topic.  It will not exceed ten pages and that

11  is the entirety, all attachments, tables.  I know how to make

12  it so you can fit 20 pages into 10.  I don't mean to do that.

13  Page 1 starts at 1 and we go through 10.

14         MR. SHATZ:  Is the caption page 1?

15         THE COURT:  It is.  I think you can do this in less

16  because I have seen briefing already on the topic.  In

17  particular, I would think maybe your -- the focus of the issue

18  should be showing what the documents do and to the extent that

19  you think that there is some further explanation from

20  California law on the topic, that to me is where the rubber

21  meets the road on the issue.

22         MR. ANGWIN:  And, Your Honor, just so I'm clear when

23  we write this, is the question whether Ocwen can seek benefit

24  of the -- being a signatory as a successor in interest through

25  this purchase agreement?

1          THE COURT:  Correct.

2          MR. ANGWIN:  Okay.  I thought that was obvious, but

3   sometimes --

4          THE COURT:  Good to crystalize it.  All right.

5          MR. ANGWIN:  I've been wrong before.

6          THE COURT:  Anything else then?

7          MR. PAINO:  Nothing further.

8          THE COURT:  All right.  Then we are in recess until

9   we hear from the jury.  Oh, oh, oh, oh.  Back on the record.

10  Do counsel stipulate to take back your evidence and hold it

11  pending any appeal?

12         MR. ANGWIN:  We do, Your Honor.

13         MR. SHATZ:  We are prepared to do so, Your Honor.

14         MR. ANGWIN:  And, Your Honor, I'm sorry.  Did you

15  give a date for filing of the briefs?

16         THE COURT:  I guess I should do that.  Before we get

17  to that, Mr. Angwin, do the plaintiffs stipulate that the

18  evidence may be returned and you keep it and will produce it

19  upon filing of an appeal?

20         MR. ANGWIN:  We do, Your Honor.

21         THE COURT:  All right.  So let's see.  What do you

22  think you need, a couple weeks or so?

23         MR. ANGWIN:  I think two weeks would be adequate,

24  Your Honor.

25         MR. PAINO:  That's fine with us, Your Honor.  We've

56

1   briefed it before.  We'll elaborate.

2            THE COURT:  November 4?

3            MR. PAINO:  That's fine with me.

4            THE COURT:  All right.  November 4.

5            MR. ANGWIN:  Okay.  And is that due by midnight?

6            THE COURT:  No.  It's due by 11:59.  11:59 on

7   November 4 -- p.m.

8            MR. SHATZ:  You'll never do that again, will you?  No

9   more midnight orders.

10           THE COURT:  All right.  Thank you.  We're off record.

11       (Recess from 3:13 p.m. to 3:29 p.m.)

12           THE COURT:  All right.  We're back on the record and

13   we have all of the -- all counsel and the parties present.  We

14   have received the verdict on the second phase.  The clerk will

15   mark the jury note as Court's Exhibit 2.  Anything before we

16   bring in the jury?

17           MR. HEENAN:  No, Your Honor.

18           MR. SHATZ:  Your Honor, as to share, we can do it

19   after the jury.  We wish to, to the extent of our prior

20   discussion from ten minutes ago, reopen to the extent to ask

21   the Court to take judicial notice of three other exhibits.  We

22   can do it after the jury.  It's part of the affirmative defense

23   argument.

24           THE COURT:  All right.  We'll need to do that after

25   because I think I --

57

1          MR. SHATZ:  I'll give them back to you.

2          THE COURT:  All right.  All right.  We'll handle that

3     after the jury.  Let's go ahead and bring in the jury at this

4     time.

5        (Jury in at .)

6          THE COURT:  All right.  We have once again all of our

7     jury members back in their places.  At this time, I will ask

8     the courtroom deputy to publish the verdict.

9                        SPECIAL VERDICT READ

10         THE CLERK:  Special verdict in the matter of Cornejo

11    vs. Ocwen Loan Servicing.  We the jury in the above-entitled

12    action find the following verdict on the question submitted to

13    us.

14         Question 1:  What amount, if any, do you award the

15    plaintiffs for their noneconomic losses caused by the

16    defendants' conduct?  As to Dora Cornejo, $300,000.  Signed on

17    October 21, 2016, by the jury foreperson.

18         THE COURT:  All right.  Thank you.  Does any party

19    wish for the jury to be polled?

20         MR. SHATZ:  Yes, Your Honor.

21         THE COURT:  All right.  Again, ladies and gentlemen,

22    I'm going to be asking you if this is your true verdict.  If it

23    is, your response will be yes.  If it is not, then your

24    response is no.

25         All right.  Juror 1, Mrs. Macchia?  Is this your true

1   verdict?

2           MS. MACCHIA:  Yes.

3           THE COURT:  All right.  Juror No. 2, Mr. Yang, is

4   this your true verdict?

5           MR. YANG:  It is, Your Honor.

6           THE COURT:  Thank you.  Mr. Wamocha, Juror No. 3, is

7   this your true verdict?

8           MR. WAMOCHA:  Yes, Your Honor.

9           THE COURT:  Thank you.  Juror No. 4, Mr. Stanfield,

10  is this your true verdict?

11          MR. STANFIELD:  Yes, Your Honor.

12          THE COURT:  All right.  Thank you.  And Mr. Price,

13  Juror No. 8, is this your true verdict?

14          MR. PRICE:  Yes, Your Honor.

15          THE COURT:  Thank you.  And Ms. Montero Pardo, Juror

16  No. 7, is this your true verdict?

17          MS. MONTERO PARDO:  Yes, Your Honor.

18          THE COURT:  Thank you.  Mr. Martinez, Juror No. 6, is

19  this your true verdict?

20          MR. MARTINEZ:  Yes, Your Honor.

21          THE COURT:  Thank you.  Mr. Moore, Juror No. 5, is

22  this your true verdict?

23          MR. MOORE:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you.  At this point, it

25  does appear that the jury's verdict is unanimous as to both

59

1   phases of the trial.  Does any party have any other further

2   business for the jury?  For the plaintiffs?

3           MR. HEENAN:  Just our thanks.

4           THE COURT:  And for the defense.

5           MR. SHATZ:  Thank you.

6           THE COURT:  All right.  Ladies and gentleman, so now

7   this does conclude your jury service.  Thank you so much for

8   your attention this last week.  We did get it done right under

9   the wire.  We did say we'd be finished by Friday and luckily we

10  are.

11          All of us here appreciate your service here.  I know

12  it's been an inconvenience.  Throughout this trial, I've been

13  telling you that you can't discuss the case with each other or

14  with anyone.  You can now do that if you choose.

15          Oftentimes, the lawyers do like to speak with jurors

16  to find out what your thoughts are, other questions about the

17  process.  You do not have to speak to the lawyers or to anyone

18  about this if you don't want to.  You are -- you may if you

19  choose.  It's just simply up to you.

20          I will tell you that if someone asks you about it and

21  you don't want to discuss it, tell them no.  If they persist,

22  return here and I'll take care of that for you.  So it's up to

23  you.  I'm going to give you a head start though.  So if you

24  don't want to talk with the lawyers, I will detain them here

25  for a few minutes to let you be free of them.  Otherwise, if

1    you'd like to speak with them, if you'd just -- we will make

2    the jury deliberation room available for you to do that.  So if

3    you'd like to speak with counsel, just remain there.

4    Otherwise, pack up your stuff and thank you so much for your

5    service.

6            As a reminder, just as a tip, if you have service in

7    state court, again, you are excused from federal service for a

8    year.  So I know maybe you -- of course, if you're called again

9    in federal service, you're excuse for a year as well.  All

10   right.  Thank you so much, and if you just leave your access

11   cards and your notebooks in the jury deliberation room, we'll

12   take care of those for you.  All right.  Thank you.

13       (Jury out at 3:35 p.m.)

14       THE COURT:  All right.  We're outside the presence of

15   the jury.  Mr. Shatz, you indicated that there are a couple

16   other documents.

17       MR. SHATZ:  One moment, Your Honor.  As the Court's

18   aware, we didn't see the verdict form prior to it being given

19   to the jury and if I heard Ms. Hall correctly, it said what

20   amount if any do you award the plaintiffs, plural, for their

21   noneconomic losses caused by defendants' conduct and I thought

22   only Ms. Cornejo was subject to an award.

23       MR. SHATZ:  There was a line indicated for Dora

24   Cornejo and that was the only option for them to award for Dora

25   Cornejo.

1          MR. SHATZ:  So we objected to the form because it

2     said plaintiffs in the question.

3          THE COURT:  All right.  Your objection is noted.

4          MR. SHATZ:  We ask the Court take judicial notice of

5     Defendants' Exhibits 585, 586, and 590 as part of our

6     discussion on the affirmative defense.

7          THE COURT:  I need to be provided those, please.

8          MR. SHATZ:  Excuse me, Your Honor.

9          THE COURT:  Thank you.  All right.  The -- it appears

10    to me that 585 is the docket of the U.S. District Court,

11    District of Columbia, Washington, D.C.  And 586 is the document

12    for which the Court has taken judicial notice in the motion for

13    summary judgment.  Isn't that the same -- I believe that is the

14    same document.

15         MR. PAINO:  That is the same, Your Honor.

16         THE COURT:  All right.  Comments by plaintiffs.

17         MR. ANGWIN:  Your Honor, the only question I have is

18    on document 585.  It's the docket sheet and the information on

19    the docket sheet isn't necessarily prepared by the court, if we

20    can clarify what they want it for.  I don't think it's an

21    issue, but as you know, when you file things on PACER, you can

22    list whatever you want to in the heading and I'm just -- I

23    don't know if it's an issue, but are you all just looking for

24    the number or what -- I mean what do you want that filed for?

25         MR. PAINO:  The only reason for the docket is to show

62

1    the filing by Ocwen of certain monitoring reports to show that

2    they're having to report the monitor.

3           THE COURT:  The fact of report to the monitor, not

4    anything beyond that.

5           MR. PAINO:  And what -- the other -- the third

6    exhibit that we referenced was Exhibit 590 which is one of the

7    actual monitor's reports and that was also included with the

8    motion for summary judgment.

9           THE COURT:  All right.  As to 585, are there

10   particular docket numbers you want to mention?  I did see at

11   least one monitor's report.  Is that the same thing as the

12   report to the monitor?

13          MR. PAINO:  I believe it is the same.  So perhaps it

14   is redundant.  I guess the PACER was more for the broader

15   principle that reports were being filed, but the report itself

16   is also being included.

17          THE COURT:  Okay.  I'm sorry.  I guess I -- I thought

18   you were saying it was a report to the monitor.  You're saying

19   it's actually the monitor's report.

20          MR. SHATZ:  The monitor's report showing compliance

21   by Ocwen with the agreement, yes.

22          THE COURT:  And is there a -- are you saying you want

23   judicial notice of every entry where it says that or is there a

24   particular entry that you're interested in or are you just

25   simply wanting to authenticate that 590 was filed on the

1    docket?

2         MR. PAINO:  Your Honor, I think it may just be

3    redundant.  I think as long as we have 590 in, the docket may

4    be superfluous.

5         MR. ANGWIN:  Your Honor, if -- I just have a

6    question.  I am certain that there is a judicially available

7    document which talks about the fact that Ocwen entered into the

8    separate agreement in the CB 1300 case, be bound to report to

9    the monitor.  That's, of course, a separate case and if you

10   want to point to that docket, that's fine.

11        The report from the monitor if you're seeking to

12   introduce that for the fact that they complied with the

13   monitor's -- the report -- if they're seeking to introduce the

14   monitor's report saying they complied with the terms of the

15   NMS, the question is whether they complied with the terms of

16   the National Mortgage Settlement with regard to this loan.

17        This just basically says they can meet some

18   thresholds and the way I've read the monitor reports before is

19   the baseline for reporting past is 5 percent or less in

20   noncompliance.  So if they're seeking to offer this document

21   for the judicial notice, that they -- that the monitor monitors

22   them, that's fine.  If they're seeking to have the Court

23   judicially notice that this establishes compliance, then we

24   would, of course, object to that.

25        THE COURT:  Well, compliance really -- I don't

64

1  know --

2         MR. ANGWIN:  Compliance related to this loan.  The

3  defense is not they complied with the National Mortgage

4  Settlement.  The defense is that you complied with the National

5  Mortgage Settlement with regard to this loan, and there's a big

6  distinction there.

7         Because I've read the compliance reports before and

8  they allow up to 5 percent variation of noncompliance and

9  still -- they're still reported as compliant.

10         THE COURT:  I think what I'm hearing, Mr. Angwin, is

11  a merits argument as opposed to an argument as to the judicial

12  notice.

13         MR. ANGWIN:  Yes, Your Honor.  I'm trying to make

14  clear what we were doing because I think there's an easier way

15  to do this, but they can do it the way they want to.

16         THE COURT:  What we're doing at this point is

17  considering the issue of judicial notice.

18         MR. ANGWIN:  Right.

19         THE COURT:  Comments on that topic?

20         MR. ANGWIN:  With that understanding, Your Honor,

21  this certainly -- we don't dispute this was a document filed in

22  that case.

23         THE COURT:  All right.  So I will take -- 584 we've

24  discussed already.  I think 585, the docket is unnecessary.

25  The Court can take judicial notice of the filing of a document

65

1    without taking judicial notice of the docket.

2         So I don't think 585 was necessary.  To the extent

3    that judicial notice is needed for the fact of the filing, the

4    Court will do that without taking judicial notice of that

5    document, but instead of the filing of -- on the docket.

6         As to 590, this is the monitor's report and help me

7    understand, Mr. Paino, you're asking for what in regard to this

8    document?

9         MR. PAINO:  Your Honor, the purpose of this document

10   is to further evidence that Ocwen is in effect obligated under

11   the consent judgment.  The fact that the monitor is reporting

12   on Ocwen's servicing practices is further evidence that Ocwen

13   is in fact obligated to perform under the consent judgment.

14        THE COURT:  Is there a particular portion of this

15   document that -- or are you just saying in summary because

16   there's a monitor's report, it demonstrates that?

17        MR. PAINO:  I think my main point is the latter

18   because this -- generally speaking, this report demonstrates --

19   further demonstrates that Ocwen is obligated under the consent

20   judgment.

21        MR. ANGWIN:  And, Your Honor, to the extent that he's

22   using it for that, we would object because Ocwen is separately

23   obligated to comply with the compliance under the decision in

24   the CB 13 -- there on CB 13-02025, which is referenced on

25   page 1 of Exhibit 585.

1          So what -- the difference is this, Your Honor.

2     It's -- the fact that they are saying that they're monitored by

3     the compliance officer is based upon a separate agreement

4     between Ocwen and the Consumer Financial Protection Bureau

5     which is subject to CB 13-02025.  There's nothing to do other

6     than it's listed on the docket here in CB 12-0361, which is the

7     case that is specifically referred to in the Hobar safe harbor

8     for the five signatories.

9          THE COURT:  I'm struggling with -- this docket that's

10    been shown here is a consolidated case, it appears to me.  It

11    addresses both 14-1047 and 13-2025.

12         MR. ANGWIN:  It does, Your Honor, and they were

13    consolidated and then all the reports did come in under

14    CB 12-0361.  The trouble is this, is Ocwen's obligation is not

15    based upon the order in 12-0361.  It's based upon the order

16    they agreed to, the consent judgment, in 13-0203 which was

17    just -- I'm sorry -- 02025 which was just consolidated for

18    purposes of ease because they're all dealing with the monitor

19    into one case.

20         And therefore, what I think the -- Ocwen's trying to

21    argue is, look, we report to the monitor -- only signatures

22    report to the monitor and that's not true.

23         And, Your Honor, we can address this in the brief.

24    We don't really need to waste the Court's time right now.

25         THE COURT:  Well, I guess I'm struggling because I

67

1   thought what you were saying is this is an issue again related

2   to whether the Court should take judicial notice.  Are you

3   saying, in fact -- and what I was hearing is merits argument

4   again.

5          MR. ANGWIN:  Your Honor, we don't dispute that Ocwen

6   reports to the monitor, if that's the issue they want

7   stipulated to.

8          THE COURT:  I didn't hear it that way, but --

9          MR. ANGWIN:  Maybe I was unclear in what Mr. Paino

10  was offering this for.

11         THE COURT:  Mr. Paino, does that relieve the need to

12  take judicial of this document if they stipulate Ocwen is being

13  monitored for compliance as a successor to GMAC?

14         MR. ANGWIN:  And, Your Honor, that's not the

15  stipulation.

16         THE COURT:  Okay.

17         MR. ANGWIN:  I'm sorry.  The monitor monitors more

18  people than the five signatories.

19         THE COURT:  I get that.

20         MR. ANGWIN:  The monitor -- it started with the

21  CB 12-361 case and then the monitor entered into separate --

22  the CFPB entered into separate agreements with Ocwen and one

23  other servicer.

24         THE COURT:  Okay.

25         MR. ANGWIN:  And he sort of rolled them all back in

68

1   to say okay, I'm already monitoring these five signatories.

2   I'm going to monitor you for basically the same thing.  So all

3   these reports are going to go back into one pile.

4          And that's what this is, but it has nothing to do

5   with the --

6          THE COURT:  Okay.  Let's just stop here and go to

7   what you are willing to stipulate to because as I look at this

8   document, it says monitor's report regarding compliance of

9   Ocwen Loan Servicing and it specifically references as

10  successor by assignment of ResCap and GMAC.

11         MR. ANGWIN:  And that's the way I believe -- I need

12  to go look at it again.  I think that's the way that they refer

13  to it in the CB 13 case, but --

14         THE COURT:  Are you disputing that this was filed --

15         MR. ANGWIN:  No, Your Honor, we're not.

16         THE COURT:  -- in the case referenced on the caption?

17         MR. ANGWIN:  We are not disputing that this document

18  was filed in PACER on the case referenced on the caption.

19         THE COURT:  Any other arguments then related to

20  judicial notice?

21         MR. ANGWIN:  No, Your Honor.  I just wanted to make

22  you aware of our argument.

23         THE COURT:  I think you will do that in your brief.

24         MR. ANGWIN:  Thank you, Your Honor.

25         THE COURT:  All right.  So I will take judicial

CRITICAL FIX

1  notice of 585 plus judicial notice that it was filed on a

2  docket, 590 -- and 590, I'll take judicial notice that it was

3  also filed on a docket.  It is document 13 in the case of

4  Husemak vs. Bank of America Corp. (phonetic).

5              All right.  Does that handle that for you, Mr. Paino?

6              MR. SHATZ:  I'm sorry.  While you were looking

7  through this stuff and speaking, Your Honor, I didn't fully

8  follow which documents you're talking judicial notice of.

9              THE COURT:  584, 585 -- I'm -- 584, 586, 590.

10             MR. SHATZ:  Three documents, Your Honor.

11             THE COURT:  Correct.

12             MR. SHATZ:  584, 586, and 590.

13             THE COURT:  Correct.

14             MR. SHATZ:  Thank you.

15             THE COURT:  All right.  Anything else at this time?

16  All right.

17             MR. SHATZ:  Thank you, Your Honor.

18             MR. ANGWIN:  Thank you, Your Honor.

19             MR. SHATZ:  Is the motion for directed verdict still

20  under submission from the Court?

21             THE COURT:  Yes.

22             MR. ANGWIN:  And, Your Honor, if I can, one more

23  thing.

24             THE COURT:  Yes.

25             MR. ANGWIN:  With regard to -- you've made your point

1  abundantly clear on the mental anguish, but for the appellate

2  record, are you going to treble those damages and then enter

3  your order?

4          THE COURT:  I will issue an amended judgment.

5          MR. ANGWIN:  I'm sorry?

6          THE COURT:  I will issue an amended judgment that

7  complies with the law.

8          MR. ANGWIN:  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.

10         ALL COUNSEL:  Thank you, Your Honor.

11     (Whereupon the trial in the above-entitled matter was

12  concluded at 4:21 p.m.)

13                         --o0o--

14                        CERTIFICATE

15     I certify that the foregoing is a correct transcript from

16  the electronic sound recording of the proceedings in the above-

17  entitled matter.

18

19  /s/ Mary C. Clark                     December 31, 2016

20  Mary C. Clark, Transcriber

21  AAERT CERT*D-00214

22

23

24

25